**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

ISSAC N. through his next friend Katy Saehler, and
TONY S. through his next friend Leigh Truhe, for
themselves and those similarly situated,

**Plaintiffs,**

v.

JARED POLIS, in his official capacity as the
Governor of Colorado; and MICHELLE BARNES,
in her official capacity as Executive Director of the
Colorado Department of Human Services

**Defendants.**

Civil Action No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs are children between the ages of 10 and 18 who are charged with juvenile delinquency and incarcerated in juvenile detention facilities by the State of Colorado. Juvenile court judges have determined that these children can be released from detention. But Defendant Colorado officials instead confine these releasable children in highly restrictive carceral facilities, often for weeks or months on end, in violation of the children's constitutional and statutory rights. Defendants warehouse Plaintiff children in dangerous and harmful detention facilities only because the State fails to provide them with the processes, placements, and services to which they are legally entitled.

1

2. Plaintiffs bring this action on behalf of themselves and all similarly-situated youth who currently are, or in the future will be, detained in a Colorado Division of Youth Services ("DYS") secure detention facility, who are not serving a commitment sentence, and for whom a juvenile court has determined that the youth may be released from detention ("Releasable Youth"). Plaintiffs seek declaratory and injunctive relief against the Governor of Colorado and the Executive Director of the Colorado Department of Human Services ("CDHS"), in their official capacities, to ameliorate these unlawful and harmful practices and provide legally required procedures, placements, and services.

3. For years, Colorado officials have publicly acknowledged the inadequacy of the State's system for releasable youth. Yet, despite repeated pleas to address these concerns, CDHS continues to illegally detain hundreds of Releasable Youth each year. Defendants' own data show that in fiscal year 2024-2025, the State held 693 youth in secure detention facilities for one or more days after a juvenile court deemed them releasable.[1] That same year the State kept over 140 of these youth in detention for more than 30 days after a judge deemed them releasable. *Id.* at 100. Many of these Releasable Youth are also in the custody of the State's foster care system and remain in detention solely because they are waiting for the State to find them a foster placement. The majority of Releasable Youth also have disabilities and require therapeutic care in the least restrictive environment appropriate to their needs.

4. Defendants' actions and inactions result in unnecessary stays in highly restrictive juvenile detention facilities, violating Releasable Youth's constitutional and statutory rights, and placing them at substantial and known risks of physical, psychological, and developmental harm.

---

[1] CDHS, *Limit the Detention of Juveniles Annual Report, State Fiscal Year 2024-2025* ("CDHS Annual Report 2025"), at 9-10 (July 1, 2025), permalink: https://perma.cc/3B6K-C82Q.

Colorado's own statutes acknowledge that detention "exacts a negative impact on the mental and physical well-being of the child" and makes it "more likely that the child or juvenile will reoffend." C.R.S. § 19-2.5-301 (2024).

5.     Juvenile detention facilities in Colorado are locked, punitive, highly restrictive settings for children, and are the functional equivalent of adult jails. The State separates and segregates Releasable Youth from their families and communities. The facilities are physically invasive, with staff routinely subjecting children to strip searches and physical and mechanical restraints. Children are issued uniforms, and facilities impose complex behavioral control systems, including withholding personal property as privileges that must be earned.

6.     Since 2024 alone, numerous public reports have highlighted the deeply harmful and dangerous nature of juvenile detention facilities in Colorado. A July 2024 report by the Office of the Colorado Child Protection Ombudsman documented incidents of excessive force by staff in juvenile detention facilities resulting in serious injuries.[2] Staff, for example, slammed youth to the ground, causing some to lose consciousness, while others received head injuries, broken bones, abrasions, and broken teeth. A September 2025 report by the Child Protection Ombudsman (CPO) found staff commonly engage in the use of strip searches in DYS facilities that violate state policy.[3] Reporting by *The Denver Post* has likewise documented widespread drug use within Colorado's

---

[2] Child Protection Ombudsman of Colorado, *Surveillance Within the Division of Youth Services: How current efforts to monitor the use of physical restraints fall short* at 1 (July 30, 2024), permalink: https://perma.cc/S29E-SE27; Sam Tabachnik, *Broken bones, excessive force and drug overdoses: Inside Colorado's juvenile detention facilities*, The Denver Post (March 2, 2025), permalink: https://perma.cc/LP4R-2H9R.
[3] The Child Protection Ombudsman of Colorado, *Strip Searches Within the Division of Youth Services*, at 2-3 (Sept. 30, 2025), permalink: https://perma.cc/K2T9-TFMX.

3

juvenile detention facilities, resulting in overdoses and at least one death.[4] A March 2026 report from Disability Law Colorado reported evidence of as many as 15 suspected overdoses among incarcerated children in Fiscal Year 2025 alone.[5] The report also found that the use of both mechanical restraints and invasive physical restraints in DYS facilities has increased by over 50% over the past four years. *Id.* Youth reported violent restraint tactics, including staff slamming or pinning them to the ground, pushing their head into the ground, choking them, hitting them in the face, and striking them with a knee to the stomach or head. *Id.*

7.      The rights of all children in the custody of government juvenile detention and child welfare systems are analyzed under the substantive due process and procedural due process provisions of the Fourteenth Amendment of the U.S. Constitution. Additionally, the right to be free from detention pending trial, is a basic liberty interest of both adults and children, also protected by the Fourteenth Amendment. Due process likewise protects an individual from punishment while they are pending trial.

8.      Such protections are heightened for children. A child in rehabilitative civil proceedings should never be subject to punishment. Under the federal Constitution, and federal and state law, a child should only be placed in detention where there is a legitimate state interest in their detention, and when they have been afforded sufficient procedures to protect against the unnecessary deprivation of their liberty. "The juvenile justice system is civil in nature and focused on rehabilitation rather than punishment." C.R.S § 19-2.5-701 (2024). Here, the Releasable Youth in this case include hundreds of youth whom juvenile court judges have specifically found can be

---

[4] Sam Tabachnik, *Teen in Greeley youth detention center died from fentanyl overdose*, The Denver Post (January 28, 2025).
[5] Disability Law Colorado, *Breaking Point: Conditions in the Colorado Division of Youth Services, September 2021–October 2025*, at 7-12 (2025), permalink: https://perma.cc/LB6M-JQZS.

released to the community, who are not serving a sentence, and who have not yet been fully adjudicated on the charges against them. Yet these children instead remain in harmful, punitive, and highly restrictive detention facilities.

9.      Defendants' unconstitutional acts and omissions violate fundamental principles of due process by depriving children in Defendants' custody of their liberty without lawful justification and by failing to institute sufficient procedures to protect these children's fundamental rights.

10.      Plaintiffs also seek to represent a subclass of Releasable Youth placed in the legal custody of a Colorado department of human or social services (the "Foster System Subclass"). Defendants violate these children's constitutional due process rights by likewise jailing them instead of providing them a placement with supportive services in the State's foster system.

11.      In addition, Plaintiffs seek to represent a subclass of Releasable Youth who have a disability, as defined under federal law (the "Disability Subclass"). Under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehab Act"), young people with disabilities who are in Defendants' custody are entitled to placement and services in the most integrated setting appropriate for their needs. 28 C.F.R § 35.130(d); 45 C.F.R. § 84.68(d). A highly restrictive DYS detention center is not the most integrated setting appropriate for these children. For youth with disabilities, Defendants violate federal disability laws by unnecessarily segregating Releasable Youth in restrictive institutions instead of serving them in a variety of more integrated settings.

12.      Plaintiffs seek declaratory and injunctive relief to address Defendants' unconstitutional and discriminatory practices. Plaintiffs do not seek an order requiring their release from detention. Rather, Plaintiffs ask that Defendants make such release possible by developing

the legally required procedures, placements, and services that are required to enable Plaintiffs' release from detention.

13. Colorado's juvenile courts have narrow jurisdiction and cannot issue the systemic, classwide relief that the Plaintiffs seek and the class requires. This classwide relief—seeking processes, placements, and services to which Plaintiffs are legally entitled under federal law— will only support the ability of Colorado's juvenile courts to address the needs of individual youth in individual cases.

## JURISDICTION AND VENUE

14. This action for declaratory and injunctive relief is brought under 42 U.S.C. § 1983 based on continuing violations of Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution, and for Plaintiffs and putative subclass members with disabilities, under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and authority to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred and continue to occur in this District and because Defendants maintain their principal offices and conduct business in this District.

## THE PARTIES

### I.     The Plaintiffs

17. *Plaintiff* **Isaac N.** is a seventeen-year-old youth charged with juvenile delinquency

6

offenses who is currently held by Defendants in a secure detention facility in Colorado.

18.    Isaac N. has been charged with but not yet adjudicated for the alleged delinquency offenses for which he is being held. He is not serving a commitment sentence.

19.    A juvenile court judge has determined that Isaac N. is releasable. Yet, Isaac N. has remained in detention for almost two months past when a juvenile court judge determined him releasable.

20.    Isaac N. has disabilities recognized under federal law. Specifically, he has been diagnosed with post-traumatic stress disorder (PTSD) and attention-deficit/hyperactivity disorder (ADHD).[6] These conditions substantially limit one or more major life activities.

21.    After several weeks in detention, Isaac N. was assessed by a treatment professional.

22.    The treatment professional found that Isaac N. would be appropriate for a community-based placement, specifically, intensive home-based treatment with intensive care coordination. The treatment professional also recommended that Isaac N. receive trauma-focused therapy. All of the recommended services in Isaac N.'s assessment could be provided in the community.

23.    Isaac N. wants to be released to the community so that he can enjoy his adolescence by doing things like going to the movies.

24.    Defendants can serve Isaac N. in the community through their existing array of home and community-based placements and services.

25.    While waiting for the necessary parties to create a release plan, Isaac N. has remained in a detention facility.

26.    While detained, Isaac N. has also witnessed staff use disproportionate force against

youth. For example, Isaac N. has seen seven adults "take down" one youth.

27.    Isaac N. also reports that staff use racial slurs against youth.

28.    Isaac N. does not understand why he is "stuck" in the detention facility.

29.    Isaac N. is currently working on his high school diploma. He hopes to be able to pursue a trade, like HVAC.

30.    He aspires to follow the example of positive adult role models in his life.

31.    Isaac N. brings this action through his Next Friend, Katy Saehler.

32.    *Plaintiff* **Tony S.** is a twelve-year-old youth charged with juvenile delinquency offenses who is currently held by Defendants in a secure detention facility in Colorado.

33.    Tony S. has been charged with, but not yet adjudicated for the delinquency offenses for which he is being held.  He is not serving a commitment sentence.

