## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01123-GPG-CYC

ISAAC N. through his next friend Kerry Simpson,
TONY S. through his next friend Leigh Truhe, and
VEGETA K. through his next friend Quentin
Montemayor, for themselves and those similarly
situated,

      Plaintiffs,

v.

JARED POLIS, in his official capacity as the
Governor of Colorado, and MICHELLE
BARNES, in her official capacity as Executive
Director of the Colorado Department of Human
Services,

      Defendants.

---

## DEFENDANTS' JOINT MOTION TO DISMISS THE FIRST AMENDED COMPLAINT [DKT. 53] UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)

**INTRODUCTION**

Plaintiffs refer to themselves as "releasable youth," but they do not, in fact, have a right to immediate release from pre-trial detention.[1] Rather, a state judge has determined that Plaintiffs—despite posing a "substantial risk of flight" and/or a "substantial risk of serious harm to others"—may nonetheless be released to a legal guardian or other community placement to await trial, but only once certain mitigating conditions are satisfied. Satisfying those conditions can take time and often depends upon collaboration with third parties that are outside of Defendants' control. Requiring satisfaction of those conditions before Plaintiffs can be released to the community does not violate Plaintiffs' rights. And Plaintiffs' suggestion that Defendants must release them from detention immediately after they receive a *conditional* bond order, *see, e.g.*, Dkt. 53 ¶ 213, is unambiguously wrong.

Despite the tenuous legal foundation of their claims, Plaintiffs seek expansive and ill-defined relief. They demand (unidentified) systemic change to how the State implements juvenile court bond orders, the appointment of a federal monitor to oversee the State's administration of that new structure, and the continuing jurisdiction of this Court to enforce compliance with their new (judicially created) rules for the state juvenile

---

[1] The term "releasable youth" is outdated and no longer used in state reports precisely because it is easily misinterpreted to suggest there is an immediate right to release (as Plaintiffs have done here). FY 2025-26 Joint Budget Committee Hearing at 24-26, Dep't of Human Servs. (Dec. 12, 2024), https://content.leg.colorado.gov/sites/default/files/fy2025-26_humhrg.pdf. The term now used to refer to youth (like Plaintiffs) who may be conditionally released pending adjudication is "youth awaiting mitigating services" or "YAMS." *Id.*; *see* Dkt. 53 ¶ 103.

detention system. Such relief violates basic principles of federalism, interferes with the state juvenile court system, and fundamentally misunderstands the role that Defendants, as executive branch officers, have in this system. To the extent Plaintiffs seek broad public policy change in the state juvenile justice system, the appropriate venue is the General Assembly, not this Court. Plaintiffs' claims against Defendants should be dismissed for lack of subject matter jurisdiction or, alternatively, because the Amended Complaint fails to state a claim.

Plaintiffs lack Article III standing. They cannot articulate an injury to a legally protected interest based on the state juvenile court's conditional release orders, and they do not allege that those orders have been violated. Indeed, by the time the Amended Complaint was filed, one Plaintiff had already been adjudicated delinquent and committed to the custody of the Colorado Department of Human Services (CDHS), Division of Youth Services (DYS), while another had been released to out-of-home placement, subject to the terms of his conditional release order. Moreover, detention itself is not an injury, as all three Plaintiffs have been charged with felony offenses, the Amended Complaint does not contest the juvenile courts' probable cause findings, and Plaintiffs disclaim any request for their release. Dkt. 53 ¶ 12. Even assuming Plaintiffs could identify a legally protected interest that was injured here, their requested relief is untethered to any tangible injury that Plaintiffs themselves have suffered.

If Plaintiffs could establish standing, their claims still would face the insurmountable hurdles of Eleventh Amendment immunity and abstention. The Amended Complaint fundamentally asks this Court to invent new policies and

procedures and direct state executive officials on how to perform their duties. As such,

Plaintiffs cannot rely on the narrow *Ex parte Young* exception to sovereign immunity,

which allows federal courts to issue injunctions to prevent imminent violations of federal

law, but which does not permit federal courts to order state officials to develop and

implement "systemic" and "statewide" policy changes. *See* 209 U.S. 123 (1908). And to

the extent Plaintiffs' claims seek to enforce state law (whether directly or indirectly), they

are precluded by *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).

Plaintiffs' claims would also interfere with ongoing juvenile proceedings, meaning

dismissal is appropriate under the abstention doctrine of *Younger v. Harris,* 401 U.S. 37

(1971). Plaintiffs have (or had) active juvenile delinquency cases in Colorado state

court. Any order altering the conditions of their pre-trial release, either directly or

through judicially mandated systemic changes, would usurp the power of those state

juvenile judges in a matter of critical state importance.

Finally, to the extent this Court reaches the merits, the Amended Complaint fails

to plausibly allege facts to support Plaintiffs' claims. Plaintiffs' claims under 42 U.S.C.

§ 1983 (alleging substantive and procedural due process violations under the

Fourteenth Amendment) fail because Plaintiffs do not have a liberty interest in

immediate release, and Defendants' alleged actions do not come close to "shocking the

conscience." Plaintiffs' claims under Title II of the Americans with Disabilities Act (ADA)

and Section 504 of the Rehabilitation Act fail because the Amended Complaint does not

allege that Plaintiffs were treated differently *because of* their disabilities. In fact, the

Amended Complaint barely mentions the named Plaintiffs, relying instead on alleged

harm to unnamed non-parties. But while Plaintiffs' counsel seek to represent a class

(and two subclasses), there is presently no class action before this Court. The viability

of the Amended Complaint therefore must fall with the individual Plaintiffs' claims.

Defendants respectfully request dismissal of the Amended Complaint in full.

Pursuant to Civ. Practice Standard 43.1A(f), Defendants respectfully request oral

argument on this Motion.

## BACKGROUND

### I.   Overview of Colorado juvenile detention proceedings.

This case involves the conditions of pre-trial release (*i.e.*, bond) for juveniles who

have been detained and charged with serious delinquency offenses. The named

Plaintiffs in this case are juveniles who were charged with felony delinquency offenses.

Dkt. 53 ¶ 1. Although the Amended Complaint calls these juveniles "Releasable Youth,"

*id.* ¶ 2, a state juvenile court judge found (1) that there was probable cause to believe

Plaintiffs committed a delinquency offense, (2) that Plaintiffs posed a "substantial risk of

flight" or a "substantial risk of serious harm to others," and (3) that Plaintiffs could *not* be

immediately released pending adjudication without other mitigating services in place.

