**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-1123-GPG-CYC

ISAAC N., through his next friend Kerry Simpson,
TONY S., through his next friend Leigh Truhe, and
VEGETA K., through his next friend Quentin
Montemayor, for themselves and those similarly
situated,

**Plaintiffs,**

v.

JARED POLIS, in his official capacity as the
Governor of Colorado; and
MICHELLE BARNES, in her official capacity as
Executive Director of the Colorado Department of
Human Services,

**Defendants.**

---

# PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

---

**FULLY IN-PERSON ARGUMENT REQUESTED**

# TABLE OF CONTENTS


TABLE OF CONTENTS ....................................................................................ii

INTRODUCTION ........................................................................................ 1

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................................ 2

I. Procedural History ................................................................................ 2

II. Statement of Facts ................................................................................ 3

A. Defendants Imprison Releasable Youth in DYS Secure Facilities. ............ 3

B. Defendants' Policies and Practices Drive Plaintiffs' Detention. .................. 4

1) Defendants Fail to Provide Sufficient Services and Placements. ........................................................... 6

2) Defendants Fail to Ensure Coordination Across Agencies, Preventing Timely Assessments, Case Management, or Release Planning. ..................................... 7

3) Defendants Do Not Have Adequate Information Management Systems. ........................................................ 9

C. Defendants' Common Systemic Failures Harm Releasable Youth with Disabilities and Releasable Youth in the Foster System. ................. 10

1) Releasable Youth with Disabilities. ................................... 10

2) Releasable Youth in the Foster System. ............................ 12

D. Common, Statewide Remedies Address Each Systemic Failure. ............ 13

E. Defendants Harm Releasable Youth by Detaining Them. ...................... 144

F. Plaintiffs: Isaac N., Tony S., Vegeta K., Otto O., and Tyrone P. .............. 15

ARGUMENT ............................................................................................ 18

III. The Proposed Class and Subclasses Satisfy the Rule 23 Requirements ......... 188

IV. The Class and Subclasses Satisfy All Rule 23(a) Requirements ....................... 20

A. The Class and Subclasses Are Numerous and Impractical to Join .......... 20

B. There Are Common Questions of Fact and Law. .......... 21

1) Common Questions of Fact and Law for the Releasable Youth Class. .......... 22

2) Common Questions of Fact and Law for the Disability Subclass. .......... 24

3) Common Questions of Fact and Law for the Foster System Subclass. .......... 24

C. The Plaintiffs Satisfy the Rule 23(a)(3) Typicality Requirement. .......... 25

D. The Named Plaintiffs Are Adequate Class Representatives and Plaintiffs' Counsel Should Be Appointed as Class Counsel. .......... 27

1) The Named Plaintiffs Are Adequate Class Representatives. .......... 28

2) Plaintiffs' Counsel Are Adequate Class Counsel. .......... 28

V. Class Certification Is Appropriate Under Rule 23(b)(2). .......... 29

CONCLUSION .......... 30

Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Isaac N., Tony S., Vegeta K., Otto O., and Tyrone P. ("Plaintiffs"), through their next friends, move the Court to certify this case as a class action on behalf of the requested class and two subclasses, to appoint Plaintiffs as class representatives, and to appoint Plaintiffs' counsel as class counsel.

## INTRODUCTION

Colorado incarcerates hundreds of children each year after juvenile courts found that those children should be released. This civil rights case arises from systemic executive agency problems with Defendants' policies, procedures, and practices that result in the unlawful incarceration of children in detention facilities. Defendants' systemic failures deprive children of their rights and place them at substantial risk of serious harm. Plaintiffs seek prospective declaratory and injunctive relief to end these violations of their rights and to require Defendants to create policies, procedures, placements, and services to stop children's unnecessary incarceration.

Plaintiffs' proposed "Releasable Youth" class is:

> **"All youth who currently are, or in the future will be, detained in a Colorado Division of Youth Services ("DYS") secure detention facility, who are not serving a commitment sentence, and for whom a juvenile court has determined that the youth may be released from detention**."

ECF 53 at ¶ 167. Within the Class, Plaintiffs propose two subclasses:

> (1) **"Releasable Youth with disabilities within the meaning of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA)"** (the "Disability Subclass"), and
>
> (2) **"Releasable Youth who are in the legal custody or legal authority of a Colorado county department of human or social services"** (the "Foster System Subclass").

ECF 53 at ¶¶ 168-69.

The proposed Class and Subclasses satisfy all requirements of Federal Rule of Civil Procedure 23(a) and (b)(2). The Class and Subclasses are numerous. Defendants detain over 700 releasable children each year, many of whom are in the foster system or have disabilities. These children often cycle through detention, making joinder impractical.

Common questions of law and fact also bind the proposed Class and Subclass members. For the Class, common questions—like whether Defendants' continued detention of them violates their substantive due process rights, and whether Defendants' failure to maintain processes to protect their rights violates procedural due process—can be resolved in one stroke. Likewise, common questions for the Disability Subclass and Foster System Subclass include whether Defendants' failure to provide services to releasable youth with disabilities in the most integrated community setting appropriate to their needs violates their rights under the ADA and whether Defendants' failure to keep detained foster children safe from harm violates their substantive due process rights.

Moreover, the Named Plaintiffs' claims are typical, and the Named Plaintiffs and their counsel will adequately represent the Class and Subclasses.

Rule 23(b)(2) is likewise satisfied because Defendants act or fail to act in the same manner toward all class members, whose common injury does not depend on individualized determinations and can be cured by a single class-wide injunction.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Procedural History

On March 18, 2026, Plaintiffs Isaac N. and Tony S. filed this class action for prospective relief. ECF 1. On June 8, 2026, Plaintiffs supplemented their pleading to add

Vegeta K. ECF 53. Contemporaneously with this motion for class certification, Plaintiffs moved to supplement the Amended Complaint to add Named Plaintiffs Otto O. and Tyrone P. Plaintiffs assert claims under 42 U.S.C. § 1983, as well as claims under the ADA, 42 U.S.C. §§ 12101 *et seq.*, and RA, 29 U.S.C. § 794. ECF 53 at ¶¶ 187-237.

## II. Statement of Facts

### A. Defendants Imprison Releasable Youth in DYS Secure Facilities.

Colorado defines "Releasable Youth" as those in detention for whom "the [juvenile] court determines that services and/or placement can mitigate the substantial risk of serious harm to others or risk of flight from prosecution."[1] According to CDHS, "[i]f services and/or placement are available to mitigate these risks, these youth may be released from detention."[2] Yet, CDHS admits that releasable youth remain detained "waiting for an available bed" or services due to the State's failure to develop policies, procedures, community-based placements, and services to effectuate their release.[3] Confirming a lack of any legitimate purpose to detain these youth, in delinquency cases:

> A juvenile shall not be placed in detention solely: (a) Due to lack of supervision alternatives, service options, or more appropriate facilities; (b) Due to the community's inability to provide treatment or services; (c) Due to a lack of supervision in the home or community. . . . C.R.S. § 19-2.5-304(3).

---

[1] Ex. 1, Colo. Dep't of Hum. Servs., *Limit the Detention of Juveniles Annual Report State Fiscal Year 24-25* at 16 (July 1, 2025). In 2026, Colorado renamed this group "youth awaiting mitigating services," but under the statute there is no difference—the state statutory scheme forbids keeping children in detention when community alternatives would mitigate risk. Plaintiffs are youth who are releasable with services, despite the State's change in terminology. Ex. 2, Colo. Dep't of Hum. Servs., *Limit the Detention of Juveniles Annual Report State Fiscal Year 25-26* at 10 (July 1, 2026).

