# EXHIBIT 1

# Limit the Detention of Juveniles Annual Report

## State Fiscal Year 24-25

July 1, 2025



COLORADO
Department of Human Services

# Table Of Contents


Table Of Contents 2
Executive Summary 8
Purpose 8
Results 9
Youth Cohort 10
Table 1: Unique Youth and Admissions by Region and Statewide 10
Releasable Youth 10
Child Welfare Involvement 11
Outcomes 11
System Disparities 12
Recommendations 13
Limitations 14
Conclusion 14
Glossary Of Acronyms 15
Key Term Definitions 16
Releasable 16
Emergency Release 16
Emergency Placement 16
Trails 16
Detention Bed Utilization Tracking Sheet (DBUTS) 17
Direct File 17
Reverse-Transfer 17
Transfer 18
Introduction 19
History 19
Alternative Placements & the Term Releasable 21
Data Units and Suppression Minimums 22
Data and the Units of Analysis for This Report 22
Data Suppression 22
Data Sources and Methods 23
Data Limitations 24
Detention Bed Utilization Tracking Sheet 24
Courts Record Review 24
Expungements 24
Commitments 24

Youth Cohort 25
Table 2: Unique Youth and Admissions by Region and Statewide 25
Performance Standards & Outcome Measures 26
Equity Focus 26
Culturally Competent Services 27
Demographics Overview 27
Table 3: Statewide Releasable and Overall Unique Youth Count with Length of Stay and Admissions by Demographic Categories 28
Demographics and Length of Stay (LOS) 30
Table 4: Cohort Comparison with Overall Colorado Youth Population 31
Figure 1: Admissions and Average Length of Stay by Race/Ethnicity 32
Length of Stay (LOS) Regional Breakouts 32
Table 5: Trends in Demographic Categories' Average Length of Stay by Region 33
Child Welfare Youth 35
Table 6: Demographics for Youth with Historical and Active Child Welfare Involvement 36
Charges Distribution by Demographic Categories Across the State 37
Table 7: Offense Category and Type by Demographic Category 38
Charges by Region Overview 40
Table 8: Regional Admission Totals by Offense Category and Types 40
Charges Distribution for Demographic Categories by Region 41
Distribution of Level of Care (LOC) Recommendations 42
Table 9: Overall Level of Care Recommendations by Demographics 42
Colorado Juvenile Risk Assessment (CJRA) Pre-Screen Demographics Overview 44
Juvenile Detention Screening and Assessment Guide (JDSAG) Demographics Overview 46
Statistical Analysis 47
Results 48
Juvenile Detention Screening and Assessment Guide (JDSAG) Screens and Demographic Analysis 48
Colorado Juvenile Risk Assessment (CJRA) Pre-Screen and Demographic Analysis 48
Charges and Demographic Analysis 49
Length of Stay and Demographic Analysis 50
Releasable Length of Stay and Demographic Analysis 51
Child Welfare Involvement and Demographic Analysis 52

Detention Involvement and Demographic Analysis 53
System Focus 55
Barriers to Placements and Services 56
Length of Stay Analysis 56
General Admission Information 57
Table 10: Admissions by County Type 58
Table 11: Admissions by Judicial District Size 58
Table 12: Admissions with a Length of Stay Over and Under 30 Days 59
Figure 2: Distribution of Admissions 30 Days and Under 60
Figure 3: Distribution of Admissions Over 30 Days 60
Table 13: Detention Length of Stay by Region 61
Table 14: Number of Admissions Compared to Overall Youth Population by Region 62
Table 15: Total Length of Stay Compared to Overall Youth Population by Region 62
Figure 4: Total Length of Stay by Region and Admission Type, with Admission Counts 63
Offense Data for Youth with a "Quick Return" to Detention 64
Table 16: Offense Type for youth with a "quick return" to detention 65
Table 17: Offense Class for youth with a "quick return" to detention 65
Admissions Under & Over 30 Days 66
What Do We Know About Admissions 30 Days Or Less? 67
What Do We Know About Admissions Over 30 Days? 68
Table 18: Offense Type for Youth in Detention 30 Days or More 69
Table 19: CJRA Pre-screen Risk Levels with Admissions Over and Under 30 Days 70
Assessments 70
Colorado Juvenile Risk Assessment (CJRA) Pre-Screen Risk Level Overview 71
Table 20: Colorado Juvenile Risk Assessment Pre-Screen Risk Level by Admissions 71
Juvenile Detention Screening & Assessment Guide (JDSAG) Screen Results and Overrides 71
Table 21: Juvenile Detention Screening and Assessment Guide Override Information and Direction 72
Table 22: Juvenile Detention Screening and Assessment Guide: Placement Screens vs. Actual Placement and Overrides by Judicial District 73
Figure 5: Juvenile Detention Screening and Assessment Guide: Result and Actual Placement Level Comparison 74

Independent Assessment (IA) Level of Care Recommendations 74
Background 74
Analysis 76
Youth & Family Perception 77
Child Welfare Involvement 78
Figure 6: Court-Involvement for Non-Delinquent Unique Youth, Over Their Lifetime 78
Prior & Current Child Welfare Involvement 78
Table 23: Child Welfare Involvement for Cohort Detention Youth 79
Child Welfare Assessments 80
Table 24: Active Child Welfare Assessments 80
Table 25: Relationship or Role of Referral/Assessment Reports for Cohort Youth 80
Child Welfare Cases 81
Table 26: Active Child Welfare Cases 81
Table 27: Active Child Welfare Cases by County 82
Table 28: Case Program Area Services by Unique Case 83
Table 29: Case Closure Reason by Unique Case 84
Accessing Meetings for Family Engagement 85
Impact of Detention Caseload to Counties 86
County Funding Impact 86
Table 30: Total and Average Amount Spent by Counties as Entered into Trails, by Service 86
County Caseload Impact Overview 87
Figure 7: Point of Identification of Juvenile Justice-Involved Youth in Child Welfare 89
Table 31: Impact of Detention Involvements on Child Welfare, Unique Youth 91
Youth Focus 92
Statistical Youth Outcomes 93
Overview 93
Child Welfare or Detention Involvement First 94
Table 32: Detention Youth First Contact by Agency Type 94
Child Welfare Involvements and Length of Stay (LOS) 94
Table 33: Detention Length of Stay and Child Welfare Involvement 95
Detention Involvements and Length of Stay (LOS) 95
Table 34: Count of Unique Youth and Their Detention Involvements 95
Table 35: Count of Unique Youth and Their Detention Involvements Prior

to the Cohort 95
Charges and Length of Stay (LOS) 97
Table 36: Offense Category, Type, and Length of Stay 97
Bonds & Releasability 98
Bonds 99
Releasable Youth 99
Additional Outcomes for Releasable Youth 100
Releasable Youth and CJRA 100
Releasable Youth and Length of Stay 101
Releasable Youth and Child Welfare Involvements 101
Table 37: Number of Releasable Admissions by Date Range 102
Table 38: Releasable Information by Region, Including DHS Involvement 102
Placement Analysis 103
Denials 103
Foster and Kinship Care 103
Table 39: Foster Home Providers by County and Judicial District, 105
Placement Upon Release 106
Table 40: Total First Placements Following Release from Detention 107
Table 41: DHS Involved Placements Following Release from Detention 109
Youth in the Transfer, Direct File, and Reverse Transfer Processes 109
Table 42: Race/Ethnicity of Youth in Transfer, Reverse-Transfer and/or Direct File Processes 110
Table 43: Number of Youth in Transfer, Reverse-Transfer, and Direct File Processes by Region 111
Process Recommendations 113
Additional Information 114
Reduce Justice Involvement for Young Children 114
Table 44: Summary of Juvenile Justice Involvement for Child Welfare Youth by JD 115
Table 45: Summary of Juvenile Justice Involvement for Child Welfare Youth by Age 116
Detention Bed Capacity & Utilization 117
Borrowed Beds, Flex Beds & Emergency Beds 118
Figure 9: Statewide Max Detention and Emergency Bed Usage 118
Figure 10: Detention Bed Definitions 119
Figure 11: Flex Bed Allowance 120
Emergency Bed Utilization Patterns 120

Peak Emergency Bed Utilization 121
Capacity Analysis 122
Table 46: Colorado Youth Detention Continuum Bed Capacity Report by Judicial District for Calendar Year 2024 122
Regional Impact Overview 123
Central Region 124
Northeast Region 124
Southern Region 125
Western Region 125
Statewide Capacity Usage Summary 126
Table 47: Calendar Year 2024 Demographic Data 127
Appendix A: Colorado Region Map 129
Figure 12: Colorado Region Map with Judicial Districts 129
Appendix B: Referenced Bills 130
Appendix C: Supplemental Demographic Information 131
Table 48: Detailed Pivot Table of Offense Categories and Types by Region 131
Table 49: CJRA Pre-screen Risk Level Admission Counts and Percentages within Each Region 132
Table 50: BHA Level of Care Recommendations by Demographics 132
Appendix D: Offense & Override Category Detail 135
Table 51: Offenses and Their Corresponding Offense Types 135
Table 52: Offense Rankings 136
Appendix E: Emergency Bed Criteria 139
Appendix F: Releasable Admissions by Judicial District and County 141
Table 53: Admissions and Releasable Admissions by Judicial District 141
Table 54: Admissions and Releasable Admissions by County 142
Appendix G: Statistical Results 144
Table 55: Statistical Correlations Results for Youth Outcomes 144
Table 56: Statistical Correlations Results for Child Welfare Involved Demographics 146
Appendix H: Emergency Bed Tables 147
Table 57: Accompanying Statewide and Regional (Southern: S, Central: Cen, Northeast: NE, Western: W) Breakdowns of Daily Emergency Bed Usage 147
Appendix I: County Costs for Services 154
Table 58: Total and Average Amount Spent by Counties as Entered into Trails, by Service 154

# Executive Summary

This report addresses data requirements from three recent bills related to Colorado Revised Statute (C.R.S.) 19-2.5-1404, including Senate Bill (SB) 21-071 and House Bills (HB) 23-1307 and 23-1249.

# Purpose

In 2021, the General Assembly of the State of Colorado enacted SB21-071 (C.R.S. 19-2.5-1404). This bill enhanced the already existing Colorado Youth Detention Continuum (CYDC) Working Group, also known as the Advisory Board, with additional partners and mandates. The related mandates given to this working group were:

- “By October 31, 2022, … develop performance standards and outcome measures, to evaluate the degree to which alleged and adjudicated offenders are in the least restrictive setting with appropriate services.”
- “Evaluate whether the number of alternative placements, range of services offered by such placements, and community-based services available meet the needs of youth in each judicial district and county.”
- “Determine whether and how specific data and outcome measures must be reported to evaluate the efficacy of less restrictive placements and community-based services.”
- “Advise the Department of Human Services concerning policies, procedures, and best practices related to serving youth in the least restrictive setting.”
- Provide recommendations to “enhance the continuum of community-based services and placement options for alleged and adjudicated juvenile offenders” to improve availability and quality of less restrictive alternative placements and community-based services for youth.

C.R.S. 19-2.5-1404 requires the Department of Human Services on or before July 1 of every year, starting with July 1, 2023, to submit this report to the CYDC Advisory Board and appropriate legislative committees. This report must include an analysis of the data collected in accordance with performance standards and outcome measures, and it must show progress toward meeting those same standards and outcomes. In addition the report must include the status of implementation efforts, and analyses of the following: continuum of in-home and out-of-home placement options and supports for alleged juvenile offenders.

HB23-1307, effective calendar year 2023, now requires reporting on:

- Demographics of release-eligible youth (race, ethnicity, gender, age, sexual orientation, gender identity, disability status)
- Youth held in detention due to lack of available services or placements
- Daily usage of emergency beds by region
- Youth released when statewide detention exceeded bed capacity

Beginning on July 1, 2023, additional requirements for HB23-1249 (enacted August 7, 2023) include:

- Reporting on youth simultaneously involved in prevention services, dependency and neglect cases, or out-of-home placements while also in delinquency proceedings
- Analysis of dual-system youth by age, race, gender and disability status across judicial districts

# Results

Qualitative and quantitative data analysis methods were used in this report. Statistical analysis was used to explore patterns, relationships and trends with youth in detention. Qualitative analysis was conducted on surveys as well as content analysis on court case notes. The cohort for this report includes information on youth detained from July 1, 2023, through June 30, 2024.

# Youth Cohort

Table 1: Unique Youth and Admissions by Region and Statewide

| Region[1] | Unique Youth in Each Region[2] | Number of Admissions | % of Total Admissions |
|---|---|---|---|
| Central | 852 | 1,139 | 40.0% |
| Northeast | 582 | 779 | 27.4% |
| Southern | 456 | 655 | 23.0% |
| Western | 184 | 272 | 9.6% |
| State | 2,012[3] | 2,845 | 100% |

# Releasable Youth

- There were 693 unique releasable youth in this year's cohort.
- The average admissions length of stay for youth who were at some point made releasable was 36.0 days, with an average of 19.9 of these days occurring after the youth was made releasable. This is compared to the average admissions length of stay for all youth of 29.6 days.
- The median length of stay while youth is releasable is six days.
- Youth who are releasable are more likely to have higher Colorado Juvenile Risk Assessment (CJRA) pre-screen risk levels; this correlation is weak, however.
- Youth who are releasable are more likely to have a longer length of stay than youth who are not; this is a moderate correlation.
    - The releasable youth length of stay would include many youth awaiting services or placements, while youth who are not releasable often include

[1] The regional map with judicial districts can be found in Appendix A.
[2] Nonexclusive numbers (some youth have been in multiple regions, so this number is the unique youth count for each region). These numbers are based on the primary judicial district variable, so if youth experience multiple regions in one admission, these numbers may be slightly underrepresented.
[3] This number differs slightly from the unique youth count in CYDC's annual report. During the data cleaning, five duplicate youth were found, and their admissions were collapsed.

those youth who were released immediately at the detention hearing, or those released within a week. This is explained further in the section "Releasable Youth and Length of Stay."

## Child Welfare Involvement

- A total of 1,488 (74.0%) of the 2,012 unique youth in the cohort were identified as having some type of involvement with a county department of human or social services at any point between their birth and their first detention admission within the cohort.
- There were 959 (47.7%) of the 2,012 unique youth in the cohort with active child welfare involvement during a cohort detention admission.
  - Of the 959 youth who had active involvement with county departments of human or social services, 596 (62.2%) of these youth had new involvement during their detention stay. "New involvement" is defined later in the report. There were 190 youth (31.9%) of the 596 youth who did not have any previous child welfare involvement prior to their cohort detention admission.

## Outcomes

- Similar to last year, a youth's prior detention involvement can predict an increase in length of stay. For every additional previous time a youth was in detention, their length of stay increases by 8.7 days.
  - It cannot be determined that detention involvement causes increased lengths of stay, only that there is a correlation between these two variables. Traditionally, outcomes within justice involvement are understood to be caused by unmet criminogenic needs[4]. Further research

[4] Some notable sources include: Andrews & Bonta, "Rehabilitating Criminal Justice Policy & Practice" (2010); Cullen, "Assessing Correctional Rehabilitation: Policy, Practice, and Prospects" (2000); Loeber,

is needed to determine additional factors that contribute to these outcomes for youth.

- Admissions in the Transfer, Direct File and/or Reverse-Transfer processes comprised nearly one-quarter (24.4%) of the total days in detention for the cohort. Additionally, these admissions accounted for 17.9% of all bed capacity within this fiscal year (a 1.4% increase from SFY 22-23). Expressed against the bed cap, this means that an average of 176.5 beds, at any given time, are available for non-Transfer, non-Direct File and/or non-Reverse-Transfer detention admissions. This represents a decrease of three available beds compared to SFY 22-23. In other words, about 38.5 beds were essentially "off-line" and unable to be accessed by other detainees as they were occupied by youth in the Transfer, Direct File and/or Reverse-Transfer processes.
- Youth charged with violent offenses are more likely to stay in detention longer than youth without violent offenses.

## System Disparities

- Similar to SFY 22-23, there are ethnic disparities present. This information, with more precise figures, is further explored in the "Equity" section of the report.
    - Black and Hispanic youth are overrepresented in the detention populations.
    - Youth who are identified as White have less severe charges than other youth.
    - Black youth tend to have more severe charges than their peers, longer lengths of stay, more detention involvements and fewer child welfare involvements.

---

"Young Children Who Commit Crime: Epidemiology, Developmental Origins, Risk Factors, Early Interventions, and Policy Implications" (2001).

- Black, Indigenous and People of Color (BIPOC) youth are also more likely to have more detention involvement.

- Male youth also tend to have a more severe offense ranking than their female peers.

# Recommendations

It remains the recommendation of the analysts for C.R.S. 19-2.5-1404 that the following priorities be set:

- Partner with a third-party evaluator to ensure fair analysis of culturally competent access to services.
- Create uniform criteria for placements statewide, including creating benchmarks for placement processes to understand youth outcomes and needs (e.g., a standard recommendation process for placements).
- Continue to invest in creating additional placement options, and implement existing funding for placements. Ensure the existing incentive program expands options for youth with substantial barriers to placement. This will alleviate the strain from barriers on long stays in detention or ultimately out-of-state placements.
- Continue to investigate approaches to support equitable treatment for youth and to address the disparity that Black youth face in the justice system. Continue to collect data and dedicate research to further understanding this disparity.
- Explore ways to defer youth from detention who would otherwise be immediately released at their detention hearing.
- Invest in data infrastructure to better support performance standards where data is currently unavailable.

# Limitations

The following is a list of limitations experienced during the preparation of this report:

- Multiple data collection systems were necessary to compile the data needed for this report, and manually aligning this information was inefficient and challenging.
- Data Sharing Agreements are in progress that will allow for more specific information to be shared and subsequently analyzed; however, those agreements were not fully in place for the SFY 24-25 report.
- Trails module builds to collect information for HB23-1249 (C.R.S. 19-2.5-1404), as defined on page 70, were implemented in September 2024 and March 2025. A more robust analysis of these results will be included in the July 2026 report.
- Privacy and data protection requirements make reporting findings limited in some cases due to small sample sizes.
- Statistical outcomes are currently limited by the early nature of this report (this is only the second full year of data). The addition of data in future years will provide more nuance and reliability (more statistical power with larger group sizes).

# Conclusion

This report is a collective analysis of data available from July 1, 2023, to June 30, 2024. There are many data processes that will take time and technology to develop, as well as stakeholder relationships that need to be further developed. However, this report provides new system information on child welfare involvement, releasable youth, system disparities for racial and ethnic minorities and more.

# Glossary Of Acronyms

| | |
|---|---|
| BHA | Behavioral Health Administration |
| BIPOC | Black, Indigenous, and People of Color |
| C.R.S. | Colorado Revised Statutes |
| CANS | Child and Adolescent Needs and Strengths tool |
| CDHS | Colorado Department of Human Services |
| CFMS | Colorado Financial Management System |
| CJRA | Colorado Juvenile Risk Assessment Pre-Screen |
| CMHHIP | Colorado Mental Health Hospital in Pueblo |
| CMP | Collaborative Management Program |
| CYDC | Colorado Youth Detention Continuum |
| DBUTS | Detention Bed Utilization Tracking Sheet |
| DCW | Division of Child Welfare |
| DOC | Department of Corrections |
| DSA | Data Sharing Agreement |
| DYS | Division of Youth Services |
| EPP | Expedited Permanency Placement |
| FFPSA | Family First Prevention Services Act |
| HB | House Bill |
| HCPF | Health Care Policy and Financing |
| IA | Independent Assessment |
| ICJ | Interstate Compact on Juveniles |
| JD | Judicial District |
| JDSAG | Juvenile Detention Screening and Assessment Guide |
| LOS | Length of Stay |
| MST | Multi-Systemic Therapy |
| PA | Program Area |
| PR Bond | Personal Recognizance Bond |
| PRTF | Psychiatric Residential Treatment Facility |
| QRTP | Qualified Residential Treatment Program |
| RCCF | Residential Child Care Facility |
| RLOS | Releasable Length of Stay |
| SB | Senate Bill |
| SFY | State Fiscal Year |
| YOS | Youthful Offender System |

# Key Term Definitions

The definitions below for "releasable, emergency release and emergency placement" were established by the working group (i.e., CYDC Advisory Board) for this report to aid in data cohesion.

## Releasable

For some youth in detention, the court determines that services and/or placement can mitigate the substantial risk of serious harm to others or risk of flight from prosecution. If services and/or placement are available to mitigate these risks, these youth may be released from detention when these opportunities become available.

## Emergency Release

The release of a youth from detention as a result of reaching the judicial district detention capacity and facility capacity, and an Emergency Bed is unable to be utilized, as defined in C.R.S. 19-2.5-1407.3(4).

## Emergency Placement

The court has ordered youth be immediately released from secure detention, and granted temporary physical and legal custody of a youth to the county departments of human or social services for appropriate placement, which may not be immediately available.

## Trails

Colorado's current Comprehensive Child Welfare Information System, known as Trails, is the official case management information system for all child welfare and youth services documentation.

## Detention Bed Utilization Tracking Sheet (DBUTS)

A protected Google Sheet that keeps personally identifiable information (PII) for detained youth within each judicial district. CYDC coordinators and bed managers use this sheet for bed and case management of youth who are in detention. This information is often manually collected from other sources (i.e., Trails or the Colorado State Court Data Access website).

## Direct File

Used to describe statutory discretion that allows prosecutors to decide whether to bring charges against persons under the age of 18 but 16 years of age or older at time of offense in juvenile court or in adult criminal court, as outlined in Section C.R.S. 19-2.5-801. When a prosecutor chooses to directly file a youth's case in adult criminal court, the juvenile court does not have jurisdiction over proceedings concerning the charge(s). In Colorado, Direct File discretion is limited to specific, serious crimes and the age range previously cited. Official language and description can be found in statute.

## Reverse-Transfer

After a preliminary hearing, a juvenile may petition the adult criminal court to transfer the case back to juvenile court. Ultimately, the court determines whether the juvenile and the community would be better served by criminal (e.g., adult) or adjudicative (e.g., juvenile) proceedings. The reverse-transfer process was established in Colorado in 2012 through HB12-1271. Complete statutory language and description can be found in C.R.S. 19-2.5-802.

## Transfer

The "juvenile court may enter an order certifying a juvenile to be held for criminal proceedings in the district court if a petition filed in juvenile court alleges the juvenile …" of a specific age is alleged to have committed specific offenses found in C.R.S. 19-2.5-802, and "the juvenile court finds it would be contrary to the best interest of the juvenile or of the public to retain jurisdiction." A petition can only be transferred from juvenile to district (e.g., adult) court after a hearing is held pursuant to the requirements and factors set forth in this statute.

# Introduction

This report addresses data requirements from three recent bills related to Colorado Revised Statute (C.R.S.) 19-2.5-1404, including Senate Bill (SB) 21-071 and House Bills (HB) 23-1307 and 23-1249.

# History

In 2018, the federal Family First Prevention Services Act (FFPSA) made available federal Title IV-E child welfare funding to reimburse states for the provision of certain evidence-based prevention services aimed at keeping children and youth safely together with their parent(s) and family whenever possible, as opposed to only supporting placement costs when a youth is removed from the home. In 2019, Colorado brought the introduction of Juvenile Justice Reforms by way of SB19-108 (Appendix B), which created opportunities to improve the outcomes for youth in the juvenile justice system by standardizing several screening tools to better align youth needs to appropriate, effective services.

The Colorado General Assembly passed SB21-071 (C.R.S. 19-2.5-1404) in 2021, which reduces the statewide statutory limit on detention bed capacity from 327 to 215 beginning in state fiscal year (SFY) 2021-2022. C.R.S.19-2.5-1404 also mandates the statutory working group (Colorado Youth Detention Continuum (CDYC) Advisory Board) to, among other things:

1) Develop performance standards and outcome measures to evaluate whether alleged and adjudicated offenders are in the least restrictive environment with appropriate services. This requires the evaluation of alternative placements, range of placements and the community-based service options available in each judicial district and county.

2) "Determine whether and how specific data and outcome measures must be reported to evaluate the efficacy of less restrictive placements and community-based services."

3) Provide recommendations to enhance the continuum of community-based services and placement options, including but not limited to, improvements of availability and quality of least restrictive alternative placement and services.

Prior to July 1, 2023, and every July thereafter, the Department of Human Services is responsible for submitting an annual report to the working group and legislative committees, which includes analysis of data collected in accordance with the stated performance standards and outcomes measures developed in subsection (3)(a)(I) of this section of C.R.S. 19-2.5-1404, as well as:

1) Implementation efforts
2) Analysis of the continuum of in-home and out-of-home placement options and supports
3) Capacity and bed demands
4) Availability/demand of all levels of placement
5) Use of funding for all levels of placement and services
6) Community-based services that allow youth to remain home
7) Barriers to placement
8) Youth detained awaiting a least restrictive placement
9) Average length of stay for detained youth
10) Family/youth satisfaction with least restrictive, alternative placement
11) Analysis of crossover youth

In 2023, both HB23-1307 and HB23-1249 added additional reporting elements to C.R.S. 19-2.5-1404. HB23-1307 requires predetermined demographic data to be reported in relation to temporary emergency bed usage and bed capacity releases.

HB23-1249 added demographic data requirements, including the number of youth by age and judicial district who had prevention services; an assessment; and an open dependency and neglect case and/or out-of-home placement at the same time they had an open delinquency case in district court, were on juvenile probation and/or had a juvenile deferred sentence.

