# EXHIBIT 2

# Limit the Detention of Juveniles Annual Report

## State Fiscal Year 25-26

July 1, 2026



COLORADO

Department of Human Services

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... **2**
**EXECUTIVE SUMMARY** .......... **8**
Purpose .......... 9
Methodology .......... 9
Youth Cohort .......... 10
*Table 1: Fiscal Year 2024-25 Cohort Overview* .......... *10*
Youth Awaiting Mitigating Services .......... 10
Child Welfare Involvement .......... 11
Detention Admissions for Youth Ages 10-12 .......... 12
Barriers .......... 12
Direct File, Transfer, and/or Reverse Transfer .......... 13
Outcomes .......... 13
System Disparities .......... 13
Length of Stay Trends .......... 14
Limitations .......... 14
Conclusion .......... 15
**GLOSSARY OF ACRONYMS** .......... **16**
**INTRODUCTION** .......... **17**
Transitioning to Youth Awaiting Mitigating Services .......... 17
Data Units and Suppression Minimums .......... 17
Data and the Units of Analysis for This Report .......... 17
Data Suppression .......... 18
Statistical Correlations .......... 18
Data Sources and Methods .......... 18
Data Limitations .......... 19
Commitments .......... 19
Court Case Activity Review .......... 19
Detention Bed Utilization Tracking Sheet .......... 19
Family Engagement Meetings .......... 20
Juvenile Judicial Data .......... 20
**YOUTH COHORT OVERVIEW** .......... **21**
General Youth Summaries .......... 21
*Table 2: Key Counts of Cohort Youth Population* .......... *21*
Demographics Overview .......... 21
Demographics and Equity .......... 22
Demographics and Length of Stay .......... 22

Demographics and Regional Length of Stay (LOS)........................................ 25
Offenses Distribution by Demographics.................................................. 25
Statistical Correlations for Demographics and Offenses........................... 26
Offenses by Region.............................................................................. 26
Statistical Correlations for Demographics and Assessments........................... 27
Demographics and Detention Involvements............................................. 28
Statistical Correlations for Demographics and Assessments........................29
Demographics and Child Welfare Involvement..........................................29
*Figure 1: Detention Cohort With Active Child Welfare Involvement, Report Year Over Year (YoY)..................................................30*
Youth Ages 10-12................................................................................. 30
Statutory Rule for Youth Ages 10-12.................................................... 32
Child Welfare Involvement and Demographic Data....................................32
*Table 3: Counts of Unique Youth and Unique Admissions by Involvement in Child Welfare................................................ 32*
Child Welfare Involvement and Length of Stay......................................... 32
*Table 4: Average and Median LOS for Youth with Active Child Welfare Involvement........................................................ 33*
Youth Race/Ethnicity........................................................................... 33
*Table 5: Average and Median LOS for Cohort Youth With Active or Historical Child Welfare Involvement, Based on Involvement Period and Race/Ethnicity..............................................................34*
Youth Gender...................................................................................... 34
*Table 6: Average and Median LOS for Cohort Youth With Active or Historical Child Welfare Involvement, Based on Involvement Period and Staff-Assigned Gender.................................................. 36*
Youth Sexual Orientation.......................................................................36
*Table 7: Average and Median LOS for Cohort Youth With Active or Historical Child Welfare Involvement, Based on Involvement Period and Sexual Orientation........................................................37*
Demographics for Youth in Detention with Historical and Active Child Welfare Involvement............................................................... 37
**COUNTY IMPACT........................................................................... 39**
Child Welfare Assessments and Cases..................................................... 39
Assessments.........................................................................................39
*Table 8: Youth with Active Child Welfare Assessments During Cohort Detention; SFY Comparison......................................... 39*

*Table 9: Original Referral Source for Active Assessments..................... 40*
Cases........................................................................................ 41
*Table 10: Youth with Active Child Welfare Cases During Cohort Detention; SFY Comparison................................................... 41*
*Figure 2: Case Counts by Program Area; SFY Comparison..................... 42*
*Table 11: PA4 and PA5 Active Case Counts by County; SFY Comparison............................................................. 42*
Impact to Caseload Over Time.............................................................. 43
*Figure 3: SFY Trends Over Time for Child Welfare Caseloads With and Without Youth in Detention............................................. 44*
*Table 12: Year over Year (YoY) Percentage Change of Child Welfare Caseloads Involving Youth Aged 10-17 Years Old in Detention and Not in Detention........................................................ 44*
Fiscal Impact of Out-of-Home Placements.................................................. 45
*Table 13: Percentage Difference of Average Daily Rates Paid for Out-of-Home (OOH) Placements, Between Youth in Detention and Not in Detention........................................................ 46*
Coordination of Family Engagement Meetings.............................................. 47
*Table 14: Family Engagement Meeting and Youth Count, by County (Post-Admission)........................................................... 48*
Court-Involved Child Welfare History........................................................ 49
*Figure 4: All Court-involvement for Unique Cohort Youth with Non-Delinquent Cases Over Their Lifetime................................. 49*
*Figure 5: Court-involvement for Unique Cohort Youth with Only One Non-Delinquent Case Over Their Lifetime............................ 50*
**DETENTION BED CAPACITY AND UTILIZATION 19-2.5-1407.......................................... 51**
Emergency Beds and Borrowed Beds.......................................................... 52
*Figure 6: Statewide Daily Max Detention and Emergency Bed Usage for SFY 24-25......................................................52*
Emergency Bed Utilization Patterns.......................................................... 53
Peak Emergency Bed Utilization.............................................................. 53
Capacity Analysis............................................................................ 54
*Table 15: Colorado Youth Detention Continuum Bed Capacity Report by Judicial District for SFY 24-25................................... 54*
Regional Impact Overview.................................................................... 56
Central Region.............................................................................. 56
Northeast Region............................................................................ 57
Southern Region............................................................................. 57

Western Region.................................................................. 58
Statewide Capacity Usage Summary..................................................58
**LENGTH OF STAY ANALYSIS.................................................................59**
Section Summary.................................................................. 59
General Admissions Information............................................................ 60
*Table 16: Admissions with a Length of Stay Over and Under Thirty Days..................................................................... 60*
*Figure 7: Distribution of Admissions by Length of Stay........................ 61*
*Figure 8: Distribution of Admissions 30 Days and Under....................... 61*
*Table 17: Detention Length of Stay by Region.................................. 62*
Admissions Under and Over Thirty Days..........................................................63
Summary..................................................................................63
Youth Released at Detention Hearing.................................................... 63
Trends for Youth Under and Over 30 Days............................................... 64
*Table 18: Admissions Under 30 Days Compared to Admissions Over 30 Days..................................................................... 65*
*Figure 9: CJRA Prescreen Results and Length of Stay......................... 66*
*Figure 10: Admissions with a Violent Offense and Length of Stay........... 67*
Quick Returns.......................................................................................... 67
*Table 19: Offense Type for Youth with a "Quick Return" to Detention..... 69*
*Table 20: Offense Class for Youth with a "Quick Return" to Detention..... 70*
Youth Outcomes for Length of Stay..................................................................70
Detention Involvements and Length of Stay (LOS)...........................................72
*Table 21: Count of Admissions and Detention Involvement Distribution...................................................................... 72*
*Table 22: Count of Unique Youth and Their Detention Involvements Prior to the Cohort......................................................... 72*
Offenses and Length of Stay (LOS)........................................................... 73
*Table 23: Offense Category, Type and Length of Stay......................... 74*
Youth with Admissions 130 Days or Longer........................................................ 75
Admissions 130 Days or Longer With Youth Awaiting Mitigating Services..................76
Child Welfare Involvement in Admissions 130 Days or Longer............................. 76
**DETENTION ASSESSMENTS..................................................................78**
Distribution of Level of Care (LOC) Recommendations..........................................78
Colorado Juvenile Risk Assessment (CJRA) Pre-Screen Risk Level Overview..............78
*Table 24: Colorado Juvenile Risk Assessment Pre-Screen Risk Level by Admissions........................................................... 79*

Juvenile Detention Screening and Assessment Guide (JDSAG) Screen Results and Overrides....79
All Completed JDSAG Screens....80
*Table 25: Juvenile Detention Screening and Assessment Guide Screen Results for SFY 24-25....80*
*Table 26: Juvenile Detention Screening and Assessment Guide Override Information and Direction.... 81*
Detention Screens for the Cohort.... 81
**PLACEMENTS AND SERVICES.... 82**
Youth Awaiting Mitigating Services....82
Youth Awaiting Mitigating Services and Ethnicity.... 83
Youth Awaiting Mitigating Services and CJRA Results....83
Enhanced Standardized Assessments....83
Analysis....85
Barriers to Placements and Services.... 86
*Table 27: Identified Barriers to Release for Youth Awaiting Mitigating Services....88*
Availability of Family Foster Homes.... 88
*Figure 11: Family Foster Home Providers Open During SFY 24-25 That Accepted Youth Ages 10-17 Years Old.... 90*
First Placement Upon Release from Detention.... 91
*Table 28: First Placement Following Release from Detention.... 92*
*Table 29: DHS Involved Placement Following Release from Detention.... 94*
**DIRECT FILE/TRANSFER/REVERSE-TRANSFER.... 96**
**JUVENILE PLACEMENT SURVEY AND COST REPORT....98**
**IDENTIFYING JUVENILE JUSTICE YOUTH IN CHILD WELFARE....99**
*Table 30: Juvenile Justice Involvement Type while in Child Welfare, by Unique Youth and by Type.... 100*
**APPENDICES....101**
Appendix A: History....101
Appendix B: Key Term Definitions.... 103
Active Child Welfare Involvement.... 103
Advisory Board.... 103
Catchment Area....103
Detention Bed Utilization Tracking Sheet (DBUTS).... 103
Direct File/Transfer/Reverse-Transfer.... 104
Direct File.... 104
Transfer....104

Reverse-Transfer........ 104
Emergency Release........ 104
Emergency Placement........ 105
Quick Returns........ 105
Region........ 105
Trails........ 105
Youth Awaiting Mitigating Services........ 105
Appendix C: Related Bills........ 106
Appendix D: Addition of 23rd Judicial District........ 107
*Figure 12: Map of Judicial Districts, Regions and Facility Locations........ 107*
Appendix E: Judicial District Sizes and County........ 108
Classifications........ 108
*Table 31: Judicial District Sizes........ 108*
*Table 32: County Type Classifications........ 109*
Appendix F: Supplemental Demographic Information........ 109
*Table 33: Statewide Cohort Demographics........ 110*
*Table 34: Cohort Youth Compared to Colorado Youth Population........ 112*
*Table 35: Regional LOS by Ethnicity and Gender........ 113*
*Table 36: Offense Distribution by Demographic Category........ 114*
*Table 37: Offense Distribution by Region........ 115*
*Table 38: Offense Class and Type by Region........ 115*
*Table 39: CJRA Pre-Screen and Detention Screen (JDSAG/CYDSI) Distribution........ 116*
*Table 40: CJRA Pre-Screen Risk Level by Region........ 116*
*Table 41: BHA Level of Care (LOC) Recommendation by Demographic Category........ 117*
*Table 42: CJRA Pre-Screen and JDSAG Screening Results by Demographic Category........ 118*
*Table 43: Demographics of Historically or Actively Involved Child Welfare Cohort Youth........ 120*
Appendix G: Offense Category Detail........ 121
*Table 44: Offenses and Their Corresponding Offense Types........ 121*
Additional Contextual Information on Offenses........ 122
*Table 45: Offense Rankings........ 123*
Appendix H: Emergency Bed Criteria........ 125
Appendix I: Emergency Bed Tables........ 127

*Table 46: Accompanying Statewide and Regional (Southern: S, Central: Cen, Northeast: NE, Western: W) Breakdowns of Daily Emergency Bed Usage* ........ *127*
Appendix J: Statistical Results ........ 133
*Table 47: Statistical Correlations Results for Youth Outcomes* ........ *133*
Appendix K: Out-of-Home Placement Costs ........ 135
*Table 48: Detailed Breakdown of Costs for Out-of-Home Placements by Youth in Detention and Not in Detention* ........ *135*
Appendix L: Unique Youth and Admissions by Region and Statewide ........ 136
*Table 49: Unique Youth and Admissions by Region and Statewide* ........ *136*

# EXECUTIVE SUMMARY

This report addresses data requirements from three bills related to Colorado Revised Statutes (C.R.S.) 19-2.5-1404 and (C.R.S.) 19-2.5-1407.3, including Senate Bill (SB) 21-071 and House Bills (HB) 23-1307 and 23-1249.

## Purpose

In 2021, the General Assembly of the State of Colorado enacted SB21-071 (C.R.S. 19-2.5-1404). This bill enhanced the already existing Colorado Youth Detention Continuum (CYDC) working group, also known as the Advisory Board, with additional partners and mandates.

C.R.S. 19-2.5-1404 requires the Department of Human Services, on or before July 1 of every year, starting with July 1, 2023, to submit this report to the CYDC Advisory Board and appropriate legislative committees. This report must include an analysis of the data collected in accordance with performance standards and outcome measures, and it must show progress toward meeting those same standards and outcomes. In addition, the report must include the status of implementation efforts, and analyses of the following: continuum of in-home and out-of-home (OOH) placement options and supports for alleged juvenile offenders.

## Methodology

Qualitative and quantitative data analysis methods were used in this report. Statistical analysis was used to explore patterns, relationships and trends with youth in detention. Content analysis was conducted on court case notes. The cohort for this report includes information on all youth detained from July 1, 2024, through June 30, 2025.

## Youth Cohort

*Table 1: Fiscal Year 2024-25 Cohort Overview*

| Unique Admissions | Unique Cohort Youth | Statewide Average Length of Stay | Statewide Median Length of Stay | Unique Youth with Active Child Welfare Involvement |
|---|---|---|---|---|
| 2,617 | 1,937 | 31.2 | 6.4 | 884 |

## Youth Awaiting Mitigating Services

In October 2024, the Advisory Board voted to update the term "releasable" to "youth awaiting mitigating services." Consequently, this report now focuses on "youth awaiting mitigating services." This is a broader, more inclusive group of youth in detention who have an active search for an OOH placement, such as a foster home or treatment facility, or services that could mitigate the substantial risk these youth pose. The number of admissions for youth awaiting mitigating services is not directly comparable to the former identifier "releasable" and should not be used as such.

The Advisory Board defined youth awaiting mitigating services as youth in secure detention for whom the court has determined they may be released once a service or placement is identified and available that would mitigate the youth's substantial risk of serious harm to others or flight from prosecution.

The cohort of detained youth for SFY 24-25 consists of 2,617 detention admissions for 1,937 unique youth. Of these youth, 974 admissions and 733 unique youth were identified as youth awaiting mitigating services.

- The average admissions length of stay[1] (LOS) for youth who were identified as awaiting mitigating services was 39.2 days. This is compared to the average admissions LOS for all youth of 31.2 days.

[1] Length of Stay is abbreviated throughout this report using LOS, which represents the total consecutive amount of time a youth would have spent in detention in one admission episode. This is explained in greater detail in the "Data Units and Suppression Minimums" section of this report.

- The median length of stay for youth awaiting mitigating services is 20.8 days, as compared to 6.4 days for all cohort youth.
- Youth awaiting mitigating services are more likely to have higher Colorado Juvenile Risk Assessment (CJRA) pre-screen risk levels.

## Child Welfare Involvement

- Youth in detention with active child welfare involvement showed notably greater average LOS and median LOS days compared to their peers who did not have any active child welfare involvement. Where a youth had no active child welfare involvement during a detention span, the average LOS was 16.5 days, and the median LOS was 2.8 days. In contrast, youth with active child welfare involvement were found to have an average LOS of 47.7 days and a median LOS of 20.4 days.
- In all but one OOH placement type, the average daily rate paid for the care of cohort youth was shown to be higher than the average daily rate paid for youth who were not in detention, as detailed in Table 13. Specifically, the average daily rates paid to therapeutic and treatment foster home providers (*Specialized Foster Home*) for cohort youth were found to be 36.0% more than the average daily rate paid for youth not in detention, while kinship foster home providers received the next highest rates paid at 25.5% more for cohort youth than for youth not in detention.

## Detention Admissions for Youth Ages 10-12

- There were 61 admissions, 2.3% of the cohort, that involved youth between 10-12.
- The majority of these admissions were for violent offenses at 67.2%.[2,3]

## Barriers

Youth awaiting placements and services that mitigate the risk of serious harm to others or risk flight from prosecution can experience barriers which make accessing available placements and services more challenging. These barriers may ultimately lead to longer lengths of stay in detention for youth awaiting mitigating services.

There were 974 of the 2,617 (34.3%) total admissions identified as having youth awaiting mitigating services. For these admissions, any barriers that were known by those entering the data were noted. Some admissions had two barriers while others had only one or none listed. There were 77 of the 974 (7.9%) admissions for youth awaiting mitigating services in which there was no data provided for barriers; this is not the same as the 287 (29.5%) admissions for youth awaiting mitigating services identified as having “no barriers.” The majority of these admissions with “no barriers” identified were released to a parent upon release from detention.

There were four barriers to release identified as most prevalent among those admissions for youth awaiting mitigating services:

- History of Aggressive Behavior (35.2%),
- Mental Health Needs (22.1%),
- History of Elopement (21.5%), and
- History of Substance Use (14.3%).

---

[2] Per C.R.S. 19-2.5-304 (2): *A juvenile court shall not order a juvenile who is ten years of age and older but less than thirteen years of age to detention unless the juvenile has been arrested for a felony or weapons charge pursuant to section 18-12-102, 18-12-105, 18-12-106, or 18-12-108.5.* More information regarding this statute can be found in the Youth Ages 10-12 section of this report.

[3] See Appendix G for additional information on violent offenses.

## Direct File, Transfer, and/or Reverse Transfer

Admissions in the Direct File, Transfer, and/or Reverse-Transfer processes comprised nearly one-quarter (24.6%) of the total days in detention for the cohort, up only slightly from last year (24.4%). These admissions accounted for 14.9% of all bed capacity within this state fiscal year (SFY) (a 3.0% decrease from SFY 23-24). Expressed against the bed cap, this means that an average of 183 beds, at any given time, were available for non-Direct File, non-Transfer, and/or non-Reverse-Transfer detention admissions, and an average of 32 beds were occupied by youth in the Direct File, Transfer, and/or Reverse-Transfer processes.

# Outcomes

## System Disparities

- Black youth continue to be more likely to experience disparate detention outcomes than their peers. This has also been noted in previous reports.
    - The length of stay for a Black youth is likely to be 36.6% longer than that of their peers.
    - Black youth are significantly overrepresented in the population, making up 20.9% of the cohort, but only 4.1% of the general juvenile population.
    - Black youth are more likely to have a higher offense severity than their peers, almost an offense level higher.
    - Black youth are also more likely to return more often to detention than their peers.

## Length of Stay Trends

- In SFY 24-25, 868 admissions (33.2%) had youth who were released at their detention hearing.

- There were 208 admissions that quickly followed another detention admission, within 30 days of release. These admissions are called "quick returns" in this report.
  - The average length of stay for quick returns increases from 16.8 days for the first admission to 29.5 days on the second admission.
  - 51.4% of these quick returns had a warrant for failure to appear or failure to comply.
- There were 139 admissions in the cohort that were 130 days or more.
  - Of these, 57.8% of the admissions were either related to a homicide offense, or the youth was in the direct file process.
- Similar to last year, a youth's prior detention involvement can predict an increase in length of stay. For every previous admission into detention, their length of stay increases by 51.6% on average.
- Offense severity correlates with a youth's length of stay. Youth with violent crime offenses are more likely to have a length of stay that is 83.3% longer than their peers.

# Limitations

The following is a list of limitations experienced during the preparation of this report:

- Multiple data collection systems were necessary to compile the data needed for this report, and manually aligning this information was inefficient and challenging.
- Privacy and data protection requirements make reporting findings limited in some cases due to small sample sizes.

# Conclusion

This report is a collective analysis of data available from July 1, 2024, to June 30, 2025. This analysis provides information on the detention population as a whole for SFY 24-25 and an initial overview of subpopulations of this larger group, including youth awaiting mitigating services, youth ages 10-12, youth with child welfare involvement and youth with varying lengths of stay.

Factors impacting the detention of this population include system disparities for racial and ethnic minorities, assessments, offense type and barriers to accessing appropriate and available placements or services. A more in-depth analysis of these subpopulations may increase understanding of the factors that impact a youth's length of stay in and release from detention. Additionally, understanding a youth's reason for child welfare involvement may help clarify system overlap.

The Colorado Department of Human Services is pleased to submit the SFY 25-26 C.R.S. 19-2.5-1404 Limit the Detention of Juveniles annual report.

# GLOSSARY OF ACRONYMS

**BHA** Behavioral Health Administration

**C.R.S.** Colorado Revised Statutes

**CDHS** Colorado Department of Human Services

**CFMS** Colorado Financial Management System

**CJRA** Colorado Juvenile Risk Assessment Pre-Screen

**CMHHIP** Colorado Mental Health Hospital in Pueblo

**CMP** Collaborative Management Program

**CPA** Child Placement Agency

**CW** Child Welfare

**CYDC** Colorado Youth Detention Continuum

**CYDSI** Colorado Youth Detention Screening Instrument

**D&N** Dependency and Neglect

**DBUTS** Detention Bed Utilization Tracking Sheet

**DOC** Department of Corrections

**DSA** Data Sharing Agreement

**DYS** Division of Youth Services

**EPP** Expedited Permanency Placement

**ESA** Enhanced Standardized Assessment

**FAR** Family Assessment Response

**FEM** Family Engagement Meeting

**FFPSA** Family First Prevention Services Act

**FYiT** Foster Youth in Transition

**HB** House Bill

**HCPF** Health Care Policy and Financing

**ICJ** Interstate Compact on Juveniles

**ISST** Individualized Service and Support Team

**JD** Judicial District

**JDSAG** Juvenile Detention Screening and Assessment Guide

**JV** Juvenile

**LOS** Length of Stay

**OOH** Out-of-Home Placement

**PA** Program Area

**PRTF** Psychiatric Residential Treatment Facility

**QRTP** Qualified Residential Treatment Program

**RCCF** Residential Child Care Facility

**SB** Senate Bill

**SFY** State Fiscal Year

**SOGIE** Sexual Orientation, Gender Identity and Expression

**YAMS** Youth Awaiting Mitigating Services

**YOS** Youthful Offender System

# INTRODUCTION

This report addresses data requirements from three recent bills related to Colorado Revised Statutes (C.R.S.) 19-2.5-1404 and (C.R.S.) 19-2.5-1407.3, including Senate Bill (SB) 21-071 and House Bills (HB) 23-1307 and 23-1249.

## Transitioning to Youth Awaiting Mitigating Services

In October 2024, the Colorado Youth Detention Continuum (CYDC) working group, also known as the Advisory Board, updated the term “releasable" to “youth awaiting mitigating services.” Consequently, this report now focuses on “youth awaiting mitigating services.” This is a broader, more inclusive group of youth in detention who have an active search for an out-of-home (OOH) placement, such as a foster home or treatment facility, or services that could mitigate the substantial risk these youth pose. The number of admissions for youth awaiting mitigating services is not directly comparable to the former identifier “releasable” and should not be used as such.

The Advisory Board defined Youth awaiting mitigating services as youth in secure detention for whom the court has determined may be released once a service or placement is identified and available that would mitigate the youth’s substantial risk of serious harm to others or flight from prosecution.

## Data Units and Suppression Minimums

### Data and the Units of Analysis for This Report

The admissions information in this report differs from other reports produced by the Division of Youth Services, which focus on facility entry as the primary unit of analysis. When a facility entry is the primary unit of analysis, if a youth transfers to a new facility within the same detention episode, this is counted as a new admission for the new facility and the length of stay (LOS) clock restarts. For purposes of this report, youth is the primary unit of analysis. Therefore, the length of stay numbers represent the total consecutive amount of time a youth

would have spent in detention in one admission episode, regardless of their facility location. There are also fewer admissions in the report as they have been "collapsed" to reflect continuous youth detentions.

