# EXHIBIT 3

1. How many days was the statewide bed cap of 215 hit in the last FY?

   Response:
   The cap was met or exceeded thirteen times last fiscal year.

   Director Jacobson testified to the Health and Human Services Committee and the combined Health and Human Services and Judiciary Committee in January. At the latter committee hearing, Director Jacobson clarified that there have been zero times the bed cap was met this FY and that the cap was met or exceeded 13 times last FY.

   It is important to note that measuring whether or not the bed cap was met or exceeded does not take into account judicial districts ensuring they have open bed space to prevent an emergency release or early release and allow for local law enforcement to have the ability to place a youth after arrest, who has met criteria for detention, into detention.

   How many emergency releases occurred in the last FY?

   Response:
   One emergency release due to statewide capacity being met occurred in October 2024.

   Emergency Release Definition: The release of a youth from detention as a result of reaching the judicial district detention capacity and facility capacity, and an Emergency Bed is unable to be utilized, as defined in (C.R.S.) 19-2.5-1407.3(4).

   Further, an emergency release would occur when all other release options have been exhausted and the court has determined that no other youth has met criteria for release. This would mean that a youth emergency released is considered a substantial risk of serious harm to others or a flight risk to avoid prosecution and while no services exist at that time to mitigate such risk, the youth is released into the community.

2. How is an “emergency release” different from the process to petition for use of an “emergency bed.”

Response:
An emergency release will occur when every bed available, including borrowed and emergency beds, are in use. An emergency release requires an order from the court to release the youth.

Judicial districts determine if emergency bed criteria has been met, and the use of the emergency beds are in an effort to avoid emergency release. This is done so by ensuring there are no detention beds available in a 50-mile radius, the judicial districts allocated beds are in use, every youth in detention has a statutory reason for detention, and there are no services at the time to mitigate risk. Upon confirming criteria, the judicial district will petition the court on the next business day for use of the emergency bed and has done so on 212 occasions from October 2023 to current.

3. How many days in 2024 were temporary emergency beds used?

   Response:
   Full implementation of Emergency Beds (EB) utilization began in December 2023. Of the 366 calendar days that followed in 2024, emergency beds were used on 232 of those days. This equates to 63.4% of the year. Conversely, there were only 134 days when EBs were not utilized (36.6% of the year).

4. On those days, how many emergency beds were used each day? We seem to only have a total number over the state fiscal year.

   Response:
   Below is a breakdown of how many beds were used within each month. For calendar year 2024, 756 emergency beds were used on 232 days. This averages to 3.3 emergency beds used on each of those days. The count of emergency beds on those 232 days ranges from 1 bed to 13 beds (see the second table that follows). More detailed data on emergency bed use, by catchment area/region, is published within the SB71 statutory reports on the CDHS Legislative Affairs website.

| CY 2024 | Count of Emergency Beds Used within Month |
|---|---|
| January | 84 |
| February | 4 |
| March | 34 |

COLORADO
Department of Human Services

| | |
|---|---|
| April | 75 |
| May | 86 |
| June | 154 |
| July | 74 |
| August | 120 |
| September | 14 |
| October | 58 |
| November | 49 |
| December | 4 |
| TOTAL | 756 |

| EB use each day (# beds) | Number of Days |
|---|---|
| 1 | 49 |
| 2 | 47 |
| 3 | 48 |
| 4 | 37 |
| 5 | 19 |
| 6 | 14 |
| 7 | 8 |
| 8 | 4 |
| 9 | 3 |
| 10 | 1 |
| 11 | 1 |
| 12 | 0 |
| 13 | 1 |
| Total | 232 |

5. What steps are being taken to ensure quick, if not immediate, placements for youth once they're releasable? 540 youth remained in secure detention after their releasable date

last FY, with an average 22.3 days between releasable date and actual date of release. 152 of them remained in secure detention for more than 30 days after their releasable date. Note: CYDC & DYS made a decision– with no community input– to stop using the word "releasable" in 2025. They now use the term "Youth Awaiting Mitigating Services, or YAMS" rather than releasable. The reality faced by these youth (whether we call them releasable youth or we call them YAMS) has not changed. These youth are being held in the most restrictive setting in the juvenile justice system (jail) because CYDC, DYS, and CDHS have failed to identify community-based services or placement for them, despite the court making that order.

Response:
The division has physical custody and not legal custody of youth in detention and does not case manage youth for transfer to their subsequent placement. Youth who are awaiting mitigation services are managed through the court. Typically, the court transfers custody to the county human services and tasks them with finding placement for the youth. The court schedules ongoing hearings to check in on the status of that placement.

Youth Awaiting Mitigating Services refers to youth whom the Colorado Youth Detention Continuum (CYDC) is actively working to release from detention. If a youth requires out-of-home community-based residential placement, the youth's parent's private insurance, the county Department of Human Services or the Regional Accountability Entity (RAE)—which coordinates Medicaid-funded medical and community-based treatment services—will manage the placement process.

For other mitigating services, the local CYDC coordinator, under the oversight of a judge and through a contract with the Division of Youth Services (DYS), works to secure the court-ordered community-based services. These services are often highly specialized, requiring time to arrange. Various factors can delay a youth's release, such as:

- A parent refusing to sign a personal recognizance (PR) bond
- Waiting for an available bed in an out-of-home placement
- Arranging transportation for youth returning to their home state
- Limited availability of specialized service providers
- Complex needs (e.g., violent offenses, multiple placement failures, or severe mental health challenges) that make placement difficult

Each youth's situation is unique, requiring careful planning to ensure both community safety and the best possible support for the individual. These placements and services are not immediate but are thoughtfully researched and executed to provide the most effective care.

