# EXHIBIT 4

COLORADO
Department of Human Services

July 1, 2024

The Honorable Rhonda Fields
Chair, Senate Health and Human Services

The Honorable Lindsey Daugherty
Chair, House Health and Human Services

The Honorable Mike Weissman
Chair, House Judiciary Committee

The Honorable Julie Gonzales
Chair, Senate Judiciary Committee

Chief Andrew Prehm
Chair, Alternative to Youth Detention Working Group

Senator Fields, Senator Gonzales, Representative Weissman, Representative Daugherty and Chief Prehm:

The Colorado Department of Human Services, in response to reporting requirements set forth in Section 19-2.5-1404, C.R.S., respectfully submits the attached Alternative to Youth Detention Working Group report.

> *"(3)(b) On or before July 1, 2023, and on or before July 1 each year thereafter, the Department of human services shall submit a report to the working group, the judiciary committees of the Senate and the House of representatives, or any successor committees, and the health and human services committee of the senate and the public and behavioral health and human services committee of the house of representatives, or any successor committees, including:*
>
> *(I) An analysis of the data collected in accordance with the performance standards and outcome measures developed pursuant to subsection (3)(a)(i) of this section, and an analysis of the progress toward meeting the performance standards and outcome measures developed pursuant to subsection (3)(a)(i) of this section;*
> *(II) The status of implementation of efforts guided by the working group's recommendations pursuant to subsection (3)(a)(ii) of this section;*
> *(III) An analysis of the continuum of in-home and out-of-home placement options and supports for alleged juvenile offenders, including the current availability capacities of the options and supports, including:*
> *(A) An analysis of the availability of and demand for less restrictive alternative placements in each judicial district and county, including but not limited to residential treatment facilities, qualified residential treatment programs, nonqualified residential treatment programs,*

COLORADO
Department of Human Services

*residential community placements, shelter placements, and family-type settings, including but not limited to foster care;*
*(B) An analysis of the availability and use of funding for less restrictive alternative placements in each judicial district and county, including but not limited to residential treatment facilities, qualified residential treatment programs, nonqualified residential treatment programs, residential community placements, shelter placements, and family-type settings, including but not limited to foster care;*
*(C) An analysis of the availability of and demand for community-based services in each judicial district and county offered to alleged and adjudicated juvenile offenders that assist in allowing children to live with family or kin, including the types of community-based services available and capacity for each type of service in each judicial district and county; and*
*(D) An analysis of the availability and use of funding for community-based services in each judicial district and county offered to alleged and adjudicated juvenile offenders, including the amount of funding spent on different types of services.*
*(IV) An analysis of barriers to placing youth in less restrictive alternative placements;*
*(V) The number of youth in detention awaiting placement in a less restrictive community setting;*
*(VI) The number of youth in detention charged by direct filing pursuant to section 19-2-517 by judicial district or county, and the average length of stay in detention for these youth;*
*(VII) An analysis of the number of youth placed in less restrictive alternative placements, including but not limited to residential treatment facilities, qualified residential treatment programs, nonqualified residential treatment programs, residential community placements, shelter placements, and family-type settings, including but not limited to foster care, and the length of stay in these placements for alleged and adjudicated offenders;*
*(VIII) An analysis of the involvement of youth and their families, and their satisfaction with less restrictive alternative placements;*
*(IX) An analysis of the number of alleged and adjudicated juvenile offenders who are served by county human services departments through their child welfare systems and the impact on those county departments; and*
*(X) The recommendations of the working group made pursuant to subsection (3)(a)(iii) of this section."*

If you have any questions, please contact Angelica Granados, CDHS' Legislative Analyst, at 303-877-0562.

Sincerely,

Christina Beisel

Christina Beisel
Acting Deputy Director of Financial Services

# Limit the Detention of Juveniles Annual Report State Fiscal Year 2023-2024

July 1, 2024



COLORADO
Department of Human Services
Division of Youth Services

# TABLE OF CONTENTS


**TABLE OF CONTENTS** 2
**EXECUTIVE SUMMARY** 7
PURPOSE 7
RESULTS 8
Youth Overview 9
Releasable Youth 9
Child Welfare Involvement 10
Outcomes 10
System Disparities 11
RECOMMENDATIONS 12
LIMITATIONS 13
CONCLUSION 14
**GLOSSARY OF ACRONYMS** 15
**KEY TERM DEFINITIONS** 17
**INTRODUCTION** 19
The History of SB21-071 19
Alternative Placements for Youth 22
Data Units and Suppression Minimums 23
Data Sources and Methods 23
Data Limitations 24
**POPULATION OVERVIEW** 25
Summary 25
Cohort Overview 25
Table 1: Unique Youth and Admissions by Region and Statewide 25
Figure 1: Colorado Region Map with Judicial Districts 26
Admissions Length of Stay Under and Over Thirty Days 27
Additional Admission Information 27
Youth with Child Welfare Involvement 28
Figure 2: Child Welfare-Involved Youth Counts 28
Figure 3: Youth Court-Involvement Over Lifetime 29
**PERFORMANCE STANDARDS & OUTCOME MEASURES** 30
EQUITY FOCUS 30
Culturally Competent Services 30
Demographics Overview 31
Table 2: Statewide Releasable and Overall Unique Youth Count with Length of Stay and Admissions by Demographic Categories 32
Demographics and Length of Stay 33
Table 3: Cohort Comparison with Overall Colorado Youth Population 34

Figure 4: Admissions and Average Length of Stay by Race/Ethnicity 35
Length of Stay Regional Breakouts 35
Table 4: Trends in Demographic Categories' Average Length of Stay by Region 36
Child Welfare Youth 37
Figure 5: Demographics for Child Welfare Involved Youth 38
Charges Distribution by Demographic Categories Across the State 39
Table 5: Offense Category and Type by Demographic Category 39
Charges by Region Overview 40
Table 6: Regional Admission Totals by Offense Category and Types 40
Charges Distribution for Demographic Categories by Region 41
Distribution of Level of Care Recommendations 41
Colorado Juvenile Risk Assessment Pre-Screen Demographics Overview 41
Table 7: Overall Level of Care Data by Demographics 43
Statistical Analysis 44
Juvenile Detention Screening and Assessment Guide and Demographic Analysis 45
Colorado Juvenile Risk Assessment Pre-Screen and Demographic Analysis 46
Charges and Demographic Analysis 47
Length of Stay and Demographic Analysis 48
Releasable Length of Stay and Demographic Analysis 49
Child Welfare Involvement and Demographic Analysis 49
Detention Involvement and Demographic Analysis 50
SYSTEM FOCUS 52
Barriers to Placements and Services 53
Length of Stay Overview 54
Table 8: Admissions with a Length of Stay Over and Under Thirty Days 55
Table 9: Detention Length of Stay by Region 55
Table 10: Number of Admissions Compared to Overall Youth Population by Region 56
Table 11: Total Length of Stay Compared to Overall Youth Population by Region 57
Additional Information on Length of Stay 57
Table 12: Colorado Juvenile Risk Assessment Pre-Screens for Youth with Admission Under or Equal to Thirty Days 59
Table 13: Colorado Juvenile Risk Assessments Pre-Screens for Youth with Admissions Over Thirty Days 59
Table 14: Offense Type for Youth in Detention Thirty Days or More 60
Figure 6: Total Long (30+), Direct File (Transfer, Reverse-Transfer, and Direct File), and Releasable Length of Stay Compared to Overall Cohort Total Length of Stay 61
Figure 7: Average Long (30+), Direct File (Transfer, Reverse-Transfer, and

Direct File), and Releasable Length of Stay Compared to Overall Cohort Average Length of Stay 61
Assessments 62
Colorado Juvenile Risk Assessment Pre-Screen Overview 62
Table 15: Colorado Juvenile Risk Assessment Pre-Screen by Admissions 62
Juvenile Detention Screening and Assessment Guide Screen Results and Overrides 63
Table 16: Juvenile Detention Screening and Assessment Guide Override Information and Direction 63
Table 17: Juvenile Detention Screening and Assessment Guide: Placement Screens vs Actual Placement and Overrides by Judicial District 64
Figure 8: Juvenile Detention Screening and Assessment Guide: Result and Actual Placement Level Comparison 65
Independent Assessment Level of Care Recommendations 65
Background 65
Analysis 66
Youth and Family Perception 67
Colorado Youth Detention Continuum Juvenile Service Plans 67
Child Welfare Involvement 68
Prior and Current Involvement 68
Assessments 69
Cases 69
Table 18: Case Program Area Services by Unique Youth 70
Table 19: Case Closure Reason for Cohort Youth 71
Accessing Meetings for Family Engagement 71
Table 20: Length of Stay in Days From Admit to First Meeting, Last Meeting to Release, and All Detention Spans During Cohort Period 73
County Funding Impact 74
Table 21: Average and Total Amount Spent by Counties by Service as Entered into Trails 74
County Caseload Impact Overview 75
Figure 9: Impact of Detention Involvements on Child Welfare Unique Youth Served 75
Crossover Youth Definition 75
YOUTH FOCUS 77
Youth Outcomes Overview 77
Outcomes and Length of Stay 78
Summary: Outcomes and Length of Stay 78
Detention Involvements and Length of Stay 79
Detention Involvements and Releasable Length of Stay 79
Child Welfare Involvements and Length of Stay 79
Child Welfare Involvements and Releasable Length of Stay 79

Charges and Length of Stay 80
Table 22: Offense Category, Type, and Length of Stay 80
Charges and Releasable Length of Stay 81
Outcomes and Detention Involvements 81
Summary: Outcomes and Detention Involvements 81
Table 23: Count of Youth and Their Detention Involvements 82
Child Welfare Involvements and Detention Involvements 82
Charges and Detention Involvements 82
Colorado Juvenile Risk Assessment Pre-Screens and Detention Involvements 82
Alternative Placements for Detention Youth 83
Bonds 83
Conditions of Release 83
Table 24: Youth Who are Releasable, Not Releasable, or Conditionally Releasable 85
Releasable Youth 85
Releasable Youth and Child Welfare Involvements 86
Table 25: Number of Releasable Admissions by Date Range 87
Table 26: Releasable Information by Region 87
Additional Outcomes for Releasable Youth 88
Denials 89
Foster and Kinship Care 89
Tables 27 and 28: Foster Home Providers by County and Judicial District 89
Kinship Placements at Release 91
Placements Analysis 91
Table 29: Total First Placements Following Release from Detention 92
Table 30: Percentage of Placements with and without Department of Human Services Involvement 94
Youth in the Transfer, Direct File, and Reverse-Transfer Processes 95
Table 31: Length of Stay for Youth in Transfer, Reverse-Transfer, and Direct File Processes 96
Table 32: Number of Youth in Transfer, Reverse-Transfer, and Direct File Processes by Region 97
PROCESS RECOMMENDATIONS 98
**ADDITIONAL INFORMATION 99**
House Bill 23-1249 99
House Bill 23-1307 100
Borrowed Beds, Flex Beds, and Emergency Beds 100
Figure 10: Detention Bed Definitions 100
Figure 11: Flex Bed Allowance 101

Table 33: Emergency Beds Used in Calendar Year 2023 by Date in the Northeast Region 102
Table 34: Emergency Beds Used in Calendar Year 2023 by Date in the Southern Region 103
Capacity Analysis 104
Table 35: Colorado Youth Detention Continuum Bed Capacity Report by Judicial District for Calendar Year 2023 and December 2023 104
Overview 105
Central Region 105
Northeast Region 105
Southern Region 105
Western Region 106
Statewide Summary 106
Recommendation 106
Table 36: Calendar Year Demographic Data 107
**APPENDIX A - Referenced Bills 108**
**APPENDIX B - Supplemental Capacity Information 110**
Table 37: Detention Utilization by Youth Center and Region: Fiscal Year 2022-23 110
Table 38: Detention Utilization by Judicial District and Region: Fiscal Year 2022-2023 111
Table 39: Colorado Youth Detention Continuum Detention Cap Report by Judicial District 112
**APPENDIX C - Supplemental Demographic Visualizations 113**
Figure 12: Distribution of Race/Ethnicity by Admissions 113
Figure 13: Admissions and Average Length Of Stay by Age at Admission 113
Figure 14: Admissions and Average Length Of Stay by Staff Assigned Gender 114
**APPENDIX D - Offense Type Detail 115**
Table 40: Offenses and Their Corresponding Offense Types 115
**APPENDIX E - Crossover Youth Definitions by Judicial District 117**
**APPENDIX F - Emergency Bed Criteria 122**
**APPENDIX G - Releasable Youth by Judicial District and County 123**
Table 41: County Releasable Length of Stay with N Sizes Greater than or Equal to Ten for Admissions 123
Table 42: Releasable Youth by Judicial District 124
**APPENDIX H - Statistical Results 125**
Table 43: Statistical Results for Youth Outcomes 125
Table 44: Statistical Results for Disparity Analysis 126
**APPENDIX I - Universal Placement Referral Form 128**

# EXECUTIVE SUMMARY

This report addresses data requirements from three recent bills related to Colorado Revised Statute (C.R.S.) 19-2.5-1404, including Senate Bill (SB) 21-071 and House Bills (HB) 23-1307 and 23-1249.

## PURPOSE

In 2021, the General Assembly of the State of Colorado enacted SB21-071 (C.R.S.) 19-2.5-1404. This bill enhanced the already existing Colorado Youth Detention Continuum (CYDC) Working Group, also known as the Advisory Board, with additional partners and mandates. The mandates given to this working group by SB21-071 were:

- "By October 31, 2022, the working group shall develop performance standards and outcome measures to evaluate the degree to which alleged and adjudicated offenders are in the least restrictive setting with appropriate services."
- "Evaluate whether the number of alternative placements, range of services offered by such placements, and community-based services available meet the needs of youth in each judicial district and county."
- "Determine whether and how specific data and outcome measures must be reported to evaluate the efficacy of less restrictive placements and community-based services."
- "Advise the Department of human services concerning policies, procedures, and best practices related to serving youth in the least restrictive setting."
- Provide recommendations to "enhance the continuum of community-based services and placement options for alleged and adjudicated juvenile offenders" to "improve availability and quality of less restrictive alternative placements and community-based services."

SB21-071 requires the Department on or before July 1 of every year, starting with July 1, 2023, to submit this report to the Advisory Board and appropriate legislative committees. This report must include an analysis of the data collected in accordance with and progress toward meeting the performance standards and outcome measures, the status of implementation efforts, and analyses of the continuum of in-home and out-of-home placement options and supports for alleged juvenile offenders.

Additional duties assigned in accordance with (C.R.S.) 19-2.5-1404 for this 2023 - 2024 state fiscal year (SFY) report, as a result of HB23-1307 for calendar year (CY) 2023, and beginning SFY 2024 - 2025 and every SFY thereafter include:

- Demographic information, "including race, ethnicity, gender, age, sexual orientation, gender identity, and disability status, to the extent the information is available, of the youth in each detention facility who are eligible for release from a detention facility, without an additional court order;"
- "If services or a placement are available for the youth but who are being held in detention due to the lack of available services or placement;"
- Number of temporary Emergency Beds used per day by each catchment area (also denoted as "region" throughout the report); and
- "The number of youth released from detention solely because the number of youth detained statewide exceeded the statewide detention bed cap."

HB23-1249 was signed into legislation on June 1, 2023 and officially enacted on August 7, 2023. HB23-1249 added to statute (C.R.S.) 19-2.5-1404 that on or before July 1, 2023 and every July 1 thereafter, the below report requirements:

- The number of youth by age and judicial district who had prevention services, assessment, open dependency and neglect case, and/or out-of-home placement at the same time they had an open delinquency case in district court, were on juvenile probation, and/or had a juvenile deferred sentence.
- The above stated data points must be analyzed in relation to "age, race/ethnicity, gender, and disability status."

## RESULTS

Qualitative and quantitative data analysis methods were used in this report. The cohort for this report includes information on youth detained from July 1, 2022 - June 30, 2023.

## Youth Overview

- In this cohort, there are 1,969 unique youth and 2,753 admissions.
- Of these, the majority (76.7%) of admissions were released within 30 days from the admission date.
- Most of the youth in this cohort were male and were between the ages of 15 through 18.
- 681 (34.6%) of the youth identified as White, 423 (21.5%) as Black or African American, and 760 (38.6%) as Hispanic.

## Releasable Youth

- Of the 1,969 unique youth, 540 (27.4%) remained in secure detention one day or more after their releasable date.
    - The average length of stay between being made releasable and being released for these youth is 22.3 days.
    - The median length of stay between being made releasable and being released is seven days.
    - Of these youth, 152 (7.7%) were detained for more than 30 days after being made releasable by the court.
- Statistical measures for releasable youth and releasable length of stay (RLOS) consistently do not have meaningful or statistically significant results. This report tested many variables related to releasable admissions, including CJRA (Colorado Juvenile Risk Assessment) pre-screen and JDSAG (Juvenile Detention Screening and Assessment Guide) screen, detention and child welfare involvements, charges, and length of stay (LOS). Very few of these tests are predictive of outcomes for youth, specifically as it relates to them being releasable.
- This indicates that the releasable designation is un-patterned and is not necessarily based on universal criteria. Going forward, this team recommends focusing on releasable youth in its original intention as it relates to impact on child welfare, and less on releasable youth as an outcomes category.

## Child Welfare Involvement

- A total of 915 (46.5%) of the 1,969 unique youth in the cohort were identified as having active involvement with county departments of human or social services during or after their detention span admission date.
    - Of the 915 youth that had active involvement with county departments of human or social services, 522 (57.0%) of these youth had new involvement during their detention stay. What is considered as "new involvement" is discussed below in the section titled "Population Overview."
        - Of these 522 youth, 389 (74.5%) had previous child welfare involvement prior to these detention admissions and then had a new subsequent referral that was screened in for assessment.
        - Of these 522 youth, 133 youth (25.5%) did not have previous child welfare involvement prior to this detention admission.
        - New child welfare involvement start dates for 101 (19.3%) of the 522 youth had a referral submitted on the same day as the start date of their detention span that would later be screened in for assessment in the cohort.

## Outcomes

- Youth with detention stays of over 30 days had higher offense rankings (i.e., more severe detaining offense), more crimes of violence (as defined in Appendix D), higher CJRA pre-screen levels (i.e. higher risk of recidivism), and most had been to detention previously.
- Youth with detention stays under 30 days had lower CJRA pre-screen levels (lower risk of recidivism), lower offense rankings (i.e., less severe detaining offense), fewer crimes of violence, and the majority were in detention for the first time.
- Prior involvement in detention proved to be a significant predictor of longer length of stay (LOS) for youth, increasing their LOS from between 10 to 20 days for each subsequent involvement.

- Prior involvement with child welfare proved to be a significant predictor of longer LOS for youth, increasing their LOS from between eight to 16 days for each subsequent detention involvement.
- Out-of-home placements through the child welfare system was also a significant predictor for longer LOS. Statistically, each removal from the home results in an increase of 16 days in length of stay while in detention.
- The level of seriousness of a charge is also a significant predictor of increased LOS.
  - Youth with crimes of violence have a standard mean difference of 28 days.
  - For each increase in offense ranking, predicted LOS increases by six days.

## System Disparities

- Disparities across outcomes in this report were consistently identified for Black youth in detention compared to youth of other races/ethnicities. Black youth are more likely to return to detention, to stay longer, to have higher offense rankings, and are overrepresented in the detention population when compared to Colorado's Black youth population, as seen in Table 3 in the "Youth Equity" section of the report.
  - The Office of Juvenile Justice and Delinquency Prevention published similar findings in November, 2014. This report found that "youth of color are more likely than White youths to be arrested and subsequently go deeper into the juvenile justice system," and found a disproportionate contact ratio of 4.7 to 1, when comparing Black youth (their term) to White youth.
  - A similar finding is true for the child welfare system, which shows that "Black children are also significantly overrepresented at every decision point on the child welfare case management continuum statewide" (ROM, 2023 Disproportionality Index).

## RECOMMENDATIONS

It is the recommendation of the SB21-071 team that the following priorities be set:

- Explore partnering with a third party analyst to identify service gaps and ensure equitable access to culturally appropriate services.
- Explore the creation of uniform criteria for placements statewide, and continue to support additional options for placements.
  - Additionally, establishing uniform need through an assessment would create a benchmark to better understand youth outcomes and resource needs (e.g. potentially placing more emphasis on the independent assessment, etc.).
- Continue to invest in creating additional placement options, and implement existing funding for placements. Continue existing incentive and support programs through HB23-1307 and HB24-1308 that expand options and services for youth with substantial barriers to placement. This will alleviate the strain from barriers on long stays in detention or ultimately out-of-state placements.
- Eliminate the use of the term “releasable,” and focus on all youth in detention who are currently awaiting placement and/or service availability in order to be released. Despite the development of a definition of "releasable" for this report by the Advisory Board in October 2023, courts and other stakeholders across the state define this term differently, which creates confusion and misunderstanding when providing data around this population. It is the conclusion of the SB71 team, following extensive conversations and data review, that the term "releasable" is too narrow and does not consider all youth in detention awaiting placement and/or services that mitigate significant risk of harm to others and risk of flight from prosecution. Additionally, the nonsignificant findings for youth who are releasable compared to youth who are not releasable further confirmed the team's decision to make this recommendation.
- Continue to investigate approaches to support equitable treatment for youth and to address disparities that Black youth face in the justice system. Continue to collect data and dedicate research to further understanding this disparity.

## LIMITATIONS

The following is a list of limitations experienced during the preparation of this report:

- By the time the performance standards and outcomes measures are established in October, the fiscal year is already complete for the report that will be published nine months later in July. Therefore, providing anticipated data requires gathering information from case notes and other sources. This is extremely time intensive. In SFY 22-23, the analysts spent a full six months of the year gathering information from case notes both for the current year's annual report and the requested ad hoc report that was published in October 2022.
- Due to the working group meeting in October for performance standards and metrics, after the state fiscal year has already started, it is helpful to understand that full data is not available until two years later. This would also include any time needed for Trails database builds to collect data, which can take as much as an additional one to two years to complete. The analysts have worked hard to mitigate these constraints by the case note method mentioned above, but it is helpful to remember that not all data is immediately available, and collecting meaningful data at times requires additional technology builds and process refinements.
- Multiple data collection systems were necessary to compile the data needed for this report, and manually aligning this information was inefficient and challenging.
- Access to some statutorily required information from other partners remains in collaborative conversations and the data sharing agreement process, rendering it temporarily inaccessible.
- A Trails build to collect information for HB23-1249, as defined on page 17, was initiated in August 2023. The build is scheduled to be implemented in July 2024, which would make more complete reporting possible in July 2026.
- Privacy and data protection requirements make reporting findings limited in some cases due to small sample sizes.

## CONCLUSION

This inaugural full state fiscal year report is a collective analysis of data available between July 1, 2022 to June 30, 2023. There are many data processes that will take time, technology, and cross-agency partnerships to develop. However, this report provides new information on child welfare involvement, releasable youth, system disparities for racial and ethnic minorities, and more.

# GLOSSARY OF ACRONYMS

**ADP** Average Daily Population
**ASO** Administrative Service Organization
**BHA** Behavioral Health Administration
**BIPOC** Black, Indigenous, and People of Color
**C.R.S.** Colorado Revised Statutes
**CANS** Child and Adolescent Needs and Strengths tool
**CCWIS** Comprehensive Child Welfare Information System
**CDAC** Colorado District Attorneys' Council
**CDHS** Colorado Department of Human Services
**CFMS** Colorado Financial Management System
**CJRA** Pre-Screen Colorado Juvenile Risk Assessment
**CMHHIP** Colorado Mental Health Hospital In Pueblo
**CMP** Collaborative Management Program
**CY** Calendar Year
**CYDC** Colorado Youth Detention Continuum
**DBUTS** Detention Bed Utilization Tracking Sheet
**DCW** Division of Child Welfare
**DOC** Department of Corrections
**DSA** Data Sharing Agreement
**DSS** Department of Social Services
**DYS** Division of Youth Services
**EPP** Expedited Permanency Placement
**ETO** Efforts to Outcomes
**FEM** Family Engagement Meeting
**FY** Fiscal Year
**GAL** Guardian Ad Litem
**HB** House Bill
**HCPF** Health Care Policy and Financing
**IA** Independent Assessment
**ICJ** Interstate Compact on Juveniles
**ICPC** Interstate Compact for the Placement of Children
**ISST** Individualized Service and Support Team
**JD** Judicial District
**JDSAG** Juvenile Detention Screening and Assessment Guide
**JSPC** Juvenile Services Planning Committee
**LOS** Length of Stay
**LOC** Level of Care
**MST** Multi-Systemic Therapy
**MDT** Multidisciplinary Team
**MOU** Memorandum of Understanding
**OCYF** Office of Children, Youth and Families
**PA** Program Area
**PII** Personally Identifiable Information
**PR Bond** Personal Recognizance Bond
**PRTF** Psychiatric Residential Treatment Facility
**QRTP** Qualified Residential Treatment Program
**RAE** Regional Accountable Entity
**RCCF** Residential Child Care Facility

| | |
|---|---|
| **RFP** | Request for Proposal |
| **RLOS** | Releasable Length of Stay |
| **SA** | Standardized Assessment |
| **SB** | Senate Bill |
| **SFY** | State Fiscal Year |
| **SMG** | Savio Management Group |
| **YOS** | Youth Offender Services |
| **YSC** | Youth Services Center |
| **YTD** | Year to Date |

# KEY TERM DEFINITIONS

The definitions below for "releasable, emergency release, and emergency placement" were established by the working group specifically for this report to aid in data cohesion.