34.    A juvenile court judge has determined that Tony S. is releasable. Tony S. has remained in detention for six months past when a juvenile court judge determined him releasable.[7]

35.    Tony S. is in the legal custody of the Department of Human Services.

36.    CDHS is responsible for locating a placement for Tony S., but has failed to do so.

37.    Tony S. has disabilities recognized under federal law. Specifically, he has been diagnosed with autism spectrum disorder and a medical condition causing cognitive impairments, behavioral issues, and development delays. These disabilities substantially limit one or more major life activities.

38.    Upon assessment, a treatment professional found that Tony S. would be appropriate for release to a less restrictive placement outside of the juvenile justice system that provides therapeutic services.

39.     Tony S. wants to be released from detention and placed in the most integrated setting appropriate to his needs.

40.     DHS can serve Tony S. in the community through its existing array of home and community-based placements and services.

41.     While waiting for DHS to find him a placement, Tony S. has remained incarcerated by Defendants in a detention facility.

42.     Tony S. struggles with being in the juvenile justice legal system. His experience has been upsetting, especially being taken to court in handcuffs.

43.     Tony S. enjoys playing board games like Clue and listening to country music.

44.     Tony S. brings this action through his Next Friend and Guardian *ad Litem*, Leigh Truhe.

## II.     The Next Friends

45.     Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff Isaac N. appears through his Next Friend, Katy Saehler. Ms. Saehler is a Guardian *ad Litem* in Colorado. She has been serving in this role for twelve years.

46.     Ms. Saehler is familiar with Isaac N.'s case and has knowledge of the allegations of this case. She understands her role as a Next Friend in this case, is willing and able to represent Isaac N., is dedicated to his best interests, and has no conflict that would preclude such representation.

47.     Pursuant to Fed. R. Civ. P. 17(c)(2), Plaintiff Tony S. appears through his Next Friend, Leigh Truhe. Ms. Truhe is Tony S.'s Guardian *ad litem*.

48.     Ms. Truhe is familiar with Tony S.'s case and has knowledge of the allegations of this case. She understands her role as a Next Friend in this case, is willing and able to represent Tony S., is dedicated to his best interests, and has no conflict that would preclude such

9

representation.

### III.   The Defendants

49.   ***Defendant Jared Polis*** is the Governor of Colorado and is sued in his official capacity. As Governor, Defendant Polis is responsible for ensuring all applicable laws in Colorado are faithfully executed. Col. Const. art. IV, § 2. Defendant Polis, as Governor, has exercised his authority over and taken responsibility for Colorado's Division of Child Welfare and Division of Youth Services in multiple ways. These include, for example, setting specific CDHS and DYS priorities; setting agency funding and staffing levels; responding to emergencies related to in-patient capacity issues for state-provided youth mental health services; advancing Colorado's use of DYS facilities to detain youth; directly appointing key leaders tasked with overseeing youth detention, including the current Executive Director of the Colorado Department of Human Services, Michelle Barnes, the Director of the Office of the Child Advocate, who is responsible for overseeing the child welfare system, and the Juvenile Justice Delinquency Prevention (JJDP) Council. Governor Polis, personally or through the actions of his agents, acted under color of state law at all times relevant to this action.

50.   ***Defendant Michelle Barnes*** is the Executive Director of the Colorado Department of Human Services ("CDHS") and is sued in her official capacity.  CDHS "is the single state agency responsible for the oversight of the administration of juvenile programs and the delivery of services for juveniles and their families in this state." C.R.S. § 19-2.5-1401 (2023). This responsibility includes the system of care for Releasable Youth at issue in this action. As the Executive Director of CDHS, she is responsible for the administration and oversight of CDHS and all of its sub-offices, including the Office of Children, Youth, and Families ("OCYF"), and those offices' subdivisions, including the Division of Child Welfare ("DCW") and the Division of Youth Services ("DYS"). CDHS is a recipient of federal funds.

**FACTUAL ALLEGATIONS**

51.     As set forth below, (a) there are strict legal limits on the detention of children in Colorado; (b) Defendants are responsible for ensuring placements and services for Releasable Youth; (c) Defendants have long been on notice of the unlawful detention of Releasable Youth but have perpetuated the problem; (d) despite their obligations, Defendants unconstitutionally incarcerate youth whom a juvenile court has determined can be released from detention; and (e) Defendants' unlawful detention of Releasable Youth imposes significant harms and risks of harms on those youth and on the broader goals of treatment and rehabilitation.

**I.      There Are Strict Legal Limits on the Pretrial Detention of Youth in Colorado.**

52.     The United States Constitution vests in every person, including children and youth, the right to be free from governmental deprivation of their liberty. This includes freedom from unnecessary or unlawful incarceration.

53.     The Fourteenth Amendment to the U.S. Constitution also prohibits detaining children as punishment.

54.     When children are deprived of their liberty, this must be accompanied by sufficient procedures to ensure adequate protection of their constitutional liberty rights and their liberty rights under state law.

55.     The Fourteenth Amendment further requires that when a state removes a child from parental care and places them in state custody through the foster system, the State assumes a constitutional duty to provide them with adequate care and protection.

56.     Title II of The Americans with Disabilities Act and Section 504 of the Rehabilitation Act require that government agencies, including those that receive federal funds like CDHS, must ensure that people with disabilities are not unnecessarily segregated and receive services in the most integrated setting appropriate to meet their needs.

57.     Plaintiffs and proposed class members bring federal claims. The class is defined based on pre-existing juvenile court orders finding the class members releasable. Colorado's framework for juvenile detention is set forth in the Colorado Children's Code and places strict limitations on the use of detention of youth. This is because in Colorado, "[t]he juvenile justice system is civil in nature and focused on rehabilitation rather than punishment." C.R.S. § 19-2.5-701 (2024). In a delinquency proceeding, a youth aged 10-17 may be taken into temporary custody by a law enforcement officer or a probation officer. C.R.S. §§ 19-2.5-204, 209 (2024). Children taken into temporary custody and placed in a detention facility are entitled to a detention hearing in juvenile court within 48 hours and a judicial determination of whether further detention is warranted, and to determine conditions of release, if appropriate. C.R.S. § 19-2.5-305(3) (2024).

58.     The Colorado Children's Code defines "[d]etention" as "the temporary care of a child who requires secure custody in physically restricting facilities pending court disposition or an execution of a court order for placement or commitment." C.R.S. § 19-1-103(55) (2024).

59.     Only the presence of the following conditions empower the court to order the ongoing detention of a child in a secure, physically restricting detention facility: the child either "poses a substantial risk of serious harm to others" or presents "a substantial risk of flight from prosecution and community-based alternatives to detention are insufficient to reasonably mitigate that risk." C.R.S. § 19-2.5-305(3)(a)(IV)(C) (2024). Absent those conditions, the youth must be released. *Id.*

60.     As expressly stated in the statute, a child "shall not be placed in detention solely" because of: (1) "lack of supervision alternatives, service options, or more appropriate facilities;" (2) "the community's inability to provide treatment or services;" (3) "a lack of supervision in the home or community;" (4) "to allow a parent, guardian, or legal custodian to avoid his or her legal

responsibility;" (5) "a risk of the juvenile's self-harm;" or (6) "to attempt to punish, treat, or rehabilitate the juvenile." C.R.S. § 19-2.5-304(3)(a)-(f) (2024).

61.    Similarly, detention is explicitly "not permitted" for foster youth for whom there are no available kinship or foster homes. *See* C.R.S. § 19-2.5-304(1)(b) (2024). Detention is impermissible for "[d]elinquent . . . juveniles who have been placed in the legal custody of a county department of human or social services pursuant to a petition in dependency or neglect and are solely awaiting out-of-home placement." *Id*.

62.    When a child facing delinquency charges does not pose a substantial risk of serious harm to others nor is a substantial flight risk, or if either risk can reasonably be mitigated through the child's participation in community-based alternatives to detention, that child must be released to their parent, guardian, or legal custodian. C.R.S. § 19-2.5-305(3)(a)(VII)(A) (2024). When it is not possible for the child to return home to their parent or guardian, they should be placed with a grandparent, kin, or other suitable person; placed in a temporary shelter facility designated by the court; or be referred to a local county department of human or social services for assessment for placement. C.R.S. §§ 19-2.5-303(2)(e), 305(3)(a)(VII-VIII). "Shelter" is defined by the Colorado Children's Code as "the temporary care of a child in physically unrestricting facilities pending court disposition or execution of a court order for placement." C.R.S. § 19-1-103(126) (2024).

63.    When a child is already in the legal custody of a county department of human services, the child can be released to the State's foster care agency through the applicable county departments of human or social services. If, at the time of the detention hearing, the County DHS or social services does not yet have custody but requires it, the court may issue temporary custody orders at the detention hearing to allow placement by the county department of human or social services.

13

64.     Notwithstanding these clear legal requirements and prohibitions, non-committed youth who are placed in detention are currently housed at one of eight secure, highly restrictive detention facilities across the State operated by DYS: (a) Gilliam Youth Services Center (in Denver); (b) Grand Mesa Youth Services Center (in Grand Junction); (c) Marvin W. Foote Youth Services Center (in Centennial); (d) Rocky Mountain Youth Services Center (in Lakewood); (e) Platte Valley Youth Services Center (in Greeley); (f) Pueblo Youth Services Center (in Pueblo); (g) Prairie Vista Youth Services Center (in Brighton); and (h) Zebulon Pike Youth Services Center (in Colorado Springs).

65.     As described in more detail in section IV(A) *infra*, these secure juvenile detention facilities are highly restrictive, punitive, and segregated environments.

## II.   Defendants Are Responsible for Ensuring Placements and Services for Plaintiff Youth.

66.     Under Colorado's system, CDHS has the responsibility to develop and administer placements and services for youth involved in delinquency cases, as well as youth involved with the foster care system. These responsibilities are largely carried out by two CDHS sub-divisions: the Division of Youth Services ("DYS"), responsible for children involved in delinquency cases, and the Division of Child Welfare ("DCW"), responsible for children involved in foster care. CDHS oversees and manages both systems, including funding, evaluating, and providing community-based placements and services.

67.     CDHS receives appropriations from the Colorado General Assembly each year to be used "for youth who are detained or can be placed in lieu of detention," and must allocate funds for placement and community-based services in lieu of detention. C.R.S. § 19-2.5-1407.3(1) (2025); C.R.S. § 19-2.5-1407.3(2) (2025). A portion of these appropriated funds must be used "to provide incentives and remove barriers for licensed providers to serve youth who may be placed

in community residential facilities or family-like settings in lieu of detention." C.R.S. § 19-2.5-1407.3(3) (2025). The DYS budget explicitly covers both institutional and community-based services.

68.    CDHS, through its sub-agency DYS, also oversees the Colorado Youth Detention Continuum ("CYDC"), a state-wide board tasked with ensuring rehabilitation and community-based programs over juvenile incarceration, assessing whether there are sufficient community-based services and alternative placements to serve detained youth, and making recommendations to improve the availability and quality of these placements and services. C.R.S. § 19-2.5-1404(3)(a) (2025).