Dkt. 53 ¶¶ 81, 84, 103; *see* C.R.S. § 19-2.5-305(3)(a)(I), (IV)(C) (requiring that juveniles

be released *unless* a judicial officer finds that the juvenile "poses a substantial risk of

serious harm to others or a substantial risk of flight from prosecution and community-

based alternatives to detention are insufficient to reasonably mitigate that risk.").

After making those findings, the judges issued orders finding that the risks of

flight and harm to the community could be mitigated, meaning Plaintiffs could be placed

in "community placements" (instead of detention) pending adjudication, but only if certain mitigating conditions could be satisfied. *See* Dkt. 53 ¶¶ 84, 89. Satisfying those conditions can take time, however, and Plaintiffs allege that it takes an average of 19.9 days for the conditions to be satisfied. *Id.* ¶ 107.

What constitutes "appropriate" conditions of release varies significantly from case to case based on the nature of the alleged offense, the individual needs of each juvenile, and judicial discretion. *See, e.g.*, C.R.S. §§ 19-2.5-305(3)(a)(IV), 19-2.5-306(4)(a), 16-4-105(8). And often the order allowing release is expressly conditioned on external factors, such as consent from the guardian *ad litem*, social workers, and other professionals responsible for the juvenile's care, or a private treatment facility or group home admitting the youth. *See, e.g.*, FY 2025-26 Joint Budget Committee Hearing at 24-26, Dep't of Human Servs. (Dec. 12, 2024), *supra* at 1 n.1.[2] It is these individualized and conditional "release" orders that Plaintiffs appear to rely on for their putative class definition. *See* Dkt. 53 ¶ 79.[3]

The Colorado juvenile courts oversee the entirety of the juvenile case, from indictment and pre-trial release from detention, through adjudication and sentencing.

---

[2] "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). "This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record." *Id.* (quotations and citation omitted). Legislative hearings and reports are properly the subject of judicial notice as "public records." *See id.*

[3] Plaintiffs' bond orders are "central" to the Amended Complaint and appropriate for this Court's consideration on a motion to dismiss. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002). Plaintiffs have not provided their bond orders, however, and Defendants reserve the right to submit those documents if and when they are produced.

C.R.S. § 19-2.5-103(1)(a). If at any point in the process the juvenile believes their treatment fails to meet the requisite state or federal standards, that juvenile can seek relief from the state court. *See id.* And although Plaintiffs criticize the Colorado juvenile court system as an inadequate forum for their "systemic" and "classwide" demands, Dkt. 53 ¶¶ 13, 181, they do not allege that they have sought relief in their ongoing juvenile cases; nor do they allege that Colorado's juvenile courts are incapable of granting relief as to the named Plaintiffs if such relief were appropriate.

## II.  Defendants' ongoing efforts to reform the juvenile justice system.

The State, including the Defendants, has expended significant energy and resources studying and seeking to reform the juvenile justice system. *See* Dkt. 53 ¶¶ 93-103. For example, with the Governor's signature, the General Assembly has passed three laws over the past five years addressing issues related to juvenile detention. *Id.* ¶ 102. The Governor's office has also commissioned a task force to conduct a "data-driven assessment of the juvenile justice system." *Id.* ¶ 95. Meanwhile, CDHS has "administered two state-wide surveys to assess shortcomings in serving Colorado's youth," *id.* ¶ 99, and other state and private entities have issued reports and studies examining Colorado's juvenile detention process and looking for ways to improve it, *id.* ¶¶ 93-103. The abundance of studies and recommendations show there is no panacea for the juvenile detention system, and Defendants' work to improve the system is ongoing.

6

### III. The Amended Complaint's factual allegations regarding Plaintiffs.

The Amended Complaint is replete with generalized allegations about youth detention facilities, but it contains very few allegations about Plaintiffs.[4] It alleges that Plaintiff Vegeta K. is a juvenile who (1) has been charged with a delinquency offense but has not been adjudicated delinquent; (2) is being held in a detention facility pending adjudication; (3) has received a judicial order finding that his risk of flight or danger to the community can be mitigated if certain conditions are satisfied; (4) has received a recommendation from a "treatment professional" for the kind of community-based placement that would be appropriate; (5) has not been released from detention; and (6) wishes to be released. *See* Dkt. 53 ¶¶ 46-64. Plaintiffs Isaac N. and Tony S. were not in pre-trial detention at the time the Amended Complaint was filed. *See* Dkt. 49 at 11 & n.6. Isaac N. pleaded guilty to his charge the day after filing this lawsuit and is now serving a commitment sentence. *See id.* And Tony S. has been placed in an out-of-state facility pending adjudication. *See id.* The Amended Complaint elides those relevant facts by alleging, *inter alia*, that "CDHS is responsible for locating a placement for Tony S., but failed to do so *at all relevant times*." *Id.* ¶ 36 (emphasis added).

---

[4] The majority of the Amended Complaint is not focused on Plaintiffs at all, and its allegations run the gamut. For instance, Plaintiffs allege, *inter alia*: (1) excessive force in youth detention facilities, *id.* ¶ 158; (2) racial disparities in juvenile treatment, *id.* ¶ 161; (3) drug use and overdoses, *id.* ¶ 165; (4) unreasonable strip searches, *id.* ¶ 164; (5) delays in providing post-detention community services, *id.* ¶ 101; and (6) delays in finding foster families for children, *id.* ¶ 116. Plaintiffs' lawsuit does not seek to remedy any of those practices, however, and the relevance to their claims is entirely unclear.

7

Plaintiffs also allege that assessment professionals' recommendations for treatment—like "trauma-focused therapy"—can be provided in the community. *See, e.g.*, *id.* ¶¶ 22, 40. Notably, however, the Amended Complaint provides no details concerning the kind of placement Plaintiffs desire, the type of facility that could provide the services they desire, or even what *specific* services would be adequate to satisfy their concerns. Nor do Plaintiffs make any allegation regarding the *reason* for their continued detention, offering only contradictory allegations. For instance, Plaintiffs imply that their injury was caused "solely by reason of her or his disability." Dkt. 53 ¶ 231 (quoting 29 U.S.C. § 794(a)). At other times, they allege their delayed release from detention was the result of a "lack of alternative placements." *Id.* ¶ 139. And other allegations seem to fault a lack of "clear procedures or guidelines." *Id.* ¶ 131.