[2] Ex. 1 at 16.

[3] Ex. 3, Colo. Dep't of Hum. Servs., Responses to Questions Regarding Division of Youth Services ("DYS") Detention Practices at 4–5.

Defendants' unlawful detention of Releasable Youth is well-documented and worsening. From July 2022 to June 2023, the first year CDHS publicly reported data, Defendants unlawfully detained 540 Releasable Youth.[4] The following year, the number increased to 693.[5] The Annual Report for 2025-26 shows CDHS detained at least 733 Releasable Youth in FY 2024-25, including 56 youth detained 130 or more days after juvenile courts found them releasable to the community.[6]

### B. Defendants' Policies and Practices Drive Plaintiffs' Detention.

Under Colorado's system, CDHS administers placements and services for youth in the delinquency and foster systems, both of which contain significant numbers of disabled youth. C.R.S. §§ 19-2.5-1401, 19-3-208(d.5), (d.7). The two CDHS sub-divisions responsible for these systems are DYS, responsible for children with delinquency cases, and the Division of Child Welfare ("DCW"), responsible for children in the foster system.[7] Colorado appropriates funds to CDHS each year "for youth who are detained or can be placed in lieu of detention," requiring CDHS to use a portion of these funds for placements and community-based services in lieu of detention. C.R.S. § 19-2.5-1407.3(1)-(3). CDHS also oversees a board tasked with ensuring youth are "supervised/incarcerated at a level that is commensurate with their risk to the community," assessing whether there are

---

[4] Ex. 4, Colo. Dep't of Hum. Servs., *Limit the Detention of Juveniles Annual Report State Fiscal Year* 23-24, at 8–9 (July 1, 2024).
[5] Ex. 1 at 10.
[6] Ex. 2 at 75.
[7] Ex. 5, Colo. Dep't of Hum. Servs., *Offices and Divisions*, https://cdhs.colorado.gov/cp-offices-and-divisions (last visited Oct. 2, 2026); *see also* C.R.S. § 19-2.5-1401 (2025) (designating CDHS as "the single state agency responsible for the oversight of the administration of juvenile programs and the delivery of services for juveniles and their families in this state").

sufficient detention alternatives, and recommending how CDHS can improve such service availability and quality. C.R.S. § 19-2.5-1404(3)(a).[8]

Despite these responsibilities and resources, Defendants fail to put required policies and procedures in place or fill gaps in the placement and service arrays, while repeatedly documenting the problem instead. In 1991, Colorado passed Senate Bill 91-94, directing CDHS to create detention alternatives.[9] But in the 35 years since, Defendants have only perpetuated this crisis.[10] For example, the same problems identified in a 2018 Council of State Governments report persist today—including lack of shelter beds, residential placements, and foster care beds, and reliance on detention as a holding facility while assessments are completed or services are coordinated.[11]

Plaintiffs' expert, Dr. Patrick McCarthy, identifies three systemic failures within Defendants' control that drive the unlawful detention of Releasable Youth:[12] (1) failure to develop sufficient community-based placements and services; (2) failure to coordinate the agencies that share responsibility for these youth, resulting in a lack of accountability

---

[8] *See also* Ex. 6, Colo. Dep't of Hum. Servs., *DYS Administrative Services*, https://cdhs.colorado.gov/dys-administrative-services (last visited Oct. 2, 2026).

[9] Ex. 7, Colo. Dep't of Hum. Servs., Div. of Youth Corr., *S.B. 94 Reference Manual 4* (Jan. 2009).

[10] *See* Ex. 8, Jennifer Brown, *One-Third of Teens in Colorado Juvenile Corrections Held for an Average of 20 Extra Days Because There's No Place to Go*, Colo. Sun (Sep. 6, 2023), https://coloradosun.com/2023/07/19/juvenile-corrections-delayed-release/.

[11] Ex. 9, Expert Report of Patrick McCarthy, October 6, 2026 at 35-36.

[12] *Id.* at 20. Dr. McCarthy served for nine years as President and C.E.O. of the Annie E. Casey Foundation where he oversaw the Foundation's juvenile justice work. During his tenure, the Foundation expanded its Juvenile Detention Alternatives Initiative to over 300 jurisdictions in 39 states. *Id*. at 7. He previously served as Director of Delaware's Division of Youth Rehabilitative Services, which operated that state's secure custody institutions, probation, aftercare, and community services, and as the Delaware Department's first Administrator for Case Management. *Id.* at 7-8; *see also id.* App. A.

for timely assessments, case management, and release planning; and (3) failure to create information systems needed to identify and fix these gaps.[13] These failings affect all Releasable Youth, and are "particularly acute for youth with mental health disabilities and youth involved with the foster system."[14]

*1) Defendants Fail to Provide Sufficient Services and Placements.*

Dr. McCarthy concluded that "[d]espite the apparently rich array of alternatives to detention listed on paper . . . the available evidence shows inadequate capacity to meet the needs of detained youth."[15] Many identified services are available only for some youth in limited parts of the state, and most—especially those providing residential care—"have only enough capacity to accept a small percentage of referred youth."[16] The State's knowledge of this failure is evident and "reports show that the State recognizes that a lack of resources prevents youth deemed 'release-eligible' by a judicial officer from being promptly placed in appropriate settings."[17]

CDHS's annual report to the legislature in 2025 admitted: "[a]t times, these placements and services are not available or take a long time to find."[18] And in its 2026 federal self-assessment of the foster system, CDHS admitted "the state is lacking placement resources for . . . [foster] youth stepping down from detention."[19] CDHS staff

[13] Ex. 9, McCarthy Rep. at 2-3, 19-20, 49; *see also id.* at 18-19, 35-36, 40-41.
[14] *Id.* at 3; *see infra* Section II.C.
[15] Ex. 9, McCarthy Rep. at 24; *see also* Ex. 1 at 76-77.
[16] Ex. 9, McCarthy Rep. at 24.
[17] *Id.*
[18] Ex. 1 at 21.
[19] Ex. 10, Colo. Dep't of Hum. Servs., *Colorado Statewide Assessment: Child and Family Services Review (CFSR) Round 4* (2026) at 124; *see also* Ex. 11, Dana Walters Flores Decl. ¶ 24.

describe placement and services waitlists as "extremely" and "insanely" long, and county DHS offices often struggle with the lack of local placement options.[20]

Further evidencing a common problem, attorneys, guardians *ad litem* (GALs), and direct-service organizations for detained youth confirm their clients experience these shortages of placements and services.[21]

*2) Defendants Fail to Ensure Coordination Across Agencies, Preventing Timely Assessments, Case Management, or Release Planning.*

Dr. McCarthy's review further found that CDHS fails to ensure coordination across sub-agencies, impeding timely assessments and case planning.[22] Although CDHS is responsible for both the delinquency and foster systems, CDHS and its sub-departments often point fingers at each other when Releasable Youth need services or placements. DYS, for example, states it "does not case manage youth for transfer to their subsequent placement" and that it is not responsible for finding residential placements or outpatient treatment for detained youth.[23]

---

[20] Ex. 12, County DHS and CMP Responses to Youth and Family Services Gap Survey (2022) (unpublished survey responses); Ex. 13, *SB21-071 Youth Family Gap Survey (Responses)* (2022) (unpublished survey responses).