The Colorado Department of Human Services (CDHS) is pleased to submit the SFY 24-25 Colorado C.R.S. 19-2.5.1404 Limit the Detention of Juveniles Annual Report.

# Alternative Placements & the Term Releasable

One statutory requirement for C.R.S. 19-2.5-1404 is analysis around the number of youth awaiting placement in the least restrictive setting. One way this is achieved is by providing alternative placements in the community for eligible detention youth. Previously, a term used to describe these youth was “releasable.”

The term “releasable” has been debated by stakeholders, and each judicial district tends to have a different working definition of the term. Some courts never make a youth “releasable,” while others make youth “releasable” only upon release. Furthermore, many youth are made “releasable” during the course of their detention, and their releasability status can fluctuate throughout their detention admission. The term has also often been misunderstood as indicating a youth should be immediately released from detention. However, in reality, youth must be placed into a court-approved location that would mitigate the youth’s risk to the community or the youth’s risk of flight from prosecution. At times, these placements and services are not available or take a long time to find.

Placement and services searches are often still being conducted for youth who may not be considered “releasable” by the court, but who still could be released if risk-mitigating placements or services are in place. Reporting on only “releasable” youth provides inconsistent analysis, and underrepresents the efforts of both CYDC and county departments of human and social services.

To simplify the reporting on alternative placements and services, expand the scope of analysis and provide consistency across the state, the working group removed the term “releasable” at its October 2024 meeting. Future reports will focus on all youth in detention with placements or services searches rather than limiting it to those who have a “releasable” designation from the court. Since the data in this report was collected prior to that decision, this report still uses the older term “releasable.”

# Data Units and Suppression Minimums

## Data and the Units of Analysis for This Report

The admissions information in this report differs a little from other reports produced by the Division of Youth Services, which focus on facility as the primary unit of analysis. When facility is the primary unit of analysis, if a youth transfers to a new facility within the same detention episode, this is counted as a new admission for the new facility and the LOS clock restarts. For purposes of this report, youth is the primary unit of analysis. Therefore, the length of stay numbers represent the total consecutive amount of time a youth would have spent in detention in one admission episode, regardless of their facility location. There are also fewer admissions in the report as they have been “collapsed” to reflect continuous youth detentions.

## Data Suppression

To keep youths’ identities confidential, this report uses data suppression minimums. In any summaries or analysis categories where youth information is shared, counts below 12 are excluded unless stated otherwise. Those numbers are replaced with “X.” Footnotes notate that data suppression exists.

# Data Sources and Methods

During the process to evaluate the directives of the working group, analysts for C.R.S. 19-2.5-1404 worked with:

- Trails, Colorado's current Comprehensive Child Welfare Information System
- Detention Bed Utilization Tracking Sheet (DBUTS); this Google Sheet is the only source of certain CYDC data regarding programming throughout the 22 Colorado judicial districts[5]
- Child Welfare Juvenile Justice-Involved Youth-County Human Services Survey (December 2024 to January 2025)
- Colorado State Courts Data Access system
- County Financial Management System (CFMS)
- Additional high-level contextual information from stakeholders.

The primary analysis methods used in this report were quantitative. Data from Trails established the basic cohort of youth, which was integrated with the other data sources. Descriptive analysis was used to provide context and summaries about the youth cohort for this report. Lastly, statistical analysis, including correlation tests and regression analysis, was used to understand system disparities and impacts on youth outcomes.

Some of the methodologies used to extract child welfare data for this report differed slightly from those applied in previous years' reports. As a result, several of the child welfare figures used in this report trend away from identical figures in the previous year, such as the number of detention or non-detention youth ever having involvement with child welfare, or the number and types of child welfare cases or assessments. Efforts to further refine and standardize the data used annually for this

[5] The 23rd judicial district will be live in Trails July 1, 2025 and therefore will not appear in this report until July 2027.

report are an ongoing priority to continuously provide comprehensive information to stakeholders.

# Data Limitations

## Detention Bed Utilization Tracking Sheet

This sheet is often used as the stopgap, data collection method for data requested from the Advisory Board that is not yet fully available in official sources. There are limitations with this data which include multiple users, manual data entry, expunged records and attempting manual retroactive lookups for additional data requests. Tracking information from one live, shared database can increase the likelihood of errors, so the analysts for C.R.S. 19-2.5-1404 review and clean the data. This process is continually being improved.

## Courts Record Review

Some of the data used for this report was manually gleaned by reading case notes from the Colorado State Courts Data Access system to find information around releasable status, release dates, bonds, placements and more. Each data point per admission takes a minimum of five minutes of reading. The data found in this one external system represents thousands of hours of research alone for this report.

## Expungements

A significant portion of the youth court records in this cohort was expunged; therefore there are limitations to the full accuracy of this dataset. At least 312 detention admissions (11.0% of cohort admissions), or 272 unique youth (13.5% of cohort youth), had court records that were identified as expunged.

## Commitments

Nine (0.3%) admissions were for primarily committed youth who have short detention stays in the middle of a DYS commitment. These admissions were removed from the detention-focused analysis.

# Youth Cohort

Table 2: Unique Youth and Admissions by Region and Statewide

| Region[6] | Unique Youth in Each Region[7] | Number of Admissions | % of Total Admissions |
|---|---|---|---|
| Central | 852 | 1,139 | 40.0% |
| Northeast | 582 | 779 | 27.4% |
| Southern | 456 | 655 | 23.0% |
| Western | 184 | 272 | 9.6% |
| State | 2,012[8] | 2,845 | 100% |

[6] A map of the regions can be found in Appendix A.
[7] Nonexclusive numbers (some youth have been in multiple regions, so this number is the unique youth count for each region). These numbers are based on the primary judicial district variable, so if youth experience multiple regions in one admission, these numbers may be slightly underrepresented.
[8] This number differs slightly from the unique youth count in CYDC's annual report. During the data cleaning, five duplicate youth were found and their admissions were collapsed.

# Performance Standards & Outcome Measures

## Equity Focus

The Colorado Department of Human Services in conjunction with designated juvenile justice serving partners will gather and analyze data to assist in reducing inequities, to ensure youth have access to culturally aware, humble, and relevant services.

---

Metric 1: Summarize the availability of culturally appropriate (aware, humble, and relevant) services by judicial district (JD) and county.

Metric 2: Analyze demographic information of youth who remain in detention awaiting services or placements, and for youth who are also currently served by counties.

Metric 3: Analyze demographic information, and identify any disparities as they relate to length of stay in detention.

Metric 4: Analyze demographic information, and identify any disparities as they relate to the level of care recommended by the detention screen and the level of care received.

Metric 5: Analyze demographic information, and identify any disparities as they relate to acceptance into facilities/programs/providers.

---

## Culturally Competent Services

This data is not currently in Trails or in other systems that report analysts can access. Collecting this data would require developing systems that are not currently in place. In the future, this information could be included in youth and family surveys, or collected via a database, if a robust services and referrals system is implemented for detention youth.

## Demographics Overview

This section details demographics of the SFY 23-24 cohort within detention centers, including an overview of releasable and child welfare-involved youth. This analysis, categorized by region, explores differences related to length of stay, offense charges, level of care recommended and received.

Data Note: While certain categories may show higher averages, these findings can often be attributed to the influence of small sample sizes. When the sample size is small, even a few extreme values can disproportionately impact the average, leading to data skew and misleading conclusions. To ensure reliability and validity, the following analysis focuses on larger sample sizes where data trends are more stable and less susceptible to random fluctuations, deriving more accurate and meaningful insights from the data. As cited in the Child Welfare section below, studies suggest disproportionate representation of LGBTQ+ youth in child welfare due to a number of unique factors.

Table 3: Statewide Releasable and Overall Unique Youth Count with Length of Stay and Admissions by Demographic Categories

| | Releasable Youth | | Total Cohort | | | |
|---|---|---|---|---|---|---|
| | Count | % | Count | % | Avg LOS | Admissions |
| **STAFF ASSIGNED GENDER** | | | | | | |
| Male | 524 | 75.6% | 1,595 | 79.3% | 32.2 | 2,247 |
| Female | 169 | 24.4% | 417 | 20.7% | 19.8 | 598 |
| **ETHNICITY** | | | | | | |
| White | 243 | 35.0% | 632 | 31.4% | 22.9 | 872 |
| Black or African American | 177 | 25.6% | 454 | 22.6% | 36.4 | 680 |
| Hispanic | 240 | 34.7% | 835 | 41.5% | 31.0 | 1,180 |
| American Indian or Alaskan Native | 12 | 1.7% | 26 | 1.3% | 23.1 | 34 |
| Asian | X | X | X | X | 17.1 | 17 |
| Native Hawaiian or Other Pacific Islander | X | X | X | X | 28.4 | 14 |
| Unable To Determine/Missing | 15 | 2.2% | 41 | 2.0% | 31.5 | 48 |
| **AGE AT ADMISSION** | | | | | | |
| 10-11 Years | X | X | 17 | 0.9% | 16.3 | 22 |
| 12 Years | X | X | 48 | 2.4% | 27.4 | 61 |
| 13 Years | 62 | 9.0% | 179 | 8.9% | 23.2 | 236 |
| 14 Years | 115 | 16.6% | 327 | 16.3% | 23.4 | 428 |
| 15 Years | 155 | 22.4% | 449 | 22.3% | 35.0 | 637 |
| 16 Years | 170 | 24.4% | 485 | 24.1% | 35.2 | 702 |
| 17 Years | 165 | 23.8% | 507 | 25.2% | 26.0 | 759 |

| | Releasable Youth | | Total Cohort | | | |
|---|---|---|---|---|---|---|
| | Count | % | Count | % | Avg LOS | Admissions |
| **SEXUAL ORIENTATION** | | | | | | |
| Bisexual | 34 | 4.9% | 88 | 4.4% | 18.0 | 134 |
| Straight or Heterosexual | 551 | 79.5% | 1,590 | 79.0% | 31.4 | 2,320 |
| Lesbian or Gay | 12 | 1.7% | 27 | 1.3% | 26.0 | 41 |
| Missing | 81 | 11.7% | 286 | 14.2% | 21.9 | 320 |
| Other Queer Identifying | X | X | X | X | 23.5 | 15 |
| Unknown | X | X | X | X | 36.7 | 15 |
| **PREFERRED GENDER PRONOUNS** | | | | | | |
| He/Him | 467 | 67.3% | 1,372 | 68.2% | 32.8 | 1,994 |
| He/They | 0 | 0.0% | X | X | 1.2 | X |
| Missing | 80 | 11.6% | 293 | 14.6% | 22.6 | 328 |
| She/Her | 139 | 20.1% | 330 | 16.4% | 21.7 | 502 |
| She/They | X | X | X | X | 62.3 | X |
| They/Them | X | X | X | X | 16.8 | X |
| Unknown | X | X | X | X | 37.8 | X |
| **GENDER IDENTITY** | | | | | | |
| Female | 147 | 21.2% | 354 | 17.6% | 21.1 | 530 |
| Male | 471 | 67.9% | 1,397 | 69.4% | 32.7 | 2,020 |
| Missing | X | X | X | X | 24.0 | 279 |
| Other | X | X | X | X | 22.1 | 16 |
| STATE TOTAL[9] | 693 | 100% | 2,012 | 100% | 29.6 | 2,845 |

[9] Note: Some values are written as "X" due to suppression minimums. "Other" Gender Identities include Genderqueer, Nonbinary/Gender non-conforming, and Two-Spirit. The lower average length of stay for 17 year olds is likely due to aging out of the juvenile detention system (youth are transferred to jail upon their 18th birthday).

## Demographics and Length of Stay (LOS)

Analyzing length of stay differences across various demographic factors such as age, gender identity, staff-assigned gender and race/ethnicity illustrates the variations in experiences within youth detention centers. It is important to keep in mind that in many of these categories, the trends of average length of stay follow the number of admissions. Male youth represent around 80% of the cohort, consistent with SFY 22-23 data, and there is a significant amount of missing data for gender identity, preferred gender pronouns, and sexual orientation. Demographic data on gender pronouns has been removed due to low population sizes, i.e., a low variety in self-reported gender identity. However, there are some notable differences to highlight.

Differences in average length of stay across races/ethnicities show Black or African American (also referred to as “Black”) youth have the highest average length of stay of 36.4 days and have the third most admissions in the cohort. Additionally, both Hispanic and Black youth are overrepresented in the detention population; Black youth significantly so (see Table 4 that follows). Black youth also have a longer length of stay compared to their peers, as seen in Figure 1 that follows. As will be further explored in the following, statistical tests consistently showed disparities for Black youth when compared to other races/ethnicities.

Understanding and addressing systemic factors such as cultural competency, access to resources and socioeconomic determinants are crucial in mitigating these disparities and ensuring equitable treatment and outcomes for all youth within detention centers. This will be further evaluated in the statistics section.

Table 4: Cohort Comparison with Overall Colorado Youth Population

| Race/Ethnicity | Count of Cohort Youth | % of Cohort Youth | % Statewide Youth Population in 2023* |
|---|---|---|---|
| American Indian or Alaskan Native | 26 | 1.3% | 1.5% |
| Asian | X | X | 3.0% |
| Black or African American | 454 | 22.6% | 4.1% |
| Hispanic | 836 | 41.5% | 33.1% |
| Native Hawaiian or Other Pacific Islander | X | X | 0.2% |
| Unable to Determine | 41 | 2.0% | N/A |
| White | 632 | 31.4% | 60.9% |
| Total | 2,012 | 100% | 102.8%[10] |

Notable disparities include:

- Black youth are significantly overrepresented, comprising 22.6% of the detention population but only 4.1% of Colorado's youth population.
- Hispanic youth are overrepresented at 41.5% compared to 33.1% of the population.
- White youth are underrepresented at 31.4% compared to 60.9% of the population.
- Asian youth are underrepresented compared to 3.0% of the population.

[10] From the Census Bureau's American Community Survey Estimates (www.census.gov - B010001 and S0101); the N/As are due to missing census data; the 102.8% is due to their Margin of Error. Some values are written as "X" due to suppression minimums. Those highlighted in yellow indicate overrepresentation, and green highlights underrepresentation.

Figure 1: Admissions and Average Length of Stay by Race/Ethnicity




## Length of Stay (LOS) Regional Breakouts

Demographics are compared across the different regions of the state. The following is an overview of length of stay (LOS) for detained youth in various regions, comparing demographic aspects to the number of admissions.

Table 5: Trends in Demographic Categories' Average Length of Stay by Region

| Region | Central | | Northeast | | Southern | | Western | |
|---|---|---|---|---|---|---|---|---|
| | Avg LOS | Admissions | Avg LOS | Admissions | Avg LOS | Admissions | Avg LOS | Admissions |
| **STAFF ASSIGNED GENDER** | | | | | | | | |
| Male | 35.8 | 886 | 28.9 | 642 | 34.6 | 526 | 20.6 | 193 |
| Female | 20.5 | 253 | 15.8 | 137 | 20.3 | 129 | 23.8 | 79 |
| **ETHNICITY** | | | | | | | | |
| White | 17.3 | 249 | 24.6 | 274 | 29.5 | 191 | 20.8 | 158 |
| Black or African American | 38.6 | 410 | 30.2 | 91 | 36.2 | 156 | 22.1 | 23 |
| Hispanic | 35.1 | 419 | 27.1 | 395 | 31.8 | 296 | 25.4 | 70 |
| American Indian or Alaskan Native | 36.3 | X | 39.4 | X | 15.7 | X | 13.7 | 15 |
| Unable To Determine/ Missing | 36.4 | 33 | 29.1 | X | 12.5 | X | 3.7 | X |
| **AGE AT ADMISSION** | | | | | | | | |
| 10-11 Years | 22.6 | X | 27.8 | X | 10.3 | X | 2.0 | X |
| 12 Years | 46.7 | X | 23.2 | X | 18.1 | X | 16.7 | X |
| 13 Years | 56.2 | 71 | 18.5 | 70 | 23.4 | 64 | 26.7 | 31 |
| 14 Years | 23.3 | 167 | 26.3 | 99 | 23.4 | 108 | 18.0 | 54 |
| 15 Years | 38.3 | 248 | 26.3 | 181 | 47.0 | 150 | 17.7 | 58 |
| 16 Years | 36.8 | 304 | 34.8 | 203 | 35.6 | 146 | 26.2 | 49 |
| 17 Years | 29.2 | 326 | 21.9 | 208 | 26.1 | 156 | 23.1 | 69 |
| **SEXUAL ORIENTATION** | | | | | | | | |
| Bisexual | 9.3 | 41 | 16.4 | 51 | 26.8 | 32 | 33.8 | X |
| Straight or Heterosexual | 34.9 | 838 | 27.8 | 682 | 34.3 | 558 | 22.3 | 242 |
| Lesbian or Gay | 25.2 | 17 | 29.2 | X | 31.1 | X | 2.5 | X |
| Missing | 28.2 | 232 | 5.9 | 25 | 5.3 | 50 | 4.1 | 13 |

| Region | Central | | Northeast | | Southern | | Western | |
|---|---|---|---|---|---|---|---|---|
| | Avg LOS | Admissions | Avg LOS | Admissions | Avg LOS | Admissions | Avg LOS | Admissions |
| GENDER IDENTITY | | | | | | | | |
| Female | 22.6 | 208 | 15.1 | 128 | 22.6 | 120 | 24.8 | 74 |
| Male | 36.0 | 722 | 29.6 | 619 | 35.9 | 494 | 21.5 | 185 |
| Missing | 30.3 | X | 4.2 | 23 | 9.4 | X | 3.6 | X |
| Unknown | 0.0 | 0 | 115.9 | X | 0.0 | 0 | 0.0 | 0 |
| TOTAL | 32.4 | 1,139 | 26.6 | 779 | 31.8 | 655 | 21.5 | 272 |
| STATE TOTAL[11] | Avg LOS: 29.6 | | | | Admissions: 2,845 | | | |

The analysis of length of stay (LOS) reveals significant differences across demographic groups and regions:

- Male youth have a substantially longer average length of stay (32.2 days) compared to female youth (19.8 days) statewide.
- Black youth have the highest average length of stay (36.4 days) statewide, with higher than average length of stay in the Central region (38.6 days).
- White youth have the lowest average length of stay among the major ethnic groups (22.9 days), with a notably low length of stay in the Central region (17.3 days).
- The Central and Southern regions show the longest average length of stay (32.4 days and 31.8 days, respectively), while the Western region has the shortest (21.5 days).

[11] Some values are written as "X" due to suppression minimums. Asian, Native Hawaiian or Other Pacific Islander ethnic categories, Other Queer Identifying, Unknown sexual orientations and "Other" Gender Identities counts have been removed due to suppressed data. "Other" Gender Identities include Genderqueer, Nonbinary/Gender non-conforming and Two-Spirit.

# Child Welfare Youth

While most of a youth's demographic information is visible to both the Divisions of Child Welfare and Youth Services in Trails, the specific point in time at which this information is collected can vary widely, and may lend to discrepancies when comparing demographic data between the two divisions. As an example, a youth's demographic details initially collected by a child welfare agency will remain unchanged during the entirety of their involvement, whereas the same youth will have their demographic information entered and updated each time they are screened for detention. Youth in the cohort with either historical or active involvement in child welfare make up 80.9% (1,627) of the 2,012 unique cohort youth and are the youth included for this analysis.

- Youth involved in both the child welfare and juvenile justice systems largely reported being straight/heterosexual (79.5%).
- The majority of youth involved in both child welfare and juvenile justice systems were 16 and 17 years old (51.3%), whereas last year, the majority of youth were 15 and 16 years old (56.8%).
- Youth noted by staff as identifying as male and those who self-reported being born male were generally comparable at 68.6% and 77.6%, respectively.

Table 6: Demographics for Youth with Historical and Active Child Welfare Involvement

| Child Welfare Involved Youth Demographics | | | | | |
|---|---|---|---|---|---|
| STAFF ASSIGNED GENDER | Count | % | SEXUAL ORIENTATION | Count | % |
| Male | 1,262 | 77.6% | Straight or Heterosexual | 1,293 | 79.5% |
| Female | 365 | 22.4% | Missing | 212 | 13.0% |
| GENDER IDENTITY | Count | % | Bisexual | 81 | 5.0% |
| Male | 1,116 | 68.6% | Lesbian or Gay | 22 | 1.4%[12] |
| Female | 315 | 19.4% | Do Not Know/ Questioning | X | X |
| Non-Binary | X | X | Pansexual | X | X |
| Missing | 186 | 11.4% | Refused to Answer | X | X |
| Unknown | X | X | Other | X | X |
| Genderqueer | X | X | AGE AT ADMISSION | Count | % |
| ETHNICITY | Count | | 10 | X | X |
| Hispanic | 641 | 39.4% | 11 | X | X |
| White | 527 | 32.4% | 12 | 39 | 2.4% |
| Black or African American | 388 | 23.8% | 13 | 135 | 8.3% |
| Unable to Determine/ Missing | 37 | 2.3% | 14 | 230 | 14.1% |
| | | | 15 | 370 | 22.7% |
| American Indian or Alaskan Native | 18 | 1.1% | 16 | 389 | 23.9% |
| Asian | X | X | 17 | 446 | 27.4% |
| Native Hawaiian or Pacific Islander | X | X | Statewide Total[13] | 1,627 | 100% |

[12] Studies suggest disproportionate representation of LGBTQ+ youth in child welfare due to a number of unique factors, many of which are discussed in the Yale Law School's Global Health Justice Partnership paper, "LGBTQ+ Youth in the Child Welfare System: What We Know." https://law.yale.edu/sites/default/files/area/center/ghjp/documents/yes-state-of-knowledge-sheet-1-lgbtq-youth-in-the-child-welfare-system.pdf

[13] Some values are written as "X" due to suppression minimums.

# Charges Distribution by Demographic Categories Across the State

This section summarizes the charges faced by youth in detention within DYS youth services centers, focusing on both the offense category (felony, misdemeanor, petty) felony, misdemeanor, petty) and offense type (person, property, weapon, drug, status, traffic, other) across the state. More information about these offense categories can be found in Appendix D.

Data Note: As noted in other sections of the report, DYS does not detain youth on petty offenses. The admissions classified as "petty" in this section include those from out of state who had run away, as well as youth charged with contempt of court for truancy matters. They also include youth charged with status offenses and other petty offenses where youth have been detained as a result of a warrant for failure to comply or failure to appear.

Traffic offenses are mostly vehicular assault, vehicular manslaughter and other similar charges, not minor traffic violations. Offense category and offense type admissions are exclusive to each other in this table.

Table 7: Offense Category and Type by Demographic Category

| Demographic Category | Offense Category | | | Offense Type | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Felony | Misd | Petty | Drug | Other | Person | Prop | Status | Traffic | Weap |
| STAFF ASSIGNED GENDER | | | | | | | | | | |
| Male | 1,612 | 603 | 32 | 57 | 136 | 1,172 | 585 | 18 | X | 266 |
| Female | 317 | 252 | 29 | 16 | 64 | 320 | 158 | 18 | X | 18 |
| ETHNICITY | | | | | | | | | | |
| White | 549 | 295 | 28 | 19 | 83 | 463 | 215 | 16 | X | 71 |
| Black or African American | 507 | 165 | X | 14 | 27 | 385 | 192 | X | 0 | 57 |
| Hispanic | 800 | 359 | 21 | 39 | 82 | 590 | 300 | X | X | 146 |
| American Indian or Alaskan Native | X | X | X | 0 | X | 15 | 13 | X | 0 | X |
| Native Hawaiian or Other Pacific Islander | 13 | X | 0 | 0 | X | X | X | 0 | X | X |
| Unable to Determine/Missing | 28 | 20 | 0 | X | X | 23 | 14 | 0 | 0 | X |
| AGE AT ADMISSION | | | | | | | | | | |
| 10-11 Years | 19 | X | 0 | 0 | 0 | 16 | X | 0 | 0 | X |
| 12 Years | 52 | X | X | 0 | X | 36 | 16 | X | 0 | X |
| 13 Years | 157 | 79 | 0 | 0 | 21 | 134 | 70 | 0 | 0 | X |
| 14 Years | 291 | 130 | X | X | 27 | 230 | 132 | X | X | 31 |
| 15 Years | 433 | 188 | 16 | 10 | 44 | 315 | 193 | X | X | 65 |
| 16 Years | 466 | 215 | 21 | 28 | 53 | 353 | 181 | 14 | X | 68 |
| 17 Years | 511 | 232 | 16 | 33 | 53 | 408 | 147 | 11 | X | 101 |
| SEXUAL ORIENTATION | | | | | | | | | | |
| Bisexual | 70 | 57 | X | X | 22 | 64 | 38 | X | X | X |
| Straight or | 1,622 | 654 | 44 | 68 | 143 | 1,222 | 603 | 27 | 11 | 246 |

| Demographic Category | Offense Category | | | | Offense Type | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Felony | Misd | Petty | | Drug | Other | Person | Prop | Status | Traffic | Weap |
| Heterosexual | | | | | | | | | | | |
| Lesbian or Gay | 25 | 15 | X | | 0 | X | 21 | X | 0 | 0 | X |
| Missing | 199 | 113 | X | | X | 26 | 165 | 85 | X | X | 32 |
| Unknown | X | X | X | | 0 | X | 13 | X | 0 | 0 | 0 |
| PREFERRED GENDER PRONOUNS | | | | | | | | | | | |
| He/Him | 1,422 | 525 | 27 | | 53 | 118 | 1,050 | 515 | 14 | X | 235 |
| He/They | X | 0 | 0 | | 0 | 0 | 0 | X | 0 | 0 | 0 |
| Missing | 203 | 117 | X | | X | 28 | 168 | 86 | X | X | 34 |
| She/Her | 276 | 202 | 24 | | 16 | 52 | 268 | 134 | 14 | X | 14 |
| GENDER IDENTITY | | | | | | | | | | | |
| Female | 290 | 213 | 27 | | 16 | 54 | 280 | 144 | 17 | X | 15 |
| Male | 1,457 | 535 | 28 | | 54 | 122 | 1,047 | 523 | 15 | X | 244 |
| Missing | 174 | 100 | X | | X | 22 | 155 | 69 | X | X | 24 |
| State Total[14] | 1,929 | 855 | 61 | | 73 | 200 | 1,492 | 743 | 36 | 17 | 284 |

- Overall breakdowns by offense category for the cohort are as follows: felony charges (67.8%), misdemeanor charges (30.1%) and petty charges (2.1%).
- Male youth have a significantly higher proportion of felony charges (71.7%) compared to female youth (53.0%).
- Female youth have a higher proportion of misdemeanor (42.1%) offenses compared to males (47.9%).
- Black youth have the highest proportion of felony charges (74.6%).