## Data Suppression

To keep youths' identities confidential, this report uses data suppression minimums. In any summaries or analysis categories where unique youth information is shared, counts below 12 are excluded unless stated otherwise. Those numbers are replaced with "x." Footnotes indicate that data suppression exists.

## Statistical Correlations

Only statistically significant results, within appropriate data reliability measures, appear in this report. Actual statistical values are in Appendix J. Non-statistically significant results are available on request.

## Data Sources and Methods

During the process to evaluate the directives of the working group, analysts for C.R.S. 19-2.5-1404 worked with:

- Trails, Colorado's current Comprehensive Child Welfare Information System;
- Detention Bed Utilization Tracking Sheet (DBUTS); this Google Sheet is the only source of certain CYDC data regarding programming throughout the 22 Colorado judicial districts (23 in future reports - see Appendix D for details);
- Colorado State Courts Data Access system;
- County Financial Management System (CFMS); and
- Additional high-level contextual information from stakeholders.

The primary analysis methods used in this report were quantitative. Data from Trails established the basic cohort of youth, which was integrated with the other data sources. Descriptive analysis was used to provide context and summaries about the youth cohort for

this report. Lastly, statistical analysis, including correlation tests and regression analysis, was used to understand system disparities and impacts on youth outcomes.

# Data Limitations

## Commitments

There were three admissions in the cohort for youth who were already committed to the custody of the Division of Youth Services (DYS) and who had short detention stays during their DYS commitment. These admissions were removed from the detention-focused analysis.

## Court Case Activity Review

Some of the data used for this report was manually gleaned by reading case notes from the Colorado State Courts Data Access system to find information around the status of youth awaiting mitigating services, release dates, bonds, placement, as well as other information. Analysts are often required to infer or interpret court case activity records due to differing levels of court record details, which may lead to the potential for data errors. Each data point per admission takes a minimum of five minutes to review and cross-reference with other sources. Thus, the data found in this one external system represents thousands of hours of research alone for this report.

## Detention Bed Utilization Tracking Sheet

This Google sheet was originally created to assist the Division of Child Welfare (DCW) in tracking youth in detention who also have child welfare involvement. Since the passing of SB21-071, this Google spreadsheet is now also utilized by this report's analysts as a data collection method for data points requested by the Advisory Board that are not yet fully available in established databases (e.g., Trails). There are limitations with this data, which include multiple users, manual data entry and attempting manual retroactive lookups for additional data requests. Tracking information from one live, shared database can increase the likelihood of errors, so the analysts for this report review and clean the data. This process is continually being improved.

## Family Engagement Meetings

Family engagement meeting (FEM) information continues to be an area where further exploration of available and accessible data resources is required in order to provide meaningful analysis. Data from known FEM sources often requires significant manual cleaning for minimal results, and outside of Trails, family engagement meetings are often and inconsistently referred to as a number of other meeting types.

## Juvenile Judicial Data

On September 11, 2025, a data sharing agreement (DSA) involving the Division of Child Welfare (DCW), the Division of Youth Services (DYS) and the Judicial Court Services Division was finalized, which directed that DCW and Colorado Youth Detention Continuum (CYDC) would receive monthly datasets containing specific types of juvenile court records that occurred during the previous month. The purpose of these datasets are to link additional and otherwise inaccessible court records with youth records in Trails in order to be used efficiently in future report data analysis; however, these datasets are voluminous and require manual matching. Further, as these datasets were initiated after the reporting timeframe, court record details were not available for analysis.

# YOUTH COHORT OVERVIEW

This report contains information on youth who were detained from July 1, 2024 - June 30, 2025. Overall, in this cohort the number of admissions and unique youth was less than in previous years; however, the average length of stay was longer than in prior years. This corresponds to the increase in offense level severity this year - indicating that this year's cohort has fewer cases but a higher average level of offense severity.

## General Youth Summaries

*Table 2: Key Counts of Cohort Youth Population*

| | Youth Count | Admission Count |
|---|---|---|
| **Overall Cohort** | 1,937 | 2,617 |
| **Active or Historical Child Welfare Involvement** | 1,563 | 2,155 |
| **Historical Child Welfare Involvement** | 1,457 | 2,020 |
| **Active Child Welfare Involvement** | 884 | 1,236 |
| **Youth Awaiting Mitigating Services** | 733 | 974 |

### Demographics Overview

This section contains the demographic[4] makeup of the State Fiscal Year (SFY) 2024-25 detention cohort, including an overview of child welfare-involved youth. The analysis explores differences related to length of stay (LOS), level of care recommended and received, and offenses, organized by demographic category and region.

Demographic categories used for analysis included the youth's race/ethnicity; age at admission; and sexual orientation, gender identity and expression (SOGIE). Throughout the report, use of the "youth with SOGIE identities" refers to youth who have sexual orientations or gender identities that fall outside of the majority, specifically where the associated unique

[4] Supplemental demographic information can be found in Appendix F.

youth counts fall at or below data suppression minimums. The "youth with SOGIE identities" categorization in this report consists of the options available in Trails, which include Lesbian or Gay, Bisexual, Pansexual, Do Not Know or Questioning, Other, and Prefer No Labels. Complete data tables for all categories are provided in Appendix F at the end of this report.

The cohort consists of 2,617 detention admissions for 1,937 unique youth. Of these youth, 974 admissions and 733 unique youth were identified as youth awaiting mitigating services.

The full demographic detail is presented in Tables 33 through 43 in Appendix F. Both the average length of stay (LOS) and the median LOS are reported for each subgroup, because the average LOS is heavily influenced by a small number of long admissions. The median is generally a better description of the typical experience, while the average reveals the impact of those longer stays. Statewide, the average LOS is 31.2 days, and the median LOS is 6.4 days.

## Demographics and Equity

***Demographics and Length of Stay***

Race and ethnicity differences in length of stay are the most pronounced demographic disparities in the cohort. Compared to the statewide average of 31.2 days and median of 6.4 days, the three largest racial and ethnic groups show the following patterns:

- Black or African American youth (561 admissions, 21.4%) had the longest stays of any racial or ethnic group, with an average LOS of 39.1 days and a median LOS of 7.8 days.

- Black youth are also more likely to have longer lengths of stay than their peers, based on statistical correlation. Their lengths of stay are on average 36.6% longer. This is consistent with data from prior reports, which show the same disparities for Black youth.

- Hispanic youth account for the largest single share of admissions (1,097 admissions, 41.9%), with an average LOS of 33.1 days and a median of 6.0 days.

- White youth (852 admissions, 32.6%) had the shortest average LOS among the three largest groups at 24.5 days, with a median of 6.1 days.

These race and ethnicity patterns persist when comparing the cohort to Colorado's general youth population. Using 2023 Census estimates for Colorado youth ages 10 through 17 (American Indian or Alaskan Native 1.5%, Asian 3.0%, Black or African American 4.1%, Hispanic 33.1%, Native Hawaiian or Other Pacific Islander 0.2%, White 60.9%):

- Black youth represent 20.9% of the unique cohort but only 4.1% of the underlying youth population, an overrepresentation factor of roughly five times.
- Hispanic youth are also overrepresented (43.4% of the unique cohort versus 33.1% of the youth population).
- White youth are underrepresented (31.3% of the unique cohort versus 60.9% of the population).

These disparities are summarized in Table 34, in Appendix F.

Gender and pronoun patterns are consistent with prior reporting. Per staff-assigned gender:

- Male youth account for 2,082 admissions (79.6%) with an average LOS of 33.4 days and a median of 6.6 days.
- Male youth are statistically more likely to have longer lengths of stay than female youth. Their lengths of stay are on average 33.0% longer. This data is also consistent with data from prior years.
- Female youth account for 535 admissions (20.4%) with an average LOS of 22.6 days and a median of 5.1 days.

Self-reported gender identity tracks the staff-assigned pattern:

- Male: 69.8% of admissions.
- Female: 17.6% of admissions.

Pronoun data show:

- He/Him: 67.4%.
- She/Her: 16.5%.
- They/Them, He/They, or She/They: 0.7% (18 admissions combined).

Sexual orientation breaks down as:

- Straight or Heterosexual: 80.4%.
- Youth with SOGIE identities (Lesbian or Gay, Bisexual, Pansexual, Do Not Know or Questioning, Other, or Prefer No Labels): 4.7% (122 admissions combined).
- Missing: 14.8%.

Age at admission ranges from 10 to 17 in this cohort, with the distribution concentrated in the older teen years:

- 17-year-olds: 721 admissions (27.6%), the largest single age group. This includes youth who turned 18 while in detention or were in the direct file/transfer/reverse-transfer process. Average LOS is 21.3 days, median 5.3 days.
- 16-year-olds: 688 admissions (26.3%). Average LOS is 39.1 days, median 6.8 days.
- 15-year-olds: 558 admissions (21.3%). Average LOS is 38.1 days, median 6.9 days.
- 14-year-olds: 388 admissions (14.8%). Average LOS is 28.1 days, median 7.5 days.
- 13-year-olds: 201 admissions (7.7%). Average LOS is 26.5 days, median 5.7 days.
- Youth ages 10-12 combined: 61 admissions (2.3%). Average LOS is 29.6 days, median 3.0 days.

***Demographics and Regional Length of Stay (LOS)***

Regional[5] LOS differences are substantial. Table 35 in Appendix F presents regional LOS details.

[5] A map of the DYS catchment areas (or regions) can be found in Appendix D.

Black youth LOS disparity is visible across regions but is most pronounced in higher volume regions. In the Southern region, admissions involving Black youth had an average LOS of 37.6 days and a median of 12.9 days, well above the regional averages of 34.0 and 8.5 days, respectively. In the Central region, Black youth admissions averaged 41.7 days (median 6.6), again above the regional averages. By contrast, White youth in the Central region had the shortest average LOS at 21.0 days.

### *Offenses Distribution by Demographics*[6]

Charge level distribution shows that youth are most frequently detained on felony level offenses.

- Felony: 1,768 admissions (67.6%).
- Misdemeanor: 786 admissions (30.0%).
- Petty offense[7]: 63 admissions (2.4%).

Offense type distribution is led by Person offenses:

- Person offenses: 1,428 admissions (54.6%).
- Property offenses: 592 admissions (22.6%).
- Weapon offenses: 319 admissions (12.2%).
- Drug, Status, Traffic, and Other offenses together: 10.6% of admissions (n=278).

Felony admissions differ notably across racial and ethnic groups:

- Black youth: 79.0% felony admissions, the highest among the three largest groups.
- Hispanic youth: 66.0% felony admissions.

---

[6] The offenses described in this report are the most severe offense at the time of a youth's admission into detention.

[7] As noted in other sections of the report, a youth is not screened into detention for a petty offense alone but could screen into detention for other reasons, which may include detention sentences, misdemeanor or felony offenses, or the youth has a failure to appear or failure to comply warrant.

- White youth: 61.5% felony admissions, the lowest among the three large groups.

Conversely, White youth had the highest misdemeanor admissions (35.2%) of any large group. These differences appear in offense type as well: Black youth had 57.6% of Person offense admissions and 24.1% of Property offense admissions. Hispanic youth had the highest Weapons[8] offense admissions at 15.6%, followed by Black youth at 13.4% and White youth at 7.9%. Table 36 presents the offense class and type by demographic detail.

**Statistical Correlations for Demographics and Offenses**

- Black youth are more likely to have a higher offense level than their peers. Their standard mean difference for offenses is 0.718, which is almost an offense level higher than their peers. (From Misdemeanor 5 to 4, for instance).
- Male youth are also more likely to have a higher offense level. Their standard mean difference for offenses is 1.044, which is over an offense level higher than that of female youth.
- Youth with SOGIE identities are more likely to have a lower offense level than their peers. Their standard mean difference for offenses is -0.712, which is almost an offense level lower than that of their peers.

***Offenses by Region***[9]

Felony admissions vary by region in a way that helps explain regional LOS differences:

- Southern: 79.4% felony admissions, by far the highest;
- Central: 67.7% felony admissions;
- Northeast: 61.4% felony admissions; and
- Western: 56.7% felony admissions.

[8] Offense-type details are listed in Table 43 in Appendix G.

[9] A map of the DYS catchment areas (or regions) can be found in Appendix D.

Misdemeanor admissions follow the inverse pattern:

- Western: 41.0% misdemeanor admissions;
- Northeast: 35.1% misdemeanor admissions;
- Central: 29.6% misdemeanor admissions; and
- Southern: 19.9% misdemeanor admissions, with the longest regional average (34.0 days) and median LOS (8.5 days).

Petty offense admissions are most concentrated in the Northeast region (3.5%) and the Central region (2.7%), and rarest in the Southern region (0.7%).

Person offenses are prevalent in all four regions, ranging from 51.8% (Central) to 57.3% (Northeast). Within the person offense category, average LOS varies considerably by region: 47.4 days in the Central region, 44.4 days in the Southern region, 36.5 days in the Northeast region, and 29.9 days in the Western region. Median LOS for person offenses ranges from 6.2 days in the Northeast region to 11.6 days in the Southern region. Weapon offense LOS shows a different pattern: Western region had the highest Weapon offense average LOS at 35.6 days (median 10.2), while Central region had the shortest at 9.0 days (median 4.2). Table 37 in Appendix F contains the regional offense distribution.

***Statistical Correlations for Demographics and Assessments***

There were some correlations found between age, ethnicity, and gender and the risk levels identified by the Colorado Juvenile Risk Assessment (CJRA).

- Younger youth are more likely to have higher risk levels identified by CJRA. This can be explained at least in part by the statute (C.R.S. 19-2.5-304(2)), which states that youth ages 10-12 may only be detained for high-level offenses. This is consistent with data in previous reports.
- Black youth are slightly more likely to have higher risk levels identified by CJRA. The effect size for this test was very weak at 0.064, indicating that ethnicity is not a strong predictor of a CJRA risk result this year. Last year's report did not show a statistical correlation between ethnicity and CJRA.

- Hispanic youth are slightly more likely to have lower risk levels identified by CJRA. The effect size for this test was -0.167, generally considered a weak effect size.
- Female youth are slightly more likely to have higher risk levels identified by CJRA. The effect size for this test was weak at 0.119. This is consistent with the results from last year's report.
- Youth with SOGIE identities are slightly more likely to have lower risk levels identified by CJRA. The effect size for this test was very weak at -0.076. Last year's report showed a minor correlation between sexual orientation and CJRA, with youth with SOGIE identities having higher risk screen results than their peers.
- Statistical tests did not show correlations between the Juvenile Detention Screening and Assessment Guide (JDSAG)[10] and youths' demographic traits. This is consistent with last year's report.

***Demographics and Detention Involvements***

Detention Involvements tracks how many times a youth has been in detention. This number includes the total number of times a youth has been in detention up until the end of the cohort period (June 30, 2025).

- The average number of detention involvements for a youth who has been detained is 2.1 times.
- The median number of detention involvements for youth is 1.0 time.

**Statistical Correlations for Demographics and Assessments**

- Black youth are more likely to have more detention involvements than their peers, with a standard average difference of 0.449, almost half an involvement more.
- Hispanics and youth of other ethnicities who are non-white, are more likely to have fewer involvements than their peers, with a standard average of 0.23 fewer for Hispanic youth and 0.458 fewer for youth of other ethnicities.

[10] Additional information about the JDSAG can be found in section Juvenile Detention Screening and Assessment (JDSAG) Screen Results and Overrides.

***Demographics and Child Welfare Involvement***

To provide an expanded view of the level and frequency of interaction with child welfare that these youth have throughout subsequent detention stays, this evaluation examines child welfare involvement occurring during any detention stay within the cohort. Of the 1,937 unique youth:

- 1,563 (80.1%) unique youth had active or historical involvement with child welfare.
    - 884 (45.6%) were identified as having active child welfare involvement with a county department of human or social services during any of their detention stays within the cohort period.
- Any involvement that may have been initiated and ended prior to a detention stay are not included as active involvement. This involvement is considered historical involvement and represents 1,457 (75.2%) unique youth.
- Comparisons to previous reporting periods of youth in detention with active child welfare involvement show limited fluctuation.

*Figure 1: Detention Cohort With Active Child Welfare Involvement, Report Year Over Year (YoY)*[11]




New child welfare involvement initiated during any of a youth's cohort detention stays included 584 unique youth (30.2% of the cohort population), of whom 559 were involved in a new assessment and 201 in a new case. Because there are some youth involved in a new assessment as well as a new case during one of multiple detention stays, these figures are not mutually exclusive.

## Youth Ages 10-12

There were 61 (2.3%) admissions, and 48 unique youth between 10-12 years-old in this cohort.

- Of the 61 total admissions, 93.4% were due to felony offenses, classified as the most serious charge. The majority of these felony offenses (72.1%) were Class 3 to Class 5 felonies.

[11] Report year 2023 included a shorter cohort period of six months, and because of this, the full cohort population and the child welfare-involved subpopulation will be smaller compared to all later reporting years.

- The majority (65.6%) of these 61 admissions had felony Person-related offenses as their most serious offense at the time of arrest, while 21.3% were for felony Property offenses as the most serious offense at the time of arrest.
- The majority (67.2%) of these admissions were for violent offenses.
- These admissions had the following CJRA risk levels[12]:
    - 31.1% were high;
    - 45.9% were moderate; and
    - 23.0% were low.
- The average LOS for these admissions was 29.6, similar to the general population's LOS, while the median was 3.0 days for these admissions.
- Of these admissions, six (9.8%) had a quick return to detention within 30 days.
- All of these admissions for youth aged 10-12 occurred in 10 of the largest counties.

Of the 48 unique youth between the ages of 10 and 12 years old, 24 (50.0%) youth had active child welfare involvement during any cohort detention stay. Of these 24 youth with active involvement:

- 13 (27.1%) were involved in a new assessment that opened during a detention stay, and 13 (27.1%) were involved in a new child welfare case that opened during a detention stay. Given that these counts are not mutually exclusive, and the count of new assessments and new cases are the same, it is unconfirmed if each may be related in order to preserve youth privacy.

[12] "Risk" under CJRA is a general risk of criminal recidivism, and a score of "low" on the CJRA does not mean a youth does not pose a substantial risk of serious harm to others or a substantial risk of flight from prosecution.

***Statutory Rule for Youth Ages 10-12***

*C.R.S. 19-2.5-304 (2) A juvenile court shall not order a juvenile who is ten years of age and older but less than thirteen years of age to detention unless the juvenile has been arrested for a felony or weapons charge pursuant to section 18-12-102, 18-12-105, 18-12-106, or 18-12-108.5. A preadjudication service program created pursuant to section 19-2.5-606 shall evaluate a juvenile described in this subsection (2). The evaluation may result in the juvenile: (a) Remaining in the custody of a parent or legal guardian; (b) Being placed in the temporary legal custody of kin, for purposes of a kinship foster care home or noncertified kinship care placement, as defined in section 19-1-103, or other suitable person under such conditions as the court may impose; (c) Being placed in a temporary shelter facility; or (d) Being referred to a local county department of human or social services for assessment for placement.*

***Child Welfare Involvement and Demographic Data***

*Table 3: Counts of Unique Youth and Unique Admissions by Involvement in Child Welfare*

| Involvement Type | Youth | Admissions |
|---|---|---|
| Active or Historical Child Welfare Involvement | 1,563 | 2,155 |
| No Active or Historical Child Welfare Involvement | 374 | 462 |
| **Total** | **1,937** | **2,617** |

***Child Welfare Involvement and Length of Stay***

Youth in detention with active child welfare involvement showed notably greater average length of stay (LOS) and median LOS days compared to their peers who did not have any active child welfare involvement. Where a youth had no active child welfare during a detention span, the average LOS was 16.5 days, and a median LOS of 2.8 days. In contrast, youth with active child welfare involvement were found to have an average LOS of 47.7 days, and a median LOS of 20.4 days. For reference, Table 3 above includes the unique youth and unique admission counts by the child welfare involvement categories, which are used to distinguish LOS days through the remainder of this section.

While this is a significant difference, the average and median LOS across all detention stays showed less contrast, with an overall average LOS of 31.2 days, and a median LOS of 6.4 days. Further, a similar contrast in average and median LOS for child welfare involved and non-child welfare involved youth was found in the previous state fiscal year report.

*Table 4: Average and Median LOS for Youth with Active Child Welfare Involvement*

| | SFY 23-24 | | SFY 24-25 | |
|---|---|---|---|---|
| **Child Welfare Involvement Status** | **Average LOS** | **Median LOS** | **Average LOS** | **Median LOS** |
| CW Involvement During Detention -Yes | 41.8 | 19.3 | 47.7 | 20.4 |
| CW Involvement During Detention - No | 17.0 | 2.8 | 16.5 | 2.8 |
| All Cohort Youth | 29.6 | 6.7 | 31.2 | 6.4 |

### Youth Race/Ethnicity

When reviewing race/ethnicity alongside the LOS for youth with active child welfare involvement compared to those without, the gap grows further. Specifically, Black youth with active child welfare involvement had an average LOS of 63.2 days, compared to 18.7 days for Black youth with no child welfare involvement, and Hispanic youth with active child welfare involvement had an average LOS of 53.6 days, compared to 18.2 days for Hispanic youth without active child welfare involvement. Having child welfare involvement prior to a detention stay during the cohort period showed a smaller but still notable difference to the average LOS when accounting for the youth's race/ethnicity.

*Table 5: Average and Median LOS for Cohort Youth With Active or Historical Child Welfare Involvement, Based on Involvement Period and Race/Ethnicity*

| Involvement Type | American Indian or Alaskan Native | Asian | Black or African American | Hispanic | Native Hawaiian/ Other Pacific Islander | Unable to Determine | White |
|---|---|---|---|---|---|---|---|
| Active Child Welfare Involvement - Avg LOS | 32.2 | 37.9 | 63.2 | 53.3 | 37.7 | 40.5 | 34.3 |
| No Active Child Welfare Involvement - Avg LOS | 16.2 | 3.7 | 18.7 | 18.2 | 12.8 | 12.2 | 12.6 |
| Historical Child Welfare Involvement - Avg LOS | 27.5 | 21.6 | 41.3 | 37.7 | 28.4 | 28.2 | 26.9 |
| No Historical Child Welfare Involvement - Avg LOS | 10.0 | 19.6 | 29.3 | 21.9 | 11.3 | 16.5 | 11.8 |
| All Child Welfare Cohort Youth - Avg LOS | 26.5 | 25.5 | 42.4 | 38.4 | 27.0 | 31.2 | 26.7 |
| Median LOS | 6.0 | 4.9 | 11.2 | 8.4 | 11.8 | 6.4 | 7.4 |
| **Involved Youth Count[13]** | **x** | **x** | **348** | **636** | **x** | **29** | **517** |
| **Involved Youth Admissions** | **21** | **14** | **484** | **843** | **9** | **35** | **749** |

### Youth Gender

When evaluating the average LOS of child welfare involved youth by their gender, similar disparities were noted between female and male youth in the cohort, but with one additional observation noted between youth with no child welfare involvement and those having either a history of or active involvement. For this area of analysis, only the youth's staff-assigned gender was used as a variable, as it was the only gender available consistently for all youth,

[13] Youth counts below 12 have been masked to preserve client privacy.

and some of the gender identity categories have values too low to meaningfully include in any comparisons.

- Youth with active child welfare involvement had longer average LOS than youth with only historical.
  - Female youth with active child welfare involvement during their detention stay experienced an average LOS of 29.5 days, compared to male youth who experienced 54.0 days.
  - Female youth with only a history of child welfare experienced 22.9 average LOS days, while male youth experienced 37.7 average LOS days.
  - An additional observation made with this group of youth was that the average LOS tended to be similar between male and female youth in a detention stay where either no historical or active child welfare involvement was identified.
- Female youth involved with child welfare tend to have shorter lengths of stay compared to male youth.
  - No active involvement in child welfare during a cohort detention stay showed an average LOS of 12.4 days for females, and 17.3 days for males.
  - Female youth with no history of child welfare involvement prior to a detention stay showed an average LOS of 20.7 days, while male youth with no history of child welfare involvement prior to a detention stay showed an average LOS of 20.4 days.