In terms of it taking 22.3 days between releasable date and actual date of release, the ability to identify community based services is measured by length of stay (LOS). The SB 71 report identified factors that influence LOS. For example, prior detention admissions have a significant impact on projected LOS with a projected increase of 10.8 days. A youth with prior detention admissions would indicate that the youth has prior adjudication(s), a failure to appear in court, probation or pre-trial violations that resulted in a remand into detention by the courts. The accumulation of these factors indicate that services have been ineffective and more intervention is needed which can take longer to find. Child welfare involvement increases a youth's projected LOS by 7.61 days. If the youth has been removed from the home, a projected LOS increases by 16.46 days for every case in which they were removed from the home. Prior removals from the home are indicative of failed placements due to behavior or runaway. These factors make subsequent placement acceptance more difficult. Offense severity increases LOS by 6.9 days for each increase in charge level (from a petty crime to F6 to F1). Community service providers and placements may have criteria that excludes youth with certain charges from their services due to risk to the provider. What this tells us is that the ability to create a package of services that mitigate risk is increasingly more difficult when these factors are present. Any one of these factors in isolation increases projected LOS, a combination of these factors, which many youth have, only exacerbates the challenges presented to juvenile justice professionals. CYDC does not approach this work unilaterally. CYDC collaborates with probation, diversion, county DHS and CMP to develop release plans. CDHS dedicates resources and professionals to assist in the staffing of cases that remain in detention. Local multi disciplinary teams include the public defender, juvenile justice agencies, and the district attorney in order to find appropriate services and plans to effect safe and successful release plans.

The CYDC Advisory Board voted to change the word from 'releasable' to 'youth awaiting mitigating services' based on the SB071 data team's recommendation. CYDC must publish its agenda publicly before the meeting and have time for public comment.

6. Do CYDC agencies maintain lists of what service providers they refer youth and family to?

Response:
Each district maintains and uses internal lists of agencies that provide services to youth and families in their community. These providers are either subcontractors to the local judicial district's CYDC program or Medicaid providers.

7. What efforts is CYDC engaging in to address gaps in services as is required by statute?

   Response:
   Each Judicial District has internal processes to assess service needs in their communities. They bring in new service providers frequently based on those needs. Many service providers seek out CYDC and seek to become part of the CYDC service community. The CYDC annual plan development, presentation, and approval process is the time for districts to bring their issues forward to the advisory board and report on new providers and efforts to close gaps.

   As a state, CDHS, HCPF, and BHA are working collaboratively and leading efforts to close gaps in the continuum and address the behavioral health needs of children and youth. The state's efforts to build a robust continuum of care, spanning prevention to recovery, are outlined in the Colorado Children and Youth Behavioral Health Implementation Plan (https://drive.google.com/file/d/1XFwa56Lruzh0Gvb4OZGkULBgM7YZ4y2k/view) which lays out the key priorities and strategy to achieve a children and youth behavioral health system in Colorado that is a comprehensive, equitable, and meets the needs of children and youth in the right place, at the right time.

   A key element of closing gaps in the continuum is the development of the system of care for youth with complex needs, and the investments in high acuity youth services advanced by HB 24-1038. BHA, CDHS, and HCPF are actively working to set the foundation for this system of care that will expand community based interventions for youth with high acuity needs.

8. Do we know how many releasable youth were in the JDs that hit their bed cap on any given day?

   Response:
   Per the most recent SB71 report, youth awaiting mitigating services are an estimated 25-27% of detained youth at some point during their detention stay.

   Judicial districts would need to provide details on how many of their youth were ‘releasable’ when they hit the cap.

9. How many JDs that exceeded their bed cap on any day, requiring them to borrow one or beds or use an emergency bed, also had releasable youth in detention (aka Youth Awaiting Mitigating Services, or YAMS).

Response:
CDHS does not have that information. The case management system (Trails) does not track this level of detail, including triangulation between youth awaiting mitigating services, bed borrowing, and emergency bed usage. Because this level of detail is not tracked, we are not able to determine the reason for the use of an emergency bed beyond current bed capacity

10. In 2024, how many youth in detention had to be moved to a different facility than they would normally go to because of the bed cap? Was the decision to move these youth caused by the statewide cap or due to the allocation for their home judicial district?

    Response:
    This figure is not tracked by judicial districts. The reasons a youth may be moved to a different facility could include the need to appear for a case in another judicial district, a need to separate co-defendants or a victim or at the request of defense counsel. CYDC coordinators report that youth transports to other facilities have declined substantially as a result of temporary emergency bed use implementation. Detention beds used away from the dedicated/home facility can also be a result of multi-jurisdictional cases.

11. Did the majority of bed borrowing in 2024 happen within detention facilities that multiple JDs share?

    Response:
    Bed borrowing occurred at all youth centers across the state and not more so at youth centers used by multiple JDs. JDs will utilize bed borrowing at other regional youth centers as well.

12. How are the 215 beds currently distributed? What metrics are used for that algorithm? When was the last time that CYDC and/or DYS considered alternatives to that algorithm?