***Releasable:*** Youth in secure detention for whom the court has made a determination that services and/or placement can mitigate the substantial risk of serious harm to others or risk of flight from prosecution, if services and/or placement are available to mitigate the said risk. These youth may be released from detention without returning to court when these services and/or placement become available.

***Emergency Release:*** The release of a youth from detention as a result of reaching the judicial district detention capacity and facility capacity, and an Emergency Bed is unable to be utilized, as defined in (C.R.S.) 19-2.5-1407.3(4).

***Emergency Placement:*** The court has ordered youth be immediately released from secure detention, and granted temporary physical and legal custody of a youth to the county departments of human or social services for appropriate placement, which may not be immediately available.

***Trails:*** Colorado's current Comprehensive Child Welfare Information System (CCWIS), known as Trails, is the official case management information system for all child welfare and youth services documentation.

***Detention Bed Utilization Tracking Sheet (DBUTS):*** The DBUTS is a protected Google Sheet that keeps personally identifiable information (PII) for detained youth within each judicial district. CYDC coordinators and bed managers use this sheet for bed and case management of youth who are in detention. This information is often manually collected from other sources (i.e., Trails or Colorado State Court Data Access website).

***Direct File:*** The term "Direct File" is used to describe statutory discretion that allows prosecutors to decide whether to bring charges against persons under the age of 18 but 16 years of age or older at time of offense in juvenile court or in adult criminal court, as outlined in Section (C.R.S.) 19-2.5-801. When a prosecutor chooses to directly file a youth's case in adult criminal court, the juvenile court does not have jurisdiction over proceedings concerning the charge(s). In Colorado, Direct File discretion is limited to specific, serious crimes and the age range previously cited. Official language and description can be found in statute.

***Reverse-Transfer:*** This refers to the process whereby, after a preliminary hearing, a juvenile may petition the adult criminal court to transfer the case back to juvenile court. Ultimately, the court determines whether the juvenile and the community would be better served by criminal (e.g., adult) or adjudicative (e.g., juvenile) proceedings. The Reverse-Transfer process was established in Colorado in 2012 through HB12-1271. Complete statutory language and description can be found in (C.R.S.) 19-2.5-802.

***Transfer:*** This refers to the process whereby the "juvenile court may enter an order certifying a juvenile to be held for criminal proceedings in the district court if a petition filed in juvenile court alleges the juvenile…" of a specific age is alleged to have committed specific offenses found in (C.R.S.) 19-2.5-802, and "the juvenile court finds it would be contrary to the best interest of the juvenile or of the public to retain jurisdiction." A petition can only be transferred from juvenile to district court after a hearing is held pursuant to the requirements and factors set forth in this statute.

# INTRODUCTION

This report addresses requirements from three recent bills related to Colorado Revised Statute (C.R.S.) 19-2.5-1404, including Senate Bill (SB) 21-071 and House Bills (HB) 23-1307 and 23-1249.

## The History of SB21-071

The Colorado General Assembly passed SB21-071 during the 2021 session. Created to address the detention of juveniles and specifically the length of time they are detained, SB21-071 reduced the statewide statutory limit on detention bed capacity from 327 to 215 starting in state fiscal year (SFY) 2021-2022 (Appendix A). From 2003 to present, statewide detention beds have been subjected to statutory reductions on four occasions. This latest reduction in detention beds has initiated the need to progress policy and advance service responses for detained youth.

In 2018, the federal Family First Prevention Services Act (Family First) (Appendix A) began a paradigm shift within child welfare. This act allows federal Title IV-E child welfare funding to reimburse states for the provision of certain evidence-based prevention services aimed at keeping children and youth safely together with their parent(s) and family whenever possible, as opposed to only supporting placement costs when a youth is removed from the home. The purpose of this change was to further prevent out-of-home placement by providing a continuum of prevention services that support children, youth, and families earlier on, including those involved in the juvenile justice system.

As child welfare and system partners began to align policy and practice with the mandates of Family First, Colorado continued to evolve and innovate resources for children, youth, and families. At the same time that major child welfare reform has taken place the last several years, juvenile justice reform has also occurred in Colorado. 2018 also saw the introduction of SB18-154 (Appendix A). This bill introduced the definition of dually-identified crossover youth as well as the requirement for local CYDC Juvenile Services Planning Committees (JSPC) to develop plans on how to best serve crossover youth.

2019 brought the introduction of Juvenile Justice Reforms in SB19-108 (Appendix A). SB19-108 created opportunities to improve the outcomes for youth in the juvenile justice system by standardizing several screening tools to better align youth needs to appropriate, effective services. Standardized screening, the identification of dually-involved youth, and the fact that juvenile justice youth are now eligible for

prevention services through Family First furthered the opportunity for the paradigm shift.

Detention bed capacity reductions that have occurred over the years are further an important part of the reform in the fields of child welfare and juvenile justice. On July 1, 2019, the statewide bed capacity went from 382 to 327, a fifty-five bed reduction. Through a State of Colorado Executive Order that coincided with the World Health Organization declaring COVID-19 as a worldwide pandemic a little over eight months later, the bed capacity was temporarily reduced to 200 on April 21, 2020, then further reduced to 188 on October 25, 2020. When the Executive Order expired, the detention bed capacity statutorily became 215 as part of SB21-071, effective July 1, 2021.

In addition to changing the detention bed cap, SB21-071 included new data requirements to further the understanding of local pre-adjudicated and adjudicated youth in the context of the juvenile justice and child welfare systems. This includes information on their assessment for services and placement in the least restrictive environment.

SB21-071 added members to the existing Colorado Youth Detention Continuum (CYDC) Working Group, also known as Advisory Board (Advisory Board), established with SB91-094, including: a county sheriff, youth advocacy organizations, at least two persons directly affected by the incarceration of youth, one of which must be a youth that is or has been in the custody of a Division of Youth Services (DYS) facility, and a family member directly affected. Additionally, SB21-071 required a minimum of three county departments of human or social services representatives to be added to membership.

In addition to their other duties as outlined in statute (C.R.S.) 19-2.5-1404, the Advisory Board must "establish criteria for both detention and commitment for the purpose of determining which juvenile offenders are appropriate for placement in the physical or legal custody of the department of human services." This criteria must be systematically uniform so that decisions for placement criteria are consistent across the State of Colorado.

SB21-071 tasked the Advisory Board to complete the following prior to October 31, 2022:

1) Develop performance standards and outcome measures to evaluate whether alleged and adjudicated offenders are in the least restrictive environment with appropriate services. This requires the evaluation of

alternative placements, range of placements, and the community based-service options available in each judicial district and county.

2) "Determine whether and how specific data and outcome measures must be reported to evaluate the efficacy of less restrictive placements and community-based services."

3) Provide recommendations to enhance the continuum of community-based services and placement options, including but not limited to, improvements of availability and quality of least restrictive alternative placement and services.

Prior to July 1, 2023 and every July thereafter, the Department of Human Services is responsible for submitting an annual report to the working group and legislative committees, which includes analysis of data collected in accordance with the stated performance standards and outcomes measures developed in subsection (3)(a)(I) of this section of SB21-071, as well as:

1) Implementation efforts;
2) An analysis of the continuum of in-home and out-of-home placement options and supports;
3) Capacity and bed demands;
4) Availability/demand of all levels of placement;
5) Use of funding for all levels of placement and services;
6) Community-based services that allow youth to remain home;
7) Barriers to placement;
8) Youth detained awaiting a least restrictive placement;
9) Average length of stay for detained youth;
10) Family/youth satisfaction with least restrictive, alternative placements; and
11) An analysis of crossover youth.

In October of both 2022 and 2023, the Advisory Board developed and approved the Performance Standards and Outcome Measures in SFYs 2022-2023 and 2023-2024 to evaluate if alleged and adjudicated offenders are in the least restrictive environment with appropriate services. The 2022-2023 Performance Standards and Outcome Measures contained over 201 data points for the reporting period of July 1, 2022 to December 31, 2022. These initial Performance Standards and Outcome Measures were refined and adopted anew within the 2023-2024 Performance Standards and Outcome Measures. This report will be the first full SFY analysis for SB21-071 (C.R.S.) 19-2.5-1404, July 1, 2022 to June 21, 2023.

In 2023, both HB23-1307 and HB23-1249 added additional reporting elements to (C.R.S.) 19-2.5-1404. HB23-1307 requires predetermined demographic data to be reported in relation to temporary Emergency Bed usage and bed capacity releases. HB23-1249 also added demographic data requirements including the number of youth by age and judicial district who had prevention services, an assessment, an open dependency and neglect case, and/or out-of-home placement at the same time they had an open delinquency case in district court, were on juvenile probation, and/or had a juvenile deferred sentence.

## Alternative Placements for Youth

*An Overview on the Term "Releasable" As It Is Used in This Report*

In accordance with the goals of placing youth in the least restrictive setting and providing alternative community-based placements, an additional focus requested in this report is to provide information on youth who are often called "releasable" youth. Originally, the goal was to understand the impact that alternative placements and services had on county departments of human or social services, however, over time the conversation has broadened. The working group continues to refine the term "releasable."

While the working group developed and approved a new definition at the October 2023 meeting, the definition of "releasable" continues to be debated among stakeholders. Ultimately, the focus tends to be placed on youth who are screened into detention but who could be released if a placement or service was available that would mitigate the youth's risk to the community or the youth's risk of flight from prosecution. At times, these placements and services are not available or take a long time to find. If such a service was immediately available, this youth could be, and arguably would be, released from detention. This report intends to focus on releasable youth - per the working group approved definition - and also the wider

group of those who do not fall into the releasable definition but who could be released with an appropriate identified placement or service after returning to court.

There are additional contextual factors that are important to note for alternative placements. While youth are in detention, a search for placements and services is conducted in an effort to assist and support youth, regardless of whether they are officially designated as "releasable." Many youth may become eligible for release later if an appropriate placement or service is found that would mitigate risk, but would require a return to court. Additional complicating factors can arise from the need to manage the statutory bed capacity of detention centers, which also means that some placements are being located for youth purely due to capacity limitations; these youth would otherwise remain detained based on their detention screening results and/or level (i.e., severity) of alleged offense.

In this report, data pertaining to releasable youth is spread throughout the report, rather than being contained to one section.

## Data Units and Suppression Minimums

***Data and the Units of Analysis for This Report:*** The admissions information in this report differs from other reports produced by the Division of Youth Services, which focus on *facility* as the primary unit of analysis. For instance, if a youth transfers to a new facility within the same detention episode, this is counted as a new admission for that new facility, and the LOS clock restarts. For purposes of this report and the statistics within, youth is the primary unit of analysis, and as such, LOS includes the total consecutive amount of time a youth would have spent in detention in one admission episode, regardless of their facility location. In summary, admissions level data are not congruent across publications due to this important unit of analysis difference.

***Data Suppression:*** In an effort to consistently maintain youth privacy by preventing potential exposure of identity, there is a limit to the minimum number of data points that are shared when they relate to a unique count of cohort youth. Where unique youth data is featured or referred to throughout the report, any population counts below ten are excluded, unless stated otherwise. Footnotes will be included in these instances to notate that data suppression exists.

## Data Sources and Methods

During the process to evaluate the directives of the working group, the SB21-071 team worked with:

- Trails, Colorado's current Comprehensive Child Welfare Information System (CCWIS);
- Savio Management Group Data System;
- Detention Bed Utilization Tracking Sheet (DBUTS); this Google Sheet is the only source of certain CYDC data regarding programming throughout the 22 Colorado Judicial Districts;
- Youth/Family Gap Survey, June 2022;
- Colorado State Courts Data Access;
- JSPC annual plans;
- County Financial Management System (CFMS); and
- Additional high-level contextual information from stakeholders.

Qualitative and quantitative data analysis methods were used in this report. Feedback was gathered from stakeholder meetings and JSPC plans and was used to create surveys that were conducted in June 2022 and April 2023. Quantitative data from Trails established the cohort of youth in detention from July 1, 2022 to June 30, 2023 and was integrated with other quantitative data sources. Descriptive analysis was used to provide context and summaries about the youth cohort for this report. Lastly, statistical analysis, including correlations tests and regression analysis, were used to understand system disparities and impacts on youth outcomes.

## Data Limitations

***Detention Bed Utilization Tracking Sheet:*** This sheet is often used as the stopgap data collection method for data requested from the Advisory Board in instances where the relevant data is not yet fully available in existing databases. There are limitations with this data sheet, which include multiple users, manual data entry, expunged records, and attempting manual retroactive lookups for additional data requests. Tracking information from one live, shared sheet can increase the likelihood of errors, so the SB21-071 team reviews and cleans the data. This process is continually being improved.

***Courts Record Review:*** Some of the data used for this report was manually gleaned by reading case notes from the Colorado Courts Data Access system to find information around: releasable status, release dates, bonds, placements, and more. Each data point per admission takes a minimum of five minutes of reading. The data found in this one external system represents thousands of hours of research alone for this report.

***Expungements:*** Several of the youth court records in this cohort were expunged, therefore, there are limitations to the full accuracy of this dataset.

- At least 424 (15.4%) court records were confirmed by the SB71 evaluation team as expunged, with potentially up to 50% of the records being expunged.

# POPULATION OVERVIEW

## Summary

***Cohort Timeframe:*** This document reports information on youth who were in detention between July 1, 2022 and June 30, 2023.

***Cohort Framework Reminder:*** The first inaugural report contained information from July 1, 2022 - December 31, 2022, since the first performance standards and metrics were established in October 2022 and much of the data requested for SB21-071 is new data, not previously tracked. This report not only adds six months of data, but includes several new data points not previously reported. Future reports will continue to follow the traditional fiscal year pattern of reporting the prior fiscal year.

## Cohort Overview

*Table 1: Unique Youth and Admissions by Region and Statewide*

| Region | Unique Youth in Each Region* | Number of Admissions | % of Total Admissions |
|---|---|---|---|
| Central | 813 | 1,099 | 39.9% |
| Northeast | 554 | 719 | 26.1% |
| Southern | 470 | 642 | 23.3% |
| Western | 192 | 293 | 10.6% |
| **State** | **1,969**** | **2,753** | **100%** |

** Nonexclusive numbers (some youth have been in multiple regions, so this number is the unique youth count for each region). These numbers are based on the primary judicial district variable, so if youth experience multiple regions in one admission, these numbers may be slightly underrepresented.*

*** This number differs slightly from the unique youth count in CYDC's annual report. During the data cleaning, three duplicate youth were found and their admissions were collapsed.*

*Figure 1: Colorado Region Map with Judicial Districts*



## Admissions Length of Stay Under and Over Thirty Days

- The majority of detained admissions, 1,442 (52.4%), were seven days or less.
- 2,111 (76.7%) admissions were 30 days or less.
- 642 (23.3%) admissions were over 30 days.
- For 1,065 (38.7%) admissions, youth were released immediately at their detention hearing date.

A guideline for analysis set by the Advisory Board in October 2022 was that youth in detention should be released from their detention hearing date within 30 days. One of the purposes of this report is to understand how the current detention system aligns with this guideline and to shed light on what resources are needed to move towards that goal. Based on this initial baseline data, the majority of youth are in and out of detention in under 30 days, and a little less than a quarter of the youth remain over 30 days. In the length of stay (LOS) analysis section of this report, more detail is given on these youth and what factors impact their LOS in detention.

However, not all youth are able to be released from detention within 30 days. For instance, some youth are held by the court specifically with no bond option, some are given detention sentences, and direct file youth are held in detention with a large cash bond awaiting the outcome of their case, which can take many months. This report tries to delineate the variety of situations in more detail throughout the remainder of this report.

## Additional Admission Information

- Seven (0.03%) of all admissions were for committed youth who have short detention stays in the middle of a DYS commitment.
- 68 (2%) of all admissions were detention sentences, with an average LOS for these youth of 29.6 days (Detention sentences are further defined on page 57).
- 44 (2%) of all admissions were for Interstate Compact on Juveniles (ICJ) youth, who eventually returned to their home state. (ICJ youth are youth with a different home state or youth who are moving from Colorado to

another state while on probation or parole. For the purposes of this report, they are primarily from another home state).

## Youth with Child Welfare Involvement

For the purposes of this report, criteria for "active" child welfare involvement included cohort youth who, being identified as a child, victim, or alleged victim, or youth-in-conflict, participated in an assessment and/or case that remained open at one of these specific points in a single detention admission.

- At initial detention admission date;
- Prior to the detention end/release date; and
- Beyond the detention end/release date.

Of the 1,969 unique youth, 915 (46.5%) were identified as also having child welfare involvement with county departments of human or social services during their first detention admission in the cohort period. This figure does not include all involvement that may have occurred and/or ended prior to the detention admission, nor does it consider any new, active involvement that may have been initiated after the youth's final release from detention during the cohort timeframe.

*Figure 2: Child Welfare-Involved Youth Counts*



*Figure 3: Youth Court-Involvement Over Lifetime*




*Note: Some values are written as "X" due to suppression minimums.*

The above chart illustrates the number of filed dependency and neglect (D&N), expedited permanency placement (EPP), truancy, and Foster Youth in Transition (FYiT) cases over the lifetime of cohort youth. An EPP is similar to a D&N but it is filed for children ages six and under (C.R.S. 19-1-123). Youth ages seven and older can be listed as participants in these cases with their younger siblings. Some cohort youth had more than one of these five case types in their lifetime which is reflected as Multiple in the figure above. These cases were manually calculated from Colorado State Courts Data Access system. As mentioned, the role of the youth within the dependency and neglect and expedited permanency placement cases are named youth within the case, not necessarily the main participant.

# PERFORMANCE STANDARDS & OUTCOME MEASURES

## EQUITY FOCUS

*The Colorado Department of Human Services in conjunction with designated juvenile justice serving partners will gather and analyze data to assist in reducing inequities, to ensure youth have access to culturally aware, humble, and relevant services.*

---

**Metric 1** ¯ Summarize the availability of culturally appropriate (aware, humble, and relevant) services by judicial district (JD) and county.

**Metric 2** ¯ Analyze demographic information of youth who are detained while releasable and youth who are served by counties due to release from detention.

**Metric 3** ¯ Analyze demographic information, and identify any disparities as they relate to length of stay in detention.

**Metric 4** ¯ Analyze demographic information, and identify any disparities as they relate to the level of care recommended by the detention screen and the level of care received.

**Metric 5** ¯ Analyze demographic information, and identify any disparities as they relate to acceptance into facilities/programs/providers.

---

### Culturally Competent Services

Juvenile Services Planning Committees (JSPCs) were asked in their annual reports to describe how their judicial district (JD) is addressing the availability of culturally appropriate (aware, humble, and relevant) services. The description of “aware, humble, and relevant” came from a state Equity, Diversity, and Inclusion (EDI) advisor in 2023. Many JSPCs indicated there is not currently a formal process for reviewing such a metric in their JD. Others identified processes of review of referrals with stakeholders regarding needs of youth being served and gaps in services among community providers. Several rural JDs reported they are often left with the limited resources available and do not always have the ability to select providers that fit the specific needs of a youth. These JDs report they are often limited to referrals to programs that can only meet virtually or require lengthy distance for transportation outside the youth’s community. Others report good relationships with specific providers, such as in the 22nd JD where they work closely with Native American providers that assist in meeting the needs of youth and families. The 8th JD reports a

stakeholder collaborative called RIDE (reimagining, inclusion, diversity, and equity) Collective that shares culturally appropriate services and events in their community, while also identifying Spanish-speaking providers, LGBTQ+ (Lesbian, Gay, Bisexual, Transgender, Queer Plus) affirming providers, and services specifically tailored to the BIPOC (Black, Indigenous, and People of Color) community. Some JDs report hiring bilingual individuals to their CYDC staff and using devices that allow for visual, audio, and written translation communication, which can be particularly useful for families in need of interpretation or translation services in American Sign Language.

A full analysis of cultural competency should include an evaluation of service providers based on a verified matrix, feedback from stakeholders on their perceptions of cultural competency access, and a comparison of placements to cultural competent services based on the assessed needs of the individual. Therefore, further steps are needed to achieve a summary of available culturally competent services, including creating surveys for youth and families and finding or creating an evaluation framework for cultural competency. Ideally, these assessments should be done by a third party evaluator and should avoid making assumptions on whether services are culturally competent based solely on demographic traits. Additionally, access to referral and outside service information is presently very limited. There is currently no information on the cultural competency of outside service organizations.

## Demographics Overview

This section delves into the comprehensive demographic landscape of the SFY 2023 cohort within detention centers, including an overview of releasable and child welfare-involved youth. This detailed analysis, categorized by region, explores differences related to LOS, level of care recommended and received, and charges. This exploration sheds light on the nuanced experiences and outcomes within youth detention.

***Data Note***: It is important to note that, in general, while certain categories may show higher averages, these findings can often be attributed to the influence of small sample sizes. When the sample size is small, even a few extreme values can disproportionately impact the average, leading to data skew and misleading conclusions. To ensure reliability and validity, the following analysis focuses on larger sample sizes where data trends are more stable and less susceptible to random fluctuations, deriving more accurate and meaningful insights from the data.

*Table 2: Statewide Releasable and Overall Unique Youth Count with Length of Stay and Admissions by Demographic Categories*

| | Releasable Youth | | Total Cohort | | | |
|---|---|---|---|---|---|---|
| | Count | % | Count | % | Average LOS | Admissions |
| **STAFF ASSIGNED GENDER** | | | | | | |
| Male | 417 | 77.2% | 1,561 | 79.3% | 30.5 | 2,172 |
| Female | 123 | 22.8% | 408 | 20.7% | 17.7 | 581 |
| **ETHNICITY** | | | | | | |
| White | 193 | 35.7% | 681 | 34.6% | 25.3 | 960 |
| Black or African American | 144 | 26.7% | 423 | 21.5% | 35.9 | 617 |
| Hispanic | 180 | 33.3% | 760 | 38.6% | 26.1 | 1,041 |
| American Indian or Alaskan Native | X | X | 23 | 1.2% | 12.4 | 36 |
| Asian | X | X | 17 | 0.9% | 24.0 | 19 |
| Native Hawaiian or Other Pacific Islander | X | X | 10 | 0.5% | 54.4 | 17 |
| Unable To Determine | X | X | 55 | 2.8% | 19.7 | 63 |
| **AGE AT ADMISSION** | | | | | | |
| 10-11 Years | X | X | 12 | 0.6% | 14.0 | 18 |
| 12 Years | X | X | 49 | 2.5% | 30.3 | 60 |
| 13 Years | 44 | 8.5% | 144 | 7.3% | 15.1 | 200 |
| 14 Years | 85 | 16.4% | 264 | 13.4% | 23.4 | 373 |
| 15 Years | 135 | 25.4% | 447 | 22.7% | 31.2 | 639 |
| 16 Years | 131 | 23.4% | 515 | 26.1% | 33.9 | 747 |
| 17-18 Years | 117 | 20.9% | 539 | 27.4% | 24.5 | 716 |
| **SEXUAL ORIENTATION** | | | | | | |
| Bisexual | 36 | 6.7% | 99 | 5.0% | 26.8 | 147 |
| Heterosexual | 438 | 81.1% | 1,550 | 78.7% | 27.8 | 2,224 |
| Homosexual | X | X | 21 | 1.1% | 17.7 | 28 |
| Missing | 44 | 8.2% | 266 | 13.5% | 31.4 | 308 |
| Other Queer Identifying | X | X | 22 | 1.1% | 16.9 | 35 |
| Unknown | X | X | 11 | 0.6% | 15.9 | 11 |
| **PREFERRED GENDER PRONOUNS** | | | | | | |
| He/Him | 381 | 70.6% | 1,327 | 67.4% | 29.9 | 1,897 |
| Missing | 43 | 8.0% | 281 | 14.3% | 28.9 | 327 |
| She/Her | 107 | 19.8% | 332 | 16.9% | 18.7 | 495 |
| They/Them | X | X | 18 | 0.9% | 41.8 | 23 |
| Unknown | X | X | 11 | 0.6% | 19.2 | 11 |
| **GENDER IDENTITY** | | | | | | |
| Female | 109 | 20.2% | 346 | 17.6% | 18.5 | 512 |
| Male | 386 | 71.5% | 1,365 | 69.3% | 29.7 | 1,941 |
| Missing | X | X | 243 | 12.3% | 32.7 | 281 |
| Gender Diverse/Queer | X | X | 15 | 0.8% | 21.1 | 19 |
| **STATE TOTAL** | **540** | **100%** | **1,969** | **100%** | **27.8** | **2,753** |

*Note: Some values are written as "X" due to suppression minimums.*

## Demographics and Length of Stay

Analyzing LOS differences across various demographic factors such as age, gender identity, staff-assigned gender, and race/ethnicity unveils some variations in experiences within youth detention centers. It is important to keep in mind that in many of these categories, the trends of Average LOS follows the number of admissions. Male youth represent around 80% of the cohort, consistent with last year's data, and there is a significant amount of missing data for gender identity, preferred gender pronouns, and sexual orientation. Demographic data on gender pronouns has been removed due to low population sizes. However, there are some notable differences to highlight.

Additionally, differences in average LOS across different races/ethnicities highlight the range of experiences within youth detention centers. Black or African American youth have an average LOS of around 35.9 days and have the third most admissions in the cohort. The highest average LOS belongs to Native Hawaiian and Pacific Islander youth, however, this average corresponds to the much lower number of admissions (refer to Figure 4: Admissions and Average Length Of Stay by Race/Ethnicity). Additionally, both Hispanic and Black youth are overrepresented in the detention population; Black youth notably so (see Table 3 below). Black youth also have longer LOS compared to their peers, as seen in Figure 4. As will be further explored in the following, statistical tests consistently showed disparities for Black youth when compared to other races/ethnicities. Understanding and addressing systemic factors such as cultural competency, access to resources, and socioeconomic determinants are crucial in mitigating these disparities and ensuring equitable treatment and outcomes for all youth within detention centers. This will be further evaluated in the statistics section.