69.    For children who are dually involved in both the child welfare and juvenile justice systems, Defendants have further specific responsibilities to ensure foster youth receive appropriate placements and services. CDHS is statutorily mandated to "assess and determine the number of placements necessary for each level of care for children" placed in out-of-home foster care, and must "develop and implement a plan to build capacity and develop appropriate and available out-of-home placement options" across the State. C.R.S. §19-3-208(d.5), (d.7) (2025).

70.    CDHS also specifically oversees the practice of county departments of human services, which serve as "agents of the state department." C.R.S. § 26-1-118(1)(a) (2022). This "responsibility includes rule promulgation, guidance, program oversight and monitoring of county performance and practice."

### III.    Defendants Have Long Been on Notice of the Unlawful Detention of Releasable Youth but Have Perpetuated the Problem.

71.    State officials have known for decades that they incarcerate Releasable Youth, violating these children's constitutional and statutory rights and placing them at significant risk of harm. The pattern has been to repeatedly document the problem without actually fixing it.  As

early as 1991, the Colorado legislature passed Senate Bill 94, directing CDHS to ensure that alternatives to detention were created, in order to ensure releasable children could be served in the community when possible. Senate Bill 94, and its follow-up legislation, mandated that CDHS limit the number of children held in detention centers and instead move towards community-based placements. *Id.* Under that legislation, CDHS bears responsibility for ensuring that appropriate placements and services are available to detained youth throughout Colorado. *Id.* Yet, in the nearly 35 years since Senate Bill 94 was passed, Defendants have documented their awareness of the problem but have failed to address, and instead have perpetuated, this longstanding crisis.

72.     Over the intervening years, CDHS officials have repeatedly acknowledged that children remain illegally detained.  In 2023, then-OCYF-Director Minna Castillo Cohen admitted that many children who need services remain detained "in a location they should not be" because CDHS does not "have a wide variety of placement settings."[8] More recently, in 2024, Castillo Cohen said, "[w]e absolutely have to be doing something" about releasable children remaining detained. *Id.*

73.     Report after report confirms these problems remain unaddressed. In May of 2018, Governor Hickenlooper established the Colorado Improving Outcomes for Youth (IOYouth) Task Force in partnership with the Council of State Governments (CSG) Justice Center. The taskforce's mission was to "conduct a data-driven assessment of the juvenile justice system from the point a youth is referred to the system through a youth's reentry into the community, provide

---

[8] Jennifer Brown, *One-third of teens in Colorado juvenile corrections held for an average of 20 extra days because there's no place to go*, The Colorado Sun (Sept. 6, 2023), permalink: https://perma.cc/B5GL-HFJR.

recommendations for improvement, and offer technical assistance."[9]

74.     The CSG report found that a "lack [of] sufficient alternatives to detention in the community [] result[] in inappropriate placements."[10] The same report confirmed that youth "with significant mental health needs . . . often end up in detention due to a lack of alternative placements." *Id.*

75.     That same year another report conducted by the Development Service Group, Inc. (DSG), at the state's behest, made similar findings. DSG showed "youth awaiting placements to other [CDHS] divisions stay in detention nearly two weeks longer than the average," and concluded "[t]oo many youth are staying in detention for too long."[11] DSG called on CDHS "to address the lack of community placements, which may be affecting detention rates" and to identify a solution such as "alternative program[s] with more services."[12]

76.     Again, in 2020, the Colorado Division of Criminal Justice, a state agency, reported that "[m]any Colorado communities do not have adequate non-secure holding facilities" for children.[13]

---

[9] IOYouth, Council of State Governments Justice Center, https://csgjusticecenter.org/projects/improving-outcomes-for-youth/; Colo. Div. of Crim. Just., Task force identifies juvenile justice policies that advance Colorado's effort to enhance public safety and improve youth outcomes (Nov. 14, 2018), permalink: https://perma.cc/Q9LU-ZGUE.

[10] Nancy Arrigona, Shanelle Johnson & Nina Salomon, *Improving Outcomes for Youth in Colorado, Second Presentation to Task Force: Assessment Findings* at 54 (July 23, 2018) https://csgjusticecenter.org/wp-content/uploads/2020/02/Colorado-Second-Task-Force-Presentation.pdf.

[11] DSG, *States Ask DSG To Take Measure of Their Juvenile Facilities*, permalink: https://perma.cc/6XXA-M36V; DSG, Colorado DYS Program Performance Evaluation, Vol. II, at 83, 86 (June 30, 2018).

[12] *Id.* at 86-87.

[13] Div. of Crim. Just., Colo. Dep't of Pub. Safety, *Colorado's Compliance Monitoring Policy and Procedures Manual for the Juvenile Justice Delinquency Prevention Act (JJDPA) and the Juvenile Justice Reform Act of 2018 (JJRA)*, at 68 (Jan. 2020). permalink: https://perma.cc/7R9S-62D3.

77.    In 2022, CDHS administered two state-wide surveys to assess its shortcomings in serving Colorado's youth. The first survey collected data from County DHS (Department of Human Services) and CMP (Collaborative Management Program) staff representing 20 of the 22 judicial districts; the survey focused on gaps in alternative youth placement, within the community, and in the juvenile criminal legal system.[14] The second CDHS survey solicited insights from a broader range of stakeholders, including Guardians *ad litem* (GAL), youth defenders, and DYS staff. The surveys identified systemic barriers that cause youth to spend longer in juvenile detention after they should be released.

78.    Both survey results identified profound deficiencies in connecting young people with community-based services and placements: DHS staff described waitlists for programs as "extremely" and "insanely" long. *Id.* Many counties' representatives lamented that there are no local placement options, with some reporting the closest placement options for youth being "3-5 hours away," while other counties resort to sending children out of state to Wyoming, Texas, and Georgia due to placement issues. DHS staff also described detained children as sitting idly because they "are unable to receive ongoing mental health treatment and support while sitting in detention waiting for placement or outside resources/services to be put in place." *Id.*  A GAL disclosed to CDHS that there is a "huge gap" in alternative youth placements, and placement delays come at a dangerous cost: "[c]hildren are overdosing and dying–a youth on my caseload died from an overdose while awaiting a bed." *Id.* Crossover youth (youth who are involved both in the delinquency and dependency systems) are an incredibly vulnerable population, and County DHS staff consider them "a population with high needs" with "significant trauma." *Id.* Despite this, DHS

---

[14] Unpublished survey data, Colorado Department of Human Services (CDHS), 2022, Response of County DHS, 18th Judicial District, Arapahoe County, on file with Plaintiffs and CDHS.

18

staff noted that services for these youth "are becoming more scarce and difficult to access." *Id.*

79.     As recently as 2025, CDHS admitted that children often face delayed release because they are "[w]aiting for an available bed in an out-of-home placement," there are "[l]imited availability of specialized service providers,"[15]

80.     Despite repeated documentation of the urgent need to address the problem of releasable youth, CDHS still does not ensure releasable children exit detention. In 2021, 2023, and 2024, the legislature passed bills aimed at addressing the over-detention crisis. Yet in 2024, state representative Lindsey Daugherty specifically critiqued CYDC for failing in its duty "to prevent kids from being detained because of a lack of alternative services."[16] Instead, "children who should be released are remaining in custody for months." *Id.*

81.     The number of releasable youth being detained is actually *increasing*. In fiscal year 2022-2023, the first year of public state reporting on this issue, CDHS illegally incarcerated 540 Releasable Youth.[17] The following year, the number of Releasable Youth increased to 693. *Id*. The most recent available reports show CDHS detained 177 Releasable Youth in December 2025 alone, and that releasable children accounted for more than half of all detained children across the state.[18] CDHS calls these children "YAMS" short for "Youth Awaiting Mitigating Services."

**IV.     Despite their Obligations, Defendants Unconstitutionally Incarcerate Youth Whom a Juvenile Court Has Determined May Be Released from Detention in Restrictive**

---

[15]  2025 CDHS Responses to DYS Questions at 4. on file with Plaintiffs and CDHS.

[16] Jennifer Brown, *Colorado is keeping kids locked in juvenile jails months longer than needed because of lack of foster homes, treatment option*. Colorado Sun (Feb. 1, 2024) permalink: https://perma.cc/4R5P-EC54.

[17] CDHS, *Limit the Detention of Juveniles Annual Report State Fiscal Year 2023 - 2024* ("CDHS Annual Report 2024"), at 9-10. (Jul. 1, 2024), permalink: https://perma.cc/C48J-UL42.

[18] C.R.S. 19-2.5-1407.3 Monthly Report: March 2026 (Mar. 2026), permalink: https://perma.cc/N9D4-B3WY.

**Detention Facilities.**

82.    In violation of these obligations, Defendants have a policy, practice, custom and/or pattern of knowingly, unnecessarily, and unlawfully detaining Releasable Youth for weeks and months on end, including the following violations: (1) Defendants illegally incarcerate Releasable Youth, (2) Defendants fail to provide releasable foster youth with adequate care and protection, instead leaving them in harmful detention facilities; (3) Defendants fail to ensure an adequate process to guarantee Releasable Youth are timely released, and (4) youth with disabilities are unlawfully segregated in detention instead of being moved to the most integrated settings appropriate to their needs.

**(A)    Defendants Illegally Incarcerate Releasable Youth**

83.    In violation of constitutional and statutory requirements, Releasable Youth are held in detention facilities because Defendants have failed to provide them legally required placements, services, and processes to meet their needs, including for hundreds of youth awaiting adjudication.

84.    Defendants' illegal incarceration of children, without a legitimate purpose, is well-documented and known to Defendants. CDHS's own data shows that in FY 2024-2025, 693 youth remained in secure detention after a court deemed them releasable.[19] CDHS admits that these are youth for whom a juvenile court "determine[d] that services and/or placement can mitigate the substantial risk of serious harm to others or risk of flight from prosecution" and that the "youth may be released from detention when these [services and/or placement] become available." *Id*. In other words, these are youth who can be released from detention, but remain locked up in violation of their federal rights. The most recent available data shows that CDHS detained 177 Releasable Youth in December 2025 alone.[20] As of December 2025, releasable children accounted for more

---

[19] CDHS Annual Report 2025, *supra* note 1, at 10.
[20] C.R.S. 19-2.5-1407.3 Monthly Report: March 2026 (Mar. 2026).

than half of all detained children across the state. *Id.*

85.    On average, Releasable Youth spend 19.9 days in detention after a court has found them "releasable."[21] CDHS data shows that during FY 2024-2025, 141 Releasable Youth remained in detention for 30 or more days after a court found them releasable, with at least 30 youth incarcerated for over 100 days. *Id.*

86.    Leaving Releasable Youth in secure DYS detention facilities is a serious deprivation of their liberty, harms them, and places them at significant risk of harm. DYS detention centers are similar to county jails where adults are held pretrial. Like adult jails, juvenile detention facilities are locked and surrounded by fences, and keep detained youth in cells during the night and portions of the day.