## IV. Plaintiffs' vague request for relief.

The Amended Complaint clearly states the remedies that Plaintiffs do *not* want. Namely, despite their criticisms about Colorado detention facilities, Plaintiffs expressly state that they do *not* want to be released from those facilities. Dkt. 53. ¶ 12. Similarly, Plaintiffs do not claim that their conditions of confinement are unconstitutional or seek relief from those conditions. *See generally id.* And while the Amended Complaint does not assert any claims under state law, it is replete with citations to specific Colorado statutes, often accompanied by the implied accusation that Defendants violated those statutes. *See, e.g.*, Dkt. 53 ¶¶ 8, 93, 81, 84, 121-22.

As to what Plaintiffs *do* want, Plaintiffs seek impossibly vague injunctive relief in the form of an order requiring Defendants to:

(i) develop and implement clear and effective procedures state-wide, including assessments, review, and case planning, to ensure Plaintiffs and class members can be timely released from detention when a juvenile court has ordered that they may be released; (ii) ensure the state-wide availability of placement and/or services to meet the needs of Plaintiffs and class members in the community; (iii) ensure an adequate array of foster home placements to meet the needs of members of the Foster System subclass; (iv) develop and implement clear and effective state-wide policies regarding case management for Foster System subclass members who are dually involved in the foster system and juvenile delinquency system; and (v) ensure the availability of sufficient placements, services and treatment opportunities in the most integrated setting appropriate to meet the needs of members of the Disability Subclass.

Dkt. 53 at 53-54. Plaintiffs do not request any concrete policy changes, and they fail to define any of the adjectives in their request for relief: The meaning of terms like "clear and effective," "timely," "adequate," "sufficient," and "appropriate" are all untethered to any established legal standard and entirely subjective.

The only concrete and comprehensible aspect of Plaintiffs' prayer for relief is their mechanism for enforcement. They ask this Court to (1) issue an order requiring Defendants to take some undefined affirmative steps to implement "systemic" change to the state juvenile justice system; (2) appoint an "expert" monitor to ensure compliance with that order; and (3) retain jurisdiction over the case for some indeterminate amount of time to monitor the State executive officials' compliance with the order. *Id.* at 64.

### LEGAL STANDARDS

Dismissal for lack of subject matter jurisdiction is appropriate under Rule 12(b)(1). *See Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) (standing); *Ruiz v. McDonnell*, 299 F.3d 1173, 1180-81 (10th Cir. 2002) (Eleventh Amendment); *D.L. v. Unified Sch. Dist. No. 497.*, 392 F.3d 1223, 1228 (10th Cir. 2004)

("*Younger* abstention is jurisdictional"); *see Peters v. United States*, No. 23-cv-03014-NYW-SKC, 2024 WL 83333, at *4 (D. Colo. Jan. 8, 2024) (noting that courts in this Circuit "treat *Younger* abstention as jurisdictional, or akin to jurisdictional"). When, as here, a Rule 12(b)(1) motion attacks the sufficiency of the complaint, it mounts a "facial attack" on subject matter jurisdiction and the court accepts the allegations as true. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

A complaint must be dismissed under Rule 12(b)(6) when the allegations do not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009). "While courts must accept well-plead allegations as true, purely conclusory statements are not entitled to this presumption." *WildEarth Guardians v. Extraction Oil & Gas, Inc.*, 457 F. Supp. 3d 936, 945 (D. Colo. 2020).

## ARGUMENT

## I. Dismissal is proper on threshold grounds under Rule 12(b)(1).

### A. Plaintiffs lack Article III standing.

Article III of the U.S. Constitution limits federal courts' jurisdiction to actual cases or controversies between real parties with concrete interests in the subject matter of the litigation. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). By design, "Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action," *id.*, meaning that some public issues of great importance must be left to "the political and democratic

processes[,]" not the courts. *Id.* at 396. To enforce those separation-of-powers limitations on federal courts, Article III requires Plaintiffs to establish (1) an injury in fact, (2) fairly traceable to the challenged actions, and (3) redressable by the relief sought. *See id.*; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149-50 (2010).

Critically, each individual Plaintiff bears the burden of establishing standing on his own behalf. *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 40 (1976). As the Supreme Court has explained, plaintiffs' characterization of their suit as a putative class action "adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *See id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). Thus, when a prisoner raises claims that rely on general prison conditions or other prisoner's injuries, courts routinely dismiss those claims for lack of standing, holding that "[s]uch general grievances are best addressed to the legislative, not the judicial, branch." *Walburn v. Brandt*, No. 23-3171-JWL, 2023 WL 4547999, at *2 (D. Kan. July 14, 2023); *see Martinez v. Mesa Cty. Sheriff's Dep't*, 69 F.3d 548 (Table), 1995 WL 640293 at *1 (10th Cir. 1995) (unpub.). On an individual basis, Plaintiffs have not plausibly alleged facts to satisfy any element of standing.

*First*, Plaintiffs cannot articulate a concrete and particularized injury-in-fact. Two of the Plaintiffs, Isaac N. and Tony S., have no injury at all because they are no longer in pre-trial detention. Dkt. 49 at 11 & n.6 (acknowledging Isaac N. and Tony S. are not in pre-trial detention). The allegations in the Amended Complaint do not support any basis

11

to claim a continuing injury. *Mink v. Suthers*, 482 F.3d 1244, 1255 (10th Cir. 2007) ("[I]t is significant Mink filed an amended complaint after the district attorney disclosed his intent not to prosecute. The sequence of events confirms Mink had no 'injury in fact' for prospective relief when he filed his amended complaint.").[5] As to the remaining Plaintiff, Vegeta K., the allegations in the Amended Complaint demonstrate that this lawsuit does not seek to redress the kind of *particularized* and imminent injury that is required to establish an Article III injury. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

In fact, Plaintiffs do not even identify a "legally protected interest" that they allege as the subject of their injury. *See id.* For instance, Plaintiffs claim that their injuries derive from state-court judicial orders declaring them "releasable" (subject to the satisfaction of mitigating conditions), *id.* ¶ 79, but they do *not* allege that Defendants violated those judicial orders. Elsewhere, Plaintiffs assert a "due process right to be free from incarceration in DYS detention facilities." *Id.* ¶ 213. But although it is well-established that plaintiffs who are being unlawfully detained can challenge their detention, *see, e.g.*, *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996), it is undisputed that Plaintiffs here were *lawfully* detained: they have been charged with a delinquency offense, have appeared before a neutral magistrate, and expressly do not seek an order requiring their release from detention. *See, e.g.*, Dkt. 53 ¶ 12. They therefore cannot rely on their detention for their purported injury. *See id.*

---

[5] Alternatively, these claims are moot, and to the extent Vegeta K. is removed from pre-trial detention, his claims will be moot as well. To conserve judicial and party resources, Defendants do not assert mootness as a basis for dismissal at this stage, but they expressly reserve the right to do so in the future as these facts develop.