[21] Ex. 14, Erin Rossiter Decl. ¶ 11; Ex. 15, Elizabeth Martinez Decl. ¶¶ 12, 16-17; Ex. 16, Quentin Montemayor Decl. ¶¶ 15-21 (restricted); Ex. 17, Katy Saehler Decl. ¶¶ 25-32; Ex. 18, Kerry Simpson Decl. ¶ 19 (restricted); Ex. 19, Leigh Truhe Decl. ¶¶ 22, 24-29 (restricted); Ex. 20, Madison Whitley Decl. ¶¶ 11-12, 22-25; Ex. 21, Elise Miller Decl. ¶¶ 11, 18, 35 (restricted); Ex. 22, Carter Hilty Decl. ¶¶ 14-21; Ex. 23, Meghal Shah Decl. ¶ 7; Ex. 24, Phillip Roybal Decl. ¶ 5; Ex. 25, Tiera Brown Decl. ¶¶ 11-12; Ex. 26, Nicole Lyells Decl. ¶¶ 15-17, 27-28; Ex. 27, Brittany Radic Decl. ¶¶ 22, 27, 30 (restricted); Ex. 28, Dani Diercks Farrell Decl. ¶ 8.

[22] Ex. 9, McCarthy Rep. at 18; *see also* Ex. 11, Walters Flores Decl. ¶ 19.

[23] Ex. 3 at 4; *see, e.g.*, Ex. 29 (restricted). *See also* Ex. 9, McCarthy Rep. at 18, 37.

Child welfare caseworkers likewise often claim "no responsibility" for a youth's placement or services when delinquency charges are filed.[24] CDHS's 2026 federal self-assessment reports that "dual-system-involvement [delinquency and child welfare] can cause delays to service coordination when system partners do not collaborate efficiently or [agree] who is responsible for coordination."[25]

Dr. McCarthy also found the State's failure to ensure coordination among many potential sources of funding and authorization for placement—including private insurance, Medicaid, and county agencies—"result[s] in a highly fragmented system of care" where "responsibility for determining which entity manages and funds placement is unclear."[26] Nor is there clear state-level guidance on which entity is responsible for case management, assessment, or discharge planning.[27] As Dr. McCarthy found, "no single person holds the responsibility" for case management and there is "no indication that CDHS has provided guidance on who should hold this responsibility."[28] Lawyers and GALs who work with impacted children confirm this repeated lack of clarity.[29]

---

[24] ECF 53 at ¶ 126; Ex. 9, McCarthy Rep. at 18, 37; Ex. 25, Brown Decl. ¶ 11; Ex. 20, Whitley Decl. ¶¶ 15, 27; Ex. 16, Montemayor Decl. ¶¶ 26-29 (restricted); Ex. 14, Rossiter Decl. ¶¶ 10, 12; Ex. 22, Hilty Decl. ¶ 20; Ex. 15, Martinez Decl. ¶ 19; Ex. 17, Saehler Decl. ¶¶ 34-36; Ex. 27, Radic Decl. ¶ 32 (restricted); Ex. 26, Lyells Decl. ¶¶ 9, 13, 23; Ex. 11, Walters Flores Decl. ¶¶ 20, 23, 25, 28.

[25] Ex. 10 at 123.

[26] Ex. 9, McCarthy Rep. at 36-37.

[27] *Id.*

[28] *Id.* at 19; *see also id.* at 40.

[29] *See, e.g.*, Ex. 25, Brown Decl. ¶ 11; Ex. 17, Saehler Decl. ¶¶ 12-19; Ex. 22, Hilty Decl. ¶ 11; Ex. 14, Rossiter Decl. ¶ 14; Ex. 16, Montemayor Decl. ¶¶ 22-27, 30 (restricted); Ex. 19, Truhe Decl. ¶ 17 (restricted); Ex. 20, Whitley Decl. ¶¶ 14, 30; Ex. 27, Radic Decl. ¶ 31 (restricted); Ex. 26, Lyells Decl. ¶¶ 13-14.

Attorneys and GALs say the result is that these youth occupy a limbo where *no* agency accepts responsibility for case management, placement, or service planning.[30] Dr. McCarthy finds "abundant" "[e]vidence that the State has failed to ensure coordination and integration across jurisdictions, agencies and organizations."[31] Coordination "is one of the most important responsibilities" of CDHS, which it "has failed to fulfill."[32]

*3) Defendants Do Not Have Adequate Information Management Systems.*

Compounding the above failures are Defendants' inadequate information management system and their failure to analyze and remediate that problem.[33] Dr. McCarthy opines that this is a "major, almost insurmountable, barrier to creating and maintaining a continuum of alternatives to detention."[34] CDHS relies on at least five separate, siloed data systems that cannot track how long youth remain detained after being found releasable, and do not collect needed data on provider availability.[35]

Thus, Dr. McCarthy concludes:

> The State has been aware for years of the problems and barriers that have resulted in the unnecessary secure custody detention of hundreds of young people . . . . Yet efforts to address these problems have not been informed by the basic data and information necessary to assess the systemic causes of the problems and to develop effective solutions.[36]

---

[30] *See, e.g.*, Ex. 17, Saehler Decl. ¶¶ 31, 36-37; Ex. 16, Montemayor Decl. ¶ 30 (restricted); Ex. 15, Martinez Decl. ¶ 13; Ex. 18, Simpson Decl. ¶ 20 (restricted); Ex. 19, Truhe Decl. ¶ 17 (restricted); Ex. 20, Whitley Decl. ¶¶ 28-29; Ex. 14, Rossiter Decl. ¶¶ 10, 15; Ex. 26, Lyells Decl. ¶¶ 10, 23-25. *See also* Ex. 9, McCarthy Rep. at 37.
[31] Ex. 9, McCarthy Rep. at 35.
[32] *Id.* at 40; *see also* Ex. 11, Walters Flores Decl. ¶ 21.
[33] Ex. 9, McCarthy Rep. at 28.
[34] *Id*. at 31.
[35] *Id*. at 19, 28–29; *see also* Ex. 1 at 23-24.
[36] *Id.* at 28; *see also id.* at 31-32.

> At both the whole-system and case levels, the failure to integrate information and resources for these vulnerable youth betrays a lack of urgency to meet their needs. This lack of urgency is reflected in a willingness to use the detention facilities as convenient and secure holding pens for young people while they await needed services.[37]

### C. Defendants' Common Systemic Failures Harm Releasable Youth with Disabilities and Releasable Youth in the Foster System.

Defendants disproportionately fail youth with disabilities and foster youth, for whom the State "has particular duties that it is failing to meet."[38]

*1) Releasable Youth with Disabilities.*

State reports indicate that "some of the longest stays in detention are due to a lack of alternative services or placements for youth with disabilities."[39] The State specifically identifies mental health needs as a barrier to release for 22.1% of detained youth.[40] CDHS's reports and outside investigations "show a . . . statewide inability to provide" an "effective community-based continuum of intensive support and supervisory services."[41] As Dr. McCarthy explains:

> [T]he State's lack of sufficient Qualified Residential Treatment Programs [QRTPs], therapeutic foster beds, substance abuse treatment beds and other intensive community-based family and mental health services are among the drivers of extended detention for youth with . . . disabilities.[42]

---

[37] *Id*. at 31.
[38] *Id*. at 3; *see also* Ex. 11, Walters Flores Decl. ¶ 19.
[39] Ex. 9, McCarthy Rep. at 15; *see also* Ex. 3 at 4-5.
[40] Ex. 9, McCarthy Rep. at 30; *see also* Ex. 2 at 85.
[41] Ex. 9, McCarthy Rep. at 17; *see also* Ex. 30, Colo. Dep't of Hum. Servs., Inaugural Analysis Report to Inform Performance Standards and Outcome Measures for Pre-Adjudicated and Adjudicated Youth (July 1, 2023); Ex. 4; Ex. 1; Ex. 2.
[42] Ex. 9, McCarthy Rep. at 14.