[14] Some values are written as "X" due to suppression minimums. The Asian ethnic category, She/They, They/Them, Unknown Preferred Gender Pronouns, Other Queer Identifying Preferred Gender Pronoun, "Other" and Unknown Gender Identity counts have been dropped due to low suppressed counts. "Other" Gender Identities include Genderqueer, Nonbinary/Gender non-conforming and Two-Spirit. Some header names are abbreviated (Misd = Misdemeanor, Prop = Property, Weap = Weapon)

- Overall, for the cohort, person-related offenses account for over half (52.4%) of all admissions, followed by property offenses (26.1%), and weapon offenses (10.0%).
- Male youth have a much higher incidence of weapon-related offenses (11.8%) compared to females (3.0%).

## Charges by Region Overview

This section focuses on the overall charges (offense category and offense type) broken down by region.

Table 8: Regional Admission Totals by Offense Category and Types

| Region | Admissions Count | | | | |
|---|---|---|---|---|---|
| | Central | Northeast | Southern | Western | Total |
| OFFENSE CATEGORY | | | | | |
| Felony | 776 | 481 | 502 | 170 | 1,929 |
| Misdemeanor | 338 | 276 | 142 | 99 | 855 |
| Petty | 25 | 22 | 11 | 3 | 61 |
| OFFENSE TYPE | | | | | |
| Person | 570 | 430 | 341 | 151 | 1,492 |
| Property | 328 | 165 | 184 | 66 | 743 |
| Weapon | 119 | 73 | 75 | 17 | 284 |
| Drug | 33 | 20 | 9 | 11 | 73 |
| Status | 21 | 8 | 6 | 1 | 36 |
| Traffic | 5 | 6 | 3 | 3 | 17 |
| Other | 63 | 77 | 37 | 23 | 200 |
| State Total | 1,139 | 779 | 655 | 272 | 2,845 |

- The Southern region has the highest proportion of felony offenses (76.6%).
- The Western and Northeast regions have higher proportions of misdemeanor offenses (36.4% and 35.4%, respectively) in relation to other regions.
- The Northeast region has the highest proportion of person offenses (55.2%).
- The Central region has the highest proportion of property offenses (28.8%).
- The Southern region has the highest proportion of weapon offenses (11.5%).

## Charges Distribution for Demographic Categories by Region

Analysis conducted for demographics and offense information by region revealed the following patterns:

- In the Central region, Black youth have the highest admission proportion for person-related felony offenses at 43.9%, closely followed by Hispanic youth at 36.7%.

- Hispanic youth have the majority of admissions in the Northeast (50.7%) and Southern (45.2%) regions, particularly for person-related felonies at 40.3% and 44.3% respectively.

- White youth have the second-most felonies statewide (28.3% of all felony related admissions), with the most in the Northeast region (59.5% of the Northeast admissions). White youth also have the most admissions in the Western region (58.1%), with the highest proportion of person (52.3%) and property (63.6%) crime-related admissions in that region.
    - This is a concerning pattern considering the White youth cohort population is underrepresented compared to the statewide population.

Disparities are further delineated in the Statistical Analysis section found later in the report.

# Distribution of Level of Care (LOC) Recommendations

This section examines the demographics for the level of care provided to youth in the juvenile justice system, focusing on two primary screening tools: CJRA pre-screens (Colorado Juvenile Risk Assessment), and JDSAG screens (Juvenile Detention Screening and Assessment Guide) conducted at admission. An overview is provided in Table 9 that follows, showing the distribution and results of these screenings, followed by an analysis of disparities in care recommendations across demographic groups and regions. The CJRA pre-screens and JDSAG[15] screens offer robust data. BHA (Behavioral Health Administration) Level of Care Recommendation Demographic Counts can be found in Appendix C.

Table 9: Overall Level of Care Recommendations by Demographics

| Demographic Category | CJRA Pre-screen Level | | | | JDSAG Screening Result Levels | | |
|---|---|---|---|---|---|---|---|
| | High | Moderate | Low | Missing | 1 | 2-5 | Excluded[16] |
| STAFF ASSIGNED GENDER | | | | | | | |
| Male | 670 | 644 | 835 | 98 | 2,147 | 58 | 42 |
| Female | 218 | 179 | 181 | 20 | 562 | 21 | 15 |
| ETHNICITY | | | | | | | |
| White | 299 | 262 | 272 | 39 | 825 | 23 | 24 |
| Black or African American | 240 | 219 | 196 | 25 | 653 | 13 | 14 |
| Hispanic | 311 | 316 | 509 | 44 | 1,122 | 41 | 17 |
| American Indian or Alaskan Native | 16 | X | X | X | 34 | 0 | 0 |

[15] The JDSAG was replaced by the CYDSI (Colorado Youth Detention Screening Instrument) which was implemented in February, 2025.
[16] Invalid for analysis, not completed within acceptable time frame.
Note: Some values are written as "X" due to suppression minimums. "Other" Gender Identities include Genderqueer, Nonbinary/Gender non-conforming and Two-Spirit. JDSAG Levels are explained below.

| Demographic Category | CJRA Pre-screen Level | | | | JDSAG Screening Result Levels | | |
|---|---|---|---|---|---|---|---|
| | High | Moderate | Low | Missing | 1 | 2-5 | Excluded[16] |
| Asian | X | X | X | X | 16 | X | 0 |
| Native Hawaiian or Other Pacific Islander | X | X | X | X | 12 | 0 | X |
| Unable To Determine/Missing | 11 | 14 | 19 | X | 47 | X | 0 |
| **AGE AT ADMISSION** | | | | | | | |
| 10-11 Years | X | X | X | 0 | 21 | X | 0 |
| 12 Years | X | X | X | X | 59 | X | 0 |
| 13 Years | 93 | 79 | 58 | X | 225 | X | X |
| 14 Years | 176 | 141 | 99 | 12 | 412 | 10 | X |
| 15 Years | 218 | 196 | 197 | 26 | 610 | 15 | 12 |
| 16 Years | 184 | 185 | 297 | 36 | 666 | 17 | 19 |
| 17 Years | 180 | 203 | 339 | 37 | 716 | 26 | 17 |
| **SEXUAL ORIENTATION** | | | | | | | |
| Bisexual | 56 | 36 | 34 | X | 130 | 0 | X |
| Straight or Heterosexual | 747 | 667 | 809 | 97 | 2,209 | 63 | 48 |
| Lesbian or Gay | X | 13 | 15 | X | 39 | X | 0 |
| Missing | 63 | 100 | 148 | X | 303 | X | X |
| Other Queer Identifying | X | X | X | X | X | 0 | X |
| Unknown | X | X | X | X | X | 0 | X |
| **PREFERRED GENDER PRONOUNS** | | | | | | | |
| He/Him | 615 | 566 | 725 | 88 | 1,902 | 52 | 40 |
| He/They | 0 | 0 | X | 0 | X | X | 0 |
| Missing | 65 | 100 | 153 | X | 310 | 15 | X |

| Demographic Category | CJRA Pre-screen Level | | | | JDSAG Screening Result Levels | | |
|---|---|---|---|---|---|---|---|
| | High | Moderate | Low | Missing | 1 | 2-5 | Excluded[16] |
| She/Her | 202 | 149 | 133 | 18 | 478 | X | 13 |
| She/They | 0 | X | 0 | 0 | X | 0 | 0 |
| They/Them | X | X | X | X | X | 0 | X |
| Unknown | X | X | X | 0 | X | 0 | 0 |
| GENDER IDENTITY | | | | | | | |
| Female | 209 | 155 | 147 | 19 | 503 | X | 13 |
| Male | 614 | 575 | 742 | 89 | 1,927 | 53 | 40 |
| Missing | 59 | X | X | X | 264 | X | X |
| Other | X | X | X | X | X | 0 | X |
| Unknown | X | 0 | 0 | 0 | X | 0 | 0 |
| State Total | 888 | 823 | 1,016 | 118 | 2,709 | 79 | 57 |

## Colorado Juvenile Risk Assessment (CJRA) Pre-Screen Demographics Overview

The Colorado Juvenile Risk Assessment measures the likelihood a youth will be charged with another offense. It assesses risk as a measure of predicted reoffense over time and uses the two domains of social and criminal history[17]. Looking at the Colorado Juvenile Risk Assessment pre-screen data, there are a large number of youth with a high-risk to reoffend across all demographic categories (32.6%), which also aligns with the number of felony offenses and number of admissions across each category. However, it is important to note that although these counts show some demographic groups as having more high-risk pre-screen levels, it does not mean that

[17] The CJRA is not used to screen a youth into detention at the time of the offense, because it does not predict a youth's risk of violent recidivism, does not account for the youth's current offense (including its severity), and is not validated in Colorado. Although valuable in some respects, because of these limitations, CJRA data has limited utility in assessing the appropriateness of detention for youth at the time they are screened into detention.

those youth are more likely to have a high-risk pre-screen level based on those demographic qualities. Regional breakouts can be found in Appendix C.

Here are some important patterns in this data:

- Younger youth (ages 11-14) have a higher distribution of high-risk screens compared to older youth. This is due to statutory requirements for when youth ages 10-12 can be detained, resulting in fewer younger youth being screened with more severe offenses compared to older youth.
- Youth with high-risk assessments have substantially longer average length of stay (36.6 days) compared to low-risk youth (22.3 days).

The risk level is otherwise balanced across the different categories, with 37.3% of aligned assessments falling in the low-risk category, 30.2% falling in the moderate-risk category and 32.6% falling in the high-risk category (valid percentages, excludes missing). "Low-risk to re-offend" on the CJRA does not necessarily mean a youth does not pose a substantial risk of serious harm to others, does not pose a substantial risk of flight from prosecution, or that community-based alternatives to detention can mitigate those risks. These are types of risks the CJRA is not designed or validated to assess or predict. Youth scoring as "low-risk" on the CJRA may, therefore, nevertheless meet statutory detention criteria.

# Juvenile Detention Screening and Assessment Guide (JDSAG)

## Demographics Overview

The JDSAG screening results show that the vast majority of youth (95.2%) are assessed at Level 1, with minimal variations across demographic groups. While Table 9 shows the overall screening results of this report's detention cohort, statistical significance between JDSAG screens and demographics is explored in the statistical analysis section that follows, and a more detailed analysis of all JDSAG screens, placements, and overrides is conducted throughout FY 23-24 is presented later in the report.

The JDSAG Level Summary is as follows:

- Level 1 - Secure Detention
- Level 2 - Staff Secure Detention
- Level 3 - Residential/Shelter
- Level 4 - Home Detention/Services
- Level 5 - Release

# Statistical Analysis

This section of the report explores if there are statistical correlations between youths' demographic traits and their detention outcomes. These tests help reveal patterns that can indicate if there are system disparities.

These tests analyze the likelihood that any data correlation is real and meaningful, as opposed to random, through statistical significance. They also measure the strength of relationships between variables—in other words, how much of the data seems to correlate to the other. Finally, these tests measure standard means, which determine if one group has a noteworthy difference in averages compared to the standard averages. For more detail on the specific tests conducted, statistics referenced, test result values and value interpretation, please refer to Appendix G.

For this report, the four demographic traits (independent variables) are:

- Ethnicity
- Sexual Orientation
- Staff-Assigned Gender
- Age

The outcomes (dependent variables) explored are:

- JDSAG Screen Result
- CJRA Pre-Screen Risk Level
- Charges (using Offense Ranking)
- Length of Stay
- Length of Stay While Releasable
- Child Welfare Involvements (active and historical)
- Detention Involvements

Data Notes: Similar to last year's report, there was not enough data for gender identity (self-assigned gender) and for preferred pronouns to conduct statistical analysis, so these categories are not included in the following results.

This year, statistical results with effect sizes under 0.1 were removed; these are considered very weak and are not strong indicators of a pattern. These are noted throughout the relevant results sections. Last year, some of these effect sizes may have been reported, but would have been noted as weak relationships.

# Results

## Juvenile Detention Screening and Assessment Guide (JDSAG) Screens and Demographic Analysis

Summary: There were no statistical correlations for JDSAG screens.

All the statistical tests for JDSAG screens and staff overrides of JDSAG screens did not have statistical significance. In other words, nothing in the data from SFY 23-24 suggested that a youth's demographic traits influence their JDSAG screen results. Ethnicity, Sexual Orientation, Gender (staff assigned) and age all showed an even distribution among screening levels for youth. This remains consistent even when taking into account staff overrides.

## Colorado Juvenile Risk Assessment (CJRA) Pre-Screen and Demographic Analysis

Summary: Weak statistical correlations do exist for youth based on sexual orientation, gender and age and their CJRA results. All of these correlations are in the threshold that is typically considered a small effect size.

- Ethnicity and CJRA pre-screen did not have a statistical correlation and demonstrated an even distribution of risk levels among youth.

- Sexual orientation and pre-screen levels did show a very minor correlation. However, effect sizes of less than 0.1 are not considered significant for the purposes of this report and were therefore removed.
- Gender (staff assigned[18]) and pre-screen levels also show a minor correlation. However, again, the effect size was less than 0.1, which is not considered significant for the purposes of this report.
- Age and pre-screen levels show a minor correlation. In this case, the correlation is negative, meaning younger youth are more likely to have higher risk levels than older youth.
    - The effect size = -0.185 (considered a small effect size);
    - Cases for youth aged 10 to 12 are only felonies and weapons cases, pursuant to C.R.S. 19-2.5-304 (2), which states a court shall not order a youth over age 10 but under age 13 to detention unless the youth has been arrested for a felony or weapons charge. Most likely, this is also skewing the data for younger youths' higher CJRA pre-screen levels.

## Charges and Demographic Analysis

Summary: Weak statistical correlations do exist for youth based on ethnicity, gender and charges received.

- Ethnicity and charges did demonstrate a minor correlation. Youth who are identified as White have less severe charges than youth who are identified as Hispanic, Black, Asian, Pacific Islander, Native American, or other non-White ethnicity.
    - Effect size = 0.111

[18] Some data in TRAILS is self-reported by youth, while at other times it is assigned by staff based on the information available.

- Further testing for youth demonstrated that Black youth have a standard mean difference in offense ranking of 0.499. Meaning, they are more likely to have an offense ranking a half level higher than non-Black youth. This is consistent with, though slightly less than, data from SFY 22-23.
- Other ethnicities were tested by the same measure, but did not demonstrate the same correlation.

- Sexual Orientation and charges did not have a statistical correlation and demonstrated an even distribution of offense rankings among youth.
- Gender and charges did demonstrate a statistical correlation. Youth who were identified as male are more likely to have higher charges than female youth.
    - Standard mean difference of 0.974, which is both significant and in line with data from SFY 22-23. Meaning, male youth are more likely to have an offense ranking a level higher than female youth.
    - Effect size = 0.397
    - For tests of this type, 0.397 is seen as a moderate correlation relationship.
- Age and charges did not have a statistical correlation and demonstrated an even distribution of charge seriousness among youth.

## Length of Stay and Demographic Analysis

Summary: Weak statistical correlations do exist for youth based on ethnicity, gender and length of stay.

- Ethnicity did demonstrate a statistical correlation, with (Black, Indigenous, Person of Color) BIPOC youth having a standard mean difference of 5.57 days compared to White youth.
  - Effect size = 0.121
- Additionally, Black youth have a standard mean difference of 4.91 days compared to non-Black youth[19].
  - Effect size = 0.106
- Gender did demonstrate a statistical correlation, with male youth having a standard average difference of 8.36 days compared to female youth.
  - Effect size = 0.182
- Sexual orientation did not demonstrate a meaningful statistical correlation.

## Releasable Length of Stay and Demographic Analysis

Summary: Correlations for releasability were measured in two ways: releasable status (whether a youth was ever made releasable), and releasable length of stay (how long after being made releasable that youth remained in detention). Weak statistical correlations do exist for youth based on ethnicity and gender releasability status. None of the tests for releasable length of stay yielded statistically significant results.

- Ethnicity was very minorly correlated with releasability status, with BIPOC youth slightly more likely to be considered releasable. However, effect sizes of less than 0.1 are not considered significant for the purposes of this report and were therefore removed.

[19] Compared to 11.9 days last year. Overall, it is recommended to have at least three years worth of data to compare data trends between years.

- Gender was very minorly correlated with releasability status, however, the effect size was less than 0.1 was not considered significant for the purposes of this report.

## Child Welfare Involvement and Demographic Analysis

Summary: Potential correlations between demographic categories and both active and historical child welfare involvement were examined. As a reminder, for this report, "active" child welfare involvement includes cohort youth who participated in an assessment and/or case at any point during their detention admission. Similar to SFY 22-23, no correlations were found for any demographic category from the perspective of active child welfare involvement during their detention admission. Historical involvement, however, showed correlation at every demographic category.

- Youth race indicated some correlation for historical (e.g., previous) involvements, with Black youth having a standard mean difference of 0.60 fewer involvements when compared to White youth.
    - Effect size = 0.153
- Hispanic ethnicity of the youth showed little correlation to the number of previous child welfare involvements, with a standard average difference of 0.84 involvements.
- Sexual orientation showed some correlation, with gay or lesbian youth having slightly more historical involvement with child welfare than youth identifying as straight or heterosexual.
    - Effect size = 0.196
- Testing for gender identity suggests that youth who reported identifying as female represented less of the cohort population, but had more historical child welfare involvement. The standard mean difference in involvements for between female and male gender identity was 0.826.

- Effect size = 0.207

- The youth's sex at birth indicated nearly identical results to the youth's gender identity. Youth born female had more previous child welfare involvement than male-identified youth (standard mean difference of 0.849), despite representing less of the overall population.
  - Effect size = 0.215
- Similar to SFY 22-23, youth age was not included in analysis, as the youth population has a significant skew toward older youth, which specifically affects these involvement statistics.

## Detention Involvement and Demographic Analysis

Summary: Statistical correlations do exist for youth based on ethnicity and detention involvements; notably, black youth are more likely to have more detention involvements.

- Ethnicity was minorly correlated with detention involvements, with BIPOC youth more likely to have higher detention involvement.
  - Effect size = 0.131
- Additionally, Black youth have a standard mean difference of 0.38 compared to non-Black youth.
  - Effect size = 0.21 (absolute value)
  - For tests of this kind, this would be considered a weak to moderate correlation relationship
- Sexual orientation and detention involvements had a highly varied distribution of results, making the data not generalizable to the population.

- Gender and detention involvements did not demonstrate a statistical correlation.
- Age and detention involvements were not tested, as statutory requirements around age would create skewed data results.

# System Focus

County departments of human and social services and Colorado Youth Detention Continuum (CYDC) will work collaboratively and provide appropriate and timely placements and services to pre-adjudicated and adjudicated youth in the least restrictive setting.

---

Metric 1: Barriers to youth accessing placements and services, including barriers related to availability and funding and analysis of the demand for services and placements.

Metric 2: Analysis of the time it takes to place youth in a service or out-of-home placement, including time between a referral to services and service received.

Metric 3: Analysis of impact to county departments of human or social services while serving detained youth, including number of youth served and financial and workload impacts.

Metric 4: Analysis of youth in detention who have prior or current child welfare involvement, which includes either an assessment, in-home, or out-of-home case at the time of detention.

Metric 6: Collect qualitative data from family and youth regarding satisfaction to the access of services received and by type.

---

# Barriers to Placements and Services

In January 2024, additional data points were added to the CYDC Detention Bed Utilization Tracking Sheet (DBUTS) at the request of the CYDC Advisory Board as a result of the data reporting requirements from HB23-1249 and HB23-1307. The additional data is meant to identify cases where a current search for placement or services is occurring and the highest level of placement or services being searched. Additionally, CYDC began collecting data based on information available regarding barriers to placements, and they were asked to report one or two barriers from a picklist. There were 402 admissions where a response of "yes" was given regarding a "current placement and services search." Since this was only available for half of the fiscal year, this likely accounts for the small number of responses. Of the 402 admissions, there were 270 (165 primary, 105 secondary) responses for either a primary or secondary barrier. Due to the small amount of responses, no specific data will be provided this year. A more comprehensive look at this information will be available in the July 2026 report.

# Length of Stay Analysis

Summary: The section below analyzes some of the factors that can impact length of stay. There are three sections which include a length of stay overview, admissions that quickly follow another detention admission, and admissions that are under and over 30 days. Here are some key points from the sections below.

- Most detention admissions fall into counties that are considered urban, and about half are within large judicial districts. The four DYS regions' admissions and length of stay correspond fairly consistently in proportion to the overall state youth populations and facility allocations. Capacity strain is discussed separately and in depth later in the Detention Bed Capacity & Utilization section.

- A significant number (33.1%) of cohort admissions end at the detention hearing date, about half are released within seven days and about three quarters within 30 days. The majority of the length of stay in each region is from proportionately few admissions. This presents two potential opportunities for future analysis and decision making:
    - To focus on the youth with short detention admissions for potential lower level overrides, with less serious offenses and no prior detention history.
    - To focus on the youth with admissions over 30 days, to better understand the conditions that led to detention and the barriers to placements outside of detention.
- Across each admissions category, CJRA pre-screen risk levels and the seriousness of offense correlate to how long youth are held in detention. The higher the risk level and the more serious the offense, the more likely a youth will stay longer.
- 10.5% of the admissions have a subsequent detention admission that occurred within 30 days. The majority of these are for failure to appear or failure to comply warrants. The majority have also had prior historical detention involvements.

## General Admission Information

- 67 (2.4%) of all admissions were detention sentences, with an average LOS for these youth of 25.9 days.
- 29 (1.0%) of all admissions were for Interstate Compact on Juveniles (ICJ), most of whom were out-of-state youth who had run away. This is a decrease of 14 admissions from the prior fiscal year (22-23).

- Most of the admissions (92.2%) fall within a county classified as urban, based on county of offense.
- The majority of the admissions (54.6%) are within large judicial districts.
  - Judicial district sizes are based on the categorizations provided by Infinite Frontier Consulting and are consistent with sizes listed in other DYS reports.

Table 10: Admissions by County Type

| County Type[20] | Count of Admissions | Percent of Admissions | Average Admission LOS |
|---|---|---|---|
| Rural | 162 | 5.7% | 32.0 |
| Rural Resort | 50 | 1.8% | 30.1 |
| Urban | 2,623 | 92.2% | 29.6 |
| Out of state | 10 | 0.4% | 8.2 |
| Grand Total | 2,845 | 100.0% | 29.6 |

Table 11: Admissions by Judicial District Size

| JD Size | Count of Admissions | Percent of Admissions | Average Admission LOS |
|---|---|---|---|
| Large | 1,554 | 54.6% | 32.0 |
| Medium | 1,081 | 38.0% | 26.3 |
| Small | 210 | 7.4% | 29.4 |
| Grand Total | 2,845 | 100.0% | 29.6 |

[20] These categories come from Colorado's Department of Local Affairs community classifications.

Table 12: Admissions with a Length of Stay Over and Under 30 Days

| LOS Time Frame | Admissions from Admit to Release | Percent of Total Admissions | Admissions from Hearing to Release | Percent of Total Admissions |
|---|---|---|---|---|
| LOS 30 Days and Under | 2,146 | 75.4% | 2,169 | 76.2% |
| Over 30 Days | 699 | 24.6% | 653 | 23.0% |
| Over 60 Days | 377 | 13.3% | 359 | 12.6% |
| Over 90 Days | 249 | 8.8% | 233 | 8.2% |

The majority of admissions are 30 days and under. Looking at this from the detention hearing date, as previously requested by the CYDC Advisory Board, shows that 76.2% of youth are released from detention within 30 days from the detention hearing.

Typically, detention hearings occur within 48 hours from admission date (average 1.97 days), as required by statute C.R.S. 19-2.5-305.

Figures 2 and 3 show the distribution of admission length, showing that a significant percentage of the population is released within a week, and the percentage of the population decreases in LOS increments up until 130+ days.

Figure 2: Distribution of Admissions 30 Days and Under




Figure 3: Distribution of Admissions Over 30 Days




As seen in Table 13 that follows, most regions' median lengths of stay are close to the state overall median (6.7 days). The Western region, with 20 bed allocations, has lower overall averages. The Central region, with 93 bed allocations, has the highest

average length of stay. This is followed closely by the Southern region which also has the highest median length of stay.