*Table 6: Average and Median LOS for Cohort Youth With Active or Historical Child Welfare Involvement, Based on Involvement Period and Staff-Assigned Gender*

| Involvement Type | Female | Male |
|---|---|---|
| Active Child Welfare Involvement - Avg LOS | 29.5 | 53.8 |
| No Active Child Welfare Involvement - Avg LOS | 12.4 | 17.3 |
| Historical Child Welfare Involvement - Avg LOS | 22.9 | 37.7 |
| No Historical Child Welfare Involvement - Avg LOS | 20.7 | 20.4 |
| All Child Welfare Cohort Youth - Avg LOS | 24.2 | 38.0 |
| Median LOS | 5.9 | 9.1 |
| **Involved Youth Count** | **340** | **1,223** |
| **Involved Youth Admissions** | **490** | **1,665** |

**Youth Sexual Orientation**

Observations made from analyzing sexual orientation against the average LOS in detention showed a modest gap between youth with a history of child welfare involvement and those without any history, and a larger gap for youth having active child welfare involvement and those without. This gap is most pronounced for youth who report being lesbian or gay, where lesbian or gay youth in a detention stay with active child welfare involvement experience an average LOS of 47.9 days, while the same group of youth that did not have active child welfare involvement experienced an average LOS of 5.8 days.

*Table 7: Average and Median LOS for Cohort Youth With Active or Historical Child Welfare Involvement, Based on Involvement Period and Sexual Orientation*

| Involvement Type | Missing/Blank | SOGIE Identity | Refused to Answer | Straight or Heterosexual |
|---|---|---|---|---|
| Active Child Welfare Involvement - Avg LOS | 24.4 | 41.3 | 3.0 | 51.2 |
| No Active Child Welfare Involvement - Avg LOS | 7.0 | 9.3 | 38.3 | 18.9 |
| Historical Child Welfare Involvement - Avg LOS | 15.0 | 31.1 | 20.6 | 37.7 |
| No Historical Child Welfare Involvement - Avg LOS | 9.0 | 28.3 | -[14] | 23.5 |
| All Child Welfare Cohort Youth - Avg LOS | 15.4 | 31.7 | 20.6 | 38.3 |
| Median LOS | 3.6 | 11.8 | 6.9 | 10.0 |
| **Involved Youth Count[15]** | **251** | **x** | **x** | **1,226** |
| **Involved Youth Admissions** | **285** | **116** | **4** | **1,750** |

***Demographics for Youth in Detention with Historical and Active Child Welfare Involvement***

Comparing demographic characteristics, child welfare-involved youth in detention showed a mostly limited change from the previous reporting year to the current reporting year, reflecting a population of mostly straight males between the ages of 15 and 16 years old. A full breakdown of this demographic data is available in Appendix F, Table 43.

Demographic changes observed for this subgroup of youth between the previous year's report and the current reporting period included:

- a 10.3% decrease in the number of Black youth, from 388 to 348,
- a 31.6% decrease in the number of 10-12-year-old youth, from 57 to 39 youth, and
- a 40.7% decrease in the number of youth identifying as bisexual, from 81 to 48.

[14] All youth with a sexual orientation response of "Refused to Answer" in Trails had historical child welfare involvement, therefore, there are no counts to include.

[15] Youth counts below 12 have been masked to preserve client privacy.

# COUNTY IMPACT

For this report, the impact of dually-involved youth on county child welfare offices was organized for interpretation into five areas of focus: the child welfare assessment or case involvement for cohort youth; the fluctuations over a period of time of caseloads with youth in detention; the fiscal impact of OOH placements; the coordination of family engagement meetings; and court-involved child welfare history. The summarizations of these areas utilized details for only cohort youth with active child welfare involvement.

## Child Welfare Assessments and Cases

### Assessments

During SFY 24-25, 677 (34.9%) unique dually-involved cohort youth were involved in at least one child welfare assessment, of which, 559 youth were involved in a new assessment that opened during one of their cohort detention stays. There were a total of 823 distinct child welfare assessments for the period (a decrease of 15.4% from the prior year).

*Table 8: Youth with Active Child Welfare Assessments During Cohort Detention; SFY Comparison*

| | SFY 23-24 | SFY 24-25 |
|---|---|---|
| **Unique Assessments Opened into Detention and During Detention** | 974 | 823 |
| **Youth with Assessment Opened into Detention and During Detention** | 745 | 677 |
| **Youth with New Assessments During Detention** | 561 | 559 |

When a report of concerns for child abuse or neglect is made to a county child welfare agency or the Hotline call center, the reporting party's relationship to the child, youth or family, or their role in either the community, is documented and assigned to one of 36 categories that are available in Trails. The majority (413, 50.1%) of the active assessments during a youth's

detention stay were initiated on behalf of the court: court-ordered assessment (251, 30.5%), court-ordered service (85, 10.3%), or court-ordered placement (77, 9.4%).

*Table 9: Original Referral Source for Active Assessments*

| Referral Source/Relationship[16] | Assessment Counts | Percentage of Total |
|---|---|---|
| Court-Ordered Assessment | 251 | 30.5% |
| Court-Ordered Service | 85 | 10.3% |
| Court-Ordered Placement | 77 | 9.4% |
| Law Enforcement | 65 | 7.9% |
| Wrap Facilitator | 52 | 6.3% |
| Court/Probation | 47 | 5.7% |
| DYS Region/Facility | 46 | 5.6% |
| Counselor/Therapist | 21 | 2.6% |
| County Dept. of Social Services | 17 | 2.1% |
| School Staff – Other | 14 | 1.7% |
| Other Referral Sources | 148 | 18.0% |
| **Total** | **823** | **100.0%** |

At the conclusion of the assessment, a disposition summary of the initial allegation(s) is entered, and the assessment is either closed or moved into a case status. Investigation findings for active assessments involving cohort youth included:

- Closed - No Findings: 571 (69.4%)[17];
- Unsubstantiated: 134 (16.3%);
- Family Assessment Response (FAR), No Findings: 70 (8.5%); and

[16] This list of referral sources is not exhaustive, and represents categories with counts above the threshold for data suppression.

[17] Within a Child Welfare Assessment, some assessments are Program Area 4 (defined as "youth in conflict") assessments, which do not carry an abuse or neglect finding.

- Substantiated: 48 (5.8%).

## Cases

Some youth have more than one detention admission during the cohort timeframe, and may have active child welfare involvement during one or more of these admissions. There were 528 (27.3%) unique cohort youth involved in 528 open child welfare cases during the cohort timeframe. Of these 528 cases, 201 opened during a youth's detention stay. Comparing case data for the current cohort period to the previous year's shows a 9% decrease in the number of cases and a 6.5% decrease in unique youth involved in those cases.

*Table 10: Youth with Active Child Welfare Cases During Cohort Detention; SFY Comparison*

| | SFY 23-24 | SFY 24-25 |
|---|---|---|
| **Unique Cases Opened into Detention or During Detention** | 583 | 542 |
| **Youth with Cases Opened into Detention or During Detention** | 562 | 528 |
| **Youth with New Cases During Detention** | 218 | 201 |

All child welfare assessments and cases are designated to a program area (PA) that describes the primary purpose of involvement. PA4 and PA5, and some instances of PA6, are generally regarded as traditional child welfare cases that provide for a child or youth's safety, permanency, and well-being, while PA3 is designated for preventative services[18].

During the cohort period, 312 (57.7%) of the 541 cases were assigned to PA4—Youth in Conflict services (PA4), while 144 (26.6%) were assigned to PA5—Child Abuse and Neglect (PA5). The remaining 86 cases were assigned to either PA3 or PA6.

The average number of days in which a PA4 case remained open for a cohort youth was 357 days compared to 370 days for all youth aged 10-17 during this state fiscal year. PA5 cases for

[18] Participation in Program Area 3 cases are voluntary to receive preventative services and is not generally considered child welfare involvement, however, is included in analysis due to statutory requirements.

cohort youth remained open an average of 631 days compared to 462 days for all youth aged 10-17 during this state fiscal year, some of which may have opened prior to a youth's cohort detention stay. A comparison of caseload counts by state fiscal year is shown in the visualization that follows.

*Figure 2: Case Counts by Program Area; SFY Comparison*




To understand the impact on the larger caseload, the counts of active child welfare cases for cohort youth were organized by county, which showed that the larger counties were responsible for managing more cases than the balance of the state. Table 11 that follows shows caseloads by county, excluding figures where the caseload count for the particular case type was at or below the minimum for suppression.

*Table 11: PA4 and PA5 Active Case Counts by County[19]; SFY Comparison*

| | SFY 23-24 | | SFY 24-25 | |
|---|---|---|---|---|
| County | Program Area 4 | Program Area 5 | Program Area 4 | Program Area 5 |
| Adams | 16 | x | 30 | 13 |
| Arapahoe | 49 | 29 | 45 | 26 |
| Denver | 40 | 14 | 49 | 17 |
| Douglas | 21 | x | 18 | x |
| El Paso | 59 | 23 | 38 | 24 |
| Jefferson | 25 | 10 | 19 | x |
| Larimer | 39 | 21 | 29 | 17 |
| Mesa | 24 | x | 19 | x |
| Pueblo | 14 | x | 13 | x |
| Weld | 33 | x | 23 | x |
| **All Counties** | **339** | **146** | **312** | **144** |

# Impact to Caseload Over Time

A retrospective look at the statewide child welfare caseload for the previous ten state fiscal years demonstrates that while largely county caseloads are gradually decreasing with every state fiscal year, the proportion of cases involving youth in detention remains relatively stable.

[19] Youth counts below 12 have been masked to preserve client privacy.

*Figure 3: SFY Trends Over Time for Child Welfare Caseloads With and Without Youth in Detention*




Within the 10-year timespan available for this review, SFY 17-18 showed the largest overall caseload of children and youth (20,732 children and youth of all ages; 8,637 youth ages 10-17; and 1,349 youth who also had concurrent detention stays). Since then, caseloads involving all children and youth and those involving youth ages 10-17 have steadily decreased year over year between 5.2% and 10.0% since SFY 20-21, while caseloads involving youth who were also in a detention stay fluctuated between 599 in SFY 20-21 and 493 youth in SFY 24-25.

*Table 12: Year over Year (YoY) Percentage Change of Child Welfare Caseloads Involving Youth Aged 10-17 Years Old in Detention and Not in Detention*

| | SFY 20 - 21 | SFY 21 - 22 | SFY 22 - 23 | SFY 23 - 24 | SFY 24 - 25 |
|---|---|---|---|---|---|
| Youth in Detention Caseload % Change | ⇩ -36.1%[20] | ⇩ -12.9% | ⇧ 11.1% | ⇩ -6.7% | ⇩ -8.9% |
| 10-17 year-old Caseload % Change | ⇩ -8.7% | ⇩ -10.0% | ⇩ -5.2% | ⇩ -7.7% | ⇩ -9.5% |

[20] This decrease in the population of youth in detention was likely influenced by the COVID-19 pandemic.

# Fiscal Impact of Out-of-Home Placements

While it remains difficult to measure the exact financial impact that youth in detention have on county departments of human and social services, insights have emerged that establish a framework for further analysis. One finding emerges from comparing daily care and administrative rates for out-of-home (OOH) placements for youth aged 10–17 with child welfare involvement but no detention involvement and cohort youth who also have child welfare involvement. OOH placements considered for cohort youth in this section occurred during SFY 24-25 but were not related to any specific detention admission.

Basing an analysis solely on the total payment amounts for these populations can be misleading, as it fails to account for critical differences, such as the significant disparity in length of stay between youth in detention and those not in detention. For instance, the days spent in a Family Foster Care Home placement for youth not in detention during the cohort time period totaled 198,227 days, while cohort youth who were in detention during the same period of time spent a total of 11,443 days in the same placement type. Because summing the total amounts paid for both groups over the state fiscal year inherently loses valuable context, the average daily rate by placement type was evaluated as a more reliable measurement.

In all but one OOH placement type, the average daily rate paid for the care of cohort youth showed to be higher than the average daily rate paid for youth who were not in detention, as detailed in Table 13 that follows. Specifically, the average daily rates paid to therapeutic and treatment foster home providers (*Specialized Foster Home*) for cohort youth were found to be 36.0% more than the average daily rate paid for youth not in detention, while kinship foster home providers were the next highest rates paid at 25.5% more for cohort youth than for youth not in detention. The only placement type for which a rate decrease was noted was Qualified Residential Treatment Placements (QRTP), where the average daily rate for cohort youth was 9.8% less than the rate for youth not in detention.

*Table 13: Percentage Difference of Average Daily Rates Paid for Out-of-Home (OOH) Placements, Between Youth in Detention and Not in Detention*

| | Placement Type | Foster Family Home Care | Foster Family Home Care-CPA[21] | Group Home | Kinship Care | Kinship Foster Care | Qualified Residential Treatment Program | Residential Child Care Facility | Specialized Foster Home[22] |
|---|---|---|---|---|---|---|---|---|---|
| All Youth (10-17 years) | *Total OOH Bed Days* | 80,053 | 129,617 | 18,633 | 253,884 | 105,106 | 26,347 | 10,033 | 25,901 |
| All Youth (10-17 years) | *Average Daily Rate* | $63.66 | $124.36 | $258.87 | $10.43 | $50.06 | $288.94 | $268.61 | $124.28 |
| Youth in Detention | *Total OOH Bed Days* | 6,868 | 4,575 | 2,982 | 14,774 | 1,750 | 7,540 | 3,644 | 2,322 |
| Youth in Detention | *Average Daily Rate* | $69.09 | $149.49 | $281.26 | $12.34 | $62.58 | $268.09 | $272.26 | $163.68 |
| Youth Not in Detention (10-17 years) | *Total OOH Bed Days* | 73,185 | 125,042 | 15,651 | 239,110 | 103,356 | 18,807 | 6,389 | 23,579 |
| Youth Not in Detention (10-17 years) | *Average Daily Rate* | $63.15 | $123.44 | $254.60 | $10.31 | $49.85 | $297.30 | $266.53 | $120.40 |
| | **% Difference in Average Daily Rate** | **9.4%** | **21.1%** | **10.5%** | **19.7%** | **25.5%** | **-9.8%** | **2.2%** | **36.0%** |

A more detailed breakdown of the information in Table 13 is listed in Appendix K, Table 48.

Two specific placement types are missing from this data: Psychiatric Residential Treatment Facility (PRTF) and placements that qualify for incentive funds designated for youth leaving detention directly to a qualified placement, as outlined in C.R.S. 19-2.5-1407.3. For youth involved in child welfare who qualify for Medicaid and do not have third-party liability, Psychiatric Residential Treatment Facilities (PRTF) placements are paid through the Colorado Department of Health Care Policy and Financing (HCPF). Without a data sharing agreement for this specific data, this information is not available for the report. Data related to the incentive funds designated by C.R.S. 19-2.5-1407.3 is retained in the County Financial Management System (CFMS) and was not extracted for this report.

[21] Child Placement Agency (CPA)

[22] "Specialized Foster Home" placements include Therapeutic Foster Home and Treatment Foster Homes.

# Coordination of Family Engagement Meetings

Coordination of a family engagement meeting (FEM) can be coordinated by a variety of different agencies, including local Collaborative Management Programs (CMP) across the state, as well as other groups and organizations. The primary purposes of these meetings are to promote safety, permanency, and well-being of children involved with child welfare. Because of this, FEMs can require county DHS support or follow-up, which can impact the larger caseload of a county DHS worker. In reviewing family engagement meeting and Individualized Service and Support Teams (ISST) data recorded in Trails for the current cohort youth with active child welfare involvement, analysts found that many of the data points collected included total unique counts that did not satisfy data suppression minimums and thus, could not be reported. Below are some points of interest that can be shared:

- Of all 884 unique youth with active child welfare involvement, 145 (16.4%) were identified as a child/youth in a total of 205 scheduled family engagement meetings.
    - 194 (94.6%) of these scheduled meetings were completed, which included 139 (95.9%) unique youth.
    - The remaining meetings were not completed due to a number of other options available in Trails, for example, participant no-show or meeting cancellation.
- 88 (45.4%) of the completed family engagement meetings listed the meeting purpose as "other," while 50 (25.8%) of these meetings listed the purpose as "90-day follow-up."

Only 18 of Colorado's 64 counties were shown to have ownership of a child welfare assessment or case that involved a cohort youth in one of these family engagement meetings, and of those 18 counties, only eight met minimum data suppression requirements. The details of these findings are as follows.

*Table 14: Family Engagement Meeting and Youth Count, by County (Post-Admission)*

| County[23] | Youth Count[24] | Family Engagement Meeting Count[25] |
|---|---|---|
| Adams | x | 7 |
| Arapahoe | 35 | 47 |
| Denver | x | 12 |
| El Paso | x | 16 |
| Jefferson | 13 | 24 |
| Larimer | 16 | 24 |
| Pueblo | 13 | 14 |
| Weld | 18 | 28 |
| **Total** | **145** | **205** |

[23] Counties having youth counts of fewer than 12 were excluded from this table to preserve client identity.

[24] Unique youth counts below 12 are masked to preserve client identity.

[25] These family engagement meetings occurred at any point after a youth's detention start date and December 31, 2025.

# Court-Involved Child Welfare History

*Figure 4: All Court-Involvement for Unique Cohort Youth with Non-Delinquent Cases Over Their Lifetime*




The above figure illustrates the number of filed dependency and neglect (D&N), expedited permanency placement (EPP), truancy and Foster Youth in Transition (FYiT) cases (juvenile non-delinquent (JV) court cases) over the lifetime of the cohort youth. An EPP is a type of D&N case that is filed for children under age 6 (C.R.S. 19-1-123). Youth ages six and older can be listed as participants in these cases with their younger siblings. As mentioned, the role of the youth within the dependency and neglect and expedited permanency placement cases are named youth within the case, not necessarily the main participant. These cases were manually calculated from the Colorado State Courts Data Access system.

*Figure 5: Court-Involvement for Unique Cohort Youth with Only One Non-Delinquent Case Over Their Lifetime*



# DETENTION BED CAPACITY AND UTILIZATION 19-2.5-1407

In June 2023, House Bill 23-1307 was signed into law (C.R.S. 19-2.5-1407), which brought significant changes to youth detention resources in Colorado, including the authorization of 22 emergency detention beds to address capacity challenges across the state.

The following analysis examines how judicial districts utilized the full spectrum of detention resources, including allocated beds, borrowed beds, and emergency beds, to manage fluctuating detention needs for SFY 24-25. This information is crucial for identifying systemic capacity challenges and evaluating the effectiveness of current resource allocation.

Notable Update: Emergency beds were updated to have an allocation of 35 to youth service centers, with an additional four unallocated emergency beds, bringing the statutory total up to 39 emergency beds on July 1, 2025. As such, this report will only analyze usage of the original 22 beds.

# Emergency Beds and Borrowed Beds

*Figure 6: Statewide Daily Max Detention and Emergency Bed Usage for SFY 24-25*




SFY 24-25 represented the second full year of implementation for the emergency bed capacity authorized by C.R.S. Section 19-2.5-1404 (HB23-1307). The data reveals that emergency bed utilization continued to track peaks in detention bed utilization across Colorado's judicial districts.

The statewide detention system operated with 215 allocated beds distributed across 22 judicial districts, supplemented by 22 emergency beds. Detention bed utilization fluctuated throughout SFY 24-25, with the highest daily maximum count of 211 beds recorded on July 8, 2024. The most concentrated emergency bed utilization with the highest peak was in the July through August 2024 and June 2025 periods, consistent usage between October and December 2024, with infrequent utilization in other months.

# Emergency Bed Utilization Patterns

- Southern Region: The Southern region demonstrated the highest and most sustained emergency bed utilization throughout SFY 24-25. Usage was heaviest in

July through August 2024, with up to nine emergency beds in use daily in early July. After declining through late fall and early 2025, Southern region emergency bed usage resurged in late spring, with up to eight emergency beds accessed daily in June 2025.

- Northeast Region: The Northeast region showed minimal emergency bed usage during SFY 24-25, with only isolated utilization of up to three emergency beds on two days in November 2024.
- Central Region: The Central region recorded zero emergency bed usage[26] throughout SFY 24-25.
- Western Region: The Western region accessed emergency beds primarily during August 2024 and October through November 2024, with peak utilization of up to four emergency beds in October. Sporadic usage was also recorded in April through May 2025. This pattern suggests seasonal detention pressures in the latter part of calendar year 2024.

# Peak Emergency Bed Utilization

- July through August 2024 Peak: The most substantial system-wide emergency bed usage of the fiscal year occurred in early July and mid-August 2024. On July 1, 2024, nine emergency beds were in use statewide, all in the Southern region. The August peak reached 11 emergency beds on August 12, 2024, driven by combined usage in the Southern (8 beds) and Western (3 beds) regions.
- June 2025 Peak: A secondary peak emerged in mid-to-late June 2025, with up to eight emergency beds in use statewide from June 22 through 25, concentrated entirely in the Southern region.

[26] The emergency bed criteria created under 23-1307 was uniquely challenging to the central region which could not meet minimum requirements to access emergency beds during times of strain.

- Mid-Year Plateau: Emergency bed usage declined significantly from November 2024 through April 2025, with January and March 2025 recording zero statewide emergency bed usage.

In addition to emergency beds, judicial districts continued to utilize borrowed beds to manage detention capacity. Districts facing high strain frequently relied on bed borrowing from other districts, initially from judicial districts in their home centers, then from their catchment area (or region) due to overflow. The ability to use emergency beds and borrow beds from other facilities during high-demand periods proved essential for many judicial districts, enabling facilities to temporarily accommodate additional youth.

# Capacity Analysis

A note on how capacity is reported in this section. Days are categorized as Under Capacity, At Capacity, or Over Capacity. Because both At Capacity and Over Capacity represent conditions where a facility has no available buffer to absorb additional detention admissions, this analysis combines them into a single measure. A district showing any strain, whether at its exact limit or above it, is operationally constrained in the same meaningful way: no bed is available without borrowing, or emergency bed activation. Under Capacity reflects days when the district had detention beds available. These two measures together account for all days in the reporting period.