    Response:
    The 215 detention beds are allocated annually to catchment areas and judicial districts per statute requirement (Section 19-2.5-1405 - Working group - allocation of beds). The working group uses an allocation model to accomplish this requirement. Since these allocations are required annually, the working group considers alternative factors on an annual basis at a minimum; in many years more frequently. The allocation model has and does change over time.

The factors used within the allocation model for each judicial district (that resulted in the current 215 statewide allocation in place today) include:

- Current, overall Colorado Juvenile Population 10-17 years of age
- Detention Screenings that include Crimes of Violence or Weapons Charge as outlined in Colorado Revised Statute 18-1.3-406 CRS (examples include murder, kidnapping, aggravated robbery, first-degree arson, and first or second-degree assault)
- Detention Admissions that are assessed as High Risk of Recidivism based on the Colorado Juvenile Risk Assessment Pre-Screen.

The factors are individually weighted, and model rules are employed (e.g., a minimum of 2 detention beds per judicial district).

In very general terms, the goal of the working group's allocation committee is to produce allocation models (bed and fiscal) that accurately demonstrate detention needs by jurisdiction.

The bed and fiscal allocation model must be presented to the CYDC advisory board and voted on prior to implementation.

13. When was the last time that algorithm was changed?

Response:
The model was changed, voted on, and accepted by the CYDC advisory board in October 2024. The fiscal year 2025-26 allocation model, effective July 1, 2025, across 23 Judicial Districts, includes the following factors:

- Juvenile Population
- Detention Screenings that resulted in a Level 1 (secure detention) actual placement
- Detention Admissions that are assessed as High Risk of Recidivism

Within the model, the factors are individually weighted, and model rules are employed (e.g., a minimum of 2 detention beds per judicial district).

14. In CDHS November 1 budget request, Director Jacobson indicated that his priority is to add medical staff and to address critical understaffing issues that make it dangerous for

COLORADO
Department of Human Services

the Division to care for the number of youth currently in detention. Is the staffing of DYS detention facilities directly tied to the bed cap? Is there any untangling that could be done there, if so?

Response:
The staffing of DYS detention facilities is based on a bed cap system, which determines when a new pod (or wing) of a building must be reopened. Each pod has a specific capacity, and as long as additional youth can be accommodated within a staffed pod without exceeding that capacity, there is no budget impact. However, if the number of youth increases to the point where an additional pod must be opened—one that is not currently staffed—then staffing costs will increase.

Beyond direct staffing for the new pod, overall facility operations must also be considered. For example, does opening a new pod or building require additional supervisory positions? Will medical and behavioral health staff need to be expanded to maintain appropriate staff-to-youth ratios? These factors all play a role in determining the overall budget impact.

Additionally, the final appropriation included in H.B. 23-1307 did not reflect the total costs originally identified by the Department. Therefore, the Division has been operating with fewer funds for the additional beds. The Department's budget request seeks to address that shortfall in combination with the bed increase.

15. What is a path forward to address critical understaffing and lack of medical services that may be contributing to child injuries and overdoses in DYS at our current bed cap before even considering directing DYS to care for more children? The CDHS JBC Budget Briefing FY 2025/2026, released November 1, 2024, explicitly states that DYS's request for more medical staff is not tied to an increase in the bed cap. See PDF p. 39:

Response:
The Division is not critically understaffed. We remain committed to maintaining safe staffing levels by working diligently and securing the necessary resources. This includes actively requesting additional funding for medical services and staff to ensure all beds are fully funded.

The behavioral health and medical services request was included in the R3 - Increase Bed Cap and Enhance Services request.

COLORADO
Department of Human Services

In the JBC Staff briefing document referenced in the question, JBC Staff accurately notes that the additional funding for behavioral health and medical services staff "are intended to support increased needs for all youth and are not exclusively related to increasing the cap." As noted above, the final appropriation included in H.B. 23-1307 did not reflect the total costs originally identified by the department. Therefore, the Division has been operating with fewer funds for the additional beds. The Department's budget request seeks to address that shortfall in combination with the bed increase.

16. DYS's Nov. 1 budget request suggests, as did the remarks offered by DYS Director Jacobson at the joint session of the Health and Human Services and Judiciary committees on DYS held January 31st, 2025, that the Division's first priority is to ensure that their facilities are adequately staffed and can provide the minimum sufficient level of medical care necessary to treat children already in their facilities. Until DYS can document a significant decrease in the two primary indicators of physical harm to children due to understaffing (restraint injuries and child overdoses), is it legally or morally acceptable to consider putting more children and youth in DYS care?

    Response:
    Data demonstrates the demand for secure detention beds continues to increase, creating an increased strain on statewide capacity. As mentioned above, it is our responsibility to work as hard as necessary to ensure safe levels of staffing, and we continue to do so, including requesting additional funding for medical services and additional staff to fully fund a bed increase.

17. The JBC Briefing Document regarding the CDHS budget request reflects insufficient evidence to support a request for additional funding for juvenile detention beds. (p. 13). While the Governor's budget included a request for $1.7 million for additional capacity within DYS, there is no requirement that the funding go to increase the bed cap- rather, would it be possible for DYS to use this funding to address the emergent needs expressed by the Director Jacobson: medical services, career education for DYS staff, critical understaffing issues relevant to insufficient ratio of staff to detained youth, and access to treatment beds.