*Table 3: Cohort Comparison with Overall Colorado Youth Population*

| Race/Ethnicity | Count of Youth | % of Youth | % Youth Population in 2022* |
|---|---|---|---|
| American Indian or Alaskan Native | 23 | 1.2% | 1.5% |
| Asian | 17 | 0.9% | 2.7% |
| Black or African American | 423 | **21.5%** | 4.7% |
| Hispanic | 760 | **38.6%** | 32.8% |
| Native Hawaiian or Other Pacific Islander | 10 | 0.5% | N/A |
| Unable to Determine | 55 | 2.8% | N/A |
| White | 681 | **34.6%** | 60.5% |
| **Total** | **1,969** | **100%** | **102%*** |

** From the Census Bureau's American Community Survey Estimates (www.census.gov); the N/As are due to missing census data; the 102% is due to their Margin Of Error.*

*Figure 4: Admissions and Average Length of Stay by Race/Ethnicity*




## Length of Stay Regional Breakouts

Next, demographics are compared to the different regions across the state. This overview of length of stay (LOS) for detained youth in various regions shows significant differences emanating from different demographic aspects when comparing them to the number of admissions.

*Table 4: Trends in Demographic Categories' Average Length of Stay by Region*

| JD Region | Central | | Northeast | | Southern | | Western | |
|---|---|---|---|---|---|---|---|---|
| | Average LOS | Admissions | Average LOS | Admissions | Average LOS | Admissions | Average LOS | Admissions |
| STAFF ASSIGNED GENDER | | | | | | | | |
| Male | 35.1 | 891 | 26.7 | 580 | 30.8 | 504 | 20.7 | 197 |
| Female | 18.1 | 208 | 18.7 | 139 | 18.1 | 138 | 15.0 | 96 |
| ETHNICITY | | | | | | | | |
| White | 27.4 | 277 | 28.8 | 271 | 25.2 | 225 | 17.3 | 187 |
| Black or African American | 40.4 | 375 | 24.5 | 84 | 32.0 | 144 | 22.0 | 14 |
| Hispanic | 27.6 | 372 | 23.0 | 343 | 29.3 | 244 | 22.6 | 82 |
| American Indian or Alaskan Native | 20.1 | 10 | 17.4 | X | 7.4 | 10 | 4.1 | X |
| Asian | 16.6 | 13 | 6.4 | X | 47.8 | X | 84.7 | X |
| Native Hawaiian or Other Pacific Islander | 55.7 | 11 | 26.5 | X | 57.2 | X | 0.0 | 0 |
| Unable To Determine | 23.8 | 41 | 18.3 | 10 | 7.5 | 11 | 1.8 | X |
| AGE AT ADMISSION | | | | | | | | |
| 10-11 Years | 4.1 | X | 7.2 | X | 16.3 | X | 22.2 | X |
| 12 Years | 67.2 | X | 19.9 | X | 21.1 | X | 26.9 | X |
| 13 Years | 14.3 | 65 | 16.0 | 47 | 20.3 | 53 | 7.5 | 35 |
| 14 Years | 23.9 | 132 | 27.3 | 93 | 22.0 | 83 | 18.5 | 65 |
| 15 Years | 38.1 | 266 | 27.5 | 177 | 26.6 | 133 | 21.8 | 63 |
| 16 Years | 38.3 | 325 | 28.6 | 196 | 35.9 | 181 | 17.7 | 45 |
| 17-18 Years | 25.7 | 299 | 21.4 | 190 | 27.4 | 165 | 20.9 | 62 |
| SEXUAL ORIENTATION | | | | | | | | |
| Bisexual | 35.0 | 40 | 32.0 | 41 | 21.6 | 33 | 15.7 | 33 |
| Heterosexual | 31.9 | 768 | 24.5 | 639 | 29.5 | 575 | 19.2 | 242 |
| Homosexual | 16.3 | X | 13.9 | X | 17.5 | X | 26.0 | X |
| Missing | 32.3 | 269 | 41.2 | 18 | 5.7 | 13 | 20.4 | X |
| Other Queer Identifying | 23.9 | X | 17.4 | 14 | 12.7 | 12 | 4.9 | X |
| Unknown | 0.0 | 0 | 20.7 | X | 4.3 | X | 16.7 | X |
| GENDER IDENTITY | | | | | | | | |
| Female | 19.8 | 158 | 19.7 | 127 | 18.2 | 136 | 15.2 | 91 |
| Male | 34.9 | 687 | 25.4 | 569 | 31.2 | 494 | 20.0 | 191 |
| Missing | 31.5 | 249 | 81.2 | 12 | 12.5 | 11 | 24.9 | X |
| Unknown | 4.5 | X | 0.0 | 0 | 0.0 | 0 | 0.9 | X |
| Gender Diverse/Queer | 12.6 | X | 17.7 | 11 | 5.5 | X | 50.0 | X |
| TOTAL | **31.9** | 1,099 | **25.2** | 719 | **28.1** | 642 | **18.8** | 293 |
| STATE TOTAL | **Avg LOS** | **27.8** | Admissions | 2,753 | | | | |

*Note: Some values are written as "X" due to suppression minimums.*

- ***Average Length of Stay By Region and Age:*** Overall, youth aged 15 and 16 have the most admissions statewide, longer average LOS compared to other youth, and their LOS trends above the statewide average. In other age groups, the LOS either does not significantly differ from the statewide average, or the N sizes for those groups are small and may distort an understanding of data trends. Specifically:

    - 12-year-olds also have a higher LOS compared to the statewide average. However, when looking at this regionally, the Central and Western regions have significantly higher LOS averages for 12-year-olds, with small N sizes (less than ten). This means these numbers are skewed, and are significantly influenced by the admissions fluctuations of a very small number of youth. As is discussed in the statistics section below, no correlation was found between age and LOS. (These types of statistical tests are more reliable, account for randomness in the data and this kind of data skew from small N size distortions on data).

    - In the Central region, 15- and 16-year-olds have the longest average length of stay (LOS) at 38 days, while 13-year-olds have a much shorter LOS at 14.3 days. This pattern is mostly consistent in other regions.

- ***Sexual Orientation***: Bisexual youth in the Central and Northeast regions have the longest average LOS at 35.0 days and 32.0 days and also have an average that is slightly higher than the statewide average. Youth in the Southern and Western regions follow the statewide average LOS. Statewide, heterosexual youth have the majority of admissions and the highest LOS.

- ***Gender Identity***: Males have the longest average LOS at 34.9 days, and females have a shorter LOS at 19.8 days. In the Western region, gender diverse and queer youth have high LOS but low admission numbers, highlighting a disparity. These differences illustrate the varied experiences of youth in detention across demographic factors in each region.

## Child Welfare Youth

- Specific demographic data points for the population simultaneously involved within both the child welfare and juvenile justice systems, suggest that this group is composed largely of youth who are straight/heterosexual (79.4%) and 15 to 16 years old (56.8%). The occurrence of youth identifying as male and

those having reported being born male was similar at 69.6% and 77.9%, respectively.

- Child welfare categorizes "Hispanic" as ethnicity rather than race. Because of this, there is no distinct option for Hispanic, leaving the only options as White, Black, American Indian/Alaskan Native, Native Hawaiian/Pacific Islander, Asian, or multi-race. Of the youth involved within both the child welfare and juvenile justice systems at the same time, 405 (50.2%) reported no Hispanic ethnicity while 345 (42.8%) reported a Hispanic ethnicity.

- Race/ethnicity data entry is structured differently for DYS Trails users than it is for Division of Child Welfare (DCW) Trails users. Because of this, demographics for child welfare-involved youth differs slightly to the demographic data that is maintained on the DYS side of Trails.

*Figure 5: Demographics for Child Welfare Involved Youth*

**Child Welfare Involved Youth Demographics**

| SEX AT BIRTH | Count | % |
|---|---|---|
| Female | 225 | 25% |
| Male | 689 | 75% |
| **GENDER IDENTITY** | **Count** | **%** |
| Female | 194 | 21% |
| Male | 613 | 67% |
| Other/Missing | X | X |
| **GENDER PRONOUNS** | **Count** | **%** |
| He/Him | 600 | 66% |
| Missing | X | X |
| She/Her | 187 | 20% |
| They/Them | X | X |
| Unknown | 113 | 12% |
| **SEXUAL PREFERENCE** | **Count** | **%** |
| Bisexual | X | X |
| Lesbian or Gay | X | X |
| Other/Missing | 125 | 14% |
| Straight or Heterosexual | 714 | 78% |

| RACE | Count | % |
|---|---|---|
| White | 633 | 69% |
| Black | 161 | 18% |
| American Indian/ Alaskan Native | X | X |
| Asian | X | X |
| Native Hawaiian or Other Pacific Islander | X | X |
| Multi-Race | 72 | 8% |
| Declined to Answer | 24 | 3% |
| Unknown | X | X |
| **HISPANIC ETHNICITY** | **Count** | **%** |
| Yes | 374 | 41% |
| No | 476 | 52% |
| Unknown/Declined | X | X |

* *Areas containing only an X represent distinct counts of youth below suppression rates*
** *Total youth in this chart adds up to 914 - one youth has a merged identifier*

## Charges Distribution by Demographic Categories Across the State

*Table 5: Offense Category and Type by Demographic Category*

| Demographic Category | Offense Category | | | | Offense Type | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Felony | Misd | Petty | Missing | Drug | Other | Person | Property | Status | Traffic | Weapon |
| **STAFF ASSIGNED GENDER** | | | | | | | | | | | |
| Male | 1,536 | 600 | 34 | X | 76 | 128 | 1,174 | 495 | 16 | 20 | 263 |
| Female | 341 | 205 | 34 | X | 22 | 47 | 317 | 148 | 22 | 10 | 15 |
| **ETHNICITY** | | | | | | | | | | | |
| White | 611 | 319 | 28 | X | 28 | 69 | 516 | 256 | 19 | X | 66 |
| Black or African American | 474 | 135 | X | 0 | 19 | 19 | 361 | 153 | X | X | 59 |
| Hispanic | 707 | 307 | 26 | X | 49 | 76 | 542 | 208 | 10 | 20 | 136 |
| American Indian or Alaskan Native | 21 | 14 | X | 0 | X | 24 | X | X | 0 | X | 0 |
| Asian | 12 | X | X | 0 | 0 | X | X | X | X | 0 | X |
| Native Hawaiian or Other Pacific Islander | 36 | 24 | X | 0 | 0 | 0 | 13 | X | 0 | 0 | 0 |
| Unable To Determine | 24 | 0 | 41 | 0 | X | X | 29 | 15 | X | X | X |
| **AGE AT ADMISSION** | | | | | | | | | | | |
| 10-11 Years | 18 | 0 | 0 | 0 | 0 | X | 15 | 0 | 0 | 0 | X |
| 12 Years | 56 | X | 0 | 0 | 0 | X | 47 | 10 | 0 | 0 | X |
| 13 Years | 118 | 78 | X | 0 | X | 15 | 122 | 42 | X | 0 | 14 |
| 14 Years | 241 | 128 | X | 0 | X | 27 | 219 | 79 | X | 0 | 40 |
| 15 Years | 451 | 167 | 20 | X | 18 | 35 | 324 | 188 | 11 | X | 55 |
| 16 Years | 527 | 197 | 22 | X | 25 | 39 | 415 | 163 | 15 | 12 | 78 |
| 17-18 Years | 466 | 231 | 18 | X | 45 | 57 | 349 | 161 | X | 10 | 87 |
| **SEXUAL ORIENTATION** | | | | | | | | | | | |
| Bisexual | 103 | 41 | X | 0 | X | 12 | 77 | 41 | X | X | X |
| Heterosexual | 1,534 | 641 | 46 | X | 79 | 145 | 1,193 | 536 | 19 | 17 | 235 |
| Homosexual | 23 | X | 0 | 0 | X | X | 20 | X | 0 | 0 | 0 |
| Missing | 198 | 94 | 16 | 0 | 14 | 12 | 172 | 51 | 14 | X | 40 |
| Other Queer Identifying | 12 | 20 | X | 0 | 0 | X | 22 | X | X | 0 | 0 |
| Unknown | X | X | 0 | 0 | 0 | 0 | X | X | 0 | 0 | 0 |
| **GENDER IDENTITY** | | | | | | | | | | | |
| Female | 316 | 173 | 22 | X | 16 | 40 | 284 | 135 | 14 | 10 | 13 |
| Male | 1,381 | 529 | 29 | X | 67 | 119 | 1,037 | 459 | 10 | 19 | 230 |
| Missing | 172 | 90 | 17 | 0 | 14 | 11 | 159 | 45 | 14 | X | 35 |
| Unknown | X | X | 0 | 0 | 0 | X | X | 0 | 0 | 0 | 0 |
| Gender Diverse/Queer | X | 12 | 0 | 0 | X | X | 11 | X | 0 | 0 | 0 |
| STATE TOTAL | **1,877** | **805** | 68 | X | **98** | 175 | 1,491 | **643** | **38** | **30** | 278 |

*Note: Some values are written as "X" due to suppression minimums. Preferred Gender Pronouns category was removed due to small N sizes.*

- Youth ages 16 and 17 have the highest admissions, mostly for felonies (28% and 24.8%, respectively), person-related offenses (27.8% and 23.4%, respectively), and property-related offenses (25.3% and 25%, respectively) across all regions.

- Male youth have significantly higher admissions than female youth, with felonies (81.8% male, 18.2% female) and person-related offenses (78.7% male, 21.3% female) being most common.

  - Male youth, especially heterosexual youth, have the majority of admissions for felonies (81.7%) and misdemeanors (79.6%) across all regions.

  - Across all regions, male youth are more involved in drug-related (3.5%) and person-related offenses (54.1%), while female youth are more involved in person (54.5%) and property-related offenses (25.4%).

  - Of the offenses Homosexual youth are involved in, the majority are person offenses across all regions (71.4%).

## Charges by Region Overview

This section summarizes the charges faced by youth within DYS youth services centers, focusing on both the Offense Category (Felony, Misdemeanor, Petty) and Offense Type (Person, Property, Weapon, Drug, Status, Traffic, Other) across different regions (note: Traffic offenses are mostly vehicular assaults, manslaughter, etc. cases, not minor traffic violations). More information about these offense categories can be found in Appendix D.

*Table 6: Regional Admission Totals by Offense Category and Types*

| JD Region | Admissions Count | | | | |
|---|---|---|---|---|---|
| | Central | Northeast | Southern | Western | Total |
| OFFENSE CATEGORY | | | | | |
| Felony | 740 | 465 | 489 | 183 | 1,877 |
| Misdemeanor | 319 | 240 | 143 | 103 | 805 |
| Petty | 39 | 13 | X | X | 68 |
| Missing | X | X | X | X | 3 |
| OFFENSE TYPE | | | | | |
| Person | 564 | 393 | 392 | 143 | 1,492 |
| Property | 248 | 174 | 134 | 86 | 642 |
| Weapon | 134 | 60 | 67 | 17 | 278 |
| Drug | 51 | 24 | X | 15 | 98 |
| Status | 30 | X | X | X | 38 |
| Traffic | X | 19 | X | X | 30 |
| Other | 66 | 47 | 33 | 29 | 175 |
| TOTAL | **1,099** | **719** | **642** | **293** | **2,753** |

*Note: Some values are written as "X" due to suppression minimums.*

## Charges Distribution for Demographic Categories by Region

A deeper level of analysis conducted for demographics and offense information by region revealed additional information on disparities. Some notable disparities are as follows:

- In the Central region, Black youth have the highest admissions, mainly for felonies and person-related offenses at 39.9%, followed closely by Hispanic youth at 33.5%.
- Hispanic youth have the majority of admissions in the Northeast (47.7%) and Southern (38.0%) regions, particularly relating to felonies and person-related offenses. In the Northeast, admissions for felonies constituted 50.1% with admissions for person-related offenses constituting 48.9%. In the Southern, admissions for felonies constituted 36.8% with admissions for person-related offenses constituting 36.5%.
- White youth in the Western region have the most admissions (63.8%) with more misdemeanors (56.3%), the second-most felonies statewide (32.5%), but the most in the Western region (69.3%), and the highest proportion of person (67.1%) and property crimes (74.4%).

Disparities are further delineated in the statistics section below.

## Distribution of Level of Care Recommendations

This section examines the demographics for the level of care provided to youth in the juvenile justice system, focusing on three primary screening tools: CJRA pre-screens (Colorado Juvenile Risk Assessment), JDSAG screens (Juvenile Detention Screening and Assessment Guide) conducted at admission, and insights from the Behavioral Health Administration (BHA). An overview is provided in Table 7, showing the distribution and results of these screenings, followed by an analysis of disparities in care recommendations across demographic groups and regions. While the CJRA pre-screens and JDSAG screens offer robust data, the analysis of BHA data may be limited based on the data available.

## Colorado Juvenile Risk Assessment Pre-Screen Demographics Overview

Looking at the CJRA pre-screen data, there are a large number of youth with a high risk level across all demographic categories, which also aligns with the number of felony offenses and number of admissions across each category. However, it is important to note that although these counts show some demographic groups as having more high risk pre-screen levels, it does not mean that those youth are more likely to have a high risk pre-screen level based on those demographic qualities. As will be discussed further in the statistics section below, queer youth, female youth, and younger youth actually have correlations with higher risk levels.

The following categories have higher risk counts:

- Males;
- Black or African American Youth;
- Hispanic Youth;
- 15-Year-Olds; and
- Homosexual and Bisexual Youth.

The risk level is otherwise balanced across the different categories, with about 39% of youth falling in the low risk category.

*Table 7: Overall Level of Care Data by Demographics*

| Demographic Category | CJRA Pre-screen Risk Level | | | | JDSAG Screening Result | | | BHA LOC Recommendation | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | High | Moderate | Low | Missing | Level 1 | Level 2-5 | Missing | Community | PRTF | QRTP | SUD Res |
| STAFF ASSIGNED GENDER | | | | | | | | | | | |
| Male | 629 | 618 | 894 | 31 | 1,975 | 177 | 20 | 29 | X | 84 | X |
| Female | 212 | 180 | 181 | X | 512 | 63 | X | 10 | X | 21 | X |
| ETHNICITY | | | | | | | | | | | |
| White | 315 | 308 | 315 | 22 | 851 | 94 | 15 | 15 | X | 51 | X |
| Black or African American | 203 | 207 | 204 | X | 569 | 47 | X | X | X | 23 | 0 |
| Hispanic | 294 | 239 | 496 | 12 | 946 | 86 | X | 12 | 0 | 29 | X |
| American Indian or Alaskan Native | 15 | X | 11 | X | 33 | X | 0 | 0 | 0 | 0 | 0 |
| Asian | X | X | 10 | 0 | 17 | X | 0 | 0 | 0 | 0 | 0 |
| Native Hawaiian or Other Pacific Islander | X | X | X | 0 | 15 | X | 0 | 0 | 0 | 0 | 0 |
| Unable To Determine | X | 25 | 30 | X | 56 | X | X | X | 0 | X | 0 |
| AGE AT ADMISSION | | | | | | | | | | | |
| 10-11 Years | X | X | X | 0 | 13 | X | 0 | 0 | 0 | X | 0 |
| 12 Years | 22 | 24 | 14 | 0 | 55 | X | 0 | X | 0 | X | 0 |
| 13 Years | 77 | 68 | 49 | X | 181 | 16 | X | X | 0 | X | 0 |
| 14 Years | 160 | 112 | 95 | X | 331 | 39 | X | X | X | 13 | 0 |
| 15 Years | 197 | 183 | 250 | X | 585 | 47 | X | 11 | X | 25 | 0 |
| 16 Years | 200 | 210 | 324 | 13 | 676 | 64 | X | 11 | 0 | 21 | X |
| 17-18 Years | 177 | 198 | 336 | X | 646 | 64 | X | X | 0 | 31 | X |
| SEXUAL ORIENTATION | | | | | | | | | | | |
| Bisexual | 61 | 52 | 31 | X | 128 | 16 | X | X | 0 | 10 | 0 |
| Heterosexual | 677 | 638 | 874 | 35 | 2,007 | 195 | 22 | 33 | X | 87 | X |
| Homosexual | 14 | X | X | 0 | 25 | X | 0 | 0 | X | X | 0 |
| Missing | 72 | 87 | 148 | X | 285 | 22 | X | X | 0 | X | 0 |
| Other Queer Identifying | 15 | 11 | X | 0 | 31 | X | 0 | 0 | 0 | X | 0 |
| Unknown | X | X | X | 0 | 11 | 0 | 0 | X | 0 | X | 0 |
| GENDER IDENTITY | | | | | | | | | | | |
| Female | 190 | 163 | 152 | X | 453 | 54 | X | X | 0 | 20 | X |
| Male | 578 | 544 | 788 | 31 | 1,754 | 167 | 20 | 27 | X | 78 | X |
| Missing | 68 | 79 | 131 | X | 259 | 19 | X | 3 | 0 | X | 0 |
| Unknown | 0 | X | X | 0 | X | 0 | 0 | 0 | 0 | X | 0 |
| Gender Diverse/Queer | X | 11 | X | 0 | 19 | 0 | 0 | 0 | X | X | 0 |
| STATE TOTAL | **841** | **798** | **1,075** | **39** | **2,487** | **266** | **26** | **39** | **3** | **105** | **6** |

** Note: Some values are written as "X" due to suppression minimums. Preferred Gender Pronouns was removed due to small N sizes.*

## Statistical Analysis

For this report, over 45 statistical tests were conducted on the demographic traits and the outcome measures to see if youth are facing discrepancies in the system based on race/ethnicity, sexual orientation, staff-assigned gender, or age. These tests offer a deeper level of analysis and look for patterns between variables. These tests analyze the likelihood that any data correlation is real and meaningful, as opposed to random through statistical significance. They also measure the strength of relationships between variables - in other words, how much of the data seems to correlate to the other. Finally, these tests measure standard means, which determine if one group has a noteworthy difference in averages compared to the standard averages. Several different types of correlations tests, as well as basic linear regression, were used for this section. For more detail on the specific tests conducted, statistics referenced, test result values, and value interpretation, please refer to Appendix H.

For this report, the four demographic traits (independent variables) are:

- Race/Ethnicity;
- Sexual Orientation;
- Staff-Assigned Gender; and
- Age.

The outcomes (dependent variables) explored are:

- CJRA Pre-Screen Risk Level;
- JDSAG Screen Results;
- Detention Involvements;
- Child Welfare Involvements;
- Offense Ranking;
- Length of Stay; and
- Length of Stay While Releasable.

***Data Notes:*** There was not enough data for gender identity (self-assigned gender) and for preferred pronouns to conduct statistical analysis, so these categories are not included below. Additionally, it should be noted that although sexual orientation is included in statistical analysis, there were 266 instances when this field was not completed, so this data may be underrepresented.

For the purposes of this section, some analysis was done comparing White youth and Non-White (BIPOC) youth, as some of the N sizes for race/ethnicity were small enough that a binary test would be more appropriate to reflect disparities. In other cases, some specific tests were conducted for Black youth, Hispanic youth, and other Non-White youth, as N sizes were too small to analyze each individual group. In cases where Black youth are referenced specifically, this is not interchangeable with the term BIPOC youth. Tests were also conducted for these other racial/ethnic categories mentioned, but did not demonstrate a disparity, and so are not called out specifically in the sections below.

***Results:***

There were some statistically significant and noteworthy results from these tests. There were consistent disparities identified for Black youth in their charges, detention involvements, child welfare involvements, and length of stay. Disparities were also identified for youth who identify as queer in child welfare involvements and CJRA pre-screen risk level. There were occasionally also some discrepancies for youth based on other variables, however, often these followed the population curve.

The effect sizes (strength of relationship) were all minor with none as moderate or strong results. From these tests and results, analysts can intuit that the traits examined and described below do indicate a disparity in the system. However, each trait is a weak or mild predictor of the associated outcome, meaning additional factors exist that impact a youth's experience in the system. Additionally, some tests revealed some noteworthy standard mean differences, which show differences in averages between two groups, comparing each to a standard average. These tests do not necessarily predict future outcomes but do show differences within the current data and often do warrant further investigation.

### *Juvenile Detention Screening and Assessment Guide and Demographic Analysis*

***Summary:*** The Juvenile Detention Screening and Assessment Guide (JDSAG) screens are completed by CYDC intake staff and used to determine if a youth screens into detention or is more appropriate to release back into the community under the care

of a parent, caregiver, or other adult. JDSAG screens and staff overrides of these screens are not a significant source of disparities for youth in FY 22-23, as far as this year's descriptive statistical analysis could determine. The exception to this is that female (staff assigned gender) youth experience slightly more staff overrides to higher levels of placement than would be statistically expected.

- Race/Ethnicity and JDSAG screening results showed even distribution among screening levels for youth by race/ethnicity. This remains consistent even when taking into account staff overrides. Staff overrides are occurring consistently regardless of race/ethnicity.

- Sexual Orientation and JDSAG screening results also showed even distribution among screening levels for youth. Staff overrides of these screens also showed consistency regardless of sexual orientation.

- Gender and JDSAG screening results also showed even distribution regardless of gender (staff assigned) and revealed no disparity.
  - However, when looking at staff overrides of JDSAG screening results, there was a slightly higher number of female youth with higher actual placements than their screening results. Male youth had slightly fewer overrides to higher levels of actual placement. These statistical tests were for youth in detention; not all JDSAG screens are conducted prior to placement.