87.    All living, sleeping, and recreation areas are locked, or to use Defendants' euphemism, "secure." Children may not move freely within or leave the facility, which is typically guarded and surrounded by locked entrances, fences, cameras, and controlled access points. Staff may use physical restraints, confinement, or isolation when they deem them necessary for security, or to stop children from attempting to move within the facility or leave it. Children are not allowed to wear their own clothes, are issued standard uniforms, and are routinely strip searched. Privacy is minimal to non-existent.

88.    While detained, youth are physically and emotionally separated from their families and communities. Family members are not allowed to visit children without DYS permission, and depending on the facility, only certain categories of family may visit and only during pre-approved hours. Visits take place in restricted areas under the supervision of guards. DYS limits the number of people whom youth may call by phone, and DYS prevents detained youth from using the

---

[21] CDHS Annual Report 2025, *supra* note 1, at 100.

21

internet to communicate.

89.    Additionally, these facilities and DYS rules and practices are physically invasive and restrictive. For example, pursuant to official DYS policy, detained youth are subject to a strip search upon initial detention, after every family visit, after off-site visits to court or other appointments, or based on "reasonable suspicion" of contraband. Such a policy automatically permitting strip searches every time youth meet with family or go to court creates an obvious disincentive for children to have their loved ones visit, to attend and participate in court hearings, or to leave the facility for outside health care appointments. Youth are also required to understand, navigate, and comply with a complex set of rules, which can be difficult to comprehend.

90.    Releasable Youth routinely remain in detention because CDHS has failed to place them with appropriate community placements and services. The former Director of OCYF has admitted that for young people who remain in detention "past an ability to be released," "it is oftentimes about locating an appropriate treatment setting, and we don't have a wide variety of placement settings."[22]

91.    Defendants have, for years, failed to take the necessary and reasonable measures to address these system failures. The result is that Releasable Youth, including foster youth, continue to remain unnecessarily incarcerated in secure DYS juvenile detention facilities causing them harm, and placing them at risk of harm, due to their incarceration.

**(B)    Defendants Fail to Provide Releasable Foster Youth with Adequate Care and Protection, Instead Leaving Them in Harmful Detention Facilities**

92.    Many Releasable Youth are locked up because they are in foster care and the State has not found them a foster placement, or because their families cannot be located or are unable or unwilling to care for them.  Although Defendants are empowered—and indeed required—in such

---

[22] Jennifer Brown, *supra* note 8.

instances to ensure the provision of alternative placements and services necessary for these children's release from secure confinement, they routinely fail to do so.

93.    Many Releasable Youth are foster children and thus already in the State's care and custody. CDHS data documents that 73.7 percent of Releasable Youth had prior or current child welfare involvement in FY 2024-2025.[23]

94.    CDHS has acknowledged that they detain "child welfare involved releasable youth" longer than other releasable youth. *Id*. Child welfare involvement is a significant predictor of longer periods of detention in Colorado. On average, Releasable Youth with child welfare involvement spend 26.1 days incarcerated beyond the date on which a judge found them releasable. *Id.* This surpasses the average releasable length of stay for all releasable youth by 6 days. *Id.*

95.    For foster youth, CDHS has admitted that "Colorado's placement continuum," which represents the types of placement options available to foster youth, "lacks the correct number and composition of beds to be fully responsive to the needs of Colorado's children." These State failures to ensure an appropriate placement continuum "can result in high numbers of children/youth on waitlists in need of appropriate treatment and placement."[24]

96.    For example, Named Plaintiff Tony S. has remained in detention for six months after being found releasable because CDHS has not been able to find him an appropriate placement through the foster system.

**(C)    Defendants Fail to Ensure an Adequate Process to Guarantee Releasable Youth Are Timely Released.**

97.    Defendants have also failed to ensure a sufficient process to guarantee that Releasable Youths' liberty interests are protected and that they are timely released. Plaintiffs have

---

[23] CDHS Annual Report 2025, *supra* note 1, at 101.
[24] CDHS, 2025-2029 Child and Family Service Plan, at 72 (June 30, 2024), permalink: https://perma.cc/Q5XR-V9YX.

a protected liberty interest to be free from unnecessary confinement, under both the Constitution and Colorado state law. Here, Defendants have not only deprived Plaintiffs of that protected liberty interest, but have also failed to ensure that there are adequate procedural protections to safeguard that right. They have failed to create statewide procedures governing the consistent provision of assessments, review, and case planning for detained children who have been found releasable by a juvenile court. Without such a statewide process in place, Defendants effectively refuse to release children from secure detention.

98.    Once a juvenile court judge enters an order that a detained child is releasable pending certain conditions, the responsibility falls to Defendants and their sub-agencies to follow this order, meet the conditions, and timely release the youth from detention. Statewide rules and procedures for DHS involved youth are set by CDHS, and executed by local DHS offices who operate as agents of CDHS. C.R.S. § 26-1-118(1)(a) (2022); 12 C.C.R. § 2509-7:7.601.1 (2024). Additionally, local CYDC contractors, who are in theory responsible for arranging community-based services, must follow requirements and guidelines set out in their Juvenile Services Plans, which CDHS approves annually. C.R.S. § 19-2.5-302(1) (2024). However, on information and belief, CDHS has failed to create any meaningful statewide procedures or guidelines as to how detained youth should receive case management, assessments, and planning services. Defendants have also failed to create policies or procedures to ensure youth and their advocates receive timely notice and information to allow them to participate in release planning efforts, or to challenge failures when release planning does not occur.

99.    When a detained youth has an open child welfare case, or when a juvenile court has ordered DHS involvement, the responsibility for case management and service planning lies with local DHS offices, which operate under the supervision of CDHS. *See* C.R.S. § 19-3-208 (2025);

24

C.R.S. § 19-3-209 (2025); C.R.S. § 26-1-118(4) (2022). However, CDHS has no statewide requirements, policies, or guidelines around this process.

100.    In practice, some local DHS offices begin the search process with a single mass email to placement providers that contains only the detained youth's delinquency charge and minimal demographic information. With little to no information given to placement providers about the youth or their service needs, it is no surprise that this barebones outreach results in few responses and even fewer acceptances. In addition, there is no consistent process or requirements governing the next steps that local DHS offices must take or the appropriate follow-up with service providers. Altogether, this process can take anywhere between multiple weeks to many months, if it occurs at all.

101.    Releasable Youth who are not already involved with the foster system, or for whom a juvenile court judge has not ordered DHS to be involved, languish in additional procedural limbo. Upon information and belief, Defendants and their sub-agencies have no procedures or clear guidance *at all* for who should take responsibility for the case management, assessment, and discharge planning of youth without prior DHS involvement. As a result, multiple agencies commonly claim to have "no responsibility" for placement or service planning for these youth, with each pointing the finger elsewhere.

102.    DYS has specifically disavowed any case management responsibilities for finding appropriate placements for Releasable Youth, stating that "DYS does not case manage youth for transfer to their subsequent placement," and that "[i]t is not the responsibility of [DYS] to find residential placement or outpatient treatment for youth in detention."[25] For youth without DHS

---

[25] CDHS responses to DYS questions, p. 4, on file with Plaintiffs and CDHS; CDYS Policy Website, permalink: https://perma.cc/4GFV-CPWY (emphasis added).

involvement, this leaves the possibility that they could receive case management through private insurance or through the Regional Accountability Entity (RAE) – which coordinates Medicaid-funded medical services. But again, there are no clear policies governing when these outside agencies should be brought in, or what their responsibilities are. Indeed, there is little incentive for these outside agencies to act timely in ensuring youth's release from detention. Accordingly, for children without DHS involvement, there is no discernable process for who is responsible for managing placement options that could meet the court's release conditions.

103.    For other mitigating services besides placements, the local CYDC coordinator, through a contract with DYS is, in theory, responsible for arranging these services. But here again, there are no clear statewide processes or procedures to ensure youth are timely assessed and referred for such services.

104.    Defendants' systemic failures in case management and release planning are compounded for the substantial number of Releasable Youth who are Medicaid-eligible. Defendants have failed to establish any coherent inter-agency planning structure to coordinate among the Division of Youth Services, the Division of Child Welfare, and the Department of Health Care Policy and Financing to ensure that the Medicaid-related needs of detained youth are addressed as part of the release planning process.

105.    This failure of inter-agency coordination is particularly acute for pre-adjudicated youth on Medicaid, who fall outside the scope of federal mandates that require states to provide pre- and post-release Medicaid services to adjudicated youth.[26] As a result, Releasable Youth on

---

[26] *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 5121, 136 Stat. 4459 (codified as amended at 42 U.S.C. § 1396a(a)(84)). Colorado has not opted into Section 5122 of the CAA, which would extend full Medicaid benefits coverage to pre-adjudicated youth, and Colorado's M-REACH reentry services program similarly excludes pre-adjudicated youth from

Medicaid who are detained pre-adjudication are not eligible for release planning like their post-adjudicated counterparts, and receive minimal transition services and no targeted case management under Medicaid to facilitate their reentry into the community.[27] The absence of adequate procedural safeguards for these youth also means that extended pre-adjudication detention places them at serious risk of losing access to needed Medicaid benefits.

106.    Defendants have failed to create any clear procedures or guidelines for how detained youth should receive case management, assessments, and planning services, leaving Releasable Youth to languish in detention without the procedural protections necessary to safeguard their liberty interests.

107.    Defendants have also failed to set forth any consistent and clear requirements or guidelines for CYDC or local DHS offices to provide notice and information to releasable detained youth, their counsel and advocates about their planning and search efforts. This results in a severe limitation on the ability of detained youth and their advocates to voice concerns or preferences in the planning process or to adequately advocate for their own timely release. And once youth are placed in detention, there is no clear way to appeal the failure to timely conduct release planning.

**(D)    Defendants Institutionalize Releasable Youth in Segregated and Punitive Prison Conditions Inappropriate for Youth with Disabilities Approved for Release to the Community.**

108.    Defendants segregate disabled Releasable Youth in highly restrictive detention facilities, even after a juvenile court has determined they may be released from detention, because Defendants have failed to develop sufficient mental health placements and services to meet youth's

---

coverage. *See* Ctrs. for Medicare & Medicaid Servs., State Health Official Letter No. 24-004, at 4–5 (noting that Section 5122 "is optional and takes effect on January 1, 2025").

[27] *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, §§ 5121–5122, 136 Stat. 4459 (mandating pre-release screening, diagnostic services, and targeted case management only for post-adjudicated eligible juveniles under § 5121, while making comparable coverage for pre-adjudicated youth optional under § 5122).

needs in the community and have failed to ensure an adequate process to connect youth with disabilities with those services. These failures mean that youth with disabilities spend longer periods of time in a restrictive detention facility when they are legally entitled to be released to a more integrated placement.