Similarly, plaintiffs in jails and prisons can sometimes be injured through unconstitutional prison conditions or unlawful treatment in custody. *See, e.g., Swoboda v. Dubach*, 992 F.2d 286, 289 (10th Cir. 1993). But Plaintiffs do not claim that they have been subjected to any such unconstitutional conditions, and they do not seek to ameliorate any of the conditions that they detail in the Amended Complaint. *See* Dkt. 49 at 3 n.3. They therefore cannot rely on those conditions as the basis for their injury.[6] Insofar as Plaintiffs rely on so-called "systemic" failures, those allegations amount to policy disputes; they do not constitute the kind of *particularized* and imminent injury required to establish an Article III injury. *See Lujan*, 504 U.S. at 560; Dkt. 53 ¶¶ 13, 179.

*Second*, to the extent Plaintiffs rely on alleged delays in their release from detention (despite the fact that they are not entitled to immediate release as a matter of fact or law), they face insurmountable traceability problems. *See Simon*, 426 U.S. at 43 (holding plaintiffs lacked standing where it was "speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents" of certain hospital services). Because Plaintiffs do not identify any unlawful actions by Defendants, they argue that Defendants' (unidentified) omissions or failures to implement policies caused their delayed release. *See, e.g.*, Dkt. 53 ¶ 122. But because Plaintiffs have not identified any tangible policies for Defendants to implement, *see, e.g.*, Dkt. 53 ¶ 239, their vague request for Defendants to implement

---

[6] While Plaintiffs appear to also claim they have been injured by Defendants' alleged failure to follow state law, Dkt. 53 ¶¶ 81, 84, 122, they insist that their case does not "depend[] on state law claims," Dkt. 49 at 1 n.1.

"effective procedures statewide" cannot establish a causal connection to any alleged delay in their pre-trial placement.[7]

*Finally*, whatever Plaintiffs articulate as their injuries, those injuries are not redressable by this Court. Plaintiffs disavow any request for concrete relief, and they may not skirt their Article III standing burden by asserting putative class allegations. *See Simon*, 426 U.S. at 40. The reality is that Defendants cannot grant *these* individual Plaintiffs any of their requested relief. That fact alone illustrates why the Amended Complaint asserts generalized policy grievances that are not cognizable under Article III. *See All. for Hippocratic Med.*, 602 U.S. at 381; *Walburn*, 2023 WL 4547999, at *2.

### B. Sovereign immunity bars Plaintiffs' claims.

The Eleventh Amendment doctrine of sovereign immunity derives from federalism principles, and it is at its pinnacle in cases asking a federal court to assert jurisdiction over high-level state executive officials, to invent vague and amorphous standards for their conduct, and to appoint a monitor to oversee their operations for an indeterminate amount of time. Here, sovereign immunity squarely bars Plaintiffs' suit, and no exception to that immunity applies.

---

[7] As explained above, Plaintiffs' conditions of release are fact-specific and depend on actions by individuals who are not within Defendants' control, including probation officers, County DHS officials, guardians *ad litem*, mental health professionals, juvenile court judges, and administrators of the community facilities. Approval by any number of those individuals may be required before the juvenile can be released for placement. *Supra* at 5. Moreover, the fact-specific circumstances of each juvenile (*i.e.*, the severity of their offense or their individual treatment needs) may cause separate hurdles to their placement. Plaintiffs offer no allegations to suggest that Defendants' alleged "failure" to adopt (unidentified) policies is the cause of Plaintiffs' delayed placement, as opposed to those individualized circumstances.

The Eleventh Amendment broadly precludes "unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner Cnty. Rural Water Dist. No. 2. v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009)). State officials sued in their official capacities are therefore immune from suit because they are "an arm of the State," *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977), and "such suits are no different from a suit against the State itself." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (quotation marks omitted). On the face of the Amended Complaint, therefore, Defendants are presumptively entitled to sovereign immunity. *See, e.g., Ruiz*, 299 F.3d at 1180 (CDHS and its director are arms of the state); *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The only question is whether the Amended Complaint alleges an *exception* to the doctrine of sovereign immunity. It does not.

### 1. The *Ex parte Young* exception does not apply to Plaintiffs' Section 1983 Claims.

*Ex parte Young* represents a "narrow exception" to sovereign immunity that exists so that federal courts are empowered to enjoin state officials from enforcing a specific state law when the enforcement of that law would otherwise violate the federal constitution. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 47 (2021) (applying *Ex parte Young*, 209 U.S. 123 (1908)). Thus, to properly invoke *Ex parte Young*, Plaintiffs must plausibly allege*, inter alia*, that the named government official has (1) a particular duty to enforce the challenged state law; and (2) a demonstrated willingness to do so. *See Free Speech Coal., Inc. v. Anderson*, 119 F.4th 732, 736 (10th Cir. 2024).

15

Here, Plaintiffs have not identified *any* state law that they are challenging. Thus, they necessarily cannot show that Defendants have a particular "duty" to "enforce" that unidentified law, much less a "demonstrated willingness" to do so. *See id.*; *see also Hendrickson*, 992 F.3d at 966. To the contrary, the Amended Complaint repeatedly alleges that Defendants have *not* implemented the unidentified policies and procedures that Plaintiffs ask this Court to invent and then impose. *See, e.g.*, Dkt. 53 ¶ 122. And unlike in *Ex parte Young*, *Whole Women's Health*, *Free Speech Coalition*, and *Hendrickson* (among a litany of similar cases), the Amended Complaint fails to identify any future act that Plaintiffs wish to enjoin Defendants from taking.