In addition, the independent assessment process, "the critical gateway to placement and services for youth with complex needs," results in long waits for services and frequently ends in a disproportionate level of care.[43] Releasable Youth waited an average of 33.2 days just for an assessment referral in FY 2023-24, and those referred spent an average of 76.2 days in detention overall.[44] Fewer than 35% of assessed youth are released to the level of care that their assessment eventually recommended.[45] GALs and attorneys representing detained youth with disabilities confirm these youth remain incarcerated despite being releasable, due in part to a lack of community-based mental health placements and services, and delayed mental health assessments.[46]

Detaining youth with disabilities is contrary to laws, regulations, and best practices, all of which require young people with disabilities to receive services in the least restrictive setting appropriate to their needs.[47] Decades of research, and Dr. McCarthy's own experience, confirm that youth with disabilities are more likely to thrive in community settings, while detention facilities "have neither the staff nor the facilities to respond to the challenges associated with their disabilities."[48] Community services and placements that

---

[43] Ex. 9, McCarthy Rep. at 15, 17, 24; *see supra* at Section II.B.2.
[44] Ex. 9, McCarthy Rep. at 23.
[45] *Id*. at 15, 17.
[46] *See, e.g.*, Ex. 25, Brown Decl. ¶ 9; Ex. 22, Hilty Decl. ¶¶ 8, 12, 22; Ex. 20, Whitley Decl. ¶¶ 17-21; Ex. 16, Montemayor Decl. ¶¶ 14-15, 18, 29 (restricted); Ex. 15, Martinez Decl. ¶¶ 12, 15, 20; Ex. 17, Saehler Decl. ¶¶ 9, 11, 22, 25, 28, 30, 32; Ex. 18, Simpson Decl. ¶ 15 (restricted); Ex. 28, Diercks Farrell Decl. ¶¶ 8-9; Ex. 19, Truhe Decl. ¶¶ 19-20, 27 (restricted); Ex. 14, Rossiter Decl. ¶¶ 8-9, 13; Ex. 21, Miller Decl. ¶¶ 10-11 (restricted), 22-25, 33, 35; Ex. 23, Shah Decl. ¶ 6; Ex. 26, Lyells Decl. ¶¶ 15-18.
[47] Ex. 9, McCarthy Rep. at 15.
[48] *Id.* at 15-16.

can address these youths' disability-related needs in a more integrated setting "can also mitigate the risks of releasing them from secure detention."[49]

*2) Releasable Youth in the Foster System.*

Foster youth are "both the largest group in Colorado's detention facilities and the group held there the longest."[50] In FY 2023–24, almost three quarters of detained youth had some child welfare involvement, and 959 had an active child welfare case.[51] Foster youth spend more time in detention: in FY 2024-25 an average of 47.7 days (median 20.4 days) versus 16.5 days (median 2.8 days) for non-involved children.[52]

Dr. McCarthy finds "the same key practice failings" explain why foster children remain in detention longer.[53] First, the State has not developed required placements and services, "including an adequate array of foster homes and therapeutic foster homes," or sufficient supported kinship care.[54] The State's federal self-assessment likewise reports "waitlists for [psychiatric residential treatment facilities (PRTFs)], QRTPs, and at times, specialized foster care homes due to the need being greater than the available resources."[55] Second, the State splits responsibility for these children "across agencies without state level guidance by CDHS," so "no one is accountable for the individual foster child."[56] Third, the State's siloed data systems prevent tracking how long foster youth

---

[49] *Id.* at 16.
[50] *Id.* at 17.
[51] *Id.*
[52] *Id.* at 18; *see also* Ex. 2 at 32.
[53] *Id.*; *see also* Ex. 4 at 53-54.
[54] Ex. 9, McCarthy Rep. at 14, 18; *see also* Ex. 4 at 53-54.
[55] Ex. 10 at 125.
[56] Ex. 9, McCarthy Rep. at 18–19; *see also id*. at 36-37; *supra* at Section II.B.2.

remain in detention after being found releasable.[57] GALs and attorneys confirm their foster-system clients remain detained because of Defendants' systemic failings.[58]

In Dr. McCarthy's opinion, the extended confinement of foster children in detention "is the most obvious and grievous consequence of the fragmentation and misalignment of Colorado's services for young people."[59] The State "assume[s] the duties of a parent" for foster youth and "[a] shortage of placements and services and an inability to coordinate among the State's own divisions does not justify holding a child in a locked institution."[60]

### D. Common, Statewide Remedies Address Each Systemic Failure.

Dr. McCarthy finds "specific known remedies [exist] to the factors that are causing the unnecessary detention" of Releasable Youth, and those remedies "are systemic, and would significantly help ameliorate the problems across all children in this situation."[61]

Dr. McCarthy describes solutions addressing the three identified systemic failures.[62] *First*, strengthening the array of placements and services, including building up community-based supports for youth released to their families or kinship care, implementing a treatment foster care program, and improving access to residential

---

[57] *Id*. at 19.
[58] Ex. 25, Brown Decl. ¶ 9; Ex. 23, Shah Decl. ¶¶ 5-6; *see also* Ex. 11, Walters Flores Decl. ¶¶ 19, 28.
[59] Ex. 9, McCarthy Rep. at 19.
[60] *Id*.
[61] *Id*. at 2, 9.
[62] *Id.* at 24-27, 33-34, 40-42. Dr. McCarthy's recommendations are based on the limited, publicly available materials reviewed to date, and he anticipates supplementing his opinions once discovery proceeds. Ex. 9, McCarthy Rep. at 9.

treatment for the small number of youth who truly require it.[63] These services already exist, at some level of capacity, but not sufficiently.[64]

*Second*, to address coordination failures, CDHS must establish clear roles, policies, and supports so that decisions about every detained youth are made with appropriate urgency, including by designating "a primary case manager with the responsibility and authority to develop and shepherd an individualized plan that knits together the funding and services from all involved agencies."[65] Dr. McCarthy identifies established models for integrating services across systems.[66]

*Third*, CDHS should establish integrated information systems to track detention overstays and provider capacity, as numerous other states have done.[67]

These remedies operate at the system level, not in individual cases. Each would plausibly enhance and improve the placements, services, procedures, and information available to all class members. Dr. McCarthy concludes: "[e]xperience[s] in other states . . . demonstrate[] the feasibility and effectiveness of developing systemic and programmatic alternatives to this practice."[68]

### E. Defendants Harm Releasable Youth by Detaining Them.

As Dr. McCarthy explains in detail, detention inflicts serious, lasting harm on youth. Secure detention in a locked institution "results in a loss of liberty and disconnection from

[63] *Id*. at 24-27.
[64] *Id.* at 21, 25-26; *see also* Ex. 11, Walters Flores Decl. ¶¶ 26-27.
[65] Ex. 9, McCarthy Rep. at 39, 41; *see also* Ex. 11, Walters Flores Decl. ¶ 56.
[66] Ex. 9, McCarthy Rep. at 41-42.
[67] *Id.* at 31-34.
[68] *Id.* at 49.

family, education, and community," and "exposes developing adolescents to conditions that . . . cause trauma, long-term physical and mental health problems and negative short- and long-term effects on development and overall well-being."[69] Confinement in secure custody is "linked to severe, sometimes life-threatening and permanently disabling side-effects."[70] Colorado's legislature recognizes detention "exacts a negative impact on the mental and physical well-being of the child or juvenile" and "make[s] it more likely that the child . . . will reoffend." C.R.S. § 19-2.5-301. Independent investigations have found particularly serious risks in DYS facilities, including serious injury from assaults, abusive physical restraints, drug overdoses, and allegations of staff sexual abuse.[71]