Table 13: Detention Length of Stay by Region

| Region | Average LOS | Median LOS | Average LOS from Hearing Date | Bed Allocations | Youth Centers |
|---|---|---|---|---|---|
| Central | 32.4 | 6.8 | 30.1 | 93 | 4[21] |
| Northeast | 26.6 | 6.0 | 24.9 | 56 | 2 |
| Southern | 31.8 | 7.2 | 29.8 | 46 | 2 |
| Western | 20.3 | 4.9 | 18.9 | 20 | 1 |
| State | 29.6 | 6.7 | 27.8 | 215 | 8 |

Tables 14 and 15 compare the percentage of youth in detention in each region with that region's percentage of total Colorado youth between ages 10-17. This helps us see if there are differences in the detention strain for regions inconsistent with the general proportion of youth in the state. While there are no significant differences, a few minor differences are noted below.

- The Central region has a very consistent proportion of admissions, and a higher proportion of the total detained days.
- The Northeast region has a lower proportion of admissions and a lower proportion of total detained days.
- The Southern region has a higher proportion of admissions and of total detained days.
- The Western region has a lower proportion of admissions and of total detained days.

[21] There were some facility allocation changes throughout the fiscal year. For a few days in the fiscal year, Betty K. Marler facility housed youth from Rocky Mountain.

Table 14: Number of Admissions Compared to Overall Youth Population by Region

| Region | Youth Population Ages 10-17 | % of CO Youth Population Ages 10-17 | Number and Percent of Admissions | Bed Allocations | Facilities |
|---|---|---|---|---|---|
| Central | 236,254 | 40.5% | 1,139 (40.0%) | 93 | 4[22] |
| Northeast | 185,305 | 31.7% | 779 (27.4%) | 56 | 2 |
| Southern | 113,603 | 19.5% | 655 (23.0%) | 46 | 2 |
| Western | 48,801 | 8.3% | 272 (9.6%) | 20 | 1 |
| State | 583,963 | 100% | 2,845 | 215 | 8 |

Table 15: Total Length of Stay Compared to Overall Youth Population by Region[23]

| Region | Youth Population Ages 10-17[24] | % of CO Youth Population Ages 10-17 | Total Detention LOS | % of Total Detention LOS | Deviation from Expected Counts +/- % |
|---|---|---|---|---|---|
| Central | 236,254 | 40.5% | 36,912.6 | 43.8% | +3.3% |
| Northeast | 185,305 | 31.7% | 20,700.5 | 24.6% | -7.1% |
| Southern | 113,603 | 19.5% | 20,824.9 | 24.7% | +5.2% |
| Western | 48,801 | 8.3% | 5,857.2 | 6.9% | -1.4% |
| Total State | 583,963 | 100% | 84,295.1 | 100% | - |

[22] There were some facility allocation changes throughout the fiscal year. For a few days in the fiscal year Betty K. Marler Youth Services Center housed youth from Rocky Mountain Youth Services Center.
[23] Population data by originating JD, not by youth services center.
[24] Department of Local Affairs, Demographer's Office 2023 estimates, as seen in the Monthly Population Report published by DYS's Data Management and Analysis team.

Figure 4: Total Length of Stay by Region and Admission Type, with Admission Counts




Figure 4 above shows the composition of total length of stay (LOS) and admissions across the four regions: Central, Northeast, Southern and Western. The total length of stay is broken down by direct file (which includes transfer, direct file, and reverse-transfer admissions), length of stay and non-direct file length of stay over and under 30 days. Length of stay values are represented as percentages and are visualized alongside the percentage of admissions per region. As it can be seen in this figure, a small number of admissions makes up a disproportionately high amount of each regions' length of stay, with direct file admissions having the highest proportion of length of stay per admission, followed by admissions that are over 30 days. There are many admissions in each region that have a short length of stay.

# Offense Data for Youth with a "Quick Return" to Detention

One variable added this year was "quick returns" to detention. This represents youth, within the cohort timeframe, with a subsequent detention that occurs within 30 days of a previous one. In SFY 23-24, there were 300 (10.5% of 2,845) admissions that met this criteria. Of the 300, 147 (5.2% of 2,845) admissions returned to detention within 14 days of the previous admission. The offense information for those admissions is listed below. Each of the offense categories, and what offenses are in each category, are further defined in Appendix D.

- Of these 300 admissions, 24 (8.0%) were listed as having failure to appear warrants, 113 (37.7%) as failure to comply warrants, and 42 (14.0%) with probable cause warrants.
    - In total, this makes up 59.67% of these cases.
    - The remaining were detained for reasons other than one of these warrants. More information on these other warrants will be available with the implementation of the Colorado Youth Detention Screening Instrument (CYDSI).
- For 184 (61.3%) of these quick returns, these consecutive admissions were not the youth's first detention involvement.
- For 116 (38.7%), the admission prior to the quick return was the youth's first detention admission.
- The average length of stay of these quick return admissions is 28.6 days.
- In the admission prior to the quick return, the average length of stay is 16.8 days.

- The quick returns admissions tended to have high or moderate CJRA pre-screen levels.
  - 134 (44.7%) had a high-risk level
  - 98 (32.7%) had a moderate-risk level
  - 60 (20.0%) had a low-risk level

The offense types between the admissions are consistent with one another, including offense types and level of severity. Granularity around the progression of offense from arrest charge to final disposition is not currently available, therefore, more research would be needed to better understand the relationship between the offenses in the first and subsequent admissions.

Table 16: Offense Type for youth with a “quick return” to detention

| Offense Type | Count of Admissions | % of Admissions |
|---|---|---|
| Drug | 10 | 3.3% |
| Other | 31 | 10.3% |
| Person | 123 | 41.0% |
| Property | 127 | 42.3% |
| Weapon | 9 | 3.0% |
| Grand Total | 300 | 100.0% |

Table 17: Offense Class for youth with a “quick return” to detention

| Offense Class | Count of Admissions | % of Admissions |
|---|---|---|
| Felony | 204 | 68.0% |
| 1 | 3 | 1.0% |
| 2 | 6 | 2.0% |

| Offense Class | Count of Admissions | % of Admissions |
|---|---|---|
| 3 | 27 | 9.0% |
| 4 | 100 | 33.3% |
| 5 | 47 | 15.7% |
| 6 | 20 | 6.7% |
| Misdemeanor | 91 | 30.3% |
| 1 | 56 | 18.7% |
| 2 | 31 | 10.3% |
| 3 | 2 | 0.7% |
| 5 | 1 | 0.3% |
| 6 | 1 | 0.3% |
| Petty[25] | 5 | 1.4% |
| 1 | 3 | 1.0% |
| 2 | 1 | 0.3 |
| 6 | 1 | 0.3% |
| Grand Total | 300 | 100.00% |

## Admissions Under & Over 30 Days

Summary: The majority of detention admissions are within 30 days or less, with about a quarter of admissions lasting over 30 days. A fairly high percentage of admissions (about a third) were released the same day as the detention hearing.

- 1,480 (52.0%) detention admissions were seven days or less.
- 2,146 (75.4%) admissions were 30 days or less.
- 699 (24.6%) admissions were over 30 days.
- For 943 (33.1%) admissions, youth were released the same day as their detention hearing date.

[25] As noted in other sections of the report, the Division of Youth Services does not detain on petty offenses. These are most likely additional charges, or the youth is detained on a failure to appear or failure to comply warrant.

This represents a drop from SFY 22-23, in which 38.7% of youth were released at their detention hearing.

Explanation of the 30-Day Metric: In October 2022, the Advisory Board set an analysis guideline that detention youth should be released from their detention hearing date within 30 days. One of the purposes of this report is to understand how the current detention system aligns with this guideline. However, it is also important to note that not all youth are eligible to be released from detention within 30 days. Some youth are held by the court with no bond option, some are given detention sentences, and many direct file youth are held in detention with a large cash bond awaiting the outcome of their case, which can take several months.

## What Do We Know About Admissions 30 Days Or Less?

- There were 49 detention sentences in the cohort for youth with an LOS under or equal to 30 days (73.1% of all detention sentences).
- The majority of admissions with an LOS under 30 days were the youth's first admission.
    - 1,187 (55.3%) of these admissions were the youth's first admission.
    - 959 (44.7%) were not the youth's first admission;
    - However, there was a substantial decrease in first-time admissions in this population from 86.6% last year to 55.3% this year. This shows that more youth were returning to detention this year.
- Youth with admissions that are 30 days or less tend to have more CJRA pre-screens with a low-risk result than pre-screens with a high-risk result (see Table 19 below).

- Fewer admissions with an LOS of 30 days or less have crimes of violence charges compared to admissions with an LOS of over 30 days. Crimes of violence are typically person-crimes of violence like assault felonies and homicide felonies. They also include aggravated robbery, firearm and weapons felonies and manslaughter felonies.
    - 819 (38.2%) of admissions that had an LOS of 30 days or less have a crime of violence charge
- 1,372 (63.9%) of admissions with an LOS of 30 days or less had a felony charge as the max offense.
- The average offense ranking for youth detained 30 days or less was equivalent to a Felony 6 charge.

## What Do We Know About Admissions Over 30 Days?

- There were 18 detention sentences in the cohort for youth with an LOS of over 30 days (26.9% of all detention sentences).
- Most of these admissions were not the youth's first detention admission.
    - 197 (28.2%) of these admissions were the youth's first detention admission.
    - 502 (71.8%) were not the youth's first detention admission.
- Youth with an admission LOS over 30 days tend to have more pre-screen levels with a high-risk result than a low-risk result (see Table 18 below).
- Admissions with an LOS over 30 days tend to have more crimes of violence charges than admissions with an LOS 30 days or under.
    - 374 (53.5%) of admissions with an LOS over 30 days have a crime of violence charge.

- The number of admissions with felony charges increases for youth with admissions over 30 days.
    - 557 (79.7%) of admissions with a LOS over 30 days had a felony charge as the max offense.
- The average offense ranking for youth detained over 30 days was equivalent to a Felony 4 charge.

Further Information on admissions with a length of stay of 30 days or more:

- 297 (42.5%) had a direct admissions-related reason for having a LOS of 30 days or more. These youth were either serving detention sentences, listed as no bond, were in the transfer, reverse transfer or direct file process, or were eventually released to DYS commitment, Department of Corrections (DOC), or county jail.
- 402 (57.5%) of these "long LOS" admissions met none of the above criteria. Tables 18 and 19 show these youths' offense information and CJRA pre-screen results.

Table 18: Offense Type for Youth in Detention 30 Days or More[26]

| Offense Type | # of Admissions | % of Admission |
|---|---|---|
| Felony | 299 | 74.4% |
| Drug | 9 | 2.2% |
| Other | 4 | 1.0% |
| Person | 179 | 44.5% |
| Property | 102 | 25.4% |
| Weapon | 5 | 1.2% |
| Misdemeanor | 103 | 25.6% |

[26] This table has information for the 402 youth that did not have a direct admissions reason to be in detention over 30 days.

| | | |
|---|---|---|
| Drug | 9 | 2.2% |
| Other | 7 | 1.7% |
| Person | 57 | 14.2% |
| Property | 18 | 4.5% |
| Weapon | 12 | 3.0% |

Table 19: CJRA Pre-screen Risk Levels with Admissions Over and Under 30 Days

| CJRA Pre-screen Risk Levels – Youth 30 Days or Less | # | % |
|---|---|---|
| Low | 868 | 40.4% |
| Moderate | 631 | 29.4% |
| High | 568 | 26.5% |
| Missing | 79 | 3.7% |
| **CJRA Pre-screen Risk Levels – Youth Over 30 Days** | **#** | **%** |
| Low | 148 | 21.2% |
| Moderate | 192 | 27.5% |
| High | 320 | 45.8% |
| Missing | 39 | 5.6% |

# Assessments

This section discusses the assessments currently available to the analysts for C.R.S. 19-2.5-1404 that address either risk of reoffending, secure detention need, or level of care recommendations.

- The Colorado Juvenile Risk Assessment Pre-Screen (CJRA);
- The Juvenile Detention Screening and Assessment Guide (JDSAG); and
- Independent Assessments (IA) completed through the BHA, which include the Child and Adolescent Needs and Strengths (CANS) tool.

Conversations are underway with stakeholders to understand what other assessment data would be helpful for this report and to draft relevant Data Sharing Agreements (DSA)/Memorandums of Understanding (MOU) requests, including independent assessments conducted through the Regional Accountable Entities (RAE).

## Colorado Juvenile Risk Assessment (CJRA) Pre-Screen Risk Level Overview

The CJRA pre-screen is used to assess risk of recidivism as a measure of predicted reoffense over time and uses the two domains of social and criminal history. This pre-screen does not take into account the current alleged offense or measure lethality. The chart below shows the screen levels identified by the assessments used for the admissions in the cohort and shows a fairly even distribution of risk.

Table 20: Colorado Juvenile Risk Assessment Pre-Screen Risk Level by Admissions

| CJRA Risk Level | Number of Admissions | Percent |
|---|---|---|
| Low | 1,016 | 35.7% |
| Moderate | 823 | 28.9% |
| High | 888 | 31.2% |
| Missing | 119[27] | 4.1% |
| Total State | 2,845 | 100% |

## Juvenile Detention Screening & Assessment Guide (JDSAG) Screen Results and Overrides

This analysis compares the initial JDSAG screen-recommended placement level and actual placement level assigned to youth after any potential overrides by a judge or magistrate. The process involves youth being referred to detention by law

[27] As seen in previous years, there are some missing CJRA pre-screens.

enforcement or court, being screened by CYDC staff, and being given a level relating to a particular placement, that could be overridden to place youth in less or more restrictive settings depending on the case. This dataset includes the youth from the cohort who had detention involvement between July 1, 2023, and June 30, 2024, and any JDSAG screens done between June 14, 2023, through June 30, 2024. It is important to also note that since not all youth are screened to secure placement, this section also includes youth outside of the cohort.

Note: The Colorado Youth Detention Screening Instrument (CYDSI) will replace the JDSAG as a detention screening tool in SFY 24-25 on February 3, 2025, per C.R.S 19-2.5-1404.

Level Summary:

- Level 1 - Secure Detention
- Level 2 - Staff Secure Detention
- Level 3 - Residential/Shelter
- Level 4 - Home Detention/Services
- Level 5 - Release

Key Takeaways Tables 21 and 22: There were 922 (21.5%) total overrides out of 4,287 screens. Therefore, 3,365 (78.5%) of youth screened were placed at the same level as they were screened. Of the 4,287 screens, 154 (3.6%) were overridden to place youth in a higher setting than the screen recommended, and 768 (17.9%) were overridden to place youth in a lower setting. The reasons for these overrides are not consistently logged in the Trails database.

Table 21: Juvenile Detention Screening and Assessment Guide Override Information and Direction

| Level Difference | Number | Percent |
|---|---|---|
| Same (No Override) | 3,365 | 78.5% |
| Lower | 768 | 17.9% |
| Higher | 154 | 3.6% |
| Total | 4,287 | 100% |

Table 22: Juvenile Detention Screening and Assessment Guide: Placement Screens vs. Actual Placement and Overrides by Judicial District[28]

| Judicial District | Screening Result | | Actual Placements | | Level Difference | | |
|---|---|---|---|---|---|---|---|
| | Level 1 | 2-5 | Level 1 | 2-5 | Lower | Equal | Higher |
| 1 | 232 | 197 | 254 | 175 | 14.5% | 77.2% | 8.4% |
| 2 | 401 | 176 | 467 | 110 | 13.3% | 84.7% | 1.9% |
| 3 | 5 | 19 | 9 | 15 | 75.0% | 25.0% | 0.0% |
| 4 | 429 | 371 | 524 | 276 | 40.4% | 57.8% | 1.9% |
| 5 | 19 | 1 | 17 | 3 | 5.0% | 80.0% | 15.0% |
| 6 | 24 | 18 | 27 | 15 | 11.9% | 88.1% | 0.0% |
| 7 | 18 | 10 | 16 | 12 | 10.7% | 78.6% | 10.7% |
| 8 | 156 | 45 | 159 | 42 | 5.5% | 91.0% | 3.5% |
| 9 | 7 | 20 | 11 | 16 | 33.3% | 59.3% | 7.4% |
| 10 | 139 | 13 | 139 | 13 | 3.3% | 95.4% | 1.3% |
| 11 | 19 | 31 | 23 | 27 | 42.0% | 56.0% | 2.0% |
| 12 | 19 | 10 | 26 | 3 | 24.1% | 69.0% | 6.9% |
| 13 | 33 | 2 | 33 | 2 | 2.9% | 94.3% | 2.9% |
| 14 | 8 | 6 | 10 | 4 | 21.4% | 78.6% | 0.0% |
| 15 | 17 | 3 | 19 | 1 | 15.0% | 80.0% | 5.0% |
| 16 | 19 | 0 | 18 | 1 | 0.0% | 94.7% | 5.3% |
| 17 | 284 | 76 | 297 | 63 | 6.7% | 88.9% | 4.4% |
| 18 | 513 | 23 | 512 | 24 | 3.5% | 94.0% | 2.4% |
| 19 | 375 | 124 | 391 | 108 | 8.0% | 85.6% | 6.4% |
| 20 | 54 | 105 | 126 | 33 | 62.9% | 35.2% | 1.9% |
| 21 | 189 | 43 | 210 | 22 | 13.4% | 84.5% | 2.2% |
| 22 | 28 | 6 | 33 | 1 | 14.7% | 85.3% | 0.0% |
| Total | 2,988 | 1,299 | 3,321 | 966 | 768 | 3,365 | 154 |

[28] Data suppression minimums did not apply here due to this data being published in other existing reports. There are currently no Level 2 Placement options in the state of Colorado, therefore there are no actual Level 2 placements.

Figure 5 which follows, shows a comparison between the initial screen level and the actual placement level.

Figure 5: Juvenile Detention Screening and Assessment Guide: Result and Actual Placement Level Comparison




# Independent Assessment (IA) Level of Care Recommendations

## Background

Independent Assessments (IA), which incorporate the Child and Adolescent Needs and Strengths (CANS) tool, are requested when it is believed a youth may qualify for Qualified Residential Treatment Program (QRTP) level of care. There are two ways in which an IA can be completed and ultimately funded. One is via the Behavioral Health Administration (BHA), who completes and funds the assessment, and the other via the Regional Accountable Entities (RAE), funded by Colorado Medicaid. IAs are completed by a Qualified Individual (QI), and the completed IA with the recommended level of care is submitted to the referring party.

The following levels of care can be recommended through the IA: community-based services, Qualified Residential Treatment Program (QRTP), Psychiatric Residential Treatment Facility (PRTF) and residential substance use treatment. Residential Child Care Facility (RCCF) placement recommendations are not included, as they are no longer eligible for Title IV-E or Medicaid per-diem reimbursements as of October 2021 as a result of the Family First Prevention Services Act (FFPSA). While residential substance use treatment is an available and recommended option, there are neither residential substance use treatment facilities currently in Colorado nor out-of-state substance use treatment facilities that accept Colorado Medicaid.

Presently, CDHS has a data sharing agreement with BHA which houses the information for the majority of IAs completed in the state. Per the BHA, RAEs reported completion of an additional 193 independent assessments during SFY 23-24. These independent assessments via the RAEs were completed for youth of all ages and were not specific to detention-aged youth or the cohort for this report and are not included in the analysis for this report. Beyond this information, IAs completed via local RAEs are not available for review or data collection by either BHA or CDHS. A data sharing agreement (DSA) to collect IA-related data from the RAEs will need to be established for analysis of this information to occur.

BHA's Children and Youth Behavioral Health Implementation Plan and Health Care Policy and Financing's (HCPF) Accountable Care Collaborative Phase III (ACC III) include expanding the use of the IA as part of a statewide Enhanced Standardized Assessment (ESA) process beginning in SFY 25-26. Whereas the IA has historically been requested to confirm the need for QRTP level of care, the ESA, which also incorporates the CANS tool, will be used to make recommendations regarding the appropriate level of care and inform treatment planning necessary for children and youth with complex, as well as unmet, behavioral health treatment needs. Development of the ESA process and creation of a system of care for children and youth with complex behavioral health needs is currently in progress. The implementation of this new process is expected to drastically increase the number of

youth receiving assessments with the CANS tool. In return, this could provide valuable information about what services and placements youth need, increasing the importance of a data sharing agreement.

The BHA compiles data regarding referral for and completion of most independent assessments across the state. This is the data used for this report.

## Analysis

There were 251 IAs completed for cohort youth via BHA referrals (209 unique youth). Of those IAs, 135 (128 unique youth) were referred during a detention admission. An additional 43 IAs (42 unique youth) were referred within 30 days following a youth's release from detention. These two groups are the primary focus for analysis.

The average (mean) number of days a youth was in detention prior to the referral for an IA was 33.2 days (an increase of about 10 days from SFY 22-23) with a median (the midpoint of the data) of 22 days (an increase of 8 days from SFY 22-23).

The average LOS for youth in detention who were referred for an IA while in detention is 76.2 days (an increase of about 6 days from SFY 22-23) and a median of 39.7 days (a decrease of almost 20 days from SFY 22-23).

Of the 135 IAs that were completed while a youth was in detention, 86 were considered releasable. The average Releasable Length of Stay (RLOS) for this group is 75.9 days (an increase of 16 days from SFY 22-23) with a median of 59.6 days (an increase of about 18 days from SFY 22-23).

The average LOS for youth in detention who were referred for an IA while in detention, but were not noted as releasable, is 76.7 days. It should be noted that 13 of these admissions remained in detention after the end of the cohort period, and the LOS was only counted from the point of admission to June 30, 2024, or the end of the cohort time period. The median is 66.7 days.

Of the 135 IAs that were referred while a youth was in detention, 84 had a QRTP recommendation.

- 19 youth (22.6% of the 84) were placed in a QRTP setting either immediately upon release from detention or within 30 days of release.
- 39 youth (46.4% of the 84) either returned home or were placed in another lower-level placement.
- 15 youth (17.9% of the 84) were placed in a higher level of care.
- 11 youth (13.1% of the 84) remained in detention at the end of the cohort time period.

## Youth & Family Perception

Due to saturation concerns after outreach and brainstorming with professionals within both child welfare and juvenile justice, it was decided that a targeted approach is necessary to appropriately disseminate surveys to address the needs of youth and families regarding their access to placements and services. The team will continue working to identify other places where youth and families are surveyed to see if collaboration is an option for gathering this important information and/or how best to gather this information in the least-intrusive, yet meaningful way.

# Child Welfare Involvement

Figure 6: Court-Involvement for Non-Delinquent Unique Youth, Over Their Lifetime[29]




The above figure illustrates the number of filed dependency and neglect (D&N), expedited permanency placement (EPP), truancy and Foster Youth in Transition (FYiT) cases over the lifetime of the cohort youth. An EPP is similar to a D&N but it is filed for children ages six and under (C.R.S. 19-1-123). Youth ages seven and older can be listed as participants in these cases with their younger siblings. Some cohort youth had more than one of these four case types within their lifetime which is reflected as "Multiple" in the figure above. These cases were manually calculated from Colorado State Courts Data Access system. As mentioned, the role of the youth within the dependency and neglect and expedited permanency placement cases are named youth within the case, not necessarily the main participant.

## Prior & Current Child Welfare Involvement

For the purposes of this report, criteria for "active" child welfare involvement included cohort youth who, being identified as a child, victim, or alleged victim, or

[29] Some of the values are labeled with an "X" due to suppression minimums.

youth-in-conflict, participated in an assessment and/or case that remained open at one of these specific points in a single detention admission:

- At initial detention admission date;
- Prior to the detention end/release date; and
- On and after the detention end/release date.

To provide an expanded view of the level and frequency of interaction with child welfare that these youth have throughout subsequent detention admissions, this evaluation examines child welfare involvement occurring during any detention admission within the cohort. Of the 2,012 unique youth, 959 (47.6%) were identified as having active child welfare involvement with a county department of human or social services during any of their detention admissions within the cohort period. Any involvement that may have been initiated and ended prior to a detention admission are not included as active involvement. This involvement is considered historical involvement, and represents 1,488 (74.0%) unique youth.

Table 23: Child Welfare Involvement for Cohort Detention Youth

| Child Welfare Assessment/Involvements[30] | Unique Youth Count | Percentage of Total |
|---|---|---|
| Total Unique Youth in Cohort | 2,012 | 100.0% |
| Child Welfare Assessment or Case Active During Detention[31] | 959 | 47.6% |
| Child Welfare Assessment or Case Historical Involvement | 1,488 | 74.0% |

[30] These counts are not mutually exclusive
[31] Youth may have participated in only a child welfare case, only a child welfare assessment, or both a case and an assessment.

# Child Welfare Assessments

During the cohort period, 745 (36.9%) youth were involved in 974 child welfare assessments during their detention admissions, of which 561 (75.3%) youth had new assessments initiated during a youth's detention admission.

Table 24: Active Child Welfare Assessments[32]

| Assessments Opened into Detention and During Detention | Unique Youth with Assessment Opened into Detention and During Detention | Unique Youth with New Assessments During Detention |
|---|---|---|
| 974 | 745 | 561 |

When a report of concerns for child abuse or neglect is made to county departments of human and social services, the reporting party's relationship to the child, youth or family, or their role in the community, is documented and assigned to one of 36 categories that are available in Trails. The majority of the active assessments during a youth's detention admission were initiated on behalf of the court for a court-ordered assessment (262), court-ordered service (112), or court-ordered placement (85).