*Table 15: Colorado Youth Detention Continuum Bed Capacity Report by Judicial District for SFY 24-25*

| | | Under Capacity | | At or Over Capacity | |
|---|---|---|---|---|---|
| JD | Bed Cap | # Days | % | # Days | % |
| **CENTRAL** | | | | | |
| 1st JD | 18 | 349.1 | 95.6% | 16.0 | 4.4% |
| 2nd JD | 29 | 75.7 | 20.7% | 289.3 | 79.2% |
| 5th JD | 2 | 248.6 | 68.1% | 116.5 | 31.9% |
| 18th JD | 36 | 6.6 | 1.8% | 358.5 | 98.2% |

| | | Under Capacity | | At or Over Capacity | |
|---|---|---|---|---|---|
| JD | Bed Cap | # Days | % | # Days | % |
| **Total** | **85** | **1,045.0** | **57.3%** | **780.0** | **42.7%** |
| **NORTHEAST** | | | | | |
| 8th JD | 11 | 296.8 | 81.3% | 68.1 | 18.7% |
| 13th JD | 2 | 213.4 | 58.5% | 151.6 | 41.5% |
| 17th JD | 20 | 132.7 | 36.3% | 232.3 | 63.6% |
| 19th JD | 19 | 336.1 | 92.1% | 28.9 | 7.9% |
| 20th JD | 7 | 285.6 | 78.3% | 79.4 | 21.7% |
| **Total** | **59** | **1,264.6** | **69.3%** | **560.4** | **30.6%** |
| **SOUTHERN** | | | | | |
| 3rd JD | 2 | 350.6 | 96.1% | 14.4 | 3.9% |
| 4th JD | 30 | 92.8 | 25.4% | 272.2 | 74.5% |
| 10th JD | 9 | 274.9 | 75.3% | 90.2 | 24.7% |
| 11th JD | 2 | 360.8 | 98.8% | 4.2 | 1.2% |
| 12th JD | 2 | 234.2 | 64.2% | 130.8 | 35.9% |
| 15th JD | 2 | 364.3 | 99.8% | 0.7 | 0.2% |
| 16th JD | 2 | 363.5 | 99.6% | 1.6 | 0.4% |
| **Total** | **49** | **2,041.1** | **79.9%** | **513.9** | **20.1%** |
| **WESTERN** | | | | | |
| 6th JD | 2 | 125.2 | 34.3% | 239.8 | 65.7% |
| 7th JD | 3 | 358.3 | 98.2% | 6.8 | 1.8% |
| 9th JD | 2 | 262.1 | 71.8% | 102.9 | 28.1% |
| 14th JD | 2 | 159.8 | 43.8% | 205.3 | 56.2% |
| 21st JD | 11 | 112.0 | 30.7% | 253.0 | 69.3% |
| 22nd JD | 2 | 104.8 | 28.7% | 260.3 | 71.3% |

| | | Under Capacity | | At or Over Capacity | |
|---|---|---|---|---|---|
| JD | Bed Cap | # Days | % | # Days | % |
| Total | 22 | 1,122.0 | 51.2% | 1,068.0 | 48.7% |
| State Total | 215 | 5,472.8 | 65.2% | 2,922.3 | 34.8% |

# Regional Impact Overview

In SFY 24-25, judicial districts across Colorado's Central, Northeast, Southern, and Western regions demonstrated significant variations in detention bed utilization. An analysis of the data reveals insights into bed capacity management, highlighting areas where certain judicial districts were consistently at or over cap, indicating a potential need to revisit detention bed allocations.

## Central Region

The Central region, comprising four judicial districts (SFY 24-25; five effective SFY 25-26), showed highly divergent capacity utilization throughout the year:

- The 18th judicial district faced critical capacity issues, with 98.2% of days at or over capacity for the year, making it the most severely strained district in the state.
- The 2nd judicial district was also significantly strained for 79.2% of days, a stark contrast to its position in prior years.
- The 1st judicial district operated well under capacity for most of the year.

Central region total for SFY 24-25: 57.3% of days were under capacity and 42.7% were at or over capacity.

## Northeast Region

The Northeast region, comprising five judicial districts, showed a mostly manageable capacity picture with one critical outlier:

- The 17th judicial district encountered critical capacity issues with 63.6% of days at or over capacity for the year.
- The 13th judicial district was at or over capacity for 41.5% of days.
- The 8th, 19th, and 20th judicial districts all operated largely within or under their allocated capacity for the majority of the year.

Northeast region total for SFY 24-25: 69.3% of days were under capacity and 30.6% were at or over capacity.

## Southern Region

The Southern region, with seven judicial districts, showed mixed capacity utilization:

- The 4th judicial district faced the most severe capacity strain at 74.5% of days, despite having one of the highest bed capacities (30 beds) in the state.
- The 12th judicial district also had elevated strain at 35.9% of days for the year.
- The 10th judicial district experienced capacity strain for 24.7% of days.
- In contrast, the 3rd, 11th, 15th, and 16th judicial districts each experienced strain on fewer than 4% of days and operated primarily under capacity, reflecting effective local capacity management.

Southern region total for SFY 24-25: 79.9% of days were under capacity and 20.1% were at or over capacity.

## Western Region

The Western region, which includes six judicial districts, exhibited significant detention bed capacity challenges:

- The 21st judicial district struggled with 69.3% of days at or over capacity, continuing to be one of the most challenged districts in the state.

- The 22nd judicial district was at or over capacity for 71.3% of days, highlighting a critical need for capacity adjustments.
- The 14th judicial district was at or over capacity for 56.2% of days.
- The 6th judicial district was at or over capacity for 65.7% of days.
- The 7th and 9th judicial districts both operated primarily under capacity, showing relative stability within the region.

Western region total for SFY 24-25: 51.2% of days were under capacity and 48.7% were at or over capacity.

## Statewide Capacity Usage Summary

Across all regions, the state totals indicate 34.8% of days were at or over capacity during SFY 24-25, with 65.2% under capacity.

The data analysis reveals that certain judicial districts were at or over capacity for a significant portion of the year. The 2nd, 4th, 6th, 14th, 17th, 18th, 21st, and 22nd judicial districts faced acute capacity strain with more than 60% of days at or over capacity, affecting their operational efficiency.

# LENGTH OF STAY ANALYSIS

## Section Summary

The section below analyzes some of the factors that can impact length of stay. There are three sections which include a length of stay overview, admissions that quickly follow another detention admission, and admissions that are under and over thirty days.

- Most detention admissions fall into counties that are considered urban, and about half are within large[27] judicial districts.
- A significant number (33.2%) of cohort admissions end at the detention hearing date, about half are released within seven days and about three quarters within 30 days. This presents two potential opportunities for future analysis and decision-making:
    - to focus on the youth with short detention admissions for potential lower-level overrides, with less serious offenses and no prior detention history;
    - to focus on the youth with admissions over 30 days, to better understand the conditions that led to detention and the barriers to placements outside of detention.
- 7.9% of the admissions have a subsequent detention admission that occurred within thirty days. The majority of these are for failure to appear or failure to comply warrants. The majority have also had prior historical detention involvements.

[27] Judicial district sizes are based on the categorizations provided by Infinite Frontier Consulting and are consistent with sizes listed in other DYS reports.

# General Admissions Information

- The average LOS is 31.2 days.
- 26 (1.0 %) of all admissions were for Interstate Compact on Juveniles (ICJ), most of whom were out-of-state youth who had run away. This is a decrease of 3 admissions from the prior fiscal year (23-24), but the same relative percentage.
- Most of the admissions (91.8%) fall within a county classified as urban, based on county of offense.
- The majority of the admissions (56.3%) are within large judicial districts (Appendix E).
- The majority of the admissions (75.2%) are 30 days or under, while about a quarter of the admissions (24.8%) are over 30 days. Table 16 shows the percent of admissions in more detail.

*Table 16: Admissions with a Length of Stay Over and Under Thirty Days*

| LOS Time Frame | Admissions from Admit to Release | Percent of Total Admissions |
|---|---|---|
| LOS 30 Days and Under[28] | 1,968 | 75.2% |
| Over 30 Days | 649 | 24.8% |
| Over 60 Days | 374 | 14.3% |
| Over 90 Days | 233 | 8.9% |

Figures 7 and 8 show the distribution of admission length, showing that a significant percent of the population is released within a week, and the percent of the population decreases in LOS increments up until 130+ days.

[28] These numbers are not mutually exclusive, i.e. some youth are counted twice in “over 30 days” and “over 60 days,” etc.

*Figure 7: Distribution of Admissions by Length of Stay*




*Figure 8: Distribution of Admissions 30 Days and Under*




As seen in Table 17 that follows, most regions' median lengths of stay are close to the state overall median (6.4 days). Both the Southern and Western regions saw median increases from last year ranging from 7.2 to 8.4 days and 4.9 to 7.1, respectively. The Central and Northeast

regions saw median decreases from 6.8 to 6.0 days and 6.0 to 5.8 days, respectively. All regions saw some increase to their average LOS, by 0.2 days for the Central region, 2.2 days for the Northeast region, 2.2 days for the Southern region, and 4.9 days for the Western region.

*Table 17: Detention Length of Stay by Region*

| Region | Average LOS | Median LOS | Bed Allocations | Youth Centers |
|---|---|---|---|---|
| Central | 32.6 | 6.0 | 93 | 3 |
| Northeast | 28.8 | 5.8 | 56 | 2 |
| Southern | 34.0 | 8.4 | 46 | 2 |
| Western | 25.2 | 7.1 | 20 | 1 |
| **Total** | **31.2** | **6.4** | **215** | **8** |

# Admissions Under and Over Thirty Days

## Summary

The majority (75.2%) of detention admissions had a length of stay that was 30 days or less, with about a quarter of admissions lasting over thirty days. About a third of detention admissions were released the same day as the detention hearing.

- For 868 (33.2%) admissions, youth were released the same day as their detention hearing date.
- 1,383 (52.8%) detention admissions were seven days or less.
- 1,968 (75.2%) admissions were thirty days or less.
- 649 (24.8%) admissions were over thirty days.

Explanation of the 30 Day Metric: In October 2022, the Advisory Board set an analysis guideline for youth with detention stays that are under or over thirty days. One of the purposes of this report is to understand how the current detention system aligns with this guideline. However, it is also important to note that not all youth are eligible to be released from detention within thirty days. Some youth are held by the court with no bond option, some are given detention sentences, and youth whose cases are direct filed are held in detention with a large cash bond awaiting the outcome of their case, which can take several months.

## Youth Released at Detention Hearing

One metric to understand detention admissions is to look at youth who were released at their detention hearing. The report analysts have previously recommended a further examination of this population, to see if these youth may not be placed in detention at all.

- In SFY 24-25, 868 admissions (33.2%) had youth who were released at their detention hearing.

- For 598 (68.9%) of these admissions, it was the youth's first detention admission.
- 53.8% (467) of these admissions have a low CJRA risk screen result, compared to 36.1% (946) for the general population. Only 18.0% (156) of these admissions have a high-risk CJRA screen result, compared to 32.6% (854) for the general population.
- 50.2% (436) of these admissions were for Person offenses, 23.2% (201) were for Property offenses, and 15.6% were for Weapons offenses. These percentages are fairly similar to the rest of the population, although about 5% less Person offenses.
- Similarly, there is about a 5% decrease in felony offenses - 63.0% (547) for youth released at their detention hearing and 67.6% (1,768) for the general cohort.
- Of these youth released at their detention hearing, 63 (7.3%) had a return to detention within 30 days. Therefore, a significant majority of these youth do not return to detention within 30 days, addressing the concern that these are the same youth who have multiple admissions within a short period of time.

## Trends for Youth Under and Over 30 Days

Generally, youth with admissions under 30 days tend to have lower CJRA prescreen results, less crimes of violence offenses, and the majority tend to be a youth's first admission. Youth with admissions over 30 days tend to have higher CJRA prescreen results, more crimes of violence offenses, and for the majority is not the youth's first admission. Youth with an admissions length of stay of 130 days or over are explored in further detail in the section "Youth with Admissions 130 Days or Longer" that follows.

*Table 18: Admissions Under 30 Days Compared to Admissions Over 30 Days*

| | Admissions 30 Days or Under | Admissions over 30 Days |
|---|---|---|
| Youth's First Admission | 1,131 (57.5%)[29] | 173 (26.7%) |
| Not a Youth's First Admission | 837 (42.5%) | 476 (73.3%) |
| Low CJRA Prescreen Result | 823 (42.8%) | 123 (19.7%) |
| High CJRA Prescreen Result | 523 (27.2%) | 331 (53.0%) |
| Crime of Violence Offenses[30] | 786 (39.9%) | 374 (57.6%) |
| **Total Youth with Admissions Under or Over 30 Days** | **1,968** | **649** |

Figures 9 and 10 below show trends for CJRA prescreen results and violent offenses by youths' LOS. Figure 9 shows that for youth with admissions that are 30 days or less, the CJRA prescreens trend from more youth with low risk screens, compared to youth with admissions over 30 days, which show a trend for more with high risk screen results.

[29] These percentages are out of 1,968 for the admissions under 30 days column, or out of 649 for the admissions over 30 days column.

[30] For more information on Crimes of Violence, see Appendix G.

*Figure 9: CJRA Prescreen Results and Length of Stay*




Figure 10 shows that as the admission's LOS increases, so does the trend in crimes of violence from 39.9% for admissions that are 30 days or less to 97% for admissions that are 210 days or more.

*Figure 10: Admissions with a Violent Offense and Length of Stay*




# Quick Returns

One metric to understand length of stay and youth is "quick returns." This represents youth, within the cohort timeframe, with a subsequent detention that occurs within 30 days of a previous one[31]. In SFY 24-25, there were 208 (7.9% of 2,617) admissions that met this criteria. This is proportionally a little less than last year, which saw 10.5% of the admissions with a quick return. Of the 208, 102 (3.9% of 2,617) admissions returned to detention within 14 days of the previous admission. The offense information for those admissions is listed below. Each of the offense categories, and what offenses are in each category, are further defined in Appendix G.

[31] This figure only represents quick returns within the cohort year. If a youth had a detention admission just prior to the start of the cohort, that would not be included in this year's analysis.

- Of the 208 admissions, 107 (51.4%) were either for failure to appear or failure to comply warrants, while 70 (33.7%) were for probable cause warrants. In total, this makes up 85.1% of these quick returns.
- For those youth who returned to detention within 30 days, only five ran away from placement, meaning that this was not a significant factor in their return to detention.
- 97.8% of these youth were placed at the same placement level their JDSAG recommended. These JDSAG screen results were for the subsequent, or returning, admission.
- For 134 (64.4%) of these quick returns, the admission prior to the quick return was not the youth's first detention admission.
- Conversely, for 74 (35.6%), the admission prior to the quick return was the youth's first detention admission.
- The average length of stay of these quick return admissions is 29.5 days. The median length of stay is 16.8 days. The smaller population size explains why these numbers are more similar compared to the general population.
- In the admission prior to the quick return, the average length of stay is 22.3 days, an increase of 5.5 days from SFY 23-24's cohort's LOS of 16.8 days.
- The ages of youth with quick returns is generally comparable to the cohort as a whole.
    - There were fewer than 12 youth between the ages of 10-12, and the majority of the youth (67.3%) were between the ages of 15-17.

The youth with quick return admissions tended to have high or moderate CJRA pre-screen levels, indicating an elevated risk of recidivism.

- 114 (54.8%) had a high risk level.
- 56 (26.9%) had a moderate risk level.

- 34 (16.3%) had a low risk level.

Table 19 below shows the types of offenses for both admissions, the first admission and the quick return admission. It shows the offenses are fairly consistent between admissions.

*Table 19: Offense Type for Youth with a "Quick Return" to Detention*[32]

| Offense Type | % of First Admission | Count of Quick Return Admissions | % of Quick Return Admissions |
|---|---|---|---|
| Drug | 1.0% | 3 | 1.4% |
| Other | 7.2% | 11 | 5.3% |
| Person | 52.4% | 119 | 57.2% |
| Property | 28.9% | 58 | 27.9% |
| Weapon | 8.7% | 13 | 6.3% |
| Traffic | 1.9% | 4 | 1.9% |
| **Total** | **100%** | **208** | **100%** |

[32] These offenses are for the returning admission.

*Table 20: Offense Class for Youth with a "Quick Return" to Detention*

| Offense Class | % of First Admission | Count of Quick Return Admissions | % of Quick Return Admissions |
|---|---|---|---|
| **Felony** | **66.3%** | **139** | **66.8%** |
| 1 | 1.9% | 5 | 2.4% |
| 2 | 3.3% | 6 | 2.9% |
| 3 | 13.0% | 30 | 14.4% |
| 4 | 24.9 | 51 | 24.5% |
| 5 | 18.7% | 39 | 18.8% |
| 6 | 4.5% | 8 | 3.8% |
| **Misdemeanor** | **31.3%** | **66** | **31.7%** |
| 1 | 22.2% | 47 | 22.6% |
| 2 | 8.2% | 18 | 8.7% |
| 3 | 0.8% | 1 | 0.5% |
| **Petty**[33] | **2.5%** | **3** | **1.4%** |
| 1 | 1.4% | 1 | 0.5% |
| 5 | 0.6% | 1 | 0.5% |
| 6 | 0.4% | 1 | 0.5% |
| **Total** | **100.0%** | **208** | **100.0%** |

# Youth Outcomes for Length of Stay

The section that follows explores how factors like offense ranking and detention involvements impacted a youth's length of stay outcomes. Linear regression tests were used to measure patterns in the data, whether those patterns were random or meaningful, and the degree to which the independent variable impacted the dependent variable.

[33] As noted in other sections of the report, a youth is not screened into detention for a petty offense alone but could screen into detention for other reasons, which may include detention sentences, misdemeanor or felony offenses, or the youth has a failure to appear or failure to comply warrant.

It is important to note that while some of the tests below show correlations in data, it cannot be determined what causes these outcomes. These correlations can be useful in providing insight, but ultimately, more research is needed to determine effective interventions. Historically, academic and government research emphasizes that justice-involved outcomes are impacted by unmet criminogenic needs.[34]

For this section, the independent variables analyzed are:

- Detention Involvements;
- Offense Ranking.

For this section, the dependent variables analyzed are:

- Length of Stay (LOS);
- Length of Stay While Awaiting Services or Placements.

[34] Andrews & Bonta, "Rehabilitating Criminal Justice Policy & Practice," (2010); Cullen "Assessing Correctional Rehabilitation: Policy, Practice, and Prospects," (2000); Loerber, "Young Children Who Commit Crime: Epidemiology, Developmental Origins, Risk Factors, Early Interventions, and Policy Implications," (2001). Commit Crime: Epidemiology, Developmental Origins, Risk Factors, Early Interventions, and Policy Implications," (2001).

## Detention Involvements and Length of Stay (LOS)

The tables below show the number of detention involvements for cohort youth. Over half of youth within the cohort only had one detention involvement up to the end of SFY 24-25.

*Table 21: Count of Admissions and Detention Involvement Distribution*

| Detention Involvement (During Cohort) | Count of Admissions | % of Cohort |
|---|---|---|
| 1 | 1,475 | 56.4% |
| 2 | 626 | 23.9% |
| 3 | 300 | 11.5% |
| 4+ | 216 | 8.3% |
| **Total** | **2,617** | **100.0%** |

*Table 22: Count of Unique Youth and Their Detention Involvements Prior to the Cohort*

| Detention Involvement Ranges (Before the Cohort) | Count of Unique Youth | % of Cohort |
|---|---|---|
| 0 | 1,306 | 67.4% |
| 1 | 272 | 14.0% |
| 2 | 140 | 7.2% |
| 3 | 97 | 5.0% |
| 4+ | 122 | 6.3% |
| **Total** | **1,937** | **100.0%** |

1,306 (67.4%) of the 1,937 youth were a youth's first admission into detention.

- Average LOS if it is a youth's first admission: 21.0 days.
- Average LOS if it is not a youth's first admission: 41.3 days.

The number of times a youth returns to detention correlates with an increase in a youth's LOS. Regression results showed that for each time a youth is in detention (prior to their cohort start date), their projected LOS increases 51.6% on average. For example, if a youth

had one prior detention involvement and remained in detention for ten days, but then later returned with two prior involvements, their subsequent length of stay would be expected to be about 15 days, on average. If they returned again and had three prior involvements, their length of stay would be expected to be about 23 days.

Regression results also showed that historical involvements did also correlate with an increase in the time a youth remains in detention after a court orders a services or placements search. For each additional detention admission, a youth's length of stay awaiting the result of a placement or services search increases by about 16.9% on average.

## Offenses and Length of Stay (LOS)

*Table 23: Offense Category, Type and Length of Stay*

| Offense Category | Admissions | Average LOS |
|---|---|---|
| Felony | 1,768 | 38.8 |
| Misdemeanor | 786 | 15.9 |
| Petty | 63 | 8.4 |
| **Offense Type[35]** | | |
| Drug | 36 | 28.2 |
| Other | 186 | 14.6 |
| Person | 1,428 | 41.9 |
| Property | 592 | 22.4 |
| Status | 26 | 8.0 |
| Traffic[36] | 30 | 7.2 |
| Weapon | 319 | 13.4 |
| **Total** | **2,617** | **31.2** |

Statistical tests on length of stay (LOS) and offenses confirmed that admissions in the cohort with a higher offense ranking are associated with longer LOS.

- Youth with nonviolent offenses had an overall average LOS of 18.4 days.
- Youth with violent offenses (homicide, assault, other violent person crimes) had an average LOS of 45.8 days.
- Statistically, based on the standard mean difference, youth with violent crime offenses are more likely to have a length of stay that is 83.3% longer than their peers.

[35] Details for Offense Type can be found in Appendix G.

[36] Traffic offenses include such offenses as vehicular manslaughter and vehicular assault and should not be interpreted as minor traffic violations.

Additionally, regression showed that with each increase in offense level (e.g. from a petty crime - level 6 to a felony crime - level 1), a youth's LOS increased by about 15% on average. For example, if a youth with a misdemeanor two offense had a length of stay of 10 days, a youth with a felony six would be expected to have a length of stay of 13.2 days on average in comparison.

Data Note: The charge data in this report is the most serious offense associated with the youth's admission into Trails at the time of entry into detention. This data comes from Trails, and the most serious offense is reviewed/validated during DYS's Data Management and Analysis team's monthly and annual data cleaning, but initially ranked upon record approval by facility admission staff supervisors.

# Youth with Admissions 130 Days or Longer

An analysis of trends regarding admissions and length of stay showed a steady decrease in the number of admissions in direct relation to an increase in length of stay. At the 130-day point in length of stay, the number of admissions began to increase again, prompting a review of this subgroup of admissions.

- There were 139 admissions in the cohort with a length of stay of 130 days or over.
- Of these, 57.8% (79) were either in the direct file process or were a non-direct file case being held on a homicide-related offense.
- There were 59 (42.5%) admissions with a length of stay of 130 days or longer that resulted in a commitment to DYS, release to county jail upon the youth's 18th birthday or a sentence to the Department of Corrections.
- Only 17 (12.2%) of these admissions were ultimately released to their parent or kin/non-parent guardian.
- 22 (39.3%) of these admissions had an Enhanced Standardized Assessments (ESA)[37].

[37] More information on Enhanced Standardized Assessments (ESA) can be found in the Placements and Services section of the report.

- 12 (8.6%) admissions were released to QRTP, PRTF or Colorado Mental Health Hospital - Pueblo (CMHHIP) after waiting in detention for more than 130 days.

## Admissions 130 Days or Longer With Youth Awaiting Mitigating Services

- 56 of the 139 admissions had an active services or placements search.
    - This means that nearly 60% of these long-stay admissions were not considered youth awaiting mitigating services.
- For the majority (60.1%) of admissions for youth awaiting mitigating services with a length of stay longer than 130 days, history of aggressive behavior was identified as a barrier to placement or services, followed by 39.3% of these admissions with mental health needs listed as a barrier.
- There were 27.7% of these admissions that identified history of elopement as a barrier to finding placement and services. There were also 27.7% of these admissions where it was determined there was “no barrier” to finding release to placement or services.

## Child Welfare Involvement in Admissions 130 Days or Longer

There were 100 out of 139 (71.9%) youth who had a detention stay greater than 130 days with an active child welfare involvement. Of these 100 youth with active involvement:

- 66 (47.1%) were involved in a new assessment that opened during a long detention stay, and 20 (14.3%) were involved in a new child welfare case that opened during a long detention stay.
    - 36 (26.2%) youth had at least one previous OOH placement prior to their long detention stay.
        - Analysis results from the July 1, 2024, “Limit the Detention of Juveniles Annual Report” found an LOS increase of 16 days for each removal from the home.

# DETENTION ASSESSMENTS

## Distribution of Level of Care (LOC) Recommendations

Two screening instruments were utilized with the cohort: the Colorado Juvenile Risk Assessment (CJRA) Pre-screen and the Juvenile Detention Screening and Assessment Guide (JDSAG).

### Colorado Juvenile Risk Assessment (CJRA) Pre-Screen Risk Level Overview

The CJRA pre-screen is used to assess risk of recidivism as a measure of predicted future reoffense and uses the two domains of social and criminal history. This pre-screen does not take into account the current alleged offense, measure lethality, or attempt to estimate a juvenile's risk of serious harm to others or risk of flight from prosecution. "Low risk" on the CJRA, for example, means a low risk of recidivism, and does not necessarily mean the youth does not pose a substantial risk of serious harm to others or flight from prosecution. The chart that follows shows the screen levels identified by the assessments used for the admissions in the cohort and shows a fairly even distribution of risk.