    Response:
    The request is tied to the detention bed cap increase. In addition to the funding requested for an increase in beds, the request includes additional funding for behavioral health and medical services staff. As noted above, the final appropriation included in

H.B. 23-1307 did not reflect the total costs originally identified by the department. Therefore, the Division has been operating with fewer funds for the additional beds. The Department's budget request seeks to address that shortfall in combination with the bed increase. Additional requests for funding for other purposes would be evaluated if they came forward.

18. How many child or staff overdoses have occurred in DYS facilities this fiscal year?

Response:
There have been four (4) youth overdoses. An overdose is considered anything that overwhelms the body's ability to function, whether intentionally or unintentionally. It does not speak to the severity of the impairment. DYS is unclear about the reference to "staff overdoses." It is important to clarify that there have been no overdoses involving staff members or staff members contributing to an overdose.

19. How many of those child or staff overdoses took place in detention facilities as opposed to other DYS placement facilities?

Response:
Zero youth overdoses took place in detention facilities. They took place at commitment facilities.

20. There were 7 child overdoses in DYS that required hospitalization in 2024, including one fatal overdose in November (the overdose was 10/21, the child died Nov. 4th, but cause of death was determined by the Coroner to be Fentanyl toxicity. Earlier in 2024, all children in residence at Spring Creek Youth Services Center were tested for drugs the day after a child detained at Spring Creek overdosed on Fentanyl but survived. 20 out of 48 youth detained in the Spring Creek facility tested positive for Fentanyl. Doesn't this suggest a widespread need for access to behavioral health care that would take place outside of DYS facilities, including residential treatment and medically supervised detox programs that include an option for children to move on to residential substance abuse treatment where appropriate?

Response:
In 2024, there were four youth overdoses, with one resulting in hospitalization. A youth who is evaluated at an emergency room does not necessarily indicate the need for hospitalization.

The Denver Post reported seven overdoses that required hospitalization based on contacting local fire departments, which reported the number of times they responded to a facility. However, local fire departments do not know the final diagnosis once the youth is discharged from the emergency room. For example, a youth may have a medical episode that appears to be drug-induced, but it is diagnosed as a seizure with no drugs involved. This would not be communicated back to the local fire department that responded to the call, but it is reported back to the Division of Youth Services. In addition, transportation to an emergency room is not an admission to a hospital.

Overall, four youth met the criteria for an overdose, and one was hospitalized.

Spring Creek and all other DYS commitment programs provide substance abuse treatment, including individual, group, and relapse prevention services. In addition, urine screen testing can take place. Committed youth are sentenced and screened to secure care until they have reduced their risk and become eligible to step down to a non-secure community-based program or parole.

Substance abuse services do not happen in DYS detention centers because the division only has physical custody and not legal custody; therefore, assessments and ongoing treatment services are not provided. In addition, there is no determination on length of stay for a detained youth, and it is not advisable to start treatment with an individual who may be separated on any day. Lastly, caution should be taken when discussing providing treatment services in detention, which could only lengthen the stay of a youth and increase the number of youth in detention beds.

21. Does the widespread use of Fentanyl at Spring Creek Youth Services Center raise special concerns, given that facility's troubled history, particularly as it relates to allegations that staff members bring illegal drugs into the facility and give them to youth?

Response:
The introduction of drug contraband raises concerns in every single case. The Division continues to work diligently on implementing as many interventions available to curb the introduction of drug contraband at all facilities. There is nothing unique to Spring Creek, as easily concealed drugs are not only a concern in the Colorado Division of Youth Services, but nationally.

To date, allegations that staff have provided illegal drugs to youth in Spring Creek has not been substantiated through both internal and external investigations.

22. Has either CYDC or DYS accessed any residential placements for inpatient substance use treatment for a pretrial youth in 2024? How many youth in DYS care have been placed in inpatient substance abuse treatment in all of 2024? How many youth in DYS care have been released after being approved for pretrial supervision by CYDC with participation in an Intensive Outpatient substance abuse treatment program as part of their community based service plan?

    Response:
    The Division does not provide case management or treatment services to detained youth, and therefore does not do residential placements for pre-trial youth. DYS has physical custody of the youth. Youth in detention are awaiting the disposition of their case, which is in control of the court. This is vastly different from youth in the commitment part of our services.

    The best way to gather this information is to work directly with each Judicial District.

23. If it is DYS's perspective that finding placements for youth in their care who may require inpatient behavioral health care falls to CDHS, how many times in 2024 did CDHS take custody of a youth who had been in secure detention and place that youth in a residential substance abuse program?

    Response:
    CDHS does not take custody of detained youth unless they are committed. As for youth who may need that level of care long term, those youth are placed out of the home through the parent's private insurance, through a RAE if they are part of Medicaid or through the local Department of Human and/or Social Services, if the local court who has jurisdiction over the case determines out of home placement is what the youth needs for treatment purposes.

24. Which agency, DYS, CYDC, or CDHS (more specifically, local Departments of Human Services) is responsible for finding a residential or intensive outpatient program for youth who is using Fentanyl or any other drug while in detention? Which agency's case manager does the legwork required to find potential placements, arrange interviews, and secure a funding stream?

    Response:

It is not the responsibility of the Division to find residential placement or outpatient treatment for youth in detention. As stated above in Question 23, it could be the family working with their own insurance to secure placement, the RAE/HCPF if the family has Medicaid and wants to have placement through the RAE or if the court determines the youth needs placement by the local county department of human or social services to follow their processes for out of home placements. The Division does not provide substance abuse treatment for detained youth. The Division only has physical custody of youth in detention and not legal custody. The court has oversight of the youth's case and engages entities outside of CDHS for placement and treatment needs, if required.