- Age and JDSAG screening results also showed an even distribution of results and showed no disparities for youth because of their age.

### *Colorado Juvenile Risk Assessment Pre-Screen and Demographic Analysis*

***Summary:*** The Colorado Juvenile Risk Assessment (CJRA) pre-screens are completed by CYDC intake staff to determine a youth's risk or likelihood of reoffense. The CJRA pre-screen did show minor correlations of higher risk levels for youth who identify as queer, for female youth, and for younger youth. All of these correlations are in the threshold that is typically considered a small effect size and do not show strong correlations. There was no correlation identified for BIPOC youth and CJRA pre-screen level.

- Race/Ethnicity and CJRA pre-screen level revealed an even distribution of risk levels among youth. Race/Ethnicity does not appear to be a reason why youth would have higher risk pre-screen levels.

- Sexual orientation pre-screen levels do show minor correlations. Youth who identify as queer have higher pre-screen risk levels. This is consistent with last year's data.
    - The effect size = 0.187.
    - In this kind of test, effect sizes of about 0.20 and below are considered small effect sizes.
- Gender (staff assigned) and pre-screen levels also show minor correlations. Youth who are identified as male are less likely to have higher pre-screen risk levels, while youth who are identified as female are more likely to have lower pre-screen levels.
    - The effect size = - 0.116 (considered a small effect size);
    - Given that far fewer female youth are in detention to begin with, this distortion is most likely skewed by the higher number of male youth within the population.
- Age and pre-screen levels also show minor correlations. In this case, the correlation is negative, meaning younger youth are slightly more likely to have higher risk levels than older youth.
    - The effect size = -0.161 (considered a small effect size);
    - It is worth noting that the cases for youth aged 10 to 12 are only felonies and weapons cases, pursuant to (C.R.S.) 19-2.5-304 (2) which states a court shall not order a youth over age 10 but under age 13 to detention unless the youth has been arrested for a felony or weapons charge. Most likely this is skewing the data for younger youth's higher CJRA pre-screen levels.

*Charges and Demographic Analysis*

***Summary:*** Analysis of demographic data and charges show a minor correlation in higher charges for BIPOC youth. The data also shows standard mean differences in offense ranking specifically for Black youth and for male youth (as separate analyses), which are nearly one offense level higher than their respective peers. The data does not show disproportionalities for youth's charges based on sexual orientation or age.

- Race/Ethnicity and charges show a minor correlation in the data. Youth identified as White have a slight correlation with lower charges, and Non-White youth have a slight correlation with higher charges
  - The effect size = 0.126 (considered a small effect size);
- However, this correlation increases in context when looking at Black and African-American youth, who have a standard mean difference of 0.743, which is not the same as effect size. This means that Black youth have an offense ranking nearly one charge higher than other youth in the cohort.
- Sexual orientation and charges did not show any correlation or disproportionate distribution of means.
- Gender (staff assigned) and charges have a standard mean difference of 0.925. Similar to the above number, male youth have an offense ranking one degree higher than female youth.
- Age and charges do not show any correlation or disproportionate distribution of means.

*Length of Stay and Demographic Analysis*

***Summary:*** Analysis of length of stay (LOS) did show a standard average difference between male and female youth, with male youth staying longer. Race/Ethnicity also showed a standard mean difference, in particular revealing correlations for Black youth and longer length of stay.

- Race/Ethnicity and LOS initially yielded conflicting results. At the continuous level using a statistical test that examined the values for youth at each interval, which is typically a more reliable test, there was no significant difference for youth's length of stay based on race/ethnicity.
  - However, there was a standard average difference in LOS where BIPOC youth have an average LOS of 6.7 days longer than White youth.
  - Based on this data, and noticing patterns in initial averages, additional tests were conducted and show that Black youth have a standard average difference of 11.9 days more, compared to Non-Black youth. This most likely also accounts for the discrepancy between the two initial tests.

- Sexual orientation and LOS did not show any correlation or disproportionate distribution of means.

- Gender (staff assigned) and LOS have a standard average difference of 15.8 days, with male youth having a longer average LOS than female youth.

- Age and LOS did not show any correlation or disproportionate distribution of means.

### *Releasable Length of Stay and Demographic Analysis*

***Summary:*** There were no discernible differences or patterns for these demographic traits and the amount of time youth were releasable. This is consistent with the results from the first annual report and also is consistent with the fact that there is no universal criteria for why a youth would be made releasable. It also shows there is not any current (as yet discerned) system bias in how long youth remain in detention between being made releasable and release from detention.

- Race/Ethnicity and length of stay while releasable (RLOS) did not show any correlation or disproportionate distribution of means.

- Sexual orientation and RLOS did not show any correlation or disproportionate distribution of means.

- Gender and RLOS did not show any correlation or disproportionate distribution of means.

- Age and RLOS did not show any correlation or disproportionate distribution of means.

### *Child Welfare Involvement and Demographic Analysis*

***Summary:*** Child welfare involvement was looked at through two lenses for this section: all historical child welfare involvements and active child welfare involvement at the time of a detention admission. For the purposes of this report, child welfare involvement is defined as an open assessment or case. There were no correlations found in any demographic category for active child welfare involvement at the time of detention admission. There were, however, correlations found in all demographic categories when all child welfare involvements were looked at over a youth's history. BIPOC youth have fewer involvements with child welfare compared to White youth. Youth who identify as queer have more involvements compared to non-queer youth.

Female youth have more child welfare involvements compared to male youth (staff identified).

- Race/ Ethnicity did not show any correlation or disproportionate distribution of means for child welfare involvement at the time of detention admissions within the cohort.
- There was a correlation between race/ ethnicity and historical involvement with child welfare, with an inverse relationship. BIPOC youth showed a standard average difference of -0.47 child welfare involvements. Youth who identified as BIPOC had an average number of 1.23 child welfare involvements compared to the adjusted average for White youth of 1.69 involvements.
  - The effect size = 0.15 (considered a small effect size);
- Sexual orientation did not show any correlation or disproportionate distribution of means for child welfare involvement at the time of detention admissions within the cohort.
- There was a correlation between sexual orientation and historical involvement with child welfare, with a standard average difference of 0.47 involvements. Youth who identify as queer have an average number of 1.83 involvements, while youth who do not identify as queer have an adjusted average of 1.36 involvements.
- Gender and child welfare involvement did not show any correlation or disproportionate distribution of means for child welfare involvement at the time of detention admissions within the cohort.
- There was a correlation between gender and historical involvement with child welfare, with a standard average difference of 0.26 involvements. Male youth (staff identified) have an average number of 1.34 involvements, while female youth have an adjusted average of 1.59 involvements.
- Age was not included in this analysis to be consistent with the detention involvement analysis below and because the youth population has a significant skew toward older youth, which specifically affects these involvement statistics.

### *Detention Involvement and Demographic Analysis*

***Summary:*** There were some minor correlations between a youth's race/ethnicity and their number of detention admissions (involvements). A deeper analysis of race/ethnicity shows that Black youth especially have more stays than their peers. As noted in the outcomes section below, detention involvement is an indicator of longer subsequent lengths of stay.

- Race/Ethnicity did have a minor correlation to detention involvement. An overall look at detention involvement for all youth based on race/ethnicity showed a minor correlation.
  - Effect size = 0.116 (considered a small effect size);
- However, once again, taking a closer look at the experiences of Black youth showed a standard mean difference of 0.31 for detention involvements. As outlined further below, the average number of total detention involvements for the entire population is 2.16. The average number of detention involvements for Black youth is 2.41 admissions compared to an adjusted average of 2.10 involvements for Non-Black youth. As explored further in the outcomes section below, the number of detention involvements is a significant indicator of future system length of stay and is worthy of attention.
- Hispanic youth and other BIPOC youth have standard means that are slightly below the average for the population for detention involvements.
- Sexual orientation did not show significant correlation or disproportionate distribution of means.
- Gender and detention involvement did not show any correlation or disproportionate distribution of means.
- Age was not included in this analysis since there is a significant skew in the detention cohort population toward older youth, which specifically involves how many times they are involved in detention.

# SYSTEM FOCUS

*County departments of human and social services and Colorado Youth Detention Continuum (CYDC) will work collaboratively and provide appropriate and timely placements and services to pre-adjudicated and adjudicated youth in the least restrictive setting.*

---

**Metric 1** ― Barriers to youth accessing placements and services, including barriers related to availability and funding and analysis of the demand for services and placements.

**Metric 2** ― Analysis of the time it takes to place youth in a service or out-of-home placement, including time between a referral to services and service received.

**Metric 3** ― Analysis of impact to county departments of human or social services while serving detained youth, including number of youth served and financial and workload impacts.

**Metric 4** ― Analysis of youth in detention who have prior or current child welfare involvement, which includes either an assessment, in-home, or out-of-home case at the time of detention.

**Metric 5** ― Identify a common definition of crossover youth to facilitate statewide understanding and uniform data collection.

**Metric 6** ― Collect qualitative data from family and youth regarding satisfaction to the access of services received and by type.

**Metric 7** ― Collect qualitative data from family and youth regarding satisfaction with least restrictive alternative placements.

**Metric 8** ― CYDC Juvenile Services Planning Committees (JSPC) will include SB21-071 Performance Standards and Outcome Measures within their yearly Juvenile Service Plans, including planning, provisions, and solutions addressing each standard.

---

## Barriers to Placements and Services

JSPCs were asked to delineate barriers to placement and services for their respective JDs again this year in their annual plans. Every JD reported limited options for placements and services, which they report, in turn, results in lengthy waitlists for

those that are available. Most rural JDs reported that not only are waitlists impacted by limited options, but the lack of options causes transportation barriers for youth and families. In these areas, placement and services often exist only in the more highly-populated areas, which results in either long commutes, inability to attend due to lack of transportation, or forced virtual programming. Virtual programming is available only if families have access to necessary technology.

Many JDs reported a lack of substance use treatment, namely inpatient treatment programming, which causes youth to be served in alternate ways. The alternate programming may not necessarily meet a youth's needs in the same way more specialized programming would. This is not only a concern for inpatient substance use treatment, but also for services in rural areas where specialized treatment programs may not be available. Additionally, it may happen in more urban areas of the state when waitlists are extremely lengthy. In some situations, a youth may be referred to a program more so because it is what is available regionally and less so because it is the best type of program to meet the youth's needs.

Placements were noted as "cost prohibitive" by several JDs, especially if funding via Medicaid or county departments of human or social services is not accessible due to a family not qualifying or already being involved with these services. Furthermore, private insurance is not always accepted at placement programs. And, while Medicaid may approve funding for services or placement, subsequent approval may become necessary if approvals expire as a result of long wait times for service provision due to lengthy waitlists. Moreover, many JDs reported a disproportionate increase in cost of services in relation to the amount of available funding for services. Some smaller JDs reported struggles with maintaining contracted providers due to the high cost of both in-home and out-of-home services, as well as limited funding resources available for the same.

Several JDs commented on the struggle to find providers that will work with youth with the behaviors that so many youth are identified as having. For example, it can be more difficult to find placement or services for youth with alleged crimes against persons or a history of certain behaviors.

In June 2022, the SB21-071 team disseminated the Youth/Family Gap Survey to all local JSPCs, directors of county departments of human or social services, school districts, law enforcement, guardians ad litem (GAL), public defenders, and district attorneys, and requested they share it with whomever they felt should have an opportunity to respond. The survey requested that respondents identify gaps in alternative youth placement, service provision within alternative youth placement,

community-based services, and the juvenile justice continuum, among other things. Responses from persons who identified themselves as a professional representative of the county departments of human or social services were reviewed and compiled into common categories. Of the 182 responses received from the survey, 51 (28.0%) were submitted by persons who identified themselves as professional representatives of county departments of human or social services. Twenty-five of 64 counties (39.1%) are represented in these 51 responses. The top five perceived barriers by this group were:

1. Lack of appropriate placement options (regarding level of care);
2. Waitlists for services;
3. Lack of substance use treatment (specifically inpatient);
4. Poor access to mental health services; and
5. Lack of appropriate available services.

In an effort to gain more specific placement and services barriers information, data points have been added to DBUTS requesting this information as it specifically relates to each admission. Additionally, data points related to barriers may become available for future editions of this report following the implementation of the universal placement referral form. The SB21-071 team intends to create and distribute a survey to county departments of human or social services in the fall of 2024, which will include requested information regarding barriers to services and placements.

## Length of Stay Overview

As mentioned in the population overview, the majority of admissions are 30 days and under. Looking at this from the detention hearing date, as previously requested by the Advisory Board, shows that almost 80% of youth are released from detention within 30 days from the detention hearing.

Typically detention hearings occur within 48 hours from admission date (average 1.7 days).

*Table 8: Admissions with a Length of Stay Over and Under Thirty Days*

| LOS Time Frame | Admissions from Admit to Release | Percent of Total Admissions | Admissions from Hearing to Release | Percent of Total Admissions |
|---|---|---|---|---|
| LOS 30 Days and Under | 2,111 | 76.7% | 2,166 | 78.7% |
| Over 30 Days | 642 | 23.3% | 575 | 20.9% |
| Over 60 Days | 353 | 12.8% | 322 | 11.7% |
| Over 90 Days | 217 | 7.9% | 204 | 7.4% |

As seen in Table 9 that follows, most regions' median lengths of stay are close to the state overall median. The Western region, with fewer youth services center and bed allocations, has lower overall averages. The Central region, with the highest number of bed allocations and facilities has the highest average, followed by the Southern region.

*Table 9: Detention Length of Stay by Region*

| Region | Average LOS | Median LOS | Average LOS from Hearing Date | Bed Allocations | Facilities |
|---|---|---|---|---|---|
| Central | 31.0 | 6.7 | 28.9 | 94 | 4 |
| Northeast | 25.2 | 6.6 | 22.2 | 55 | 2 |
| Southern | 28.1 | 6.9 | 25.2 | 47 | 2 |
| Western | 18.8 | 4.2 | 15.9 | 19 | 1 |
| State | 27.8 | 6.5 | 24.9 | 215 | 9 |

What can be seen when comparing Tables 10 and 11 which follow:

- The Central region's admissions are in alignment with the regional state youth population but have an overall longer share of the total state LOS, which includes more than 40% of the state's Transfer, Reverse-Transfer and Direct File cases.
- The Northeastern region has a lower share of both admissions and LOS compared to their regional population numbers.
- The Southern region has higher shares of both LOS and admissions.
- The Western region has a lower share of LOS and higher share of admissions compared to the overall regional percentages.
- Additional information on capacity analysis for each region can be found in the capacity section of this report.

*Table 10: Number of Admissions Compared to Overall Youth Population by Region*

| Region | Youth Population Ages 10-17* | % of CO Youth Population Ages 10-17 | Number of Admissions | % of Total Admissions | Bed Allocations | Facilities |
|---|---|---|---|---|---|---|
| Central | 227,633 | 39.4% | 1,099 | 39.9% | 94 | 4 |
| Northeast | 180,164 | 31.2% | 719 | 26.1%* | 55 | 2 |
| Southern | 119,337 | 20.7% | 642 | 23.3% | 47 | 2 |
| Western | 50,251 | 8.7% | 293 | 10.6% | 19 | 1 |
| State | 577,385 | 100% | 2,753 | 100% | 215 | 9 |

** These numbers are highlighted to help the reader see what is discussed in the bulleted section above. They flag over/underrepresented populations.*

*Table 11: Total Length of Stay Compared to Overall Youth Population by Region*

| Region | Youth Population Ages 10-17* | % of CO Youth Population Ages 10-17 | Total Detention LOS | % of Total Detention LOS | +/- % |
|---|---|---|---|---|---|
| Central | 227,633 | 39.4% | 34,998.88 | 45.7% | 6.3%*** |
| Northeastern | 180,164 | 31.2% | 18,094.26 | 23.6% | -7.6% |
| Southern | 119,337 | 20.7% | 18,005.04 | 23.5% | 2.8% |
| Western | 50,251 | 8.7% | 5,517.99 | 7.2% | -1.5% |
| Total State | 577,385 | 100% | 76,616.17 | 100% | - |

** Department of Local Affairs, Demographer's Office 2022 estimates, as reported in the monthly CYDC JDSAG Supplemental report.*
*** Population data by originating JD, not by youth services center.*
**** These numbers are highlighted to help the reader see what is discussed in the bulleted section above. They flag over/underrepresented populations.*

### *Additional Information on Length of Stay*

There is some additional information that provides context around youth in detention over and under 30 days. This data follows expected trends. For instance, most youth with admissions under 30 days were in detention for the first time, had lower CJRA pre-screen levels (lower risk of recidivism), and less serious charges. Conversely, most youth in detention over 30 days had been to detention previously, had higher CJRA pre-screen levels (higher risk of recidivism), and more serious charges, including increased felonies and crimes of violence. The majority of admissions are pre-adjudicated youth awaiting disposition of the alleged charges against them. Some youth are in detention post-adjudication and are serving a sentence in detention (detention sentence).

- The majority of the detention sentences in the cohort were for youth with an LOS under or equal to 30 days (44 admissions or 64.7% of all detention sentences).

- Most admissions with an LOS of under or equal to 30 days were the youth's first admission (1,198 admissions or 86.8% of first admissions).

- Of the 1,380 admissions that were a youth's first admission, 182 (13.2%) had an LOS over 30 days.

- Youth with an LOS under or equal to 30 days tend to have more low risk CJRA pre-screen levels than high pre-screen levels (see Table 12 below).

- Youth with an LOS over 30 days tend to have more pre-screen levels with a high risk result than a low risk result (see Table 13 below).

- Most youth in both categories screened to Level 1 for JDSAG screen placement (detention, see page 64 below for Level definitions).
    - For youth with an LOS under or equal to 30 days, 89.8% (1,896 admissions) screened to Level 1.
    - For youth with an LOS over 30 days, 92.1% (591 admissions) screened to Level 1.

- Crimes of violence increase for youth with an LOS over 30 days. Crimes of violence are typically person-crimes of violence like assault felonies and homicide felonies. They also include aggravated robbery, firearm and weapons felonies, and manslaughter felonies.
    - 38.0% (916) of youth admissions resulting in an LOS under 30 days were crimes of violence.
    - 56.8% (364) of the youth admissions resulting in an LOS over 30 days were crimes of violence.

- The number of admissions with felony charges as the max offense also increases for youth with admissions resulting in an LOS of over 30 days.
    - For admissions resulting in an LOS of 30 days or under, 64.3% (1,356) were felonies.
    - For admissions resulting in an LOS over 30 days, 81.2% (521) were felonies.

- The offense ranking increases from an average for felony offense from 13.8 to 14.6 for youth in detention over 30 days compared to youth in detention under 30 days. An average offense ranking of 15 means the

average offense was a felony 3, 2, or 1, indicating high charge levels for both groups, but especially the group of youth in detention over 30 days.

*Table 12: Colorado Juvenile Risk Assessment Pre-Screens for Youth with Admission Under or Equal to Thirty Days*

| CJRA Pre-Screen Level | Count of Admissions | Percent of Admissions |
|---|---|---|
| Low | 926 | 43.9% |
| Moderate | 607 | 28.8% |
| High | 546 | 25.9% |
| Missing | 32 | 1.5% |

*Table 13: Colorado Juvenile Risk Assessments Pre-Screens for Youth with Admissions Over Thirty Days*

| CJRA Pre-Screen Level | Count of Admissions | Percent of Admissions |
|---|---|---|
| Low | 149 | 23.2% |
| Moderate | 191 | 29.8% |
| High | 295 | 46.0% |
| Missing | 7 | 1.1% |

- Of the 642 admissions with an LOS of 30 days or more:
  - 249 admissions (38.8%) had an admissions-related reason for being in detention for 30 days or more. These youth were either serving detention sentences, listed as no bond, were in the transfer, reverse-transfer or direct file process, were Interstate Compact on Juveniles (ICJ) youth, or were eventually released to commitment, the Colorado Department of Corrections (DOC), or jail.
  - 393 (61.2%) of these “long LOS” admissions met none of the above criteria. The charges for those 393 youth are presented in Table 14: Offense Type for Youth in Detention Thirty Days or More.

*Table 14: Offense Type for Youth in Detention Thirty Days or More*

| Offense Type | Count of Offense Type |
|---|---|
| **Felony** | **307** |
| 1 | 11 |
| 2 | 31 |
| 3 | 47 |
| 4 | 68 |
| 5 | 55 |
| 6 | 25 |
| Missing | 70 |
| **Misdemeanor** | **86** |
| 1 | 45 |
| 2 | 19 |
| 3 | X |
| 6 | X |
| Missing | 12 |
| **TOTAL** | **393** |

Figures 6 and 7 show "long LOS" (admissions over 30 days or more), releasable LOS, and transfer, reverse-transfer and direct file LOS compared to the total and average LOS numbers for each region. Youth may be represented in multiple of these categories. As mentioned elsewhere, transfer, reverse-transfer and direct file LOS accounts for 16.5% of the total capacity LOS (215 X 365 days per year), meaning that only 179.5 beds statewide, averaged out across the year, are available for youth not in the transfer, reverse-transfer or direct file processes. The chart below also shows how the significant majority of the LOS is from the 642 admissions (23.3% of 2,753) of 30 days or more.

*Figure 6: Total Long (30+), Direct File (Transfer, Reverse-Transfer, and Direct File), and Releasable Length of Stay Compared to Overall Cohort Total Length of Stay*



*Figure 7: Average Long (30+), Direct File (Transfer, Reverse-Transfer, and Direct File), and Releasable Length of Stay Compared to Overall Cohort Average Length of Stay*




## Assessments

This section discusses the assessments currently available to the SB21-071 team that address either risk of reoffending, secure detention need, or level of care recommendations.

- The Colorado Juvenile Risk Assessment Pre-Screen (CJRA);
- The Juvenile Detention Screening and Assessment Guide (JDSAG); and
- Independent Assessments (IA) completed through the BHA, which includes the Child and Adolescent Needs and Strengths (CANS) tool.

Conversations are underway with relevant stakeholders to understand what other assessment data would be helpful for this report and to draft relevant Data Sharing Agreements/Memorandums of Understanding requests, including Independent Assessments conducted through the Regional Accountable Entities (RAE).

### *Colorado Juvenile Risk Assessment Pre-Screen Overview*

The CJRA pre-screen is used to assess risk of recidivism as a measure of predicted reoffense over time and uses the two domains of social and criminal history. This

pre-screen does not take into account the current alleged offense or measure lethality. The chart below shows the screen levels identified by the assessments used for the admissions in the cohort and shows a fairly even distribution of risk.

*Table 15: Colorado Juvenile Risk Assessment Pre-Screen by Admissions*

| CJRA Risk Level | Number of Admissions | Percent |
|---|---|---|
| Low | 1,075 | 39.0% |
| Moderate | 798 | 28.9% |
| High | 841 | 30.5% |
| Missing | 39 | 1.4% |
| TOTAL | 2,753 | 100% |

*Data Note: This year, we substantially improved on the missing CJRA Pre-screen data from 18.8% missing down to 1.4% missing. Some margin of missing data may always be expected.*

### *Juvenile Detention Screening and Assessment Guide Screen Results and Overrides*

This analysis compares the initial JDSAG screen-recommended level and actual placement level assigned to youth after any potential overrides by a judge or magistrate. This dataset includes the youth from the cohort who had detention involvement between July 1, 2022 and June 30, 2023 and any JDSAG screens done between June 14, 2022 through June 30, 2023. It is important to also note that since not all youth are screened to secure placement, this section includes youth outside of the cohort as well.

***Level Summary:***

- Level 1 - Secure Detention
- Level 2 - Staff Secure Detention
- Level 3 - Residential/Shelter
- Level 4 - Home Detention/Services
- Level 5 - Release

***Key Takeaways Tables 16 & 17:*** There were 742 (19.3%) total overrides out of 3,839 screens. Therefore 3,097 (80.7%) of youth screened were placed at the same level as they were screened. Of the 3,097 screens, 181 (4.7%) were overridden to place youth in a higher setting than the screen recommended, and 561 (14.6%) were overridden to place youth in a lower setting. The reasons for these overrides are not consistently logged in the Trails database.

*Table 16: Juvenile Detention Screening and Assessment Guide Override Information and Direction*

| Level Difference | Number | Percent |
|---|---|---|
| Same (No Override) | 3,097 | 80.7% |
| Lower | 561 | 14.6% |
| Higher | 181 | 4.7% |
| **Total** | **3,839** | **100%** |

*Table 17: Juvenile Detention Screening and Assessment Guide: Placement Screens vs Actual Placement and Overrides by Judicial District*

| Judicial District | Screening Result | | Actual Placements | | Level Difference | | |
|---|---|---|---|---|---|---|---|
| | Level 1 | 2-5 | Level 1 | 2-5 | Lower | Equal | Higher |
| 1 | 269 | 175 | 254 | 190 | 9.7% | 82.0% | 8.3% |
| 2 | 414 | 115 | 383 | 146 | 8.3% | 89.6% | 2.1% |
| 3 | 14 | 3 | 12 | 5 | 23.5% | 76.5% | 0.0% |
| 4 | 477 | 177 | 423 | 231 | 31.0% | 64.1% | 4.9% |
| 5 | 13 | 2 | 15 | 0 | 0.0% | 86.7% | 13.3% |
| 6 | 24 | 20 | 15 | 29 | 22.7% | 65.9% | 11.4% |
| 7 | 15 | 12 | 18 | 9 | 3.7% | 85.2% | 11.1% |
| 8 | 154 | 24 | 153 | 25 | 3.4% | 94.9% | 1.7% |
| 9 | 10 | 12 | 5 | 17 | 36.4% | 63.6% | 0.0% |
| 10 | 149 | 19 | 145 | 23 | 11.3% | 88.7% | 0.0% |
| 11 | 32 | 15 | 29 | 18 | 31.9% | 68.1% | 0.0% |
| 12 | 20 | 7 | 16 | 11 | 29.6% | 66.7% | 3.7% |
| 13 | 45 | 10 | 45 | 10 | 12.7% | 78.2% | 9.1% |
| 14 | 15 | 5 | 16 | 4 | 5.0% | 90.0% | 5.0% |
| 15 | 25 | 0 | 25 | 0 | 0.0% | 100% | 0.0% |
| 16 | 9 | 3 | 12 | 0 | 0.0% | 75.0% | 25.0% |
| 17 | 291 | 31 | 313 | 9 | 1.9% | 89.8% | 8.4% |
| 18 | 457 | 22 | 466 | 13 | 2.5% | 94.2% | 3.3% |
| 19 | 261 | 71 | 247 | 85 | 10.2% | 81.6% | 8.1% |
| 20 | 118 | 42 | 52 | 108 | 56.9% | 38.8% | 4.4% |
| 21 | 221 | 15 | 188 | 48 | 19.1% | 80.5% | 0.4% |
| 22 | 23 | 3 | 19 | 7 | 15.4% | 84.6% | 0.0% |
| **Total** | **3,056** | **783** | **2,851** | **988** | **561** | **3,097** | **181** |

*Note: Data suppression minimums did not apply here due to this data being published in other existing reports.*

The chart that follows shows a comparison between the initial screen level and the actual placement level.