109.    The Named Plaintiffs and members of the Disability Subclass are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its regulations, 28 C.F.R. § 35.104. A disability is a "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); 28 C.F.R. § 35.108. *See also* 29 U.S.C. §§ 794, 705(20); 45 C.F.R. §§ 84.4, 84.10 (Rehab Act).

110.    The Supreme Court recognized, in *Olmstead v. L.C.*, 527 U.S. 581, 607 (1999), that unnecessary institutionalization constitutes unlawful discrimination under the ADA. States must provide community-based treatment for persons with disabilities when, as is the case for the Named Plaintiffs and members of the Disability Subclass, treatment professionals determine such placement is appropriate, the affected persons do not oppose such treatment, and the provision of such placements does not fundamentally alter the State's service system. This "integration mandate" applies to situations "where a public entity administers its programs in a manner that results in unjustified segregation of persons with disabilities."[28]   Defendants in this case are violating the integration mandate for Plaintiffs Isaac N. and Tony S. and the Disability Subclass.

111.    The U.S. Department of Justice has explained that,

> Integrated settings are those that provide individuals with disabilities opportunities to live, work, and receive services in the greater community,

---

[28] U.S. Dep't of Justice, Civil Rights Division, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* (June 22, 2011), permalink: https://perma.cc/2PZC-CLSD (DOJ Statement).

like individuals without disabilities. Integrated settings are located in mainstream society; offer access to community activities and opportunities at times, frequencies and with persons of an individual's choosing; afford individuals choice in their daily life activities; and, provide individuals with disabilities the opportunity to interact with non-disabled persons to the fullest extent possible.

*Id.*

112.    As a result of their disability, or of behaviors manifesting from their disability, children in the Disability Subclass are unnecessarily segregated in detention facilities in violation of their right to receive services in the most integrated setting appropriate to their needs.

113.    DYS secure detention facilities are the very antithesis of an integrated setting. As described in detail above, at IV(A), DYS detention facilities are highly restrictive, carceral environments that punitively segregate youth away from their family, peers, and communities. The National Center for Learning Disabilities estimates that 65-70% of youth involved in the juvenile justice system nationally have a disability.[29] Similarly, young people with disabilities are significantly over-represented in juvenile detention facilities in Colorado. According to DYS Annual Reports, 67–75% of youth presented co-occurring mental health and substance use needs, 80–87% required formal mental health intervention, and 78–84% required substance use treatment, during Fiscal Years 2022-2024.[30]

114.    Releasable Youth in the Disability Subclass who need placement in a community-based setting outside of detention often face long waitlists. In fact, approximately one third of the releasable youth who remain illegally detained for 30 days or more are ultimately released to a

---

[29] National Center for Learning Disabilities, *Unlocking Futures: Youth with Learning Disabilities & the Juvenile Justice System*, Syndman, J. (2022) at 2, permalink: https://perma.cc/959R-UDNH.

[30] *See* Disability Law Colorado, *Breaking Point* (Mar. 2026) at 3, permalink: https://perma.cc/LB6M-JQZS, (citing DYS Annual reports, FY 2019 through FY 2024).

therapeutic placement (compared to approximately 7% of youth overall), a strong indication that these youth remain detained because they are waiting for a spot in a therapeutic placement to become available to them. [31]

115.    For example, Named Plaintiff Isaac N. has been recommended for "intensive care coordination with intensive home-based treatment." However, CDHS has not located an appropriate placement and services for such care, leaving Isaac N. to languish in detention.

116.    For example, Named Plaintiff Tony S. has been recommended for placement outside of detention that serves his needs. However, CDHS has not located an appropriate placement for him so he continues to languish in detention.

117.    Four years ago, CDHS was warned of the very issues Tony S. is currently experiencing. DHS staff in Tony S.' local county urgently responded to CDHS's survey about service gaps, stating that "[p]lacement should not be dependent on Child Welfare, as we cannot support those needs due to limited resources and more difficult criteria to access these programs. We need more and better access to mental health facilities - for longer than a week or two!"[32] If CDHS had acted upon receiving this alert, Tony S. would likely not be sitting in detention today.

118.    As recently as March 2025, CDHS reported that there were waitlists for youth to access appropriate treatment beds, and that there are "a significant number of children/youth who are in therapeutically inappropriate settings awaiting an appropriate bed for treatment."[33]

119.    Family-based treatment options such as therapeutic foster care are even more difficult for Releasable Youth in the Disability Subclass to access, because there are such a limited

---

[31] CDHS Annual Report 2024, *supra* note 17 at 94, 97.
[32] Unpublished survey data, Colorado Department of Human Services (CDHS), 2022, Response of County DHS, 17th Judicial District, Adams County, on file with Plaintiffs and CDHS.
[33] CDHS Performance Plan 2025-2026, p. 19-20, permalink: https://perma.cc/6HSW-H4BJ.

number of spots available statewide.

120.    Many Releasable Youth have previously succeeded in a community-based environment with appropriate services that are already provided in Colorado, though not in sufficient amounts and not available statewide.

121.    Both Named Plaintiffs, Isaac N. and Tony S., desire to be out of detention and placed in a community setting.

## V.    Defendants' Unlawful Detention of Releasable Youth Imposes Significant Harms and Risks of Harm on those Youth and the Broader Goals of Treatment and Rehabilitation.

### (A)    Unlawful Incarceration Causes Significant and Lasting Harm to Releasable Youth.

122.    Release of Plaintiff youth, as required by their Constitutional and statutory rights, is particularly important and urgent because Defendants' continued detention of Releasable Youth exposes them to substantial harms and serious risk of harm. The unconstitutional detention of youth is *per se* harmful as a legal matter. In addition, incarcerating children, even for relatively short periods of time, can cause profound and lasting consequences. The Colorado General Assembly has itself recognized in statute that "the placement of children and juveniles in a detention facility *exacts a negative impact on the mental and physical well-being of the child or juvenile*" and "may make it *more likely that the child or juvenile will reoffend*."  C.R.S. § 19-2.5-301 (2024) (emphases added). As discussed below, a vast body of research confirms that incarceration has a uniquely harmful impact on children and adolescents, including physically, neurologically, psychologically, socially, and academically. These harms often last into adulthood.

123.    Youth placed in juvenile detention facilities are at high risk of physical harm while detained, including violence and abuse. Youth in detention often endure violence at the hands of both staff and other youth. Excessive physical force, such as during restraints or behavior

31

management, may be deployed against detained youth. As explained in greater detail in the subsequent section, Colorado's youth detention facilities have a well-documented history of such harms.

124.     In part because of its traumatic nature, detention poses a physical harm and neurological risk to the physical infrastructure and functioning of the still-developing adolescent brain. Adolescent brains undergo significant changes during puberty that allow for maturation as the brain adapts. However, the brain's adaptability during this time also renders it vulnerable. Exposure to stressful and traumatic conditions, such as those experienced in detention, can result in long-term negative changes in youths' brains, resulting in maladaptation that "disrupts brain circuitry" and reduces brain volume. Put simply, detention can literally and permanently alter young peoples' developing brains.

125.     Detention also poses numerous psychological harms and risks to youth. Detention is strongly linked to higher rates of various mental health conditions, including anxiety, depression, and post-traumatic stress disorder (PTSD). Even short periods of incarceration during adolescence can increase mental health conditions like depression. Plus, incarceration may impair critical cognitive skills in adolescents. Research has shown incarcerated youth "experience deficits in executive functions like cognitive control, emotion recognition, and emotion regulation," which in turn harms these youth's "ability to navigate social interactions and make sound decisions."

126.     Detention also harms social development. Detention separates youth from the natural social supports of their family, friends, teachers, coaches, and community, restricting and supervising the limited interactions allowed. At the same time, detention exposes detained youth to peers who may encourage negative behaviors.

127.     Additionally, detention threatens to harm the academic futures of incarcerated

youth. There is overwhelming evidence that incarcerated youth perform below their peers in the community academically. Even a short period of detention can cause significant educational disruption that children struggle to recover from, with one study tying short periods of pretrial detention to a 38% decline in the probability of graduating high school.

128.    At many detention facilities, the lights are left on all night in cells, causing youth to suffer sleep deprivation which can impair cognitive function and lead to memory recall deficits, behavioral dysregulation, attention-related disorders, social withdrawal, self-injury, and suicidal ideation. Detained sleep-deprived children also face a higher risk for negative cardio-metabolic outcomes including diabetes, obesity, endothelial dysfunction, hypertension, and inflammatory states.

129.    Pre-adjudication detention in particular significantly impacts how well youth are able to defend against their underlying delinquency charges. Detention prevents youth from fully participating in their defense, impedes communication with attorneys, and can pressure releasable children to accept guilty pleas solely to exit detention. Pre-adjudication detention also undermines a youth's ability to demonstrate mitigation and success with community-based resources. Statistically, placement into detention makes youth more likely to be an adjudicated delinquent and face longer incarceration sentences post-adjudication.

130.    The harms youth experience while in detention can impact them throughout their adulthood. A study of the long-term well-being of delinquent youth found that detention was linked to negative outcomes in education, housing, employment, criminal activity, mental health, and substance abuse. And detained children are far more likely to have subsequent criminal justice involvement as adults.

**(B)    DYS Detention Facilities Place Youth at Significant Risk of Physical Abuse and Other Harm.**

131.    Underscoring the urgency in addressing the unnecessary and unlawful detention of Releasable Youth, in addition to the generally pervasive harms associated with the incarceration of children in carceral facilities, Colorado's detention centers in-particular have a documented history of causing harm to youth. Facilities in Colorado are near or over capacity and chronically understaffed, creating pressure cooker environments where dangerous conditions are rampant. Plaintiffs experience excessive force and injury-causing restraints, invasive strip searches, and exposure to illegal drugs.