Instead, Plaintiffs seek a sweeping mandatory injunction that would require Defendants to develop new policies, implement new procedures, and create an entirely new pre-trial detention system for juveniles. Dkt. 53 ¶¶ 81, 84, 239, 262. Such a sweeping federal intrusion into state affairs falls well outside the "narrow" scope of *Ex parte Young*. *See Whole Woman's Health*, 595 U.S. at 47; *see also Signature Props. Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1269 (10th Cir. 2002) (noting that caution is especially appropriate where the type of injunction sought is "mandatory rather than prohibitory"); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 277-78 (1997) (explaining "wisdom and necessity of considering, when determining the applicability of the Eleventh Amendment, the real affront to a State of allowing a suit to proceed"). There is no reason for this Court to widen the *Ex parte Young* exception to vindicate any federal rights here.

*Second*, Plaintiffs' constitutional claims fail because neither *Ex parte Young* nor

42 U.S.C. § 1983 permits plaintiffs to sue state officials to enforce *state* law. *See*

*Pennhurst*, 465 U.S. at 106. In *Pennhurst*, the U.S. Supreme Court reversed the district

court's judgment against a state institution for the mentally disabled, holding that a

federal court cannot order state officials to conform their conduct to state law. *Id.* at 97.

*Pennhurst* is a useful comparator because it involved disabled individuals and findings

of neglect, abuse, and mistreatment, yet the Supreme Court still held that sovereign

immunity applied, noting it was "difficult to think of a greater intrusion on state

sovereignty than when a federal court instructs state officials on how to conform their

conduct to state law[,]" and holding that "[s]uch a result conflicts directly with the

principles of federalism that underlie the Eleventh Amendment." *See id.* at 106.

Although Plaintiffs purport to disavow any reliance on state law, their claims

necessarily depend on it and are therefore precluded by *Pennhurst*. *See id.* Indeed,

Plaintiffs expressly allege that "[s]tatewide rules and procedures for DHS-involved youth

are set by CDHS and executed by local DHS offices that operate as agents of CDHS,"

Dkt. 53 ¶ 122, yet they fault CDHS for allegedly "fail[ing] to create any meaningful

statewide procedures or guidelines as to how detained youth should receive case

management, assessments, and planning services," *id.* ¶ 123. Indeed, the entire basis

for Plaintiffs' class definition depends on state juvenile court judges issuing orders that

Plaintiffs claim are not being dutifully enforced. *See id.* ¶¶ 79, 81, 84, 122. If Plaintiffs'

references to state law were excised from the Amended Complaint, their claims would

be devoid of any guiding principles and would amount to a bare invitation for this Court

17

to invent "statewide procedures or guidelines" out of thin air. Wherever the outer limit of *Ex parte Young* lies, the Amended Complaint far exceeds it.

### 2. Eleventh Amendment immunity applies to the ADA claim.

Congress's intent to abrogate Eleventh Amendment immunity must be made "unmistakably clear in the language of the statute" and it must "act[] pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003). In *United States v. Georgia*, 546 U.S. 151, 159 (2006), the Supreme Court established a three-part test to determine if Congress validly abrogated a state's sovereign immunity for a particular Title II claim. *Id*. At the pleading stage, a court must determine: "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id*.; *see Havens v. Colorado Dep't of Corr.*, 897 F.3d 1250, 1256 n.5 (10th Cir. 2018) (discussing three-part test). If the challenged conduct does not violate Title II, the inquiry ends after step one. *See, e.g., Havens*, 897 F.3d at 1256 n.5; *Block v. Tex. Bd. of L. Exam'rs*, 952 F.3d 613, 617 n.11 (5th Cir. 2020); *Babcock v. Michigan*, 812 F.3d 531, 539 (6th Cir. 2016). As explained in section II.C., Plaintiffs do not allege any conduct by the Governor or the Director that plausibly violates Title II, and that conclusion should end the sovereign immunity inquiry for the ADA claim.

In addition, because the Amended Complaint does not seek damages, the rule from *Georgia* does not even apply. *See, e.g., Brooks v. Colo. Dep't of Corr*., 12 F.4th 1160, 1168 (10th Cir. 2021). Instead, Plaintiffs must demonstrate that *Ex parte Young* applies, which, as established in section I.B.1. above, they cannot do. *See Guttman v. Khalsa*, 669 F.3d 1101, 1127 (10th Cir. 2012) ("An individual can bring an *Ex parte Young* claim against a state official in federal court for an ADA or § 1983 violation.") (citation omitted); *see also Bd. of Tr. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 371 n.9 (2001) (stating that suits for prospective injunctive relief under Title I of the ADA are actionable against a state under *Ex Parte Young*); *Miller v. King*, 384 F.3d 1248, 1264 (11th Cir. 2004) (applying the holding in *Garrett* to Title II ADA claims and collecting cases) (*overruled* on other grounds); *Georgia*, 546 U.S. at 160 (Stevens, J., concurring) (endorsing the Eleventh Circuit's holding in *Miller*).

Even if the *Georgia* analysis applied and Plaintiffs had sufficiently alleged a Title II violation, "[t]he Supreme Court closely scrutinizes prophylactic legislation under § 5 to ensure Congress does not overreach into core state governmental functions." *Guttman*, 669 F.3d at 1112. "Congress enjoys greater power under § 5 when it responds to a clearly discernible pattern of state encroachment on fundamental or other important constitutional rights." *Id.* (citation omitted). Plaintiffs cannot demonstrate that Congress identified a history of disability discrimination in states' pre-trial placement of juvenile defendants when it enacted Title II. *Cf. id.* at 1119; *Garrett*, 531 U.S. at 370 (with respect to Title I of the ADA, finding there were insufficient congressional findings to

19

demonstrate a pattern of state discrimination in the employment of persons with

disabilities). The Eleventh Amendment therefore bars Plaintiffs' ADA claim.[8]

### C. This Court should abstain from interfering with ongoing state court juvenile proceedings under *Younger*.

Plaintiffs' claims should be dismissed under *Younger* because their requested

injunction would require this Court to supervise release, placement, services, and

review issues that Colorado juvenile courts are already administering in ongoing

delinquency proceedings. *Younger* requires federal courts to abstain where federal

relief would unduly interfere with ongoing state proceedings. *Sprint Commc'ns, Inc. v.