### F. Plaintiffs: Isaac N., Tony S., Vegeta K., Otto O., and Tyrone P.

**Plaintiff Isaac N.** was 17 years old, charged with juvenile delinquency, and in DYS detention when the Complaint was filed.[72] He is a youth with disabilities recognized under federal law, including post-traumatic stress disorder (PTSD) and attention-deficit/hyperactivity disorder (ADHD).[73] These disabilities substantially impair his major life activities of concentration, thinking, and participating in school.[74] In January 2026, a juvenile court judge found he was releasable upon agreement of the GAL, DHS, and Probation.[75] In February 2026, a CDHS treatment professional found him appropriate for

[69] *Id*. at 13.
[70] *Id.* at 43.
[71] *Id.* at 4-5, 46-48.
[72] Ex. A to ECF 76 at 2, 4, 6–7 (restricted).
[73] Ex. 31, at 17 (restricted); Ex. 18, Simpson Decl. ¶ 17 (restricted). *See, e.g.*, *Robinson v. Pine Hills Mgmt. Co.*, 19-cv-3219-RBJ, 2021 WL 62594, at *1 (D. Colo. Jan. 7, 2021).
[74] Ex. 32, at 4 (restricted).
[75] Ex. A to ECF 76 at 7–8 (restricted); Ex. 18, Simpson Decl. ¶¶ 8-10 (restricted).

community-based treatment.[76] Isaac N. desires to be placed in the community.[77] Yet, CDHS detained him for almost two more months.[78]

**Plaintiff Tony S.** is now 13 years old, was charged with juvenile delinquency, and was incarcerated in DYS detention when the Complaint was filed.[79] Tony S. is in CDHS's legal custody and is a member of the Foster System Subclass.[80] Tony S. has autism spectrum disorder and cognitive impairments, both of which qualify as disabilities under federal law.[81] These disabilities limit major life activities such as thinking, communicating, and attending school.[82] A juvenile court judge determined in September 2025 that Tony S. was releasable.[83] In February 2026, a CDHS treatment professional found he could be sent to a therapeutic placement.[84] Tony S. desires to be placed in the community.[85] Yet, CDHS detained him for another seven months.[86] Eventually, he was moved to an out-of-state placement.[87]

**Plaintiff Vegeta K.** is 12 years old, charged with juvenile delinquency, and CDHS incarcerated him in DYS detention when the Amended Complaint was filed. He was in

---

[76] Ex. 31 at 23 (restricted).
[77] Ex. 33 (restricted).
[78] Ex. A to ECF 76 at 1, 5; Ex. 18, Simpson Decl. ¶ 21 (restricted). He is now 18.
[79] Ex. 19, Truhe Decl. ¶¶ 6-7, 11 (restricted).
[80] Ex. 34 (restricted).
[81] Ex. 35, at 8–9 (restricted); 28 C.F.R. § 36.105(d)(2)(iii)(C) & (E). *See, e.g.*, *A.V. ex rel. Hanson v. Douglas Cnty. Sch. Dist. RE-1*, 586 F. Supp. 3d 1053, 1065 (D. Colo. 2022).
[82] Ex. 35 at 8-9 (restricted).
[83] Ex. 19, Truhe Decl. ¶¶ 7-11 (restricted); Ex. 34 (restricted); Ex. C to ECF 76 at 2.
[84] Ex. 36, at 11 (restricted).
[85] Ex. 37 (restricted).
[86] Ex. 19, Truhe Decl. ¶¶ 10-16, 18-21 (restricted).
[87] *Id.* ¶¶ 20-21.

CDHS's legal custody and is a member of the Foster System Subclass.[88] In May 2026, a juvenile court magistrate determined he was releasable.[89] Vegeta K. also has PTSD and ADHD, which impair his major life activities including emotional regulation, concentrating, and thinking, and which qualify as disabilities under federal law.[90] *See supra* at Section II.F (Isaac N.). In May 2026, a CDHS treatment professional found him appropriate for a less restrictive therapeutic placement outside of detention.[91] Vegeta K. desires to be placed in the community.[92] He was finally released after weeks in detention.[93]

**Plaintiff Otto O.** is 14 years old, charged with juvenile delinquency, and is incarcerated in a DYS detention facility; he has not yet been adjudicated and is not serving a commitment sentence.[94] He has ADHD, an anxiety disorder, adjustment disorder, speech and language disorders, PTSD, and autism spectrum disorder, all of which substantially impair his major life activities of thinking, concentrating, learning, communicating, and completing schoolwork, and which qualify him as a person with a disability under federal law.[95] *See supra* at Section II.F (Isaac N. and Tony S.). In June 2026, a judge found Otto O. releasable to a less restrictive therapeutic placement that a CDHS treatment professional previously deemed appropriate.[96] Otto O. wants to be

[88] Ex. 38 (restricted); Ex. 39, at 1 (restricted).
[89] Ex. B to ECF 76 (restricted); Ex. 16, Montemayor Decl. ¶¶ 7-14 (restricted).
[90] Ex. 16, Montemayor Decl. ¶ 12 (restricted); Ex. 40, at 4 (restricted).
[91] Ex. 16, Montemayor Decl. ¶¶ 7, 10-11 (restricted).
[92] Ex. 41 (restricted).
[93] Ex. 16, Montemayor Decl. ¶ 14 (restricted).
[94] Ex. 21, Miller Decl. ¶ 14 (restricted); Ex. 42 (restricted); Ex. 43 (restricted).
[95] Ex. 42 (restricted); Ex. 44 (restricted); Ex. 45, at 13, 26-28 (restricted).
[96] Ex. 21, Miller Decl. ¶¶ 15-16, 22-23 (restricted).

placed in the community.[97] Yet he remains in detention more than three months after being found releasable because CDHS has not located a placement for him.[98]

**Plaintiff Tyrone P.** is 16 years old, charged with juvenile delinquency, and is incarcerated in a DYS secure detention facility; he has not been adjudicated and is not serving a commitment sentence.[99] He has PTSD, which substantially impairs his major life activities of learning and communicating; this condition qualifies him as a person with a disability under federal law. *See supra* at Section II.F (Isaac N.).[100] In July 2026, a juvenile court judge determined Tyrone P. is releasable, yet CDHS is still detaining him over two months later.[101] Although Tyrone P. cannot return home to his parents, CDHS has not initiated a search for a foster placement for him.[102] In early September 2026, a treatment professional found him appropriate for placement in the community.[103] Tyrone P. desires to be placed in the community.[104] But Tyrone P.'s mental health evaluation was delayed for weeks, which delayed even putting him on placement waitlists.[105]

## ARGUMENT

### III. The Proposed Class and Subclasses Satisfy the Rule 23 Requirements.

Civil rights actions are particularly amenable to class treatment: Rule 23 was amended in the 1960s to "facilitate the bringing of class actions in the civil-rights area."

[97] Ex. 46 (restricted).
[98] Ex. 21, Miller Decl. ¶¶ 24-25 (restricted).
[99] Ex. 27, Radic Decl. ¶ 8 (restricted); Ex. 47 (restricted); Ex. 48 (restricted).
[100] Ex. 48 at 10 (restricted).
[101] Ex. 27, Radic Decl. ¶¶ 10-11, 19 (restricted).
[102] Ex. 27, Radic Decl. ¶¶ 9-10, 12, 15, 18-19 (restricted).
[103] Ex. 48 at 12-13 (restricted).
[104] Ex. 49 (restricted).
[105] Ex. 27, Radic Decl. ¶¶ 13-16 (restricted).