Table 25: Relationship or Role of Referral/Assessment Reports for Cohort Youth

| Referral Source/Relationship | Assessment Counts | Percentage of Total |
|---|---|---|
| Court-Ordered Assessment | 262 | 35.2% |
| Court-Ordered Service | 112 | 15.1% |
| Court-Ordered Placement | 85 | 11.4% |
| Court/Probation | 82 | 11.0% |
| Law Enforcement | 76 | 10.2% |
| Wrap Facilitator | 66 | 8.9% |

[32] The methodology used to extract child welfare data was refined for this report which may have contributed to the significant decrease in the number of assessments compared to SFY 22-23.

| Referral Source/Relationship | Assessment Counts | Percentage of Total |
|---|---|---|
| DYS Region/Facility | 65 | 8.7% |
| County Department of Social Services | 38 | 5.1% |
| Counselor/Therapist | 25 | 3.3% |

At the conclusion of the assessment, a disposition summary of the initial allegation(s) is entered, and the assessment is either closed or moved into a case status. Some of the investigation findings for assessments involving cohort youth included:

- No Abuse/Neglect (413)
- Program Area 4 (Youth in Conflict), No Findings (216)
- Unfounded (139)
- Family Assessment Response (FAR), No Findings (57)
- Inconclusive (52)
- Founded (49)

## Child Welfare Cases

During their detention admissions, 562 (27.9%) unique cohort youth were involved in 583 open child welfare cases, some of whom had multiple detention admissions within an open child welfare case.

Table 26: Active Child Welfare Cases[33]

| Cases Opened into Detention and During Detention | Unique Youth with Cases Opened into Detention and During Detention | Unique Youth with New Cases During Detention |
|---|---|---|
| 583 | 562 | 218 |

[33] Parameters for active child welfare cases and detention admissions were changed slightly this reporting year, examining active cases occurring during any of the youth's detention admissions in the cohort period rather than only cases occurring during the youth's first detention admission in the cohort.

Thirty-four county departments of human or social services managed these cases, eleven of which are listed in Table 27. Case counts for the remaining 23 county child welfare agencies fall below the established suppression minimum, and included:

- Alamosa
- Archuleta
- Bent
- Broomfield
- Clear Creek
- Conejos
- Costilla
- Delta
- Eagle
- Elbert
- Garfield
- La Plata
- Lake
- Las Animas
- Logan
- Montezuma
- Morgan
- Otero
- Prowers
- Teller
- Yuma

Table 27: Active Child Welfare Cases by County

| County | Case Counts During Detention |
|---|---|
| Adams | 27 |
| Arapahoe | 87 |
| Boulder | 18 |
| Denver | 62 |
| Douglas | 26 |
| El Paso | 86 |
| Jefferson | 47 |
| Larimer | 65 |
| Mesa | 36 |
| Pueblo | 36 |
| Weld | 53 |
| Remaining Counties[34] | 41 |
| Total | 583 |

[34] Includes county child welfare agencies with unique case counts below the suppression minimum.

Of the 562 youth with active child welfare cases during detention, involvement for 440 (78.2%) youth began before the detention start date. As with assessments, there are some instances of siblings within the cohort that were simultaneously involved in the same child welfare case, meaning that one active child welfare case may involve two or more youth.

All child welfare assessments and cases are designated a program area that describes the primary purpose of involvement. Program Areas 4 and 5, and some Program Area 6, are generally regarded as being traditional child welfare cases that provide for a child or youth's safety, permanency, and well-being. Program Area 3 is designated for prevention services. It should be noted that some counties do not use Program Area 3. This report includes the Program Area 3 case type in its analysis due to statutory requirements.

During the cohort period, 335 (57.5%) of the 583 cases were assigned to Program Area 4-Youth in Conflict services, while 146 (25.0%) were assigned to Program Area 5-Child Abuse and Neglect[35]. The remaining 103 cases consisted of cases in Program Areas 3 and 6. Excluding Program Areas 3 and 6 cases, the average number of days that a case remained open was 414 days, compared to an average 432 days open for active PA4 and PA5 cases during SFY 23-24 that involved non-detention youth 10-17 years old.

Table 28: Case Program Area Services by Unique Case

| Program Area 3 | Program Area 4 | Program Area 5 | Program Area 6 |
|---|---|---|---|
| 64 | 335 | 146 | 39 |

When a child welfare case is closed, the county caseworker will enter into Trails a pre-populated reason that the case has come to a conclusion. Among the cohort youth child welfare cases, the three highest reasons for case closure included Court Action (150), Services Successful (150), and Transferred to DYS (42). While the specific

[35] There is a single, active child welfare case that is assigned to two different program areas involving two youth in this cohort.

reason for case closure is often more nuanced than the broad closure reasons available in Trails, cases closed due to a court action or a transfer to DYS most often indicate:

- the closure is due to the court establishing its full jurisdiction over the youth;
- all objectives of court-ordered child welfare involvement have been achieved, including a placement or reunification;
- the youth has entered into a detention sentence or was committed to the custody of DYS, which shifts ownership of the case entirely to DYS.

Table 29: Case Closure Reason by Unique Case[36]

| Case End Reason | Count |
|---|---|
| Court Action | 150 |
| Services Successful | 150 |
| Transferred to DYS | 42 |
| Services to Be Given By Other | 28 |
| Runaway Child | 25 |
| Transfer to Foster Youth In Transition (FYiT) Program | 23 |
| Services not Needed | 23 |
| Legal Emancipation/Age Majority | 20 |

## Accessing Meetings for Family Engagement

Collaborative Management Programs (CMP) facilitate many of the family engagement meetings across the state. CMP is currently transitioning to a new database, which tracks the family engagement meetings for the counties where CMP is involved. Until the new record management system is made fully available to select partners, data from engagement meetings facilitated through CMP coordination are not accessible for analysis. Some data regarding family engagement meetings is also recorded in Trails, Savio Management Group database or other local databases. Analysts are developing a process that can incorporate all this data to provide the most comprehensive assessment of family engagement meetings.

[36] Case end reasons only appear if a case has been approved for closure.

# Impact of Detention Caseload to Counties

## County Funding Impact

During SFY 23-24, 590 (29.3%) of the 2,012 unique cohort youth received services for which counties were responsible for some or all of the funding, which is an increase from 459 (23.3%) unique youth in the previous year's cohort. These services (excluding placements) are tracked within the service authorization area of Trails, which may be used to pay for direct services or used to track services provided by the county via other mechanisms. Some of these services may also result from a youth's detention case, or as short-term services from a child welfare assessment. In total, 33 out of 64 counties within 21 of 22 judicial districts were responsible for coordinating 10,787 different services and payments for youth during the cohort period, which is also an increase from the previous year's count of 8,758 service authorizations. The highest total payments made by counties for services directly related to cohort youth were for Foster Family Home Care ($580,745), Qualified Residential Treatment Program ($487,812) and Residential Child Care Facilities ($213,050). In Table 30 below are the ten services with the highest county costs, however, the extended table that lists all of the service types and dollar amounts is available in Appendix I.

Table 30: Total and Average Amount Spent by Counties as Entered into Trails, by Service

| Service Type | Total County Cost for Cohort | Average County Cost per Episode |
|---|---|---|
| Foster Family Home Care | $580,745 | $265 |
| Qualified Residential Treatment Program | $487,812 | $470 |
| Residential Child Care Facility | $213,050 | $750 |
| Group Center Care | $97,299 | $616 |
| Life Skills | $87,957 | $106 |

| Service Type | Total County Cost for Cohort | Average County Cost per Episode |
|---|---|---|
| Adoption | $73,447 | $59 |
| Group Home Care | $61,538 | $669 |
| Home-Based Services | $53,826 | $101 |
| Kinship Foster Care | $45,467 | $277 |
| Community Based Family Support Services | $31,654 | $264 |
| Supervised Visitation | $22,942 | $61 |

One service type not listed in Table 30 is Psychiatric Residential Treatment Facilities (PRTF). While counties sometimes pay for a portion of this service, typically these placements are not paid for by counties using county funds, but instead, the Department of Health Care Policy and Financing (HCPF) is billed by and reimburses the provider directly for services. During the cohort period, there were 134 (1.2%) different monthly service authorizations submitted by counties for Psychiatric Residential Treatment Facility placements.

## County Caseload Impact Overview

To understand, analyze and narrate the experiences of youth involved in both the juvenile justice and child welfare systems, data collaboration and stakeholder partnerships are essential. The Colorado child welfare system is state-supervised and county-administered, meaning 64 counties contribute to the data collection for youth involved in the child welfare system. As a result, differences in data collection and recording are prevalent and expected. To gain more understanding of the differences between counties, analysts for C.R.S. 19-2.5-1404 created a county-facing survey to outline the varying policy and practice across the counties.

Leadership within Colorado's 64 counties were asked to complete the Child Welfare Juvenile Justice-Involved Youth: County Human Service Survey. The counties were asked to provide insight using information maintained locally with two guidelines:

- Youth involved in both child welfare and juvenile justice, and youth in detention
- Services provided during State Fiscal Year 23-24 (July 1, 2023 – June 30, 2024)

Colorado has 64 counties; 35 (54.7%) responded to the survey. Of the 35 who responded, 20 were rural (57.1% of responding counties), eight were urban (22.9% of responding counties) and seven were resort rural counties (20.0% of responding counties). Additionally, 10 (28.6% of responding counties) reported they have staff who work with juvenile justice-involved youth, though only three (8.6% of responding counties) had specific designated roles/functions that address the specific needs of juvenile justice-involved youth.

Montezuma County stated they have a half-time employee who "provide(s) all out of home assessment reports, make(s) QRTP referrals routinely, offer(s) prevention services and work those cases, attend JJ [juvenile justice] court docket twice a month." Similarly, Denver County shared that while they do not have staff fully dedicated to juvenile justice-involved youth, they:

> *"[S]trive to assign JJ [juvenile justice] involved youth to specific intake and ongoing caseworkers. But this varies based on assignments, number of open assessments, cases etc. Our best estimate based on our youth teams, and the quantity of JJ [juvenile justice] involved youth we 20 youth FTE [full-time employees] with extensive crossover, and JJ [juvenile justice] involved youth in both intake and permanency caseloads that we don't have clear estimate for FTE [full-time employee] equivalency at this time, and will begin to look at tracking this moving forward."*

Across all of the survey questions, counties had very diverse responses that were difficult to quantify. When asked at what point in the process youth are identified by the county as being juvenile justice-involved, some consensus was found, as seen in Figure 7 that follows.

Figure 7: Point of Identification of Juvenile Justice-Involved Youth in Child Welfare




Referrals and assessments were indicated as the primary points of contact counties have with youth and families with dual system involvement.

As a follow-up question to point of process identification, counties were asked to identify how they track justice-involved youth within their data to differentiate them from non-justice-involved youth. The responses to this question could not be quantified. Counties like Broomfield County reported creating a process in which juvenile justice-involved youth are tracked on a separate spreadsheet along with their high acuity youth. El Paso County commented, “We don't in particular. We can capture some through court ordered involvement orders, but that's not for all. This is a very manual process to collect. It is not automated through Trails or CO Courts.”

Overall, documentation fluctuated from either no documentation to a mixed use of systems and partners in order to collect the data. The identification process and data collection strategies for the counties continue with the understanding and reporting

of county-specific programs/services each county funds for the youth and families they serve. Services, programming and funding, whether county or other funding source, are diverse among counties. The top 10 funding sources identified by the counties are:

- Core funding / core services, which may include Signal contracts
- County funding
- Collaborative Management Program (CMP)
- Medicaid
- C.R.S 19-2.5-1407.3 (HB23-1307)
- Block funding
- Chaffee funds
- Housing vouchers
- Substance Education Awareness (SEA) funds
- Partnership funds

During the State Fiscal Year 23-24, some counties reported not having any juvenile justice-involved youth during this time frame that nullified their need to create a data tracking policy. Comparable counties, like Arapahoe, were unable to quantify the number of youth they served due to the complexities of tracking this data with a fluctuating workforce.

The county departments of human or social services have illustrated through this survey that they understand the challenges and needs of youth involved within both the juvenile justice and child welfare systems. Moving forward, the C.R.S. 19-2.5-1404 analysts will focus on engaging those counties that did not respond to the survey. Analysts will outreach counties with dual system-involved youth during the State Fiscal Year 24-25 to begin conversations around process and policy change to better serve this population.

Table 31: Impact of Detention Involvements on Child Welfare, Unique Youth

| State Fiscal Year | Unique CW with Ongoing Case Count (All Ages) | Unique CW with Ongoing Case for Youth 10 to 17 Count | Unique CW Youth with Ongoing Case with Detention Involvement[37] | % Youth 10-17 with Detention Involvement |
|---|---|---|---|---|
| 2019-2020 | 18,749 | 7,563 | 937 | 12.4% |
| 2020-2021 | 17,677 | 6,911 | 576 | 8.3% |
| 2021-2022 | 15,851 | 6,205 | 514 | 8.3% |
| 2022-2023 | 14,947 | 5,909 | 588 | 10.0% |
| 2023-2024 | 13,899 | 5,451 | 562 | 10.3% |

The previous five state fiscal years demonstrate that the child welfare caseload to county agencies of human and social services has decreased over time for all youth, including those aged 10-17 years old. Meanwhile, the number of detention-involved youth also participating in a child welfare case has fluctuated slightly since SFY 20-21. The percentage of detention-involved youth in the county child welfare caseload has slightly increased annually since SFY 20-21. Having more county workload feedback, as anticipated in future years, combined with a retrospective review of this caseload data, could produce more meaningful insights and analysis.

[37] Narrowed parameters for child welfare involvement for detention youth produced changes to these figures compared to the previous report. For this report, a detention youth's involvement was limited to an open child welfare case during SFY 22-23, while the previous report looked at concurrent involvements in detention and child welfare.

# Youth Focus

Pre-adjudicated and adjudicated youth will have access to placements and services in the least restrictive setting that meet their treatment needs as identified through assessments, as well as mitigate the youth's substantial risk of serious harm to others or the youth's flight risk from prosecution.

---

Metric 1: Analysis of youth in detention who are awaiting placements or services, as well as the time it takes to place them.

Metric 2: Analysis of youth in detention who are granted a PR bond.

Metric 3: Analysis of youth being served in the least restrictive setting, which includes level of care recommended, level of care received and reasons for staff overrides.

Metric 4: Analysis of youth being served in the least restrictive setting, which includes level of care recommended, level of care received and reasons for staff overrides.

Metric 5: Analysis of youths' access to family facilitated meetings and the impacts of these meetings on youth outcomes.

Metric 6: Analysis of youth in detention who are in the transfer and direct file processes.

---

# Statistical Youth Outcomes

## Overview

The section below explores how factors like offense ranking and detention involvements impacted a youth's length of stay outcomes. Linear regression tests were used to measure patterns in the data, whether those patterns were random or meaningful, and the degree to which the independent variable impacted the dependent variable.

It is important to note that while some of the tests below show correlations in data, it cannot be determined what causes these outcomes. These correlations can be useful in providing insight, but ultimately, more research is needed to determine effective interventions. Historically, a lot of academic and government research emphasizes that justice involved outcomes are impacted by unmet criminogenic needs.[38]

For this section, the independent variables analyzed are:

- Detention Involvements
- Child Welfare Involvement
- Offense Ranking

For this section, the dependent variables analyzed are:

- Length of Stay (LOS)
- Length of Stay While Releasable (RLOS)

[38] Andrews & Bonta, "Rehabilitating Criminal Justice Policy & Practice," (2010); Cullen "Assessing Correctional Rehabilitation: Policy, Practice, and Prospects," (2000); Loerber, "Young Children Who Commit Crime: Epidemiology, Developmental Origins, Risk Factors, Early Interventions, and Policy Implications," (2001).

## Child Welfare or Detention Involvement First

The table below summarizes whether a cohort youth had child welfare or juvenile justice contact first, and includes historical and/or active child welfare involvement during their first detention admission.

Table 32: Detention Youth First Contact by Agency Type

| First Contact by Agency | Youth Count | Percentage of Youth |
| --- | --- | --- |
| Child Welfare First | 1,460 | 72.6% |
| Detention First[39] | 530 | 26.3% |
| Same Day in Both | 22 | 1.0.% |
| Total | 2,012 | 100% |

Of the youth who have a child welfare contact and a detention involvement, the majority of them have the child welfare contact prior to the detention involvement.

## Child Welfare Involvements and Length of Stay (LOS)

The table below shows the average and median length of detention stay for cohort youth by whether the child welfare involvement was active or historical prior to the detention admission.

[39] This number includes youth who have no child welfare involvement, or child welfare involvement after their last detention release date in this cohort.

Table 33: Detention Length of Stay and Child Welfare Involvement

| Child Welfare Involvement Status | Average Length of Stay (LOS) | Median Length of Stay (LOS) |
|---|---|---|
| CW Involvement During Detention –Yes | 41.8 | 19.3 |
| CW Involvement During Detention – No | 17.0 | 2.8 |
| CW Involvement History – Yes | 32.3 | 8.7 |
| CW Involvement History – No | 18.9 | 3.3 |
| All Youth | 29.6 | 6.7 |

Regression results show that having child welfare involvement during the detention period significantly increases the length of detention stay. Regression results also show that having historical child welfare involvement significantly increases the length of detention stay.

## Detention Involvements and Length of Stay (LOS)

The tables below show the number of detention involvements for cohort youth. About half of youth within the cohort only had one detention involvement up to the end of SFY 23-24. Many of the youth in the cohort (68.9%) did not have previous detentions prior to this cohort.

Table 34: Count of Unique Youth and Their Detention Involvements

| Detention Involvement Ranges (All Time) | Count of Unique Youth | % of Cohort |
|---|---|---|
| 1 | 1,061 | 52.7% |
| 2 | 411 | 20.4% |
| 3 | 200 | 9.9% |
| 4+ | 340 | 16.9% |

Table 35: Count of Unique Youth and Their Detention Involvements Prior to the Cohort[40]

| Detention Involvement Ranges (Before the Cohort) | Count of Unique Youth | % of Cohort |
|---|---|---|
| 0 | 1,386 | 68.9% |
| 1 | 287 | 14.3% |
| 2 | 134 | 6.7% |
| 3 | 87 | 4.3% |
| 4+ | 118 | 5.9% |

1,286 of the 2,845 admissions were a youth's first admission into detention.

- Average LOS if it is a youth's first admission: 15.7 days
- Average LOS if it is not a youth's first admission: 30.1 days

The number of times a youth returns to detention has a significant impact on a youth's LOS. Regression results showed that for each time a youth is in detention (prior to their cohort start date), their projected LOS increases within the fiscal year by 8.7 days.

Regression results also showed that historical involvements did not have a meaningful impact on the time a youth remains in detention after being designated as releasable.

[40] In the report for FY 22-23, these numbers were presented as all time detention admissions, while this table shows only detention admissions prior to the cohort. The numbers are presented slightly differently as a result.

## Charges and Length of Stay (LOS)

Table 36: Offense Category, Type, and Length of Stay

| Offense Category | Admissions | Average LOS |
|---|---|---|
| Felony | 1,929 | 36.6 |
| Misdemeanor | 855 | 15.7 |
| Petty | 61 | 5.7 |
| Offense Type | | |
| Drug | 73 | 28.8[41] |
| Other | 200 | 11.4 |
| Person | 1,492 | 38.4 |
| Property | 743 | 24.8 |
| Status | 36 | 6.4 |
| Traffic[42] | 17 | 7.1 |
| Weapon | 284 | 13.6 |
| Total | 2,845 | 29.6 |

Statistical tests on length of stay (LOS) and offenses confirmed that admissions in the cohort with a higher offense ranking are associated with longer LOS.

- Youth with nonviolent charges had an overall average LOS of 19.8 days.
- Youth with violent charges (homicide, assault, other violent person crimes) had an average LOS of 43.2 days. This represents a decrease in LOS of about five days since SFY 22-23 report.
- The standard mean difference for youth with charges of a violent crime is 12.87 days, a decrease from last year of 15.6 days.

[41] This is a substantial increase from the FY 22-23 report average LOS for youth in detention with a drug offense, which was 15.7 days. However, generally it's recommended to look at trends over a few years to discern any patterns.
[42] Traffic offenses include such charges as vehicular manslaughter and vehicular assault and should not be interpreted as minor traffic violations.

- Effect size = 0.282 (absolute value)

Additionally, regression showed that with each increase in charge level (e.g., from a level 6 petty crime to a level 1 felony crime), a youth's LOS increased 3.55 days. From this data, it can be concluded that increased charges correlate to an increase in a youth's LOS while in detention.

Data Note: The charge data in this report is the max offense (e.g., most serious offense) associated with the youth's admission into Trails at the time of entry. This data comes from Trails, and the max offense is reviewed/validated during DYS's Data Management and Analysis team's annual year end data clean, but initially ranked upon record approval by facility admission staff supervisors. Trails contains an algorithm for ranking each admission's offenses (from least serious to most serious); this ranking process is automated upon admission record approval. Additionally, it should be kept in mind this is a basic analysis. As this report continues to evolve and improve year after year, more information will help deepen these results.

There was no discernible pattern or statistically significant result for charges and releasable youth. The tests did not indicate a statistically significant result, meaning that any numbers produced were most likely the result of chance and that the two variables are not related. This indicates that charges are not a significant factor in how long it takes to release a youth after they have been made releasable. It can also indicate that more information is needed.

## Bonds & Releasability

This section concerns youth who are eligible for alternative placements if risk of serious harm to community or risk of flight is mitigated.

## Bonds

The initial intention of this metric was to understand how many youth are held in detention with either a placement in lieu or personal recognisance (PR) bond, which would allow the youth to be released if the requirements of the bond were met. However, the data needed to answer this question is not fully available.

Bond information changes frequently throughout a youth's detention admission, and only one bond can be added to a youth's record in the Detention Bed Utilization Tracking Sheet. It is inconsistent at which point in a youth's admission the bond is added. Many times, youth with no bond are given a (PR) bond when the youth is released from detention, making it unclear whether a finding of placement in lieu or a PR bond was a factor in a youth's length of stay in detention.

In April 2025, the Advisory Board voted to remove this as a metric, since PR Bond information is not currently available for analysis to answer this metric. Instead, future reports will focus on information about youth awaiting mitigating services or placements.

## Releasable Youth

As noted previously, in October 2024, the CYDC Advisory Board voted to remove the requirements in performance standards and metrics for releasable youth. Instead, they recommended tracking information for all youth who were in detention awaiting placements or services searches, and if those searches impact a youth's length of stay while in detention. However, this year's data was collected before that decision was made and still uses the older term releasable.

- Of the 2,012 unique youth, 693 (34.4%) were made releasable by a court if substantial risk of serious harm or flight risk could be mitigated by appropriate community placement. Regional unique youth counts are non-exclusive as

youth may have admissions in multiple regions. Full information on releasable youth by judicial district and county can be found in Appendix F.

- Central: 348 unique youth
- Northeast: 166 Unique youth
- Southern: 125 unique youth
- Western: 72 unique youth

- Of the 2,845 admissions, 860 (30.2%) were releasable.
  - 15 of these admissions had detention sentences.
  - 14 of these admissions were in the Transfer, Reverse Transfer and/or Direct File processes.
  - 57 of these admissions were committed to the custody of DYS immediately following their detention stay.
  - Two were released to the Department of Corrections.
  - Four were released to county jail due to age.
- The average releasable length of stay (RLOS) by admission is 19.9 days. RLOS is the time between the date the youth was made releasable by the court and their release date.
- The median RLOS is six days.
- 141 of these admissions (5.0% of total admissions) were detained for more than 30 days after being made releasable (RLOS).

# Additional Outcomes for Releasable Youth

## Releasable Youth and CJRA

Youth who are considered releasable are more likely to have a higher CJRA pre-screen risk level compared to youth not considered releasable.

- Effect size = 0.220

- Generally, in tests of this kind, 0.220 is considered a weak to moderate relationship

## Releasable Youth and Length of Stay

Youth who are considered releasable are more likely to have a longer length of stay in detention than youth who are not considered releasable, with a standard mean difference of 17.0 days. The team hopes to expound on this in future reports, when information on youth awaiting mitigating services and placements becomes available.

- Effect size = 0.374 (absolute value)
- For tests of this type, 0.374 is considered a moderate correlation relationship

## Releasable Youth and Child Welfare Involvements

Of the 693 unique releasable youth, 471 (73.7%) had child welfare involvement at some point prior to or during a cohort detention admission in which they were considered releasable by the court.

- All releasable youth with child welfare involvement had involvement in a case and an assessment.
- The average RLOS for all child welfare involved releasable youth across all regions was 26.1 days, which is about six days higher than the average for all releasable youth.
- The median RLOS for all child welfare involved releasable youth across all regions was eight days, which is two days higher than the median for all releasable youth.