The CJRA Pre-Screen results, shown in the chart that follows, show that the cohort results are split roughly into thirds: 946 admissions (36.1%) are classified as Low risk, 750 (28.7%) are Moderate, and 855 (32.7%) are High; 66 admissions (2.5%) are missing a CJRA classification.

- Low-risk admissions had an average LOS of 22.3 days and a median of 2.9 days.
- Moderate-risk admissions averaged 26.4 days (median 6.4).
- High-risk admissions averaged 42.6 days (median 18.6).

*Table 24: Colorado Juvenile Risk Assessment Pre-Screen Risk Level by Admissions*[38]

| CJRA Risk Level | Number of Admissions | Percent |
|---|---|---|
| Low | 946 | 36.1% |
| Moderate | 750 | 28.7% |
| High | 855 | 32.7% |
| Missing | 66 | 2.5% |
| **Total** | **2,617** | **100.0%** |

# Juvenile Detention Screening and Assessment Guide (JDSAG) Screen Results and Overrides

This report still uses the JDSAG screen assessment data, which was in use from July 1, 2024 – February 3, 2025. The Colorado Youth Detention Screening Instrument (CYDSI), the new validated screening assessment tool, began its implementation on February 3, 2025. To follow implementation best practices, the first few months of the CYDSI will not be reported to allow for a transition period and quality assurance on the data. CYDSI data will first appear in the SFY 26-27 report, which will be published in July 2027, and report on data from SFY 25-26.

The JDSAG has been the detention-screening instrument used to determine which youth are held in secure detention until their detention hearing. JDSAG produced a recommended level (Level 1 through Level 5).

As a reminder, the JDSAG Level Summary is as follows:

- Level 1 - Secure Detention
- Level 2 - Staff Secure Detention
- Level 3 - Residential/Shelter

[38] As seen in previous years, there are some missing CJRA pre-screens.

- Level 4 - Home Detention/Services
- Level 5 - Release

## All Completed JDSAG Screens

This dataset includes the youth from the cohort who had detention involvement between July 1, 2024, and June 30, 2025, and any JDSAG screens done through Feb 3, 2025. It is also important to note that since not all youth are screened to secure placement, this section also includes youth outside of the cohort.

This analysis compares the initial JDSAG screen-recommended placement level and actual placement level assigned to youth after any potential overrides by a judge or magistrate. The override process involves youth being referred to detention by law enforcement or court, being screened by CYDC staff, and being given a level relating to a particular placement, which could be overridden to place youth in less or more restrictive settings depending on the case.

The majority of youth (79.0%) were placed at the same level as they were screened. There were 475 (21.0%) total overrides out of 2,257 screens. Of these screens, 398 (17.6%) were overridden to place youth in a lower, less secure setting than the screen recommended, while 77 (3.4%) were overridden to place youth in a higher, more secure setting. The reasons for these overrides are not consistently logged in the Trails database.

*Table 25: Juvenile Detention Screening and Assessment Guide Screen Results for SFY 24-25*

| JDSAG LEVEL | Initial Screen Level | Percent of Screens | Actual Placement Level | Percent of Screens |
|---|---|---|---|---|
| LEVEL 1 | 1,722 | 76.3% | 1,556 | 68.9% |
| LEVEL 2[39] | 13 | 0.6% | 0 | 0.0% |
| LEVEL 3 | 60 | 2.7% | 13 | 0.6% |
| LEVEL 4 | 385 | 17.1% | 370 | 16.4% |

[39] There are currently no Level 2 Placement options in the state of Colorado, therefore there are no Actual Level 2 placements.

| JDSAG LEVEL | Initial Screen Level | Percent of Screens | Actual Placement Level | Percent of Screens |
|---|---|---|---|---|
| LEVEL 5 | 77 | 3.4% | 318 | 14.1% |
| **Total** | **2,257** | **100.0%** | **2,257** | **100.0%** |

*Table 26: Juvenile Detention Screening and Assessment Guide Override Information and Direction*

| Level Difference | Number | Percent |
|---|---|---|
| Same (No Override) | 1,782 | 79.0% |
| Higher | 77 | 3.4% |
| Lower | 398 | 17.6% |
| **Total** | **2,257** | **100.0%** |

## Detention Screens for the Cohort

- Due to the detention screen transition year, moving from the JDSAG to CYDSI, the total cohort admissions (2,617) breakdown is as follows: 1,640 admissions had an associated JDSAG; 957 admissions had an associated CYDSI; and 20 admissions were missing a valid detention screen.
- Future reports will contain more robust data on cohort youth and detention screening results, when full SFY data is available for analysis.
- Table 41 in Appendix F presents the limited Level Of Care distributions to the extent possible.

# PLACEMENTS AND SERVICES

## Youth Awaiting Mitigating Services

There were 974 admissions (733 unique youth) for youth awaiting mitigating services for this cohort. The overall detention length of stay for these admissions was 39.2 days, with a median of 20.8 days. This is 8 days longer than the statewide cohort average for the fiscal year and nearly two weeks longer in median.

Of the 974 admissions for youth awaiting mitigating services, 474 (48.7%) were released from detention to home once the court determined appropriate services were identified and became available to mitigate the youth's substantial risk of serious harm to others or substantial risk of flight from prosecution.

Conversely, the admissions not identified as youth awaiting mitigating services had an average length of stay in detention of 26.4 days with a median of 3.3 days. This is on average about five days less than the statewide average for the cohort and nearly half the median days. This indicates that the majority of the admissions not identified as youth awaiting mitigating services were released from detention quickly.

A total of 1,169 (71.2%) of admissions for youth not awaiting mitigating services were released from detention to home. Of these youth not awaiting mitigating services admissions, 186 (11.3%) were released to kin, kin-like, or non-parent guardian. Just over 9% of these admissions were released to be confined elsewhere. For these admissions, the average length of stay was 119.8 days, median 59.1 days. Nearly 7% of these admissions remained in detention at the end of the cohort time period. The remaining admissions (less than 2%) were released to CMHHIP, escaped custody, were placed in a community residential treatment program, were released to themselves or were returned to their home state via the Interstate Compact on Juveniles (ICJ).

## Youth Awaiting Mitigating Services and Ethnicity

- Hispanic youth are a little more likely than their peers to have a placement or services search ordered by the court. The effect size (a measure of strength of relationship) is small, at 0.09, which indicates ethnicity is not a prominent factor in this decision.
- Male youth are also slightly more likely than their peers to have a placement or services search ordered by the court. The effect size is 0.056, which indicates gender is not a prominent factor in this decision.
- Black youth are more likely to remain in detention longer than their peers after a court has ordered a placement or services search. Their length of stay awaiting the outcome of the search is, on average, 11.3 days longer.

## Youth Awaiting Mitigating Services and CJRA Results

- Youth awaiting mitigating services are more likely to have higher risk levels identified by the CJRA. The effect size for this test was 0.325, which is generally considered a moderate correlation relationship.

# Enhanced Standardized Assessments

Enhanced Standardized Assessments (ESA) are requested when it is believed a youth may qualify for residential treatment level of care. Like the previously used independent assessments, there are two ways in which an ESA can be completed and ultimately funded. One is via the Behavioral Health Administration (BHA), which completes and funds the assessment, and the other via the Regional Accountable Entities (RAE), funded by Colorado Medicaid. Once ESAs are completed via the BHA, a summary of the assessment, including the recommended level of care, is submitted to the referring party. If the ESA is completed via the RAE, a request for records must be submitted by the parent or legal guardian to gain access to the assessment.

The ESA is a clinical, psychosocial assessment used to determine a youth's current behavioral health needs. It is completed by licensed behavioral health providers and includes a clinical interview with the youth, family, and other professionals. It utilizes the Child and Adolescent Needs and Strengths (CANS) tool. The ESA is tasked with determining the most appropriate and least restrictive level of care in order to address the youth's behavioral health needs, as well as determine individual service and treatment recommendations for youth and families. Community safety and delinquent behaviors are not considered in isolation when determining a recommended level of care. Because this assessment is designed to look at the youth's clinical behavioral health treatment needs, it considers whether the community safety or delinquent behaviors are either a symptom of an underlying behavioral health concern or due to other factors such as social, developmental or environmental concerns. The level of care and treatment recommended is designed to address the specific behavioral health concerns and not community safety. Therefore, the ESA is only one piece of information utilized by the court and other professionals when determining a potential release plan for a youth.

The following levels of care can be recommended through the ESA: community-based services, Qualified Residential Treatment Program (QRTP), Psychiatric Residential Treatment Facility (PRTF) and residential substance use treatment. RCCF placements are no longer eligible for Title IV-E or Medicaid per-diem reimbursements as of October 2021 as a result of the federal Family First Prevention Services Act (FFPSA). While residential substance use treatment is an available and recommended option, there are neither residential substance use treatment facilities currently in Colorado nor out-of-state substance use treatment facilities that accept Colorado Medicaid.

Presently, the Colorado Department of Human Services (CDHS) has a data sharing agreement with BHA, which houses the information for the majority of ESAs completed in the state. Per the BHA, RAEs reported completion of an additional 261 ESAs during SFY 24-25. These ESAs via the RAEs were completed for youth of all ages and were not specific to detention-aged youth or the cohort for this report and are not included in the analysis for this report. Beyond this information, ESAs completed via local RAEs are not available for review or data collection by either BHA or CDHS. A data sharing agreement (DSA) to collect ESA-related data from the RAEs will need to be established for analysis of this information to occur. The BHA compiles

data regarding referral for and completion of most ESAs across the state. This is the data used for this report.

## Analysis

There were 256 ESAs completed for 212 unique cohort youth via BHA referrals. This indicates that multiple ESAs were completed for some cohort youth during this time period. Subsequent ESAs can be requested for various reasons, which include but are not limited to, a new treatment episode or a change in the youth's status (i.e. the youth is in detention). Of those 256 ESAs, half (126 ESAs, 118 unique youth), were referred during a detention admission. The average number of days a youth was in detention prior to the referral for an ESA was 34 days, with a median of 22 days. These numbers are consistent with those reported from SFY 23-24. The average LOS for youth in detention who were referred for an ESA while in detention is 80.9 days (an increase of 4.5 days from SFY 23-24) and a median of 64.5 days (an increase of almost 25 days from SFY 23-24).

Of the 126 ESAs that were referred while a youth was in detention, 65 had a QRTP recommendation and 46 had a community recommendation. The remainder had recommendations for either PRTF or residential substance use treatment.

- Overall, 34.9% of the admissions that had an ESA referral while the youth was in detention were released to the same level of care recommended.
- About 10.3% of all admissions with ESAs left detention to placement in a higher level of care than was recommended in the ESA. Less than 8% of these admissions with an ESA remained in a detention setting (county jail or DYS commitment) following release.
- About 25% of these admissions resulted in a youth being released from detention to a lower level of care than recommended by the ESA. These lower placements include returning home when the placement was not a community recommendation.

- There were 18 admissions (23.4% of the 65) where the youth were placed in a QRTP setting either immediately upon release from detention or, if it could be confirmed, within 30 days of release.
- A total of 50 of the 126 (39.7%) admissions with ESA recommendations were released to home, foster, therapeutic foster, or kin, kin-like, kin-foster, or non-parent guardian. Of these, 26 youth had a community placement recommendation.
- Of the admissions with ESAs referred while in detention, 21.4% remained in detention at the end of the cohort time period.

BHA (Behavioral Health Administration) Level of Care Recommendation Demographic Counts can be found in Appendix F.

# Barriers to Placements and Services

Barriers to placements and services is a data point that has been difficult to gather for this report. The analysts have tried various methods to gather this information in an attempt to provide a comprehensive overview of barriers to release from detention. As this information is not officially collected in Trails or reported by county departments of human and social services, analysts added a data point in the Detention Bed Utilization Tracking Sheet (DBUTS) that requests identification of barriers to placements and services for those youth who are identified as youth awaiting mitigating services. In January 2025, data points were added to the DBUTS, and two identical dropdown lists were provided for data collection of up to two barriers to release for each admission. The following is an evaluation of the data collected.

There were 974 of the 2,617 (34.3%) total admissions identified as having youth awaiting mitigating services. For these admissions, any barriers that were known by those entering the data were noted. Some admissions had two barriers, while others had only one or none listed. There were 77 of the 974 (7.9%) admissions for youth awaiting mitigating services in which there was no data provided for barriers; this is not the same as the 287 (29.5%) admissions for youth awaiting mitigating services identified as having “no barriers.” The majority of these admissions with “no barriers” identified were released to a parent upon release from

detention. The average length of stay for these admissions with "no barriers" was 15.6 days, with a median of 6.5 days. This is significantly lower than youth identified as having a barrier to release.

There were four barriers to release identified as most prevalent among those admissions for youth awaiting mitigating services:

- History of Aggressive Behavior (35.2%),
- Mental Health Needs (22.1%),
- History of Elopement (21.5%), and
- History of Substance Use (14.3%).

Less than five percent of admissions for youth awaiting mitigating services identified barriers due to placement capacity and waitlists. This indicates that barriers to placement are less about strictly the number of placements and services available and more about the number of appropriate placements and services available, placements and services that could meet the needs of the youth in detention.

*Table 27: Identified Barriers to Release for Youth Awaiting Mitigating Services*

| Identified Barrier | N[40] | % of Total YAMS | Average LOS | Median LOS |
|---|---|---|---|---|
| History of Aggressive Behavior | 343 | 35.2% | 53.8 | 35.0 |
| Mental Health Needs | 215 | 22.1% | 56.4 | 41.7 |
| History of Elopement | 209 | 21.5% | 49.4 | 34.9 |
| History of Substance Use | 139 | 14.3% | 46.1 | 35.8 |
| Needs Higher Level of Care | 51 | 5.2% | 65.9 | 34.6 |
| History of Sexualized Behavior | 43 | 4.4% | 50.3 | 34.6 |
| Placement Capacity | 19 | 2.0% | 70.3 | 48.4 |
| On a Waitlist | 16 | 1.6% | 61.2 | 46.1 |
| Youth's Age | x[41] | x | x | x |
| Needs Lower Level of Care | x | x | x | x |
| No Barrier | 287 | 29.5% | 15.6 | 6.5 |
| **Total** | **1,339** | **100.0%** | - | - |

# Availability of Family Foster Homes

When it is determined that a child or youth should be placed in an OOH setting, counties are encouraged to find care in a family-like setting, preferably a kin foster home or a family foster home when available, partially attributable to the passage of the Family First Prevention Services Act of 2018 (Family First), but more so because Colorado's child welfare system requires the placement of any child or youth in the least restrictive and most appropriate setting possible. In an ongoing effort to further understand and report on the availability of or barriers to foster family home care options for youth in detention, analysts collected information on and reviewed contracted family foster home providers whose license reflected as "open" during SFY 24-25, focusing only on those providers having a documented

[40] Some admissions are counted twice, as they had two barriers identified

[41] Counts below 12 have been masked to preserve client privacy.

preference for youth of any gender, ages 10-17 years old[42]. These providers were further categorized by the county in which the home or mailing address was located, and Figure 11 that follows depicts how these family foster home providers are spread across the state.

The largest concentration of licensed family foster home providers was seen in El Paso county (73), while counties with smaller population counts showed fewer available homes. Over half of Colorado's 64 counties (53.1% of 34 counties) did not have any options for foster home placement for youth ages 10-17 years old. It is important to note that the availability of foster home providers as discussed here should not be interpreted as representative of all available foster home providers across the state: first, there remain numerous family foster home providers that are available in less dense or rural counties that solely accept placement of younger children and babies outside of the age range expected with youth in detention. Secondly, because family foster home providers are not required during licensure to indicate a preference for or against placement of youth involved in juvenile justice, it is not immediately known during a placement search whether or not a potential provider is capable of caring for these youth, even when it is indicated that they accept youth 10-17 years old.

[42] Trails foster family home preferences based on age are specifically categorized for youth up to 18 years old.

*Figure 11: Family Foster Home Providers Open During SFY 24-25 That Accepted Youth Ages 10-17 Years Old*[43]




[43] Trails data on foster family home preferences based on age may be under-reported as it is not a mandatory field.

# First Placement Upon Release from Detention

Data for where and to whom a youth is released is available in Trails and DBUTS following a detention stay. This information is not collected for any youth post-detention release unless they have child welfare involvement. Placements made by county departments of human and social services are recorded in Trails and can be accessed by analysts. As a result, subsequent placement information is only available for youth placed by the county departments of human or social services, as it is recorded in Trails. Table 28 that follows indicates the first placement of youth immediately following their release from detention.

*Table 28: First Placement Following Release from Detention*

| Placement Type | # Total First Placements Following Release | % of Total First Placements Following Release |
|---|---|---|
| Home/Self | 1,645 | 62.9% |
| Kin, Kin-Foster, Kin-Like, Guardian | 337 | 12.9% |
| DYS/Commitment | 140 | 5.4% |
| Foster Care | 65 | 2.5% |
| RCCF[44] | 50 | 1.9% |
| QRTP | 48 | 1.8% |
| County Jail (reached age 18) | 42 | 1.6% |
| PRTF | 36 | 1.4% |
| Group Home | 19 | 0.7% |
| ICJ | 18 | 0.7% |
| CMHHIP/Hospital | 13 | 0.5% |
| YOS | x[45] | x |
| Therapeutic Foster Care | x | x |
| Out-of-state treatment, Deported, US Marshall | x | x |
| "Other DHS placement" | x | x |
| Escape | x | x |
| Remained in Detention at the end of the SFY | 177 | 6.8% |
| **Total** | **2,617** | **100.0%** |

It should be noted that if information was available indicating a youth was released to a parent following release from detention but immediately placed in a QRTP setting, for example, this youth was categorized as QRTP placement.

[44] Residential Child Care Facility (RCCF)

[45] Youth counts below 12 have been masked to preserve client privacy.

All youth with "placement" in a county jail were transported there upon turning 18 years of age, per statute requirement (C.R.S. 19-2.5-305(4)(g)). Youth in "Other DHS Placement" upon release either had immediate placement in a county office or hotel, placement in independent living situations or placement in shelters. Youth who are placed in a county office or hotel are in the custody of the county department of human or social services since formal placement is not immediately available. Data indicated these placements accounted for fewer than five releases from detention.

More than 75% of all admissions resulted in a return home or placement with kin-foster, kin, guardian, or in a kin-like setting immediately following release from detention. Of those, less than 4% had confirmed involvement by county departments of human or social services.

Nearly 8% of admissions resulted in youth being released from detention to be confined elsewhere. These youth were either committed to the custody of DYS, transferred to county jail upon turning 18 years of age, or sentenced to the Department of Corrections' Youthful Offender System (YOS).

One way to further understand the impact of placements on county departments of human or social services is to review the number of placements immediately following a youth's release from detention in which county departments of human or social services were involved. There were 301 (11.5%) of the 2,617 total release placements (compared to 11.9% last year, and 13.3% of detention releases the year before) in which involvement from county departments of human or social services could be verified. None of these admissions resulted in a youth being released home. These admissions accounted for 239 (12.3%) of the 1,937 unique cohort youth. Of all first placements following a youth's detention release, 153 (5.9% of total admissions) were made to either a Residential Child Care Facility (RCCF), QRTP, PRTF, or group home settings. DHS was involved in 145 (94.8%) of those placements.

Table 29 shows the number of placements in each category where a county department of human or social services was involved.

*Table 29: DHS Involved Placement Following Release from Detention*

| Placement Type | # Total DHS Involved Placements | % of Total DHS Involved Placements |
|---|---|---|
| Foster Care | 65 | 21.6% |
| Kin, Kin-Foster, Kin-Like, Guardian | 54 | 17.9% |
| RCCF | 48 | 16.0% |
| QRTP | 44 | 14.6% |
| PRTF | 35 | 11.6% |
| Home | 19 | 6.3% |
| Group Home | 18 | 6.0% |
| Therapeutic Foster Care | x[46] | x |
| CMHHIP/Hospital | x | x |
| "Other DHS Placement" | x | x |
| Out-of-state treatment, Deported, US Marshall | x | x |
| ICJ | x | x |
| **Total** | **301** | **100.0%** |

Of the 301 admissions where DHS had confirmed involvement at the time of release from detention, the placement end reason was available for 264 (87.7%) placements.

More than a quarter of the placements ended in a return to detention or in the youth running away from the placement.

- Almost 13% of these placements ended in the youth returning to detention. The average length of stay in placement for this group prior to returning to detention was 92.9 days, median of 65.0 days.
- There were 38 placements (14.4%) terminated as a result of a youth running away. The average time a youth was in a placement prior to running away was 47.6 days, median 23.0 days.

[46] Youth counts below 12 have been masked to preserve client privacy.

There were 15 placements (5.7%) that had an end reason of "Child Returned Home." The average length of time for the youth in these placements was 73.7 days, median 31.0 days.

# DIRECT FILE/TRANSFER/REVERSE-TRANSFER

Youth involved in the Direct File, Transfer, and/or Reverse-Transfer processes can remain in detention for extended periods of time, as the courts ultimately decide which jurisdiction will best serve the juvenile and the community. For this report, data for youth in the Direct File, Transfer, and/or Reverse-Transfer processes was found using two sources: Trails data extract and Detention Bed Utilization Tracking Sheet. Information from the Colorado District Attorney's Council, the primary entity that officially houses this data, was not available for this year's report.

There were 83 admissions (83 unique youth) in detention during this cohort period that were related to cases in Direct File, Transfer, and/or Reverse-Transfer processes. Cohort youth in this group range in age from 12 to 17 years old at the time of detention admission. However, the average age of a youth in the Direct File, Transfer, and/or Reverse-Transfer processes for this cohort is 16 years old. More than 90% of these youth were male. This is considerably higher than the male population for the total cohort (79.6%).

Of the 83 admissions,

- 8 had a length of stay of 30 days or less, and
- 53 admissions had a length of stay of 90 days or more,
    - 24 of which were in detention for 365 days or more.
- The longest admission was 966.8 days.
- The average length of stay was 241.5 days (an increase of almost 36 days from SFY 23-24), and
- The median was 172.6 days (a decrease of about eight days from SFY 23-24).
- About 77% of the youth in this group were charged with homicide or attempted homicide.

Records indicate that 49 of the 83 unique youth had a DHS placement prior to their admission for this case. And for 30 of these youth (36.2%), this was their first ever detention.

Admissions in the Direct File, Transfer, and/or Reverse-Transfer processes comprised nearly one-quarter (24.6%) of the total days in detention for the cohort, up only slightly from last year (24.4%). It should be noted that the lengths of stay for these admissions include days in detention from prior fiscal years, if the youth remains in detention from the previous year(s). The total detention days include all of these days. It is important to note that compared to last fiscal year, there were 17 fewer admissions, but of which comprised nearly the same percentage of total detention admissions days.

Additionally, these admissions accounted for 14.9% of all bed capacity within this fiscal year (a 3.0% decrease from SFY 23-24). Expressed against the bed cap, this means that an average of 183 beds, at any given time, are available for non-Direct File, non-Transfer, and/or non-Reverse-Transfer detention admissions, and an average of 32 beds were occupied by youth in the Direct File, Transfer, and/or Reverse-Transfer processes. This represents an increase of 6.5 available beds compared to SFY 23-24.

# JUVENILE PLACEMENT SURVEY AND COST REPORT

Between December 2024 and January 2025, the first survey focused on Child Welfare and Juvenile Justice-Involved Youth within County Human Services was conducted. This initiative highlighted significant concerns regarding participant saturation following initial outreach and brainstorming sessions with professionals across both sectors. Consequently, the team determined that a more targeted approach is essential for the effective dissemination of surveys. Such a focus is necessary to accurately address the specific needs of youth and families concerning their access to vital placements and services.

Moving forward, the team remains committed to identifying additional platforms where youth and families are surveyed. The objective is to evaluate potential collaborations for gathering critical data in a way that is both meaningful and least intrusive to the participants. This ongoing effort aims to refine the methodology for capturing the lived experiences of those within the system.