25. Did investigations into youth overdoses in DYS provide any information about how drugs were obtained, apart from the existing report that a DYS employee providing opiates to the young person who died following a Fentanyl overdose on October 21st, 2024 (the overdose was 10/21, the youth was hospitalized and on life support until his death on November 4th).

    Response:
    The investigations into the youth overdoses have not provided any information on how the drugs were obtained. We are unaware of any existing official report that a DYS employee provided opiates to a youth in our care. We are aware that the Denver Post wrote an article specifically stating that it was alleged, which is correct.

    In regards to that situation, the Division immediately alerted local law enforcement and the local county department of human services to report the incident. The Division has cooperated fully with both entities. At this time, no charges have been brought forward. Both investigations continue, and we await the final outcome.

26. Were youth denied in-person visits with families in the wake of these overdoses? If so, is that standard protocol, and how long does the prohibition on in-person family visits last?

    Response:
    Yes, the implementation of virtual visitation for the purposes of ensuring safety for youth and staff has happened at Platte Valley, Campus at Lookout Mountain, Spring Creek, and Gilliam. Each situation is case specific and can be facility-wide or individualized. There is an administrative review process and approval. In some cases, special approval for contact visits can be provided. The 'prohibition' can be a few days or as long as thirty days based on what has been done to date.

27. In the wake of youth overdoses, are their new protocols put in place to reduce the likelihood that staff will bring drugs into facilities? If so, how long do those protocols remain in effect (ie, are they permanent or temporary)?

Response:
There has not been a confirmed case of staff bringing drugs into a youth center. The Division routinely reviews all protocols available to them to curb the introduction of contraband and prevent drug contraband from entering a youth center. Currently, staff must pass through a metal detector and can be further screened with a hand held metal detection wand. They are required to use clear backpacks and bags to enter the youth center, which are subject to full review. Staff can be asked to take off shoes, socks, and other articles of clothing. They are also asked to empty all of their pockets to clear the metal detection. The Division also holds a contract with a K9 company and they can be used to search staff, staff belongings, along with the general area when needed.

28. Have any new protocols been put into place to reduce these incidents?

Response:
The Division has the ability to move to virtual visitation for families, professionals, volunteers, and contractors to limit the potential for contraband introduction. This is an intervention that we hope not to use on a consistent basis because we believe that in-person family connection is extremely important as well as volunteer and legal contact.

Currently, the division uses several different interventions to curb the introduction of contraband. Some examples of that are as follows:

- Metal detection equipment, both standing and hand-held
- Clear bag requirement and open search for all individuals entering the secure portion of a youth center, including staff
- Clear signage at the front entry door informing staff and visitors of state law regarding the introduction of contraband
- Youth searches following visitation and on-site activities
- Staff searches upon arrival to work and for cause
- Utilization of stationary cameras to monitor activity in the youth center and conduct investigations
- For cause and random urine screen testing to determine any current drug use in a secure setting
- Drug wand to detect and confirm illegal substances

- Routine searches of bedrooms, bathrooms, classrooms, and common area space
- The ability to use dogs to detect drug contraband
- Youth have unimpeded access to contact the Child Abuse Hotline, the Child Protection Ombudsman, and the Disability Law Colorado to report any suspicion of contraband
- Staff have a policy requirement to report any known introduction of contraband and to report that to the child abuse hotline, which is in addition to reporting to their supervisor
- Staff also have the ability to anonymously report any suspected contraband introduction, which is referred for investigation
- Staff and youth dialogue through a professional relationship can generate tips to investigate contraband introduction
- Professional dialogue occurs with other correctional agencies to learn what they do to curb the introduction of contraband
- Posted, as appropriate, signs within the youth centers to bring caution to drug use
- Standing Drug Intervention Workgroup to address drug contraband concerns
- Statewide Safety Committees in our youth centers
- When indicated, individual and/or group substance abuse treatment for youth in commitment

In addition, the division has worked with an outside consultant to provide a safety, security and risk mitigation assessment. That assessment will highlight areas for security improvement and this assessment will highlight areas for security improvement. The department would need to assess the resources that would be required to implement any of the recommendations. This could have an impact on mitigating drugs entering the facility.

29. What barriers exist to putting new safety protocols in place around drug access?

Response:
Expanding or enhancing our current security to prevent contraband into facilities have to be considered within available state resources. Any updates or changes need to be weighed against the budget priorities statewide and during challenging budget years new initiatives are hard to justify over maintaining current protocols.

30. Is Narcan readily available at all DYS facilities? If so, are all staff trained in its use, and how often is re-training required on this subject?

    Response:
    Narcan is available in all DYS youth centers. Staff are trained to administer. Re-training takes place annually and as needed.

31. If Narcan and other overdose reversal medications are available in DYS facilities, is this a statutory requirement or a current DYS policy?

    Response:
    This is a current DYS protocol. The history of allowable use is as follows and can be found here.

    Naloxone Standing Orders, C.R.S. §12-36-117.7 was signed into law on April 3, 2015. This law concerns the ability to furnish a supply of emergency drugs for the purposes of treating individuals who may experience an opiate-related overdose event. This bill allows licensed prescribers to prescribe, and licensed dispensers to dispense, an opiate antagonist, either pursuant to a direct prescriber order or in accordance with standing orders and protocols.