*Figure 8: Juvenile Detention Screening and Assessment Guide: Result and Actual Placement Level Comparison*




***Independent Assessment Level of Care Recommendations***

**Background**

Independent Assessments (IA), which incorporates the Child and Adolescent Needs and Strengths (CANS) tool, are requested when it is believed a youth may qualify for Qualified Residential Treatment Program (QRTP) level of care. IAs are completed by a Qualified Individual via the local Administrative Service Organization (ASO) and are funded by the BHA. The completed IA and a recommendation for level of care is reported to the party who made the request.

The following levels of care can be recommended through the IA: community-based services, Qualified Residential Treatment Program (QRTP), Psychiatric Residential Treatment Facility (PRTF), and residential substance use treatment. Residential Child Care Facility (RCCF) placement recommendations are not included, as they are no longer eligible for Title IV-E or Medicaid per-diem reimbursements as of October 2021 as a result of the Family First. While the option for recommendation for residential substance use treatment is available and is used, there are neither residential substance use treatment facilities currently in Colorado nor out-of-state substance use treatment facilities that accept Colorado Medicaid.

The BHA compiles data regarding referrals for and completion of IAs across the state. A Data Sharing Agreement (DSA) between BHA and CDHS, specifically the SB21-071 team, was finalized this past fiscal year, which allows for sharing of client-specific data regarding IAs that have been requested and completed. At this time, IAs completed via local RAEs are not available for review or data collection by either BHA or CDHS. A DSA to collect IAs from the RAEs will need to be established for SB21-071 to analyze this information.

BHA's Children and Youth Behavioral Health Implementation Plan and Health Care Policy and Financing's (HCPF) Accountable Care Collaborative Phase III (ACC III) include expanding the use of the IA as part of a statewide Standardized Assessment (SA) process beginning in SFY 25-26. Whereas the IA has historically been requested to confirm the need for QRTP level of care, the SA, which also incorporates the CANS tool, will be used to make recommendations regarding the appropriate level of care and inform treatment planning necessary for children and youth with complex, as well as unmet, behavioral health treatment needs. Development of the SA process and creation of a system of care for children and youth with complex behavioral health needs is currently in progress.

**Analysis**

214 IAs were completed for cohort youth through BHA referrals (184 unique cohort youth). Of those 214 IAs, 121 were referred during a detention admission (113 unique cohort youth). This group is the focus for analysis.

- 17 of the 121 (14.1%) IAs were requested during the youth's detention, but the youth was released prior to the court's receipt of level of care recommendations. Just over half of those youth released prior to the court's receipt of the IA recommendation were placed in the level of care recommended by the IA.
- The average (mean) number of days a youth was in detention prior to the referral for an IA was 23.3 days with a median (the midpoint of the data) of 14 days.
- The average time a youth remained in detention following the court's receipt of the recommended level of care was 40.5 days, and the median was 30 days.
- The average LOS for youth in detention who received an IA while in detention is 69.9 days with a median of 59.9 days.
- 44 (51.2%) of the 86 were released from detention within 30 days of the completion of the IA.

- There were 66 releasable detention admissions who had IAs. The average RLOS for this group is 59.5 days with a median of 41.5 days.
- The average LOS for youth with a recommendation for PRTF was 158.5 days (N=<10).

There were 86 IAs with a recommendation for QRTP level of care.

- 24 (27.9%) were placed in a QRTP level of care.
- 42 (48.8%) were placed in a lower level of care.
- 20 (23.3%) were placed in a higher level of care.

Placement following 15 (12.4%) of the 121 IAs was to the custody of DYS upon release from detention. Further investigation of these cases found that placement and services searches were conducted for each of these prior to the court's sentence of commitment. A causal link could not be established between placement availability and the court's decision for commitment to DYS.

For these youth who were eventually committed:

- The average amount of time in custody following their IA was 71.4 days with a median of 64 days.
- The longest a youth waited to be committed post IA was 104 days, and the least was 41 days.

## Youth and Family Perception

Due to saturation concerns after outreach and brainstorming with professionals within both child welfare and juvenile justice, it was decided that a targeted approach is necessary to appropriately disseminate surveys to address the needs of youth and families regarding their access to placements and services. The team will continue working to identify other places where youth and families are surveyed to see if collaboration is an option for gathering this important information and/or how best to gather this information in the least-intrusive, yet meaningful way.

## Colorado Youth Detention Continuum Juvenile Service Plans

As previously mentioned, a section was added to the annual JSPC plans for SFY 2024-2025. The intention of this is to continue awareness of the parameters of (C.R.S.) 19-2.5-1404 (i.e., SB21-071) and to request information as needed for reporting. This section of the JSPC plans will remain and will be updated with any changes made to performance standards and outcome measures annually. All performance standards and metrics were listed in the plan for SFY 2024-2025, though JSPCs were only asked to respond to a few.

### *Child Welfare Involvement*

#### Prior and Current Involvement

In the cohort of 1,969 unique youth, 915 (46.5%) were identified as having active child welfare involvement with county human and social services at some point during their cohort detention span. Of the 915 youth that had active involvement with county departments of human or social services, 522 (57.0%) of these youth had new referrals that were later screened in during their detention stay. Additionally of the 915 youth, 215 (23.5%) were involved in both an assessment and a case but counted separately for each involvement type, which could result in a deceptive increase to the total, if included in a combined count. For the purposes of this report, qualifying criteria for "active" child welfare involvement included any youth who were identified as a child, victim or alleged victim, or youth-in-conflict in an assessment or case that remained in an open state at one of these specific points in a single detention span timeline:

- At initial detention admission date;
- Prior to the detention end/release date;
- Beyond the detention end/release date.

For youth having a single detention span in the cohort, child welfare involvement was measured against the start and end dates of that span. However, youth having multiple detention spans during the cohort period had their child welfare involvement measured slightly differently. To understand any child welfare involvement that was established prior to cohort detention, the first detention admission date was used for analysis, while the release date of the last cohort detention span was used to understand involvement at the end of detention and beyond. Because a child welfare assessment stems from a screened-in referral, the referral screen-in date is used for determining the start and end date of an assessment throughout the report.

One key finding from the data for child welfare involved youth was that 101 (17.8%) of the 522 youth had a referral submitted on the same day as the start date of their detention span in the cohort. While investigating the details around these involvements and their relationship to a new detention span was outside of the timeframe for this report, it is worth exploring in future report periods to better understand which of these involvement types are initiated first and/or which result in the start of the other.

Every child welfare case is assigned to one of four service Program Areas (PA) depending upon the needs of the family or the severity of abuse or neglect:

- ***PA 3***: Prevention and intervention services for children, youth, and families at risk of involvement with child welfare;
- ***PA 4***: Youth in conflict;
- ***PA 5***: Children in need of protection; or
- ***PA 6***: Children in need of specialized services.

### *Assessments*

Within the cohort period, 756 (38.4%) unique youth were involved in a total of 1,231 unique child welfare assessments, which are reports of child abuse or neglect or of a youth being in conflict. It was found that 26 related youth were involved in 11 of the same assessments. There were 522 (69.0%) unique youth with new assessments initiated during a cohort youth's detention admission. Of the 756 unique assessments, 437 (65.8%) were referred within the first five calendar days of a new detention admission start date and were the result of a court-ordered assessment (140), court-ordered placement (67), or court-ordered service (42).

At the conclusion of the assessment, a disposition of the initial allegation(s) are summarized, and the assessment is either closed or moved into a case status. Of the cohort period assessments, 631 (95%) were closed due to no findings being made, 83 of which were assessments initially assigned to Program Area 4, Youth in Conflict. Of all intrafamilial assessments for the cohort youth, allegations for only 30 (4.5%) of these assessments were substantiated.

### *Cases*

Within the cohort, 374 (19.1%) unique youth were involved in 402 open cases during their first cohort detention span, with all four program areas having been distributed

across the cohort. Youth involved in an active case that was opened prior to and remained open on the first day of their first detention span in the cohort totaled 290 (77.3%) youth.

Of the 374 unique youth, 85 (22.7%) became involved in a new case following the first date of their first detention span, which includes child welfare cases opened on the same start day of their detention span (9 cases or 10.6%); within five days of the detention span start date (10 cases or 11.8%), and prior to the release date for the continuous detention span (66 cases or 77.7%). Similar to cohort assessments, some related youth in the cohort were also included in the same case. It was found that 10 unique cases involved 20 unique and related youth. Cases initiated after the youth's detention span start date remained open for 31 days on average.

Program Areas 4 and 5, and to some extent Program Area 6, are generally regarded as being traditional child welfare cases. However, as all four service program areas impact a county human services to some degree, all will be included in this report's analysis unless otherwise indicated.

During the cohort period, 243 of the 402 cases were assigned to Program Area 4 services, while 84 were assigned to Program Area 5. The remaining cases, Program Area 3 and Program Area 6, were counted at 84 cases and 24 cases, respectively. The longest open case span for a case opened after the cohort youth entered detention was 529 days and assigned to Program Area 4.

*Table 18: Case Program Area Services by Unique Youth*

| Program Area 3 | Program Area 4 | Program Area 5 | Program Area 6 |
|---|---|---|---|
| 49 | 243 | 84 | 24 |

** Data Note: Program Areas for two of the youth were listed as "Other."*

As one of the routine processes to close a child welfare case, the county caseworker will enter into Trails a pre-populated reason that the case has come to a conclusion. Among the cohort youth child welfare cases, the three highest reasons for case closure included Court Action (104), Services Successful (93), and Transferred to DYS (27).

*Table 19: Case Closure Reason for Cohort Youth*

| Case End Reason | Count* |
|---|---|
| Court Action | 104 |
| Services Successful | 93 |
| Transferred to DYS | 27 |
| Services to be Given by Other | 20 |
| Transfer to FYiT Program | 20 |
| Legal Emancipation | 20 |
| Runaway Child | 13 |

* *Data Note: Case end reasons only appear if a case is approved for closure.*

### *Accessing Meetings for Family Engagement*

Family Engagement Meetings (FEMs) are designed to promote safety, well-being, and permanency for youth who are involved with child welfare. The FEM allows the youth, the family, their supports, a neutral facilitator, and other child welfare professionals to work together to develop and plan for the involved child or youth's safety and permanency.

In a similar framework, Individual Service and Support Team (ISST) meetings promote the collaboration and coordination of necessary services across different systems at the request of the court or court professionals or a youth's school district when there is a truancy charge or a risk thereof.

Finally, Multidisciplinary Team (MDT) meetings take place for a youth once in detention, with the ultimate goal being to determine the most appropriate placement, services, alternatives, permanency, and education for the youth. It is important to note that MDT meetings are often coordinated by local CYDC programs, thus, these meetings may not be entered into Trails but may be documented in the Savio Management Group (SMG) database.

Information regarding completed facilitated family meetings was collected from Trails and SMG. The information gathered is entered into each system by its primary users: county case workers and CYDC case managers. The SB21-071 team attempted to gather this information from the data management system used only by Collaborative Management Programs (CMP) across the state: Efforts to Outcomes (ETO). While there was data available from ETO, it was reported to be incomplete for various reasons, namely that the system was not available for CMPs across the state for several months during this fiscal year, rendering much of the data unavailable. Additionally, this information is not easily organized and would require extensive manual data collection to access information specific to cohort youth. If this information can be acquired in full form in future years, this information may be included. Because of this limited access to data maintained in ETO, all meeting details that are not available through Trails or provided by Savio Management Group will be included in the analysis for this report.

Considering all 2,753 admissions during the cohort period, 908 engagement meetings were completed during the detention spans while 62 were scheduled but not completed due to cancellations on behalf of the caseworker, youth, or family, no-showing of the youth or family, or attempts that were unsuccessful due to the youth being unavailable. Listed as a participating youth in a meeting, irrespective of completion, were 362 unique cohort youth (18.4%). Of the 908 completed meetings, 402 were FEMs, 424 were ISST meetings, and 82 were MDTs. As the details regarding MDT meetings for the cohort youth are not available in their entirety due to limited data availability, the true number of those meetings are likely higher than what is reflected here.

To understand how long a youth may wait after admission to detention before participating in an FEM, ISST, or MDT, the LOS was calculated from the first date of a youth's detention to the date of the first meeting to be completed. Further, the LOS was calculated from the last meeting date to the corresponding detention release date. The number of days remaining detained between the detention start and the first engagement meeting and the length of days between the last engagement

meeting and release are relatively consistent.

*Table 20: Length of Stay in Days From Admit to First Meeting, Last Meeting to Release, and All Detention Spans During Cohort Period*

| | Admission to Meeting | Meeting to Release |
|---|---|---|
| Average | 28.2 | 30.0 |
| Median | 20.5 | 17 |
| Minimum | 0 | 1 |
| Maximum | 171 | 168 |

## County Funding Impact

During the cohort period, 459 of the 1,969 youth (23.3%) received services during the detention span of this report, for which counties were responsible for funding some or all of the service costs. In total, 31 out of 64 counties (48.4%) were responsible for coordinating 8,758 different services and payments during the cohort period.

*Table 21: Average and Total Amount Spent by Counties by Service as Entered into Trails*

| Service Type | Total County Cost for Cohort | Average County Cost per Episode |
|---|---|---|
| Group Home Care | $48,007 | $662 |
| Mobile Intervention Team | $7,490 | $624 |
| Residential Child Care Facility | $377,757 | $534 |
| Qualified Residential Treatment Program | $892,174 | $486 |
| Group Center Care | $41,135 | $397 |
| Multi Systemic Therapy | $19,845 | $395 |
| Family Strengths | $716 | $358 |
| Family Outreach | $3,400 | $340 |
| Kinship Foster Care | $12,205 | $303 |
| Reconnecting Youth | $2,920 | $292 |
| Trauma Informed Care/Services | $17,271 | $269 |
| Foster Family Home Care | $369,441 | $267 |
| Youth Intervention Program | $2,505 | $258 |
| Day Treatment | $2,486 | $249 |
| Life Skills | $76,036 | $215 |
| Independent Living | $4,422 | $145 |
| Mental Health Services | $3,922 | $128 |
| Family Group Decision Making | $842 | $120 |
| Community Based Family Support Services | $8,014 | $102 |
| Reunification/Permanency - for Foster Care | $6,531 | $99 |
| Intensive Family Therapy | $8,072 | $96 |
| Home-Based Services | $38,215 | $85 |
| Accelerating Parenting | $509 | $83 |
| Mentoring | $12,486 | $74 |
| Functional Family Therapy | $439 | $73 |
| Relative Guardianship | $6,158 | $69 |
| Sexual Abuse Treatment | $13,799 | $61 |
| Domestic Violence Intervention Svcs | $60 | $60 |
| Adoption | $24,915 | $58 |
| Structured Parenting Time | $560 | $51 |
| Child Mentoring and Family Support | $8,014 | $50 |
| Special Economic Assistance | $70 | $35 |
| Family Engagement Meeting/Services | $554 | $34 |
| Supervised Visitation | $1,954 | $34 |
| Substance Abuse Treatment | $1,441 | $33 |
| Out-of-Home Case Services | $270 | $27 |

## County Caseload Impact Overview

*Figure 9: Impact of Detention Involvements on Child Welfare Unique Youth Served*




The figure above shows a decrease in unique youth in Child Welfare caseloads over the course of the past five state fiscal years. There was a 2.5% percent decrease (but about half the detention-involved caseload) in child welfare youth with detention involvement between SFY 18-19 and SFY 20-21. Since then, there has been a slight annual increase, less than half a percent annually, in child welfare youth with detention involvements. During the current cohort year, 2.8% of statewide unique youth in Child Welfare caseloads also had detention involvement.

## Crossover Youth Definition

Developing a statewide definition of crossover youth is a task of the SB21-071 team. Colorado Revised Statute currently states "Dually identified crossover youth" means youth who are currently involved in the juvenile justice system and the child welfare

system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case." (C.R.S.) 19-2.5-102(19). Although this definition is part of statute, it is broad and allows for some flexibility. As a result, there are still differences across judicial districts and counties who choose to use other definitions that may better reflect how they are serving this population locally. Crossover definitions were provided in annual CYDC JSPC plans for SFY 2024-2025. These definitions can be found in Appendix E.

# YOUTH FOCUS

*Pre-adjudicated and adjudicated youth will have access to placements and services in the least restrictive setting that meet their treatment needs as identified through assessments, as well as mitigate the youth's substantial risk of serious harm to others or the youth's flight risk from prosecution.*

---

**Metric 1** — Analysis of youth in detention who are releasable (without return to court) once out-of-home placement and/or services are available that meet the youth's needs and mitigate risk, as well as the time it takes to place them.

**Metric 2** — Analysis of youth in detention who are releasable with conditions.

**Metric 3** — Analysis of youth in detention who are releasable to a PR bond.

**Metric 4** — Analysis of youth in detention who are not considered releasable.

**Metric 5** — Analysis of youth being served in the least restrictive setting, which includes level of care recommended, level of care received, and reasons for staff overrides.

**Metric 6** — Analysis of youth being served in the least restrictive setting, which includes level of care recommended, level of care received, and reasons for staff overrides.

**Metric 7** — Analysis of youth's access to family facilitated meetings and the impacts of these meetings on youth outcomes.

**Metric 8** — Analysis of youth in detention who are in the transfer and direct file processes.

---

## Youth Outcomes Overview

The section below explores how factors like offense ranking and child welfare involvement impacted a youth's outcomes in detention for length of stay and number of detention involvements. Over 30 linear regression tests were used to measure patterns in the data, whether those patterns were random or meaningful, and the degree to which the independent variable impacted the dependent variable. For more detail on the test result values, please refer to Appendix H.

For this section, the independent variables analyzed are:

- Detention Involvements (as an influencer on length of stay);
- Child Welfare Involvements; and
- Offense Ranking.

For this section, the dependent variables analyzed are:

- Length of Stay (LOS);
- Length of Stay While Releasable (RLOS); and
- Detention Involvements.

## Outcomes and Length of Stay

### *Summary: Outcomes and Length of Stay*

Prior involvement with either DYS or county departments of human or social services predicts a longer length of stay (LOS) in detention. Those youth that have the most contact with the system are the youth who are staying within the system longer. These types of tests do not prove causality, so it cannot be said that prior system involvement causes longer LOS. However, more contact with the system is predictive of longer LOS, and that can be used as a guide to support youth in detention. Most likely, these youth have longer LOS because they have the more complex cases, with many compounding factors both within and outside the system. The more involvements a youth has with the system, the more time they will mostly spend in detention in a subsequent involvement.

Charges also have a strong correlation to increased LOS for youth, with crimes of violence having a significant standard mean difference.

Statistical measures of releasable LOS proved to either show no statistical patterns or to be a diluted sample of the general population. The outcomes for RLOS mirror the outcomes for general LOS but are typically less strong. Since RLOS is a part of LOS (these are measuring smaller segments of the same timeframes), it is more likely they are just reflecting the results from LOS in general, rather than being unique to the releasable youth. This indicates a certain amount of randomness in how long youth are releasable.

### *Detention Involvements and Length of Stay*

The number of times a youth returns to detention has a significant impact on a youth's LOS. Regression results showed that each time a youth returns to detention, their projected LOS increases by 10.8 days.

- Looking at only detention involvements prior to the cohort time frame showed that each stay increases the youth's current cohort LOS by 8.7 days.
- Looking at the detention involvements only within the fiscal year (22-23) showed that each detention admission increases a youth's projected LOS by 21.4 days. This suggests that each detention involvement increases a youth's LOS overall but that returns to detention within a more concentrated amount of time have a higher impact on this outcome for youth.

Additionally, 1,380 (50.1%) of the 2,753 admissions were a youth's first ever admission into detention.

- Average LOS if it is a youth's first admission - 19.9 days
- Average LOS if it is not a youth's first admission - 35.8 days

### *Detention Involvements and Releasable Length of Stay*

The number of times a youth returns to detention has some impact on how long that youth may be considered releasable, but the impact is not as significant as their overall LOS in detention. In this case, detention history has more of an impact on a youth's RLOS. For each detention involvement prior to the start of the cohort, a youth's RLOS would increase by 5.02 days. The number of times the youth returned to detention within the fiscal year does not impact their RLOS.

### *Child Welfare Involvements and Length of Stay*

The more DHS cases a youth has in their history, the longer their predicted LOS. For each prior child welfare case, a youth's predicted LOS is expected to increase by 7.61 days. This increases substantially if the youth has cases in their history where they were removed from their home, in which case their expected detention LOS increases by 16.46 days for every case in which they were removed from the home.

### *Child Welfare Involvements and Releasable Length of Stay*

Releasable youth with prior child welfare cases have a slight increase in their predicted RLOS. For each additional child welfare case in a youth's history, their RLOS is predicted to increase by 4.0 days. Similar to LOS in general, youth with cases in which they were removed from home have longer RLOS. For each instance of being removed from the home through child welfare, their RLOS increases by 15.4 days.

### *Charges and Length of Stay*

*Table 22: Offense Category, Type, and Length of Stay*

| Offense Category | Count | Average LOS |
|---|---|---|
| Felony | 1,877 | 34.0 |
| Misdemeanor | 805 | 15.1 |
| Petty | 68 | 10.0 |
| Missing | 3 | 12.0 |
| **Offense Type** | | |
| Drug | 98 | 15.7 |
| Other | 175 | 12.2 |
| Person | 1,491 | 35.8 |
| Property | 643 | 23.6 |
| Status | 38 | 12.5 |
| Traffic* | 30 | 10.7 |
| Weapon | 278 | 13.0 |
| **Total** | **2,753** | **27.8** |

**Traffic offenses include such charges as vehicular manslaughter and vehicular assault and should not be interpreted as minor traffic violations.*

Statistical tests on LOS and charges confirmed that admissions in the cohort with a higher offense ranking are associated with longer LOS.

- Youth with nonviolent charges had an overall average LOS of 19.8 days.
- Youth with violent charges (homicide, assault, other violent person crimes) had an average LOS of 48.3 days.
- The mean difference for youth with charges of a violent crime is 28.5 days, which is a substantial increase in LOS.

Additionally, regression showed that with each increase in charge level (e.g. from a petty crime, level 6 to a felony crime, level 1), a youth's LOS increased 6.9 days. From this data, it can be concluded that increased charges correlate to an increase in a youth's LOS while in detention.

The charge data in this report is the max offense associated with the youth's admission into Trails at the time of entry. This data comes from Trails, and the max offense is vetted/ selected during the Data Management and Analysis team's annual year end data clean.

### *Charges and Releasable Length of Stay*

There was no discernible pattern or statistically significant result for charges and releasable youth. This is surprising, especially given the strong results in the section above. The tests did not indicate a statistically significant result, meaning that any numbers produced were most likely the result of chance and that the two variables are not related. This indicates that charges are not a significant factor in how long it takes to release a youth after they have been made releasable. It can also indicate that more information is needed.

## Outcomes and Detention Involvements

### *Summary: Outcomes and Detention Involvements*

The results for this outcome measure did not show results as strong as the results for the section on LOS. However, this is in part due to limits on the data available for this year's report. However, there is a moderate correlation between the CJRA pre-screen level and the number of times a youth returns to detention.

This section looks at how many times youth in the cohort returned to detention and began to explore what impacts these returns. Since this is the first year of this data being collected, data is still somewhat limited.

The average number of detention involvements for youth, including prior to the cohort and within the cohort timeframe, is 2.2 admissions. The average number of involvements within the cohort timeframe is 1.4. These numbers are further shown in Table 23 below.

*Table 23: Count of Youth and Their Detention Involvements*

| Detention Involvement Ranges (All Time) | Count of Unique Youth | % of Cohort |
|---|---|---|
| 1 | 1,053 | 53.5% |
| 2 | 398 | 20.2% |
| 3 | 205 | 10.4% |
| 4+ | 314 | 15.9% |

### *Child Welfare Involvements and Detention Involvements*

Simple linear regression showed no discernable pattern between previous child welfare assessments or cases and the number of times a youth returns to detention either for a youth's history or within the cohort timeframe. Therefore, this further emphasizes the assumption above that the youth with longer lengths of stay have more complex factors and are not solely impacted because of system involvement.