132.    In Colorado DYS detention centers, detained youth are subject to inappropriate and excessive use of force at the hands of the adults who are supposed to keep them safe. Internal records, state reports, and interviews with youth point to the frequent use of illegal, excessive force by staff on detained youth. A recent March 2026 report from Disability Law Colorado found that the use of mechanical restraints and invasive physical restraints has increased by 54% and 60%, respectively, over the past four years.[34] Youth reported that staff restraints resulted in cuts and bruising. *Id.* One in every three interviewed youth observed or were victims of violent restraint tactics, including staff slamming or pinning them to the ground, pushing their head into the ground, choking them, hitting them in the face, or striking them with a knee to the stomach or head. *Id.*

133.    In March 2025, the Denver Post published an investigation detailing the use of excessive force in DYS facilities. The investigation relied on a year's worth of internal critical incident reports, from December 2023 through November 2024, and interviews with advocates,

---

[34] Disability Law Colorado, *Breaking Point: Conditions in the Colorado Division of Youth Services, September 2021–October 2025,* at 7-9 (2025), permalink: https://perma.cc/LB6M-JQZS.

former DYS staff, and impacted youth and families. One youth reported that a staff member slammed him to the point of losing consciousness.[35] Another youth had his head "bashed" into the wall so forcefully it broke the drywall. *Id.* At least six different children reported that they were placed on a "concussion protocol" after striking their heads during a restraint. *Id.* At least two youth report receiving minimal medical attention after sustaining head injuries. *Id.* Internal reports show youth suffering broken bones including broken hands, clavicles, arms, and noses. *Id.* Other physical abuse documented in the reports included staff pushing heads, pulling hair, and elbowing youth in the face. *Id.*

134.    The State's own data, which simply tracks reported restraint incidents without analyzing whether they were justified or otherwise proper, shows that restraint use is on the rise. Documented restraints, or instances where staff admit to using force, show a 39% increase in restraint use between September 2023 and February 2024, and between March 2024 and August 2024.[36] The same data shows a disproportionate use of restraints against Black youth. *Id.*

135.    Detained youth must also endure frequent, traumatic, and improper strip searches. Strip searches are a routine part of juvenile detention in Colorado.[37] Yet, these invasive searches only yield contraband about 10% of the time. *Id.*

136.    In 2023, the Office of the Colorado Child Protection Ombudsman began monitoring the use of strip searches in DYS facilities after receiving troubling reports of targeted, punitive searches. The office reviewed records from 1,009 strip searches that occurred during 2023-2025,

---

[35] Sam Tabachnik, *Broken bones, excessive force and drug overdoses: Inside Colorado's juvenile detention facilities*, The Denver Post (March 2, 2025), permalink: https://perma.cc/N2C7-VGH6.

[36] Colorado Division of Youth Services, Youth Seclusion & Restraint Working Group, Semi-Annual Report 14 (Jan. 1, 2025) at 4, 16.

[37] The Child Protection Ombudsman of Colorado, Strip Searches Within the Division of Youth Services, at 2-4 (Sept. 30, 2025), permalink: https://perma.cc/K2T9-TFMX.

and found that DYS officials violated their own strip search policy in 1,006 of those searches. Put differently, fewer than 0.3% of all searches done in a two-year period were compliant with DYS policies. These violations (and there was often more than one violation per search) include conducting a strip search without documented approval from youth center administrators, without the proper number of staff present (only one staff member conducting the search when two are required to be present), and without documentation of the reason for the search and results. *Id.*

137. Detention centers compound already existing trauma by subjecting youth to these ineffective and at times, punitive, strip searches. As the Ombudsman observed, youth in DYS centers "have likely experienced multiple traumas during their lives," and a strip search "can add to that trauma or trigger other trauma responses." *Id.* The Ombudsman continued, "knowing that psychological damage to youth is likely, even when strip searches are performed exactly as intended, it is even more alarming to consider the consequences when the strip searches are not being carried out per policy and are not finding the targeted dangerous items." *Id.*

138. Colorado's detention centers expose vulnerable youth to drugs at great risk to their physical safety. The March 2026 report from Disability Law Colorado reported evidence of as many as 15 suspected overdoses in Fiscal Year 2025 alone.[38] DYS reported to CDHS that at least four youth overdosed in DYS facilities in 2024, including tragically, a 16-year-old who died of a fentanyl overdose at the DYS facility in Greeley.[39] At the Rocky Mountain Youth Services Center in Lakewood, 11 of the 21 youth incarcerated there tested positive for THC and/or methamphetamines. *Id.*

---

[38] Disability Law Colorado, *Breaking Point: Conditions in the Colorado Division of Youth Services, September 2021–October 2025,* at 12 (2025), permalink: https://perma.cc/LB6M-JQZS
[39] Sam Tabachnik, *Teen in Greeley youth detention center died from fentanyl overdose*, The Denver Post, Jan. 28, 2025, https://www.denverpost.com/2025/01/28/platte-valley-youth-services-center-overdose-death-autopsy-report/.

## CLASS ACTION ALLEGATIONS

139. This action is properly maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(2). This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). It also satisfies the criteria for certifying a class action for declaratory and/or injunctive relief under Rule 23(b)(2).

140. Plaintiffs Isaac N. and Tony S., by and through their Next Friends, bring this action on behalf of themselves and all other similarly-situated youth as members of the following proposed Plaintiff class ("the Releasable Youth Class"): all youth who currently are, or in the future will be, detained in a Colorado Division of Youth Services ("DYS") secure detention facility, who are not serving a commitment sentence, and for whom a juvenile court has determined that the youth may be released from detention.

141. Plaintiffs Isaac N. and Tony S. by and through their Next Friends also seek to represent a subclass (the "Disability Subclass") of "all members of the Class who have disabilities as defined under Title II of the ADA or Section 504 of the Rehabilitation Act."

142. Plaintiff Tony S., by and through his Next Friends, also seeks to represent a subclass (the "Foster System Subclass") of "all members of the Class who are in the legal custody of a Colorado county department of human or social services pursuant to a finding of dependency or neglect."

## I.     Numerosity

143. The proposed class and subclasses are sufficiently numerous as to make joinder impracticable. Fed. R. Civ. P. 23(a)(1). Given the turnover of children entering custody, the population of the Releasable Youth Class, Disability Subclass, and Foster System Subclass are fluid, inherently transitory, and constantly changing, which also militates in favor of class action status. Class members are identifiable and can be ascertained by using records maintained in the

ordinary course of business by Defendants.

(a)     Upon information and belief, the size of the Releasable Youth Class is substantial. According to publicly-released DYS statistics, 693 youth remained in secure detention one or more days after being deemed releasable in FY 2024-2025.[40]

(b)     The Disability Subclass is sufficiently numerous to make joinder impracticable. According to DYS Annual Reports, 67–75% of youth in DYS detention presented co-occurring mental health and substance use needs, and 80–87% required formal mental health intervention.[41]

(c)     The Foster System Subclass is also sufficiently numerous to make joinder impractical. According to publicly-released statistics, 73.7% of releasable youth had historic or ongoing child welfare involvement in FY 2024-2025.[42]

## II.     **Commonality**

144.    One or more common questions of law and fact exist as to all members of the Class and Subclasses. The Named Plaintiffs seek common declaratory and injunctive relief concerning whether Defendants' policies, practices, and procedures violate the constitutional and statutory rights of the class members.

145.    With regard to the Releasable Youth Class, common questions of law and fact include whether:

- Defendants, through their actions or inaction, maintain a policy, pattern, practice, or custom of incarcerating in DYS detention facilities children, who are not serving a commitment sentence, and for whom a juvenile court has determined that the youth may be released from detention;

---

[40] CDHS Annual Report 2025, *supra* note 1, at 10.
[41] *See* Disability Law Colorado, *Breaking Point* (Mar. 2026) at 3, permalink: https://perma.cc/LB6M-JQZS  citing DYS Annual reports, FY 2019 through FY 2024.
[42] CDHS Annual Report 2025, *supra* note 1, at 101.

- Defendants' failure to provide adequate procedures, including assessments, case management, and discharge planning, are significant factors that drive(s) children being incarcerated in DYS facilities past the dates on which a juvenile court finds them to be releasable;

- Defendants' actions or inaction in incarcerating in DYS detention facilities children whom a juvenile court has determined may be released from detention violates the Fourteenth Amendment to the United States Constitution;

- Defendants' failure to provide adequate procedures to ensure children are timely released to the community, including screenings, assessments, case management, and discharge planning, violates the Fourteenth Amendment to the United States Constitution; and

- Defendants' continued detention of Plaintiffs constitutes punishment in violation of the Fourteenth Amendment to the United States Constitution.

146.   With regard to the Disability Subclass, common questions of law and fact include whether:

- Defendants, through their actions or inaction, maintain a policy, pattern, practice, or custom of unnecessarily institutionalizing Plaintiffs in segregated detention facilities rather than providing services and placement in the most integrated settings appropriate to their needs;

- Defendants' failure to provide, fund, and effectively utilize community-based placements and services so that Plaintiffs can be placed in more integrated settings are significant factors that drive(s) unnecessarily institutionalizing Plaintiffs in segregated detention facilities; and

- Defendants' policy, pattern, practice, or custom of institutionalizing Plaintiffs in segregated detention facilities rather than providing services and placement and services in the most integrated settings appropriate to their needs violates Title II of the Americans with Disabilities Act and the Rehabilitation Act.

147.   With respect to the Foster System Subclass, common questions of law and fact include whether:

- Defendants, through their actions or inaction, maintain a policy, pattern, practice, or custom of failing to provide detained foster children with sufficient community-based placements and services to ensure these youth's timely release;

- Defendants, through their actions or inaction, maintain a policy, pattern, practice, or custom of failing to provide detained foster children with sufficient policies and

39

procedures, including case management, to ensure these youth's timely release;

- Defendants' failure to provide detained foster children with sufficient community-based placements and services to ensure these youth's timely release, and failure to provide detained foster children with sufficient policies and procedures, including case management, to ensure these youth's timely release, drive(s) Defendants' policy, pattern, practice, or custom of incarcerating in DYS detention facilities detained foster children whom a juvenile court has determined may be released from detention;

- Defendants' actions or inactions, and policies, practices, or customs outlined above in this section fail to ensure that children in the Foster System Subclass are reasonably safe from a substantial risk of serious harm in violation of the Fourteenth Amendment to the United States Constitution.

148. The proposed Class and Subclasses, therefore, meet the requirements of Fed. R. Civ. P. 23(a)(2).

### III. Typicality

149. Named Plaintiffs' claims are typical of the respective class members' and subclass members' claims. The injuries that Named Plaintiffs have suffered and will suffer because of Defendants' unlawful course of conduct are typical of the injuries suffered by members of the respective class and subclasses. All class and subclass members seek the same declaratory and injunctive relief. Accordingly, the requirements of Fed. R. Civ. P. 23(a)(3) are met.

### IV. Adequacy of Representation

150. The Named Plaintiffs will fairly and adequately represent the interests of the Class and subclass members they seek to represent. Plaintiffs' counsel knows of no conflicts between or among members of the Class or the subclasses. Plaintiffs are represented by counsel with experience and success in litigating complex civil rights matters in federal court on behalf of children in the child welfare and juvenile justice systems, and on behalf of adults and children with disabilities. Accordingly, the requirements of Fed. R. Civ. P. 23(a)(4) are met.