Jacobs*, 571 U.S. 69, 72, 77-78 (2013).

"Under the *Younger* abstention doctrine, federal courts should not 'interfere with

state court proceedings by granting equitable relief—such as injunctions of important

state proceedings or declaratory judgments regarding constitutional issues in those

proceedings—' when a state forum provides an adequate avenue for relief." *Weitzel v.

Div. of Occupational & Pro. Licensing of Dep't of Com. of State of Utah*, 240 F.3d 871,

875 (10th Cir. 2001) (citation omitted). Specifically:

---

[8] Plaintiffs' claim under the Rehabilitation Act is facially meritless, as explained *infra* at II.C. Thus, Defendants do not explicitly assert, nor do they waive, any Eleventh Amendment defense to Plaintiffs' Rehabilitation Act claim. "'[T]he scope of the Eleventh Amendment immunity waiver directly correlates to the state department or agency receiving federal financial assistance.'" *Arbogast v. Kan. Dep't of Labor*, 789 F.3d 1174, 1183 (10th Cir. 2015) (quoting *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 171 (3d Cir. 2002)). Under the statutory definitions in the Rehabilitation Act, the state, as a whole, cannot be a "program or activity" subject to any waiver. *Koslow*, 302 F.3d at 171; *Jim C. v. United States*, 235 F.3d 1079, 1081 (8th Cir. 2000).

> A federal court must abstain from exercising jurisdiction when: (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Id.* (citation and internal quotation marks omitted). When those elements are met, abstention is mandatory unless there is bad faith, harassment, or extraordinary circumstances. *Weitzel*, 240 F.3d at 875. Each element of the *Younger* test is satisfied here and Plaintiffs have not alleged any exception to abstention.

*First*, the Amended Complaint itself defines the putative class by reference to ongoing juvenile delinquency proceedings. Dkt. 53 ¶ 79. Plaintiffs are youth charged with delinquency offenses and detained, pending satisfaction of pre-release conditions required by a juvenile court order. Dkt. 53 ¶¶ 1-2, 17-19, 32-34, 46-48. Those release conditions, including appropriate out-of-home placement, are not collateral to the state cases; they are part of the state cases. Colorado juvenile courts determine whether a juvenile may be released, under what conditions, and whether those conditions have been satisfied. State juvenile courts receive regular updates on the juveniles' progress for assessments, services, and placements, and issue orders and bond conditions based on those individual circumstances. Plaintiffs' requested injunction would therefore interfere directly with ongoing juvenile-court supervision. Indeed, the implementation of policies and procedures governing juvenile detention and release created by the federal judiciary, as Plaintiffs request this Court to order, Dkt. 53 ¶ 239, would effectively usurp, or at minimum limit, the exercise of state judicial discretion in ongoing proceedings.

21

*Second*, Colorado juvenile courts provide an adequate forum for Plaintiffs' federal claims. Plaintiffs bear the burden to show that state law bars presentation of their federal issues. *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 14-15 (1987); *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999). If Plaintiffs believe their continued detention, release conditions, placement delays, case planning, services, or CDHS' alleged failure to accommodate their disability-related needs violate federal law, they may raise those objections in the juvenile proceedings that control their custody and release conditions. *Younger* requires an adequate opportunity to raise federal issues; but it does not require that the state forum provide Plaintiffs' preferred classwide remedy or a federal monitor. *Moore v. Sims*, 442 U.S. 415, 430 (1979); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1292 (10th Cir. 1999).

Plaintiffs try to avoid *Younger* by characterizing their case as alleging "systemic violations of Plaintiffs' federal constitutional and statutory rights." Dkt. 53 ¶ 152; *see id.* ¶¶ 13, 153-59. But that argument proves the *Younger* problem rather than avoiding it. Plaintiffs ask this Court to impose statewide procedures governing release planning, foster-care placement capacity, disability-related services, case management, monitoring, and ongoing compliance. That relief would require continuous federal oversight of issues committed to state juvenile courts in individual delinquency proceedings. The Supreme Court has rejected injunctions that would require such an "ongoing federal audit" of state criminal proceedings. *O'Shea v. Littleton*, 414 U.S. 488, 500-02 (1974); *see also Rizzo v. Goode*, 423 U.S. 362, 379-80 (1976).

*Joseph A. ex. rel. Wolfe v. Ingram*, 275 F.3d 1253 (10th Cir. 2002), directly supports abstention. There, a class of children in state custody sought federal enforcement of systemic child-welfare reforms. The Tenth Circuit held that *Younger* barred federal relief to the extent it would interfere with ongoing children's-court proceedings, including relief affecting case planning, permanency planning, and court filings. *Id.* at 1272-75; *see also Ashley W. v. Holcomb*, 34 F.4th at 588, 593-94 (7th Cir. 2022). Plaintiffs seek the same kind of relief here: statewide case-planning procedures, placements and services, foster-care capacity, disability-related placements, a monitor, and continuing federal jurisdiction. As in *Joseph A.*, those orders would not regulate executive officials in the abstract; they would dictate how state officials satisfy conditions in pending juvenile cases and would inevitably affect the juvenile courts' management of those cases.

*Third*, Colorado's administration of its juvenile justice system implicates core state interests. The Tenth Circuit has recognized that the state has an "important interest in the care, disposition, and welfare" of children in its custody. *J.B. ex rel. Hart*, 186 F.3d at 1291-92 (affirming *Younger* abstention in a systemic child-custody reform case). And the Supreme Court has recognized that juvenile proceedings rest on the State's *parens patriae* interest in preserving and promoting child welfare, as well as its interest in protecting the community from juvenile crime. *Schall v. Martin*, 467 U.S. 253, 263-65 (1984). Juvenile delinquency proceedings involve Colorado's administration of its juvenile justice system, public safety determinations, child welfare, family integrity, rehabilitation, placement, services, and court supervision of youth charged with

delinquency offenses. These interests fall squarely within the state's police powers

guaranteed by the Tenth Amendment. *See Morrow v. Winslow*, 94 F.3d 1386, 1393-97

(10th Cir. 1996). Federal supervision of juvenile-justice reform would intrude on a

quintessential state function: the State's ongoing judicial and administrative

responsibility to determine the care, custody, treatment, and rehabilitation of juveniles.