7AA *Wright & Miller's Federal Practice & Procedure* § 1775 (3d ed. 2018). This case presents precisely the type of population and claims for which class certification is warranted, as the nature of the alleged harm makes the case "uniquely suited for a class action." *Menocal v. GEO Grp., Inc.*, 320 F.R.D. 258, 261 (D. Colo. Feb. 27, 2017), *aff'd,* 882 F.3d 905 (10th Cir. 2018). Courts in this Circuit frequently certify Rule 23(b)(2) classes of people in state custody. *See, e.g.*, *Decoteau v. Raemisch*, 304 F.R.D. 683 (D. Colo. 2014); *Ogden v. Figgins*, 315 F.R.D. 670 (D. Kan. 2016); *Skinner v. Uphoff*, 209 F.R.D. 484, 489 (D. Wyo. 2002). Courts likewise frequently certify classes of youth harmed by systemic failures in residential and foster care settings. *See, e.g.*, *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188 (10th Cir. 2010).

To obtain class certification, plaintiffs must meet four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and satisfy at least one provision of Rule 23(b). *See* Fed. R. Civ. P. 23(a), (b); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997); *Menocal*, 882 F.3d at 913-14. Class certification under Rule 23(b)(2) further requires that "[defendant] has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

"The Court should not pass judgment on the merits of the case but must conduct a 'rigorous analysis' to ensure that the requirements of Rule 23 are met." *Decoteau*, 304 F.R.D. at 686. Class certification is particularly appropriate here, as all the elements of Rule 23 are met, and there is no other way to challenge the legality of Defendants' actions.

## IV. The Class and Subclasses Satisfy All Rule 23(a) Requirements.

### A. The Class and Subclasses Are Numerous and Impractical to Join.

Rule 23(a)(1) requires the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity, however, is not simply a "question of numbers." *Horn v. Assoc. Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir. 1977). Courts must assess "class size, the geographic diversity of class members, the relative ease or difficulty in identifying members of the class for joinder, the financial resources of class members, and the ability of class members to institute individual lawsuits." *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, 09-CV-02757-WYD-KMT, 2012 WL 1378531, at *2 (D. Colo. Apr. 20, 2012), *aff'd*, 765 F.3d 1205 (10th Cir. 2014). The analysis is relaxed where the class seeks only prospective relief. *See Kurlander v. Kroenke Arena Co., LLC*, 276 F. Supp. 3d 1077, 1086 (D. Colo. 2017).

Numerosity is easily met. CDHS's 2026 annual report shows at least 733 youth remained in detention after being found releasable in FY 2024–2025.[106] *See Medina v. Allen*, 4:21-CV-00102-DN-PK, 2024 WL 5186929, at *6-7 (D. Utah Dec. 20, 2024).

The Foster System Subclass is likewise numerous: in FY 2023-24, 73.7 percent of releasable youth—471 of 693 children—had prior or current child welfare involvement.[107] CDHS admits it detains "child welfare involved releasable youth" longer than others.[108]

The Disability Subclass is also sufficiently numerous. Although Defendants do not track this number, the 2026 CDHS Annual Report identified over 400 children in FY 2024-

[106] Ex. 2 at 10. *See also supra* at Section II.A.
[107] Ex. 1 at 101.
[108] Id.

2025 who faced barriers to release related to their disabilities.[109] In 2024, CDHS reported 30% of releasable youth who spent more than 30 days detained ended up placed in residential placements, most of which provide disability-related services and treatment.[110] Further, over 85% of children committed to DYS detention require mental health interventions.[111] Particularly given Defendants' failure to track data, this evidence amply supports numerosity for the Disability Subclass.

Joinder is also impracticable because children enter and leave detention daily and may be found releasable at any point in their cases, making the class fluid and constantly shifting. *Colo. Cross-Disability Coal.*, 765 F.3d at 1215 ("[T]he fact that the class includes unknown, unnamed future members also weighs in favor of certification.").

The Class and Subclasses thus satisfy Rule 23(a)(1)'s numerosity requirement.[112]

**B. There Are Common Questions of Fact and Law.**

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Class members' "claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination

---

[109] Ex. 2 at 86.

[110] Ex. 4 at 97.

[111] Ex. 50, Colo. Dep't of Hum. Servs., Div. of Youth Servs., Annual Report FY 2023-24 9 (2025).

[112] The Tenth Circuit "treat[s] ascertainability as a sub-requirement of numerosity," *Evans v. Brigham Young Univ.*, 22-4050, 2023 WL 3262012, at *5 (10th Cir. May 5, 2023), and holds Rule 23(b)(2) classes, like this one, need not be "readily ascertainable." *Shook v. El Paso Cnty., Colo.*, 386 F.3d 963, 972 (10th Cir. 2004). Even so, here the Class and Subclasses *are* ascertainable; there is a "feasible mechanism of determining whether putative class members" are in the class. *See Evans*, 2023 WL 3262012, at *8. Defendants track and publish the numbers of releasable youth who remain detained. *See generally* Ex. 2.

of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350 (2011). "What matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original). "[C]ommonality requires only a single question of law or fact common to the entire class." *Menocal*, 882 F.3d at 914. Commonality does "not require that every member of the class share a fact situation *identical*" to the named plaintiff. *Colo. Cross-Disability Coal.*, 765 F.3d at 1216 (emphasis in original). Rather, commonality is satisfied where all class members are exposed to Defendants' policies or practices that create a substantial risk of serious harm, even if the policies or practices affect class members differently. *See Decoteau*, 304 F.R.D. at 688-89 (commonality established for incarcerated people challenging denial of exercise despite differing amounts of time).

*1) Common Questions of Fact and Law for the Releasable Youth Class.*

Considerable evidence—discussed in detail in Section II.B—plainly shows a common pattern of prolonged and unnecessary detention of Releasable Youth, caused by Defendants' policies and practices, and affecting all class members. These common practices include Defendants' failures to: (1) develop community-based placements and services; (2) coordinate agencies that share responsibility for these youth; and (3) create the information systems needed to identify and fix system gaps. Section II.B *supra*. As ample evidence reveals and Dr. McCarthy's expert report explains, these failures operate statewide and "are not limited to a small number of especially challenging cases."[113]

[113] Ex. 9, McCarthy Rep. at 16; *see id.* at 19-20.

This satisfies the commonality requirement. *Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) ("[M]istreatment" of individual incarcerated people is irrelevant when prison "policies and practices of statewide and systemic application expose all [prisoners] . . . to a substantial risk of serious harm."). That class members are at different stages of their cases or have varying needs is irrelevant. *See id*. at 680. Those differences do not negate their shared challenge to Defendants' systemic practices. *See Colo. Cross-Disability Coal.*, 765 F.3d at 1216 (citing *Wal-Mart Stores*, 564 U.S. at 348-49); *Parsons*, 754 F.3d at 676. Nor must every question be resolvable class-wide; a single common question suffices. *Colo. Cross-Disability Coal.*, 765 F.3d at 1216.

Common questions for all the Releasable Youth Class members include:

- Whether Defendants, through their actions or inactions, maintain a policy, pattern, practice, or custom of incarcerating class members in DYS detention facilities after a juvenile court determined the youth may be released;
- Whether Defendants' failure to provide adequate procedures, including assessments, case management, and discharge planning, is a significant factor driving class members' incarceration in DYS facilities past the date when a juvenile court finds them to be releasable;
- Whether Defendants' actions or inactions in incarcerating class members in DYS detention facilities after a juvenile court has determined they may be released violate the Fourteenth Amendment;
- Whether Defendants' failure to provide adequate procedures to ensure class members are timely released to the community, including screenings, assessments, case management, and discharge planning, violates the Fourteenth Amendment; and,
- Whether Defendants' continued detention of class members pre-adjudication constitutes unlawful punishment in violation of the Fourteenth Amendment.