Table 37: Number of Releasable Admissions by Date Range

| Total Releasable Days Date Ranges (RLOS) | # of Admissions (All releasable admissions) | % of Admissions (All releasable admissions) | # of Admissions (CW Involved Youth with releasable admissions only) | % of Admissions (CW Involved Youth with releasable admissions only) |
|---|---|---|---|---|
| 0-6 Days | 409 | 47.6% | 245 | 41.2% |
| 7-13 Days | 131 | 15.2% | 100 | 16.8% |
| 14-29 Days | 99 | 11.5% | 91 | 15.3% |
| 30-59 Days | 80 | 9.3% | 81 | 13.6% |
| 60-99 Days | 38 | 4.4% | 43 | 7.2% |
| 100+ Days | 32 | 3.7% | 35 | 5.9% |
| Total | 789[43] | 91.7% | 595 | 100% |

Table 38: Releasable Information by Region, Including DHS Involvement

| Region | Releasable Admissions (ALL) | Average RLOS | Median RLOS | DHS Involved Releasable Admissions | Average RLOS for DHS Involved Youth | Median RLOS for DHS Involved Youth |
|---|---|---|---|---|---|---|
| Central | 429 | 19.5 | 7 | 302 | 25.1 | 9 |
| Northeast | 192 | 23.7 | 7 | 151 | 28.4 | 12 |
| Southern | 151 | 21.0 | 5 | 87 | 30.6 | 7 |
| Western | 88 | 12.3 | 3 | 55 | 18.9 | 6 |
| TOTAL | 860 | 17.8 | 6 | 595 | 26.1 | 8 |

[43] The remaining releasable dates were missing

# Placement Analysis

## Denials

The number of denials by placement providers when youth are not accepted into the recommended level of care has not been collected historically. Beginning in June 2024, Colorado's Division of Child Welfare began piloting a universal placement referral form with nine counties and two regional accountable entities in an effort to begin tracking referrals and denials to placements. This information will be integral in better understanding how placement programs can be supported and where the gaps in services are, however, this form remains in its testing phase and data is not available for this reporting period.

## Foster and Kinship Care

Foster home placement may be a beneficial option for any youth in need of temporary, out-of-home care and support while the county or involved placement agency coordinates efforts to achieve permanency for the youth. Detained youth awaiting release often face unique hurdles in being accepted into a foster home placement, as provider preferences may exclude this population of youth due to their juvenile justice involvement, among other identified preferences. While the youth's status of active juvenile justice involvement is not a preference option available for the foster family home provider to explicitly indicate, the preference options that are available include the minimum and maximum ages of the foster child/youth, their gender, as well as an indication that the provider has no specific preferences,

An alternative to a foster family home is kinship care, either in a certified kinship foster care home or a non-certified kinship home, delineated only by the kinship provider's ability or interest to seek formal certification through their county human or social services agency. In addition to kinship family foster homes and non-certified

kinship care, there are also informal kinship caregivers, which are living arrangements the youth has with relatives or kin that are not managed or monitored by an agency.

Based on the preferences as identified by foster family home providers, there are currently 231 certified foster homes statewide that accept youth between the ages of 10 and 20 years old, regardless of the gender of the youth. Nearly all of these foster homes (230) were certified as foster family home care, with the remaining provider being a kinship foster home.

Table 39: Foster Home Providers by County and Judicial District[44,45]

| County | Number of Homes |
|---|---|
| Adams | 18 |
| Arapahoe | 29 |
| Boulder | 4 |
| Broomfield | 1 |
| Chaffee | 2 |
| Crowley | 1 |
| Delta | 1 |
| Denver | 18 |
| Douglas | 11 |
| El Paso | 57 |
| Elbert | 1 |
| Fremont | 4 |
| Jefferson | 10 |
| Kit Carson | 1 |
| La Plata | 2 |
| Larimer | 9 |
| Logan | 1 |
| Mesa | 12 |
| Montrose | 4 |
| Otero | 1 |
| Park | 1 |
| Prowers | 1 |
| Pueblo | 23 |
| Rio Grande | 2 |
| Weld | 15 |
| Yuma | 2 |
| Grand Total | 231 |

| Judicial District | Number of Homes |
|---|---|
| 1 | 10 |
| 2 | 18 |
| 4 | 57 |
| 6 | 2 |
| 7 | 5 |
| 8 | 9 |
| 10 | 23 |
| 11 | 7 |
| 12 | 2 |
| 13 | 4 |
| 15 | 1 |
| 16 | 2 |
| 17 | 19 |
| 18 | 41 |
| 19 | 15 |
| 20 | 4 |
| 21 | 12 |
| Grand Total | 231 |

[44] Counties or judicial districts not listed in either of these tables do not have current certified foster homes available with preferred age ranges that match the specific age range of the cohort youth (10-20 years). Agencies are not restricted to placing in their respective county or jurisdiction.
[45] For all foster home providers that were open for at least one day during SFY 23-24.

# Placement Upon Release

Information available regarding placements becomes increasingly limited following the initial placement upon release from detention. Subsequent placement information is only available for youth placed by the county departments of human or social services and recorded in Trails. Table 40 below indicates the first placement of youth immediately following their release from detention and includes release information up to April 1, 2025 for youth who remained in detention beyond the end of the cohort time period.

Table 40: Total First Placements Following Release from Detention

| Placement Type | # Total 1st Placements Following Release | % of Total First Placements Following Release |
|---|---|---|
| Home | 1,849 | 65.0% |
| Kin, Kin-Foster, Kin-Like, Guardian | 373 | 13.1% |
| DYS Commitment | 199 | 7.0% |
| Foster Care | 84 | 3.0% |
| QRTP | 68 | 2.4% |
| County Jail[46] | 62 | 2.2% |
| RCCF | 40 | 1.4% |
| Other | 32 | 1.1% |
| PRTF | 29 | 1.0% |
| Other DHS Placement | 29 | 1.0% |
| ICJ – Return to Home State | 23 | 0.8% |
| Group Home | 18 | 0.6% |
| Colorado Mental Health Hospital in Pueblo (CMHHIP) | 13 | 0.5% |
| Department of Corrections / Youth Offender Services (DOC/YOS) | X | X |
| Out-of-State Placement | X | X |
| Unknown | X | X |

It should be noted that if information was available indicating a youth was released to a parent following release from detention but immediately placed in a QRTP setting, for example, this youth was categorized as QRTP placement.

[46] All youth with "placement" in a county jail were transported there upon turning 18 years of age, per statute requirement (C.R.S. 19-2.5-305(4)(g)).

Youth in “Other DHS Placement” upon release either had immediate placement in a county office or hotel, placement in independent living situations or shelters, or the placement of the youth was unknown based on information available. Youth who are placed in a county office or hotel are in the custody of the county department of human or social services since formal placement is not immediately available. These placements accounted for less than 10 releases from detention.

More than 75% of all admissions resulted in a return home or placement with kin-foster, kin, guardian, or in a kin-like setting immediately following release from detention. Of those, less than 5% had involvement by county departments of human or social services.

Nearly 10% of admissions resulted in youth being released from detention to be confined elsewhere. These youth were either committed to the custody of DYS, transferred to county jail upon turning 18 years of age, or sentenced to the Department of Corrections.

One way to further understand the impact of placements on county departments of human or social services is to review the number of placements immediately following a youth’s release from detention in which county departments of human or social services were involved. There were 338 (11.9%) of the 2,845 total release placements (compared to 13.3% of last year’s detention releases) in which involvement from county departments of human or social services could be verified. These admissions accounted for 265 (13.2%) of the 2,012 unique cohort youth.

Table 41 shows percentages of total placements in each category outlining placements in which a county department of human or social services was involved. Of all first placements following a youth’s detention release, 155 (5.5% of total admissions) were made to either RCCF, QRTP, PRTF and group home settings. DHS was involved in 132 (85.2%) of those placements.

Table 41: DHS Involved Placements Following Release from Detention

| Placement Type | # Total DHS Involved Placements | % of Total DHS Involved Placements |
|---|---|---|
| Foster | 70 | 20.7% |
| Kin[47] | 67 | 19.8% |
| QRTP | 56 | 16.6% |
| RCCF | 35 | 10.4% |
| Other Placements | 30 | 8.9% |
| PRTF | 26 | 7.7% |
| Home/Trial Home Visit | 23 | 6.8% |
| Group Home | 15 | 4.4% |
| Unknown Placement | 16 | 4.7% |

## Youth in the Transfer, Direct File, and Reverse Transfer Processes

Youth involved in the Transfer, Direct File, and/or Reverse-Transfer processes can remain in detention for extended periods of time, as the courts ultimately decide which jurisdiction will best serve the juvenile and the community. For this report, data for youth in the Transfer, Direct File, and/or Reverse-Transfer processes was found using two sources: Trails data extract and Detention Bed Utilization Tracking Sheet. Information from the Colorado District Attorney's Council, the primary entity that houses direct file-specific data, was not available for this year's report.

In January 2025, the Advisory Board voted to send a letter to the Colorado District Attorney's Council requesting data sharing as it relates to direct file case data. The sharing of this data will increase the accuracy in reporting specifically which youth are considered part of the direct file process. Combining data from multiple sources

[47] This number includes certified and non-certified kinship placements.

can present challenges and may result in minor data errors. In addition to maintaining its collaboration with Colorado District Attorney's Council, the analysts for C.R.S. 19-2.5-1404 continue to make progress in the effort to obtain a DSA with the judicial department in order to have the most accurate data available. This DSA is in its final stage and will hopefully be available for data sharing for the 2026 report. There were 100 admissions (94 unique youth) in detention during this cohort period that were related to cases in Transfer, Direct File, and/or Reverse-Transfer processes. A few youth (N=<10) had more than one admission during the cohort that related to the case in the Transfer, Direct File, and/or Reverse-Transfer process. Cohort youth in this group range in age from 14 to 17 years old at the time of detention admission. However, the average age of a youth in the Transfer, Direct File, and/or Reverse-Transfer processes for this cohort is 16 years old.

More than 90% of these youth were male. This is considerably higher than the male population for the total cohort (79.3%).

Table 42: Race/Ethnicity of Youth in Transfer, Reverse-Transfer and/or Direct File Processes

| Race/Ethnicity | # Unique Youth | % Unique Youth |
|---|---|---|
| Hispanic | 50 | 53.2% |
| Black or African American | 29 | 30.9% |
| White | 14 | 14.9% |
| Unable to Determine | 1 | 1.0% |

Eighteen of the 100 admissions were 30 days or less. There were 11 admissions between 31 and 89 days. Seventy-one admissions were 90 days or more, 13 of which were 400 or more days. The longest detention admission for a youth in the Transfer, Direct File and/or Reverse-Transfer process was 662.5 days.

The average length of stay was 205.8 days (a decrease of almost 50 days from SFY 22-23), and the median was 180.7 days (a decrease of about 17 days from SFY 22-23). (Average and median length of stay numbers are based on the total time youth were

in detention for each admission, even if they were released after the cohort timeframe. At the time these numbers were calculated, only two youth remained in detention. Their end date was truncated to reflect 03/30/2025.)

About 80% of the youth in this group were charged with homicide or attempted homicide.

Table 43: Number of Youth in Transfer, Reverse-Transfer, and Direct File Processes by Region

| Region | Total # Unique Youth in Transfer, Direct File and/or Reverse-Transfer Processes[48] | % Youth in Transfer, Direct File, and/or Reverse-Transfer Processes | Total # Days in Detention |
|---|---|---|---|
| Central | 37 | 38.9% | 8,655.9 |
| Northeast | 28 | 29.5% | 5,933.1 |
| Southern | 24 | 25.3% | 5,042.4 |
| Western | 6 | 6.3% | 951.5 |

More than 40% of the youth in the Transfer, Direct File, and/or Reverse-Transfer processes were from the Central region, and less than 5% were from the Western region.

Admissions in the Transfer, Direct File and/or Reverse-Transfer processes comprised nearly one-quarter (24.4%) of the total days in detention for the cohort. Additionally, these admissions accounted for 17.9% of all bed capacity within this fiscal year (a 1.4% increase from SFY 22-23). Expressed against the bed cap, this means that an average of 176.5 beds, at any given time, are available for non-Transfer, non-Direct File and/or non-Reverse-Transfer detention admissions. This represents a decrease of three available beds compared to SFY 22-23. In other words, about 38.5 beds were

[48] There are 94 unique youth, however, one youth is represented in two separate regions, causing this total to be 95.

essentially “off-line” and unable to be accessed by other detainees as they were occupied by youth in the Transfer, Direct File and/or Reverse-Transfer processes.

# Process Recommendations

Recommendation 1: Work with the Judicial Department to create language/processes that standardize court orders across the state.

Recommendation 2: Develop common definitions for terms used and a data dictionary that displays data sources and calculations used for outcome measures.

The process of amending the current DSA between CDHS and the Judicial Department is in its final stages and scheduled to be in place by SFY 25-26. This DSA will provide access to the court details needed to create substantially more context and analysis of the larger juvenile justice involved youth throughout the state of Colorado. Though the DSA will likely not be initiated before the first 60-90 days of state fiscal year 2025-2026, some data may be cleaned and prepared in time for inclusion into the 2026 report.

The working group met in October 2023 and approved new definitions for two terms and finalized a third term definition in January 2024. Since many groups use these terms and seemed to have competing definitions, the working group determined a need for standardizing these definitions for the purposes of reporting information related to this work. These terms were: releasable, emergency release and emergency placement.

# Additional Information

## Reduce Justice Involvement for Young Children

Throughout 2023 and 2024, the Division of Child Welfare’s Trails development team worked to construct a specific Trails module build that would collect the data needed pursuant to statute (C.R.S. 19-2.5-1404). Data collection requires child welfare case workers to identify the youth who, “at the time of they received service from a county department, including, but not limited to, services received through prevention services, an assessment, or an open dependency and neglect case had an open delinquency case in district court, were on juvenile probation, or had a juvenile deferred sentence” (C.R.S. 19-2.5-1404). Data collection began officially in Trails in September 2024. Preliminary data collection for the first four months is reported in Table 42 below.

Table 44: Summary of Juvenile Justice Involvement for Child Welfare Youth by JD

| JD | Diversion | Probation | Deferred | Delinquency | No Juvenile Justice Involvement | Total Responses |
|---|---|---|---|---|---|---|
| 1 | 5 | 13 | 0 | 47 | 509 | 573 |
| 2 | X | 13 | X | 72 | 867 | 953 |
| 3 | 0 | X | 0 | X | 36 | 40 |
| 4 | X | X | X | 84 | 1,597 | 1,698 |
| 5 | X | 0 | X | X | 95 | 105 |
| 6 | X | X | 0 | X | 63 | 70 |
| 7 | 13 | 0 | 0 | X | 222 | 239 |
| 8 | X | 14 | X | 34 | 422 | 472 |
| 9 | X | X | 0 | X | 186 | 200 |
| 10 | X | 13 | X | 22 | 298 | 331 |
| 11 | X | X | 0 | X | 141 | 149 |
| 12 | 0 | X | 0 | X | 63 | 71 |
| 13 | X | X | 0 | X | 202 | 210 |
| 14 | X | 0 | 0 | X | 42 | 46 |
| 15 | 0 | X | 0 | X | X | 55 |
| 16 | 0 | 0 | 0 | X | X | 73 |
| 17 | X | 13 | X | 51 | 1,063 | 1,130 |
| 18 | X | 32 | 0 | 96 | 1,929 | 2,057 |
| 19 | X | 16 | X | 65 | 683 | 764 |
| 20 | X | X | X | 16 | 504 | 534 |
| 21 | X | X | X | X | 321 | 367 |
| 22 | 0 | X | 0 | X | X | 110 |
| Total[49] | 69 | 165 | 19 | 576 | 9,469 | 10,247 |

[49] Table cells that include only an "X" are masks for counts that are below 12.

Table 45: Summary of Juvenile Justice Involvement for Child Welfare Youth by Age

| Age | Diversion | Probation | Deferred | Delinquency | No Juvenile Justice Involvement | Total Youth Count |
|---|---|---|---|---|---|---|
| 10 | X | X | X | X | 1,403 | 1,419 |
| 11 | X | X | X | X | 1,261 | 1,281 |
| 12 | X | X | X | 30 | 1,372 | 1,413 |
| 13 | X | 18 | X | 69 | 1,316 | 1,405 |
| 14 | 16 | 27 | X | 93 | 1,217 | 1,351 |
| 15 | 13 | 41 | X | 132 | 1,115 | 1,290 |
| 16 | 13 | 47 | 0 | 114 | 1,036 | 1,197 |
| 17 | X | 29 | X | 113 | 749 | 891 |
| Total | 69 | 165 | 19 | 576 | 9,469 | 10,247 |

A second Trails build is underway to collect similar data related to juvenile justice involvement as it relates to youth who are placed out of the home. This data collection began in Trails in March 2025. Unfortunately, an error has been identified that has not yet been resolved at the time of the writing of this report, and there is no estimated time of completion. This data will hopefully be available at least in part for the July 2026 report.

# Detention Bed Capacity & Utilization

In June 2023, House Bill 23-1307 was signed into law (C.R.S.19-2.5-1404), which brought significant changes to youth detention resources in Colorado, including the authorization of 22 emergency detention beds to address capacity challenges across the state. This legislation specifically requires reporting on detention bed utilization by calendar year rather than the fiscal year framework used elsewhere in this report.

In June 2025, HB25-1146 was signed into law (C.R.S. 19-2.5-1407), and increased the number of emergency beds available and changed requirements necessary to access emergency beds effective July 2025.

The following analysis examines how judicial districts utilized the full spectrum of detention resources—allocated beds, borrowed beds, flex beds and emergency beds—to manage fluctuating detention needs. This information is crucial for identifying systemic capacity challenges and evaluating the effectiveness of current resource allocation.

# Borrowed Beds, Flex Beds & Emergency Beds

Figure 9: Statewide Max Detention and Emergency Bed Usage




Calendar Year (CY) 2024 represented the first full year of implementation for the emergency bed capacity authorized by C.R.S. 19-2.5-1404 (HB23-1307). The data reveals that emergency bed utilization follows the peak detention bed utilization across Colorado's judicial districts.

The statewide detention system operated with 215 allocated beds distributed across 22 judicial districts, supplemented by 22 emergency beds that became fully operational in December 2023. Emergency bed criteria can be found in Appendix E. As shown in Figure 10, detention bed utilization fluctuated throughout 2024, with peak periods observed in April-June and infrequent utilization in other months.

Figure 10: Detention Bed Definitions




Detention bed borrowing and flex bed utilization are options used across the state when judicial districts are at capacity. Judicial districts may borrow a bed from another judicial district in their catchment area.

Figure 11: Flex Bed Allowance




## Emergency Bed Utilization Patterns

- Southern Region: The Southern region showed the highest emergency bed utilization in the first quarter of 2024, particularly in January, when it consistently used four to six emergency beds daily. Emergency bed usage in this region declined significantly after February, with only sporadic usage in March through early May.
- Northeast Region: The Northeast region demonstrated more concentrated emergency bed usage patterns, with peak utilization occurring in April-May and January. The highest usage was recorded in late April when the region utilized up to four to five emergency beds daily.
- Central Region: The Central region showed minimal emergency bed usage for most of the year, with notable exceptions in late April when two to four

emergency beds were activated for a brief period. This suggests effective capacity management within their allocated detention beds.

- Western Region: The Western region displayed the most consistent pattern of emergency bed usage in the latter part of the year, particularly from August through November. The region accessed one to four emergency beds daily during peak periods in October-November, indicating possible seasonal detention pressures.

## Peak Emergency Bed Utilization

- April-May Peak: The most substantial system-wide emergency bed usage occurred in late April, when up to 13 emergency beds were utilized statewide on April 29, 2024. This peak was driven primarily by combined usage in the Southern and Northeast regions.
- June-July Peak: A secondary peak emerged in mid-June through early July, with up to nine emergency beds in use statewide, primarily concentrated in the Southern region.
- August Peak: A smaller but notable spike occurred in mid-August, with 11 emergency beds utilized on August 12, distributed across both Southern and Western regions.

In addition to emergency beds, judicial districts continued to utilize borrowed beds and flex beds to manage detention capacity:

- Borrowed Beds: Districts with high over-capacity percentages frequently relied on bed borrowing from other districts, initially from judicial districts in their home centers, then from their catchment area due to overflow, which is typical for sending youth from their receiving centers to catchment areas. This flexibility allowed for more efficient resource utilization while keeping youth closer to their communities.

- Flex Beds: The ability to “flex up” by adding one to two detention beds at each youth center during high-demand periods proved essential for many judicial districts. This approach enabled facilities to temporarily accommodate additional youth without requiring emergency bed activation.

The complete emergency bed usage per day by region can be found in Appendix H.

## Capacity Analysis

Table 46: Colorado Youth Detention Continuum Bed Capacity Report by Judicial District for Calendar Year 2024

| JD | Bed Cap | Under Capacity | | At Capacity | | Over Capacity | |
|---|---|---|---|---|---|---|---|
| | | # Days | % | # Days | % | # Days | % |
| CENTRAL | | | | | | | |
| 1 | 19 | 362.3 | 99.0% | 2.4 | 0.7% | 1.3 | 0.4% |
| 2 | 36 | 347.1 | 94.8% | 10.6 | 2.9% | 8.3 | 2.3% |
| 5 | 2 | 141.2 | 38.6% | 171.4 | 46.8% | 53.4 | 14.6% |
| 18 | 36 | 104.7 | 28.6% | 26.0 | 7.1% | 235.4 | 64.3% |
| Total | 93 | 955.2 | 65.2% | 210.4 | 14.4% | 298.5 | 20.4% |
| NORTHEAST | | | | | | | |
| 8 | 10 | 191.6 | 52.4% | 67.4 | 18.4% | 107.0 | 29.3% |
| 13 | 2 | 252.7 | 69.0% | 67.9 | 18.6% | 45.4 | 12.4% |
| 17 | 18 | 47.3 | 12.9% | 33.8 | 9.2% | 285.0 | 77.9% |
| 19 | 16 | 136.0 | 37.2% | 46.7 | 12.8% | 183.3 | 50.1% |
| 20 | 10 | 339.8 | 92.9% | 7.1 | 2.0% | 19.0 | 5.2% |
| Total | 56 | 967.3 | 52.9% | 222.9 | 12.2% | 639.8 | 35.0% |
| SOUTHERN | | | | | | | |
| 3 | 2 | 358.8 | 98.0% | 7.2 | 2.0% | 0.0 | 0.0% |
| 4 | 27 | 39.2 | 10.7% | 23.1 | 6.3% | 303.7 | 83.0% |

| JD | Bed Cap | Under Capacity | | At Capacity | | Over Capacity | |
|---|---|---|---|---|---|---|---|
| | | # Days | % | # Days | % | # Days | % |
| 10 | 9 | 204.6 | 55.9% | 37.6 | 10.3% | 123.8 | 33.8% |
| 11 | 2 | 332.4 | 90.8% | 32.9 | 9.0% | 0.7 | 0.2% |
| 12 | 2 | 76.5 | 20.9% | 115.5 | 31.6% | 173.9 | 47.5% |
| 15 | 2 | 336.4 | 31.9% | 22.7 | 6.2% | 6.9 | 1.9% |
| 16 | 2 | 309.4 | 84.5% | 22.6 | 6.2% | 34.0 | 9.3% |
| Total | 46 | 1,657.4 | 64.7% | 261.7 | 10.2% | 643.0 | 25.1% |
| WESTERN | | | | | | | |
| 6 | 2 | 90.2 | 24.6% | 97.0 | 26.5% | 178.8 | 48.8% |
| 7 | 3 | 335.9 | 91.8% | 30.1 | 8.2% | 0.0 | 0.0% |
| 9 | 2 | 282.3 | 77.1% | 82.5 | 22.5% | 1.3 | 0.4% |
| 14 | 2 | 132.8 | 36.3% | 87.4 | 23.9% | 145.8 | 39.8% |
| 21 | 9 | 28.9 | 7.9% | 29.8 | 8.1% | 307.3 | 84.0% |
| 22 | 2 | 183.6 | 50.2% | 93.0 | 25.4% | 89.3 | 24.4% |
| Total | 20 | 1,053.8 | 48.0% | 419.9 | 19.1% | 722.4 | 32.9% |
| STATE | | | | | | | |
| Total | 215 | 210.4 | 57.5% | 50.5 | 13.8% | 104.7 | 28.6% |

## Regional Impact Overview

In the calendar year 2024, judicial districts (JDs) across Colorado's Central, Northeast, Southern, and Western regions demonstrated significant variations in detention bed utilization. An analysis of the data reveals insights into bed capacity management, highlighting areas where certain judicial districts were consistently over cap, indicating a potential need to revisit detention bed allocations.

## Central Region

The Central region, comprising four judicial districts, showed mixed capacity utilization throughout the year:

- The 18th judicial district faced severe capacity issues with 64.3% of days over capacity for the year, making it one of the most critically overcapacity districts in the region.
- The 5th judicial district, despite its small capacity of only two beds, was over capacity for 14.6% of days and at capacity for 46.8% of days.

Central Region Total for 2024: 14.4% of days were at capacity, and 20.4% were over capacity.

## Northeast Region

The Northeast region, comprising five judicial districts, faced substantial capacity challenges across the region:

- The 17th judicial district encountered critical overcapacity issues with 77.9% of days over capacity for the year.
- The 19th judicial district was significantly over capacity for 50.1% of days in 2024.
- The 8th judicial district experienced moderate capacity issues with 29.3% of days over capacity.

Northeast Region Total for 2024: 12.2% of days were at capacity, and 35.0% were over capacity.