A secondary initiative, the Juvenile Placement Survey and Cost Report, is in development by Development Services Group, Inc. The primary goal of this project is to evaluate the statewide access to mitigating services and placements and to identify actionable solutions that increase both access and operational efficiency. By utilizing a mixed-methods approach that combines qualitative and quantitative data, the project ensures a comprehensive understanding of the current landscape through statewide engagement.

This data-driven and practice-informed approach is structured across five key tasks, designed to yield clear findings. The ultimate outcome of this project will be a set of actionable policy and practice recommendations. These recommendations are specifically intended to improve access to community-based mitigating services and placements for youth currently in juvenile detention, ensuring that the system better serves its most vulnerable populations. Results from this survey will be delivered to the Colorado House Health and Human Services Committee and the Colorado Senate Health and Human Services Committee by July 1, 2027.

# IDENTIFYING JUVENILE JUSTICE YOUTH IN CHILD WELFARE

In June 2023, the act, HB23-1249 *Reduce Justice-involvement For Young Children*, was signed into law, which added a new requirement that:

> *"...the department of human services add to its report information on the number of youth who at the time they received services from the county department of human or social services or were placed in out-of-home placement by a county department had an open delinquency case in a district court, were on juvenile probation, or had a juvenile deferred sentence."*

In response to the act, this team of analysts spent one full year working in collaboration with the Trails development teams from the Division of Youth Services and the Division of Child Welfare to build and implement new modules into modernized Trails that would collect the required data points. Between September 2024 and March 2025, these new modules became "live" updates, collecting data around a youth's involvement in juvenile justice at the time that a child welfare service is provided.

These new modules each included the same five yes/no questions nested within the "Current Juvenile Justice Involvement" Trails screen, to be completed whenever a youth matches qualifications, including youth ages 10-17 years old who are identified as participating as a child (Participating as a Child=PAC) in a child welfare involvement. Responses to these questions by county caseworkers are now expected each time a qualified youth is involved in a new child welfare assessment; a prevention case where services are provided; and at the start and end of every OOH placement. These five yes/no questions specifically ask:

1. Current Diversion Involvement
2. Current Probation Involvement
3. Deferred Sentence

4. Open JD Case/Delinquency (including pre-trial and detention)

5. No Current Juvenile Justice Involvement

Because there has not yet been a full state fiscal year of implementation, an analysis of this data for use in this report was not completed, however will be provided with more in-depth summaries in future reports.

To provide an example of the data expected from this new source, analysts have compiled a brief summary based on the data collected between September 1, 2024, and June 30, 2025, categorized by the involvement type indicated at the point in time at which the data was collected. This data is listed in Table 30 that follows.

*Table 30: Juvenile Justice Involvement Type while in Child Welfare, by Unique Youth and by Type*

| | Youth Count | | | |
|---|---|---|---|---|
| Involvement Type | At Assessment | At Out-of-Home (OOH) Placement | At Prevention Case Service | Unique Youth Count |
| Diversion | 143 | 7 | 7 | 155 |
| Probation | 356 | 51 | 18 | 416 |
| Deferred Sentence | 42 | 5 | 3 | 49 |
| Open Delinquency Case | 1,116 | 67 | 54 | 1,188 |

# APPENDICES

## Appendix A: History

In 2018, the federal Family First Prevention Services Act (FFPSA) made available federal Title IV-E child welfare funding to reimburse states for the provision of certain evidence-based prevention services aimed at keeping children and youth safely together with their parent(s) and family whenever possible, as opposed to only supporting placement costs when a youth is removed from the home. In 2019, Colorado brought the introduction of Juvenile Justice Reforms by way of SB19-108 (Appendix C), which created opportunities to improve the outcomes for youth in the juvenile justice system by standardizing several screening tools to better align youth needs to appropriate, effective services.

The Colorado General Assembly passed SB21-071 (C.R.S. 19-2.5-1404) in 2021, which reduces the statewide statutory limit on detention bed capacity from 327 to 215 beginning in state fiscal year 21-22. C.R.S.19-2.5-1404 also mandates the statutory working group (Colorado Youth Detention Continuum (CDYC) Advisory Board) to, among other things:

1) Develop performance standards and outcome measures to evaluate whether alleged and adjudicated offenders are in the least restrictive environment with appropriate services. This requires the evaluation of alternative placements, range of placements and the community-based service options available in each judicial district and county.

2) Determine whether and how specific data and outcome measures must be reported to evaluate the efficacy of less restrictive placements and community-based services.

3) Provide recommendations to enhance the continuum of community-based services and placement options, including but not limited to, improvements of availability and quality of least restrictive alternative placement and services.

Prior to July 1, 2023, and every July thereafter, the Department of Human Services is responsible for submitting an annual report to the working group and legislative committees, which includes analysis of data collected in accordance with the stated performance

standards and outcomes measures developed in subsection (3)(a)(I) of this section of C.R.S. 19-2.5-1404, as well as:

1) Implementation efforts

2) Analysis of the continuum of in-home and OOH placement options and supports

3) Capacity and bed demands

4) Availability/demand of all levels of placement

5) Use of funding for all levels of placement and services

6) Community-based services that allow youth to remain home

7) Barriers to placement

8) Youth detained awaiting a least restrictive placement

9) Average length of stay for detained youth

10) Family/youth satisfaction with least restrictive, alternative placement

11) Analysis of crossover youth

In 2023, both HB23-1307 and HB23-1249 added additional reporting elements to C.R.S. 19-2.5-1404. HB23-1307 requires predetermined demographic data to be reported in relation to temporary emergency bed usage and bed capacity releases.

HB23-1249 added demographic data requirements, including the number of youth by age and judicial district who had prevention services; an assessment; and an open dependency and neglect case and/or OOH placement at the same time they had an open delinquency case in district court, were on juvenile probation and/or had a juvenile deferred sentence.

# Appendix B: Key Term Definitions

The definitions below for youth awaiting mitigating services, emergency release and emergency placement" were established by the working group (i.e., CYDC Advisory Board) for this report to aid in data cohesion.

## Active Child Welfare Involvement

For the purposes of this report, criteria for "active" child welfare involvement included cohort youth who, being identified as a child, victim, or alleged victim, or youth-in-conflict, participated in an assessment and/or case that was open or active during any point of a detention stay. Any involvement that may have been initiated and ended prior to a detention stay are not included as active involvement.

## Advisory Board

C.R.S. 19-2.5-1404 establishes a working group heretofore referred to as the Advisory Board. This group is formed by the executive director of the department of human services and the state court administrator of the judicial department (or designees of such persons) and, among several other tasks, was charged with creating the performance standards and outcome measures and maintaining continued oversight for this report.

## Catchment Area

Often referred to as "regions," these are geographic boundaries specifically tied to juvenile detention facilities, bed allocations and court jurisdictions as specified in C.R.S. 19-2.5-1513(1)(a).

## Detention Bed Utilization Tracking Sheet (DBUTS)

A protected Google Sheet that keeps personally identifiable information (PII) for detained youth within each judicial district. CYDC coordinators and bed managers use this sheet for bed and case management of youth who are in detention. This information is often manually collected from other sources (i.e., Trails or the Colorado State Court Data Access website).

# Direct File/Transfer/Reverse-Transfer

### *Direct File*

Used to describe statutory discretion that allows prosecutors to decide whether to bring charges against persons under the age of 18 but 16 years of age or older at the time of offense in juvenile court or in adult criminal court, as outlined in Section C.R.S. 19-2.5-801. When a prosecutor chooses to directly file a youth's case in adult criminal court, the juvenile court does not have jurisdiction over proceedings concerning the charge(s). In Colorado, Direct File discretion is limited to specific, serious crimes and the age range aforementioned.

### *Transfer*

The "juvenile court may enter an order certifying a juvenile to be held for criminal proceedings in the district court if a petition filed in juvenile court alleges the juvenile ..." of a specific age is alleged to have committed specific offenses found in C.R.S. 19-2.5-802, and "the juvenile court finds it would be contrary to the best interest of the juvenile or of the public to retain jurisdiction." A petition can only be transferred from juvenile to district (e.g., adult) court after a hearing is held pursuant to the requirements and factors set forth in this statute.

### *Reverse-Transfer*

After a preliminary hearing, a juvenile may petition the adult criminal court to transfer the case back to juvenile court. Ultimately, the court determines whether the juvenile and the community would be better served by criminal (e.g., adult) or adjudicative (e.g., juvenile) proceedings. The reverse-transfer process was established in Colorado in 2012 through HB12-1271. Complete statutory language and description can be found in C.R.S. 19-2.5-802.

# Emergency Release

The release of a youth from detention as a result of reaching the judicial district detention capacity and facility capacity, and an Emergency Bed is unable to be utilized, as defined in C.R.S. 19-2.5-1407.3(4).aa

## Emergency Placement

The court has ordered youth be immediately released from secure detention, and granted temporary physical and legal custody of a youth to the county departments of human or social services for appropriate placement, which may not be immediately available.

## Quick Returns

Youth who return to detention within 30 days of their previous release from detention.

## Region

Similar to catchment areas, these are administrative zones managed by the Division of Youth Services (DYS) that oversee case management, parole and community resources. The four DYS regions are: Central, Northeast, Southern and Western.

## Trails

Colorado's current Comprehensive Child Welfare Information System, known as Trails, is the official case management information system for all child welfare and youth services documentation.

## Youth Awaiting Mitigating Services

Youth in secure detention for whom the court has determined may be released once a service or placement is identified and available that would mitigate the youth's substantial risk of serious harm to others or flight from prosecution.

# Appendix C: Related Bills

| | |
|---|---|
| HR 253 | Family First Prevention Services Act of 2017<br>https://www.congress.gov/115/bills/hr253/BILLS-115hr253ih.pdf |
| SB 18-154 | Juvenile Planning Committee Crossover Youth Plans<br>https://leg.colorado.gov/sites/default/files/2018a_154_signed.pdf |
| SB 18-254 | Child Welfare Reforms<br>https://leg.colorado.gov/sites/default/files/2018a_254_signed.pdf |
| SB 19-108 | Juvenile Justice Reform<br>https://leg.colorado.gov/sites/default/files/2019a_108_signed.pdf |
| SB 21-071 | Limit The Detention Of Juveniles<br>https://leg.colorado.gov/sites/default/files/2021a_071_signed.pdf |
| HB 23-1249 | Reduce Justice involvement For Young Children<br>https://leg.colorado.gov/bills/hb23-1249 |
| HB 23-1269 | Extended Stay And Boarding Patients<br>https://leg.colorado.gov/bills/hb23-1269 |
| HB 23-1307 | Juvenile Detention Services And Funding<br>https://leg.colorado.gov/bills/hb23-1307 |
| HB 25-1146 | Juvenile Detention Bed Cap<br>https://leg.colorado.gov/bills/hb25-1146 |

# Appendix D: Addition of 23rd Judicial District

Effective January 2, 2025, Colorado added its 23rd judicial district as a result of HB20-1026. This change established Arapahoe County as a stand alone county within the 18th judicial district and moved Douglas, Elbert and Lincoln counties, all of which were previously in the 18th judicial district, into the new 23rd judicial district.

Because of the timing of this change, the data for this report does not include the new 23rd judicial district. Data for this new judicial district began collection on July 1, 2025, and will be included in the SFY 26-27 report (which analyzes SFY 25-26 data).

*Figure 12: Map of Judicial Districts, Regions and Facility Locations*



# Appendix E: Judicial District Sizes and County Classifications[47]

*Table 31: Judicial District Sizes*

| Judicial District | Size | Judicial District | Size |
|---|---|---|---|
| 1 | Large | 12 | Small |
| 2 | Large | 13 | Small |
| 3 | Small | 14 | Small |
| 4 | Large | 15 | Small |
| 5 | Small | 16 | Small |
| 6 | Small | 17 | Medium |
| 7 | Small | 18 | Large |
| 8 | Medium | 19 | Medium |
| 9 | Small | 20 | Medium |
| 10 | Medium | 21 | Medium |
| 11 | Small | 22 | Small |

[47] Judicial district sizes match those determined by Infinite Frontier Consulting. County Classifications from the Colorado Department of Local Affairs website.

*Table 32: County Type Classifications*

| Urban | Rural | Rural Resort |
|---|---|---|
| Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, El Paso, Jefferson, Larimer, Mesa, Pueblo, Teller, Weld | Alamosa, Baca, Bent, Cheyenne, Clear Creek, Conejos, Costilla, Crowley, Custer, Delta, Dolores, Elbert, Fremont, Garfield, Gilpin, Huerfano, Jackson, Kiowa, Kit Carson, Las Animas, Lincoln, Logan, Mineral, Moffat, Montezuma, Montrose, Morgan, Otero, Park, Phillips, Prowers, Rio Blanco, Rio Grande, Saguache, Sedgwick, Washington, Yuma | Archuleta, Chaffee, Eagle, Grand, Gunnison, Hinsdale, Lake, LaPlata, Ouray, Pitkin, Routt, San Jaun, San Miguel, Summit |

# Appendix F: Supplemental Demographic Information

*Table 33: Statewide Cohort Demographics*[48]

| | Adm | % Adm | Unique Youth | % Youth | Avg LOS | Median LOS |
|---|---|---|---|---|---|---|
| **Total (all admissions)** | **2,617** | **100.0%** | **1,937** | **100.0%** | **31.2** | **6.4** |
| **Staff-Assigned Gender** | | | | | | |
| Male | 2,082 | 79.6% | 1,552 | 80.1% | 33.4 | 6.6 |
| Female | 535 | 20.4% | 385 | 19.9% | 22.6 | 5.1 |
| **Race/Ethnicity** | | | | | | |
| Hispanic | 1,097 | 41.9% | 840 | 43.4% | 33.1 | 6.0 |
| White | 852 | 32.6% | 606 | 31.3% | 24.5 | 6.1 |
| Black or African American | 561 | 21.4% | 404 | 20.9% | 39.1 | 7.8 |
| Unable to Determine | 48 | 1.8% | 41 | 2.1% | 24.5 | 4.2 |
| American Indian or Alaskan Native | 28 | 1.1% | 20 | 1.0% | 22.5 | 5.0 |
| Asian | 18 | 0.7% | x[49] | x | 20.8 | 4.9 |
| Native Hawaiian/Other Pacific Islander | 13 | 0.5% | x | x | 20.5 | 10.9 |
| **Age at Admission** | | | | | | |
| 10 to 12 | 61 | 2.3% | 48 | 2.5% | 29.6 | 3.0 |
| 13 | 201 | 7.7% | 138 | 7.1% | 26.5 | 5.7 |
| 14 | 388 | 14.8% | 270 | 13.9% | 28.1 | 7.5 |
| 15 | 558 | 21.3% | 409 | 21.1% | 38.1 | 6.9 |
| 16 | 688 | 26.3% | 507 | 26.2% | 39.1 | 6.8 |
| 17+ | 721 | 27.6% | 565 | 29.2% | 21.3 | 5.3 |
| **Sexual Orientation** | | | | | | |
| Straight or Heterosexual | 2,103 | 80.4% | 1,500 | 77.4% | 34.6 | 7.1 |
| SOGIE Identity | x | x | x | x | 30.8 | 11.1 |

[48] A note on small categories: several demographic groups in this cohort have very small admission counts (for example, Asian youth, Native Hawaiian or Other Pacific Islander youth, American Indian or Alaskan Native youth, and youth identifying as non-binary or genderqueer), and have been merged accordingly.

[49] Youth counts below 12 have been masked to preserve client privacy.

| | Adm | % Adm | Unique Youth | % Youth | Avg LOS | Median LOS |
|---|---|---|---|---|---|---|
| Refused to Answer | x | x | x | x | 20.6 | 6.9 |
| Missing/Blank | 388 | 14.8% | 346 | 17.9% | 13.0 | 2.8 |
| **Gender Identity (self-reported)** | | | | | | |
| Male | 1,826 | 69.8% | 1,328 | 68.6% | 36.1 | 7.1 |
| Female | 460 | 17.6% | 316 | 16.3% | 24.5 | 6.1 |
| Non-binary or Genderqueer[50] | x | x | x | x | 46.9 | 18.4 |
| Missing/Blank | x | x | x | x | 11.9 | 2.8 |
| **Pronouns** | | | | | | |
| He/Him | 1,765 | 67.4% | 1,272 | 65.7% | 36.3 | 7.5 |
| She/Her | 432 | 16.5% | 294 | 15.2% | 25.6 | 6.6 |
| They/Them, He/They, She/They | x | x | x | x | 32.3 | 14.5 |
| Unknown | x | x | x | x | 2.7 | 1.9 |
| Missing/Blank | 395 | 15.1% | 352 | 18.2% | 14.8 | 2.8 |
| **Region** | | | | | | |
| Central | 1,078 | 41.2% | 820 | 42.3% | 32.6 | 6.0 |
| Northeast | 695 | 26.6% | 537 | 27.7% | 28.8 | 5.8 |
| Southern | 583 | 22.3% | 441 | 22.8% | 34.0 | 8.5 |
| Western | 261 | 10.0% | 178 | 9.2% | 25.2 | 7.1 |

[50] Because "genderqueer" is a drop-down option in Trails for a youth's gender identity, it is not changed to "youth with SOGIE identity" as this population is otherwise identified throughout the report.

*Table 34: Cohort Youth Compared to Colorado Youth Population*[51]

| Race/Ethnicity | Cohort Unique Youth | % of Cohort | % of CO Youth Pop. (2023 Census) | Representation Ratio |
|---|---|---|---|---|
| Hispanic | 840 | 43.4% | 33.1% | 1.31x |
| White | 606 | 31.3% | 60.9% | 0.51x |
| Black or African American | 404 | 20.9% | 4.1% | 5.10x |
| American Indian or Alaskan Native | 20 | 1.0% | 1.5% | 0.69x |
| Asian | 14 | 0.7% | 3.0% | 0.24x |
| Native Hawaiian/Other Pacific Islander | 12 | 0.6% | 0.2% | 3.10x |
| Unable to Determine/Other | 41 | 2.1% | n/a | n/a |
| **Total** | **1,937** | **100.0%** | **100.0%** | - |

[51] Population denominator from U.S. Census Bureau, 2023 American Community Survey, Colorado youth ages 10 to 17. The representation ratio values above 1.0 indicate overrepresentation in the detention cohort.

*Table 35: Regional LOS by Ethnicity and Gender*

| Region[52] | Adm | Unique Youth | Avg LOS | Median LOS |
|---|---|---|---|---|
| **Central** | **1,078** | **820** | **32.6** | **6.0** |
| Hispanic | 420 | 330 | 34.1 | 6.4 |
| White | 276 | 193 | 21.0 | 5.1 |
| Black or African American | 330 | 253 | 41.7 | 6.6 |
| Other/Unknown (collapsed) | 52 | 44 | 24.7 | 4.4 |
| Male | 852 | 650 | 35.2 | 6.5 |
| Female | 226 | 170 | 22.9 | 3.7 |
| **Northeast** | **695** | **537** | **28.8** | **5.8** |
| Hispanic | 369 | 298 | 32.1 | 4.0 |
| White | 245 | 180 | 24.8 | 7.6 |
| Black or African American | 60 | 42 | 29.3 | 10.5 |
| Other/Unknown (collapsed) | 21 | 17 | 15.1 | 2.7 |
| Male | 554 | 439 | 30.6 | 5.8 |
| Female | 141 | 98 | 21.7 | 6.0 |
| **Southern** | **583** | **441** | **34.0** | **8.5** |
| Hispanic | 251 | 193 | 36.4 | 9.1 |
| White | 162 | 134 | 28.1 | 5.8 |
| Black or African American | 158 | 103 | 37.6 | 12.9 |
| Other/Unknown (collapsed) | 12 | x | 17.9 | 5.3 |
| Male | 492 | 364 | 35.4 | 8.7 |
| Female | 91 | 77 | 26.5 | 7.9 |
| **Western** | **261** | **178** | **25.2** | **7.1** |
| Hispanic | 57 | 40 | 17.8 | 6.0 |
| White | 169 | 112 | 26.4 | 7.1 |
| Black or African American | 13 | x | 37.1 | 6.7 |
| Other/Unknown | 22 | 15 | 28.7 | 8.7 |
| Male | 184 | 131 | 27.9 | 7.1 |
| Female | 77 | 47 | 18.8 | 7.1 |

[52] Regional totals include all racial and ethnic groups; only the three largest groups and a collapsed Other category are shown for each region in the interest of readability.

*Table 36: Offense Distribution by Demographic Category*

| Subgroup | Adm | Felony % | Misdo % | Petty[53] % | Person % | Property % | Weapon % |
|---|---|---|---|---|---|---|---|
| **Total** | **2,617** | **67.6%** | **30.0%** | **2.4%** | **54.6%** | **22.6%** | **12.2%** |
| **By Race/Ethnicity** | | | | | | | |
| Hispanic | 1,097 | 66.0% | 32.0% | 2.0% | 54.0% | 20.0% | 15.6% |
| White | 852 | 61.5% | 35.2% | 3.3% | 53.6% | 25.2% | 7.9% |
| Black or African American | 561 | 79.0% | 19.6% | 1.4% | 57.6% | 24.1% | 13.4% |
| Unable to Determine | 48 | 64.6% | 29.2% | 6.3% | 52.1% | 18.8% | 6.2% |
| Native Hawaiian or Other Pacific Islander/American Indian or Alaskan Native/Asian | 59 | 78.0% | 18.6% | 3.4% | 52.5% | 23.7% | 5.1% |
| **By Staff-Assigned Gender** | | | | | | | |
| Male | 2,082 | 70.3% | 27.7% | 2.0% | 54.5% | 21.7% | 13.5% |
| Female | 535 | 57.0% | 39.1% | 3.9% | 55.0% | 26.2% | 7.1% |
| **By Age Group** | | | | | | | |
| 10 to 12 | 61 | 93.4% | 6.6% | 0.0% | 65.6% | 21.3% | 9.8% |
| 13 to 15 | 1147 | 67.2% | 30.0% | 2.8% | 58.0% | 24.6% | 8.5% |
| 16 to 17+ | 1,409 | 66.7% | 31.1% | 2.2% | 51.3% | 21.1% | 15.3% |

[53] Petty offense includes Petty Offense Class 1 and 2 admissions. Person, Property, and Weapon are reported because they account for the majority of admissions across all subgroups; Drug, Status, Traffic, and Other are summarized in Table 37.

*Table 37: Offense Distribution by Region*

| Region | Adm | Felony % | Misdo % | Petty % | Person % | Property % | Weapon % | Other[54] % |
|---|---|---|---|---|---|---|---|---|
| Central | 1,078 | 67.7% | 29.6% | 2.7% | 51.8% | 23.6% | 15.1% | 9.5% |
| Northeast | 695 | 61.4% | 35.1% | 3.5% | 57.3% | 20.6% | 9.6% | 12.5% |
| Southern | 583 | 79.4% | 19.9% | 0.7% | 56.8% | 25.0% | 12.2% | 6.0% |
| Western | 261 | 56.7% | 41.0% | 2.3% | 54.0% | 18.8% | 6.9% | 20.3% |
| **Total** | **2,617** | **67.6%** | **30.0%** | **2.4%** | **54.6%** | **22.6%** | **12.2%** | **10.6%** |

*Table 38: Offense Class and Type by Region*

| Region | Offense Category/Type | Drug | Other | Person | Property | Status | Traffic | Weapon | Total |
|---|---|---|---|---|---|---|---|---|---|
| **Central** | Felony | 14 | 13 | 456 | 197 | 0 | x | 43 | 730 |
| | Misdemeanor | x[55] | 43 | 102 | 46 | 0 | x | 120 | 319 |
| | Petty | 0 | x | 0 | x | x | 0 | 0 | 29 |
| | **Total** | **21** | **62** | **558** | **254** | **12** | **8** | **163** | **1,078** |
| **Northeast** | Felony | x | 13 | 284 | 101 | 0 | x | 20 | 427 |
| | Misdemeanor | x | x | x | 35 | 0 | x | 47 | 244 |
| | Petty | 0 | x | x | 7 | 12 | 0 | 0 | 24 |
| | **Total** | **7** | **58** | **398** | **143** | **12** | **10** | **67** | **695** |
| **Southern** | Felony | x | x | 300 | 123 | x | x | 22 | 463 |
| | Misdemeanor | x | x | x | x | x | x | 49 | 116 |
| | Petty | 0 | 0 | x | x | x | x | 0 | 4 |
| | **Total** | **4** | **25** | **331** | **146** | **2** | **4** | **71** | **583** |
| **Western** | Felony | x | x | 95 | 32 | 0 | x | x | 148 |
| | Misdemeanor | x | 32 | x | 17 | 0 | x | x | 107 |
| | Petty | x | x | x | 0 | 0 | 0 | x | 6 |
| | **Total** | **4** | **41** | **141** | **49** | **0** | **8** | **18** | **261** |
| **Statewide** | **Subtotal** | **36** | **186** | **1,428** | **592** | **26** | **30** | **319** | **2,617** |

[54] Other % combines Drug, Status, Traffic, and Other offense types.