    The Third Party Naloxone, C.R.S. §18-1-712 law allows for a person other than a health care provider or health care facility who acts in good faith to administer naloxone to another person whom the person believes to be suffering an opiate-related drug overdose. The individual who administers naloxone shall be immune from criminal prosecution for such an act. Amended July 13, 2020 to extend immunity to individuals administering expired naloxone.

    The C.R.S.13-21-108.7 legislative declaration encourages the administration and distribution of opioid antagonists, including expired opioid antagonists, by persons and entities, including law enforcement personnel, school district personnel, and health care providers, for the purpose of saving the lives of people who suffer opioid-related drug overdose events. Persons responding to an opioid overdose are encouraged to call for emergency services immediately.

32. Acknowledging the point made by DYS Director Anders Jacobson in the January 31st hearing before a joint session of the Health and Human Services and Judiciary committees that it's impossible, in his view, to keep all drugs out of DYS secure detention facilities, what harm reduction experts does DYS leadership consult on a

regular basis to determine how best to address pervasive presence and use of dangerous illegal drugs in many of its facilities?

Response:
The division is well connected to both in-state and out-of-state experts when it comes to both safety and security and treatment service delivery. For example, the National Commission on Correctional Health Care, the Council of Juvenile Justice Administrators, and the Colorado Department of Corrections. In addition, the division is accredited by the National Commission on Correctional Healthcare which holds a high-level of standards and expectations when it comes to overall operations and knowledge of facilitating a secure youth services program. Colorado is not the only state facing this challenge.

Illegal drugs in correctional sites is not new. The introduction of synthetic drugs in the country has provided a different level of risk than seen before. They are easily undetected, and are unpredictable in terms of the synthetic make-up of the drug. The pervasive presence of dangerous and illegal drugs are available far more widely in the general community than you will see in a secure youth center.

The division understands the complexity this provides when the vast majority of youth come to us with substantial drug use backgrounds, which generates drug seeking behavior until effective change can be made. Together, with the community, we partner to help curb drug and alcohol abuse.

33. The Child Protection Ombudsman's Office, along with other agencies, are investigating a significant increase in injuries to children in DYS care due to excessive force and staff misconduct. As of July 2024, the Ombudsman's Office reported a 27% increase in physical restraint as compared to the previous year. As of January 2025, the Restraint and Seclusion Working Group data reflected that physical restraints were used by DYS staff 6,573 times in the final six month period of 2024, a 39% increase as compared to the July 2024 numbers. Is there data on these injuries, what caused them, and what action is being taken to reduce incidents of injury in the future?

Response:
The Division partners closely with the Child Protection Ombudsman's (CPO) office and fully supports any and all outside investigations into allegations of abuse as a result of physical management. The Division has made available unfettered access phone lines for youth to contact the CPO, the Child Abuse Hotline, and Disability Law Colorado. The Division works closely with all three entities to help them investigate all allegations of

abuse. The Division does not recall a 'founded' abuse claim submitted in writing/final report due to the CPO's investigations. Of the numerous allegations submitted, the local human services agency investigated 29 incidents and found 6 met the criteria for abuse.

Regarding the use of Protective Supports and Interventions (physical restraint), the Division recorded an increase in restraint techniques from 4,720 to 6,573 between September 2023 and August 2024—this refers to the number of restraint techniques used, not the number of physical management incidents. As an example, one youth restraint may include eight techniques (two each from four different staff members). It is also important to note that 50.2% of the 6,573 restraint techniques used were guided touch (touching the back of a youth's arm only) or an escort (locking arms with a youth). As a result, the Division can say that in 50% of the techniques used, we are preventing the use of more physically restrictive restraints.

During the same six-month period, the number of individual youth who experienced a restraint increased by 5%, which was an additional 25 individual youth served across 14 youth centers compared to the prior six-month reporting period. To put this in perspective: If you break it down further, this would be an additional 1.8 youth physically managed per youth center.

34. CYDC has spent more than 90% of their nearly $16 million allocation on assessments, financial support to clients to ensure compliance with physical supervision, and physical supervision tools that are extremely expensive but relatively ineffective at preventing crime, such as ankle-worn GPS monitors. At the same time, CDYC has repeatedly failed to implement community-based services proven to reduce long-term recidivism, such as connection to community-based organizations that provide behavioral health support, mentorship, connection to Credible Messengers, introduction to community-based restorative justice processes, and education support to ensure continued engagement in a supportive school environment. Given the current crises facing DYS regarding youth in detention experiencing serious mental health and behavioral health concerns, how does CYDC justify spending only a very small percentage of their allocation on treatment services for youth who they end up supervising for part of the period those youth are in the community pretrial?