### *Charges and Detention Involvements*

The available data for this analysis was limited to the cohort year, therefore charges could only be compared for the number of detention admissions within the cohort fiscal year, which did not produce a statistically significant or discernable result. Given available data, potentially more robust tests could be conducted in future reports.

***Colorado Juvenile Risk Assessment Pre-Screens and Detention Involvements***

A correlations test was conducted to see if there is a pattern between a youth's pre-screen risk level to their number of detention involvements within the cohort timeframe, which did reveal a moderate correlation. This can be taken to indicate that youth with a higher CJRA pre-screen risk level could be predicted to have more detention involvements. Since this data was limited to the detention cohort timeframe, a wide data lens would most likely show a stronger correlation (i.e., looking farther post-release).

- Effect size = 0.30
- In this kind of test, effect sizes of about 0.25-0.75 are considered moderate effect sizes.

## Alternative Placements for Detention Youth

*Youth Who are Eligible for Alternative Placements if Risk of Serious Harm to Community or Risk of Flight is Mitigated*

The information in the following section reviews cases where youth remain in detention while alternative placements are being located and provides more clarity on what factors impact what is referred to as "releasable length of stay" (RLOS). In October 2023, additional information was requested on bonds and on youth who may eventually have alternative placements, but require a return to court. This begins to reflect the broader efforts from both DYS and county departments of human or social services to find placements for youth regardless of their official releasable status.

***Bonds***

The performance standard for bond information was approved in October of 2023 and was not, therefore, tracked for youth in this cohort for FY 22-23. However, the SB 071 analysts were able to find bond information by reading case notes in the Colorado Courts Data Access system. However, due to time constraints and the high amount of information needed from these case notes, bond information was only able to be confirmed for admissions that were over 30 days.

Of these admissions:

- 260 had a Personal Recognizance (PR) Bond. Of those:
    - 109 were not considered releasable.
    - 151 were considered releasable.
- There were 70 placement in lieu bonds upon agreement in this cohort.
- 165 were specifically considered no bond.
- 135 either had no bond or no information regarding bonds.

***Conditions of Release***

- One of the metrics established in October 2023 was to analyze "conditionally releasable youth." Conditionally releasable youth may be eligible for alternatives to detention but require a return to court before they can be released. Complete information on this was not available this year. However:
    - There were 21 youth estimated to have a placement in lieu bond listed by the court that were not designated as releasable.
    - There were 521 youth estimated to have a PR cosigner bond (without a first placement of commitment) who were also not designated as releasable. However, it is unclear what the conditions of those cosigner bonds were (whether they were awaiting a parent cosigner, DHS cosigned, or if they could be immediately released, etc.). Further review will be needed in future years to more fully understand this group of youth.
    - There were 1,309 additional admissions not considered releasable, not specifically listed as no bond, but without PR consigned bonds or placements in lieu.
        - Of these, 124 admissions were for 30 days or more, with the majority under 30 days.
- ***Data Note:*** As stated above, these bonds are estimates, as only the bonds for youth with a LOS of 30 days or more could be fully vetted this year due to time constraints.

- It should be noted that placements or services are often being located for the majority of the youth within detention, whether as a potential alternative placement or to support the youth in general.

*Table 24: Youth Who are Releasable, Not Releasable, or Conditionally Releasable*

| | Admissions (LOS) < 30 Days* | % Admissions < 30 Days | Admissions (LOS) >= to 30 Days | % Admissions >= Equal |
|---|---|---|---|---|
| Releasable | 457 | 21.6% | 218 | 34.0% |
| Not Releasable | 46 | 2.2% | 165 | 25.7% |
| No Releasable Designation | 1,608 | 76.2% | 259 | 40.3% |
| **Total** | **2,111** | **100%** | **642** | **100%** |

** Only bond information for youth with admissions of 30 days or more was thoroughly vetted by reading through case notes. Admissions information of 30 days and under comes from DBUTS and was manually entered. It may contain some misalignment with the new releasable definitions voted on in October of 2023.*

### *Releasable Youth*

- Of the 1,969 unique youth, 540 (27.4%) were made releasable by a court if substantial risk of serious harm or flight risk could be mitigated by appropriate community placement.
    - Central: 240 unique youth*
    - Northeast: 132 unique youth
    - Southern: 118 unique youth
    - Western: 66 unique youth

** Regional unique youth counts are non-exclusive.*

- Of the 2,753 admissions, 675 (24.5%) were releasable.
  - Five of these admissions were in the Transfer, Reverse-Transfer and/or Direct File youth.
  - 16 of these admissions were committed immediately following their detention stay.
  - Five of these admissions were released to county jail due to age.
- ***Data Notes***:
  - Youth with a detention sentence were manually excluded from these releasable numbers but are included in the "conditionally releasable" numbers.
  - ICJ youth were excluded from all releasable numbers since these youth would not primarily have long term placements in Colorado but would be returned to their home state.
- The average releasable length of stay (RLOS) by admission is 22.3 days. RLOS is the time between the date the youth was made releasable by the court and their release date.
- The median RLOS is seven days.
- 152 of these admissions (5.5% of total admissions) were detained for more than 30 days after being made releasable (RLOS).

***Releasable Youth and Child Welfare Involvements***

- The majority of youth considered releasable by a court had DHS involvement in their history first (comparing lifetime involvements).
  - 98 youth (18.1%) had contact with the Division of Youth Services first.
  - 433 youth (80.2%) had contact with county departments of human or social services first (case or assessment).
- Correlation tests indicated no relationship between a youth's RLOS and which department the youth had contact with first.

*Table 25: Number of Releasable Admissions by Date Range*

| Total Releasable Days Date Ranges (RLOS) | # of Admissions | % of Admissions Youth |
|---|---|---|
| 1 Day or More | 675 | 100% |
| 7+ Days | 348 | 51.6% |
| 14+ Days | 252 | 37.3% |
| 30+ Days | 152 | 22.5% |
| 60+ Days | 68 | 10.1% |
| 100+ Days | 36 | 5.3% |

*Table 26: Releasable Information by Region*

| Region | Releasable Admissions | Average RLOS | Median RLOS | Total RLOS |
|---|---|---|---|---|
| Central | 288 | 21.4 | 7 | 6,170 |
| Northeast | 157 | 21.0 | 7 | 3,301 |
| Southern | 139 | 32.9 | 14 | 4,569 |
| Western | 91 | 11.3 | 4 | 1,031 |

- Full information on releasable admissions and RLOS by judicial district and county is included in Appendix G, however some highlights are included here.
    - Two JDs had a significant percentage of the total RLOS, with the 4th JD containing 29.5% of the total state RLOS and making up most of the releasable admissions for the Southern region, and the 2nd JD containing 20% of the total state RLOS, with the majority of the releasable admissions in the Central region.
    - Three JDs had average RLOS numbers which deviated substantially from the state average, including the 13th (56 days), the 17th (49 days), and the 4th (36.5 days).

- Similarly, El Paso County contained 30.9% of the state RLOS, followed by Arapahoe County with 12.3% of the state RLOS, and Adams County with 12% of the RLOS.
- Two counties had an average RLOS number which deviated from the state average, including Arapahoe County (28.2 days) and El Paso County (37.9 days).
- ***Data Note:*** County, in this case, is based on the county of offense and not necessarily the county where DHS is involved in placing releasable youth.

*Additional Outcomes for Releasable Youth*

A few additional statistical tests were conducted to see if youth designated as releasable have different outcomes from youth who are not designated releasable.

- Releasable youth do not have statistical differences in their length of stay compared to non-releasable youth.
- Releasable youth have a small correlation with higher CJRA pre-screen levels compared to non-releasable youth.
  - Effect size = 0.21.
  - In this kind of test, effect sizes of about 0.25 and under are considered small effect sizes.
- Releasable youth showed no statistical differences in charges compared to youth who are not designated releasable.
- Releasable youth showed no statistical differences in JDSAG screen levels compared to youth who are not designated releasable.

## Denials

The number of denials by placement providers when youth are not accepted into the recommended level of care (LOC) has not been collected historically. Beginning in June 2024, DCW began piloting a universal placement referral form (APPENDIX I) with eight counties and two RAEs in an effort to begin tracking referrals and denials to placements. This information will be integral in better understanding how placement programs can be supported and where the gaps in services are.

## Foster and Kinship Care

Foster home placement may be a beneficial option for any youth in need of temporary, out-of-home care and support while the county or involved placement agency coordinates efforts to achieve permanency for the youth. Detained youth awaiting release often face unique hurdles being accepted into a foster home placement, as provider preferences may exclude this population of youth due to their juvenile justice involvement, among other identified preferences.

An alternative to a foster family home is kinship care, either in a certified kinship foster care home or a non-certified kinship home, delineated only by the kinship provider's ability or interest to seek formal certification through their county human or social services agency. In addition to kinship family foster homes and non-certified kinship care, there are also informal kinship caregivers, which are living arrangements the youth has with relatives or kin that are not managed or monitored by an agency.

Based on some of these identified preferences, there are 455 certified foster homes statewide that accept youth between the ages of 10 and 20 years old. The majority of these foster homes (451) were certified as foster family home care, with the remaining four being certified kinship foster homes.

*Tables 27 and 28: Foster Home Providers by County and Judicial District*

| County | # of Placement Types Foster Home | County | # of Placement Types Foster Home |
|---|---|---|---|
| Adams | 199 | Kit Carson | 3 |
| Alamosa | 20 | La Plata | 19 |
| Arapahoe | 322 | Lake | 2 |
| Archuleta | 5 | Larimer | 214 |
| Baca | 3 | Las Animas | 8 |
| Bent | 3 | Lincoln | 1 |
| Boulder | 90 | Logan | 17 |
| Broomfield | 32 | Mesa | 135 |
| Chaffee | 8 | Mineral | 0 |
| Cheyenne | 0 | Moffat | 8 |
| Clear Creek | 5 | Montezuma | 22 |
| Conejos | 2 | Montrose | 45 |
| Costilla | 0 | Morgan | 38 |
| Crowley | 2 | Otero | 17 |
| Custer | 3 | Ouray | 1 |
| Delta | 34 | Park | 4 |
| Denver | 423 | Phillips | 9 |
| Dolores | 3 | Pitkin | 3 |
| Douglas | 168 | Prowers | 2 |
| Eagle | 1 | Pueblo | 100 |
| El Paso | 448 | Rio Blanco | 4 |
| Elbert | 14 | Rio Grande | 9 |
| Fremont | 43 | Routt | 9 |
| Garfield | 24 | Saguache | 1 |
| Gilpin | 1 | San Juan | 1 |
| Grand | 3 | San Miguel | 4 |
| Gunnison | 1 | Sedgwick | 1 |
| Hinsdale | 1 | Summit | 10 |
| Huerfano | 4 | Teller | 29 |
| Jackson | 1 | Washington | 10 |
| Jefferson | 211 | Weld | 278 |
| Kiowa | 4 | Yuma | 3 |
| Grand Total | | 3,085 | |

| Judicial District | # of Placement Types Foster Home |
|---|---|
| 1 | 212 |
| 2 | 423 |
| 3 | 12 |
| 4 | 477 |
| 5 | 18 |
| 6 | 25 |
| 7 | 86 |
| 8 | 215 |
| 9 | 31 |
| 10 | 100 |
| 11 | 58 |
| 12 | 32 |
| 13 | 81 |
| 14 | 20 |
| 15 | 9 |
| 16 | 22 |
| 17 | 231 |
| 18 | 505 |
| 19 | 278 |
| 20 | 90 |
| 21 | 135 |
| 22 | 25 |
| Grand Total | 3,085 |

** Counties not listed in the table to the left do not have foster homes available in their county. If/when a placement is needed, those counties can access nearby placements.*

** For all foster home providers that were open for at least one day during SFY 2023*

Because there are no distinct or formal indicators that a certified foster home cannot or will not accept placement of pre-adjudicated or adjudicated youth who otherwise can be served in a family-like setting, caseworkers/managers may face challenges when attempting to find placement for these youth. Outcomes of navigating these hurdles are evidenced as time and resources spent unnecessarily pursuing foster home placements that do not clearly indicate a preference to care for youth not involved in juvenile justice. As foster homes in Colorado are managed by both counties and private Child Placement Agencies, there is currently no ability to consistently record and report a foster home's preference in accepting alleged and adjudicated youth.

## Kinship Placements at Release

While last year's report examined the number of distinct youth who were involved in kinship placements that followed a detention release, the additional detention spans that come with a full cohort period changes the presentation of the data for the current reporting period. Previously, with only six months of data, unique counts of youth as they were released to either existing or new kinship placements was completed for analysis. Having now 12 months of data to examine in this reporting period slightly alters which detention spans and which placements may qualify as new or existing following release. This year's report will focus on the number of detention releases to kinship placements rather than the number of youth.

## Placements Analysis

Information available regarding placements becomes increasingly limited following the initial placement upon release from detention. Placement information beyond that which occurs immediately following release from detention is only available for youth placed by the county departments of human or social services. The table below indicates the first placement of youth immediately following their release from detention. It should be noted that if information was available indicating a youth was released to a parent following release from detention but immediately placed in a QRTP setting, this youth was categorized as QRTP placement.

*Table 29: Total First Placements Following Release from Detention*

| Placement Type | # Total 1st Placement Following Release | % of Total 1st Placements Following Release |
|---|---|---|
| Home | 1,729 | 62.8% |
| Kin, Kin-Foster, Guardian, or Kin-Like | 383 | 13.9% |
| DYS Commitment | 188 | 6.8% |
| QRTP | 112 | 4.1% |
| Foster Care | 78 | 2.8% |
| County Jail | 50 | 1.8% |
| ICJ - Return to Home State | 44 | 1.6% |
| RCCF | 37 | 1.3% |
| PRTF | 26 | 0.9% |
| Colorado Mental Health Hospital In Pueblo (CMHHIP) | 20 | 0.7% |
| Other DHS Placement | 17 | 0.6% |
| Department of Corrections/Youth Offender Services (DOC/YOS) | 14 | 0.5% |
| Out-of-State Placement | 10 | 0.4% |
| Group Home | 10 | 0.4% |
| Other | 6 | 0.2% |
| Unknown | 29 | 1.1% |
| **Total** | **2,753** | **100%** |

More than 75% of all admissions resulted in a return home or placement with kin-foster, kin, guardian, or in a kin-like setting immediately following release from detention. Of those, less than 5% had involvement by county departments of human or social services.

More than 80% of total foster placements had DHS involvement.

Out of 2,753 youth admissions, 252 (9.2%) were released from detention to be confined elsewhere:

- In 188 admissions (186 unique youth), the youth were committed to DYS.
- In 14 admissions (14 unique youth), the youth were transferred to the Department of Corrections (DOC) or Youth Offender Services (YOS) program.
- In 50 admissions (50 unique youth), the youth were transferred to local county jails as a result of the youth turning 18 years of age.

One way to further understand the impact of placements on county departments of human or social services is to review the number of placements immediately following release from detention in which county departments of human or social services were involved. There were 365 (13.3%) of the 2,753 total release placements in which involvement from county departments of human or social services could be verified. The table below shows percentages of total placements in each category outlining placements in which a county department of human services, or DHS, was and was not involved. Of all first placements following detention release, 185 (6.7%) were made to RCCF, QRTP, PRTF, and group home settings combined. DHS was involved in 172 (93.0%) of those placements.

Of the youth who were placed in residential treatment programs (RCCF, QRTP, PRTF, and group homes):

- 9.7% exited placement directly to detention.
- 19.5% were reported as having run away from placement.
- 21.1% had unknown reasons for end to placement.

Youth listed as being placed in “Other DHS Placement” upon release were those youth who were noted as either having immediate placement in a county office or hotel due to no formal placement being immediately available, placement in independent living situations, or placement in shelters. Of the youth placed in “Other DHS Placement”, 47.1% (N=<10) were temporarily cared for by county departments of human or social

services staff in county offices or hotels. Less than 25% in this group remained in detention for 30 days or more after being made releasable.

*Table 30: Percentage of Placements with and without Department of Human Services Involvement*

| Placement Type | Percent with DHS | Percent without DHS |
|---|---|---|
| Home | 2.9% | 97.1% |
| Kin, Guardian, or Kin-Like | 12.4% | 87.6% |
| DYS Commitment | 0.5% | 99.5% |
| QRTP | 93.3% | 6.7% |
| Foster or Kin Foster | 86.4% | 13.6% |
| County Jail | 0% | 100% |
| ICJ Return to Home State | 9.1% | 90.9% |
| RCCF | 85.7% | 14.3% |
| PRTF | 100% | 0% |
| CMHHIP | 20% | 80% |
| Other DHS Placement | 100% | 0% |
| DOC/YOS | 0% | 100% |
| Out-of-State Placement | 50% | 50% |
| Group Home | 100% | 0% |
| Hospital | 83.3% | 16.7% |
| Unknown | 6.9% | 93.1% |

** Youth listed as being placed with Other DHS Placement upon release were those youth who were noted as either having immediate placement in a county office or hotel due to no formal placement being immediately available, placement in independent living situations, or placement in shelters.*

Of the 675 releasable youth admissions:

- 382 (56.6%) youth returned home;
- 117 (17.3%) youth were placed with kin, guardian, or in kin-like placement;
- 98 (14.5%) youth went to residential care (RCCF, QRTP, PRTF, group home);
- 39 (5.8%) youth were placed in foster care; and
- 39 (5.8%) youth were placed in other various placements.

152 of the 675 releasable youth (22.5%) remained in detention for 30 or more days after being made releasable.

Of the 152 releasable for 30 or more days:

- 56 (36.8%) returned home;
- 47 (30.1%) went to residential care (RCCF, QRTP, PRTF, group home);
- 17 (11.2%) were placed with kin, kin-foster, guardian, or in kin-like placement;
- 11 (7.2%) were eventually committed to DYS;
- 10 (6.6%) were placed in foster care; and
- The remaining 11 (7.2%) were placed in other various placements.

## Youth in the Transfer, Direct File, and Reverse-Transfer Processes

Cases involved in the Transfer, Direct File, and/or Reverse-Transfer processes can remain in detention for extended periods of time, as the courts ultimately decide which jurisdiction will best serve the juvenile and the community.

For this report, data for youth in the Transfer, Reverse-Transfer and/or Direct File processes was found using three sources: Calendar Year 2022 data received from Colorado District Attorneys' Counsel (CDAC), Trails data extract, and DBUTS. Combining data from three sources can present challenges and may result in minor data errors. In addition to maintaining its collaboration with CDAC, the SB21-071 team continues to make progress in the effort to obtain a DSA with the judicial department in order to have the most accurate data available.

There were 61 youth in detention during this cohort period that were in Transfer, Reverse-Transfer and/or Direct File processes. Of these, 17 started the process prior to the start of the cohort period, and two had an adult criminal (CR) court case number assigned after the end of the cohort timeframe.

Cohort youth in this group range in age from 14 to 17 years old at the time of detention admission. However, the average age of a youth in the Transfer, Reverse-Transfer and/or Direct File processes for this cohort is 16 years old. More than 90% of these youth were male. Hispanic youth made up the majority (49.2%) of these cases, while Black youth made up 31.2%. White youth made up 13.1% of these cases. The remainder of youth (6.5%) were either identified as Native Hawaiian or Other Pacific Islander or unable to be determined.

Seven youth spent 30 days or less in detention. Forty of the 61 youth (65.6%) in these processes were in detention for 90 days or more, with 10 of those youth spending 500 or more days in detention. The most days spent in detention for a youth was 809 days. More than 40% of the youth in the Transfer, Reverse-Transfer and/or Direct File processes were from the central region, and less than 5% were from the western region. Nearly 80% of the youth in this group were charged with homicide or attempted homicide.

*Table 31: Length of Stay for Youth in Transfer, Reverse-Transfer, and Direct File Processes*

| | |
|---|---|
| **Average LOS** | 255.4 |
| **Median LOS** | 198 |

** These numbers are based on the total time youth were in detention for this admission, even if they were released after the cohort timeframe. At the time these numbers were calculated, only two youth remained in detention. Their end date was truncated to reflect 04/30/2024.*

*Table 32: Number of Youth in Transfer, Reverse-Transfer, and Direct File Processes by Region*

| Region | % Youth in Transfer, Reverse-Transfer, and Direct File Processes | Total # Days in Detention |
|---|---|---|
| Central | 42.62% | 6,816.8 |
| Northeast | 27.87% | 2,637.7 |
| Southern | 24.60% | 2,654 |
| Western | 4.92% | 817.5 |

Youth in the Transfer, Reverse-Transfer, and/or Direct File processes accounted for 16.5% of all bed capacity within this fiscal year, which expressed against the bed cap, means that an average of 179.5 beds, at any given time, are available for non-Transfer, non-Reverse-Transfer, and/or non-Direct File detention admissions.

# PROCESS RECOMMENDATIONS

**Recommendation 1** — Work with the Judicial Department to create language/processes that standardize court orders across the state.

**Recommendation 2** — Develop common definitions for terms used and a data dictionary that displays data sources and calculations used for outcome measures.

The process recommendations above are part of the performance standards and outcomes metrics established by the advisory board. The following is an update on the implementation of these process recommendations.

The process of adding an appendix to the master Data Sharing Agreement between CDHS (DCW and DYS) and the Judicial Department is underway. This agreement will provide opportunities for further analysis of information between the two departments.

The working group met in October 2023 and approved new definitions for two terms and finalized a third term definition in January 2024. Since many groups use these terms and seemed to have competing definitions, the working group determined a need for standardizing these definitions for the purposes of reporting information related to this work. These terms were: releasable, emergency release, and emergency placement. The new definitions can be found in the Key Terms section of this report.

# ADDITIONAL INFORMATION

## House Bill 23-1249

Data required as a result of HB23-1249 Reduce Justice Involvement will be discussed in the next annual report in 2025. This bill was signed by the governor on June 1, 2023 and did not go into effect until August 8, 2023, after the fiscal year for this report was concluded. Per statute, the next report will include progress on the implementation of this data for SFY 23-24.

Trails database builds are underway to allow for data collection that will assist in better understanding the impact alleged and adjudicated offenders have on the county departments of human or social services who serve them. One specific Trails build is required to understand the number of youth that, at the time, had prevention services, assessment, and/or an open dependency and neglect case, also at the same time had an open delinquency case in district court, were on juvenile probation, and/or had a juvenile deferred sentence. The first Trails build process began in August 2023, with a projected implementation of July 2024. As a result, preliminary data and subsequent analysis will be available July 1, 2026 in the general SFY reporting sequence.

A second Trails build is required to understand the number of youth that had out-of-home placement by a county departments of human or social services and at the same time had an open delinquency case in district court, were on juvenile probation, and/or had a juvenile deferred sentence. The process for this Trails build is scheduled to start August 2024.

In addition to the above Trails builds, and as mentioned within the Transfer, Direct File, and Reverse-Transfer section of this report, the SB21-071 team continues to make steps forward in the effort to obtain a DSA with the judicial department in order to have the most accurate data available.

## House Bill 23-1307

### Borrowed Beds, Flex Beds, and Emergency Beds

Calendar Year (CY) 2023 marked a significant increase in Average Daily Population (ADP) and notable detention strain within the 22 judicial districts. As the ADP rose to 190.2, a 9.6% increase from 2022 (173.5) detention admissions also grew by 23%. When examining the average daily count, each of the eight youth centers operated at or above 100% capacity at some point during calendar year 2023. Compounded by a rising facility length of stay (23.3 days), the 22 local CYDC programs were maximizing every detention bed available by means of bed borrowing and accessing flex beds, DYS partially implemented emergency bed capacity on September 1, 2023, and implemented the remainder of the  22 emergency beds byDecember 1, 2023.

*Figure 10: Detention Bed Definitions*



Detention bed borrowing and flex bed utilization are options used across the state when JDs are at capacity. JDs may borrow a bed from another JD in their catchment area.

*Figure 11: Flex Bed Allowance*




Flex beds, also frequently utilized by JDs, allow a JD to "flex up" by adding two detention beds at each youth center at times of strain when the facility is at capacity. Flex beds, essentially borrowed beds from the statewide allocation of 215, are an ideal option when trying to avoid detaining a youth away from their catchment area. The Northeast and Central regions demonstrated routine bed borrowing and frequent access of flex beds throughout 2023. For example, the 18th JD accessed 74 borrowed beds and 72 flex beds in 2023, while the 19th JD used 253 borrowed beds, 16 flex beds, and one emergency bed.

In June 2023, HB23-1307 was signed into law and brought several resources for youth in detention, including access to 22 additional detention beds, called emergency beds, that are accessible if specific criteria (Appendix F) are met. Statute indicated that the emergency beds needed to be fully operational on December 1, 2023. Eleven emergency beds came online statewide on September 1, 2023 that included two in the Southern region, two in the Central region, one in the Northeast region, and six in

the Western region. Five additional emergency beds became available on November 16, 2023 for the Southern region, thus relieving the detention strain this region experienced. All remaining emergency beds across the state became available on December 1, 2023.

There were 152 flex beds utilized statewide in CY 2023. On both October 22, 2023 and October 23, 2023, the state reached its detention capacity. As a result, one emergency release occurred. Additionally, two emergency beds were utilized on October 22, 2023 and three on October 23, 2023. The state was one bed away from reaching the statewide cap again on November 27, 2023. All seven emergency beds available in the Southern region were in use that day, and two of these beds were relinquished and re-filled that same day, allowing a total of nine unique youth to access emergency beds in the region that day. In addition to all seven Southern region emergency beds being used, the 10th JD in the Southern region, which alone was operating 159.3% above capacity, also had to borrow detention beds in the Central region. A total of one emergency bed was used by the Northeast region, and 30 instances of emergency bed use were incurred by the Southern region from October through December 2023. The Central and Western regions did not use emergency beds in 2023.