**V.  Rule 23(b)(2)**

151.    Defendants have consistently acted and refused to act on grounds generally applicable to the Class and Subclass, making final injunctive and declaratory relief appropriate with respect to the Class and Subclass as a whole. For all members of the Class and Subclasses, Defendants have kept them incarcerated in detention facilities past the time at which juvenile courts determined the youth to be releasable. For the Releasable Youth Class, Defendants, through their actions or inaction, maintain a policy, pattern, practice, or custom of incarcerating in DYS detention facilities children whom a juvenile court has determined may be released from detention. For the Disability Subclass Defendants, through their actions or inaction, maintain a policy, pattern, practice, or custom of institutionalizing Plaintiffs in segregated detention facilities rather than providing services and placement in the most integrated setting appropriate to their needs. For the Foster System Subclass, Defendants, through their actions or inaction, maintain a policy, practice, or custom of failing to provide detained foster children with sufficient procedures and community placements and services to ensure these youth's timely release and safety. Defendants' policies, practices, action and inaction regarding releasable youth apply generally to all such youth. The prosecution of separate actions by individual members of the Class and Subclasses would be impractical and would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants. Accordingly, the requirements of Fed. R. Civ. P. 23(b)(2) are met.

**COLORADO'S JUVENILE COURTS HAVE LIMITED JURISDICTION TO REMEDY SYSTEMIC HARMS TO PLAINTIFFS' FEDERAL RIGHTS**

152.    Defendants' ongoing policies, practices, customs, and procedures cause and result in systemic violations of Plaintiffs' federal constitutional and statutory rights.

153.    As alleged above, Plaintiffs bring claims on behalf of themselves and a proposed class and subclasses, for systemwide relief to remedy violations of their constitutional rights to due process and federal statutory rights under the ADA and Rehabilitation Act.

154.    Colorado's juvenile courts have narrow jurisdiction and cannot issue the systemic, classwide relief that Plaintiffs and the class seek and require. The state juvenile courts have limited jurisdiction, encompassing *only* five specific types of proceedings:

- individual cases "concerning any juvenile ten years of age or older who has violated [ ] any federal or state law," and certain "county or municipal ordinance[s;]"

- direct filings in adult criminal courts of individual prosecutions of youth aged 16 or older for specified felony offenses;

- specified traffic offenses charged against individual youth age 16 or older;

- concurrent jurisdiction with county courts over specified individual prosecutions of youth under age 18; and,

- specified jurisdiction over individual determinations of legal custody and guardianship of children.[43]

155.    Moreover, in delinquency proceedings, Colorado juvenile courts are statutorily limited to addressing individual determinations—they may not issue class wide relief. *See* Colo. Rev. Stat. § 19-2.5-103.

156.    Colorado's juvenile courts lack a procedural mechanism, such as Federal Rule of Civil Procedure 23 or Colorado Rule of Civil Procedure 23, to certify a class or grant system-wide injunctive or declaratory relief to children in juvenile detention facilities, including the Releasable Youth. C.R.S. § 19-2.5-103 (2025).

157.    Plaintiffs are therefore unable to raise their federal constitutional and statutory

---

[43] *See* 103 Colo. Rev. Stat. § 19-2.5-103 (2025). The Colorado Supreme Court held that "juvenile courts, as creatures of statute, have "no jurisdiction except that provided by statute." *Pueblo Cnty. Comm'rs v. Dist. Ct.,* 708 P.2d 466, 467 (Colo. 1985).

claims for classwide, systemic relief in their individual delinquency proceedings in state juvenile courts.

158.    Plaintiffs' claims here do not replace or otherwise interfere with the juvenile court delinquency adjudication process.

159.    Colorado juvenile courts have already found that the Plaintiffs and proposed class members do not meet the legal criteria for detention and can be released.  Under the statutory detention factors, ongoing detention of a child in a secure, physically restricting detention facility is only permitted when the child "poses a substantial risk of serious harm to others" or "a substantial risk of flight from prosecution and community-based alternatives are insufficient to reasonably mitigate that risk."  C.R.S. § 19-2.5-305(3)(a)(IV)(C).  This lawsuit does not seek relief that would instruct Colorado juvenile courts on how to conduct their delinquency adjudication process or interfere with juvenile courts' efforts to enforce orders.

## CAUSES OF ACTION

### COUNT I

**Violation of the Fourteenth Amendment to the United States Constitution
(42 U.S.C. § 1983) – Substantive Due Process – all Plaintiffs and the Releasable Youth
Class Against All Defendants**

160.    The Named Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

161.    Plaintiffs assert this claim against all Defendants in their official capacities.

162.    Due process under the Fourteenth Amendment protects children's basic liberty interest to be free from detention, unless there is a legitimate state interest requiring continued detention.

163.    When a Colorado juvenile court has determined that a child may be released from

43

detention, Defendants are responsible for ensuring the child is timely released home or to an appropriate placement or service.

164. By leaving Plaintiffs and putative Releasable Youth Class members incarcerated in juvenile detention facilities past the date a court has ordered that they may be released, without any legitimate state interest, Defendants have and are unlawfully depriving Plaintiffs of their liberty interests under the Fourteenth Amendment without just cause.

165. Defendants' actions also constitute punishment of Plaintiffs and putative Releasable Youth Class members, in violation of their substantive due process rights under the Fourteenth Amendment.

166. Defendants knew of a substantial risk of serious harm to youth as a result of these practices and policies, yet disregarded this risk by failing to take reasonable measures to abate it.

167. Defendants' actions shock the conscience and demonstrate deliberate indifference to a substantial risk of serious harm to Plaintiffs and putative Releasable Youth Class members, in violation of their rights under the Fourteenth Amendment to the U.S. Constitution.

168. By depriving the youth of liberty without just cause, acting under color of state law, Defendants in their official capacities, and their agents, officials, and employees, have violated and continue to violate Plaintiffs' and putative Releasable Youth Class members' rights secured by the U.S. Constitution under the Fourteenth Amendment.

169. Plaintiffs and the putative Releasable Youth Class have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act. Unless enjoined by the Court, Defendants will continue to violate and cause the violation of Plaintiffs' and putative Releasable Youth Class members' constitutional rights. Plaintiffs are without adequate remedy at law and are entitled to declaratory and injunctive relief to avoid any

44

further injury.

## COUNT II

### Violation of the Fourteenth Amendment to the United States Constitution
### (42 U.S.C. § 1983) – Substantive Due Process – Plaintiff Tony S. and the Foster System
### Subclass Against All Defendants

170.    Named Plaintiff Tony S. incorporates each and every allegation of the Complaint as if fully set forth below.

171.    Named Plaintiff Tony S. and the Foster System Subclass assert this claim against all Defendants in their official capacities.

172.    When the State takes a child into its custody and classifies the child as a dependent in the foster system, it assumes a duty under the Fourteenth Amendment to ensure the child is reasonably safe from a substantial risk of serious harm.

173.    This substantive due process right includes, but is not limited to: the right to be free from and protected from physical, psychological, and emotional harm; the right to necessary treatment, care, and services; the right not to deteriorate physically, psychologically, or emotionally while in state custody; and the right to be free from substantial risks of the above-mentioned harms.

174.    Defendants have a pattern, custom, practice and policy of failing to provide a sufficient number and array of placements and services for Foster System Subclass member children, and instead are incarcerating foster children whom a juvenile court has determined may be released from juvenile detention facilities.

175.    Defendants knew of a substantial risk of serious harm that youth would suffer as a result of these practices and policies, yet did not exercise professional judgment in taking sufficient measures to remedy these violations.

176.    Defendants' actions shock the conscience and demonstrate deliberate indifference

45

to a substantial risk of serious harm to Plaintiffs and putative Foster System Subclass members, in violation of their rights under the Fourteenth Amendment to the U.S. Constitution.

177. Defendants as well as their agents, officials, and employees, acting in their official capacities and under color of state law, have violated and continue to violate Plaintiffs' and putative Foster System Subclass members' rights secured by the U.S. Constitution under the Fourteenth Amendment by failing to provide a sufficient number of foster care placements and services for and by incarcerating foster children whom a juvenile court has determined may be released from detention.

178. Plaintiffs and the proposed Foster System Subclass have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act. Unless enjoined by the Court, Defendants will continue to violate Plaintiffs' and putative Foster System Subclass members' constitutional rights. Plaintiffs are without adequate remedy at law and are entitled to declaratory and injunctive relief to avoid any further injury.

## COUNT III

**Violation of the Fourteenth Amendment to the United States Constitution**
**(42 U.S.C. § 1983) – Procedural Due Process –All Plaintiffs and the Releasable Youth Class Against All Defendants**

179. The Named Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

180. Plaintiffs and the Class assert this claim against all Defendants in their official capacity.

181. The Due Process Clause of the Fourteenth Amendment prohibits Defendants from depriving any person of life, liberty, or property without due process of law.

182. Colorado law uses mandatory language and substantive predicates in dictating procedures for determining whether youth charged with delinquency offenses may be incarcerated.

46

183. Colorado law prohibits securely detaining children who do not meet the criteria stated in C.R.S. § 19-2.5-305 (2024).

184. Colorado law explicitly dictates that "[d]etention is not permitted for… [d]elinquent and nondelinquent juveniles who have been placed in the legal custody of a county department of human or social services pursuant to a petition in dependency or neglect and are solely awaiting out-of-home placement." C.R.S. § 19-2.5-304(1)(b) (2024).

185. Colorado law also explicitly prohibits securely detaining children (1) due to a "lack of supervision alternatives, service options, or more appropriate facilities;" (2) due to "the community's inability to provide treatment or services;" (3) due to "a lack of supervision in the home or community;" (4) "to allow a parent, guardian, or legal custodian to avoid his or her legal responsibility;" (5) due to "a risk of the juvenile's self-harm;" or (6) "to attempt to punish, treat, or rehabilitate the juvenile." C.R.S. § 19-2.5-304(3)(a-f) (2024).

186. Plaintiffs have a due process right to be free from incarceration in DYS detention facilities under the Fourteenth Amendment and Colorado law.

187. Plaintiffs further have a protected liberty interest in not being detained solely due to a lack of community-based alternatives to incarceration.

188. Defendants, while acting under color of law, have unlawfully deprived Plaintiffs and putative Releasable Youth Class members of their protected liberty interests without providing adequate procedural safeguards by failing to guarantee that youth whom a juvenile court has determined may be released from detention are promptly released, and by continuing to incarcerate such youth in a juvenile detention facility in violation of C.R.S. § 19-2.5-304.

189. Defendants deprive Plaintiffs and putative Releasable Youth Class members of the liberty guaranteed to them by the Fourteenth Amendment and Colorado law without due process

47

by failing to create, maintain, and enforce consistent procedures that would allow youth to exit detention when a judge has found them to be releasable. Defendants' actions, inactions, customs, patterns, policies, and practices deprive Plaintiffs and putative Releasable Youth Class members of their liberty interest without due process.