## II. Plaintiffs fail to plausibly allege any claim under Rule 12(b)(6).

### A. Plaintiffs fail to plausibly allege substantive due process claims (Counts I & II).

There are "two types of substantive due process claims: (1) claims that the

government has infringed a 'fundamental' right;… and (2) claims that government action

deprived a person of life, liberty, or property in a manner so arbitrary it shocks the

judicial conscience." *Stepp v. Lockhart*, 168 F.4th 1286, 1313 (10th Cir. 2026) (citations

omitted). The Tenth Circuit applies "the fundamental-rights approach when the plaintiff

challenges *legislative action*, and the shocks-the-conscience approach when the plaintiff

seeks relief for tortious *executive action*." *Id.* (quotation marks omitted). Plaintiffs'

allegations are unclear, but their substantive due process claim fails under either test.

Ultimately, Plaintiffs' lawsuit seeks to address a policy concern related to the

resources devoted to the speed of juvenile community placements. Plaintiffs' theory is

fundamentally flawed, however, to the extent that it depends on a fundamental right to

*immediate* release. "[A] detainee may have a constitutional interest in freedom from

detention intended as punishment, but that right is not fundamental." *Glendening as*

*Next Friend of G.W. v. Howard*, 707 F. Supp. 3d 1089, 1104 (D. Kan. 2023) (citing

*United States v. Deters*, 143 F.3d 577, 583 (10th Cir. 1998); *Dawson v. Bd. of Cnty.*

*Comm'rs of Jefferson Cnty., Colorado*, 732 F. App'x 624, 631 (10th Cir. 2018)). Indeed, the Amended Complaint declares that Plaintiffs "do not seek an order requiring their release from detention." Dkt. ¶¶ 12, 239. Plaintiffs' disavowal of any request for release demonstrates their understanding that they have no absolute right—whether statutory, constitutional, or otherwise—to be released from detention after a judge has found (1) there is probable cause that they committed a crime, and (2) that they pose a threat of serious harm to the community or a flight risk (or both).

Alternatively, to the extent that Plaintiffs' claims can be construed as alleging "tortious executive action," they do not meet the exceedingly high standard to "shock the conscience." "Conduct that shocks the judicial conscience" is "deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice." *Id.* at 1313-14 (quoting *Hernandez v. Ridley*, 734 F.3d 1254, 1261 (10th Cir. 2013)). "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or employed it as an instrument of oppression." *Stepp,* 168 F.4th at 1314-14 (citation omitted). When considering shocks-the-conscience due process claims, courts must consider: "(1) the need for restraint in defining their scope, (2) the concern that § 1983 not replace state tort law, and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety." *Id.* (quoting *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995)).

Here, Plaintiffs do not allege that Defendants took *any* affirmative acts to harm them. In fact, given the actions that Plaintiffs acknowledge Defendants have taken to

25

improve the juvenile justice system, *see, e.g.*, Dkt. 53 ¶¶ 93-103, it is hard to imagine what they could possibly point to as egregious misconduct that satisfies the shocks-the-conscience standard. At most, Plaintiffs have alleged some form of negligence, not the kind of willful acts required to shock the conscience in the context of claims involving juveniles. *See Stepp*, 168 F.4th at 1313; *compare T.D. v. Patton*, 868 F.3d 1209, 1213 (10th Cir. 2017) (social worker's actions that led to physical and sexual abuse of a minor shocked the conscience), *with Abeyta v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253 (10th Cir. 1996) (defendant teacher calling 12 year-old female student a "prostitute" in class did not shock the conscience), *and Doe v. Woodard*, 912 F.3d 1278, 1286 (10th Cir. 2019) (defendant DHS caseworker did not shock the conscience when she performed visual inspection of minor for signs of abuse and photographed the minor's private areas and partially unclothed body).

### B.  Plaintiffs fail to allege a procedural due process claim (Count III).

"A procedural due process claim consists of two elements: (i) deprivation by state action of a protected interest in life, liberty, or property, and (ii) inadequate state process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). Plaintiffs allege neither.

Plaintiffs have not articulated any protected property or liberty interest sufficient to trigger due process protections. For instance, while they claim a "liberty" interest to be "free from incarceration," Dkt. 53 ¶ 186, they affirmatively disavow any claim for release from incarceration, *id.* ¶ 12. Similarly, while they claim a liberty interest in "not being detained solely due to a lack of community-based alternatives to incarceration," they can point only to state law as a basis for that alleged right. *See id.* ¶¶ 182-89.  And

26

as discussed above, sovereign immunity protects any claim for prospective relief to

enforce compliance with state law.

In addition, the juvenile state court system provides adequate "process" for any

alleged deprivation. Allowing access to a state or federal court is usually sufficient to

provide adequate *process* to individuals (*i.e.*, notice and an opportunity to be heard).

Cases finding procedural due process violations occur much more frequently in the

context of administrative adjudications. *See generally Cleveland Bd. of Educ. v.

Loudermill*, 470 U.S. 532, 542-46 (1985) (surveying procedural due process caselaw).

### C. Plaintiffs fail to state a plausible claim under the ADA or the Rehabilitation Act (Counts IV-V).

"The requirements for stating a claim under [Title II of the ADA and the

Rehabilitation Act] are substantially the same." *Sullivan v. Univ. of Kan. Hosp. Auth.*,

844 F. App'x 43, 48 (10th Cir. 2021). To state a claim under Title II, "a plaintiff must

allege . . . he 'was either excluded from participation in or denied the benefits of some

public entity's services, programs, or activities, or was otherwise discriminated against

by the public entity'; and . . . 'such exclusion, denial of benefits, or discrimination was by

reason of the plaintiff's disability.'" *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1312

(10th Cir. 2021) (quoting *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d. 1289, 1295 (10th Cir.

2016)). Similarly, the Rehabilitation Act requires a plaintiff to allege that they were

excluded from or denied the benefits of a public program "solely by reason of her or his

disability." 29 U.S.C. § 794(a). The principal distinction between an ADA and

Rehabilitation Act claim is that the Rehabilitation Act imposes a more stringent standard

of causation, requiring a plaintiff to show their disability was the *sole* cause of the

27

alleged discrimination. *Crane*, 15 F.4th at 1312-13. Failure to plead any one of the required elements necessarily defeats the claim under either act. *Id.* Applying those elements, Plaintiffs have failed to state a claim under the ADA or Rehabilitation Act.