All class members seek the same prospective relief, and the Court can resolve the legality of Defendants' conduct "in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

*2) Common Questions of Fact and Law for the Disability Subclass.*

Disability Subclass members are commonly harmed by the same failures and are specifically harmed by Defendants' failure to provide sufficient therapeutic placements and services to treat their mental health needs in the community. *See supra* at Section II.C.1. And children with disabilities who require assessments for their placement needs are detained longer than other releasable youth. *Id.*[114] As a result, children with disabilities are unnecessarily segregated in detention rather than served in the community.[115] Common questions include:

- Whether Defendants maintain a policy, pattern, practice, or custom of unnecessarily institutionalizing Disability Subclass members in segregated detention facilities rather than providing services and placement in the most integrated settings appropriate to their needs;
- Whether Defendants' failure to provide, fund, and effectively utilize community-based placements and services so that Disability Subclass members can be placed in more integrated settings is a significant factor that drives the unnecessary institutionalization of Plaintiffs in segregated detention facilities; and,
- Whether Defendants' policy, pattern, practice, or custom of institutionalizing Disability Subclass members in segregated detention facilities rather than providing services and placement in the most integrated settings appropriate to their needs violates Title II of the ADA and the Rehabilitation Act.

The answers to these questions resolve the Disability Subclass's claims in one stroke.

*3) Common Questions of Fact and Law for the Foster System Subclass.*

Foster System Subclass members face the same placement shortages as all class members, plus foster placement shortages and case management failures specific to the

[114] *See also* Ex. 9, McCarthy Rep. at 18, 24.
[115] Ex. 9, McCarthy Rep. at 14-16.

foster system, and are detained disproportionately longer as a result. *See supra* Section II.C.2.[116] Common questions of law and fact include:

- Whether Defendants maintain a policy, pattern, practice, or custom of failing to provide Foster System Subclass members with sufficient community-based placements and services to ensure these youth's timely release;

- Whether Defendants maintain a policy, pattern, practice, or custom of failing to provide Foster System Subclass members sufficient policies and procedures, including case management, to ensure their timely release;

- Whether Defendants' failure to provide Foster System Subclass members with sufficient community-based placements and services to ensure these youth's timely release, and/or failure to provide detained foster children with sufficient policies and procedures, including case management, to ensure these youth's timely release, drives Defendants' policy, pattern, practice, or custom of incarcerating in DYS detention facilities detained foster children a juvenile court has determined may be released from detention; and,

- Whether Defendants' actions or inactions, and policies, practices, or customs fail to ensure that Foster System Subclass members are reasonably safe from a substantial risk of serious harm in violation of the Fourteenth Amendment to the U.S. Constitution.

Answers to these questions resolve the Foster System Subclass's claims in one stroke.

### C. The Plaintiffs Satisfy the Rule 23(a)(3) Typicality Requirement.

Rule 23(a)(3) requires that named plaintiffs' claims be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

> The commonality and typicality requirements of Rule 23(a) tend to merge as each looks to the nature of the claims presented in the case, and whether the named plaintiffs are similarly situated as to those claims.

*Wal-Mart Stores*, 564 U.S. at 349 n.5. Typicality "requires only that the claims of the class representative and class members are based on the same legal or remedial

[116] *See also* Ex. 1 at 101; Ex. 9, McCarthy Rep. at 16-19.

theory." *Menocal,* 882 F.3d at 917 (internal quotation marks omitted); *see Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982) (shared threat of harm from common practices established typicality).

Named Plaintiffs and the putative class challenge the same policies and conditions created by the Defendants on the same legal grounds. The Named Plaintiffs seek the same declaratory and injunctive relief as the proposed Class and Subclasses and face the same violations of their constitutional and statutory rights. Their claims are not only representative of, but inextricable from, those of the class they seek to represent.

Each of the Named Plaintiffs spent weeks or months imprisoned in DYS detention facilities after judges in their delinquency cases found they could be released with appropriate services.[117] Each Named Plaintiff experienced delays in assessments that continued their detention.[118] Each Named Plaintiff in the Disability Subclass has a disability, and was assessed as being appropriate for a community-based placement and desires community placement, yet each remained in detention facilities rather than more integrated community-based settings. *See supra* at Section II.F. Tony S. and Vegeta K., who are in DHS custody and thus Foster System Subclass members, remained detained for lack of foster placements. *See supra* at Section II.C.2. These needs are all common among detained youth, and Defendants' failures to address these problems "are not

---

[117] *See supra* at Section II.F; Ex. A to ECF 76 at 8-9, 4 (restricted); Ex. 19, Truhe Decl. ¶¶ 10-16, 18-21 (restricted); Ex. 34 (restricted); Ex. B to ECF 76 (restricted); Ex. 16, Montemayor Decl. ¶ 14 (restricted); Ex. 43 (restricted); Ex. 29 (restricted); Ex. 21, Miller Decl. ¶¶ 23-25 (restricted); Ex. 47 (restricted); Ex. 27, Radic Decl. ¶¶ 10-11, 19 (restricted).

[118] *See supra* at Section II.F.

limited to a small number of especially challenging cases."[119] The Named Plaintiffs have expressed, through their grievances, a clear desire to be placed in the community rather than in a more restrictive detention setting. *See supra* at Section II.F.

The Named Plaintiffs' experiences are typical of those experienced by class members, as several GALs and public defenders across the state attest. These attorneys routinely represent clients with the same, or substantially similar, juvenile court orders to those of the Named Plaintiffs and their clients likewise remain detained waiting only for placements, services, assessments, and case planning.[120]

As with commonality, differences in class members' backgrounds or circumstances do not defeat typicality. *Wal-Mart Stores*, 564 U.S. at 349 n.5; *Colo. Cross-Disability Coal.*, 765 F.3d at 1216. Thus, because all Class and Subclass members are subject to the same conduct and raise the same legal challenges, typicality is satisfied.

### D. The Named Plaintiffs Are Adequate Class Representatives and Plaintiffs' Counsel Should Be Appointed as Class Counsel.

Plaintiffs here will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where class representatives do not have conflicts with other class members and will vigorously prosecute the action through qualified

[119] Ex. 9, McCarthy Rep. at 16; *see id.* at 15, 48; *see also* Ex. 11, Walters Flores Decl. ¶ 12; *supra* at Section II.C.1.

[120] Ex. 25, Brown Decl. ¶ 11; Ex. 17, Saehler Decl. ¶ 38; Ex. 22, Hilty Decl. ¶¶ 6-7, 23; Ex. 15, Martinez Decl. ¶¶ 9-10, 12; Ex. 16, Montemayor Decl. ¶¶ 8-9, 32 (restricted); Ex. 19, Truhe Decl. ¶¶ 7, 23 (restricted); Ex. 18, Simpson Decl. ¶¶ 8-11 (restricted); Ex. 20, Whitley Decl. ¶¶ 5, 9-10; Ex. 28, Diercks Farrell Decl. ¶¶ 6-7; Ex. 14, Rossiter Decl. ¶¶ 6-7; Ex. 21, Miller Decl. ¶¶ 10-12, 22-23, 29, 32-33, 37, 39 (restricted); Ex. 27, Radic Decl. ¶¶ 20-21, 26 (restricted); Ex. 26, Lyells Decl. ¶¶ 7-8.

counsel. *See Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187–88 (10th Cir. 2002).

*1) The Named Plaintiffs Are Adequate Class Representatives.*

Named Plaintiffs have no conflicts with the Class and Subclasses: they assert the same claims and seek the same relief. Each appears through a next friend who is also his GAL. *Id.* ¶¶ 242-43. They seek no unique benefit, only relief that will protect themselves, the Class, and the Subclasses from Defendants' unlawful policies and practices.