## Southern Region

The Southern region, with seven judicial districts, showed mixed capacity utilization:

- The 4th judicial district faced the second-most severe over capacity situation at 83.0% of days throughout the year, despite having one of the highest bed capacities (27) in the state.
- The 12th judicial district also had high over capacity percentages at 47.5% for the year.
- The 10th judicial district experienced over capacity for 33.8% of days.
- In contrast, the 3rd judicial district had 0% days over capacity and 98.0% of days under capacity.

Southern Region Total for 2024: 10.2% of days were at capacity, and 25.1% were over capacity.

## Western Region

The Western region, which includes six judicial districts, exhibited significant detention bed capacity challenges:

- The 21st judicial district struggled severely with only 7.9% of days under capacity and a significant 84.0% of days over capacity throughout the year, the highest over capacity percentage in the state.
- The 6th judicial district had 48.9% of days over capacity, highlighting a critical need for capacity adjustments.
- The 14th judicial district was over capacity for 39.8% of days.

Western Region Total for 2024: 19.1% of days were at capacity, and 32.9% over capacity.

# Statewide Capacity Usage Summary

Across all regions, the state totals indicate 28.6% of days were over capacity for 2024, with 13.8% at capacity and 57.5% under capacity.

The data analysis reveals that certain judicial districts were over capacity for a significant portion of the year. The 4th, 6th, 21st, 17th, 18th, 19th, and 21st judicial districts faced acute overcapacity issues, affecting their operational efficiency. Districts showing more than 50% of days over capacity (4th, 17th, 18th, and 19th, and 21st) require attention to alleviate these capacity issues.

Table 47: Calendar Year 2024 Demographic Data

| | CY 2024 Youth | |
|---|---|---|
| | Count | % |
| STAFF ASSIGNED GENDER | | |
| Male | 1,612 | 79.8% |
| Female | 408 | 20.2% |
| ETHNICITY | | |
| White | 659 | 32.6% |
| Black or African American | 435 | 21.5% |
| Hispanic | 836 | 41.4% |
| American Indian or Alaskan Native | 22 | 1.1% |
| Asian | X | X |
| Native Hawaiian or Other Pacific Islander | X | X |
| Unable To Determine/Missing | 49 | 2.4% |
| AGE AT ADMISSION | | |
| 10-11 Years | 17 | 0.8% |
| 12 Years | 37 | 1.8% |
| 13 Years | 164 | 8.1% |
| 14 Years | 290 | 14.4% |
| 15 Years | 412 | 20.4% |
| 16 Years | 502 | 24.9% |
| 17 Years | 598 | 29.6% |
| SEXUAL ORIENTATION | | |
| Bisexual | 66 | 3.3% |
| Straight or Heterosexual | 1,564 | 77.4% |
| Lesbian or Gay | 24 | 1.2% |
| Missing | 349 | 17.3% |

| | CY 2024 Youth | |
|---|---|---|
| | Count | % |
| Other Queer Identifying | X | X |
| Unknown | X | X |
| PREFERRED GENDER PRONOUNS | | |
| He/Him | 1,336 | 66.1% |
| He/They | X | X |
| Missing | 356 | 17.6% |
| She/Her | 310 | 15.3% |
| She/They | X | X |
| They/Them | X | X |
| Unknown | X | X |
| GENDER IDENTITY | | |
| Female | 331 | 16.4% |
| Male | 1,338 | 68.7% |
| Missing | X | X |
| Non-Binary/Gender Non-Conforming | X | X |
| State Total[50] | 2,020 | 100% |

[50] Some values are written as “X” due to suppression minimums.

# Appendix A: Colorado Region Map

Figure 12: Colorado Region Map with Judicial Districts



# Appendix B: Referenced Bills

| | |
|---|---|
| HR 253 | Family First Prevention Services Act of 2017<br>https://www.congress.gov/115/bills/hr253/BILLS-115hr253ih.pdf |
| SB 18-154 | Juvenile Planning Committee Crossover Youth Plans<br>https://leg.colorado.gov/sites/default/files/2018a_154_signed.pdf |
| SB 18-254 | Child Welfare Reforms<br>https://leg.colorado.gov/sites/default/files/2018a_254_signed.pdf |
| SB 19-108 | Juvenile Justice Reform<br>https://leg.colorado.gov/sites/default/files/2019a_108_signed.pdf |
| SB 21-071 | Limit The Detention Of Juveniles<br>https://leg.colorado.gov/sites/default/files/2021a_071_signed.pdf |
| HB 23-1249 | Reduce Justice involvement For Young Children<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1249_enr.pdf |
| HB 23-1269 | Extended Stay And Boarding Patients<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1269_enr.pdf |
| HB 23-1307 | Juvenile Detention Services And Funding<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1307_enr.pdf |

# Appendix C: Supplemental Demographic Information

Table 48: Detailed Pivot Table of Offense Categories and Types by Region[51]

| Offense Category | Offense Type | | | | | | |
|---|---|---|---|---|---|---|---|
| | Drug | Other | Person | Property | Status | Traffic | Weapon |
| CENTRAL | | | | | | | |
| Felony | 20 | X | 438 | 258 | 0 | X | 44 |
| Misdemeanor | 13 | 50 | 132 | 68 | 0 | 0 | 75 |
| Petty | 0 | X | 0 | X | 21 | 0 | 0 |
| NORTHEAST | | | | | | | |
| Felony | X | 23 | 312 | 116 | 0 | X | 17 |
| Misdemeanor | X | 47 | 118 | 43 | 0 | X | 56 |
| Petty | X | X | 0 | X | X | 0 | 0 |
| SOUTHERN | | | | | | | |
| Felony | X | X | 305 | 143 | 0 | X | 37 |
| Misdemeanor | X | 25 | 36 | 37 | 0 | 0 | 38 |
| Petty | 0 | X | 0 | X | X | 0 | 0 |
| WESTERN | | | | | | | |
| Felony | X | X | 108 | 44 | 0 | X | X |
| Misdemeanor | X | 17 | 43 | 21 | 0 | X | X |
| Petty | 0 | X | 0 | X | X | 0 | 0 |

[51] Some values are written as “X” due to suppression minimums.

Table 49: CJRA Pre-screen Risk Level Admission Counts and Percentages within Each Region

| CJRA PRE-SCREEN RISK LEVEL WITHIN REGION | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Region | Low | | Moderate | | High | | Missing | | Total |
| | # | % | # | % | # | % | # | % | # |
| Central | 400 | 35.1% | 330 | 29.0% | 388 | 34.1% | 21 | 1.8 | 1,139 |
| Northeast | 298 | 38.3% | 229 | 29.4% | 223 | 38.3% | 29 | 3.7 | 779 |
| Southern | 245 | 37.4% | 183 | 27.9% | 172 | 26.3% | 55 | 8.4 | 655 |
| Western | 73 | 26.8% | 81 | 29.8% | 105 | 38.6% | 13 | 4.8 | 272 |
| State Total | 1,016 | 35.7% | 823 | 28.9% | 888 | 31.2% | 118 | 4.2 | 2,845 |

Table 50: BHA Level of Care Recommendations by Demographics

| Demographic Category | BHA LOC Recommendation | | | |
|---|---|---|---|---|
| | Community | PRTF | QRTP | SUD Res |
| STAFF ASSIGNED GENDER | | | | |
| Male | 68 | X | 109 | X |
| Female | 21 | X | 32 | X |
| ETHNICITY | | | | |
| White | 39 | X | 67 | X |
| Black or African American | 21 | 0 | 33 | 0 |
| Hispanic | 26 | X | 36 | X |
| American Indian or Alaskan Native | 0 | 0 | X | 0 |
| Asian | X | 0 | X | 0 |
| Native Hawaiian or Other Pacific Islander | 0 | X | X | 0 |

| Demographic Category | BHA LOC Recommendation | | | |
|---|---|---|---|---|
| | Community | PRTF | QRTP | SUD Res |
| Unable To Determine/Missing | X | 0 | X | 0 |
| **AGE AT ADMISSION** | | | | |
| 10-11 Years | X | 0 | X | 0 |
| 12 Years | X | 0 | X | 0 |
| 13 Years | X | X | X | 0 |
| 14 Years | 14 | X | 27 | 0 |
| 15 Years | 17 | X | 32 | X |
| 16 Years | 27 | X | 33 | X |
| 17 Years | 19 | X | 33 | X |
| **SEXUAL ORIENTATION** | | | | |
| Bisexual | X | X | X | 0 |
| Straight or Heterosexual | 71 | X | 103 | X |
| Lesbian or Gay | X | 0 | X | 0 |
| Missing | X | X | 17 | 0 |
| Other Queer Identifying | X | 0 | X | X |
| Unknown | X | 0 | X | 0 |
| **PREFERRED GENDER PRONOUNS** | | | | |
| He/Him | 59 | X | 93 | X |
| He/They | 0 | 0 | 0 | 0 |
| Missing | X | X | 18 | 0 |
| She/Her | 19 | X | 27 | 0 |
| She/They | 0 | X | 0 | 0 |
| They/Them | 0 | 0 | X | X |

| Demographic Category | BHA LOC Recommendation | | | |
|---|---|---|---|---|
| | Community | PRTF | QRTP | SUD Res |
| Unknown | X | 0 | X | 0 |
| GENDER IDENTITY | | | | |
| Female | 20 | X | 28 | 0 |
| Male | 59 | X | 93 | X |
| Missing | X | X | 16 | 0 |
| Other | 0 | 0 | X | X |
| Unknown | X | 0 | X | 0 |
| STATE TOTAL[52] | 89 | 12 | 141 | 9 |

[52] Some values are written as "X" due to suppression minimums.

# Appendix D: Offense & Override Category Detail

Table 51: Offenses and Their Corresponding Offense Types

| Offense Type | Offenses |
|---|---|
| Person | Homicide, Manslaughter, Criminally Negligent Homicide, Vehicular Homicide, Assault, Vehicular Assault, Menacing, Kidnapping, Sexual Assault/Contact, Robbery, Aggravated Robbery, Child Abuse, Sexual Exploitation of a Child, Domestic Violence, Wrongs to At-Risk Adults, Incest, Sexual Assault on a Child, Reckless Endangerment |
| Property | Burglary and Related Offenses, Motor Vehicle Theft, Aggravated Motor Vehicle Theft, Theft, Trespass/Tampering/Criminal Mischief |
| Drug | Use/Possession/Distribution of Controlled Substance IV/V, Possession/Distribution of Controlled Substance I/II/III, Drug Paraphernalia Use |
| Weapon | Possession of a Handgun, Firearms and Weapons, Carrying a Concealed Weapon |
| Other | Forgery/Simulation/Impersonation, Fraud, Financial Transaction Device Crimes, Sexual Exploitation of a Child, Public Indecency, Obstructing Justice/False ID, Escape, Bribery and Corrupt Influences, Offenses Relating to Judicial Proceedings, Victim/Witness Intimidation, Holding Hostage, Disorderly Conduct, Cruelty to Animals, Offenses Involving Communications/Threats, Stalking, Organized Crime (Gang), Resisting Arrest, Sex Offender Failure to Register, Obstructing a Peace Officer |
| Traffic | Vehicular Manslaughter, Vehicular Eluding, Vehicular Eluding Resulting in Death, Reckless Driving, Other Traffic, Driving Under the Influence, Driving While Intoxicated |
| Status | Runaway, Truancy, Drinking Under Age |

## Additional Contextual Information on Charges

Offense ranking: Offense ranking is a numerical value assigned to the offense category (felony, misdemeanor, petty) and the offense class (felony 1, misdemeanor 4, etc.). The offense ranking values are assigned in order of least severity to highest severity. These rankings are primarily used for statistical tests. The rankings are shown in the table that follows.

Table 52: Offense Rankings

| Offense Category and Class | Offense Rank |
|---|---|
| Felony | |
| 1 | 17 |
| 2 | 16 |
| 3 | 15 |
| 4 | 14 |
| 5 | 13 |
| 6 | 12 |
| Misdemeanor | |
| 1 | 11 |
| 2 | 10 |
| 3 | 9 |
| 4 | 8 |
| 5 | 7 |
| 6 | 6 |
| Petty | |
| 1 | 5 |
| 2 | 4 |
| 3 | 3 |

| Offense Category and Class | Offense Rank |
|---|---|
| 4 | 2 |
| 5 | 1 |
| 6 | 0 |

Crimes of Violence: Crimes of violence are typically person crimes of violence like assault felonies and homicide felonies. They also include menacing, aggravated robbery, firearm and weapons felonies and manslaughter felonies.

Crimes of Violence are defined by statute in C.R.S. 18-1.3-406:

"(II) Subsection (2)(a)(I) of this section applies to the following crimes:

(A) Any crime against an at-risk adult or at-risk juvenile;
(B) Murder;
(C) First or second degree assault;
(D) Kidnapping;
(E) A sexual offense pursuant to part 4 of article 3 of this title;
(F) Aggravated robbery;
(G) First degree arson;
(H) First degree burglary;
(I) Escape;
(J) Criminal extortion;
(K) First or second degree unlawful termination of pregnancy;
(L) Human trafficking for involuntary servitude of an adult or a minor in violation of section 18-3-503; or
(M) Human trafficking for sexual servitude of an adult or a minor in violation of section 18-3-504.

(b) (I) "Crime of violence" also means any unlawful sexual offense in which the defendant caused bodily injury to the victim or in which the defendant used threat, intimidation, or force against the victim. For purposes of this subparagraph (I),

"unlawful sexual offense" shall have the same meaning as set forth in section 18-3-411(1), and "bodily injury" shall have the same meaning as set forth in section 18-1-901(3)(c)."

# Appendix E: Emergency Bed Criteria

A judicial district may access an emergency bed once the following criteria have been met, in accordance with C.R.S. 19-2.5-1407.3(4)(c)(I)(A-D).

1. All beds allocated to the judicial district are being utilized by the JD.
2. The DYS detention facility(s) in which the judicial district's beds are located are all being utilized.
3. There are no beds available in the catchment area.
4. There are no open detention beds to borrow within fifty miles of the judicial district's initial receiving detention facility.
    a. This does not apply if the point of arrest was fifty miles or more from the initial detention receiving facility.
    b. This does not apply if the juvenile is being returned to the initial detention receiving facility as a result of being in a borrowed bed that was relinquished.

A petition must be filed by the district attorney or the county attorney that supports the above criteria no later than the next business day in accordance with. C.R.S. 19-2.5-1407.3(4)(c)(II).

The court shall issue an order permitting the use of the emergency bed upon finding in accordance with C.R.S. 19-2.5-1407.3(4)(c)(II)(A-D).

1. There is a legal basis for the detention of all youth by the JD.
2. There are currently no services available that mitigate the substantial risk or flight risk of any of the youth detained by the JD.

3. There are no services available to mitigate the risk of the youth being detained, including the youth being placed in the emergency bed.

A hearing must be held every five business days to inform the court that the circumstances still exist and that the juvenile is still in an emergency detention bed as defined in C.R.S. 19-2.5-1407.3(4)(IV).

# Appendix F: Releasable Admissions by Judicial District and County

Table 53: Admissions and Releasable Admissions by Judicial District

| Judicial District | Count of Admissions | Average LOS | Count of Releasable Admissions | Average RLOS |
|---|---|---|---|---|
| 1 | 224 | 26.0 | 99 | 8.71 |
| 2 | 397 | 34.2 | 164 | 9.14 |
| 3 | X | 36.8 | X | 11.40 |
| 4 | 434 | 30.6 | 115 | 6.81 |
| 5 | 19 | 24.4 | X | 2.54 |
| 6 | 22 | 28.3 | X | 0.64 |
| 7 | 13 | 35.4 | X | 1.75 |
| 8 | 152 | 21.3 | 46 | 4.03 |
| 9 | X | 40.2 | X | 0.00 |
| 10 | 138 | 35.7 | 20 | 0.81 |
| 11 | 18 | 20.2 | X | 0.27 |
| 12 | 22 | 60.8 | X | 1.29 |
| 13 | 32 | 24.6 | X | 0.74 |
| 14 | X | 42.9 | X | 0.00 |
| 15 | 17 | 12.7 | X | 0.54 |
| 16 | 19 | 22.7 | X | 0.93 |
| 17 | 252 | 26.8 | 95 | 11.14 |
| 18 | 499 | 34.1 | 161 | 6.87 |
| 19 | 287 | 24.3 | 19 | 1.29 |
| 20 | 56 | 52.7 | 26 | 17.07 |

| Judicial District | Count of Admissions | Average LOS | Count of Releasable Admissions | Average RLOS |
|---|---|---|---|---|
| 21 | 196 | 18.1 | 75 | 5.39 |
| 22 | 27 | 24.2 | X | 1.68 |
| Grand Total | 2,845 | 29.6 | 860 | 19.9 |

Table 54: Admissions and Releasable Admissions by County

| County | Count of Admissions | Average LOS | Count of Releasable Admissions | Average RLOS |
|---|---|---|---|---|
| El Paso | 435 | 30.6 | 115 | 6.92 |
| Denver | 377 | 33.7 | 148 | 8.67 |
| Arapahoe | 372 | 37.8 | 125 | 8.11 |
| Weld | 284 | 23.4 | 21 | 1.18 |
| Jefferson | 248 | 24.2 | 109 | 8.18 |
| Adams | 238 | 28.9 | 86 | 9.55 |
| Mesa | 204 | 18.6 | 76 | 5.63 |
| Larimer | 151 | 21.5 | 48 | 4.45 |
| Pueblo | 138 | 35.6 | 21 | 1.09 |
| Douglas | 105 | 24.9 | 33 | 5.90 |
| Boulder | 52 | 55.4 | 23 | 16.54 |
| Montezuma | 24 | 27.9 | X | 2.13 |
| Broomfield | 18 | 27.1 | X | 23.88 |
| Fremont | 18 | 23.0 | X | 2.42 |
| Morgan | 16 | 50.6 | X | 1.00 |
| Prowers | 14 | 15.1 | X | 0.58 |
| Otero | 13 | 28.5 | X | 4.14 |

The following counties also had releasable admissions but were removed from Tables 50 and 51 above due to N sizes being less than 12 and due to space constraints.

- Alamosa
- Archuleta
- Baca
- Bent
- Chaffee
- Conejos
- Costilla
- Crowley
- Delta
- Eagle
- Elbert
- Garfield
- Grand
- Gunnison
- Kit Carson
- La Plata
- Lake
- Las Animas
- Logan
- Moffat
- Montrose
- Park
- Phillips
- Rio Grande
- Routt
- Saguache
- Summit
- Teller
- Washington
- Yuma
- Other State than Colorado
- Colorado/Move out of State

# Appendix G: Statistical Results

Supplemental Statistical Information

In the charts below, only the statistically significant and noteworthy results are included. Additional tests were also conducted that were not included due to insignificant effect sizes or lack of statistical significance.

Table 55: Statistical Correlations Results for Youth Outcomes

| Independent Variable | Dependent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|---|
| Age | CJRA Level | Spearman's Rho | 0.001 | -0.185 | Effect Size |
| Ethnicity: Black youth | Detention Involvements (all) | T-Test | 0.001 | 0.38 | Standard Mean Difference |
| Ethnicity | Offense Ranking | Eta/ Spearman | 0.001 | 0.111 | Effect Size |
| Ethnicity: Black youth | Offense Ranking | T-Test | 0.001 | -0.499 | Standard Mean Difference |
| Gender | Offense Ranking | T-Test | 0.001 | 0.974 | Standard Mean Difference |
| Ethnicity: Black Youth | LOS | T-Test | 0.001 | 4.91 | Standard Mean Difference |
| Ethnicity: Black Youth | LOS | Cohen’s D (T-Test) | 0.001 | 0.106 | Effect Size |
| Ethnicity | LOS | T-Test | 0.001 | 5.57 | Standard Mean Difference |
| Ethnicity | LOS | Cohen’s D (T-Test) | 0.001 | 0.121 | Effect Size |

| Independent Variable | Dependent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|---|
| Gender | LOS | T-Test | 0.001 | 8.36 | Standard Mean Difference |
| Gender | LOS | Cohen's D (T-Test) | 0.001 | 0.182 | Effect Size |
| Releasable (YN) | CJRA Level | Somer's D/ Cramer's V | 0.001 | 0.22 | Effect Size |
| Releasable (YN) | LOS | T-Test | 0.001 | 17.03 | Standard Mean Difference |
| Releasable (YN) | LOS | Cohen's D (T-Test) | 0.001 | 0.374 | Effect Size |
| Violent Crime | LOS | T Test | 0.001 | 12.87 | Standard Mean Difference |
| Violent Crime | LOS | Cohen's D (T Test) | 0.001 | 0.282 | Effect Size |

Table 56: Statistical Correlations Results for Child Welfare Involved Demographics

| Independent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|
| Race: Black Youth | T-Test | 0.001 | 0.601 | Standard Mean Difference |
| Race: Black Youth | Cohen's D (T-Test) | 0.001 | 0.153 | Effect Size |
| Race: Hispanic | T-Test | 0.001 | 0.838 | Standard Mean Difference |
| Race: Hispanic | Cohen's D (T-Test) | 0.001 | 0.212 | Effect Size |
| Sexual Preference: Straight/Heterosexual / Gay/Lesbian | T-Test | 0.001 | -0.798 | Standard Mean Difference |
| Sexual Preference: Straight/Heterosexual / Gay/Lesbian | Cohen's D (T-Test) | 0.001 | 0.196 | Effect Size |
| Gender Identity | T-Test | 0.001 | 0.826 | Standard Mean Difference |
| Gender Identity | Cohen's D (T-Test) | 0.001 | 0.207 | Effect Size |
| Gender Identity | Pearson | 0.001 | -0.017 | Coefficient |
| Sex at Birth | T-Test | 0.001 | 0.849 | Standard Mean Difference |
| Sex at Birth | Cohen's D (T-Test) | 0.001 | 0.215 | Effect Size |
| Sex at Birth | Pearson | 0.001 | -0.094 | Coefficient |

# Appendix H: Emergency Bed Tables

Table 57: Accompanying Statewide and Regional (Southern: S, Central: Cen, Northeast: NE, Western: W) Breakdowns of Daily Emergency Bed Usage

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | | | | | | February | | | | | |
| 1/1/24 | 0 | 0 | 0 | 0 | **0** | 2/1/24 | 0 | 0 | 0 | 0 | **0** |
| 1/2/24 | 0 | 0 | 0 | 0 | **0** | 2/2/24 | 0 | 0 | 0 | 0 | **0** |
| 1/3/24 | 0 | 0 | 0 | 0 | **0** | 2/3/24 | 0 | 0 | 0 | 0 | **0** |
| 1/4/24 | 1 | 0 | 0 | 0 | **1** | 2/4/24 | 0 | 0 | 0 | 0 | **0** |
| 1/5/24 | 1 | 0 | 0 | 0 | **1** | 2/5/24 | 0 | 0 | 0 | 0 | **0** |
| 1/6/24 | 1 | 0 | 0 | 0 | **1** | 2/6/24 | 0 | 0 | 0 | 0 | **0** |
| 1/7/24 | 4 | 0 | 0 | 0 | **4** | 2/7/24 | 0 | 0 | 0 | 0 | **0** |
| 1/8/24 | 5 | 0 | 0 | 0 | **5** | 2/8/24 | 0 | 0 | 0 | 0 | **0** |
| 1/9/24 | 4 | 0 | 0 | 0 | **4** | 2/9/24 | 0 | 0 | 0 | 0 | **0** |
| 1/10/24 | 3 | 0 | 0 | 0 | **3** | 2/10/24 | 0 | 0 | 0 | 0 | **0** |
| 1/11/24 | 4 | 0 | 0 | 0 | **4** | 2/11/24 | 0 | 0 | 0 | 0 | **0** |
| 1/12/24 | 6 | 0 | 0 | 0 | **6** | 2/12/24 | 0 | 0 | 0 | 0 | **0** |
| 1/13/24 | 5 | 0 | 0 | 0 | **5** | 2/13/24 | 0 | 0 | 0 | 0 | **0** |
| 1/14/24 | 6 | 0 | 0 | 0 | **6** | 2/14/24 | 0 | 0 | 0 | 0 | **0** |
| 1/15/24 | 6 | 0 | 0 | 0 | **6** | 2/15/24 | 0 | 0 | 0 | 0 | **0** |
| 1/16/24 | 6 | 0 | 0 | 0 | **6** | 2/16/24 | 0 | 0 | 0 | 0 | **0** |
| 1/17/24 | 4 | 0 | 0 | 0 | **4** | 2/17/24 | 0 | 0 | 0 | 0 | **0** |
| 1/18/24 | 4 | 0 | 0 | 0 | **4** | 2/18/24 | 0 | 0 | 0 | 0 | **0** |
| 1/19/24 | 3 | 0 | 0 | 0 | **3** | 2/19/24 | 0 | 0 | 0 | 0 | **0** |
| 1/20/24 | 2 | 0 | 0 | 0 | **2** | 2/20/24 | 0 | 0 | 0 | 0 | **0** |
| 1/21/24 | 2 | 0 | 0 | 0 | **2** | 2/21/24 | 1 | 0 | 0 | 0 | **1** |
| 1/22/24 | 2 | 0 | 0 | 0 | **2** | 2/22/24 | 1 | 0 | 0 | 0 | **1** |
| 1/23/24 | 0 | 0 | 0 | 0 | **0** | 2/23/24 | 1 | 0 | 0 | 0 | **1** |
| 1/24/24 | 1 | 0 | 0 | 0 | **1** | 2/24/24 | 0 | 0 | 0 | 0 | **0** |
| 1/25/24 | 2 | 0 | 0 | 0 | **2** | 2/25/24 | 0 | 0 | 0 | 0 | **0** |
| 1/26/24 | 2 | 0 | 0 | 0 | **2** | 2/26/24 | 0 | 0 | 0 | 0 | **0** |
| 1/27/24 | 1 | 0 | 0 | 0 | **1** | 2/27/24 | 0 | 0 | 0 | 0 | **0** |