[55] Counts below 12 have been masked to preserve client privacy.

*Table 39: CJRA Pre-Screen and Detention Screen (JDSAG/CYDSI) Distribution*[56]

| Screen/Level | Adm | % of Adm | Unique Youth | Avg LOS | Median LOS |
|---|---|---|---|---|---|
| **CJRA Pre-Screen Risk** | | | | | |
| Low | 946 | 36.1% | 856 | 22.3 | 2.9 |
| Moderate | 750 | 28.7% | 624 | 26.4 | 6.4 |
| High | 855 | 32.7% | 579 | 42.6 | 18.6 |
| Missing | 66 | 2.5% | 65 | 13.0 | 2.5 |
| **Detention Screen (JDSAG/CYDSI)** | | | | | |
| JDSAG (through Feb 3, 2025) | 1,640 | 62.7% | 1,080 | 38.9 | 7.4 |
| CYDSI (Feb 3, 2025 onward) | 957 | 36.6% | 837 | 16.8 | 4.8 |
| Missing | 20 | 0.8% | 20 | 5.5 | 2.5 |
| **Total** | **2,617** | **100.0%** | **1,937** | **31.2** | **6.4** |

*Table 40: CJRA Pre-Screen Risk Level by Region*

| Region | Low # | Low % | Moderate # | Moderate % | High # | High % | Missing # | Missing % | Total |
|---|---|---|---|---|---|---|---|---|---|
| Central | 369 | 34.2% | 301 | 27.9% | 392 | 36.4% | 16 | 1.5% | 1,078 |
| Northeastern | 280 | 40.3% | 178 | 25.6% | 224 | 32.2% | 13 | 1.9% | 695 |
| Southern | 237 | 40.7% | 168 | 28.8% | 144 | 24.7% | 34 | 5.8% | 583 |
| Western | 60 | 23.0% | 103 | 39.5% | 95 | 36.4% | 3 | 1.1% | 261 |
| **Statewide** | **946** | **36.1%** | **750** | **28.7%** | **855** | **32.7%** | **66** | **2.5%** | **2,617** |

[56] CYDSI replaced JDSAG as the detention screening instrument starting February 2025. The shorter LOS associated with CYDSI partly reflects the fact that CYDSI admissions had less elapsed time to accumulate admissions before the data cutoff of June 30, 2025. JDSAG LEVEL 2 through LEVEL 5 are collapsed because cell sizes (n = 7 admissions combined) are too small for statistics.

*Table 41: BHA Level of Care (LOC) Recommendation by Demographic Category*

| Demographic | Community | PRTF | QRTP | SUD Res | Total |
|---|---|---|---|---|---|
| **Region** | | | | | |
| Central | 22 | x[57] | 34 | x | 63 |
| Northeastern | x | x | x | 0 | 28 |
| Southern | x | x | x | 0 | 20 |
| Western | x | 0 | x | 0 | 13 |
| **Staff-Assigned Gender** | | | | | |
| Male | 34 | x | 51 | x | 95 |
| Female | x | x | x | 0 | 29 |
| **Race/Ethnicity** | | | | | |
| Hispanic | x | x | 17 | 0 | 31 |
| White | 21 | x | 26 | 0 | 52 |
| Black or African American | 14 | x | 16 | x | 34 |
| Unable to Determine | 0 | x | x | 0 | 4 |
| American Indian or Alaskan Native | 0 | 0 | x | 0 | x |
| Asian | x | 0 | 0 | 0 | x |
| Native Hawaiian/ Other Pacific Islander | 0 | x | 0 | 0 | x |
| **Age Group** | | | | | |
| 12 | 0 | x | x | 0 | x |
| 13 | x | x | x | 0 | x |
| 14 | x | x | 13 | x | 21 |
| 15 | 13 | x | x | 0 | 27 |
| 16 | 14 | x | 15 | x | 32 |
| 17+ | 10 | 0 | 20 | 0 | 30 |
| **Total** | **46** | **14** | **63** | **1** | **124**[58] |

[57] Youth counts below 12 have been masked to preserve client privacy.

[58] The number of ESAs was 126, of which two youth had more than one ESA during their admission.

*Table 42: CJRA Pre-Screen and JDSAG Screening Results by Demographic Category*

| Demographic | CJRA Low | CJRA Mod. | CJRA High | CJRA Missing | JDSAG Lvl 1 | JDSAG Lvl 2-5 | JDSAG Excl.[59] |
|---|---|---|---|---|---|---|---|
| **Region** | | | | | | | |
| Central | 369 | 301 | 392 | 16 | 660 | x | 406 |
| Northeastern | 280 | 178 | 224 | 13 | 411 | 21 | 263 |
| Southern | 237 | 168 | 144 | 34 | 369 | x | 206 |
| Western | 60 | 103 | 95 | x | 158 | x | 102 |
| **Staff-Assigned Gender** | | | | | | | |
| Male | 798 | 580 | 649 | 55 | 1285 | 31 | 766 |
| Female | 148 | 170 | 206 | x | 313 | x | 211 |
| **Race/Ethnicity** | | | | | | | |
| Hispanic | 494 | 268 | 303 | 32 | 663 | 26 | 408 |
| White | 236 | 282 | 317 | 17 | 527 | x | 314 |
| Black or African American | 173 | 173 | 199 | 16 | 351 | x | 205 |
| Unable to Determine | 21 | 16 | x | 0 | 27 | 0 | 21 |
| American Indian or Alaskan Native | x | x | 13 | x | 13 | 0 | 15 |
| Asian | x | x | x | 0 | x | 0 | x |
| Native Hawaiian/Other Pacific Islander | x | x | x | 0 | x | 0 | x |
| **Age Group** | | | | | | | |
| 10-12 | 14 | 28 | 19 | 0 | 30 | x | 30 |
| 13 | 36 | 73 | 90 | x | 127 | x | 68 |
| 14 | 84 | 132 | 166 | x | 254 | x | 127 |
| 15 | 193 | 151 | 198 | 16 | 338 | x | 215 |
| 16 | 278 | 193 | 193 | 24 | 421 | x | 260 |
| 17+ | 341 | 173 | 189 | 18 | 428 | 16 | 277 |
| **Sexual Orientation** | | | | | | | |

[59] Invalid for analysis, not completed within acceptable time frame, or transitioned to using the CYDSI after Feb 3rd 2025.

| Demographic | CJRA Low | CJRA Mod. | CJRA High | CJRA Missing | JDSAG Lvl 1 | JDSAG Lvl 2-5 | JDSAG Excl.[59] |
|---|---|---|---|---|---|---|---|
| Straight or Heterosexual | 735 | 586 | 722 | 60 | 1271 | 37 | 795 |
| Bisexual | x | 19 | 45 | x | 47 | 0 | 28 |
| Lesbian or Gay | x | x | x | x | 19 | 0 | 14 |
| Missing | 181 | 130 | 75 | x | 250 | x | 133 |
| **Pronouns** | | | | | | | |
| He/Him | 643 | 484 | 586 | 52 | 1082 | 29 | 654 |
| She/Her | 101 | 134 | 185 | 12 | 253 | x | 172 |
| Missing | 191 | 126 | 76 | x | 251 | x | 139 |
| **Gender Identity** | | | | | | | |
| Male | 674 | 505 | 594 | 53 | 1,120 | 30 | 674 |
| Female | 115 | 136 | 197 | x | 265 | x | 188 |
| Missing | 156 | 105 | 58 | x | 206 | x | 0 |
| **Total** | **946** | **750** | **855** | **66** | **1,598** | **42** | **977** |

*Table 43: Demographics of Historically or Actively Involved Child Welfare Cohort Youth*

| Child Welfare Involved Youth Demographics | | | | | |
|---|---|---|---|---|---|
| **Staff-Assigned Gender** | **Count** | **%** | **Sexual Orientation** | **Count** | **%** |
| Male | 1,223 | 78.2% | Straight or Heterosexual | 1,226 | 78.4% |
| Female | 340 | 21.8% | Missing | 251 | 16.1% |
| **Gender Identity** | | | Bisexual | 48 | 3.1% |
| Male | 1,063 | 68.0% | Lesbian or Gay | 24 | 1.5% |
| Female | 285 | 18.2% | Do Not Know/Questioning | x[60] | x |
| Missing | 209 | 13.4% | Refused to Answer | x | x |
| Non binary/ gender Non-conforming | x | x | Pansexual | x | x |
| Genderqueer | x | x | Prefer No Labels | x | x |
| **Ethnicity** | | | Other | x | x |
| Hispanic | 636 | 40.7% | **Age at Admission** | | |
| White | 517 | 33.1% | 10 | x | x |
| Black or African American | 348 | 22.3% | 11 | x | x |
| Unable to Determine/Missing | 29 | 1.9% | 12 | 26 | 1.7% |
| American Indian or Alaskan Native | 15 | 1.0% | 13 | 121 | 7.7% |
| Asian | x | x | 14 | 227 | 14.5% |
| Native Hawaiian/Pacific Islander | x | x | 15 | 328 | 21.0% |
| | | | 16 | 405 | 25.9% |
| | | | 17 | 443 | 28.3% |
| | | | **Total** | **1,563** | **100.0%** |

[60] Youth counts below 12 have been masked to preserve client privacy.

# Appendix G: Offense Category Detail

*Table 44: Offenses and Their Corresponding Offense Types*

| Offense Type | Offenses |
|---|---|
| Person | Homicide, Manslaughter, Criminally Negligent Homicide, Vehicular Homicide, Assault, Vehicular Assault, Menacing, Kidnapping, Sexual Assault/Contact, Robbery, Aggravated Robbery, Child Abuse, Sexual Exploitation of a Child, Domestic Violence, Wrongs to At-Risk Adults, Incest, Sexual Assault on a Child, Reckless Endangerment |
| Property | Burglary and Related Offenses, Motor Vehicle Theft, Aggravated Motor Vehicle Theft, Theft, Trespass/Tampering/Criminal Mischief |
| Drug | Use/Possession/Distribution of Controlled Substance IV/V, Possession/Distribution of Controlled Substance I/II/III, Drug Paraphernalia Use |
| Weapon | Possession of a Handgun, Firearms and Weapons, Carrying a Concealed Weapon |
| Other | Forgery/Simulation/Impersonation, Fraud, Financial Transaction Device Crimes, Sexual Exploitation of a Child, Public Indecency, Obstructing Justice/False ID, Escape, Bribery and Corrupt Influences, Offenses Relating to Judicial Proceedings, Victim/Witness Intimidation, Holding Hostage, Disorderly Conduct, Cruelty to Animals, Offenses Involving Communications/Threats, Stalking, Organized Crime (Gang), Resisting Arrest, Sex Offender Failure to Register, Obstructing a Peace Officer |
| Traffic | Vehicular Manslaughter, Vehicular Eluding, Vehicular Eluding Resulting in Death, Reckless Driving, Other Traffic, Driving Under the Influence, Driving While Intoxicated |
| Status | Runaway, Truancy, Drinking Under Age |

# Additional Contextual Information on Offenses

Offense ranking: Offense ranking is a numerical value assigned to the offense category (felony, misdemeanor, petty) and the offense class (felony 1, misdemeanor 4, etc.). The offense ranking values are assigned in order of least severity to highest severity. These rankings are primarily used for statistical tests. The rankings are shown in the table that follows.

*Table 45: Offense Rankings*

| Offense Category and Class | Offense Rank |
|---|---|
| **Felony** | |
| 1 | 17 |
| 2 | 16 |
| 3 | 15 |
| 4 | 14 |
| 5 | 13 |
| 6 | 12 |
| **Misdemeanor** | |
| 1 | 11 |
| 2 | 10 |
| 3 | 9 |
| 4 | 8 |
| 5 | 7 |
| 6 | 6 |
| **Petty** | |
| 1 | 5 |
| 2 | 4 |
| 3 | 3 |
| 4 | 2 |
| 5 | 1 |
| 6 | 0 |

Crimes of Violence: Crimes of violence are typically Person crimes of violence like assault felonies and homicide felonies. They also include menacing, aggravated robbery, firearm and weapons felonies and manslaughter felonies.

Crimes of Violence are defined by statute in C.R.S. 18-1.3-406:

"(II) Subsection (2)(a)(I) of this section applies to the following crimes:

(A) Any crime against an at-risk adult or at-risk juvenile;

(B) Murder;

(C) First or second degree assault;

(D) Kidnapping;

(E) A sexual offense pursuant to part 4 of article 3 of this title;

(F) Aggravated robbery;

(G) First degree arson;

(H) First degree burglary;

(I) Escape;

(J) Criminal extortion;

(K) First or second degree unlawful termination of pregnancy;

(L) Human trafficking for involuntary servitude of an adult or a minor in violation of section 18-3-503; or

(M) Human trafficking for sexual servitude of an adult or a minor in violation of section 18-3-504.

(b) (I) "Crime of violence" also means any unlawful sexual offense in which the defendant caused bodily injury to the victim or in which the defendant used threat, intimidation, or force against the victim. For purposes of this subparagraph (I), "unlawful sexual offense" shall have the same meaning as set forth in section 18-3-411(1), and "bodily injury" shall have the same meaning as set forth in section 18-1-901(3)(c)."

# Appendix H: Emergency Bed Criteria

A judicial district may access an emergency bed once the following criteria have been met, in accordance with C.R.S. 19-2.5-1407.3(4)(c)(I)(A-D).

1. All beds allocated to the judicial district are being utilized by the JD.
2. The DYS detention facility(s) in which the judicial district's beds are located are all being utilized.
3. There are no beds available in the catchment (or region) area.
4. There are no open detention beds to borrow within fifty miles of the judicial district's initial receiving detention facility.
    a. This does not apply if the point of arrest was fifty miles or more from the initial detention receiving facility.
    b. This does not apply if the juvenile is being returned to the initial detention receiving facility as a result of being in a borrowed bed that was relinquished.

A petition must be filed by the district attorney or the county attorney that supports the above criteria no later than the next business day in accordance with. C.R.S. 19-2.5-1407.3(4)(c)(II).

The court shall issue an order permitting the use of the emergency bed upon finding in accordance with C.R.S. 19-2.5-1407.3(4)(c)(II)(A-D).

1. There is a legal basis for the detention of all youth by the JD.
2. There are currently no services available that mitigate the substantial risk or flight risk of any of the youth detained by the JD.
3. There are no services available to mitigate the risk of the youth being detained, including the youth being placed in the emergency bed.

A hearing must be held every five business days to inform the court that the circumstances still exist and that the juvenile is still in an emergency detention bed as defined in C.R.S. 19-2.5-1407.3(4)(IV).

# Appendix I: Emergency Bed Tables

*Table 46: Accompanying Statewide and Regional (Southern: S, Central: Cen, Northeast: NE, Western: W) Breakdowns of Daily Emergency Bed Usage*

| Date | S | Cen | NE | W | State | Date | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| July 2024 | | | | | | August 2024 | | | | | |
| 7/1/24 | 9 | 0 | 0 | 0 | 9 | 8/1/24 | 0 | 0 | 0 | 0 | 0 |
| 7/2/24 | 6 | 0 | 0 | 0 | 6 | 8/2/24 | 0 | 0 | 0 | 0 | 0 |
| 7/3/24 | 4 | 0 | 0 | 0 | 4 | 8/3/24 | 0 | 0 | 0 | 0 | 0 |
| 7/4/24 | 4 | 0 | 0 | 0 | 4 | 8/4/24 | 1 | 0 | 0 | 0 | 1 |
| 7/5/24 | 4 | 0 | 0 | 0 | 4 | 8/5/24 | 2 | 0 | 0 | 0 | 2 |
| 7/6/24 | 5 | 0 | 0 | 0 | 5 | 8/6/24 | 3 | 0 | 0 | 0 | 3 |
| 7/7/24 | 5 | 0 | 0 | 0 | 5 | 8/7/24 | 3 | 0 | 0 | 1 | 4 |
| 7/8/24 | 6 | 0 | 0 | 0 | 6 | 8/8/24 | 2 | 0 | 0 | 0 | 2 |
| 7/9/24 | 3 | 0 | 0 | 0 | 3 | 8/9/24 | 3 | 0 | 0 | 0 | 3 |
| 7/10/24 | 0 | 0 | 0 | 0 | 0 | 8/10/24 | 4 | 0 | 0 | 0 | 4 |
| 7/11/24 | 3 | 0 | 0 | 0 | 3 | 8/11/24 | 6 | 0 | 0 | 1 | 7 |
| 7/12/24 | 3 | 0 | 0 | 0 | 3 | 8/12/24 | 8 | 0 | 0 | 3 | 11 |
| 7/13/24 | 2 | 0 | 0 | 0 | 2 | 8/13/24 | 7 | 0 | 0 | 2 | 9 |
| 7/14/24 | 1 | 0 | 0 | 0 | 1 | 8/14/24 | 7 | 0 | 0 | 2 | 9 |
| 7/15/24 | 1 | 0 | 0 | 0 | 1 | 8/15/24 | 2 | 0 | 0 | 2 | 4 |
| 7/16/24 | 1 | 0 | 0 | 0 | 1 | 8/16/24 | 4 | 0 | 0 | 0 | 4 |
| 7/17/24 | 1 | 0 | 0 | 0 | 1 | 8/17/24 | 5 | 0 | 0 | 0 | 5 |
| 7/18/24 | 1 | 0 | 0 | 0 | 1 | 8/18/24 | 5 | 0 | 0 | 0 | 5 |
| 7/19/24 | 2 | 0 | 0 | 0 | 2 | 8/19/24 | 5 | 0 | 0 | 0 | 5 |
| 7/20/24 | 2 | 0 | 0 | 0 | 2 | 8/20/24 | 3 | 0 | 0 | 0 | 3 |
| 7/21/24 | 2 | 0 | 0 | 0 | 2 | 8/21/24 | 3 | 0 | 0 | 0 | 3 |
| 7/22/24 | 3 | 0 | 0 | 0 | 3 | 8/22/24 | 2 | 0 | 0 | 0 | 2 |
| 7/23/24 | 3 | 0 | 0 | 0 | 3 | 8/23/24 | 2 | 0 | 0 | 0 | 2 |
| 7/24/24 | 2 | 0 | 0 | 0 | 2 | 8/24/24 | 2 | 0 | 0 | 1 | 3 |
| 7/25/24 | 1 | 0 | 0 | 0 | 1 | 8/25/24 | 3 | 0 | 0 | 1 | 4 |
| 7/26/24 | 0 | 0 | 0 | 0 | 0 | 8/26/24 | 4 | 0 | 0 | 1 | 5 |
| 7/27/24 | 0 | 0 | 0 | 0 | 0 | 8/27/24 | 4 | 0 | 0 | 0 | 4 |
| 7/28/24 | 0 | 0 | 0 | 0 | 0 | 8/28/24 | 5 | 0 | 0 | 0 | 5 |
| 7/29/24 | 0 | 0 | 0 | 0 | 0 | 8/29/24 | 4 | 0 | 0 | 0 | 4 |

| Date | S | Cen | NE | W | State | Date | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/30/24 | 0 | 0 | 0 | 0 | 0 | 8/30/24 | 4 | 0 | 0 | 0 | 4 |
| 7/31/24 | 0 | 0 | 0 | 0 | 0 | 8/31/24 | 3 | 0 | 0 | 0 | 3 |
| September 2024 | | | | | | October 2024 | | | | | |
| 9/1/24 | 3 | 0 | 0 | 0 | 3 | 10/1/24 | 0 | 0 | 0 | 0 | 0 |
| 9/2/24 | 3 | 0 | 0 | 0 | 3 | 10/2/24 | 0 | 0 | 0 | 0 | 0 |
| 9/3/24 | 3 | 0 | 0 | 0 | 3 | 10/3/24 | 0 | 0 | 0 | 0 | 0 |
| 9/4/24 | 1 | 0 | 0 | 0 | 1 | 10/4/24 | 0 | 0 | 0 | 0 | 0 |
| 9/5/24 | 0 | 0 | 0 | 0 | 0 | 10/5/24 | 0 | 0 | 0 | 0 | 0 |
| 9/6/24 | 0 | 0 | 0 | 0 | 0 | 10/6/24 | 0 | 0 | 0 | 0 | 0 |
| 9/7/24 | 0 | 0 | 0 | 0 | 0 | 10/7/24 | 0 | 0 | 0 | 0 | 0 |
| 9/8/24 | 0 | 0 | 0 | 0 | 0 | 10/8/24 | 0 | 0 | 0 | 4 | 4 |
| 9/9/24 | 0 | 0 | 0 | 0 | 0 | 10/9/24 | 0 | 0 | 0 | 4 | 4 |
| 9/10/24 | 0 | 0 | 0 | 0 | 0 | 10/10/24 | 1 | 0 | 0 | 1 | 2 |
| 9/11/24 | 0 | 0 | 0 | 0 | 0 | 10/11/24 | 2 | 0 | 0 | 1 | 3 |
| 9/12/24 | 0 | 0 | 0 | 0 | 0 | 10/12/24 | 1 | 0 | 0 | 0 | 1 |
| 9/13/24 | 0 | 0 | 0 | 0 | 0 | 10/13/24 | 1 | 0 | 0 | 1 | 2 |
| 9/14/24 | 0 | 0 | 0 | 0 | 0 | 10/14/24 | 3 | 0 | 0 | 1 | 4 |
| 9/15/24 | 0 | 0 | 0 | 0 | 0 | 10/15/24 | 3 | 0 | 0 | 0 | 3 |
| 9/16/24 | 0 | 0 | 0 | 0 | 0 | 10/16/24 | 2 | 0 | 0 | 0 | 2 |
| 9/17/24 | 0 | 0 | 0 | 0 | 0 | 10/17/24 | 0 | 0 | 0 | 1 | 1 |
| 9/18/24 | 0 | 0 | 0 | 0 | 0 | 10/18/24 | 0 | 0 | 0 | 1 | 1 |
| 9/19/24 | 0 | 0 | 0 | 0 | 0 | 10/19/24 | 0 | 0 | 0 | 0 | 0 |
| 9/20/24 | 0 | 0 | 0 | 1 | 1 | 10/20/24 | 1 | 0 | 0 | 0 | 1 |
| 9/21/24 | 0 | 0 | 0 | 1 | 1 | 10/21/24 | 1 | 0 | 0 | 2 | 3 |
| 9/22/24 | 0 | 0 | 0 | 1 | 1 | 10/22/24 | 0 | 0 | 0 | 3 | 3 |
| 9/23/24 | 0 | 0 | 0 | 1 | 1 | 10/23/24 | 0 | 0 | 0 | 3 | 3 |
| 9/24/24 | 0 | 0 | 0 | 0 | 0 | 10/24/24 | 0 | 0 | 0 | 2 | 2 |
| 9/25/24 | 0 | 0 | 0 | 0 | 0 | 10/25/24 | 0 | 0 | 0 | 3 | 3 |
| 9/26/24 | 0 | 0 | 0 | 0 | 0 | 10/26/24 | 0 | 0 | 0 | 4 | 4 |
| 9/27/24 | 0 | 0 | 0 | 0 | 0 | 10/27/24 | 0 | 0 | 0 | 4 | 4 |
| 9/28/24 | 0 | 0 | 0 | 0 | 0 | 10/28/24 | 0 | 0 | 0 | 4 | 4 |
| 9/29/24 | 0 | 0 | 0 | 0 | 0 | 10/29/24 | 0 | 0 | 0 | 2 | 2 |
| 9/30/24 | 0 | 0 | 0 | 0 | 0 | 10/30/24 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | 10/31/24 | 0 | 0 | 0 | 2 | 2 |
| November 2024 | | | | | | December 2024 | | | | | |