COLORADO
Department of Human Services

National Center for Youth Law

**2024 CO Youth Detention Continuum Spending by Judicial District**

Most JDs spent less than 10% of their allocation on mental health or behavioral health services

The 2nd JD spent 1.7% on treatment

The 17th JD spent 1.5% on treatment

The 18th JD spent 3.7% on treatment

TABLE 1. ALLOCATIONS AND EXPENDITURES BY JUDICIAL DISTRICT

| | | Percent of Allocation by Expenditure Category | | | | | |
|---|---|---|---|---|---|---|---|
| JD | Annual Allocation | Client Assessment | Treat-ment | Direct Support | Super-vision | Restorative Services | Local Plan Admin |
| 1 | 1,387,304 | 35.1 | 4.4 | 32.2 | 19.0 | 0.0 | 9.3 |
| 2 | 1,877,988 | 27.5 | 1.8 | 39.3 | 21.3 | 0.0 | 10.1 |
| 3 | 119,342 | 32.2 | 3.1 | 31.2 | 24.3 | 0.0 | 9.2 |
| 4 | 2,085,496 | 17.5 | 9.5 | 53.2 | 10.7 | 0.0 | 9.1 |
| 5 | 235,557 | 8.5 | 50.0 | 9.6 | 26.2 | 0.0 | 5.7 |
| 6 | 146,101 | 27.7 | 11.1 | 49.4 | 7.4 | 0.5 | 3.9 |
| 7 | 256,819 | 21.4 | 0.0 | 40.4 | 25.2 | 3.2 | 9.8 |
| 8 | 1,065,082 | 16.0 | 11.0 | 37.7 | 26.0 | 0.0 | 9.3 |
| 9 | 230,084 | 22.7 | 6.6 | 32.3 | 23.4 | 5.6 | 9.4 |
| 10 | 541,767 | 5.6 | 0.8 | 48.6 | 35.9 | 0.0 | 9.1 |
| 11 | 229,989 | 19.8 | 0.6 | 53.3 | 9.9 | 3.3 | 13.1 |
| 12 | 183,394 | 12.0 | 0.0 | 36.7 | 44.1 | 0.0 | 7.2 |
| 13 | 267,430 | 18.0 | 0.0 | 35.4 | 36.9 | 0.0 | 9.7 |
| 14 | 129,404 | 19.7 | 2.4 | 21.9 | 46.7 | 0.0 | 9.3 |
| 15 | 121,870 | 10.3 | 1.2 | 47.8 | 32.4 | 0.0 | 8.3 |
| 16 | 122,793 | 7.2 | 0.1 | 44.0 | 32.9 | 0.0 | 15.8 |
| 17 | 1,606,243 | 14.5 | 1.5 | 44.0 | 30.3 | 0.0 | 9.7 |
| 18 | 2,597,768 | 20.8 | 3.7 | 38.0 | 28.6 | 0.0 | 8.9 |
| 19 | 1,227,353 | 12.0 | 10.1 | 38.8 | 30.4 | 0.0 | 8.7 |
| 20 | 816,071 | 25.2 | 10.2 | 35.7 | 17.1 | 3.8 | 8.0 |
| 21 | 491,081 | 21.4 | 5.7 | 35.3 | 27.3 | 0.8 | 9.5 |
| 22 | 122,303 | 8.1 | 10.8 | 34.5 | 37.7 | 0.0 | 8.9 |
| State | 15,861,239 | 20.2 | 5.7 | 40.4 | 24.1 | 0.4 | 9.2 |
| | $15,861,239 | | | | | | |
| | $689,859 | CYDC Statewide Plan Administration | | | | | |
| | $16,551,098 | Total Funding[6] | | | | | |

Response:
CYDC has increasingly become more sophisticated in their approach to accessing treatment services that are supported by systems that can extend services beyond the scope of CYDC supervision. CYDC works with families to access Medicaid services and private insurance along with other sources such as probation offender service funds, Collaborative Management Programs, Program area 3 child welfare services (voluntary services) through the County DHS to pay for treatment services. By accessing fund sources that are able to continue beyond CYDC services, we see a continuity in treatment plans that can impact recidivism. Some of the limitations around expanding services are outlined in the following question.

CYDC outcomes measures show that less than 10% of youth served fail to appear in court or receive new charges during CYDC supervision.

Expenditures for compliance monitoring do not entirely describe the work that is being done with youth and families. Electronic Home Monitoring (EHM) and GPS are used during supervision, oftentimes these are court ordered as part of a release plan to mitigate risk. Supervision in CYDC is not constructed as an agent of the court who merely oversees compliance. Case management involves developing relationships with

the youth and family that include problem solving, learning to negotiate family conflict, and advocacy for the youth in the community and schools. Exit interviews from one judicial district find that the most meaningful element of their time with CYDC is the relationship developed with their case manager or person assigned to supervise them.

35. Why has CYDC not onboarded more providers in each judicial district since the passage of SB 21-71 and HB 23-1307, both of which included statutory mandates to expand access to community based services for youth who are in secure detention but could be served in the community if CYDC would seek and accept new contracts.

Response:
The state is facing a significant shortage of youth providers, with many leaving the field for various reasons. Those who remain are often unwilling to serve DYS youth due to the challenges involved, particularly given the current reimbursement rates. Conversations with local coordinators highlight a “provider desert,” even in populous areas, as agencies struggle to find available providers.

Key barriers include cost-prohibitive state contracts, rising insurance requirements, and an unfavorable workload compared to private pay or insurance-based services. While agencies like CYDC seek to engage providers with lived experience, background check requirements often prevent their participation. Additionally, providers report high levels of burnout and vicarious trauma due to the severity of cases they handle. Many also express concerns about their safety when providing services in the community or their offices.

36. Why has CYDC’s focus, in the 34 years since the passage of Senate Bill 94, been limited primarily to the physical supervision of pretrial youth, which only mitigates risk for the period of time that a youth is being supervised? Isn’t this a missed opportunity to provide pretrial youth with vital support during the period when said support is most likely to reduce the likelihood that they will commit future crime?