*Table 33: Emergency Beds Used in Calendar Year 2023 by Date in the Northeast Region*

| October 2023 | # Emergency Beds Used |
|---|---|
| 10/22/2023 | 1 |

*Table 34: Emergency Beds Used in Calendar Year 2023 by Date in the Southern Region*

| October 2023 | # Emergency Beds Used | November 2023 | # Emergency Beds Used | December 2023 | # Emergency Beds Used |
|---|---|---|---|---|---|
| 10/01/2023 | 0 | 11/01/2023 | 0 | 12/01/2023 | 5 |
| 10/02/2023 | 0 | 11/02/2023 | 0 | 12/02/2023 | 5 |
| 10/03/2023 | 0 | 11/03/2023 | 0 | 12/03/2023 | 6 |
| 10/04/2023 | 0 | 11/04/2023 | 0 | 12/04/2023 | 6 |
| 10/05/2023 | 0 | 11/05/2023 | 0 | 12/05/2023 | 5 |
| 10/06/2023 | 0 | 11/06/2023 | 0 | 12/06/2023 | 5 |
| 10/07/2023 | 0 | 11/07/2023 | 0 | 12/07/2023 | 4 |
| 10/08/2023 | 1 | 11/08/2023 | 0 | 12/08/2023 | 4 |
| 10/09/2023 | 1 | 11/09/2023 | 0 | 12/09/2023 | 5 |
| 10/10/2023 | 0 | 11/10/2023 | 0 | 12/10/2023 | 5 |
| 10/11/2023 | 0 | 11/11/2023 | 0 | 12/11/2023 | 5 |
| 10/12/2023 | 0 | 11/12/2023 | 0 | 12/12/2023 | 3 |
| 10/13/2023 | 0 | 11/13/2023 | 0 | 12/13/2023 | 3 |
| 10/14/2023 | 0 | 11/14/2023 | 0 | 12/14/2023 | 2 |
| 10/15/2023 | 1 | 11/15/2023 | 0 | 12/15/2023 | 3 |
| 10/16/2023 | 2 | 11/16/2023 | 5 | 12/16/2023 | 5 |
| 10/17/2023 | 1 | 11/17/2023 | 5 | 12/17/2023 | 5 |
| 10/18/2023 | 3 | 11/18/2023 | 4 | 12/18/2023 | 5 |
| 10/19/2023 | 3 | 11/19/2023 | 4 | 12/19/2023 | 4 |
| 10/20/2023 | 3 | 11/20/2023 | 5 | 12/20/2023 | 2 |
| 10/21/2023 | 2 | 11/21/2023 | 5 | 12/21/2023 | 0 |
| 10/22/2023 | 2 | 11/22/2023 | 8 | 12/22/2023 | 0 |
| 10/23/2023 | 3 | 11/23/2023 | 8 | 12/23/2023 | 0 |
| 10/24/2023 | 0 | 11/24/2023 | 8 | 12/24/2023 | 1 |
| 10/25/2023 | 0 | 11/25/2023 | 8 | 12/25/2023 | 1 |
| 10/26/2023 | 0 | 11/26/2023 | 8 | 12/26/2023 | 1 |
| 10/27/2023 | 0 | 11/27/2023 | 9 | 12/27/2023 | 0 |
| 10/28/2023 | 0 | 11/28/2023 | 9 | 12/28/2023 | 0 |
| 10/29/2023 | 0 | 11/29/2023 | 7 | 12/29/2023 | 0 |
| 10/30/2023 | 1 | 11/30/2023 | 5 | 12/30/2023 | 0 |
| 10/31/2023 | 1 | | | 12/31/2023 | 0 |

**While only seven emergency beds were available in the month of November, there are some days that reflect eight or nine beds used. This is a result of one or more beds being relinquished only to be used again later that same day. Only seven emergency beds were in use at any given time during each day between November 16, 2023 and December 1, 2023.*

## Capacity Analysis

*Table 35: Colorado Youth Detention Continuum Bed Capacity Report by Judicial District for Calendar Year 2023 and December 2023*

| | Bed Cap | Under Cap | | | | At Cap | | | | Over Cap | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CY 2023 | | Dec-23 | | CY 2023 | | Dec-23 | | CY 2023 | | Dec-23 | |
| | | # Days | % | # Days | % | # Days | % | # Days | % | # Days | % | # Days | % |
| CENTRAL | | | | | | | | | | | | | |
| 1st JD | 19 | 319.3 | 87.5% | 31.0 | 100.0% | 22.6 | 6.2% | 0.0 | 0.0% | 23.08 | 6.3% | 0.0 | 0.0% |
| 2nd JD | 36 | 344.6 | 94.4% | 30.2 | 97.5% | 5.5 | 1.5% | 0.8 | 2.6% | 14.83 | 4.1% | 0.0 | 0.0% |
| 5th JD | 2 | 341.6 | 93.6% | 30.3 | 97.7% | 23.4 | 6.4% | 0.7 | 2.3% | 0.00 | 0.0% | 0.0 | 0.0% |
| 18th JD | 36 | 78.2 | 21.4% | 0.0 | 0.0% | 27.1 | 7.4% | 0.0 | 0.0% | 259.75 | 71.2% | 31.0 | 100.0% |
| **TOTAL** | **93** | **1,083.7** | **74.2%** | **91.5** | **73.8%** | **78.7** | **5.4%** | **1.5** | **1.2%** | **297.67** | **20.4%** | **31.0** | **25.0%** |
| NORTHEAST | | | | | | | | | | | | | |
| 8th JD | 10 | 230.5 | 63.2% | 31.0 | 100.0% | 63.0 | 17.3% | 0.0 | 0.0% | 71.5 | 19.6% | 0.0 | 0.0% |
| 13th JD | 2 | 155.8 | 42.7% | 31.0 | 100.0% | 94.8 | 26.0% | 0.0 | 0.0% | 114.4 | 31.4% | 0.0 | 0.0% |
| 17th JD | 18 | 91.9 | 25.2% | 6.2 | 19.9% | 33.7 | 9.2% | 12.2 | 39.4% | 239.4 | 65.6% | 12.6 | 40.7% |
| 19th JD | 16 | 193.5 | 53.0% | 0.0 | 0.0% | 44.7 | 12.3% | 2.2 | 7.0% | 126.8 | 34.7% | 28.8 | 93.0% |
| 20th JD | 10 | 290.9 | 79.7% | 13.4 | 43.2% | 36.4 | 10.0% | 14.0 | 45.2% | 37.7 | 10.3% | 3.6 | 11.7% |
| **TOTAL** | **56** | **962.6** | **52.8%** | **81.5** | **52.6%** | **272.6** | **14.9%** | **28.4** | **18.3%** | **589.8** | **32.3%** | **45.1** | **29.1%** |
| SOUTHERN | | | | | | | | | | | | | |
| 3rd JD | 2 | 320.5 | 87.8% | 31.0 | 100.0% | 41.0 | 11.2% | 0.0 | 0.0% | 3.5 | 1.0% | 0.0 | 0.0% |
| 4th JD | 27 | 15.7 | 4.3% | 0.0 | 0.0% | 27.8 | 7.6% | 2.8 | 8.9% | 321.5 | 88.1% | 28.3 | 91.1% |
| 10th JD | 9 | 83.3 | 22.8% | 0.0 | 0.0% | 32.8 | 9.0% | 0.0 | 0.0% | 248.9 | 68.2% | 31.0 | 100.0% |
| 11th JD | 2 | 335.0 | 91.8% | 31.0 | 100.0% | 27.2 | 7.4% | 0.0 | 0.0% | 2.8 | 0.8% | 0.0 | 0.0% |
| 12th JD | 2 | 67.0 | 18.4% | 0.0 | 0.0% | 163.5 | 44.8% | 0.0 | 0.0% | 134.5 | 35.9% | 31.0 | 100.0% |
| 15th JD | 2 | 303.2 | 83.1% | 27.2 | 87.6% | 59.3 | 16.2% | 2.3 | 7.4% | 2.5 | 0.7% | 1.5 | 5.0% |
| 16th JD | 2 | 230.5 | 63.2% | 31.0 | 100.0% | 123.3 | 33.8% | 0.0 | 0.0% | 11.2 | 3.1% | 0.0 | 0.0% |
| **TOTAL** | **46** | **1,355.1** | **53.0%** | **120.2** | **55.4%** | **474.8** | **18.6%** | **5.0** | **2.3%** | **725.0** | **28.4%** | **91.8** | **42.3%** |
| WESTERN | | | | | | | | | | | | | |
| 6th JD | 2 | 237.4 | 65.0% | 0.0 | 0.0% | 107.0 | 29.3% | 11.6 | 37.4% | 20.6 | 5.7% | 19.4 | 62.6% |
| 7th JD | 3 | 320.2 | 87.7% | 31.0 | 100.0% | 37.8 | 10.3% | 0.0 | 0.0% | 7.0 | 1.9% | 0.0 | 0.0% |
| 9th JD | 2 | 292.0 | 80.0% | 17.6 | 56.7% | 73.0 | 20.0% | 13.4 | 43.3% | 0.0 | 0.0% | 0.0 | 0.0% |
| 14th JD | 2 | 296.1 | 81.1% | 31.0 | 100.0% | 37.8 | 10.4% | 0.0 | 0.0% | 31.0 | 8.5% | 0.0 | 0.0% |
| 21st JD | 9 | 20.8 | 5.7% | 0.0 | 0.0% | 10.2 | 2.8% | 0.0 | 0.0% | 334.0 | 91.5% | 31.0 | 100.0% |
| 22nd JD | 2 | 281.4 | 77.1% | 29.8 | 96.2% | 64.1 | 17.6% | 1.2 | 3.8% | 19.5 | 5.4% | 0.0 | 0.0% |
| **TOTAL** | **20** | **1,448.0** | **66.1%** | **109.4** | **58.8%** | **329.8** | **15.1%** | **26.2** | **14.1%** | **412.2** | **18.8%** | **50.4** | **27.1%** |
| STATE TOTAL | **215** | **4,849.4** | **60.4%** | **402.6** | **59.0%** | **1,156.0** | **14.4%** | **61.1** | **9.0%** | **2,025** | **25.2%** | **218** | **32.0%** |

## Overview

In CY 2023, various Judicial Districts (JD) within the Central, Northeast, Southern, and Western regions exhibited significant variations in detention bed utilization. Analyzing the data above reveals key insights into bed capacity management, highlighting areas where certain JDs were consistently over cap, thus prompting a potential need to revisit detention bed caps. Emergency beds were fully online statewide as of December 1, 2023. Looking at the data for the month of December 2023 provides further granularity on these trends and further highlights the large number of days regions were over capacity.

***Central Region***

The Central region, comprising four JDs, demonstrated a mixed capacity utilization throughout the year:

- The 18th Judicial District faced severe capacity issues with 71.2% of days over cap for the year. In December 2023, this district was over cap for 100% of the days, underscoring an acute shortage of detention beds.

Central region Total for 2023: 5.4% of days were at cap, and 20.4% were over cap.
Central region Total for December 2023: 25.0% of days were over cap.

***Northeast Region***

- The 13th Judicial District was over cap for 31.4% of days in 2023, though it managed to stay under cap in December.
- The 17th Judicial District encountered critical overcapacity with 65.6% of days over cap for the year. December data indicates 40.7% of days over cap.
- The 19th Judicial District was significantly over cap for 34.7% of the days in 2023, with a staggering 93.0% of days over cap in December.

Northeast region Total for 2023: 14.9% of days were at cap, and 32.3% were over cap.
Northeast region Total for December 2023: 18.3% of days were at cap, and 29.1% were over cap.

***Southern Region***

- The 4th Judicial District faced severe over-cap days at 88.1% throughout the year. December mirrored this with 91.1% days over cap.

- The 10th Judicial District and 12th Judicial District also had high over cap percentages at 68.2% and 36.9%, respectively, for the year. December showed 100% over cap days for both.

Southern region Total for 2023: 18.6% of days were at cap, and 28.4% were over cap.
Southern region Total for December 2023: 42.3% of days were over cap.

***Western Region***

The Western region, which includes six JDs, exhibited similar detention bed capacity utilization:

- The 6th Judicial District had 62.6% of days over cap in December, highlighting a critical need for capacity adjustments.
- The 21st Judicial District struggled with only 5.7% of days under cap and a significant 91.5% of days over cap throughout the year, maintaining 100% over cap days in December.

Western region Total for 2023: 18.8% of days were over cap.
Western region Total for December 2023: 14.1% of days were at cap, and 27.1% over cap.

***Statewide Summary***

Across all regions, the state totals indicate 25.2% of days were over cap for 2023. In December 2023, 32.0% of days were over cap.

## Recommendation

The data analysis reveals that certain Judicial Districts, particularly in the Central, Northeast, and Southern regions, were over cap for a significant portion of the year, with a noticeable increase in over cap days during December 2023. The 18th, 4th, 17th, 13th, 21st, and 10th Judicial Districts faced acute overcapacity issues, affecting their operational efficiency and potentially compromising the quality of care and management. Data reflects a need to revisit and adjust the detention bed caps. Increasing the cap for these high-demand districts, redistributing resources where possible, and potentially expanding facility capacity could mitigate overcapacity issues. Implementing these changes will help ensure a balanced distribution of beds across all Judicial Districts, promoting better management and care within the system. The December 2023 data reinforces the need for immediate attention to districts that showed 100% over cap days, such as the 18th, 10th, and 21st Judicial Districts.

*Table 36: Calendar Year Demographic Data*

| | CY 2023 Youth | |
|---|---|---|
| | **Count** | **%** |
| | | |
| STAFF ASSIGNED GENDER | | |
| Male | 1,716 | 81.0% |
| Female | 402 | 19.0% |
| ETHNICITY | | |
| White | 695 | 32.8% |
| Black or African American | 464 | 21.9% |
| Hispanic | 853 | 40.3% |
| American Indian or Alaskan Native | 20 | 0.9% |
| Asian | 17 | 0.8% |
| Native Hawaiian or Other Pacific Islander | 11 | 0.5% |
| Unable To Determine/Missing | 58 | 2.7% |
| AGE AT ADMISSION | | |
| 10-11 Years | 17 | 0.8% |
| 12 Years | 41 | 1.9% |
| 13 Years | 150 | 7.1% |
| 14 Years | 259 | 12.2% |
| 15 Years | 457 | 21.6% |
| 16 Years | 559 | 26.4% |
| 17+ Years | 635 | 30.0% |
| SEXUAL ORIENTATION | | |
| Bisexual | 90 | 4.3% |
| Heterosexual | 1,662 | 78.5% |
| Homosexual | 27 | 1.3% |
| Missing | 312 | 14.7% |
| Other Queer Identifying | X | X |
| Unknown | X | X |
| PREFERRED GENDER PRONOUNS | | |
| He/Him | 1,447 | 68.3% |
| Missing | 321 | 15.2% |
| She/Her | 327 | 15.4% |
| They/Them | X | X |
| Unknown | X | X |
| GENDER IDENTITY | | |
| Female | 347 | 16.4% |
| Male | 1,473 | 69.6% |
| Missing | 283 | 13.4% |
| Gender Diverse/Non Binary | 15 | 0.7% |
| **STATE TOTAL** | **2,118** | **100%** |

# APPENDIX A

## Referenced Bills

| | |
|---|---|
| HR 253 | Family First Prevention Services Act of 2017<br>https://www.congress.gov/115/bills/hr253/BILLS-115hr253ih.pdf |
| SB 18-154 | Juvenile Planning Committee Crossover Youth Plans<br>https://leg.colorado.gov/sites/default/files/2018a_154_signed.pdf |
| SB 18-254 | Child Welfare Reforms<br>https://leg.colorado.gov/sites/default/files/2018a_254_signed.pdf |
| SB 19-108 | Juvenile Justice Reform<br>https://leg.colorado.gov/sites/default/files/2019a_108_signed.pdf |
| SB 21-071 | Limit The Detention Of Juveniles<br>https://leg.colorado.gov/sites/default/files/2021a_071_signed.pdf |
| HB 23-1249 | Reduce Justice-involvement For Young Children<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1249_enr.pdf |
| HB 23-1269 | Extended Stay And Boarding Patients<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1269_enr.pdf |
| HB 23-1307 | Juvenile Detention Services And Funding<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1307_enr.pdf |

# APPENDIX B

## Supplemental Capacity Information

*Table 37: Detention Utilization by Youth Center and Region: Fiscal Year 2022-23*

| Youth Center & Region | 22-23 CAP | ADP | Max Count | Client Load* |
|---|---|---|---|---|
| Gilliam | 35 | 26.9 | 36 | 28.4 |
| Marvin Foote | 37 | 33.4 | 39 | 35.1 |
| Rocky Mountain | 22 | 15.7 | 24 | 16.6 |
| Willow Point | 0 | 0.1 | 3 | 0.2 |
| Central | 94 | 76.1 | 91 | 73.4 |
| Prairie Vista | 38 | 31.7 | 41 | 33.4 |
| Platte Valley | 17 | 13.5 | 20 | 22.2 |
| Northeast | 55 | 45.2 | 57 | 44.3 |
| Pueblo | 20 | 17.0 | 22 | 18.0 |
| Zebulon Pike | 27 | 26.1 | 29 | 27.1 |
| Southern | 47 | 43.2 | 50 | 40.3 |
| Grand Mesa | 19 | 14.8 | 20 | 17.7 |
| Western | 19 | 14.8 | 20 | 22.9 |
| STATE | 215 | 179.2 | 208 | 198.5 |

** The Client Load statistic represents the average number of clients that cycle in (new admissions), out (new releases), or remain inside detention centers on a daily basis across the state.*

*Table 38: Detention Utilization by Judicial District and Region: Fiscal Year 2022-2023*

| JD & Region | 22-23 CAP | ADP | Max Count | Client Load* |
|---|---|---|---|---|
| 1 | 20 | 14.6 | 20 | 15.3 |
| 2 | 35 | 26.2 | 37 | 28.7 |
| 5 | 2 | 0.2 | 4 | 0.2 |
| 18 | 37 | 33.8 | 40 | 35.5 |
| Central | 94 | 74.7 | 91 | 73.4 |
| 8 | 11 | 8.0 | 14 | 10.6 |
| 13 | 2 | 2.4 | 7 | 2.5 |
| 17 | 17 | 17.6 | 25 | 18.5 |
| 19 | 15 | 12.7 | 13 | 18.2 |
| 20 | 10 | 4.9 | 8 | 5.1 |
| Northeast | 55 | 45.5 | 57 | 44.3 |
| 3 | 2 | 0.9 | 3 | 0.9 |
| 4 | 27 | 31.7 | 37 | 33 |
| 10 | 10 | 7.3 | 10 | 7.8 |
| 11 | 2 | 0.6 | 3 | 0.7 |
| 12 | 2 | 1.8 | 3 | 1.8 |
| 15 | 2 | 1.1 | 3 | 1.2 |
| 16 | 2 | 0.8 | 3 | 0.8 |
| Southern | 47 | 44.2 | 50 | 40.3 |
| 6 | 2 | 0.5 | 3 | 0.5 |
| 7 | 3 | 2.5 | 6 | 2.8 |
| 9 | 2 | 0.8 | 4 | 0.8 |
| 14 | 2 | 0.8 | 2 | 0.8 |
| 21 | 8 | 8.8 | 13 | 11.3 |
| 22 | 2 | 1.5 | 4 | 1.5 |
| Western | 19 | 14.7 | 20 | 22.9 |
| Other | | 0.0 | | |
| STATE | 215 | 179.2 | 208 | 198.5 |

** The Client Load statistic represents the average number of clients that cycle in (new admissions), out (new releases), or remain inside detention centers on a daily basis across the state.*

*Table 39: Colorado Youth Detention Continuum Detention Cap Report by Judicial District*

| Region | Judicial District | 22-23 CAP | Under Cap | | At cap | | Over Cap | | | Total Hrs in Period |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | # of Hrs | % | # of Hrs | % | AHP Over | # of Hrs | % | |
| Central | | | | | | | | | | |
| | 1st | 19 | 7,505 | 85.4 | 663 | 7.6 | 2.2% | 616 | 7.0 | 8,784 |
| | 2nd | 36 | 8,455 | 96.3 | 70 | 0.8 | 2.3% | 259 | 2.9 | 8,784 |
| | 5th | 2 | 8,314 | 94.7 | 470 | 5.4 | 0.0% | 0 | 0.0 | 8,784 |
| | 18th | 36 | 3,252 | 37.0 | 794 | 9.0 | 2.9% | 4,738 | 53.9 | 8,784 |
| **Totals for Central** | | **93** | **27,526** | **78.3** | **1,997** | **5.7** | **2.8%** | **5,613** | **16.0** | **35,136** |
| Northeast | | | | | | | | | | |
| | 8th | 10 | 4,954 | 54.4 | 1,353 | 15.4 | 1.9% | 2,477 | 28.2 | 8,784 |
| | 13th | 2 | 1,620 | 18.4 | 3,423 | 38.9 | 1.4% | 3,741 | 42.6 | 8,784 |
| | 17th | 18 | 2,146 | 24.4 | 589 | 6.7 | 3.5% | 6,049 | 68.9 | 8,784 |
| | 19th | 16 | 7,062 | 80.4 | 688 | 7.8 | 2.1% | 1,034 | 11.8 | 8,784 |
| | 20th | 10 | 8,402 | 95.7 | 310 | 3.5 | 1.0% | 72 | 0.8 | 8,784 |
| Totals for Northeast | | **56** | **24,184** | **55.1** | **6,363** | **14.5** | **2.5%** | **13,373** | **30.5** | **43,920** |
| Southern | | | | | | | | | | |
| | 3rd | 2 | 7,567 | 86.2 | 1,133 | 12.9 | 1.0% | 84 | 0.9 | 8,784 |
| | 4th | 27 | 318 | 3.6 | 421 | 4.8 | 5.4% | 8,045 | 91.6 | 8,784 |
| | 10th | 9 | 6,073 | 69.1 | 1,031 | 11.7 | 2.7% | 1,680 | 19.1 | 8,784 |
| | 11th | 2 | 7,778 | 88.6 | 925 | 10.5 | 1.5% | 81 | 0.9 | 8,784 |
| | 12th | 2 | 3,304 | 37.6 | 3,317 | 37.8 | 1.1% | 2,163 | 24.6 | 8,784 |
| | 15th | 2 | 5,658 | 64.4 | 2,924 | 33.3 | 1.0% | 202 | 2.3 | 8,784 |
| | 16th | 2 | 6,469 | 73.6 | 2,279 | 25.9 | 1.0% | 36 | 0.4 | 8,784 |
| Totals for Southern | | **46** | **37,167** | **60.5** | **12,030** | **19.6** | **4.2%** | **12,291** | **19.9** | **61,488** |
| Western | | | | | | | | | | |
| | 6th | 2 | 7,622 | 86.8 | 1,145 | 13.0 | 1.0% | 17 | 0.2 | 8,784 |
| | 7th | 3 | 4,377 | 49.8 | 3,669 | 41.8 | 1.2% | 738 | 8.4 | 8,784 |
| | 9th | 2 | 7,683 | 87.5 | 1,005 | 11.4 | 1.0% | 96 | 1.1 | 8,784 |
| | 14th | 2 | 6,022 | 68.6 | 2,017 | 22.9 | 1.0% | 745 | 8.5 | 8,784 |
| | 21st | 9 | 500 | 5.7 | 397 | 4.5 | 3.4% | 7,887 | 89.8 | 8,784 |
| | 22nd | 2 | 5,205 | 59.3 | 2,074 | 23.6 | 1.1% | 1,505 | 17.1 | 8,784 |
| Totals for Western | | **20** | **31,409** | **59.6** | **10,307** | **19.6** | **2.7%** | **10,988** | **20.9** | **52,704** |
| State Totals | | **215** | **120,286** | **62.2** | **30,697** | **15.9** | **3.1%** | **42,265** | **21.9** | **193,248** |

# APPENDIX C

## Supplemental Demographic Visualizations

*Figure 12: Distribution of Race/Ethnicity by Admissions*




*Figure 13: Admissions and Average Length Of Stay by Age at Admission*



*Figure 14: Admissions and Average Length Of Stay by Staff Assigned Gender*



# APPENDIX D

## Offense Type Detail

*Table 40: Offenses and Their Corresponding Offense Types*

| Offense Type | Offenses |
|---|---|
| **Person** | Homicide, Manslaughter, Criminally Negligent Homicide, Vehicular Homicide, Assault, Vehicular Assault, Menacing, Kidnapping, Sexual Assault/Contact, Robbery, Aggravated Robbery, Child Abuse, Sexual Exploitation of a Child, Domestic Violence, Wrongs to At-Risk Adults, Incest, Sexual Assault on a Child, Reckless Endangerment |
| **Property** | Burglary and Related Offenses, Motor Vehicle Theft, Aggravated Motor Vehicle Theft, Theft, Trespass/Tampering/Criminal Mischief |
| **Drug** | Use/Possession/Distribution of Controlled Substance IV/V, Possession/Distribution of Controlled Substance I/II/III, Drug Paraphernalia Use |
| **Weapon** | Possession of a Handgun, Firearms and Weapons, Carrying a Concealed Weapon |
| **Other** | Forgery/Simulation/Impersonation, Fraud, Financial Transaction Device Crimes, Sexual Exploitation of a Child, Public Indecency, Obstructing Justice/False ID, Escape, Bribery and Corrupt Influences, Offenses Relating to Judicial Proceedings, Victim/Witness Intimidation, Holding Hostage, Disorderly Conduct, Cruelty to Animals, Offenses Involving Communications/Threats, Stalking, Organized Crime (Gang), Resisting Arrest, Sex Offender Failure to Register, Obstructing a Peace Officer |
| **Traffic** | Vehicular Manslaughter, Vehicular Eluding, Vehicular Eluding Resulting in Death, Reckless Driving, Other Traffic, Driving Under the Influence, Driving While Intoxicated |
| **Status** | Runaway, Truancy, Drinking Under Age |

**Additional Contextual Information on Charges**

***Crimes of Violence:*** Crimes of violence are typically person crimes of violence like assault felonies and homicide felonies. They also include menacing, aggravated robbery, firearm and weapons felonies, and manslaughter felonies.
Crimes of Violences are defined by statute in C.R.S. 18-1.3-406:

"(II) Subsection (2)(a)(I) of this section applies to the following crimes:

(A) Any crime against an at-risk adult or at-risk juvenile;
(B) Murder;
(C) First or second degree assault;
(D) Kidnapping;
(E) A sexual offense pursuant to part 4 of article 3 of this title;
(F) Aggravated robbery;
(G) First degree arson;
(H) First degree burglary;
(I) Escape;
(J) Criminal extortion;
(K) First or second degree unlawful termination of pregnancy;
(L) Human trafficking for involuntary servitude of an adult or a minor in violation of section 18-3-503; or
(M) Human trafficking for sexual servitude of an adult or a minor in violation of section 18-3-504.