190.    By depriving Plaintiffs and putative Releasable Youth Class members of their liberty without due process, while acting under color of state law, Defendants in their official capacities, and their agents, officials, and employees, have violated and continue to violate Plaintiffs' rights secured by the U.S. Constitution under the Fourteenth Amendment and Colorado law.

191.    Plaintiffs and putative Releasable Youth Class members have suffered and will imminently suffer irreparable injury as a result of Defendants' policies, practices, and failures to act and are entitled to injunctive relief to avoid any further injury. Unless enjoined by the Court, Defendants will continue to violate and cause the violation of Plaintiffs' and putative Releasable Youth Class members' constitutional rights. Plaintiffs are without adequate remedy at law and are entitled to declaratory and injunctive relief to avoid any further injury.

### COUNT IV

**Violation of Title II of the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq*.**
**Plaintiffs Isaac N. and Tony S. and the Disability Subclass Against All Defendants**

192.    The Named Plaintiffs Isaac N. and Tony S. incorporate each and every allegation of the Complaint as if fully set forth below.

193.    Plaintiffs Isaac N. and Tony S. and the Disability Subclass assert this claim against all Defendants in their official capacity.

194.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

48

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

195.    The regulations implementing Title II of the ADA require that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

196.    Defendants, named in their official capacities, each administer programs of the state, including CDHS, which is a public entity as defined by the ADA, 42 U.S.C. § 12131(1)(A-B), and its implementing regulations, 28 C.F.R. § 35.104.

197.    Further, a public entity must "make reasonable modifications in policies, practice, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

198.    Plaintiffs Isaac N. and Tony S. and members of the Disability Subclass are "qualified individuals with disabilities" as defined by the ADA, 42 U.S.C. § 12131(2), and its implementing regulations, 28 C.F.R. § 35.104, 28 C.F.R. § 35.108.

199.    Defendants fail to administer services, programs, and activities for Plaintiffs and putative Disability Subclass members in the most integrated setting appropriate to their needs. Defendants unlawfully discriminate against the Named Plaintiffs and the Disability Subclass by denying them the opportunity to receive necessary services in the most integrated settings appropriate, thus causing them to be unnecessarily segregated and discriminated against in violation of Title II of the ADA, 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulations. Plaintiffs and the Disability Subclass do not oppose receiving services in such settings.

200.    Defendants fail to make reasonable modifications to their policies, practices, and

49

procedures that are necessary to avoid discrimination against Plaintiffs and the Disability Subclass on the basis of their disability, such as by expanding availability of the State's existing services and placements that are necessary to serve the Subclass in the most integrated setting appropriate to their needs. Such reasonable modifications would not fundamentally alter the nature of the Defendants' services, programs, or activities. 28 C.F.R. § 35.130(b)(7).

201.    Plaintiffs and the Disability Subclass have suffered and will suffer irreparable injury because of Defendants' failure to administer services, programs, and activities for Plaintiffs and putative Disability Subclass members in the most integrated setting appropriate to their needs. Plaintiffs are without adequate remedy at law. Plaintiffs are entitled to declaratory and injunctive relief to avoid any further injury.

### COUNT V

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
**Plaintiffs Isaac N. and Tony S. and the Disability Subclass – Against All Defendants**

202.    The Named Plaintiffs Isaac N. and Tony S. incorporate each and every allegation of the Complaint as if fully set forth below.

203.    Plaintiffs and the Disability Subclass assert this claim against all Defendants in their official capacity.

204.    Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The regulations implementing Section 504 require that entities receiving federal financial assistance "administer programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. 45 C.F.R. § 84.68(d)

205.    Covered entities "shall make reasonable modifications in policies, practices, or procedures when such modifications are necessary to avoid discrimination on the basis of disability," unless the entity can "demonstrate that making such modifications would fundamentally alter the nature of the program or activity." 45 C.F.R. § 84.68(b)(7).

206.    Named Plaintiffs Isaac N. and Tony S. and the Disability Subclass have disabilities that substantially limit one or more major life activities, or have a record of such impairments, and therefore have a disability for purposes of the Rehabilitation Act and its implementing regulations, 45 C.F.R. § 84.4. They are "qualified individuals with disabilities" for purposes of the Rehabilitation Act and its implementing regulations, 45 C.F.R. § 84.10.

207.    Defendants receive federal financial assistance, as defined in 45 C.F.R. § 84.10, to operate their juvenile detention facilities and foster care systems, Defendants operate programs or activities that receive federal financial assistance for purposes of 29 U.S.C. § 794(b).

208.    Defendants are violating Section 504 of the Rehabilitation Act by failing to administer services, programs, and activities for Plaintiffs in the most integrated setting appropriate to their needs. Defendants discriminate against the Disability Subclass by denying them the opportunity to receive necessary services in these settings. Plaintiffs and the Disability Sub-class do not oppose receiving services in such settings.

209.    Defendants fail to make reasonable modifications to their policies, practices, and procedures that are necessary to avoid discrimination against Plaintiffs and the Disability Subclass on the basis of their disability, such as by expanding the availability of the State's existing services and placements that are necessary to serve the Sub-Class in the most integrated setting appropriate to their needs. Such reasonable modifications would not fundamentally alter the nature of the Defendants' services, programs, or activities. 45 C.F.R. § 84.68(b)(7).

210. Plaintiffs and the Disability Subclass have suffered and will suffer irreparable injury because of Defendants' failure to administer services, programs, and activities for Plaintiffs and putative Disability Subclass members in the most integrated setting appropriate to their needs. Plaintiffs are without adequate remedy at law. Plaintiffs are entitled to declaratory and injunctive relief to avoid any further injury.

## PRAYER FOR RELIEF

211. WHEREFORE, Plaintiffs respectfully request that this Court:

A. Certify the proposed class and subclasses pursuant to Fed. R. Civ. P. §§ 23(a) and 23(b)(2).

B. Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure.

C. Declare under Fed. R. Civ. P. 57 that:

i. Defendants' continued incarceration of all Plaintiffs and the Releasable Youth class, whom a juvenile court has determined may be released from detention, violates Plaintiffs' substantive due process rights under the Fourteenth Amendment to the United States Constitution to be free from confinement when there is no legal basis for detention and to be free from punishment.

ii. Defendants' failure to maintain a sufficient number and array of appropriate foster care placements and services for Plaintiff Tony S. and all those in the proposed Foster System Subclass, and failure to administer processes to ensure the timely release of foster youth whom a juvenile court has determined may be released from detention, violates Plaintiffs' substantive due process rights under

the Fourteenth Amendment to the United States Constitution to ensure children in state custody are reasonably safe from a substantial risk of serious harm.

iii.     Defendants' failure to institute and maintain a process to ensure that youth whom a juvenile court has determined may be released from detention are assessed and timely released violates the procedural due process rights of all Plaintiffs and the Releasable Youth class under the Fourteenth Amendment of the United States Constitution to be free from secure confinement without due process of law.

iv.     Defendants' failure to administer services, programs, and activities for Plaintiffs Isaac N. and Tony S. and all those in the proposed Disability Subclass in the most integrated setting appropriate to meet their needs unlawfully discriminates against Plaintiffs and subclass on the basis of their disability and violates their rights under Title II of the ADA and under Section 504 of the Rehabilitation Act.

212.   Grant permanent injunctive relief, pursuant to Fed. R. Civ. P. 65.  Plaintiffs do not seek an order requiring their release from detention. Rather, Plaintiffs request permanent injunctive relief requiring Defendants to: (i) develop and implement clear and effective procedures state-wide, including assessments, review, and case planning, to ensure Plaintiffs and class members can be timely released from detention when a juvenile court has ordered that they may be released; (ii) ensure the state-wide availability of placement and/or services to meet the needs of Plaintiffs and class members in the community; (iii) ensure an adequate array of foster home placements to meet the needs of members of the Foster System subclass; (iv) develop and implement clear and effective state-wide policies regarding case management for Foster System subclass members who

are dually involved in the foster system and juvenile delinquency system; and (v) ensure the availability of sufficient placements, services and treatment opportunities in the most integrated setting appropriate to meet the needs of members of the Disability Subclass.

D.      Appoint a neutral expert(s) under Federal Rule of Evidence 706 to efficiently monitor performance under the provisions of the Court order;

E.      Retain the Court's jurisdiction to oversee compliance with its Order.

F.      Award Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to applicable law.

G.      Grant such other and further equitable relief as the Court deems just, necessary, and proper to protect Plaintiffs and the Plaintiff Class

DATED: March 18, 2026

Respectfully submitted,

/s/ Stephanie Persson
**Children's Rights**
Stephanie Persson, N.Y. 5469648*
Ira Lustbader, N.Y. 2516946*
Stephen Dixon, La. 18185*
Micaela Heery-Hyatt, N.Y. 5742218*
Eleanor Roberts, N.Y. 5994652*
88 Pine Street, Suite 800
New York, NY 10005
Tel: (212) 683-2210
spersson@childrensrights.org
ilustbader@childrensrights.org
sdixon@childrensrights.org
mheeryhyatt@childrensrights.org
eroberts@childrensrights.org

**American Civil Liberties Union of Colorado**
Timothy R. Macdonald, Colo. 29180
Emma Mclean-Riggs, Colo. 51370

54

Sara Neel, Colo. 36904
Scott Medlock, Colo. 57210
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Tel: (303) 777-5482
tmacdonald@aclu-co.org
emcleanriggs@aclu-co.org
sneel@aclu-co.org
smedlock@aclu-co.org

**Center for Legal Advocacy**
**D/B/A Disability Law Colorado**
Emily Harvey, Colo. 47188
1580 Logan Street, Suite 600
Denver, CO 80203
Tel: (303) 722-0300
eharvey@disabilitylawco.org

**ACLU National Prison Project**
Corene T. Kendrick, Cal. 226642*
Marisol J. Dominguez-Ruiz, Cal. 345416*
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org
mdominguez-ruiz@aclu.org

Nancy Rosenbloom, N.Y. 2168425*
125 Broad Street
New York, NY 10004
Tel: (202) 393-4930
nrosenbloom@aclu.org

David C. Fathi, Wash. 24893**
Elisa C. Epstein, IL 6349195**
Quinn Phillips, Mass. 717737**
915 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 393-4930
dfathi@aclu.org
eepstein@aclu.org
qphillips@aclu.org

**Ropes & Gray LLP**
Timothy R. Farrell, IL and N.Y. 6303276***
Nicholas Smith, IL 6327626***

55

191 North Wacker Drive, 32nd Floor
Tel: (312) 845-1209
Timothy.Farrell@ropesgray.com
Nicholas.Smith@ropesgray.com

*Admitted to D. Colo.
**Admitted to D. Colo. Not admitted in D.C.;
practice limited to federal courts.
***Application to bar for U.S. District Ct. for the
District of Colorado pending.

*Attorneys for Plaintiffs*