Plaintiffs' theory of discrimination is that "Defendants fail to make reasonable modifications to their policies, practices, and procedures" necessary to ensure that the putative disability subclass members are placed "in the most integrated setting appropriate to their needs."[9] Dkt. 53 ¶¶ 227, 236. But as an initial matter, the Amended Complaint is devoid of any allegation that any named Plaintiff requested modifications from Defendants or the Division of Youth Services. While the failure to affirmatively request a modification is not necessarily fatal to an ADA or Rehabilitation Act claim, the need for a modification must at least be "obvious" where no such accommodation was requested. *E.g.*, *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1197-98 (10th Cir. 2007); *see also West-Helmle v. Denver Dist. Attys. Office*, No. 19-cv-02304-RM-STV, 2020 WL 6119524, at *10-11 (D. Colo. May 29, 2020) (applying the "obvious need" standard in the context of a motion to dismiss).

Obviousness requires more than mere awareness of a disability; it rests upon a subjective understanding of the limitations imposed by a plaintiff's disability. *See*

---

[9] Plaintiff's Amended Complaint also asserts that Defendants "unnecessarily segregated and discriminated against" them in violation of the ADA and Rehabilitation Act by failing to administer their programs in "the most integrated setting appropriate to [Plaintiffs'] needs." Dkt. 53 ¶¶ 226, 235. This allegation is, in substance, a lack of reasonable modifications claim, as it asserts Defendants failed to tailor their programming according to Plaintiffs' disabilities. The claim of "segregation" is further unsupported by the Amended Complaint, as Plaintiffs do not allege they were separated from the general population in detention in any way, let alone on the basis of disability.

28

*Robertson*, 500 F.3d at 1197, n.10; *Trujillo v. Rio Arriba Cnty.*, 319 F.R.D. 571, 633-34 (D.N.M. 2016). Here, Plaintiffs do not offer even a conclusory assertion that it was obvious that they required any modifications to existing practices to be placed outside of detention. To the contrary, Plaintiffs assert strictly non-visible mental health and neurological disabilities. Dkt. 53 ¶¶ 20, 37, 51. Moreover, the Amended Complaint fails to demonstrate any nexus between the disabilities and a need for modifications to facilitate placement. Rather, each Plaintiff alleges their disabilities impose limitations in educational settings, with no apparent connection to their needs in an out-of-home placement living environment. *Id.* ¶¶ 20, 38, 52. And Plaintiffs completely fail to allege or even articulate the existence of a modification that would ease the purported burdens on their access to out-of-home placement caused by their disabilities. *See id*. ¶ 239.

Tenth Circuit precedent is clear: Plaintiffs bear the initial burden of establishing that a modification exists. *Beebe v. Colorado*, No. 18-cv-01357-CMA-KMT, 2019 WL 6255763, at *4-5 (D. Colo. Nov. 22, 2019) (citing *McCulley v. Univ. of Kan. Sch. Of Med.*, 591 F. App'x 648, 650-51 (10th Cir. 2014)). Although Plaintiffs need not fully discharge that burden in their Amended Complaint, their inability to articulate a particular modification that was requested, obviously needed, or which this Court should order as relief demonstrates that they have not stated a plausible claim for relief.

The more serious deficiency, however, is Plaintiffs' failure to allege any facts demonstrating causation, independently requiring dismissal. *Crane*, 15 F.4th at 1312-13; *see Dorsey v. Pueblo Sch. Dist. 60*, 140 F. Supp. 3d 1102, 1117 (D. Colo. 2015) (dismissing plaintiff's ADA and Rehabilitation Act claims under Rule 12(b)(6) for failure

to plead facts supporting causation); *Kassal v. Colorado Dep't of Corr.*, No. 24-cv-00369-SBP, 2025 WL 2799839, at *18 (D. Colo. Sept. 30, 2025) ("On a Rule 12(b)(6) motion, the question is whether the [complaint] plausibly alleges the disability-based causal link" under the ADA and Rehabilitation Act).

In fact, Plaintiffs' own allegations necessarily defeat the notion that any purportedly discriminatory practices are by reason of disability. The injury that each Plaintiff alleges is that they remained in detention for some period after the juvenile court conditionally authorized their release. Dkt. 53 ¶¶ 19, 25, 34, 42, 48, 59. However, Plaintiffs do not assert that their injury is unique to them or even unique to disabled youth. To the contrary, Plaintiffs allege system-wide operational deficiencies that affect all youth who received conditional release orders, regardless of disability status. *E.g.*, Dkt. 53 ¶¶ 1-4, 105-08. Without any factual allegations whatsoever about their specific circumstances, Plaintiffs fail to plausibly connect the length of their respective detentions to their disability status, let alone plausibly allege that their disability status *caused* their ongoing detention. At most, the Amended Complaint describes widespread placement delays experienced by the general population in detention. Without well-pled facts demonstrating that disability is the reason Plaintiffs have experienced delays in being placed, their ADA and Rehabilitation Act claims fail as a matter of law.

## CONCLUSION

WHEREFORE, Defendants respectfully request that the Court dismiss all of Plaintiffs' claims against them under Rule 12(b)(1) or, alternatively, 12(b)(6).

Respectfully submitted this 29th day of June 2026.

PHILIP J. WEISER Attorney General

s/ Kolya D. Glick
Kolya D. Glick*
Lily E. Nierenberg
Senior Assistant Attorneys General
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor Denver, CO 80203
Telephone: 720.508.6000
Lily.Nierenberg@coag.gov
Kolya.Glick@coag.gov

*Attorneys for Defendant Governor Jared Polis*

PHILIP J. WEISER
Attorney General

s/ Kevin G. Webster
Jennifer H. Hunt
Michele Mulhausen
Senior Assistant Attorneys General
Kevin G. Webster
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor Denver, CO 80203
Telephone: (720) 508-6000
Michele.Mulhausen@coag.gov
Kevin.Webster@coag.gov
Jennifer.hunt@coag.gov

*Attorneys for Defendant Michelle Barnes*

*Practice in Colorado temporarily authorized
 pending admission under C.R.C.P. 205.6.

31