*2) Plaintiffs' Counsel Are Adequate Class Counsel.*

Under Federal Rule of Civil Procedure 23(g), any order certifying a class must appoint class counsel who will "fairly and adequately represent the interests of the class." In deciding whether counsel meet this standard, courts consider "the work counsel has done in identifying or investigating potential claims in the action," "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," "counsel's knowledge of the applicable law," and "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv). Counsel must be "competent and experienced in the particular substantive area involved." *See In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 118 (D. Colo. 1986).

Plaintiffs' counsel amply satisfy these criteria. Counsel from Children's Rights, the American Civil Liberties Union Foundation, the ACLU of Colorado, Disability Justice,[121] and Ropes & Gray LLP represent Plaintiffs. Counsel have extensive experience litigating

[121] Formerly known as Disability Law Colorado.

civil rights class actions, including cases involving children in foster care, people with disabilities, and incarcerated people, and will fairly and adequately protect the Class and Subclasses.[122] Counsel have invested considerable time investigating the claims and have the resources to litigate this action and enforce any relief. No conflicts of interest exist and counsel have a proven capacity for demanding, long-term litigation.[123] The Court should therefore appoint Plaintiffs' counsel as class counsel.

## V. Class Certification Is Appropriate Under Rule 23(b)(2).

Rule 23(b)(2) provides that, after Rule 23(a)'s requirements are met, a "class action may be maintained" where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) has two requirements: "the defendants' actions or inactions be based on grounds generally applicable to all class members[,]" and "final injunctive relief be appropriate for the class as a whole." *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso, Colo.*, 543 F.3d 597, 604 (10th Cir. 2008).[124] "[A]ctions in the civil rights field" are paradigmatic Rule 23(b)(2) cases. *See* Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment.

This case falls squarely within Rule 23(b)(2), which is designed for uniform, class-wide injunctive and declaratory relief. *See D.G. ex rel. Stricklin*, 594 F.3d at 1199-

---

[122] *See* Ex. 51, Kendrick Decl.; Ex. 52, Macdonald Decl.; Ex. 53, Persson Decl.; Ex. 54, Farrell Decl.; Ex. 55, Harvey Decl.

[123] *See id.*

[124] At the class certification stage, a plaintiff is not "required to come forward with an injunction that satisfies Rule 65(d) with exacting precision." *Id.* at 605 n.4.

1201. For example, relief for the class could be achieved through a single common injunction requiring Defendants to: provide sufficient community-based services and supports, create policies and practices around inter-agency collaboration, and develop data management and quality assurance processes.[125] These remedies draw on proven reforms in other jurisdictions and Dr. McCarthy's decades of experience, and readily meet the standard at the class certification stage.[126] *See, e.g.*, *D.G. ex rel. Stricklin*, 594 F.3d at 1200-01 (affirming certification of class seeking foster system caseworker practice requirements); *D.B.U. v. Trump*, 349 F.R.D. 228, 241 (D. Colo. 2025) (certifying class of noncitizens seeking notice and due process prior to detention and removal).

Defendants' challenged policies and practices apply to all class members, and Plaintiffs seek plausible class-wide remedies addressing each "driver" of their unlawful detention. *See supra* Sections II.B, II.D. The same indivisible relief would also remedy the harms to the Disability and Foster System Subclasses. *See supra* at Section II.C.[127]

## CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.

---

[125] Ex. 9, McCarthy Rep. at 24-27, 32-34, 39-42; *see also supra* at Section II.D.

[126] Ex. 9, McCarthy Rep. at 5, 7-8, 49.

[127] If the Court finds the record insufficient to support class certification of the general Class or Subclasses at this time, Plaintiffs request such denial be without prejudice and that Plaintiffs be entitled to begin discovery so that this class certification and the merits can be resolved as quickly as possible given the urgency of the harms at issue.

Respectfully submitted, this 7th day of October, 2026,

*/s/ Timothy R. Farrell*
**Ropes & Gray LLP**
Timothy R. Farrell, IL & N.Y. 6303276*
Nicholas Smith, IL 6327626*
Jashan Kashyap, IL 6346084*
191 North Wacker Drive, 32nd Floor
Tel: (312) 845-1209
Timothy.Farrell@ropesgray.com
Nicholas.Smith@ropesgray.com
Jashan.Kashyap@ropesgray.com

**Children's Rights**
Stephanie Persson, N.Y. 5469648*
Ira Lustbader, N.Y. 2516946*
Stephen Dixon, La. 18185*
Micaela Heery-Hyatt, N.Y. 5742218*
Eleanor Roberts, N.Y. 5994652*
88 Pine Street, Suite 800
New York, NY 10005
Tel: (212) 683-2210
spersson@childrensrights.org
ilustbader@childrensrights.org
sdixon@childrensrights.org
mheeryhyatt@childrensrights.org
eroberts@childrensrights.org

**American Civil Liberties Union of Colorado**
Timothy R. Macdonald, Colo. 29180
Emma Mclean-Riggs, Colo. 51370
Sara Neel, Colo. 36904
Scott Medlock, Colo. 57210
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Tel: (303) 777-5482
tmacdonald@aclu-co.org

emcleanriggs@aclu-co.org
sneel@aclu-co.org
smedlock@aclu-co.org

**Center for Legal Advocacy**
**D/B/A Disability Justice**
Emily Harvey, Colo. 47188
1580 Logan Street, Suite 600
Denver, CO 80203
Tel: (303) 722-0300
eharvey@disabilityjustice.co

**ACLU National Prison Project**
Corene T. Kendrick, Cal. 226642*
Marisol J. Dominguez-Ruiz, Cal. 345416*
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org
mdominguez-ruiz@aclu.org

David C. Fathi, Wash. 24893**
Quinn Phillips, Mass. 717737**
915 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 393-4930
dfathi@aclu.org
eepstein@aclu.org
qphillips@aclu.org

*Admitted to D. Colo.
**Admitted to D. Colo. Not admitted in D.C.; practice limited to federal courts.

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE WITH D.C.COLO.LCIVR 7.1(a)**

Pursuant to D.C.COLO.LCivR 7.1(a), Plaintiffs' counsel conferred with counsel for Defendants Polis and Barnes on October 1, 2026. Defendants' counsel advised that Defendants do not consent to the relief requested in Plaintiffs' Motion for Class Certification and Appointment of Class Counsel.

Dated: October 7, 2026

*/s/ Jashan Kashyap*

Jashan Kashyap
**Ropes & Gray LLP**
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1384
Jashan.Kashyap@ropesgray.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2026, a copy of the foregoing was sent to all parties via electronic filing through CM/ECF upon the following:

Lily E. Nierenberg
Kolya D. Glick*
Senior Assistant Attorneys General
**Colorado Department of Law**
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: 720.508.6000
Lily.Nierenberg@coag.gov
Kolya.Glick@coag.gov

*Attorneys for Defendant*
*Governor Jared Polis*

Jennifer H. Hunt
Michele Mulhausen
Senior Assistant Attorneys General
Kevin G. Webster
Assistant Attorney General
**Colorado Department of Law**
Ralph L. Carr Colorado Judicial Center
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: (720) 508-6000
michele.mulhausen@coag.gov
kevin.webster@coag.gov
jennifer.hunt@coag.gov

*Attorneys for Defendant*
*Michelle Barnes*

Dated: October 7, 2026

*/s/ Jashan Kashyap*

Jashan Kashyap
**Ropes & Gray LLP**
191 North Wacker Drive, 32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1384
Jashan.Kashyap@ropesgray.com

*Attorney for Plaintiffs*