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/28/24 | 1 | 0 | 2 | 0 | **3** | 2/28/24 | 1 | 0 | 0 | 0 | **1** |
| 1/29/24 | 1 | 0 | 3 | 0 | **4** | 2/29/24 | 0 | 0 | 0 | 0 | **0** |
| 1/30/24 | 0 | 0 | 1 | 0 | **1** | | | | | | |
| 1/31/24 | 0 | 0 | 1 | 0 | **1** | | | | | | |
| March | | | | | | April | | | | | |
| 3/1/24 | 0 | 0 | 0 | 0 | **0** | 4/1/24 | 0 | 0 | 0 | 0 | **0** |
| 3/2/24 | 0 | 0 | 0 | 0 | **0** | 4/2/24 | 0 | 0 | 0 | 0 | **0** |
| 3/3/24 | 0 | 0 | 0 | 0 | **0** | 4/3/24 | 0 | 0 | 0 | 0 | **0** |
| 3/4/24 | 1 | 0 | 0 | 0 | **1** | 4/4/24 | 0 | 0 | 0 | 0 | **0** |
| 3/5/24 | 2 | 0 | 0 | 0 | **2** | 4/5/24 | 0 | 0 | 0 | 0 | **0** |
| 3/6/24 | 1 | 0 | 0 | 0 | **1** | 4/6/24 | 0 | 0 | 0 | 0 | **0** |
| 3/7/24 | 0 | 0 | 0 | 0 | **0** | 4/7/24 | 0 | 0 | 0 | 0 | **0** |
| 3/8/24 | 0 | 0 | 0 | 0 | **0** | 4/8/24 | 0 | 0 | 0 | 0 | **0** |
| 3/9/24 | 0 | 0 | 0 | 0 | **0** | 4/9/24 | 0 | 0 | 0 | 0 | **0** |
| 3/10/24 | 0 | 0 | 0 | 0 | **0** | 4/10/24 | 0 | 0 | 0 | 0 | **0** |
| 3/11/24 | 1 | 0 | 0 | 0 | **1** | 4/11/24 | 0 | 0 | 0 | 0 | **0** |
| 3/12/24 | 2 | 0 | 0 | 0 | **2** | 4/12/24 | 0 | 0 | 0 | 0 | **0** |
| 3/13/24 | 2 | 0 | 0 | 0 | **2** | 4/13/24 | 0 | 0 | 0 | 0 | **0** |
| 3/14/24 | 0 | 0 | 0 | 0 | **0** | 4/14/24 | 0 | 0 | 0 | 0 | **0** |
| 3/15/24 | 0 | 0 | 0 | 0 | **0** | 4/15/24 | 0 | 0 | 0 | 0 | **0** |
| 3/16/24 | 0 | 0 | 0 | 0 | **0** | 4/16/24 | 0 | 0 | 2 | 0 | **2** |
| 3/17/24 | 0 | 0 | 0 | 0 | **0** | 4/17/24 | 0 | 0 | 2 | 0 | **2** |
| 3/18/24 | 1 | 0 | 0 | 0 | **1** | 4/18/24 | 0 | 0 | 1 | 0 | **1** |
| 3/19/24 | 2 | 0 | 0 | 0 | **2** | 4/19/24 | 0 | 0 | 1 | 0 | **1** |
| 3/20/24 | 1 | 0 | 0 | 0 | **1** | 4/20/24 | 0 | 0 | 0 | 0 | **0** |
| 3/21/24 | 1 | 0 | 0 | 0 | **1** | 4/21/24 | 2 | 0 | 0 | 0 | **2** |
| 3/22/24 | 1 | 0 | 0 | 0 | **1** | 4/22/24 | 4 | 0 | 0 | 0 | **4** |
| 3/23/24 | 1 | 0 | 0 | 0 | **1** | 4/23/24 | 5 | 0 | 0 | 0 | **5** |
| 3/24/24 | 3 | 0 | 0 | 0 | **3** | 4/24/24 | 7 | 0 | 0 | 0 | **7** |
| 3/25/24 | 4 | 0 | 0 | 0 | **4** | 4/25/24 | 5 | 0 | 1 | 0 | **6** |
| 3/26/24 | 4 | 0 | 0 | 0 | **4** | 4/26/24 | 6 | 0 | 4 | 0 | **10** |
| 3/27/24 | 4 | 0 | 0 | 0 | **4** | 4/27/24 | 4 | 0 | 4 | 0 | **8** |

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/28/24 | 2 | 0 | 0 | 0 | **2** | 4/28/24 | 5 | 0 | 3 | 0 | **8** |
| 3/29/24 | 1 | 0 | 0 | 0 | **1** | 4/29/24 | 5 | 4 | 4 | 0 | **13** |
| 3/30/24 | 0 | 0 | 0 | 0 | **0** | 4/30/24 | 3 | 2 | 1 | 0 | **6** |
| 3/31/24 | 0 | 0 | 0 | 0 | **0** | | | | | | |
| May | | | | | | June | | | | | |
| 5/1/24 | 1 | 1 | 4 | 0 | **6** | 6/1/24 | 0 | 0 | 3 | 0 | **3** |
| 5/2/24 | 0 | 0 | 3 | 0 | **3** | 6/2/24 | 0 | 0 | 3 | 0 | **3** |
| 5/3/24 | 0 | 0 | 3 | 0 | **3** | 6/3/24 | 0 | 0 | 3 | 0 | **3** |
| 5/4/24 | 0 | 0 | 3 | 0 | **3** | 6/4/24 | 0 | 0 | 5 | 0 | **5** |
| 5/5/24 | 0 | 0 | 4 | 0 | **4** | 6/5/24 | 0 | 0 | 7 | 0 | **7** |
| 5/6/24 | 0 | 0 | 5 | 0 | **5** | 6/6/24 | 0 | 0 | 5 | 0 | **5** |
| 5/7/24 | 0 | 0 | 4 | 0 | **4** | 6/7/24 | 0 | 0 | 5 | 0 | **5** |
| 5/8/24 | 0 | 0 | 3 | 0 | **3** | 6/8/24 | 0 | 0 | 4 | 0 | **4** |
| 5/9/24 | 0 | 0 | 5 | 0 | **5** | 6/9/24 | 2 | 0 | 4 | 0 | **6** |
| 5/10/24 | 0 | 0 | 4 | 0 | **4** | 6/10/24 | 2 | 0 | 4 | 0 | **6** |
| 5/11/24 | 0 | 0 | 2 | 0 | **2** | 6/11/24 | 2 | 0 | 4 | 0 | **6** |
| 5/12/24 | 0 | 0 | 2 | 0 | **2** | 6/12/24 | 2 | 0 | 1 | 0 | **3** |
| 5/13/24 | 0 | 0 | 2 | 0 | **2** | 6/13/24 | 3 | 0 | 1 | 0 | **4** |
| 5/14/24 | 0 | 0 | 0 | 0 | **0** | 6/14/24 | 3 | 0 | 1 | 0 | **4** |
| 5/15/24 | 1 | 0 | 0 | 0 | **1** | 6/15/24 | 3 | 0 | 0 | 0 | **3** |
| 5/16/24 | 1 | 0 | 0 | 0 | **1** | 6/16/24 | 7 | 0 | 0 | 0 | **7** |
| 5/17/24 | 3 | 0 | 0 | 0 | **3** | 6/17/24 | 8 | 0 | 0 | 0 | **8** |
| 5/18/24 | 2 | 0 | 0 | 0 | **2** | 6/18/24 | 7 | 0 | 0 | 0 | **7** |
| 5/19/24 | 3 | 0 | 1 | 0 | **4** | 6/19/24 | 5 | 0 | 0 | 0 | **5** |
| 5/20/24 | 2 | 0 | 2 | 0 | **4** | 6/20/24 | 6 | 0 | 0 | 0 | **6** |
| 5/21/24 | 0 | 0 | 2 | 0 | **2** | 6/21/24 | 8 | 0 | 0 | 0 | **8** |
| 5/22/24 | 0 | 0 | 0 | 0 | **0** | 6/22/24 | 7 | 0 | 0 | 0 | **7** |
| 5/23/24 | 1 | 0 | 0 | 0 | **1** | 6/23/24 | 7 | 0 | 0 | 0 | **7** |
| 5/24/24 | 1 | 0 | 0 | 0 | **1** | 6/24/24 | 7 | 0 | 0 | 0 | **7** |
| 5/25/24 | 0 | 0 | 0 | 0 | **0** | 6/25/24 | 5 | 0 | 0 | 0 | **5** |
| 5/26/24 | 0 | 0 | 2 | 0 | **2** | 6/26/24 | 5 | 0 | 0 | 0 | **5** |

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/27/24 | 1 | 0 | 3 | 0 | **4** | 6/27/24 | 3 | 0 | 0 | 0 | **3** |
| 5/28/24 | 2 | 0 | 3 | 0 | **5** | 6/28/24 | 3 | 0 | 0 | 0 | **3** |
| 5/29/24 | 1 | 0 | 2 | 0 | **3** | 6/29/24 | 3 | 0 | 0 | 0 | **3** |
| 5/30/24 | 1 | 0 | 3 | 0 | **4** | 6/30/24 | 6 | 0 | 0 | 0 | **6** |
| 5/31/24 | 0 | 0 | 3 | 0 | **3** | | | | | | |
| July | | | | | | August | | | | | |
| 7/1/24 | 9 | 0 | 0 | 0 | **9** | 8/1/24 | 0 | 0 | 0 | 0 | **0** |
| 7/2/24 | 6 | 0 | 0 | 0 | **6** | 8/2/24 | 0 | 0 | 0 | 0 | **0** |
| 7/3/24 | 4 | 0 | 0 | 0 | **4** | 8/3/24 | 0 | 0 | 0 | 0 | **0** |
| 7/4/24 | 4 | 0 | 0 | 0 | **4** | 8/4/24 | 1 | 0 | 0 | 0 | **1** |
| 7/5/24 | 4 | 0 | 0 | 0 | **4** | 8/5/24 | 2 | 0 | 0 | 0 | **2** |
| 7/6/24 | 5 | 0 | 0 | 0 | **5** | 8/6/24 | 3 | 0 | 0 | 0 | **3** |
| 7/7/24 | 5 | 0 | 0 | 0 | **5** | 8/7/24 | 3 | 0 | 0 | 1 | **4** |
| 7/8/24 | 6 | 0 | 0 | 0 | **6** | 8/8/24 | 2 | 0 | 0 | 0 | **2** |
| 7/9/24 | 3 | 0 | 0 | 0 | **3** | 8/9/24 | 3 | 0 | 0 | 0 | **3** |
| 7/10/24 | 0 | 0 | 0 | 0 | **0** | 8/10/24 | 4 | 0 | 0 | 0 | **4** |
| 7/11/24 | 3 | 0 | 0 | 0 | **3** | 8/11/24 | 6 | 0 | 0 | 1 | **7** |
| 7/12/24 | 3 | 0 | 0 | 0 | **3** | 8/12/24 | 8 | 0 | 0 | 3 | **11** |
| 7/13/24 | 2 | 0 | 0 | 0 | **2** | 8/13/24 | 7 | 0 | 0 | 2 | **9** |
| 7/14/24 | 1 | 0 | 0 | 0 | **1** | 8/14/24 | 7 | 0 | 0 | 2 | **9** |
| 7/15/24 | 1 | 0 | 0 | 0 | **1** | 8/15/24 | 2 | 0 | 0 | 2 | **4** |
| 7/16/24 | 1 | 0 | 0 | 0 | **1** | 8/16/24 | 4 | 0 | 0 | 0 | **4** |
| 7/17/24 | 1 | 0 | 0 | 0 | **1** | 8/17/24 | 5 | 0 | 0 | 0 | **5** |
| 7/18/24 | 1 | 0 | 0 | 0 | **1** | 8/18/24 | 5 | 0 | 0 | 0 | **5** |
| 7/19/24 | 2 | 0 | 0 | 0 | **2** | 8/19/24 | 5 | 0 | 0 | 0 | **5** |
| 7/20/24 | 2 | 0 | 0 | 0 | **2** | 8/20/24 | 3 | 0 | 0 | 0 | **3** |
| 7/21/24 | 2 | 0 | 0 | 0 | **2** | 8/21/24 | 3 | 0 | 0 | 0 | **3** |
| 7/22/24 | 3 | 0 | 0 | 0 | **3** | 8/22/24 | 2 | 0 | 0 | 0 | **2** |
| 7/23/24 | 3 | 0 | 0 | 0 | **3** | 8/23/24 | 2 | 0 | 0 | 0 | **2** |
| 7/24/24 | 2 | 0 | 0 | 0 | **2** | 8/24/24 | 2 | 0 | 0 | 1 | **3** |
| 7/25/24 | 1 | 0 | 0 | 0 | **1** | 8/25/24 | 3 | 0 | 0 | 1 | **4** |

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/26/24 | 0 | 0 | 0 | 0 | **0** | 8/26/24 | 4 | 0 | 0 | 1 | **5** |
| 7/27/24 | 0 | 0 | 0 | 0 | **0** | 8/27/24 | 4 | 0 | 0 | 0 | **4** |
| 7/28/24 | 0 | 0 | 0 | 0 | **0** | 8/28/24 | 5 | 0 | 0 | 0 | **5** |
| 7/29/24 | 0 | 0 | 0 | 0 | **0** | 8/29/24 | 4 | 0 | 0 | 0 | **4** |
| 7/30/24 | 0 | 0 | 0 | 0 | **0** | 8/30/24 | 4 | 0 | 0 | 0 | **4** |
| 7/31/24 | 0 | 0 | 0 | 0 | **0** | 8/31/24 | 3 | 0 | 0 | 0 | **3** |
| September | | | | | | October | | | | | |
| 9/1/24 | 3 | 0 | 0 | 0 | **3** | 10/1/24 | 0 | 0 | 0 | 0 | **0** |
| 9/2/24 | 3 | 0 | 0 | 0 | **3** | 10/2/24 | 0 | 0 | 0 | 0 | **0** |
| 9/3/24 | 3 | 0 | 0 | 0 | **3** | 10/3/24 | 0 | 0 | 0 | 0 | **0** |
| 9/4/24 | 1 | 0 | 0 | 0 | **1** | 10/4/24 | 0 | 0 | 0 | 0 | **0** |
| 9/5/24 | 0 | 0 | 0 | 0 | **0** | 10/5/24 | 0 | 0 | 0 | 0 | **0** |
| 9/6/24 | 0 | 0 | 0 | 0 | **0** | 10/6/24 | 0 | 0 | 0 | 0 | **0** |
| 9/7/24 | 0 | 0 | 0 | 0 | **0** | 10/7/24 | 0 | 0 | 0 | 0 | **0** |
| 9/8/24 | 0 | 0 | 0 | 0 | **0** | 10/8/24 | 0 | 0 | 0 | 4 | **4** |
| 9/9/24 | 0 | 0 | 0 | 0 | **0** | 10/9/24 | 0 | 0 | 0 | 4 | **4** |
| 9/10/24 | 0 | 0 | 0 | 0 | **0** | 10/10/24 | 1 | 0 | 0 | 1 | **2** |
| 9/11/24 | 0 | 0 | 0 | 0 | **0** | 10/11/24 | 2 | 0 | 0 | 1 | **3** |
| 9/12/24 | 0 | 0 | 0 | 0 | **0** | 10/12/24 | 1 | 0 | 0 | 0 | **1** |
| 9/13/24 | 0 | 0 | 0 | 0 | **0** | 10/13/24 | 1 | 0 | 0 | 1 | **2** |
| 9/14/24 | 0 | 0 | 0 | 0 | **0** | 10/14/24 | 3 | 0 | 0 | 1 | **4** |
| 9/15/24 | 0 | 0 | 0 | 0 | **0** | 10/15/24 | 3 | 0 | 0 | 0 | **3** |
| 9/16/24 | 0 | 0 | 0 | 0 | **0** | 10/16/24 | 2 | 0 | 0 | 0 | **2** |
| 9/17/24 | 0 | 0 | 0 | 0 | **0** | 10/17/24 | 0 | 0 | 0 | 1 | **1** |
| 9/18/24 | 0 | 0 | 0 | 0 | **0** | 10/18/24 | 0 | 0 | 0 | 1 | **1** |
| 9/19/24 | 0 | 0 | 0 | 0 | **0** | 10/19/24 | 0 | 0 | 0 | 0 | **0** |
| 9/20/24 | 0 | 0 | 0 | 1 | **1** | 10/20/24 | 1 | 0 | 0 | 0 | **1** |
| 9/21/24 | 0 | 0 | 0 | 1 | **1** | 10/21/24 | 1 | 0 | 0 | 2 | **3** |
| 9/22/24 | 0 | 0 | 0 | 1 | **1** | 10/22/24 | 0 | 0 | 0 | 3 | **3** |
| 9/23/24 | 0 | 0 | 0 | 1 | **1** | 10/23/24 | 0 | 0 | 0 | 3 | **3** |
| 9/24/24 | 0 | 0 | 0 | 0 | **0** | 10/24/24 | 0 | 0 | 0 | 2 | **2** |

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/25/24 | 0 | 0 | 0 | 0 | **0** | 10/25/24 | 0 | 0 | 0 | 3 | **3** |
| 9/26/24 | 0 | 0 | 0 | 0 | **0** | 10/26/24 | 0 | 0 | 0 | 4 | **4** |
| 9/27/24 | 0 | 0 | 0 | 0 | **0** | 10/27/24 | 0 | 0 | 0 | 4 | **4** |
| 9/28/24 | 0 | 0 | 0 | 0 | **0** | 10/28/24 | 0 | 0 | 0 | 4 | **4** |
| 9/29/24 | 0 | 0 | 0 | 0 | **0** | 10/29/24 | 0 | 0 | 0 | 2 | **2** |
| 9/30/24 | 0 | 0 | 0 | 0 | **0** | 10/30/24 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | 10/31/24 | 0 | 0 | 0 | 2 | **2** |
| November | | | | | | December | | | | | |
| 11/1/24 | 0 | 0 | 0 | 2 | **2** | 12/1/24 | 0 | 0 | 0 | 2 | **2** |
| 11/2/24 | 0 | 0 | 0 | 1 | **1** | 12/2/24 | 0 | 0 | 0 | 2 | **2** |
| 11/3/24 | 0 | 0 | 0 | 2 | **2** | 12/3/24 | 0 | 0 | 0 | 1 | **1** |
| 11/4/24 | 0 | 0 | 0 | 2 | **2** | 12/4/24 | 0 | 0 | 0 | 1 | **1** |
| 11/5/24 | 0 | 0 | 0 | 2 | **2** | 12/5/24 | 0 | 0 | 0 | 1 | **1** |
| 11/6/24 | 0 | 0 | 0 | 2 | **2** | 12/6/24 | 0 | 0 | 0 | 0 | **0** |
| 11/7/24 | 0 | 0 | 0 | 2 | **2** | 12/7/24 | 0 | 0 | 0 | 0 | **0** |
| 11/8/24 | 0 | 0 | 0 | 3 | **3** | 12/8/24 | 0 | 0 | 0 | 0 | **0** |
| 11/9/24 | 0 | 0 | 0 | 3 | **3** | 12/9/24 | 0 | 0 | 0 | 0 | **0** |
| 11/10/24 | 0 | 0 | 0 | 3 | **3** | 12/10/24 | 0 | 0 | 0 | 0 | **0** |
| 11/11/24 | 0 | 0 | 0 | 3 | **3** | 12/11/24 | 0 | 0 | 0 | 0 | **0** |
| 11/12/24 | 0 | 0 | 0 | 3 | **3** | 12/12/24 | 0 | 0 | 0 | 0 | **0** |
| 11/13/24 | 0 | 0 | 0 | 3 | **3** | 12/13/24 | 0 | 0 | 0 | 0 | **0** |
| 11/14/24 | 0 | 0 | 0 | 3 | **3** | 12/14/24 | 0 | 0 | 0 | 0 | **0** |
| 11/15/24 | 0 | 0 | 0 | 2 | **2** | 12/15/24 | 0 | 0 | 0 | 0 | **0** |
| 11/16/24 | 0 | 0 | 0 | 0 | **0** | 12/16/24 | 0 | 0 | 0 | 0 | **0** |
| 11/17/24 | 0 | 0 | 0 | 0 | **0** | 12/17/24 | 0 | 0 | 0 | 0 | **0** |
| 11/18/24 | 0 | 0 | 0 | 0 | **0** | 12/18/24 | 0 | 0 | 0 | 0 | **0** |
| 11/19/24 | 0 | 0 | 3 | 0 | **3** | 12/19/24 | 0 | 0 | 0 | 0 | **0** |
| 11/20/24 | 0 | 0 | 3 | 0 | **3** | 12/20/24 | 0 | 0 | 0 | 0 | **0** |
| 11/21/24 | 0 | 0 | 0 | 0 | **0** | 12/21/24 | 0 | 0 | 0 | 0 | **0** |
| 11/22/24 | 0 | 0 | 0 | 0 | **0** | 12/22/24 | 0 | 0 | 0 | 0 | **0** |
| 11/23/24 | 0 | 0 | 0 | 0 | **0** | 12/23/24 | 0 | 0 | 0 | 0 | **0** |

| DATE | S | Cen | NE | W | State | DATE | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/24/24 | 0 | 0 | 0 | 1 | **1** | 12/24/24 | 0 | 0 | 0 | 0 | **0** |
| 11/25/24 | 0 | 0 | 0 | 1 | **1** | 12/25/24 | 0 | 0 | 0 | 0 | **0** |
| 11/26/24 | 0 | 0 | 0 | 1 | **1** | 12/26/24 | 0 | 0 | 0 | 0 | **0** |
| 11/27/24 | 0 | 0 | 0 | 2 | **2** | 12/27/24 | 0 | 0 | 0 | 0 | **0** |
| 11/28/24 | 0 | 0 | 0 | 2 | **2** | 12/28/24 | 0 | 0 | 0 | 0 | **0** |
| 11/29/24 | 0 | 0 | 0 | 2 | **2** | 12/29/24 | 0 | 0 | 0 | 0 | **0** |
| 11/30/24 | 0 | 0 | 0 | 2 | **2** | 12/30/24 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | 12/31/24 | 0 | 0 | 0 | 0 | **0** |

# Appendix I: County Costs for Services

Table 58: Total and Average Amount Spent by Counties as Entered into Trails, by Service

| Service Type | Total County Cost for Cohort | Average County Cost per Episode |
|---|---|---|
| Foster Family Home Care | $580,745 | $265 |
| Qualified Residential Treatment Program | $487,812 | $470 |
| Residential Child Care Facility | $213,050 | $750 |
| Group Center Care | $97,299 | $616 |
| Life Skills | $87,957 | $106 |
| Adoption | $73,447 | $59 |
| Group Home Care | $61,538 | $669 |
| Home-Based Services | $53,826 | $101 |
| Kinship Foster Care | $45,467 | $277 |
| Community-Based Family Support Services | $31,654 | $264 |
| Supervised Visitation | $22,942 | $61 |
| Therapeutic Foster Home | $22,084 | $235 |
| Relative Guardianship | $18,667 | $103 |
| Mentoring | $16,967 | $112 |
| Child Mentoring and Family Support | $15,692 | $74 |
| Sexual Abuse Treatment | $14,502 | $50 |
| Multi Systemic Therapy | $11,489 | $230 |
| Reunification/Permanency - for Foster Care | $10,936 | $280 |
| Trauma Informed Care/Services | $10,626 | $126 |
| Intensive Family Therapy | $10,442 | $97 |
| Day Treatment | $7,973 | $469 |
| Adoption Case Services | $7,132 | $45 |

| Service Type | Total County Cost for Cohort | Average County Cost per Episode |
|---|---|---|
| SILP - Youth Payment | $4,547 | $239 |
| Substance Abuse Treatment | $3,461 | $72 |
| Reconnecting Youth | $2,680 | $179 |
| Treatment Foster Home | $2,427 | $404 |
| Mobile Intervention Team | $2,219 | $1,109 |
| Mediation | $2,157 | $98 |
| Structured Parenting Time | $2,128 | $112 |
| Youth Intervention Program | $1,731 | $35 |
| Special Economic Assistance | $1,404 | $468 |
| Out Of Home Case Services | $951 | $29 |
| Family Strengths | $896 | $179 |
| Nurturing Program | $889 | $40 |
| Mental Health Services | $868 | $51 |
| Family Group Decision Making | $849 | $212 |
| Kinship Care (DHS Custody) | $772 | $193 |
| Family Engagement Meeting/Services | $743 | $44 |
| Functional Family Therapy | $435 | $145 |
| CO Kinnected Navigator Services | $353 | $118 |
| Domestic Violence Intervention Services | $274 | $69 |
| Accelerating Parenting | $196 | $39 |
| Adoption Counseling | $45 | $45 |
| Non-Recurring Adoption Expenses | $33 | $33 |
| Kinship Evaluation and Training | $30 | $30 |
| Family Safety and Medical | $18 | $9 |
| Grand Total | $1,932,354 | $221 |