| Date | S | Cen | NE | W | State | Date | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/1/24 | 0 | 0 | 0 | 2 | **2** | 12/1/24 | 0 | 0 | 0 | 2 | **2** |
| 11/2/24 | 0 | 0 | 0 | 1 | **1** | 12/2/24 | 0 | 0 | 0 | 2 | **2** |
| 11/3/24 | 0 | 0 | 0 | 2 | **2** | 12/3/24 | 0 | 0 | 0 | 1 | **1** |
| 11/4/24 | 0 | 0 | 0 | 2 | **2** | 12/4/24 | 0 | 0 | 0 | 1 | **1** |
| 11/5/24 | 0 | 0 | 0 | 2 | **2** | 12/5/24 | 0 | 0 | 0 | 1 | **1** |
| 11/6/24 | 0 | 0 | 0 | 2 | **2** | 12/6/24 | 0 | 0 | 0 | 0 | **0** |
| 11/7/24 | 0 | 0 | 0 | 2 | **2** | 12/7/24 | 0 | 0 | 0 | 0 | **0** |
| 11/8/24 | 0 | 0 | 0 | 3 | **3** | 12/8/24 | 0 | 0 | 0 | 0 | **0** |
| 11/9/24 | 0 | 0 | 0 | 3 | **3** | 12/9/24 | 0 | 0 | 0 | 0 | **0** |
| 11/10/24 | 0 | 0 | 0 | 3 | **3** | 12/10/24 | 0 | 0 | 0 | 0 | **0** |
| 11/11/24 | 0 | 0 | 0 | 3 | **3** | 12/11/24 | 0 | 0 | 0 | 0 | **0** |
| 11/12/24 | 0 | 0 | 0 | 3 | **3** | 12/12/24 | 0 | 0 | 0 | 0 | **0** |
| 11/13/24 | 0 | 0 | 0 | 3 | **3** | 12/13/24 | 0 | 0 | 0 | 0 | **0** |
| 11/14/24 | 0 | 0 | 0 | 3 | **3** | 12/14/24 | 0 | 0 | 0 | 0 | **0** |
| 11/15/24 | 0 | 0 | 0 | 2 | **2** | 12/15/24 | 0 | 0 | 0 | 0 | **0** |
| 11/16/24 | 0 | 0 | 0 | 0 | **0** | 12/16/24 | 0 | 0 | 0 | 0 | **0** |
| 11/17/24 | 0 | 0 | 0 | 0 | **0** | 12/17/24 | 0 | 0 | 0 | 0 | **0** |
| 11/18/24 | 0 | 0 | 0 | 0 | **0** | 12/18/24 | 0 | 0 | 0 | 0 | **0** |
| 11/19/24 | 0 | 0 | 3 | 0 | **3** | 12/19/24 | 0 | 0 | 0 | 0 | **0** |
| 11/20/24 | 0 | 0 | 3 | 0 | **3** | 12/20/24 | 0 | 0 | 0 | 0 | **0** |
| 11/21/24 | 0 | 0 | 0 | 0 | **0** | 12/21/24 | 0 | 0 | 0 | 0 | **0** |
| 11/22/24 | 0 | 0 | 0 | 0 | **0** | 12/22/24 | 0 | 0 | 0 | 0 | **0** |
| 11/23/24 | 0 | 0 | 0 | 0 | **0** | 12/23/24 | 0 | 0 | 0 | 0 | **0** |
| 11/24/24 | 0 | 0 | 0 | 1 | **1** | 12/24/24 | 0 | 0 | 0 | 0 | **0** |
| 11/25/24 | 0 | 0 | 0 | 1 | **1** | 12/25/24 | 0 | 0 | 0 | 0 | **0** |
| 11/26/24 | 0 | 0 | 0 | 1 | **1** | 12/26/24 | 0 | 0 | 0 | 0 | **0** |
| 11/27/24 | 0 | 0 | 0 | 2 | **2** | 12/27/24 | 0 | 0 | 0 | 0 | **0** |
| 11/28/24 | 0 | 0 | 0 | 2 | **2** | 12/28/24 | 0 | 0 | 0 | 0 | **0** |
| 11/29/24 | 0 | 0 | 0 | 2 | **2** | 12/29/24 | 0 | 0 | 0 | 0 | **0** |
| 11/30/24 | 0 | 0 | 0 | 2 | **2** | 12/30/24 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | 12/31/24 | 0 | 0 | 0 | 0 | **0** |
| **January 2025** | | | | | | **February 2025** | | | | | |
| 1/1/25 | 0 | 0 | 0 | 0 | **0** | 2/1/25 | 0 | 0 | 0 | 0 | **0** |
| 1/2/25 | 0 | 0 | 0 | 0 | **0** | 2/2/25 | 0 | 0 | 0 | 0 | **0** |
| 1/3/25 | 0 | 0 | 0 | 0 | **0** | 2/3/25 | 0 | 0 | 0 | 0 | **0** |

| Date | S | Cen | NE | W | State | Date | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1/4/25 | 0 | 0 | 0 | 0 | **0** | 2/4/25 | 0 | 0 | 0 | 0 | **0** |
| 1/5/25 | 0 | 0 | 0 | 0 | **0** | 2/5/25 | 0 | 0 | 0 | 0 | **0** |
| 1/6/25 | 0 | 0 | 0 | 0 | **0** | 2/6/25 | 0 | 0 | 0 | 0 | **0** |
| 1/7/25 | 0 | 0 | 0 | 0 | **0** | 2/7/25 | 0 | 0 | 0 | 0 | **0** |
| 1/8/25 | 0 | 0 | 0 | 0 | **0** | 2/8/25 | 0 | 0 | 0 | 0 | **0** |
| 1/9/25 | 0 | 0 | 0 | 0 | **0** | 2/9/25 | 0 | 0 | 0 | 0 | **0** |
| 1/10/25 | 0 | 0 | 0 | 0 | **0** | 2/10/25 | 0 | 0 | 0 | 0 | **0** |
| 1/11/25 | 0 | 0 | 0 | 0 | **0** | 2/11/25 | 0 | 0 | 0 | 0 | **0** |
| 1/12/25 | 0 | 0 | 0 | 0 | **0** | 2/12/25 | 0 | 0 | 0 | 0 | **0** |
| 1/13/25 | 0 | 0 | 0 | 0 | **0** | 2/13/25 | 0 | 0 | 0 | 0 | **0** |
| 1/14/25 | 0 | 0 | 0 | 0 | **0** | 2/14/25 | 0 | 0 | 0 | 0 | **0** |
| 1/15/25 | 0 | 0 | 0 | 0 | **0** | 2/15/25 | 0 | 0 | 0 | 0 | **0** |
| 1/16/25 | 0 | 0 | 0 | 0 | **0** | 2/16/25 | 0 | 0 | 0 | 0 | **0** |
| 1/17/25 | 0 | 0 | 0 | 0 | **0** | 2/17/25 | 0 | 0 | 0 | 0 | **0** |
| 1/18/25 | 0 | 0 | 0 | 0 | **0** | 2/18/25 | 0 | 0 | 0 | 0 | **0** |
| 1/19/25 | 0 | 0 | 0 | 0 | **0** | 2/19/25 | 0 | 0 | 0 | 0 | **0** |
| 1/20/25 | 0 | 0 | 0 | 0 | **0** | 2/20/25 | 0 | 0 | 0 | 0 | **0** |
| 1/21/25 | 0 | 0 | 0 | 0 | **0** | 2/21/25 | 0 | 0 | 0 | 0 | **0** |
| 1/22/25 | 0 | 0 | 0 | 0 | **0** | 2/22/25 | 0 | 0 | 0 | 0 | **0** |
| 1/23/25 | 0 | 0 | 0 | 0 | **0** | 2/23/25 | 1 | 0 | 0 | 0 | **1** |
| 1/24/25 | 0 | 0 | 0 | 0 | **0** | 2/24/25 | 1 | 0 | 0 | 0 | **1** |
| 1/25/25 | 0 | 0 | 0 | 0 | **0** | 2/25/25 | 0 | 0 | 0 | 0 | **0** |
| 1/26/25 | 0 | 0 | 0 | 0 | **0** | 2/26/25 | 0 | 0 | 0 | 0 | **0** |
| 1/27/25 | 0 | 0 | 0 | 0 | **0** | 2/27/25 | 0 | 0 | 0 | 0 | **0** |
| 1/28/25 | 0 | 0 | 0 | 0 | **0** | 2/28/25 | 0 | 0 | 0 | 0 | **0** |
| 1/29/25 | 0 | 0 | 0 | 0 | **0** | | | | | | |
| 1/30/25 | 0 | 0 | 0 | 0 | **0** | | | | | | |
| 1/31/25 | 0 | 0 | 0 | 0 | **0** | | | | | | |
| March 2025 | | | | | | April 2025 | | | | | |
| 3/1/25 | 0 | 0 | 0 | 0 | **0** | 4/1/25 | 0 | 0 | 0 | 0 | **0** |
| 3/2/25 | 0 | 0 | 0 | 0 | **0** | 4/2/25 | 0 | 0 | 0 | 0 | **0** |
| 3/3/25 | 0 | 0 | 0 | 0 | **0** | 4/3/25 | 0 | 0 | 0 | 0 | **0** |
| 3/4/25 | 0 | 0 | 0 | 0 | **0** | 4/4/25 | 0 | 0 | 0 | 0 | **0** |
| 3/5/25 | 0 | 0 | 0 | 0 | **0** | 4/5/25 | 0 | 0 | 0 | 0 | **0** |
| 3/6/25 | 0 | 0 | 0 | 0 | **0** | 4/6/25 | 0 | 0 | 0 | 0 | **0** |

| Date | S | Cen | NE | W | State | Date | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3/7/25 | 0 | 0 | 0 | 0 | **0** | 4/7/25 | 0 | 0 | 0 | 0 | **0** |
| 3/8/25 | 0 | 0 | 0 | 0 | **0** | 4/8/25 | 0 | 0 | 0 | 0 | **0** |
| 3/9/25 | 0 | 0 | 0 | 0 | **0** | 4/9/25 | 0 | 0 | 0 | 0 | **0** |
| 3/10/25 | 0 | 0 | 0 | 0 | **0** | 4/10/25 | 0 | 0 | 0 | 0 | **0** |
| 3/11/25 | 0 | 0 | 0 | 0 | **0** | 4/11/25 | 0 | 0 | 0 | 0 | **0** |
| 3/12/25 | 0 | 0 | 0 | 0 | **0** | 4/12/25 | 0 | 0 | 0 | 0 | **0** |
| 3/13/25 | 0 | 0 | 0 | 0 | **0** | 4/13/25 | 0 | 0 | 0 | 0 | **0** |
| 3/14/25 | 0 | 0 | 0 | 0 | **0** | 4/14/25 | 0 | 0 | 0 | 0 | **0** |
| 3/15/25 | 0 | 0 | 0 | 0 | **0** | 4/15/25 | 0 | 0 | 0 | 0 | **0** |
| 3/16/25 | 0 | 0 | 0 | 0 | **0** | 4/16/25 | 0 | 0 | 0 | 3 | **3** |
| 3/17/25 | 0 | 0 | 0 | 0 | **0** | 4/17/25 | 0 | 0 | 0 | 3 | **3** |
| 3/18/25 | 0 | 0 | 0 | 0 | **0** | 4/18/25 | 0 | 0 | 0 | 3 | **3** |
| 3/19/25 | 0 | 0 | 0 | 0 | **0** | 4/19/25 | 0 | 0 | 0 | 2 | **2** |
| 3/20/25 | 0 | 0 | 0 | 0 | **0** | 4/20/25 | 0 | 0 | 0 | 2 | **2** |
| 3/21/25 | 0 | 0 | 0 | 0 | **0** | 4/21/25 | 0 | 0 | 0 | 2 | **2** |
| 3/22/25 | 0 | 0 | 0 | 0 | **0** | 4/22/25 | 0 | 0 | 0 | 1 | **1** |
| 3/23/25 | 0 | 0 | 0 | 0 | **0** | 4/23/25 | 1 | 0 | 0 | 1 | **1** |
| 3/24/25 | 0 | 0 | 0 | 0 | **0** | 4/24/25 | 1 | 0 | 0 | 1 | **1** |
| 3/25/25 | 0 | 0 | 0 | 0 | **0** | 4/25/25 | 0 | 0 | 0 | 1 | **1** |
| 3/26/25 | 0 | 0 | 0 | 0 | **0** | 4/26/25 | 0 | 0 | 0 | 1 | **1** |
| 3/27/25 | 0 | 0 | 0 | 0 | **0** | 4/27/25 | 0 | 0 | 0 | 1 | **1** |
| 3/28/25 | 0 | 0 | 0 | 0 | **0** | 4/28/25 | 0 | 0 | 0 | 1 | **1** |
| 3/29/25 | 0 | 0 | 0 | 0 | **0** | 4/29/25 | 0 | 0 | 0 | 1 | **1** |
| 3/30/25 | 0 | 0 | 0 | 0 | **0** | 4/30/25 | 0 | 0 | 0 | 1 | **1** |
| 3/31/25 | 0 | 0 | 0 | 0 | **0** | | | | | | |
| **May 2025** | | | | | | **June 2025** | | | | | |
| 5/1/25 | 0 | 0 | 0 | 1 | **1** | 6/1/25 | 2 | 0 | 0 | 0 | **2** |
| 5/2/25 | 0 | 0 | 0 | 1 | **1** | 6/2/25 | 2 | 0 | 0 | 0 | **2** |
| 5/3/25 | 0 | 0 | 0 | 0 | **0** | 6/3/25 | 2 | 0 | 0 | 0 | **2** |
| 5/4/25 | 0 | 0 | 0 | 0 | **0** | 6/4/25 | 4 | 0 | 0 | 0 | **4** |
| 5/5/25 | 0 | 0 | 0 | 0 | **0** | 6/5/25 | 4 | 0 | 0 | 0 | **4** |
| 5/6/25 | 0 | 0 | 0 | 0 | **0** | 6/6/25 | 2 | 0 | 0 | 0 | **2** |
| 5/7/25 | 0 | 0 | 0 | 0 | **0** | 6/7/25 | 2 | 0 | 0 | 0 | **2** |
| 5/8/25 | 0 | 0 | 0 | 0 | **0** | 6/8/25 | 3 | 0 | 0 | 0 | **3** |
| 5/9/25 | 0 | 0 | 0 | 0 | **0** | 6/9/25 | 4 | 0 | 0 | 0 | **4** |

| Date | S | Cen | NE | W | State | Date | S | Cen | NE | W | State |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/25 | 0 | 0 | 0 | 0 | **0** | 6/10/25 | 4 | 0 | 0 | 0 | **4** |
| 5/11/25 | 0 | 0 | 0 | 0 | **0** | 6/11/25 | 4 | 0 | 0 | 0 | **4** |
| 5/12/25 | 0 | 0 | 0 | 0 | **0** | 6/12/25 | 3 | 0 | 0 | 0 | **3** |
| 5/13/25 | 0 | 0 | 0 | 0 | **0** | 6/13/25 | 3 | 0 | 0 | 0 | **3** |
| 5/14/25 | 0 | 0 | 0 | 0 | **0** | 6/14/25 | 4 | 0 | 0 | 0 | **4** |
| 5/15/25 | 0 | 0 | 0 | 0 | **0** | 6/15/25 | 4 | 0 | 0 | 0 | **4** |
| 5/16/25 | 0 | 0 | 0 | 0 | **0** | 6/16/25 | 6 | 0 | 0 | 0 | **6** |
| 5/17/25 | 0 | 0 | 0 | 0 | **0** | 6/17/25 | 6 | 0 | 0 | 0 | **6** |
| 5/18/25 | 0 | 0 | 0 | 0 | **0** | 6/18/25 | 5 | 0 | 0 | 0 | **5** |
| 5/19/25 | 0 | 0 | 0 | 0 | **0** | 6/19/25 | 4 | 0 | 0 | 0 | **4** |
| 5/20/25 | 0 | 0 | 0 | 0 | **0** | 6/20/25 | 7 | 0 | 0 | 0 | **7** |
| 5/21/25 | 0 | 0 | 0 | 0 | **0** | 6/21/25 | 7 | 0 | 0 | 0 | **7** |
| 5/22/25 | 1 | 0 | 0 | 0 | **1** | 6/22/25 | 8 | 0 | 0 | 0 | **8** |
| 5/23/25 | 1 | 0 | 0 | 0 | **1** | 6/23/25 | 8 | 0 | 0 | 0 | **8** |
| 5/24/25 | 2 | 0 | 0 | 0 | **2** | 6/24/25 | 8 | 0 | 0 | 0 | **8** |
| 5/25/25 | 2 | 0 | 0 | 0 | **2** | 6/25/25 | 5 | 0 | 0 | 0 | **5** |
| 5/26/25 | 2 | 0 | 0 | 0 | **2** | 6/26/25 | 2 | 0 | 0 | 0 | **2** |
| 5/27/25 | 2 | 0 | 0 | 0 | **2** | 6/27/25 | 3 | 0 | 0 | 0 | **3** |
| 5/28/25 | 4 | 0 | 0 | 0 | **4** | 6/28/25 | 6 | 0 | 0 | 0 | **6** |
| 5/29/25 | 5 | 0 | 0 | 0 | **5** | 6/29/25 | 7 | 0 | 0 | 0 | **7** |
| 5/30/25 | 4 | 0 | 0 | 0 | **4** | 6/30/25 | 7 | 0 | 0 | 0 | **7** |
| 5/31/25 | 2 | 0 | 0 | 0 | **2** | | | | | | |

# Appendix J: Statistical Results

These are the values for the statistical tests mentioned throughout this report. In the charts below, only the statistically significant and noteworthy results are included. Additional tests were also conducted that were not included due to insignificant effect sizes or lack of statistical significance.

*Table 47: Statistical Correlations Results for Youth Outcomes*

| Independent Variable | Dependent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|---|
| Ethnicity | Charge Level | T-Test | 0.001 | -0.59 | Standard Mean Difference |
| Ethnicity (Black youth) | Charge Level | T-Test | 0.001 | 0.718 | Standard Mean Difference |
| Gender | Charge Level | T-Test | 0.001 | 1.044 | Standard Mean Difference |
| Sexual Orientation | Charge Level | T-Test | 0.003 | 0.71 | Standard Mean Difference |
| Age | CJRA Level | Spearman's Rho | 0.001 | -0.195 | Effect Size |
| Ethnicity | CJRA Level | Somer's D/Cramer's V | 0.001 | -0.132 | Effect Size |
| Ethnicity - Black youth | CJRA Level | Somer's D/Cramer's V | 0.015 | 0.064 | Effect Size |
| Ethnicity - Hispanic youth | CJRA Level | Somer's D/Cramer's V | 0.001 | -0.167 | Effect Size |
| Gender | CJRA Level | Somer's D/Cramer's V | 0.001 | 0.119 | Effect Size |
| Youth Awaiting Mitigating Services (YN) | CJRA Level | Somer's D/Cramer's V | 0.001 | 0.325 | Effect Size |
| Sexual Orientation | CJRA Level | Somer's D/Cramer's V | 0.003 | -0.076 | Effect Size |

| Independent Variable | Dependent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|---|
| Ethnicity (Black youth) | Detention Involvements (all) | T-Test | 0.001 | 0.449 | Standard Mean Difference |
| Ethnicity (Hispanic youth) | Detention Involvements (all) | T-Test | 0.004 | 0.23 | Standard Mean Difference |
| Ethnicity (Asian other non White) | Detention Involvements (all) | T-Test | 0.014 | 0.458 | Standard Mean Difference |
| Ethnicity | LOS | Eta/Spearman | 0.009 | 0.051 | Effect Size |
| Ethnicity - Black Youth | LOS | T-Test | 0.001 | 36.6% | Standard Mean Difference |
| Detention Involvements (prior to cohort) | LOS | Linear Regression | 0.001 | 0.416/51.6% | Log value B Coefficient |
| Detention Involvements (prior to cohort) | LOS Awaiting Services | Linear Regression | 0.001 | 0.156/16.9% | Log value B Coefficient |
| Offenses | LOS | Linear Regression | 0.001 | 0.14/15.0% | Log value B Coefficient |

# Appendix K: Out-of-Home Placement Costs

*Table 48: Detailed Breakdown of Costs for Out-of-Home Placements by Youth in Detention and Not in Detention*

| | Placement Type[61] | Foster Family Home Care | Foster Family Home Care-CPA | Group Home | Kinship Care | Kinship Foster Care | Qualified Residential Treatment Program | Residential Child Care Facility | Specialized Foster Home |
|---|---|---|---|---|---|---|---|---|---|
| All Youth (10-17 years) | *Total OOH Bed Days* | 80,053 | 129,617 | 18,633 | 253,884 | 105,106 | 26,347 | 10,033 | 25,901 |
| | *Expenditure Total* | $5,095,820 | $16,119,114 | $4,823,518 | $2,647,473 | $5,261,543 | $7,612,627 | $2,694,998 | $3,219,097 |
| | *Average Daily Rate* | $63.66 | $124.36 | $258.87 | $10.43 | $50.06 | $288.94 | $268.61 | $124.28 |
| Youth in Detention | *Total OOH Bed Days* | 6,868 | 4,575 | 2,982 | 14,774 | 1,750 | 7,540 | 3,644 | 2,322 |
| | *Expenditure Total* | $474,510 | $683,923 | $838,710 | $182,239 | $109,518 | $2,021,387 | $992,107 | $380,068 |
| | *Average Daily Rate* | $69.09 | $149.49 | $281.26 | $12.34 | $62.58 | $268.09 | $272.26 | $163.68 |
| Youth Not in Detention (10-17 years) | *Total OOH Bed Days* | 73,185 | 125,042 | 15,651 | 239,110 | 103,356 | 18,807 | 6,389 | 23,579 |
| | *Expenditure Total* | $4,621,310 | $15,435,191 | $3,984,808 | $2,465,234 | $5,152,025 | $5,591,240 | $1,702,891 | $2,839,029 |
| | *Average Daily Rate* | $63.15 | $123.44 | $254.60 | $10.31 | $49.85 | $297.30 | $266.53 | $120.40 |
| | **% Difference in Average Daily Rate** | **9.4%** | **21.1%** | **10.5%** | **19.7%** | **25.5%** | **-9.8%** | **2.2%** | **36.0%** |

[61] Costs for Psychiatric Residential Treatment Facility (PRTF) placements are not included here as the Colorado Department of Health Care Policy and Financing (HCPF) provides payments for these beds.

# Appendix L: Unique Youth and Admissions by Region and Statewide

*Table 49: Unique Youth and Admissions by Region and Statewide*

| Region | Unique Youth in Each Region[62] | Number of Admissions | % of Total Admissions |
|---|---|---|---|
| Central | 820 | 1,078 | 41.2% |
| Northeast | 537 | 695 | 26.6% |
| Southern | 441 | 583 | 22.3% |
| Western | 178 | 261 | 10.0% |
| **Statewide** | **1,937[63]** | **2,617** | **100.0%** |

[62] Nonexclusive numbers (some youth have been in multiple regions, so this number is the unique youth count for each region). These numbers are based on the primary judicial district variable, so if youth experience multiple regions in one admission, these numbers may be slightly underrepresented.

[63] This number differs slightly from the unique youth count in CYDC's annual report. During the data cleaning, some duplicate youth were found and their admissions were collapsed.