Response:
CYDC has adapted and improved over the past 34 years and has followed the research on best practices in the delivery of services. CYDC services have included intermediate interventions to prevent detentions, home-based treatment services directed at the youth and family, and research-informed services that include multi-systemic therapy, wrap-around service, and functional family therapy (as examples). The statutory limit on detention capacity in the state, starting in 2003, required that districts spend time and resources on detention bed management.

Expenditures by Judicial Districts demonstrate that 40.4% of CYDC's allocation is Direct Support services, with an additional 5.7% of the budget going toward treatment services. Supervision represents less than a quarter of the expenditures (24.1%). The full breakdown for FY 2023-24 is shown in the table that follows, and is available in CDHS RFI Item 4, submitted to the JBC on November 1, 2024. This same expenditure breakdown is available annually within the RFI response.

| Percent of Allocation by Expenditure Category | | | | | | | |
|---|---|---|---|---|---|---|---|
| JD | Annual Allocation | Client Assessment | Treat-ment | Direct Support | Super-vision | Restorative Services | Local Plan Admin |
| 1 | 1,387,304 | 35.1 | 4.4 | 32.2 | 19.0 | 0.0 | 9.3 |
| 2 | 1,877,988 | 27.5 | 1.8 | 39.3 | 21.3 | 0.0 | 10.1 |
| 3 | 119,342 | 32.2 | 3.1 | 31.2 | 24.3 | 0.0 | 9.2 |
| 4 | 2,085,496 | 17.5 | 9.5 | 53.2 | 10.7 | 0.0 | 9.1 |
| 5 | 235,557 | 8.5 | 50.0 | 9.6 | 26.2 | 0.0 | 5.7 |
| 6 | 146,101 | 27.7 | 11.1 | 49.4 | 7.4 | 0.5 | 3.9 |
| 7 | 256,819 | 21.4 | 0.0 | 40.4 | 25.2 | 3.2 | 9.8 |
| 8 | 1,065,082 | 16.0 | 11.0 | 37.7 | 26.0 | 0.0 | 9.3 |
| 9 | 230,084 | 22.7 | 6.6 | 32.3 | 23.4 | 5.6 | 9.4 |
| 10 | 541,767 | 5.6 | 0.8 | 48.6 | 35.9 | 0.0 | 9.1 |
| 11 | 229,989 | 19.8 | 0.6 | 53.3 | 9.9 | 3.3 | 13.1 |
| 12 | 183,394 | 12.0 | 0.0 | 36.7 | 44.1 | 0.0 | 7.2 |
| 13 | 267,430 | 18.0 | 0.0 | 35.4 | 36.9 | 0.0 | 9.7 |
| 14 | 129,404 | 19.7 | 2.4 | 21.9 | 46.7 | 0.0 | 9.3 |
| 15 | 121,870 | 10.3 | 1.2 | 47.8 | 32.4 | 0.0 | 8.3 |
| 16 | 122,793 | 7.2 | 0.1 | 44.0 | 32.9 | 0.0 | 15.8 |
| 17 | 1,606,243 | 14.5 | 1.5 | 44.0 | 30.3 | 0.0 | 9.7 |
| 18 | 2,597,768 | 20.8 | 3.7 | 38.0 | 28.6 | 0.0 | 8.9 |
| 19 | 1,227,353 | 12.0 | 10.1 | 38.8 | 30.4 | 0.0 | 8.7 |
| 20 | 816,071 | 25.2 | 10.2 | 35.7 | 17.1 | 3.8 | 8.0 |
| 21 | 491,081 | 21.4 | 5.7 | 35.3 | 27.3 | 0.8 | 9.5 |
| 22 | 122,303 | 8.1 | 10.8 | 34.5 | 37.7 | 0.0 | 8.9 |
| State | 15,861,239 | 20.2 | 5.7 | 40.4 | 24.1 | 0.4 | 9.2 |
| | $15,861,239 | | | | | | |
| | $689,859 | CYDC Statewide Plan Administration | | | | | |
| | $16,551,098 | Total Funding | | | | | |

37. Where does DYS/CYDC maintain and update a public-facing list of all current community-based service providers contracted with CYDC in each judicial district? Wouldn't such a list help both CYDC and the community providers who are not yet contracting with CYDC to identify and fill gaps in services?

Response:
There is not a public-facing "list" of service providers contracted by Judicial District. CYDC maintains a database that includes all 23 Judicial District plans. These plans are available to each of the JDs. Local planning committees regularly share provider information with CYDC. CYDC is contacted throughout the year by prospective providers. Those providers are put in contact with all CYDC programs so that they can present their programming to the local CYDC programs. CYDC coordinators meet at the statewide and regional levels to share information about what is working in their communities.

38. Does DYS or CYDC have full-time positions for people to engage with local communities and curate a list of community-based providers of non-residential services to youth who are willing to accept referrals for youth presently in detention, should they be released?

Response:
CYDC has a local coordinator in all 22 (soon to be 23) Judicial Districts. It is their responsibility, with the assistance of their local planning committee members, to continually seek out service providers to meet the needs of their community. Local coordinators hold "open house" meetings for prospective providers and request providers attend and present their services to the planning committees throughout the year. It is important to note, that the majority of youth awaiting mitigating services, are awaiting residential placement.