(b)

(I) "Crime of violence" also means any unlawful sexual offense in which the defendant caused bodily injury to the victim or in which the defendant used threat, intimidation, or force against the victim. For purposes of this subparagraph (I), "unlawful sexual offense" shall have the same meaning as set forth in section 18-3-411(1), and "bodily injury" shall have the same meaning as set forth in section 18-1-901(3)(c)."

# APPENDIX E

## Crossover Youth Definitions by Judicial District

**Crossover Youth definitions as reported by judicial districts in Colorado**

**Statute Definition:**
"Dually identified crossover youth" means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case (C.R.S.) 19-2.5-102[19].

**1st Judicial District**
Youth who reside in Jefferson County, have a current child welfare case, and commit a new district level offense. Youth who reside in Jefferson County in the past three years (date from offense), have had a history of being involved in the child welfare system, and commit a new district level offense. Exclusions: Youth charged with a sexual offense, youth ages 10 to 12, as these youth are served by the Youngers Program and youth committed to the Department of Youth Services.

**2nd Judicial District**
Youth who have an open case (voluntary, Dependency/Neglect, through delinquency) with the Denver Department of Human Services (DDHS) or a prior DHS assessment, as well as having been charged with a delinquency case at the District level.

**3rd Judicial District**
Youth who have been screened through CYDC who have historical or current child welfare involvement cases (voluntary, Dependence/Neglect or Delinquency) with the Department of Human Services/Social Services (DHS/DSS), a finding of maltreatment in their history, as well as having been arrested at the district level (not municipal) or currently under the supervision of State Probation for a delinquency case.

**4th Judicial District**
Any youth involved in the juvenile justice system that has an open dependency and neglect case.

**5th Judicial District**
Youth identified as a crossover youth are youth who are currently involved in the juvenile justice system and the child welfare system or have a history (closed) in the

child welfare system that can include, but is not limited to, a family assessment response service plan or an open case.

**6th Judicial District**

Crossover youth is a youth who is currently involved with both the juvenile justice and child welfare systems or in the recent past has had a history of being involved in the child welfare system. This includes any child welfare case opened for assessments and services due to a Dependency and Neglect, Juvenile Delinquency case, Youth in Conflict case, or a voluntary case.

**7th Judicial District**

Any youth, ages 10 through 17, who are currently involved in the juvenile justice system (with district level charges) and the child welfare system or have a history in the child welfare system that includes assessments, a family assessment response service plan, or an open PA4, PA5, or PA6 case.

This excludes:

- PA3 - prevention cases and referrals;
- Youth initially involved in the child welfare system who are subsequently referred to and become involved in the juvenile justice system, as defined above; and
- Youth who are initially involved in the juvenile justice system and are subsequently referred to and become involved in the child welfare system, as defined above.

**8th Judicial District**

A crossover youth is defined as any youth who has experienced maltreatment and engaged in delinquency (regardless of whether he or she has come to the attention of the child welfare and/or delinquency systems).

Dually involved youth are a subgroup of crossover youth who are simultaneously receiving services, at any level, from both the child welfare and juvenile justice systems.

Dually adjudicated youth are a subgroup of dually involved youth, encompassing only those youth who are concurrently adjudicated by both the child welfare and juvenile justice systems.

### 9th Judicial District

A crossover youth is defined as a youth or family who is currently involved in both the juvenile justice and currently involved in the child welfare system or has a history of involvement in child welfare, including an open case assessment with any founded outcome, Dependency and Neglect case, or non-court involved case where a service plan was developed.

### 10th Judicial District

To be identified as crossover (Crossover defined as originating in the child welfare system and then crossover into the juvenile justice system), youth must have a child welfare open case within the past three years where services were rendered or out of home placement (could be D&N or voluntary).

### 11th Judicial District

A crossover youth is identified at the time of the juvenile screening. The definition of a crossover youth is youth that has current or previous involvement with the Department of Human Services. This information is obtained by reviewing the client's history in Trails, family court history, and truancy history.

### 12th Judicial District

Crossover is defined as a youth who is currently involved with both the juvenile justice and child welfare systems or, in the recent past, has had a history of being involved in the child welfare system. This includes any child welfare case opened for assessments and services due to a Dependency and Neglect, juvenile delinquency case, youth in conflict case, or a voluntary case.

### 13th Judicial District

A dually identified crossover youth means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case.

### 14th Judicial District

A dually identified crossover youth means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case.

### 15th Judicial District

A dually identified crossover youth means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case.

**16th Judicial District**
A crossover youth is a youth who has been screened through SB94/CYDC and involvement with child welfare systems or, in the recent past, has had a history of being involved in the child welfare system (voluntary, Dependency/Neglect, or Delinquency.) youth in conflict case or a voluntary case.

**17th Judicial District**
Crossover youth is a youth with one of the following:

- Open D&N/Open JD/Open Truancy (combo of two or three);
- Open JD with HIstory of D&N or Truancy;
- Open D&N with History of JD or Truancy; or
- Open Truancy with History of JD or D&N.

**18th Judicial District**
A crossover youth is one that penetrates two or more systems, including at least DHS or juvenile justice.

**19th Judicial District**
As adapted from the Georgetown model: Crossover youth are defined as youth who have experienced abuse and/or neglect and who engage in delinquency. Experienced abuse and/or neglect can be defined as: 1) a finding of "founded and/or inconclusive" abuse/neglect in which the youth was the identified victim or an assessment/case in which services were provided to the youth within the past 5 years.

**20th Judicial District**
Youth arrested and detained at the JAC that have a history of child welfare involvement. (We will be discussing getting more specific about this and deciding if we want to include any history/contacts (referrals), just assessment and case history, etc.)

**21st Judicial District**
"Dually identified crossover youth" means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child

welfare system that includes, but is not limited to, a family assessment response service plan or an open case (CRS) 19-1-103 [44.7].

**22nd Judicial District**

A crossover youth is a youth that is currently involved in the juvenile justice system, with a history with the child welfare system in the form of a currently open case, any case history, or a family assessment response service plan in the entirety of the youth's life. This does not include youth that have had high-risk assessment referrals to the department of social services.

# APPENDIX F

## Emergency Bed Criteria

**Emergency Bed Criteria**

A judicial district may access an Emergency Bed once the following criteria have been met, in accordance with C.R.S. 19-2.5-1407.3(4)(c)(I)(A-D).

1. All beds allocated to the judicial district are being utilized by the JD.
2. The DYS detention facility(s) in which the judicial district's beds are located are all being utilized.
3. There are no beds available in the catchment area.
4. There are no open detention beds to borrow within fifty miles of the judicial district's initial receiving detention facility.
    a. This does not apply if the point of arrest was fifty miles or more from the initial detention receiving facility.
    b. This does not apply if the juvenile is being returned to the initial detention receiving facility as a result of being in a borrowed bed that was relinquished.

A petition must be filed by the District Attorney or the County Attorney that supports the above criteria no later than the next business day in accordance with. (C.R.S.) 19-2.5-1407.3(4)(c)(II).

The court shall issue an order permitting the use of the Emergency Bed upon finding in accordance with (C.R.S.) 19-2.5-1407.3(4)(c)(II)(A-D).

1. There is a legal basis for the detention of all youth by the JD.
2. There are currently no services available that mitigate the substantial risk or flight risk of any of the youth detained by the JD.
3. There are no services available to mitigate the risk of the youth being detained, including the youth being placed in the Emergency Bed.

A hearing must be held every five business days to inform the court that the circumstances still exist and that the juvenile is still in an emergency detention bed as defined in (C.R.S.) 19-2.5-1407.3(4)(IV).

# APPENDIX G

## Releasable Youth by Judicial District and County

### Releasable Youth Information by County and Judicial District

*Table 41: County Releasable Length of Stay with N Sizes Greater than or Equal to Ten for Admissions*

| County | Count of Admissions | % Admissions | Average RLOS | Total RLOS | % RLOS |
|---|---|---|---|---|---|
| Adams | 76 | 11.1% | 23.71 | 1,802 | **12.0%** |
| Arapahoe | 66 | 9.7% | **28.20** | 1,861 | **12.3%** |
| Denver | 124 | 18.7% | 20.40 | 2,530 | **16.8%** |
| Douglas | 16 | 2.7% | 16.94 | 271 | 1.8% |
| El Paso | 123 | 18.1% | **37.84** | 4,654 | **30.9%** |
| Jefferson | 63 | 8.7% | 14.52 | 915 | 6.1% |
| Larimer | 37 | 5.3% | 12.38 | 458 | 3.0% |
| Mesa | 89 | 13.7% | 12.42 | 1,105 | 7.3% |
| Missing | 23 | 3.2% | 20.09 | 462 | 3.1% |
| Weld | 15 | 2.2% | 19.33 | 290 | 1.9% |

The following counties also had releasable admissions but were removed from the table above due to N sizes being less than 10 and due to space constraints in the table above.

- Alamosa
- Baca
- Boulder
- Broomfield
- Chaffee
- Cheyenne
- Costilla
- Delta
- Fremont
- Gunnison
- Logan
- Montezuma
- Morgan
- Prowers
- Pueblo
- Rio Grande
- Summit
- Yuma

*Table 42: Releasable Youth by Judicial District*

| Judicial District | Count of Admissions | % Admissions | Average RLOS | Total RLOS | % RLOS |
|---|---|---|---|---|---|
| **Central** | **288** | **42.7%** | **21.42** | **6,170** | **40.9%** |
| 1 | 68 | 10.1% | 17.16 | 1,167 | 7.7% |
| 2 | 136 | 20.1% | 22.76 | 3,096 | **20.5%** |
| 5 | X | X | 26.50 | 53 | 0.4% |
| 13 | X | X | **56.00** | 56 | 0.4% |
| 17 | X | X | **49.00** | 49 | 0.3% |
| 18 | 80 | 11.9% | 21.86 | 1,749 | 11.6% |
| **Northeast** | **157** | **23.3%** | **21.03** | **3,301** | **21.9%** |
| 8 | 42 | 6.2% | 12.33 | 518 | 3.4% |
| 13 | X | X | 20.29 | 142 | 0.9% |
| 17 | 86 | 12.7% | 25.73 | 2,213 | 14.7% |
| 19 | 14 | 2.1% | 17.21 | 241 | 1.6% |
| 20 | X | X | 23.38 | 187 | 1.2% |
| **Southern** | **139** | **20.6%** | **32.87** | **4,569** | **30.3%** |
| 4 | 122 | 18.1% | **36.45** | 4,447 | **29.5%** |
| 10 | X | X | 10.00 | 90 | 0.6% |
| 11 | X | X | 1.00 | 2 | 0.0% |
| 12 | X | X | 6.75 | 27 | 0.2% |
| 15 | X | X | 1.50 | 3 | 0.0% |
| **Western** | **91** | **13.5%** | **11.33** | **1,031** | **6.8%** |
| 7 | X | X | 13.00 | 52 | 0.3% |
| 21 | 85 | 12.6% | 11.44 | 972 | 6.4% |
| 22 | X | X | 3.50 | X | X |
| **TOTAL** | **675** | **100%** | **22.33** | **15,071** | **100%** |

# APPENDIX H

## Statistical Results

**Supplemental Statistical Information***

In the charts below, only the statistically significant and noteworthy results are included. Additional tests were also conducted that were not included due to insignificant effect sizes or lack of statistical significance.

*Table 43: Statistical Results for Youth Outcomes*

| Independent Variable | Dependent Variable | Statistical Significance | B Coefficient |
|---|---|---|---|
| Detention Involvements (all time) | LOS | 0.001 | 10.78 |
| Detention Involvements (prior to cohort) | LOS | 0.001 | 8.67 |
| Detention Involvements (in cohort) | LOS | 0.001 | 21.43 |
| Detention Involvements (prior to cohort) | RLOS | 0.001 | 5.02 |
| Child Welfare Involvements (cases only) | LOS | 0.001 | 7.61 |
| Child Welfare Involvements (cases with out of home) | LOS | 0.001 | 16.46 |
| Child Welfare Involvements (cases only) | RLOS | 0.032 | 3.98 |
| Child Welfare Involvements (cases with out of home) | RLOS | 0.001 | 15.42 |
| Charges | LOS | 0.001 | 6.92 |

*Table 44: Statistical Results for Disparity Analysis*

| Independent Variable | Dependent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|---|
| Violent Crime | LOS | T Test | 0.001 | 28.47 | Standard mean difference |
| Sexual Orientation | CJRA Pre-screen Level | Somer's D/ Cramer's V | 0.001 | 0.187 | Effect Size |
| Gender | CJRA Pre-screenLevel | Somer's D/ Cramer's V | 0.001 | -0.116 | Effect Size |
| Age | CJRA Pre-screenLevel | Spearman's Rho | 0.001 | -0.161 | Effect Size |
| Race/Ethnicity | Charge Level | Eta/ Spearman | 0.001 | 0.126 | Effect Size |
| Race/Ethnicity (Black youth) | Charge Level | T-Test | 0.001 | 0.743 | Standard mean difference |
| Gender | Charge Level | T-Test | 0.001 | 0.925 | Standard mean difference |
| Race/Ethnicity | LOS | T-Test | 0.001 | 6.65 | Standard mean difference |
| Race/Ethnicity (Black youth) | LOS | T-Test | 0.001 | 11.87 | Standard mean difference |
| Gender | LOS | T-Test | 0.001 | 15.79 | Standard mean difference |
| Race/Ethnicity | Detention Involvements (all) | Eta/ Spearman | | 0.116 | Effect Size |
| Race/Ethnicity | Detention Involvements (all) | T-Test | 0.001 | 0.31 | Standard mean difference |
| Sexual Orientation | Detention Involvements (all) | T-Test | 0.018 | 0.28 | Standard mean difference |
| Gender | Child Welfare Involvements (all) | T-Test | 0.02 | 0.26 | Standard mean difference |
| Sexual Orientation | Child Welfare Involvements (all) | T-Test | 0.041 | 0.47 | Standard mean difference |
| Race/Ethnicity | Child Welfare Involvements (all) | Spearman's Rho | 0.001 | 0.15 | Effect Size |
| Race/Ethnicity | Child Welfare Involvements (all) | T-Test | 0.001 | -0.47 | Standard mean difference |

| Independent Variable | Dependent Variable | Correlations Test | Statistical Significance | Value | Value Description |
|---|---|---|---|---|---|
| CJRA Pre-screen level | Detention Involvements (cohort) | Eta, Cohen's D | 0.001 | 0.302 | Effect Size |
| Releasable (YN) | CJRA Pre-screen Level | Somer's D/ Cramer's V | 0.001 | 0.211 | Effect Size |

** Between 80-100 statistical tests were conducted in total for this report.*

# APPENDIX I

## Universal Placement Referral Form

COLORADO
Office of Children, Youth & Families
Department of Human Services

### Colorado Placement Referral Form

Revised: 12/13/2023

*Please complete this form to the best of your ability using any current information. A provider may need additional information to make a decision and will request that if so.* ***Sections of this form with an asterisk must be completed for emergency placements****. All other sections must be completed within 30 days of entering out-of-home placement. Sections of this form that are underlined are additional documentation required to providers and/or foster parents to meet the needs of the child/youth in out-of-home placement. New referral forms for youth needing out-of-home placement will need to be created every 90 days, or as needed.*

* What type of referral is this (please select all that apply)?

- ☐ Foster Family Home Care
- ☐ Group Home/Group Center
- ☐ Qualified Residential Treatment Program (QRTP)
- ☐ Psychiatric Residential Treatment Facility (PRTF)
- ☐ Regional Accountable Entity (RAE)
- ☐ Children's Habilitation Residential Program (CHRP)

| Case and Contact Information | | |
|---|---|---|
| *Trails Case ID# | *County: | *Custody/Guardianship: |
| *Referral Date: | *DHS Caseworker: | *Email/Phone Number: |
| *Current Location of Child/Youth | *DHS Supervisor: | *Email/Phone Number: |
| (as applicable) | Placement Coordinator: | Email/Phone Number: |
| | Case Management Agency: | Email/Phone Number: |
| | Medicaid/RAE: | Email/Phone Number: |
| | GAL/CFY: | Email/Phone Number: |
| | Other: | Email/Phone Number: |

| Child/Youth Information | | |
|---|---|---|
| *Legal Name: | *Birthdate: | *State ID#: |
| | *Birth Location: | *Age: |
| *Preferred Name: | *Sex: | *Gender Identity: |
| *Permanency Goal: | *Primary Language: | *Race/Ethnicity: |
| *Documentation Status: | *Religious/Spiritual Affiliation: | *ICPC: |
| Special Immigration Needs: | *ICWA and Tribal Involvement: | *Medicaid/Waiver Eligible: |

| Child/Youth Needs | | | |
|---|---|---|---|
| ☐ Initial Referral | ☐ Repeat Referral | Date of Last Referral: | Reason for Re-Submission: |

COLORADO
Office of Children, Youth & Families
Department of Human Services

| | | | |
|---|---|---|---|
| Full Scale IQ: | Adaptive Score: | Description: | |
| Currently on Waiver: | ☐ CES | ☐ CHRP | ☐ Other |
| **Need Assistance to Complete Activities of Daily Living (ADLs)** | | | |
| Feeding/Eating Assistance: | ☐ Yes, Needed | ☐ No, Not Needed | Details: |
| Toileting Assistance: | ☐ Yes, Needed | ☐ No, Not Needed | |
| Describe details (accident based or consistent, diapers required, smearing/hiding behaviors, can they clean themselves, encopresis/enuresis, etc.): | | | |
| Bathing Assistance: | ☐ Yes, Needed | ☐ No, Not Needed | Details: |
| Mobility Assistance: | ☐ Yes, Needed | ☐ No, Not Needed | Details: |
| **Running/Elopement** | | | |
| ☐ Yes, Currently | ☐ Yes, in Past 3 Months | ☐ Yes, Over 3 Months Ago | ☐ Not Applicable |
| Frequency: | | Duration: | |
| Date(s) of Last Episode for Each Identified: | | | |
| Describe Last Time Running/Eloping and Circumstances: | | | |
| **Substance Use** | | | |
| ☐ Yes, Currently | ☐ Yes, in Past 3 Months | ☐ Yes, Over 3 Months Ago | ☐ Not Applicable |
| List all substances used now or in the past and any details surrounding timeframes: | | | |
| ☐ Past Detox Needed | Timeframe: | ☐ Past Overdose(s) | Timeframe: |
| **Suicidal and Homicidal Ideation** | | | |
| Suicidal Ideation: | ☐ Yes, Currently | ☐ Yes, in Past 3 Months<br>☐ Yes, Over 3 Months Ago | ☐ Not Applicable |
| Suicide Attempts: | ☐ Yes, Recently | ☐ Yes, in Past 3 Months<br>☐ Yes, Over 3 Months Ago | ☐ Not Applicable |
| Describe details of current or past ideation or attempts and what prompts this, if known: | | | |
| Homicidal Ideation: | ☐ Yes, Currently | ☐ Yes, in the Past | ☐ Not Applicable |
| Homicide Attempts: | ☐ Yes, Currently | ☐ Yes, in the Past | ☐ Not Applicable |

COLORADO
Office of Children, Youth & Families
Department of Human Services

| | | | |
|---|---|---|---|
| Describe details of current or past ideation or attempts, to whom, and what prompts this, if known: | | | |
| Self Harm Behaviors Currently or in the Past: | | | |
| Hospitalization History (dates, locations, details,etc.): | | | |
| **Inappropriate Sexualized Behaviors** | | | |
| List any inappropriate sexualized behaviors or inappropriate self-soothing or self-stimulating behaviors: | | | |
| List Any Criminal Charges: | | | |
| Adjudication: | | ☐ Yes | ☐ No |
| SOMB Treatment: | | ☐ Yes | ☐ No |
| Individual Supervision and Management Plan (ISMP): | | ☐ Yes | ☐ No |
| Concerns of Trafficking (please list if so): | | ☐ Yes | ☐ No |
| **Aggressive Behaviors** | | | |
| Type: | ☐ Physical | ☐ Verbal | ☐ Other |
| Toward: | ☐ Peers<br>☐ Siblings | ☐ Property<br>☐ Animals | ☐ Adults<br>☐ Caregivers |
| Timeframe: | ☐ Yes, currently | ☐ Yes, in Past 3 Months | ☐ Yes, Over 3 Months Ago |
| Description: | | | |
| Are weapons used now or in the past?: | | | |

| | | | |
|---|---|---|---|
| **Therapeutic Needs** | | | |
| Please list all known psychiatric diagnoses for the child/youth: | | | |
| Mental Health Therapy: | ☐ Yes, Currently | ☐ No, But Needing This Service | ☐ Not Involved |
| ABA/Pediatric Behavioral Therapy: | ☐ Yes, Currently | ☐ No, But Needing This Service | ☐ Not Involved |
| Occupational Therapy: | ☐ Yes, Currently | ☐ No, But Needing This Service | ☐ Not Involved |
| Speech Therapy: | ☐ Yes, Currently | ☐ No, But Needing This Service | ☐ Not involved |
| If marked "Yes, currently", please detail provider names and contacts: | | | |

COLORADO
Office of Children, Youth & Families
Department of Human Services

| | | | |
|---|---|---|---|
| Does the youth have a treatment plan? If so, please include with the referral: | | | |
| What is the child/youth hoping to achieve with treatment? | | | |
| ***Visitation Information** | | | |
| *Will child/youth have visits with family of origin?: | ☐ Yes, Allowed and Scheduled | ☐ Yes, Needing to Be Scheduled | ☐ No Contact Allowed |
| | Frequency: | Flexibility: | Dates/Times: |
| *Individuals Who Cannot Have Contact with Child/Youth: | | | |
| *Transportation Needs Being Requested: | | | |
| ***Education Information** | | | |
| *School District: | Contact Name: | Contact Phone/Email: | |
| Name of Last School Attended: | Educational Contact: | *Current Grade: | BID Needed: |
| IEP: | 504 Plan: | READ Plan: | Other: |
| **Other Services and Discharge Plan** | | | |
| County offered services to provider(s)/child/youth: | | Discharge Plan: | |
| **Placement History** | | | |
| Detail Placement History from Past Year: | | | |
| **Additional Considerations for Providers** | | | |
| Any additional considerations you would like to note that have not already been identified? | | | |

| **Parent/Guardian/Trusted Adults and Funding Information** | |
|---|---|
| *(1) Parent/Guardian Name: | *(2) Parent/Guardian Name: |
| *Relationship to Youth: | *Relationship to Youth: |
| *Phone Number: | *Phone Number: |
| *Address: | *Address: |
| *Primary Language: | *Primary Language: |
| *Visits Permitted (Y/N, Frequency, Notes from FSP): | *Visits Permitted (Y/N, Frequency, Notes from FSP): |
| *Educational or Medical Decision-Making? (Y/N) | *Educational or Medical Decision-Making? (Y/N) |
| ***Funding Information** | |
| *Medicaid or Insurance#: | *Referral Funding Source: |

COLORADO
Office of Children, Youth & Families
Department of Human Services

| *Additional Funding Source: | Children's Habilitation Residential Program (CHRP): |
|---|---|
| *Please list any other pertinent information that was not identified above or any other funding sources not listed above. | |

| **Please Return With the Following Information:** | | | |
|---|---|---|---|
| Provider Name: | License Type: | Name of Staff Filling Out Form: | |
| Acceptance or Denial: | ☐ Accepted | ☐ Pending | ☐ Denied |
| Primary Reasons for Denial: | ☐ Active Suicidal or Homicidal Behaviors<br>☐ Age or Gender Outside of Program Scope<br>☐ Aggression<br>☐ Cognitive/Functional Impairment<br>☐ Delinquent Behavior | ☐ Elopement<br>☐ Incomplete Referral Information<br>☐ Insufficient Staff<br>☐ Medical Needs Above Capacity of Provider<br>☐ Past Placement Issues<br>☐ Lack of Discharge Plan | ☐ Primary Funding Source<br>☐ Problematic Sexualized Behaviors<br>☐ Program/Milieu at Capacity<br>☐ Substance Use Disorder Treatment Needs or Detox<br>☐ Other |
| Was more information requested? If so, was it received, and did it impact your denial or acceptance? | | | |
| Additional Comments: | | | |
| Waitlist: | ☐ Yes | ☐ No | Details: |