# EXHIBIT 7

# Senate Bill 94 Reference Manual

Colorado Department of Human Services
Division of Youth Corrections
January
2009

# COLORADO DEPARTMENT OF HUMAN SERVICES
# DIVISION OF YOUTH CORRECTIONS

## THE SENATE BILL 94 INITIATIVE

**OCTOBER 2008**

## TABLE OF CONTENTS

VISION ........ 3
MISSION ........ 3
HISTORY ........ 4
PROGRAM STRUCTURE / ROLES AND RESPONSIBILITIES ........ 6
JUVENILE DETENTION SCREENING AND ASSESSMENT GUIDE 12
(JDSAG) ........ 12
COLORADO JUVENILE RISK ASSESSMENT (CJRA) ........ 12
SENATE BILL 94 ANNUAL PLAN ........ 13
DIRECTORY OF SERVICES ........ 14
DETENTION BED MANAGEMENT ........ 20
TRAILS ........ 20
FORMS ........ 24
STATUTES ........ 25
CONTRACTS ........ 31
PROCUREMENT ........ 63
INTERSTATE COMPACT ........ 65
ACRONYMS & COMMONLY USED TERMS ........ 66
JUVENILE JUSTICE TERMS AND DEFINITIONS ........ 77
WEBSITES ........ 87
CONTACT INFORMATION ........ 87

## VISION

"Working with Colorado Communities to Achieve Justice"

## MISSION

The Mission of the Division of Youth Corrections is to protect, restore, and improve public safety through a continuum of services and programs that:

- Effectively supervise juvenile offenders,
- Promote offender accountability to victims and communities, and
- Build skills and competencies of youth to become responsible citizens.

Senate Bill 94 programs
Match the right services for the right youth
while
Reducing secure confinement
by
Providing cost effective alternatives
that
Promote excellent outcomes.

# HISTORY

**Senate Bill 91-94** -- Prior to the 1991 Legislative Session, the projections for future Division of Youth Corrections (DYC) populations were indicating the need for approximately 500 additional beds in the DYC system. Discussions among the Executive Director of the Department of Institutions, DYC Staff, Legislators and Joint Budget Committee Staff included the possibility of local service options as a viable alternative to building expensive state facilities. These discussions culminated in the development of Senate Bill 91-94, which was introduced and adopted during the 1991 Legislative Session. One provision of the bill provided for the establishment of a Juvenile Services Fund that would provide resources to local jurisdictions on or after July 1, 1993, to fund alternative to incarceration services described in local juvenile services plans developed by each jurisdiction. Plans were to include, but not be limited to, such services as “intervention, treatment, supervision, lodging, assessment, bonding programs and family services.” These services were to be designed, for appropriate youth, as viable alternatives to placement in State-funded detention and commitment facilities.

**Senate Bill 93-134** -- Senate Bill 134, enacted during the 1993 Legislative Session, changed the local jurisdictions for juvenile services funding allocations from counties to judicial districts, specified how local juvenile services planning committees were to be appointed, and how plans were to be approved.

***Statewide Implementation***

During FY 1993-94, local juvenile services plans that provided for alternatives to incarceration were developed, approved, and implemented in each of the twenty-two judicial districts. Senate Bill 94 (SB 94) programs were viewed as an important element in meeting DYC bed capacity needs. It was therefore determined that DYC budget documents, and the General Assembly’s formula for funding DYC capacity needs, would assume that SB 94 programs would be 70% successful in preventing the placement of at-risk youth in State-operated facilities. Thus, all funding decisions since that time estimated that SB 94 program services would reduce the need for State-funded beds

**Senate Bill 96-1363** -- Senate Bill 1363, enacted during the 1996 Legislative Session, deleted the list of potential services included in Senate Bill 91-94 and replaced it with language stating that juvenile services funds should be expended for services “that are intended to prevent the juvenile from being held in detention prior to adjudication, sentenced to detention, or committed to the Department of Human Services or to reduce the length of time the juvenile is held in preadjudication or postadjudication detention or held in a commitment facility.”

**Senate Bill 03-286** -- Senate Bill 286, enacted during the 2003 Legislative Session, placed a statutory limit on state funded secure and staff secure detention beds of 479 beds. Senate Bill 286 directs the “working group” to annually allocate juvenile detention beds to catchment areas

and judicial districts within the catchment areas. Judicial districts are required to develop plans to manage the number of beds allocated to the judicial district to ensure that the judicial district does not exceed its allocation.

# PROGRAM STRUCTURE / ROLES AND RESPONSIBILITIES

State Coordinator
Statewide Advisory Board
Judicial District Coordinators
Local Juvenile Services Planning Committee
Contractors/Fiscal Agents

The following roles and responsibilities shall be considered a minimum expectation of all parties. Local policies may dictate additional roles or responsibilities or establish additional expectations.

**State Coordinator and the Division of Youth Corrections**
Through collaboration with the Statewide SB 94 Advisory Board, the following roles and responsibilities shall be enacted.

- Develop policies and procedures for judicial districts to follow in order to receive and expend SB 94 funds.

- Provide programmatic and fiscal monitoring of local SB 94 programs which includes monitoring for compliance with the local written plan and contract provisions.

- Provide or arrange for technical assistance to local programs, Juvenile Services Planning Committees (JSPCs), and coordinators when requested and/or as needed.

- Provide information, technical assistance, and training to coordinators to support the implementation of the SB 94 plan.

- Review and approve recommendations concerning criteria for placement of youth in detention or commitment.

- Review and approve recommendations for the formula to allocate resources to each judicial district to fund local juvenile services plans developed by local planning committees.

- Develop procedures for the review and approval of local Senate Bill 94 plans.

- Develop the format by which local Senate Bill 94 programs submit their yearly plan.

- Select the contractor who will provide a yearly evaluation of the effectiveness of the Senate Bill 94 Program.

- Represent DYC and SB 94 as staff to the Statewide Advisory Board.

- Provide training and orientation to new Advisory Board members.

**Statewide Advisory Board**
The Advisory Board is directed to complete Legislative Directives described in the following:

**19-2-212 C.R.S.**

- Review and recommend on an annual basis a set of criteria for both detention and commitment for the purposes of determining which juvenile offenders are appropriate for placement in the physical or legal custody of the Department of Human Services.

- Review and recommend on an annual basis the formula for the purpose of allocating juvenile services funds to each judicial district.

- Facilitate the development of plans for community-based detention services by local Juvenile Services Planning Committees. Individual plans will be reviewed by the State Advisory Board prior to the start of the fiscal year.

**19-2-402.5 C.R.S.**

- Submit recommendations concerning configuration of the detention catchment areas annually to the Director of Youth Corrections for transmittal to the Executive Director of the Department of Human Services and the State Court Administrator.

**19-2-1202 C.R.S.**

- Annually allocate the number of juvenile detention beds to each catchment area and judicial district.

- Develop a mechanism for loaning of beds between judicial districts.
- Develop emergency release guidelines that shall be used by each judicial district.
- Develop juvenile detention placement guidelines for use by each judicial district.

**Additional duties of the Advisory Board include:**

- Advise the Division of Youth Corrections regarding the annual mandates of the SB 94 legislation.
- Act as a liaison between local Juvenile Service Planning Committees and the Division of Youth Corrections.
- Serve as an oversight group to evaluate the quality of the local Juvenile Services Planning Committees.
- Review judicial districts annual plans and make recommendations to the Division of Youth Corrections on approval.
- Promote positive relations between the Division of Youth Corrections and other governmental agencies.
- Champion the facilitation of coordination and communication among youth initiatives.
- Encourage local government and community participation in the juvenile justice system.

**Judicial District Coordinators**

- Provide oversight and ensure that the annual SB 94 Plan is effectively implemented.
- Serve as contact person for the local SB 94 program to the local JSPC, the Statewide SB 94 Advisory Board, the State Coordinator, and the Division of Youth Corrections.

- Annually review detention bed policies to ensure compliance with state law and rule.

- Ensure compliance with statutory requirements regarding completion of assessments and data entry.

- Receive and disburse to the JSPC and other stakeholders authorized by the JSPC, in a timely fashion, all Senate Bill 94 information received from the Division of Youth Corrections, the Statewide Coordinator, or the Statewide SB 94 Advisory Board.

- Provide requested information to the local JSPC or the Division of Youth Corrections in a timely manner.

- Ensure that all required service data is accurately entered into the Colorado Trails SB 94 database within a maximum of 7 days of the verifiable start and end date of service.

- Attend statewide coordinator meetings, regional catchment area meetings, and other meetings scheduled by the state coordinator and/or JSPC.

- Create a process to provide orientation and training to new JSPC members.

- Assist the fiscal agent to ensure compliance with DYC contractual requirements for SB 94.

**Local Juvenile Services Planning Committee** (JSPC)

- Comply with the duties described in 19-2-211 C.R.S.

- Select a contractor(s) to implement the annual SB 94 plan. A competitive selection process administered at least every five years is required to select contractors receiving funds directly from DYC unless the contractor is a governmental entity or the only one in a particular geographic area who can provide the services. The State procurement process must be followed for either Request for Proposals or Sole Source approval.

- Design and approve the local SB 94 Juvenile Services Plan.

- Provide general oversight to ensure that services are being delivered in accordance with the local SB 94 plan.

- Provide oversight to ensure implementation of the contract with the Division of Youth Corrections.

- Monitor expenditures regularly throughout the fiscal year (at least twice per year).

- Develop procedures to monitor the performance of Senate Bill 94 service providers (at least twice per year).

- In conjunction with the fiscal agent, develop a process to hire, train, supervise, pay, and evaluate the performance of the coordinator. The evaluation shall occur at least annually, as shall review and update to the coordinators job description.

- Comply with all Department of Human Services/Division of Youth Corrections contractual requirements for Senate Bill 94 Programs.

- Develop and implement operating rules for the management and operation of the JSPC.

- Ensure that policies and procedures are developed to support a local emergency release plan for managing the detention cap in accordance with SB 03-286.

**SB 94 Contractors/Fiscal Agents**

- Implement the local Juvenile Services Plan or a component of the plan under the direction of the local Juvenile Services Planning Committee and in accordance with the approved written plan for the district.

- Comply with all Department of Human Services/Division of Youth Corrections contractual requirements for Senate Bill 94 Programs.

- Provide requested information to the local Juvenile Services Planning Committee, the coordinator, and the Division of Youth Corrections in a timely manner.

- Provide a financial report to the JSPC regularly, but no less than twice per year.

- In conjunction with the JSPC, shall develop a process to hire, train, supervise, establish pay scales, and evaluate the performance of the coordinator. The evaluation shall occur at least annually, as shall review and update to the coordinators job description.

# JUVENILE DETENTION SCREENING AND ASSESSMENT GUIDE (JDSAG)

The "Screening Team" defined in Section 19-1-103 (94.5) C.R.S. completes the screening process described in 19-2-507 (2) C.R.S. and the Colorado Rules of Juvenile Procedure #3.7 utilizing the **Juvenile Detention Screening and Assessment Guide (JDSAG).**

Each judicial district shall have an implementation procedure for completion of the JDSAG.

All youth referred for detention must be screened using the JDSAG. This includes all youth who are remanded from court and youth who are sentenced to detention.

The JDSAG --including the verification (right) side of the screen -- shall be completed and entered into Trails no later than seven (7) days from detention admission.

A copy of the JDSAG and JDSAG manual can be found on the DYC Senate Bill 94 webpage. www.cdhs.state.co.us/dyc/sb94.htm

# COLORADO JUVENILE RISK ASSESSMENT (CJRA)

The Colorado Juvenile Risk Assessment (CJRA) Pre-screen shall be completed on each juvenile screened into a juvenile secure or staff secure detention facility.

**<u>COLORADO JUVENILE RISK ASSESSMENT</u>**

The Colorado Juvenile Risk Assessment (CJRA) Pre-Screen shall be administered and the data entered in the Colorado Trails database. The CJRA is a validated risk instrument which provides information related to a youth's the risk to recidivate and can be utilized to address both detention bed management as well as case planning for community supervision.

Trails reports related to the CJRA include:

CJRA Quality Control (QC) Report
Monthly – used by coordinators for quality control & possibly data reporting
- provides a summary of CJRA Pre-screens completed for the requested time period based on youth who were screened using the JDSAG

- provides verification all youth entering detention have a CJRA Pre-Screen on file

**Local Judicial District Discretion**

It is recommended, but not required, that a CJRA pre-screen be completed when SB 94 services are being requested for a youth who is being supervised in the community. For example a request for services for a sentenced youth who would be detained without SB 94 intervention.

Youth who have a detention eligible offense may have a CJRA full screen completed.

**Data Entry into Trails**

The CJRA Pre-screen shall be completed and entered into Trails no later than seven (7) days from detention admission.

**Colorado Juvenile Risk Assessment Training**

Local SB 94 coordinators will complete train the trainer courses in order to maintain ongoing training for their districts.

Each Division of Youth Corrections regional office will have CJRA trainers available to assist SB 94 with ongoing training and technical assistance.

CJRA training and educational tools are available on the SB 94 webpage.
www.cdhs.state.co.us/dyc/sb94.htm

## SENATE BILL 94 ANNUAL PLAN

19-2-211 C.R.S. directs the local juvenile services planning committee to develop an annual plan for the allocation of resources for juvenile services within the judicial district for each fiscal year.

The annual plan format is developed by the statewide advisory board each year and distributed to the local juvenile services planning committee in November. The completed SB 94 plan is submitted to the Division of Youth Corrections, SB 94 office and advisory board for review. The SB 94 plan is generally due in early March each year. The actual submission date is determined when the plan format is distributed.

The statewide advisory board reviews each local plan and recommends approval of plans to the Division of Youth Corrections. The Division of Youth Corrections makes final plan approvals.

An amended plan is required anytime a judicial district adds a new program or line item in the budget. This plan must be reviewed and approved by the statewide advisory board and Division of Youth Corrections. Amended plans will also require a contract amendment. Contract amendments can take up to 6 weeks to process and new programs or spending cannot take place until the contract amendment has been approved.

A copy of the annual plan format can be found on the SB 94 website.

## DIRECTORY OF SERVICES

Included in this section are the two categories of SB 94 eligible youth, a list of allowable and unallowable costs, along with a list of common SB 94 services to be used as a guide in developing a SB 94 annual plan. Currently the JDSAG and CJRA pre screen are considered mandatory for each judicial district. This list should not be considered as the only services that may be funded by SB 94. Local SB 94 programs are encouraged to develop new and innovative programs that are designed to fulfill the mandate of SB 94.

The Statewide Advisory Board and Division of Youth Corrections has an expectation that a portion of SB 94 funding in each local plan includes programming that is either Evidence Based or incorporates the principles of Evidence Based Programs.

Each SB 94 program, through the JSPC, determines which services will be made available and funded through SB 94 in the annual plan.

Youth considered for SB 94 funded services should fit into one of the following categories prior to the service authorization.

1. Preadjudicated Youth

This area includes any SB 94 services provided for youth who are not on probation, parole or committed, but who are at eminent risk of being placed or remaining in detention.

2. Sentenced Youth

This area includes SB 94 services provided for youth on probation and are at eminent risk of being placed in detention or committed to DYC without the use of SB 94 intervention services.

**Allowable Costs**

In order for any of these services or costs to be defined as allowable it must first be approved through the SB 94 plan review process by the Statewide SB 94 Advisory Board and the Division of Youth Corrections. Service types or line items in the budget that are added to the annual plan after DYC plan approval will require the submission of a plan amendment and approval by the Statewide Advisory and the Division of Youth Corrections.

**Unallowable Costs**

General Rule: Costs not identified in the approved plan or costs that have not received prior approval through the SB 94 plan approval or plan amendment process, or costs for services for youth who do not qualify for SB 94 services. Non-compliance with this standard may result in the state refusing to reimburse the contractor for these expenses or requiring the contractor to reimburse the state if the contractor has already received payment for the questioned expense.

**GENERAL DESCRIPTIONS OF SB 94 SERVICES**
LISTED BY SERVICE TYPE AND SERVICE DETAIL

| | |
|---|---|
| **Service Type: Client Assessment/Evaluation Services Screen through Placement in Detention** | |
| **Service Detail** | **Definitions** |
| Assessment, Screening and/or Evaluation | • Risk and need assessment,<br>• JDSAG -Juvenile Detention screening Assessment Guide (Required Service)<br>• Court reports (detention hearing, bond revocation, progress report<br>• CJRA – Colorado juvenile Risk Assessment. (Required Service)<br>• MAYSI – Massachusetts Adolescent Youth Screening Instrument # 2<br>• TRAILS –<br>• Interpreters |
| Medical Assessment | • Screenings or assessments for:<br>o Medical conditions<br>o Psychiatric or psychological conditions. |
| Substance Abuse Assessment | • Drug and Alcohol screening evaluation / assessment |
| Interagency Evaluation and/or Staffing Services | • Includes collaborative efforts to staff a youth using an interagency staffing approach (CET)<br>• Team decisions making (TDM)<br>• Wrap around services<br>• Family conferencing<br>• Case Management<br>• Mediation |

| SERVICES IN COMMUNITY | |
|---|---|
| **Service Detail** | **Definitions** |
| Substance Abuse Treatment | Includes<br>• Inpatient or Outpatient drug treatment<br>• Individual and group drug treatment services.<br>• Urinalysis or other drug testing and monitoring. |
| Mental Health Treatment | • Individual counseling<br>• Family therapy<br>• MST<br>• FFT<br>• ART<br>• DBT<br>• Offense specific Treatment<br>• Psychiatric treatment<br>• Mental health screening and evaluation<br>• Day Treatment |
| Intervention Programs | • Anger management<br>• Domestic violence<br>• Gang Intervention<br>• Life skills<br>• Pregnancy prevention and intervention<br>• Independent Living skills preparation<br>• Cognitive restructuring<br>• Day and evening reporting<br>• Mentoring<br>• Includes collaborative efforts to staff a youth using an interagency staffing approach (CET)<br>• Team decisions making (TDM)<br>• Wrap around services<br>• Family conferencing<br>• Mediation<br>• Case Management |

| Service Detail | Definitions |
| --- | --- |
| Educational/ Vocational Support | Provided for educational/vocational purposes.<br>• Tuition,<br>• Books,<br>• GED fees,<br>• Academic tutoring,<br>• Credit recovery,<br>• Vocational assessments and programs,<br>• Vocational tools and supplies,<br>• Work force development |
| Client/Family Assistance | Includes support provided to the client or family of the client.<br>• Transportation<br>• Food<br>• Clothing<br>• Medical<br>• Telephone<br>• Housing cost and furnishings<br>• Utilities<br>• Day care<br>• Respite care |
| Community Support and Supervision | Includes<br>• Tracking services<br>• Case management<br>• Electronic Monitoring and GPS<br>• Mentoring |
| Community based Placements | • Temporary holding for reasons such as screening or hold until moved to another placement.<br>• Residential (staff secure, shelter, proctor home, group home)<br>• Transitional living<br>• Home detention<br>• Day and evening reporting |

| | |
|---|---|
| Community Service Programs | Includes Restorative Justice Principles<br>• Community service<br>• Work programs<br>• Restitution Program<br>• Mediation |

| | |
|---|---|
| **Program Administration** | Program Administration/Operating Costs should be included in each of the above service detail categories and allocated among categories proportionate to that categories use of the administrative/Operating expenses. Example: If staff in the supervision category use 30% of the office space, 30% of that cost (rent) would be attributed to that category. |
| Excludes the 10% for the administrative fee. | Includes directly administrating plan resources such as:<br>• Supplies and operating costs (rent, utilities, maintenance)<br>• Equipment<br>• Coordinator Direct Service Delivery<br>• Coordinator Benefits<br>• Costs associated with the operation or training of the JSPC<br>• Travel expenses including mileage, accommodations, meals etc<br>• Training and conferences |
| **Program Fiscal Administration**<br>As approved in the Plan, not to exceed 10%. | Includes proportional costs associated with the administration of Senate Bill 94:<br>• Accounting<br>• HR<br>• Insurance<br>• Benefits<br>• Supplies and operating costs (rent, utilities, maintenance)<br>Coordinator Salary/Percentage of FTE dedicated to– Plan Implementation and Oversight |

## DETENTION BED MANAGEMENT

Senate Bill 03-286 placed a statutory limit on the number of state funded secure and staff secure detention beds. This statutory limit is 479 beds statewide. This limit on detention beds shall not be exceeded.

The statewide advisory board is required to allocate detention beds annually to catchment areas and judicial districts within catchment areas. The statewide advisory board allocates beds by applying a formula. This formula includes the following factors: 1) juvenile population (ages 10-17) by judicial district, 2) delinquency petitions by judicial district, 3) unduplicated new probation intakes by judicial district, 4) mandatory holds from the JDSAG by judicial district, 5) risk to self from the JDSAG by judicial district, and 6) risk to community from the JDSAG by judicial district.

Each judicial district is required to develop a plan to manage their allocation of detention beds to ensure the judicial district does not exceed the detention bed allocation.

Additionally, each catchment area develops catchment area operating procedures, which outline judicial district allocations and mechanisms for detention bed borrowing. Each catchment area operating procedure can be found on the SB 94 webpage.

## TRAILS

The SB 94 new user access form can be found on the SB 94 webpage. This form must be completed for all new SB 94 users and prior to Trails training.

SB 94 Trails training must be completed before access will be granted. Trails training is available at the training center in Thornton, CO as well as via remote link. An on-line pre-requisite course is required prior to the training.

The following is a list of trails reports that SB 94 coordinators, the JSPC, and staff should review on a regular basis.

<u>SB 94 ADP Report</u>
Run monthly – used by coordinators for quality control

- Check for old cases that need to be closed.
- Cross-reference with Child/Youth In Placement with Provider Report (see below) and/or rosters/caseload reports from providers.
- (Note: this report may be used for general reporting by DYC to the JBC).

Detention Screening Information

Run monthly – used by coordinators & screening teams for quality control

- Check monthly with screening team.
- Check for entry of arrest and charge information.
- Check for entering and locking of JDSAG within 24 hours (48 hours detention hearing information).
- Check to ensure that the JDSAG verification has been completed on each JDSAG.

JDSAG Screening & Profile Detail Report

Run monthly – used by coordinators & screening teams for quality control

- Check for all information correctly entered completely (ensures gender and ethnicity is entered).
- Good for reviewing screening results vs. actual placement and to monitor overrides.

JDSAG Screening & Profile Report

Run monthly – used by coordinators for quality control

- Excellent report for JSPC meetings.
- Can be used to see trends.
- Summary data at end of report.
- May replace some local data tracking mechanisms.
- Can compare local with statewide data.

*Reminder access to the report is not immediately available. Upon request, hit RUN and do not re-enter the date range.

Child/Youth in Placement with Provider

Run monthly – used by coordinators for quality control of contracts and caseloads of particular providers/contractors

- Especially useful if there are major providers as contractors (ex. pretrial release services).
- Have providers review for accuracy.
- Coordinators can use for quality control audits and to pull files for review of accuracy.

- May select a particular county or select "All Counties" when using this report.

SB 94 Case Terminations Report

Run monthly & Bi-annually – used by coordinators for quality control & possibly data reporting

- Used by coordinator for quality control.
- Give to provider to cross check terminations.
- Also check that new charges and FTA's are recorded.
- Check that ethnicity/gender information is entered.

Monthly

- Check for any cases that are left open when all services have been closed.
- Should be run immediately with start date of 7/1/2001 to see if there are any old cases lingering open then run monthly always with start date of 7/1 of current fiscal year.
- Following the "roster" section cumulative data summaries provide information on number of FTA's and New Charges for a specific timeframe and positive/neutral leave reasons and negative leave reasons by legal status.
- All data may be effectively used in the Annual Plan and statewide program evaluation reporting providing all information is entered accurately and completely.

SB 94 Case Information

Run as needed/quarterly at minimum

- Not particularly helpful although it appears to pick up some old lingering open cases that are not necessarily appearing on ADP or other roster reports. Is somewhat redundant with Child/Youth in Placement with Provider and SB 94 ADP Report.

SB 94 Detention Cap Snapshot Report

Run daily/as needed by SB 94 Coordinators and bed management teams

- Brief description of real time bed capacity & daily utilization.
- Note: Always compare with internal data for accuracy.

SB 94 Facility Detention Cap Roster

Run daily/as needed – by SB 94 Coordinators and bed management teams

- Defines open beds in a particular facility to borrow.

- May be used as a roster for your JD.

SB 94 JD Detention Cap Roster

Run daily/as needed by SB 94 Coordinators and bed management teams

- Run to see a summary roster of detained youth.
- Shows number of beds occupied and number of beds available.

SB 94 Service Details Report

Run as needed

- Reports show all services all youth are receiving in judicial district SB 94 programs.
- Lists all of services and service details by providers.
- Report is good for quality control to check if all services and details are entered.

**Other Tips to Consider for Coordinators** (include more detail, are there other issues for this section)

- End date in details ensures accuracy – reminder: there may be several different services detailed, each one needs to have an accurate end date.
- Must enter details on all services.
- Enter brief comments on every service.
- Reports may be exported to file or be printed.
- Contact the Helpdesk to request merger for duplicate cases
- Occasionally get the commitment information from Division of Youth Corrections or ITS by Judicial District to show commitment profile trends.
  Trails Helpdesk # - 1-877-487-4871

# FORMS

The following are descriptions of required forms for SB 94. The forms are located on the SB 94 webpage. http://www.cdhs.state.co.us/dyc/sb94.htm

**SB 94 Budget Revision Form:**

The Budget Revision form is required in order to make changes to the approved SB 94 plan budget of more than 10% between budget categories. This form requires the signatures from the JSPC Chair, Fiscal Agent, Coordinator, Regional Director, and DYC SB 94 Coordinator. Actual revisions and expenditures should not occur until all signatures have been obtained. The local fiscal agent shall keep this form on file.

**SB 94 Equipment Purchase Form:**

The equipment purchase form shall be used anytime a SB 94 program makes an equipment purchase that is greater than $500.00. The local SB 94 coordinator and DYC regional director must sign this form. The local fiscal agent should keep this form on file.

**Inventory Form:**

This form is submitted annually to the DYC SB 94 office no later than August 15th and is a record of inventory maintained by the local SB 94 program for the previous fiscal year (July 1st-June 30th).

Inventory for the purpose of this report shall be all controlled assets defined as tangible personal property and equipment with a useful life of more than one year with a purchase price over $500.00 per item. Examples would include computers, furniture, printers or fax machines.

**Surplus Inventory:**

Inventory that has been purchased with Senate Bill 94 funds is still considered state property and cannot be sold or transferred to another agency or department without prior approval.

The following website will provide you information on how to dispose of surplus inventory. http://www.cijvp.com/serviceproviders/surplus/index.html?disposal

**Trails Access Form:**

This form is used to obtain Colorado Trails database access for SB 94 users. This form is also used to revoke use when employees terminate service with SB 94. ***It is very important that current trails access is reviewed regularly to ensure individuals who no longer need access to trails are revoked to prevent unauthorized access.***

# STATUTES

Senate Bill 94 is guided by the Colorado Revised Statutes. Statutes govern planning, policy, detention cap and other requirements. Those cites are summarized here.

**19-2-211 C.R.S.- Local juvenile services planning committee - creation -duties.**

If all of the boards of commissioners of each county or the city council of each city and county in a judicial district agree, there shall be created in such judicial district a local juvenile services planning committee that shall be appointed by the chief judge of the judicial district or, for the second judicial district, the presiding judge of the Denver juvenile court from persons recommended by the boards of commissioners of each county or the city council of each city and county within the judicial district. The committee, if practicable, shall include but not be limited to a representative from the county department of social services, a local school district, a local law enforcement agency, a local probation department, the division of youth corrections, private citizens, the district attorney's office, and the public defender's office and a community mental health representative and a representative of the concerns of municipalities. The committee, if created, shall meet as necessary to develop a plan for the allocation of resources for local juvenile services within the judicial district for the fiscal year. Such plan shall be approved by the Department of Human Services. A local juvenile services planning committee may be consolidated with other local advisory boards pursuant to section 24-1.7-103, C.R.S.

**19-2-212 C.R.S. Working group for criteria for placement of juvenile offenders - establishment of formula - review of criteria.**

(1) The executive director of the Department of Human Services and the state court administrator of the judicial department, or any designees of such persons, in consultation with the Division of Criminal Justice of the Department of Public Safety, the Office of State Planning and Budgeting, the Colorado district attorneys council, law enforcement representatives, and representatives of local and county governments, shall form a working group that shall carry out the following duties:

(a) To establish a set of criteria for both detention and commitment for the purposes of determining which juvenile offenders are appropriate for placement in the physical or legal custody of the Department of Human Services. Such criteria shall conform with section 19-2-508. This set of criteria, when adopted by the Department of Human Services

and the judicial department, shall be used to promote a more uniform system of determining which juveniles should be placed in the physical custody of the Department of Human Services or in the legal custody of the Department of Human Services so that decisions for such placement of a juvenile are made based upon a uniform set of criteria throughout the state. In developing such set of criteria, the working group shall utilize any existing risk scale devised by the Department of Human Services or any other measures to determine when it is appropriate to place a juvenile in the physical custody of the Department of Human Services or in the legal custody of the Department of Human Services. The working group established pursuant to this subsection (1) shall hold a meeting once each year to review and propose revision to the criteria established pursuant to this paragraph (a) and the formula created pursuant to paragraph (b) of this subsection (1).

(b) To establish a formula for the purpose of allocating funds by each judicial district in the State of Colorado for alternative services to placing juveniles in the physical custody of the Department of Human Services or in the legal custody of the Department of Human Services. Such allocation shall take into consideration such factors as the population of the judicial district, the incidence of offenses committed by juveniles in such judicial district, and such other factors as deemed appropriate. The working group shall consider and take into account whether any federal moneys or matching funds are available to cover the costs of juveniles within the system, including parent fees and third-party reimbursement as authorized by law or reimbursements under Title IV-E of the federal "Social Security Act", as amended.

(2) Of the members of the working group established pursuant to subsection (1) of this section, the executive director of the Department of Human Services and the state court administrator of the judicial department, or any designees of such persons, shall have final authority to carry out the duty of creating the set of criteria pursuant to paragraph (a) of subsection (1) of this section and creating the formula pursuant to paragraph (b) of subsection (1) of this section. This authority shall be exercised after working with and participating in the working group process established in this section.

## 19-2-302 C.R.S. - Preadjudication program created - community advisory board established - duties of board.

(1) The chief judge to any judicial district may issue an order that any juvenile who applies for preadjudication release be evaluated for placement by a preadjudication service program established pursuant to this section. In evaluating the juvenile, the service

agency shall follow criteria for the placement of a juvenile established pursuant to section 19-2-212 C.R.S. Upon evaluation, the service agency shall make a recommendation to the court concerning placement of the juvenile with a preadjudication service program.

(2) Any county or city and county or judicial district in the state may establish a preadjudication service program for use by the district court for the county or city and county or judicial district. Such program shall be established in accordance with a local justice plan developed pursuant to section 19-2-211 C.R.S.

(3) The local justice plan shall provide for the assessment of juveniles taken into custody and detained by law enforcement officers, which assessment shall be based on criteria for the placement of juveniles established pursuant to section 19-2-212 C.R.S., so that relevant information may be presented to the judge presiding over the detention hearing. The information provided to the court through the screening process, which information shall include the record of any prior adjudication of the juvenile, is intended to enhance the court's ability to make a more appropriate detention and bond decision, based on facts relative to the juvenile's welfare or the juvenile's risk of danger to the community.

(4) The plan may include different methods and levels of community-based supervision as conditions for preadjudication release. The plan may provide for the use of the same supervision methods that have been established for adult defendants as a pretrial release method to reduce pretrial incarceration or that have been established as sentencing alternatives for juvenile or adult offenders placed on probation or parole. The use of such supervision methods is intended to reduce preadjudication detentions without sacrificing the protection of the community from juveniles who may be risks to the public. The plan may provide for the use of any of the following supervision methods as conditions of preadjudication release:

(a) Periodic telephone communications with the juvenile;
(b) Periodic office visits by the juvenile to the preadjudication service agency;
(c) Periodic home visits to the juvenile's home;
(d) Periodic drug testing of the juvenile;
(e) Periodic visits to the juvenile's school;
(f) Mental health or substance abuse treatment for the juvenile, which treatment may include residential treatment;
(g) Domestic violence or child abuse counseling for the juvenile, if applicable;
(h) Electronic monitoring of the juvenile;
(i) Work release for the juvenile, if school attendance is not applicable or appropriate under the circumstances; or
(j) Juvenile day reporting and day treatment programs.

## 19-2-310 C.R.S. - Appropriations to Department of Human Services for Services to juveniles.

The general assembly shall appropriate moneys for the provision of services to juveniles to the Department of Human Services which shall allocate such moneys by each judicial district in the state. Such appropriation and allocation shall be made based upon the formula developed in section 19-2-212 (1) (b) C.R.S. The Department of Human Services shall administer such appropriated moneys. The moneys appropriated to the Department of Human Services for allocation by each judicial district shall be expended in such judicial district by the Department of Human Services for services to juveniles that are intended to prevent the juvenile from being held in detention prior to adjudication, sentenced to detention, or committed to the Department of Human Services or to reduce the length of time the juvenile is held in preadjudication or postadjudication detention or held in a commitment facility operated under section 19-2-403 C.R.S. If a judicial district has a local juvenile services planning committee, the expenditure of moneys for juvenile services in such judicial district shall be made in accordance with the plan developed pursuant to section 19-2- 211 C.R.S.

## 19-2-911 C.R.S. - Sentencing - alternative services - detention.

( l ) Except as otherwise provided in section 19-2-601 C.R.S. for an aggravated juvenile offender and except as provided in subsection (2) of this section, the court may sentence the juvenile to alternative services funded through section 19-2-212 C.R.S. or other alternative services programs. If a juvenile who is twelve years of age or older fails to make satisfactory progress in the alternative services to which he or she is sentenced or if the court finds that a sentence to alternative services would be contrary to the community interest, the court may sentence any juvenile adjudicated for an offense that would constitute a class 3, class 4, class 5, or class 6 felony or misdemeanor if committed by an adult to detention for a period not to exceed forty-five days. Release for purposes of work, therapy, education, or other good cause may be granted by the court. The court may not sentence to detention any juvenile adjudicated for an offense that would constitute a class l or class 2 felony if committed by an adult.

(2) In the case of a juvenile who has been adjudicated a juvenile delinquent for the commission of one of the misdemeanor offenses described in section 19-2-508 (3) (a) (III) (C) C.R.S., the court shall sentence the juvenile to a minimum mandatory period of detention of not less than five days.

# Detention Cap Statutes

### 19-2-1201 C.R.S. – Juvenile detention bed cap.

For the fiscal year 2003-04 and each fiscal year thereafter, the number of available juvenile detention beds statewide shall be limited to four hundred seventy-nine.

### 19-2-1202 C.R.S. – Working group – allocation of beds.

(1) The executive director of the department of human services and the state court administrator in the judicial department, or a designee of such persons, in consultation with the division of criminal justice in the department of public safety, the office of state planning and budgeting, the Colorado district attorneys council, and law enforcement representatives shall form a working group which shall carry out the following duties:

(a) The working group established pursuant to this subsection (1) shall annually allocate the number of juvenile detention beds to each catchment area in the state created pursuant to section 19-2-402.5 C.R.S., based on the number of juvenile beds established pursuant to section 19-2-1201 C.R.S. Once the allocation of the juvenile detention beds is made to the catchment areas, the working group shall allocate detention beds within the catchment areas to the judicial districts within each catchment area. Judicial districts shall not exceed the number of beds allocated to them except for circumstances provided for in paragraph (b) of this subsection (1).

(b) The working group shall develop a mechanism for judicial districts within the same catchment area to loan detention beds to other judicial districts within the catchment area in cases of need.

(c) The working group shall develop emergency release guidelines that shall be used by each judicial district to prevent placement of a juvenile in a juvenile detention facility in excess of the number of beds allocated to the judicial district.

(d) The working group shall develop juvenile detention placement guidelines for each judicial district to use in complying with the number of juvenile detention beds allocated to the judicial district.

**19-2-1203 C.R.S. Judicial districts – plans for the cap.**

Each judicial district shall annually develop a plan to manage the limit on the number of juvenile detention beds allocated to the judicial district by the working group pursuant to section 19-2-1202 (1) (a) C.R.S. The judicial district shall consider the emergency release guidelines and placement guidelines developed pursuant to section 19-2-1202 C.R.S. in its annual plan to manage the limit. The annual plan developed by the judicial district shall ensure the judicial district does not exceed the number of juvenile detention beds allocated to it pursuant to section 19-2-1202 C.R.S.

**19-2-1204 C.R.S. Use of juvenile detention beds.**

A juvenile committed to the department of human services pursuant to article 3 of this title shall not be placed in a juvenile detention bed unless the juvenile is subject to an action proceeding under this article.

# CONTRACTS

The Fiscal Agent, chosen by the JSPC, is the actual contractor for the judicial district's SB 94 services. It is important that the SB 94 coordinator is aware of the expectations of this contract. DYC SB 94 will use the contract as a guideline to conduct monitoring visits.

The following is an example of a SB 94 contract. This contract template is the same for each judicial district. Each district's individual statement of work from the annual plan is also included the contract.

A contract amendment is required anytime a judicial district adds programming or line items to the plan or statement of work. An amended plan must be submitted and approved by the statewide advisory board and Division of Youth Corrections prior to beginning a contract amendment. It should be noted that contracts and contract amendments take up to 6 weeks to process.

## Exhibit A

## I. Statement of Work

A. The Contractor, under the direction of the **XX Judicial District Juvenile Services Planning Committee**, shall implement the Juvenile Services Plan developed for the judicial district by such committee, The goals of this plan shall be to reduce placement or length of stay of delinquent youths in State funded detention centers, and/or to prevent commitment to the Division of Youth Corrections.

B. The Juvenile Services Plan, commonly known as the **Senate Bill 94** (SB94) Plan, shall be implemented, in accordance with the plan description in **Exhibit B,** specifically "**Section III. Statement of Work (Description of Services)", and Exhibit C, "Section VI. Plan Budget";** both exhibits made a part hereof and attached hereto.

C. The Contractor's designated staff shall enter into the Colorado Trails SB94 database ("Trails") all client and service information required for the statewide evaluation of local SB94 programs. Data shall be entered into Trails no later than 7 calendar days from the time of service. If there are technical Trails-system issues, the Contractor shall immediately request a Trails Helpdesk ticket. Immediately following the closure

of the Helpdesk ticket, the Contractor shall enter Trails data. The Contractor shall provide computer hardware and software to staff entering information into the SB94 database that complies with the requirements published by the Department of Human Services for the Colorado Trails system. Such designated staff shall sign confidentiality agreements provided by the State and shall consider all such data to be confidential in accordance with **Provision D**. below.

D. All records and information maintained by the Contractor pertaining to youths served by the program shall remain confidential and shall not be released to anyone other than the person in interest or the State without specific order of the court with proper jurisdiction. Prior to the release of any information or record, the Contractor shall notify the State. Nothing in this paragraph shall be construed in any way to prevent the Contractor from releasing information to authorized parties during the normal legal conduct of the Contractor's business.

E. The Contractor acknowledges it is fully bound by the Federal Regulations on the Confidentiality of Alcohol/Drug Abuse Patient Records 42CFR Part 2 when receiving, storing, or otherwise dealing with any information related to a client receiving drug and alcohol treatment services. The Contractor acknowledges that prior to the release of any client's drug and/or alcohol treatment services information, a written document granting permission to release the herein mentioned information must be signed by the client and placed in his/her file.

F. The Contractor shall comply with DYC Policy 3.21 without limitation and made a part hereof by this reference. This policy requires the Contractor and subcontractors to conduct criminal background checks and a drug screen for newly hired direct care staff and to maintain a reporting system and policy for existing direct care staff that violate the rules of the herein mentioned policy.

G. Health Insurance Portability & Accountability Act of 1996 ("HIPAA"). Federal law and regulations governing the privacy of certain health information requires a "Business Associate Contract" between the State and the Contractor. 45 C.F.R. Section 164.504(e). Attached and incorporated herein by reference and agreed to by the parties is a **HIPAA Business Associate Addendum** for HIPAA compliance as **Exhibit E.** Terms of the Addendum shall be considered binding upon execution of this contract and shall remain in effect during the term of the contract including any extensions.

H. The Contractor agrees to attend annual and on-going training, as identified and coordinated by DYC Senate Bill 94 Coordinator, for the Colorado Juvenile Risk Assessment (CJRA).

I. The Contractor shall allow the State and the **XX Judicial District** Juvenile Services Planning Committee to review any and all fiscal records relevant to the program, including all direct charges and overhead/indirect charges, and provide fiscal information to the State or the Judicial District Juvenile Services Planning Committee when requested to do so.

J. Tangible **personal property** with a useful life of more than one year and an acquisition cost of more than FIVE HUNDRED DOLLARS ($500.00) whether capitalized or not capitalized, that is purchased through funds provided by this contract, at the request of the State, must be transferred to any party specified by the State within thirty (30) days of such time as the Contractor is no longer providing services through the SB94 program. The party receiving the equipment shall be responsible for any transportation required to obtain the equipment.

K. The State shall establish billing procedures for payment due the Contractor in providing services pursuant to this contract, based on the submission of monthly expenditure statements, on forms prescribed by the State, in accordance with the **budget** information included in **Exhibit C**.
The monthly billing for services provided shall be submitted by the 10th of the month following the month of service, on forms prescribed by the State, in accordance with the **budget, Exhibit C**. All billings shall be submitted to, and eligible expenditures approved by, the DYC **[name of Region]** Contract Manager. Bills shall be returned unpaid if the bills do not conform to the approved format or the documentation to support the invoice is inadequate.

L. It is understood and agreed that in the event payment is authorized and received for services provided through this contract, to any youth not eligible for SB94 services, the Contractor shall refund the payment made for those services forthwith.

M. Requests for revisions to budget line items of more than ten percent (10%) or deletion or addition of new line items must be submitted in writing by the local Juvenile Services Planning Committee to the appropriate DYC Region Director and the DYC Senate Bill 94 Coordinator for written approval prior to implementation. Budget revisions are subject to the limitation of the maximum payable amount stated in **Section II., Provision A.** below.

N. The State shall reimburse the Contractor for only the eligible cost of services provided by the Contractor and their authorized subcontractor. The Contractor shall have adequate procedures and controls to ensure that there is no double billing of either units of services and/or salaries and related operating costs to this DYC contract. It is further understood and agreed the Contractor may not receive duplicate payments from any source for the same service. If a duplicate payment for services is made by the State, either by the Division of Youth Corrections or any other State agency, or by a federal agency; the Contractor shall refund the payments forthwith.

O. The Contractor shall provide year-end expenditure and inventory reports to the State within forty-five (45) days of the completion of the fiscal year. Such reports shall be submitted on forms prescribed by the State.

## II. Additional Provisions

A. Payment pursuant to this contract shall be made as earned, in whole or in part, from available funds encumbered in an amount not to exceed THOUSANDS, HUNDREDS, TENS and NO/100 DOLLARS **($XXX,XXX.xx)** for the purchase of the within-described services. The liability of the State, at any time for such payments shall be limited to the unspent amount remaining of such encumbered funds.

B. The Contractor must have in place a double entry accounting system, which complies with generally accepted accounting principles (GAAP). All expenses must be posted to the double entry accounting system. Billings for services must be reconcilable to the double entry accounting system. The vendor must have adequate time keeping and cost allocation systems to allocate salary cost and indirect cost to appropriate cost centers.

C. The Contractor must have an annual audit of their financial statements (Income Statement, Balance Sheet, and Statement of Cash Flows) by an independent public accounting firm if the Contractor receives $400,000 dollars or more of state funds. If the Contractor is a government agency that has an independent audit done by another agency of that government, their regular audit meets this requirement. The audit must be completed and a copy provided to DYC Program Services within six (6) months after the end of the Contractor's fiscal year. The audited financial statements must contain supplemental statements providing detailed financial information for the expenditures of this contract. Contractors that are a subsidiary

of a parent organization must submit separate financial statements for the subsidiary that detail each of the Contractor's facilities and/or programs that provide services for the Division and also must reconcile with the consolidated statements of the parent organization. In cases where audit deficiencies are noted, a plan of corrective action shall be submitted to DYC for approval within four (4) months of the date of the audit.

D. If Contractors do not submit their annual audit or refuse to disclose financial information regarding the operation of the program in a timely manner, DYC may withhold payment until the audit and/or requested information is submitted.

E. The Contractors financial records shall be open for inspection and audit at reasonable times by an authorized representative of the State. The Contractor must allow the State complete access to all-financial and accounting records pertaining to the operation of the Contractor's program. This shall include but not be limited to inspection of the Contractor's accounting information system and any records related to the Contractor's accounting information system.

F. Failure to comply with any of these requirements is justification for DYC to terminate this contract.

G. The state may require continued performance for a period of 12 months for any services at the rates and terms specified in the contract. The state may exercise the option by written notice to the contractor within 90 days prior to the end of the current contract term in a form substantially equivalent to **Exhibit F.**

If the state exercises this option, the extended contract will be considered to include this option provision. The total duration of this contract, including the exercise of any options under this clause, shall not exceed (list the term of the procurement method) years.

The state may unilaterally increase/decrease the maximum amount payable under this contract based upon the unit prices established in the contract and the schedule of services required, as set by the state. The state may exercise the option by providing a fully executed option to the contractor, in a form substantially equivalent to **Exhibit F** immediately upon signature of the State Controller or his delegate. Performance of the service shall continue at the same rate and under the same terms as established in the contract.

H. Other bilateral modifications to this contract not within the terms of this Exhibit must be executed by formal amendment to the contract approved in accordance with State law.

# EXHIBIT D
# HIPAA BUSINESS ASSOCIATE ADDENDUM

This **Business Associate Addendum** ("Addendum") is a part of the Contract dated (Enter date) between the **Colorado Department of Human Services, Division of Youth Corrections** ("State") and the **(Legal Name of the Contractor)** ("Contractor"). For purposes of this Addendum, the State is referred to as "Covered Entity" or "CE" and the Contractor is referred to as "Associate". Unless the context clearly requires a distinction between the Contract document and this Addendum, all references herein to "the Contract" or "this Contract" include this Addendum.

## RECITALS

A. CE wishes to disclose certain information to Associate pursuant to the terms of the Contract, some of which may constitute Protected Health Information ("PHI") (defined below).

B. CE and Associate intend to protect the privacy and provide for the security of PHI disclosed to Associate pursuant to this Contract in compliance with the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d – 1320d-8 ("HIPAA") and its implementing regulations promulgated by the U.S. Department of Health and Human Services, 45 C.F.R. Parts 160 and 164 (the "Privacy Rule") and other applicable laws, as amended.

C. As part of the HIPAA regulations, the Privacy Rule requires CE to enter into a contract containing specific requirements with Associate prior to the disclosure of PHI, as set forth in, but not limited to, Title 45, Sections 160.103, 164.502(e) and 164.504(e) of the Code of Federal Regulations ("C.F.R.") and contained in this Addendum.

The parties agree as follows:

1. Definitions.

a. Except as otherwise defined herein, capitalized terms in this Addendum shall have the definitions set forth in the HIPAA Privacy Rule at 45 C.F.R. Parts 160 and 164, as amended. In the event of any conflict between the mandatory provisions of the Privacy

Rule and the provisions of this Contract, the Privacy Rule shall control. Where the provisions of this Contract differ from those mandated by the Privacy Rule, but are nonetheless permitted by the Privacy Rule, the provisions of this Contract shall control.

b. "Protected Health Information" or "PHI" means any information, whether oral or recorded in any form or medium: (i) that relates to the past, present or future physical or mental condition of an individual; the provision of health care to an individual; or the past, present or future payment for the provision of health care to an individual; and (ii) that identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual, and shall have the meaning given to such term under the Privacy Rule, including, but not limited to, 45 C.F.R. Section 164.501.

c. "Protected Information" shall mean PHI provided by CE to Associate or created or received by Associate on CE's behalf. To the extent Associate is a covered entity under HIPAA and creates or obtains its own PHI for treatment, payment and health care operations, Protected Information under this Contract does not include any PHI created or obtained by Associate as a covered entity and Associate shall follow its own policies and procedures for accounting, access and amendment of Associate's PHI.

2. Obligations of Associate.

a. Permitted Uses. Associate shall not use Protected Information except for the purpose of performing Associate's obligations under this Contract and as permitted under this Addendum. Further, Associate shall not use Protected Information in any manner that would constitute a violation of the Privacy Rule if so used by CE, except that Associate may use Protected Information: (i) for the proper management and administration of Associate; (ii) to carry out the legal responsibilities of Associate; or (iii) for Data Aggregation purposes for the Health Care Operations of CE. Additional provisions, if any, governing permitted uses of Protected Information are set forth in **Attachment A** to this Addendum.

b. Permitted Disclosures. Associate shall not disclose Protected Information in any manner that would constitute a violation of the Privacy Rule if disclosed by CE, except that Associate may disclose Protected Information: (i) in a manner permitted pursuant to this Contract; (ii) for the proper management and administration of Associate; (iii) as required by law; (iv) for Data Aggregation purposes for the Health Care Operations of CE; or (v) to report violations of law to appropriate federal or state authorities, consistent with 45 C.F.R. Section 164.502(j)(1). To the extent that Associate

discloses Protected Information to a third party, Associate must obtain, prior to making any such disclosure: (i) reasonable assurances from such third party that such Protected Information will be held confidential as provided pursuant to this Addendum and only disclosed as required by law or for the purposes for which it was disclosed to such third party; and (ii) an agreement from such third party to notify Associate within two business days of any breaches of confidentiality of the Protected Information, to the extent it has obtained knowledge of such breach. Additional provisions, if any, governing permitted disclosures of Protected Information are set forth in **Attachment A**.

c. Appropriate Safeguards. Associate shall implement appropriate safeguards as are necessary to prevent the use or disclosure of Protected Information other than as permitted by this Contract. Associate shall maintain a comprehensive written information privacy and security program that includes administrative, technical and physical safeguards appropriate to the size and complexity of the Associate's operations and the nature and scope of its activities.

d. Reporting of Improper Use or Disclosure. Associate shall report to CE in writing any use or disclosure of Protected Information other than as provided for by this Contract within five (5) business days of becoming aware of such use or disclosure.

e. Associate's Agents. If Associate uses one or more subcontractors or agents to provide services under the Contract, and such subcontractors or agents receive or have access to Protected Information, each subcontractor or agent shall sign an agreement with Associate containing substantially the same provisions as this Addendum and further identifying CE as a third party beneficiary with rights of enforcement and indemnification from such subcontractors or agents in the event of any violation of such subcontractor or agent agreement. Associate shall implement and maintain sanctions against agents and subcontractors that violate such restrictions and conditions and shall mitigate the effects of any such violation.

f. Access to Protected Information. Associate shall make Protected Information maintained by Associate or its agents or subcontractors in Designated Record Sets available to CE for inspection and copying within ten (10) business days of a request by CE to enable CE to fulfill its obligations to permit individual access to PHI under the Privacy Rule, including, but not limited to, 45 C.F.R. Section 164.524.

g. Amendment of PHI. Within ten business (10) days of receipt of a request from CE for an amendment of Protected Information or a record about an individual contained in a Designated Record Set, Associate or its agents or subcontractors shall make

such Protected Information available to CE for amendment and incorporate any such amendment to enable CE to fulfill its obligations with respect to requests by individuals to amend their PHI under the Privacy Rule, including, but not limited to, 45 C.F.R. Section 164.526. If any individual requests an amendment of Protected Information directly from Associate or its agents or subcontractors, Associate must notify CE in writing within five (5) business days of receipt of the request. Any denial of amendment of Protected Information maintained by Associate or its agents or subcontractors shall be the responsibility of CE.

h. Accounting Rights. Within ten (10) business days of notice by CE of a request for an accounting of disclosures of Protected Information, Associate and its agents or subcontractors shall make available to CE the information required to provide an accounting of disclosures to enable CE to fulfill its obligations under the Privacy Rule, including, but not limited to, 45 C.F.R. Section 164.528. As set forth in, and as limited by, 45 C.F.R. Section 164.528, Associate shall not provide an accounting to CE of disclosures: (i) to carry out treatment, payment or health care operations, as set forth in 45 C.F.R. Section 164.506; (ii) to individuals of Protected Information about them as set forth in 45 C.F.R. Section 164.502; (iii) pursuant to an authorization as provided in 45 C.F.R. Section 164.508; (iv) to persons involved in the individual's care or other notification purposes as set forth in 45 C.F.R. Section 164.510; (v) for national security or intelligence purposes as set forth in 45 C.F.R. Section 164.512(k)(2); (vi) to correctional institutions or law enforcement officials as set forth in 45 C.F.R. Section 164.512(k)(5); (vii) incident to a use or disclosure otherwise permitted by the Privacy Rule; (viii) as part of a limited data set under 45 C.F.R. Section 164.514(e); or (ix) disclosures prior to April 14, 2003. Associate agrees to implement a process that allows for an accounting to be collected and maintained by Associate and its agents or subcontractors for at least six (6) years prior to the request, but not before the compliance date of the Privacy Rule. At a minimum, such information shall include: (i) the date of disclosure; (ii) the name of the entity or person who received Protected Information and, if known, the address of the entity or person; (iii) a brief description of Protected Information disclosed; and (iv) a brief statement of purpose of the disclosure that reasonably informs the individual of the basis for the disclosure, or a copy of the individual's authorization, or a copy of the written request for disclosure. In the event that the request for an accounting is delivered directly to Associate or its agents or subcontractors, Associate shall within five (5) business days of the receipt of the request forward it to CE in writing. It shall be CE's responsibility to prepare and deliver any such accounting requested. Associate shall not disclose any Protected Information except as set forth in **Section 2(b)** of this Addendum.

i. Governmental Access to Records. Associate shall make its internal practices, books and records relating to the use and disclosure of Protected Information available to the Secretary of the U.S. Department of Health and Human Services (the "Secretary"), in a time and manner designated by the Secretary, for purposes of determining CE's compliance with the Privacy Rule. Associate shall provide to CE a copy of any Protected Information that Associate provides to the Secretary concurrently with providing such Protected Information to the Secretary.

j. Minimum Necessary. Associate (and its agents or subcontractors) shall only request, use and disclose the minimum amount of Protected Information necessary to accomplish the purpose of the request, use or disclosure, in accordance with the Minimum Necessary requirements of the Privacy Rule including, but not limited to 45 C.F.R. Sections 164.502(b) and 164.514(d).

k. Data Ownership. Associate acknowledges that Associate has no ownership rights with respect to the Protected Information.

l. Retention of Protected Information. Except upon termination of the Contract as provided in **Section 4(d)** of this Addendum, Associate and its subcontractors or agents shall retain all Protected Information throughout the term of this Contract and shall continue to maintain the information required under **Section 2(h)** of this Addendum for a period of six (6) years.

m. Associate's Insurance. Associate shall maintain casualty and liability insurance to cover loss of PHI data and claims based upon alleged violations of privacy rights through improper use or disclosure of PHI. All such policies shall meet or exceed the minimum insurance requirements of the Contract (e.g., occurrence basis, combined single dollar limits, annual aggregate dollar limits, additional insured status and notice of cancellation).

n. Notification of Breach. During the term of this Contract, Associate shall notify CE within two business days of any suspected or actual breach of security, intrusion or unauthorized use or disclosure of PHI and/or any actual or suspected use or disclosure of data in violation of any applicable federal or state laws or regulations. Associate shall take (i) prompt corrective action to cure any such deficiencies and (ii) any action pertaining to such unauthorized disclosure required by applicable federal and state laws and regulations.

o. Audits, Inspection and Enforcement. Within ten (10) business days of a written request by CE, Associate and its agents or subcontractors shall allow CE to conduct a reasonable inspection of the facilities, systems, books, records, agreements, policies and procedures relating to the use or disclosure of Protected Information pursuant to this Addendum for the purpose of determining whether Associate has complied with this Addendum; provided, however, that: (i) Associate and CE shall mutually agree in advance upon the scope, timing and location of such an inspection; (ii) CE shall protect the confidentiality of all confidential and proprietary information of Associate to which CE has access during the course of such inspection; and (iii) CE shall execute a nondisclosure agreement, upon terms mutually agreed upon by the parties, if requested by Associate. The fact that CE inspects, or fails to inspect, or has the right to inspect, Associate's facilities, systems, books, records, agreements, policies and procedures does not relieve Associate of its responsibility to comply with this Addendum, nor does CE's (i) failure to detect or (ii) detection, but failure to notify Associate or require Associate's remediation of any unsatisfactory practices, constitute acceptance of such practice or a waiver of CE's enforcement rights under the Contract.

p. Safeguards During Transmission. Associate shall be responsible for using appropriate safeguards to maintain and ensure the confidentiality, privacy and security of Protected Information transmitted to CE pursuant to the Contract, in accordance with the standards and requirements of the Privacy Rule, until such Protected Information is received by CE, and in accordance with any specifications set forth in **Attachment A** to this Addendum.

q. Restrictions and Confidential Communications. Within ten (10) business days of notice by CE of a restriction upon uses or disclosures or request for confidential communications pursuant to 45 C.F.R. 164.522, Associate will restrict the use or disclosure of an individual's Protected Information, provided Associate has agreed to such a restriction. Associate will not respond directly to an individual's requests to restrict the use or disclosure of Protected Information or to send all communication of Protect Information to an alternate address. Associate will refer such requests to the CE so that the CE can coordinate and prepare a timely response to the requesting individual and provide direction to Associate.

3. Obligations of CE.

a. Safeguards During Transmission. CE shall be responsible for using appropriate safeguards to maintain and ensure the confidentiality, privacy and security of PHI transmitted to Associate pursuant to this Contract, in accordance with the standards

and requirements of the Privacy Rule, until such PHI is received by Associate, and in accordance with any specifications set forth in **Attachment A.**

b. Notice of Changes. CE shall provide Associate with a copy of its notice of privacy practices produced in accordance with 45 C.F.R. Section 164.520, as well as any subsequent changes or limitation(s) to such notice, to the extent such changes or limitations may effect Associate's use or disclosure of Protected Information. CE shall provide Associate with any changes in, or revocation of, permission to use or disclose Protected Information, to the extent it may affect Associate's permitted or required uses or disclosures. To the extent that it may affect Associate's permitted use or disclosure of PHI, CE shall notify Associate of any restriction on the use or disclosure of Protected Information that CE has agreed to in accordance with 45 C.F.R. Section 164.522. CE may effectuate any and all such notices of non-private information via posting on CE's web site. Associate shall review CE's designated web site for notice of changes to CE's HIPAA privacy policies and practices on the last day of each calendar quarter.

4. Termination.

a. Material Breach. In addition to any other provisions in the Contract regarding breach, a breach by Associate of any provision of this Addendum, as determined by CE, shall constitute a material breach of this Contract and shall provide grounds for immediate termination of this Contract by CE pursuant to the provisions of the Contract covering termination for cause, if any. If the Contract contains no express provisions regarding termination for cause, the following terms and conditions shall apply:

(1) Default. If Associate refuses or fails to timely perform any of the provisions of this Contract, CE may notify Associate in writing of the non-performance, and if not promptly corrected within the time specified, CE may terminate this Contract. Associate shall continue performance of this Contract to the extent it is not terminated and shall be liable for excess costs incurred in procuring similar goods or services elsewhere.

(2) Associate's Duties. Notwithstanding termination of this Contract, and subject to any directions from CE, Associate shall take timely, reasonable and necessary action to protect and preserve property in the possession of Associate in which CE has an interest.

(3) Compensation. Payment for completed supplies delivered and accepted by CE shall be at the Contract price. In the event of a material breach under

paragraph 4a, CE may withhold amounts due Associate as CE deems necessary to protect CE against loss from third party claims of improper use or disclosure and to reimburse CE for the excess costs incurred in procuring similar goods and services elsewhere.

(4) Erroneous Termination for Default. If after such termination it is determined, for any reason, that Associate was not in default, or that Associate's action/inaction was excusable, such termination shall be treated as a termination for convenience, and the rights and obligations of the parties shall be the same as if this Contract had been terminated for convenience, as described in this Contract.

b. Reasonable Steps to Cure Breach. If CE knows of a pattern of activity or practice of Associate that constitutes a material breach or violation of the Associate's obligations under the provisions of this Addendum or another arrangement and does not terminate this Contract pursuant to **Section 4(a),** then CE shall take reasonable steps to cure such breach or end such violation, as applicable. If CE's efforts to cure such breach or end such violation are unsuccessful, CE shall either (i) terminate the Contract, if feasible or (ii) if termination of this Contract is not feasible, CE shall report Associate's breach or violation to the Secretary of the Department of Health and Human Services.

c. Judicial or Administrative Proceedings. Either party may terminate the Contract, effective immediately, if (i) the other party is named as a defendant in a criminal proceeding for a violation of HIPAA, the HIPAA Regulations or other security or privacy laws or (ii) a finding or stipulation that the other party has violated any standard or requirement of HIPAA, the HIPAA Regulations or other security or privacy laws is made in any administrative or civil proceeding in which the party has been joined.

d. Effect of Termination.

(1) Except as provided in paragraph (2) of this subsection, upon termination of this Contract, for any reason, Associate shall return or destroy all Protected Information that Associate or its agents or subcontractors still maintain in any form, and shall retain no copies of such Protected Information. If Associate elects to destroy the PHI, Associate shall certify in writing to CE that such PHI has been destroyed.

(2) If Associate believes that returning or destroying the Protected Information is not feasible, Associate shall promptly provide CE notice of the conditions making return or destruction infeasible. Upon mutual agreement of CE and Associate that return or destruction of Protected Information is infeasible, Associate shall continue to extend the protections of **Sections 2(a), 2(b), 2(c), 2(d) and 2(e)** of this Addendum to

such information, and shall limit further use of such PHI to those purposes that make the return or destruction of such PHI infeasible.

5. Injunctive Relief. CE shall have the right to injunctive and other equitable and legal relief against Associate or any of its subcontractors or agents in the event of any use or disclosure of Protected Information in violation of this Contract or applicable law.

6. No Waiver of Immunity. No term or condition of this Contract shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protection, or other provisions of the Colorado Governmental Immunity Act, CRS 24-10-101 *et seq.* or the Federal Tort Claims Act, 28 U.S.C. 2671 *et seq.* as applicable, as now in effect or hereafter amended.

7. Limitation of Liability. Any limitation of Associate's liability in the Contract shall be inapplicable to the terms and conditions of this Addendum.

8. Disclaimer. CE makes no warranty or representation that compliance by Associate with this Contract, HIPAA or the HIPAA Regulations will be adequate or satisfactory for Associate's own purposes. Associate is solely responsible for all decisions made by Associate regarding the safeguarding of PHI.

9. Certification. To the extent that CE determines an examination is necessary in order to comply with CE's legal obligations pursuant to HIPAA relating to certification of its security practices, CE or its authorized agents or contractors, may, at CE's expense, examine Associate's facilities, systems, procedures and records as may be necessary for such agents or contractors to certify to CE the extent to which Associate's security safeguards comply with HIPAA, the HIPAA Regulations or this Addendum.

10. Amendment.

a. Amendment to Comply with Law. The parties acknowledge that state and federal laws relating to data security and privacy are rapidly evolving and that amendment of this Addendum may be required to provide for procedures to ensure compliance with such developments. The parties specifically agree to take such action as is necessary to implement the standards and requirements of HIPAA, the Privacy Rule, the Final HIPAA Security regulations at 68 Fed. Reg. 8334 (Feb20, 2003), 45 C.F.R. § 164.314 and other applicable laws relating to the security or privacy of PHI. The parties understand and agree that CE must receive satisfactory written assurance from Associate that Associate will adequately safeguard all Protected Information. Upon the request of either party, the

other party agrees to promptly enter into negotiations concerning the terms of an amendment to this Addendum embodying written assurances consistent with the standards and requirements of HIPAA, the Privacy Rule or other applicable laws. CE may terminate this Contract upon thirty (30) days written notice in the event (i) Associate does not promptly enter into negotiations to amend this Contract when requested by CE pursuant to this Section or (ii) Associate does not enter into an amendment to this Contract providing assurances regarding the safeguarding of PHI that CE, in its sole discretion, deems sufficient to satisfy the standards and requirements of HIPAA and the Privacy Rule.

b. Amendment of **Attachment A** to this Addendum. **Attachment A** may be modified or amended by mutual agreement of the parties in writing from time to time without formal amendment of this Addendum.

11. Assistance in Litigation or Administrative Proceedings. Associate shall make itself, and any subcontractors, employees or agents assisting Associate in the performance of its obligations under the Contract, available to CE, at no cost to CE up to a maximum of 30 hours, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against CE, its directors, officers or employees based upon a claimed violation of HIPAA, the Privacy Rule or other laws relating to security and privacy or PHI, except where Associate or its subcontractor, employee or agent is a named adverse party.

12. No Third Party Beneficiaries. Nothing express or implied in this Contract is intended to confer, nor shall anything herein confer, upon any person other than CE, Associate and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

13. Interpretation and Order of Precedence. The provisions of this Addendum shall prevail over any provisions in the Contract that may conflict or appear inconsistent with any provision in this Addendum. Together, the Contract and this Addendum shall be interpreted as broadly as necessary to implement and comply with HIPAA and the Privacy Rule. The parties agree that any ambiguity in this Contract shall be resolved in favor of a meaning that complies and is consistent with HIPAA and the Privacy Rule. This Contract supercedes and replaces any previous separately executed HIPAA addendum between the parties.

14. Survival of Certain Contract Terms. Notwithstanding anything herein to the contrary, Associate's obligations under Section 4(d) ("Effect of Termination") and

Section 12 ("No Third Party Beneficiaries") shall survive termination of this Contract and shall be enforceable by CE as provided herein in the event of such failure to perform or comply by the Associate. This Addendum shall remain in effect during the term of the Contract including any extensions.

15. Representatives and Notice.

a. Representatives. For the purpose of the Contract, the individuals identified elsewhere in this Contract shall be the representatives of the respective parties. Either party may from time to time designate in writing new or substitute representatives.

b. Notices. All required notices shall be in writing and shall be hand delivered or given by certified or registered mail to the representatives at the addresses set forth in accordance with the contract.

# ATTACHMENT A
# to the HIPAA BUSINESS ASSOCIATE ADDENDUM
# for DYC CONTRACTS

This Attachment sets forth additional terms to the HIPAA Business Associate Addendum, which is part of the Contract dated **(Enter Made Date of Contract)** between **the Colorado Department of Human Services, Division of Youth Corrections** and the (**Legal Name of the Contractor),** contract number **#XX-IKA-XXXXX** ("Contract") and is effective as of (**Enter Effective Date of Contract)**. This Attachment may be amended from time to time as provided in **Section 10(b) of the Addendum**.

1. Additional Permitted Uses. In addition to those purposes set forth in **Section 2(a)** of the Addendum, Associate may use Protected Information as follows: __________
None except as otherwise directed in writing by the State.

2. Additional Permitted Disclosures. In addition to those purposes set forth in **Section 2(b)** of the Addendum, Associate may disclose Protected Information as follows:
None except as otherwise directed in writing by the State.

3. Subcontractor(s). The parties acknowledge that the following subcontractors or agents of Associate shall receive Protected Information in the course of assisting Associate in the performance of its obligations under this Contract:
None except as otherwise directed in writing by the State.

4. Receipt. Associate's receipt of Protected Information pursuant to this Contract shall be deemed to occur as follows, and Associate's obligations under the Addendum shall commence with respect to such PHI upon such receipt: ____________________
Upon the effective date of the contract.

5. Additional Restrictions on Use of Data. CE is a Business Associate of certain other Covered Entities and, pursuant to such obligations of CE, Associate shall comply with the following restrictions on the use and disclosure of Protected Information: ________
As may be directed in writing by the State.

6. Additional Terms. *[This section may include specifications for disclosure format, method of transmission, use of an intermediary, use of digital signatures or PKI, authentication, additional security of privacy specifications, de-identification or re-identification of data and other additional terms.]*

Department or Agency Name
CDHS/Division of Youth Corrections
Routing Number: 0x-IKA-00xxx
Program: Program/Vendor

**OPTION LETTER**

**Exhibit E**

Date: _________ State Fiscal Year: Option Letter No. _____

**SUBJECT:** *(Please indicate purpose by choosing one of the following)*

**1 - Option to renew only (for an additional term)**
**2 - Change in the amount of goods within current term**
**3 - Change in amount of goods in conjunction with renewal for additional term**
**4 - Level of service change within current term**
**5- Level of service change in conjunction with renewal for additional term**

**In accordance with Paragraph(s) _________ of contract routing number (*FY*)** *(Agency) (Routing #*)**, between the State of Colorado, Department of Human Services,** *(division name)*, and *(contractor's name)* **the** state hereby exercises the option for an additional term of *(include performance period here)* at a cost/price specified in Paragraph/Section/Provision _____, AND/OR an increase/decrease in the amount of goods/services at the same rate(s) as specified in Paragraph/Schedule/Exhibit

The amount of the current Fiscal Year contract value is increased/decreased by ($ *amount of change)* to a new contract value of ($_______) to satisfy services/goods ordered under the contract for the current fiscal year *(indicate Fiscal Year)*. The first sentence in Paragraph/Section/Provision ______ is hereby modified accordingly.

The total contract value to include all previous amendments, option letters, etc. is ($_______).

**APPROVALS:**

**State of Colorado:**

Bill Ritter Jr., Governor

By: __________________________________ Date: _________________ Executive Director
Colorado Department of Human Services

**ALL CONTRACTS MUST BE APPROVED BY THE STATE CONTROLLER**

CRS 24-30-202 requires that the State Controller approve all state contracts. This contract is not valid until the State Controller, or such assistant as he may delegate, has signed it. The contractor is not authorized to begin performance until the contract is signed and dated below. If performance begins prior to the date below, the State of Colorado may not be obligated to pay for goods and/or services provided.

**State Controller**
**David J. McDermott, CPA**

By: ____________________
Date: ______________________

DEPARTMENT OF HUMAN SERVICES

ROUTING NO. XX IKA XXXXX

# CONTRACT

This contract is made and entered into by and between the named parties. In accordance with the purposes stated herein, it is hereby agreed as follows:

| | |
|---|---|
| **STATE**:<br><br>State of Colorado for the use & benefit of the<br>Department of Human Services<br>Division of Youth Corrections (DYC)<br>4255 S. Knox Ct.<br>Denver, CO 80236 | **CONTRACTOR**:<br><br>Contractor's Legal Business Name<br>Address<br>City, State Zip |
| **CONTRACT MADE DATE:**<br>XX/XX/XXXX | **CONTRACTOR ENTITY TYPE:**<br>List Entity Type |
| **PO/SC ENCUMBERANCE NUMBER**:<br>C-XX-XXXXXX | **BILLING STATEMENTS RECEIVED**:<br>Monthly |
| **TERM**:<br>This contract shall be effective upon approval by the State Controller, or designee, or on **XX/XX/XXXX**, whichever is later. The contract shall end on **XX/XX/XXXX**. | **STATUTORY AUTHORITY**:<br>C.R.S.<br>**CONTRACT PRICE NOT TO EXCEED**:<br><br>**MAXIMUM AMOUNT AVAILABLE PER FISCAL YEAR**:<br>FY XX: $ |
| **PROCUREMENT METHOD:**<br>RFP/Sole Source/Exempt/Grant Specified<br>**BID/RFP/LIST PRICE AGREEMENT NUMBER**:<br>List the Procurement # or N/A<br>**LAW SPECIFIED VENDOR STATUTE**:<br>Not Applicable | **PRICE STRUCTURE**:<br>Cost Reimbursement and Fixed Price<br>**FUND SOURCE – NAME OF FEDERAL PROGRAM/GRANT AND FUNDS ID#** |
| **STATE REPRESENTATIVE**<br>Name of DYC Manager, Title<br>Division of Youth Corrections<br>Regional Office Address<br>City, State Zip<br>Phone #: | **CONTRACTOR REPRESENTATIVE**:<br>Name of Signatory, Title<br>Contractor Legal Business Name as Per Above<br>Business Address<br>City, State Zip<br>Phone #: |

**SCOPE OF WORK**:

In accordance with the provisions of this contract and its exhibits and attachments, the Contractor shall: Provide community based alternatives to secure detention services for delinquent youth, in accordance with the Senate Bill 94 Juvenile Plan for the **XX** Judicial District.

**EXHIBITS:**

The following exhibits are hereby incorporated:

| | |
|---|---|
| Exhibit A- | Statement of Work |
| Exhibit B- | Juvenile Services Plan – Section III: Contractor's Statement of Work (Description of Services) |
| Exhibit C- | Juvenile Services Plan – Section VI: Plan Budget |
| Exhibit D- | HIPAA Business Addendum |
| Exhibit E- | Sample Option Letter |

**COORDINATION:**

The State warrants that required approval, clearance and coordination has been accomplished from and with appropriate agencies.

**APPROVAL:**

In no event shall this contract be deemed valid until it shall have been approved by the State Controller or his/her designee.

**PROCUREMENT:**

This contractor has been selected in accordance with the requirements of the Colorado Procurement Code.

**PRICE PROVISIONS:**

Payments pursuant to this contract shall be made as earned, in whole or in part, from available funds, encumbered for the purchase of the described services and/or deliverables. The liability of the State at any time for such payments shall be limited to the encumbered amount remaining of such funds.

Authority exists in the laws and funds have been budgeted, appropriated and otherwise made available, and a sufficient unencumbered balance thereof remains available for payment.

Financial obligations of the State of Colorado payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted and otherwise made available.

The Contractor understands and agrees that the State shall not be liable for payment for work or services or for costs or expenses incurred by the Contractor prior to the proper execution and State Controller approval of this contract.

# General Provisions

The following clauses apply to this contract:

A. Governmental Immunity/Limitation of Liability: Notwithstanding anything herein to the contrary, no term or condition of this contract shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protection, or other provisions of the "Colorado Governmental Immunity Act", C.R.S. §24-10-101, *et seq.*, as now or hereinafter amended. The parties understand and agree that the liability of the State for claims for injuries to persons or property arising out of negligence of the State of Colorado, its departments, institutions, agencies, boards, officials and employees is controlled and limited by the provisions of C.R.S. §24-10-101, *et seq.*, as now or hereafter amended and the risk management statutes, C.R.S. §24-30-1501, *et seq.*, as now or hereafter amended. Any liability of the State created under any other provision of this contract, whether or not incorporated herein by reference, shall be controlled by, limited to, and otherwise modified so as to conform with, the above cited laws.

B. Federal Funds Contingency: Payment pursuant to this contract, if in federal funds, whether in whole or in part, is subject to and contingent upon the continuing availability of federal funds for the purposes hereof. In the event that said funds, or any part thereof, become unavailable, as determined by the State, the State may immediately terminate this contract or amend it accordingly.

C. Billing Procedures: The State shall establish billing procedures and requirements for payment due the Contractor in providing performance pursuant to this contract. The Contractor shall comply with the established billing procedures and requirements for submission of billing statements. The State shall comply with CRS 24-30-202(24) when paying vendors upon receipt of a correct notice of the amount due for goods or services provided hereunder.

D. Exhibits- Interpretation: Unless otherwise stated, all referenced exhibits are incorporated herein and made a part of this contract. And, unless otherwise stated, in the event of conflicts or inconsistencies between this contract and its exhibits or attachments, such conflicts shall be resolved by reference to the documents in the following order of priority: 1) the Special Provisions of this contract shall always be controlling over other provisions in the contract or amendments; 2) the contract "cover" pages; 3) the exhibits to this contract 4) the General Provisions of this contract.

E. Notice and Representatives: For the purposes of this contract, the representative for each party is as designated herein. Any notice required or permitted may be delivered in person or sent by registered or certified mail, return receipt requested, to the party at the address provided, and if sent by mail it is effective when posted in a U.S. Mail Depository with sufficient postage attached thereto. Notice of change of address or change or representative shall be treated as any other notice.

F. Contractor Representations:
1. Licenses and Certifications: The Contractor certifies that, at the time of entering into this contract, it and its agents have currently in effect all necessary licenses, certifications, approvals, insurance, etc. required to properly provide the services and/or supplies covered by this contract in the state of Colorado. Proof of such licenses, certifications, approvals, insurance, etc. shall be provided upon the State's request. Any revocation, withdrawal or nonrenewal of necessary license, certification, approval, insurance, etc. required for the Contractor to properly perform this contract, shall be grounds for termination of this contract by the State.
2. Qualification: Contractor certifies that it is qualified to perform such services or provide such deliverables as delineated in this contract.
3. Debarment and Suspension: The Contractor certifies to the best of its knowledge and belief that the Contractor, its principals and authorized subcontractors are not presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from

participation in this transaction by any federal department or agency.

G. Legal Authority: The Contractor warrants that it possesses the legal authority to enter into this contract and that it has taken all actions required by its procedures, by-laws, and/or applicable law to exercise that authority, and to lawfully authorize its undersigned signatory to execute this contract and bind the Contractor to its terms. The person(s) executing this contract on behalf of the Contractor warrant(s) that such person(s) have full authorization to execute this contract.

H. Indemnification: Contractor shall indemnify, save, and hold harmless the State, its employees and agents, against any and all claims, damages, liability and court awards including costs, expenses, and attorney fees and related costs, incurred as a result of any act or omission by Contractor, or its employees, agents, subcontractors, or assignees pursuant to the terms of this contract.

***[Applicable Only to Intergovernmental Contracts]*** No term or condition of this contract shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protection, or other provisions, of the Colorado Governmental Immunity Act, CRS §24-10-101 et seq., or the Federal Tort Claims Act, 28 U.S.C. 2671 et seq., as applicable, as now or hereafter amended.

I. Insurance - Contractor: The contractor shall obtain, and maintain at all times during the term of this contract, insurance in the following kinds and amounts:

7. Workers' Compensation Insurance as required by state statute, and Employer's Liability Insurance covering all of contractor's employees acting within the course and scope of their employment.
8. Commercial General Liability Insurance written on ISO occurrence form CG 00 01 10/93 or equivalent, covering premises operations, fire damage, independent contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows:
   a. $1,000,000 each occurrence;
   b. $1,000,000 general aggregate;
   c. $1,000,000 products and completed operations aggregate; and
   d. $50,000 any one fire.

   If any aggregate limit is reduced below $1,000,000 because of claims made or paid, the contractor shall immediately obtain additional insurance to restore the full aggregate limit and furnish to the State a certificate or other document satisfactory to the State showing compliance with this provision.

   e. Automobile Liability Insurance covering any auto (including owned, hired and non-owned autos) with a minimum limit as follows: $1,000,000 each accident combined single limit.
   f. Professional liability insurance with minimum limits of liability of not less than $1,000,000.
3. The State of Colorado shall be named as additional insured on the Commercial General Liability and Automobile Liability Insurance policies (leases and construction contracts will require the additional insured coverage for completed operations on endorsements CG 2010 11/85, CG 2037, or equivalent). Coverage required of the contract will be primary over any insurance or self-insurance program carried by the State of Colorado.
4. The Insurance shall include provisions preventing cancellation or non-renewal without at least 45 days prior notice to the State by certified mail.
5. The contractor will require all insurance policies in any way related to the contract and secured and maintained by the contractor to include clauses stating that each carrier will waive all rights of recovery, under subrogation or otherwise, against the State of Colorado, its agencies, institutions, organizations, officers, agents, employees and volunteers.
6. All policies evidencing the insurance coverage's required hereunder shall be issued by insurance companies satisfactory to the State.
7. The contractor shall provide certificates showing insurance coverage required by this contract to the State within 7 business days of the effective date of the contract, but in no event later than the commencement of the services or delivery of the goods under the contract. No later than 15 days prior to the expiration date of any such coverage, the contractor shall deliver the State certificates of insurance evidencing renewals thereof. At any time during the term of this contract, the State may request in writing, and the contractor shall thereupon within 10 days

supply to the State, evidence satisfactory to the State of compliance with the provisions of this section.

8. Notwithstanding subsection A of this section, if the contractor is a "public entity" within the meaning of the Colorado Governmental Immunity Act CRS 24-10-101, et seq., as amended ("Act'), the contractor shall at all times during the term of this contract maintain only such liability insurance, by commercial policy or self-insurance, as is necessary to meet its liabilities under the Act. Upon request by the State, the contractor shall show proof of such insurance satisfactory to the State.

J. Disaster Planning and Pandemic Outbreaks: The State may require the Contractor to submit a Disaster Response Plan (Plan) to ensure the delivery hereunder of essential government services during a disaster, declared emergency, and/or pandemic outbreak. The Plan would take precedence over and nullify any contractual provision relating to force majeure or "Acts of God." Accordingly, should the work performed by the Contractor under this contract include the provision of any essential government services, the State may request a Plan from the Contractor, and, upon such request, the Contractor shall forthwith submit a Plan, and the Contractor shall be bound to perform hereunder in accordance therewith.

K. Rights in Data, Documents and Computer Software or Other Intellectual Property:
All intellectual property including without limitation, databases, software, documents, research, programs and codes, as well as all, reports, studies, data, photographs, negatives or other documents, drawings or materials prepared by the contractor in the performance of its obligations under this contract shall be the exclusive property of the State. Unless otherwise stated, all such materials shall be delivered to the State by the contractor upon completion, termination, or cancellation of this contract. Contractor shall not use, willingly allow or cause to have such materials used for any purpose other than the performance of the contractor's obligations under this contract without a prior written consent of the State. All documentation, accompanying the intellectual property or otherwise, shall comply with the State requirements which include but is not limited to all documentation being in a paper, human readable format which is useable by one who is reasonably proficient in the given subject area.

L. Proprietary Information: Proprietary information for the purpose of this contract is information relating to a party's research, development, trade secrets, business affairs, internal operations and management procedures and those of its customers, clients or affiliates, but does not include information lawfully obtained by third parties, which is in the public domain, or which is developed independently.

Neither party shall use or disclose directly or indirectly without prior written authorization any proprietary information concerning the other party obtained as a result of this contract. Any proprietary information removed from the State's site by the Contractor in the course of providing services under this contract will be accorded at least the same precautions as are employed by the Contractor for similar information in the course of its own business.

M. Records Maintenance, Performance Monitoring & Audits: The Contractor shall maintain a complete file of all records, documents, communications, and other materials that pertain to the operation of the program/project or the delivery of services under this contract. Such files shall be sufficient to properly reflect all direct and indirect costs of labor, materials, equipment, supplies and services, and other costs of whatever nature for which a contract payment was made. These records shall be maintained according to generally accepted accounting principles and shall be easily separable from other Contractor records.

The Contractor shall protect the confidentiality of all records and other materials containing personally identifying information that are maintained in accordance with this contract. Except as provided by law, no information in possession of the Contractor about any individual constituent shall be disclosed in a form including identifying information without the prior written consent of the person in interest, a minor's parent, guardian, or the State. The Contractor shall have written policies governing access to, duplication and dissemination of, all such information and advise its agents, if any, that they are subject to these confidentiality requirements. The Contractor shall provide its agents, if any, with a copy or written explanation of these confidentiality requirements before access to confidential data is permitted.

The Contractor authorizes the State, the federal government or their designee, to perform audits and/or inspections of its records, at any reasonable time, to assure compliance with the state or federal government's terms and/or to evaluate the

Contractor's performance. Any amounts the State paid improperly shall be immediately returned to the State or may be recovered in accordance with other remedies.

All such records, documents, communications, and other materials shall be the property of the State unless otherwise specified herein and shall be maintained by the Contractor, for a period of three (3) years from the date of final payment or submission of the final federal expenditure report under this contract, unless the State requests that the records be retained for a longer period, or until an audit has been completed with the following qualification. If an audit by or on behalf of the federal and/or state government has begun but is not completed at the end of the three (3) year period, or if audit findings have not been resolved after a three (3) year period, the materials shall be retained until the resolution of the audit findings.

The Contractor shall permit the State, any other governmental agency authorized by law, or an authorized designee thereof, in its sole discretion, to monitor all activities conducted by the Contractor pursuant to the terms of this contract. Monitoring may consist of internal evaluation procedures, reexamination of program data, special analyses, on-site verification, formal audit examinations, or any other procedures as deemed reasonable and relevant. All such monitoring shall be performed in a manner that will not unduly interfere with contract work.

N. <u>Taxes</u>: The State, as purchaser, is exempt from all federal excise taxes under Chapter 32 of the Internal Revenue Code [No. 84-730123K] and from all state and local government use taxes [C.R.S. §39- 26-114(a) and 203, as amended]. The contractor is hereby notified that when materials are purchased for the benefit of the State, such exemptions apply except that in certain political subdivisions the vendor may be required to pay sales or use taxes even though the ultimate product or service is provided to the State. These sales or use taxes will not be reimbursed by the State.

O. <u>Conflict of Interest:</u> During the term of this contract, the Contractor shall not engage in any business or personal activities or practices or maintain any relationships which conflict in any way with the Contractor fully performing his/her obligations under this contract.

Additionally, the Contractor acknowledges that, in governmental contracting, even the appearance of a conflict of interest is harmful to the interests of the State. Thus, the Contractor agrees to refrain from any practices, activities or relationships which could reasonably be considered to be in conflict with the Contractor's fully performing his/her obligations to the State under the terms of this contract, without the prior written approval of the State.

In the event that the Contractor is uncertain whether the appearance of a conflict of interest may reasonably exist, the Contractor shall submit to the State a full disclosure statement setting forth the relevant details for the State's consideration and direction. Failure to promptly submit a disclosure statement or to follow the State's direction in regard to the apparent conflict shall be grounds for termination of the contract.

Further, the Contractor shall maintain a written code of standards governing the performance of its agent(s) engaged in the award and administration of contracts. Neither the Contractor nor its agent(s) shall participate in the selection, or in the award or administration of a contract or subcontract supported by Federal funds if a conflict of interest, real or apparent, would be involved. Such a conflict would arise when:

1. The employee, officer or agent;
2. Any member of the employee’s immediate family;
3. The employee’s partner; or
4. An organization which employees, or is about to employ, any of the above,

has a financial or other interest in the firm selected for award. Neither the Contractor nor its agent(s) will solicit nor accept gratuities, favors, or anything of monetary value from Contractor’s potential contractors, or parties to subagreements.

P. <u>Conformance with Law:</u> The Contractor and its agent(s) shall at all times during the term of this contract strictly adhere to all applicable federal laws, state laws, Executive Orders and implementing regulations as they currently exist and may hereafter be amended. Without limitation, these federal laws and regulations include:

- Age Discrimination Act of 1975, 42 U.S.C. Section 6101 <u>et seq</u>. and its implementing regulation, 45 C.F.R. Part 91;
- Age Discrimination in Employment Act of 1967, 29 U.S.C. 621 <u>et seq</u>.;
- Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. 12101 <u>et seq</u>.;
- The Drug Free Workplace Act of 1988, 41 U.S.C. 701 <u>et seq</u>.;
- Equal Pay Act of 1963, 29 U.S.C. 206;

- Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d et seq. and implementing regulations, 45 C.F.R. Parts 160 and 164;
- Immigration Reform and Control Act of 1986, 8 U.S.C. 1324b;

- Pro-Children Act of 1994, 20 U.S.C. 6081 et seq.;
- Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, as amended, and implementing regulation 45 C.F.R. Part 84;
- Titles VI & VII of the Civil Rights Act of 1964, 42 U.S.C. 2000(d) & (e);
- The Personal Responsibility and Work Opportunity Reconciliation Act of 1996, 42 USC 604a, PL 104-193. See also State Executive Order D 015 00;
- Title IX of the Education Amendments of 1972, 20 U.S.C. 1681 et seq.;
- The Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments (Common Rule), at 45 CFR, Part 92;
- The Uniform Administrative Requirements for Awards and Sub-awards to Institutions of Higher Education, Hospitals, Other Non-Profit Organizations, and Commercial Organizations (Common Rule), at 2 CFR 215;
- Office of Management and Budget Circulars A-87, A-21 or A-122, and A-102 or A-110, whichever is applicable.
- The Hatch Act (5 USC 1501-1508) and Civil Service Reform Act, Public Law 95-454 Section 4728.
- Departments of Labor, Health and Human Services, and Education and Related Agencies Appropriations Act, 1990, PL 101-166, Section 511.
- 45 CFR Subtitle A, Department of Health and Human Services regulations.
- The Single Audit Act Amendments of 1996, 31 USC 7501, Public Law 104-156, OMB Circular A-133, and 45 CRF 74.26.

Q. Restrictions on Public Benefits: Pursuant to House Bill 06S-1023, as codified at C.R.S. § 24-76.5-101 et seq., except as otherwise provided therein or where exempt by federal law, the State is required to verify the lawful presence in the United States of each natural person 18 years of age or older who applies for state or local public benefits or for federal public benefits for the applicant. Accordingly, should the work performed by the Contractor under this contract include the provision of any of said benefits to any natural person 18 years of age or older who applies therefore for the applicant, the Contractor shall follow the requirements of said law in the provision of said benefits as if it were the State. The State will provide the Contractor with specific instruction on the identification documentation required and the process to be followed by the Contractor to properly comply with the law if the work done under this contract is subject to these requirements.

R. Sole Source Government Contracts as Defined in Colorado Constitution Article XXVIII:
This provision applies only to sole source government contracts and does not apply to any contract which used a public and competitive bidding process in which the State agency or institution of higher education solicited at least three bids prior to awarding the contract.

Contractor certifies, warrants, and agrees that it has complied and will comply with Colorado Constitution Article XXVIII, including but not necessarily limited to the following prohibitions and obligations:

1. If during the term of the contract, contractor holds sole source government contracts with the State of Colorado and any of its political subdivisions cumulatively totaling more than $100,000 in a calendar year, then for the duration of this contract and for two years after, contractor will not make, cause to be made, or induce by any means a contribution, directly or indirectly, on behalf of contractor or contractor's immediate family member(s) for the benefit of any political party or for the benefit of any candidate any elected office of the State or any of its political subdivisions; and
2. Contractor represents that contractor has not previously made or caused to be made, and will not in the future make or cause to be made, any contribution intended to promote or influence the result of a ballot issue election related to the subject matter of this contract; and
3. Contractor will satisfy contractor's obligations to promptly report to the Colorado Department of Personnel & Administration information included in the Government Contract Summary and the Contract Holder Information, regarding this contract and any other sole source government contracts to which contractor is a party; and
4. Contractor understands that any breach of this section or of Contractor's responsibilities under Colorado Constitution Article XXVIII may result in either contractual or

constitutionally mandated penalties and remedies; and

5. A Contractor that intentionally violates Colorado Constitution Article XXVIII, Section 15 or 17(2), shall be ineligible to hold any sole source government contract, or public employment with the state or any of its political subdivisions for three years; and
6. By execution of this contract, Contractor hereby confirms it is qualified and eligible under such provisions to enter into this contract.

For purposes of this clause, the term "contractor" shall include persons that control ten percent or more shares or interest in contractor, as well as contractor's officers, directors, and trustees. The term "immediate family member" shall include a spouse, child, spouse's child, son-in-law, daughter-in-law, parent, sibling, grandparent, grandchild, stepbrother, stepsister, stepparent, parent-in-law, brother-in-law, sister-in-law, aunt, niece, nephew, guardian, or domestic partner.

S. <u>Discrimination:</u> The Contractor during the performance of this contract shall:

1. not discriminate against any person on the basis of race, color, national origin, age, sex, religion and handicap, including Acquired Immune Deficiency Syndrome (AIDS) or AIDS related conditions.
2. not exclude from participation in, or deny benefits to any qualified individual with a disability, by reason of such disability.

Any person who thinks he/she has been discriminated against as related to the performance of this contract has the right to assert a claim, Colorado Civil Rights Division, C.R.S. §24-34-302, <u>et seq</u>.

T. <u>Criminal Background Check:</u> Pursuant to C.R.S. §27-1-110 and Department of Human Services Policy VI-2.4, any independent contractor, and its agent(s), who is designated by the Executive Director or the Executive Director's designee to be a contracting employee under C.R.S. §27-1-110, who has direct contact with vulnerable persons in a state-operated facility, or who provides state-funded services that involve direct contact with vulnerable persons in the vulnerable person's home or residence, shall:

1. submit to a criminal background check, and
2. report any arrests, charges, or summonses for any disqualifying offense as specified by C.R.S. §27-1-110 to the State.

Any Contractor or its agent(s), who does not comply with C.R.S. §27-1-110 and DHS Policy VI-2.4, may, at the sole discretion of the State, be suspended or terminated.

U. <u>Litigation:</u> The Contractor shall within five (5) calendar days after being served with a summons, complaint, or other pleading which has been filed in any federal or state court or administrative agency notify the State that it is a party defendant in a case which involves services provided under this contract. The Contractor shall deliver copies of such document(s) to the State's Executive Director. The term "litigation" includes an assignment for the benefit of creditors, and filings in bankruptcy, reorganization and/or foreclosure.

V. <u>Disputes:</u> Except as herein specifically provided otherwise, disputes concerning the performance of this contract which cannot be resolved by the designated contract representatives shall be referred in writing to a senior departmental management staff designated by the department and a senior manager designated by the Contractor. Failing resolution at that level, disputes shall be presented in writing to the Executive Director and the Contractor's chief executive officer for resolution. This process is not intended to supersede any other process for the resolution of controversies provided by law.

W. <u>Remedies:</u> Acceptance is dependent upon completion of all applicable inspection procedures. The State reserves the right to inspect the goods and/or services provided under this contract at all reasonable times and places. The Executive Director of the State or her/his designee may exercise the following remedial actions should s/he find the Contractor substantially failed to satisfy the scope of work found in this contract. Substantial failure to satisfy the scope of work shall be defined to mean substantially insufficient, incorrect or improper activities or inaction by the Contractor. Without limitation, the State has the right to:

1. withhold payment until performance is cured,
2. require the vendor to take necessary action to ensure that the future performance conforms to contract requirements,
3. request removal of a Contractor's agent from contract work,

4. equitably reduce the payment due the vendor to reflect the reduced value of the services performed,
5. recover payment for work that due to the Contractor cannot be performed or would be of no value to the State,
6. modify or recover payments (from payments under this contract or other contracts between the State and the vendor as a debt due to the State) to correct an error due to omission, error, fraud and/or defalcation,
7. terminate the contract.

These remedies in no way limit the remedies available to the State in the termination provisions of this contract, or remedies otherwise available at law.

X. Termination:

1. Termination for Default: The State may terminate the contract for cause. If the State terminates the contract for cause, it will first give ten (10) days prior written notice to the Contractor, stating the reasons for cancellation, procedures to correct problems, if any, and the date the contract will be terminated in the event problems have not been corrected. In the event this contract is terminated for cause, the State will only reimburse the Contractor for accepted work or deliverables received up to the date of termination. In the event this contract is terminated for cause, final payment to the Contractor may be withheld at the discretion of the State until completion of final audit. Notwithstanding the above, the Contractor may be liable to the State for the State's damages. If it is determined that the Contractor was not in default then such termination shall be treated as a termination for convenience as described herein.
2. Termination for Convenience: The State shall have the right to terminate this contract by giving the Contractor at least twenty (20) days prior written notice. If notice is so given, this contract shall terminate on the expiration of the specified time period, and the liability of the parties hereunder for further performance of the terms of this contract shall thereupon cease, but the parties shall not be released from the duty to perform their obligations up to the date of termination.
3. Immediate Termination: This contract is subject to immediate termination by the State in the event that the State determines that the health, safety, or welfare of persons receiving services may be in jeopardy. Additionally, the State may immediately terminate this contract upon verifying that the Contractor has engaged in or is about to participate in fraudulent or other illegal acts.
4. Termination for Financial Exigency: The State shall have the right to terminate this contract for financial exigency by giving the Contractor at least thirty (30) days prior written notice. For the purposes of this provision, a financial exigency shall be a determination made by the Colorado legislature or its Joint Budget Committee that the financial circumstances of the State are such that it is in the best interest of the State to terminate this contract. If notice of such termination is so given, this contract shall terminate on the expiration of the time period specified in the notice, and the liability of the parties hereunder for further performance of the terms of this contract shall thereupon cease, but the parties shall not be released from the duty to perform their obligations up to the date of termination.

In the event that the State terminates this contract under the Termination for Convenience or Termination for Financial Exigency provisions, the Contractor is entitled to submit a termination claim within ten (10) days of the effective date of termination. The termination claim shall address and the State shall consider paying the following costs:

a. the contract price for performance of work, which is accepted by the State, up to the effective date of the termination.
b. reasonable and necessary costs incurred in preparing to perform the terminated portion of the contract
c. reasonable profit on the completed but undelivered work up to the date of termination
d. the costs of settling claims arising out of the termination of subcontracts or orders, not to exceed 30 days pay for each subcontractor
e. reasonable accounting, legal, clerical, and other costs arising out of the termination settlement.

In no event shall reimbursement under this clause exceed the contract amount reduced by amounts previously paid by the State to the Contractor.

Y. Venue: The parties agree that venue for any action related to performance of this contract shall be in the City and County of Denver, Colorado.

Z. Understanding of the Parties:

1. Complete Understanding: This contract is intended as the complete integration of all understandings between the parties. No prior or contemporaneous addition, deletion, or other amendment hereto shall have any force or effect whatsoever, unless embodied herein in writing. No subsequent novation, renewal, addition, deletion, or other amendment hereto shall have any force or effect unless embodied in a written contract executed and approved pursuant to the State Fiscal Rules. Descriptive headings as used herein are for convenience and shall not control or affect the meaning or construction of any provision of this contract.
2. Severability: To the extent that this contract may be executed and performance of the obligations of the parties may be accomplished within the intent of the contract, the terms of this contract are severable, and should any term or provision hereof be declared invalid or become inoperative for any reason, such invalidity or failure shall not affect the validity of any other term or provision hereof.
3. Benefit and Right of Action: Except as herein specifically provided otherwise, it is expressly understood and agreed that this contract shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. All rights of action relating to enforcement of the terms and conditions shall be strictly reserved to the State and the named Contractor. Nothing contained in this agreement shall give or allow any claim or right of action whatsoever by any other third person. It is the express intention of the State and the Contractor that any such person or entity, other than the State or the Contractor, receiving services or benefits under this agreement shall be deemed an incidental beneficiary only.
4. Waiver: The waiver of any breach of a term hereof shall not be construed as a waiver of any other term, or the same term upon subsequent breach.
5. Survival: The State and the Contractor's obligations under this contract shall survive following termination or expiration to the extent necessary to give effect to the intent and understanding of the parties.
6. Subcontracting: Except as herein specifically provided otherwise, the duties and obligations of the Contractor arising hereunder cannot be assigned, delegated, subgranted or subcontracted except with the express prior written consent of the State. The subgrants and subcontracts permitted by the State shall be subject to the requirements of this contract. The Contractor is responsible for all subcontracting arrangements, delivery of services, and performance of any subgrantor or subcontractor. The Contractor warrants and agrees that any subgrant or subcontract, resulting from its performance under the terms and conditions of this contract, shall include a provision that the said subgrantor or subcontractor shall abide by the terms and conditions hereof. Also, the Contractor warrants and agrees that all subgrants or subcontracts shall include a provision that the subgrantor or subcontractor shall indemnify and hold harmless the State. The subgrantors or subcontractors must be certified to work on any equipment for which their services are obtained.

AA. Holdover: In the event that the State desires to continue the services provided for in this Contract and a replacement contract has not been fully executed by the expiration date of the Contract, this Contract may be extended unilaterally by the State for a period of up to two (2) months upon written notice to the Contractor under the same terms and conditions of the original Contract including, but not limited to, prices, rates, and service delivery requirements. However, this extension terminates when the replacement contract becomes effective when signed by the State Controller or an authorized delegate.

# SPECIAL PROVISIONS

These Special Provisions apply to all contracts except where noted in *italics*.

**1. CONTROLLER'S APPROVAL**. **CRS §24-30-202(1)**. This contract shall not be valid until it has been approved by the Colorado State Controller or designee.

**2. FUND AVAILABILITY**. **CRS §24-30-202(5.5)**. Financial obligations of the State payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available.

**3. GOVERNMENTAL IMMUNITY**. No term or condition of this contract shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protections, or other provisions, of the Colorado Governmental Immunity Act, CRS §24-10-101 et seq., or the Federal Tort Claims Act, 28 U.S.C. §§1346(b) and 2671 et seq., as applicable now or hereafter amended.

**4. INDEPENDENT CONTRACTOR**. Contractor shall perform its duties hereunder as an independent contractor and not as an employee. Neither Contractor nor any agent or employee of Contractor shall be deemed to be an agent or employee of the State. Contractor and its employees and agents are not entitled to unemployment insurance or workers compensation benefits through the State and the State shall not pay for or otherwise provide such coverage for Contractor or any of its agents or employees. Unemployment insurance benefits will be available to Contractor and its employees and agents only if such coverage is made available by Contractor or a third party. Contractor shall pay when due all applicable employment taxes and income taxes and local head taxes incurred pursuant to this contract. Contractor shall not have authorization, express or implied, to bind the State to any agreement, liability or understanding, except as expressly set forth herein. Contractor shall **(a)** provide and keep in force workers' compensation and unemployment compensation insurance in the amounts required by law, **(b)** provide proof thereof when requested by the State, and **(c)** be solely responsible for its acts and those of its employees and agents.

**5. COMPLIANCE WITH LAW**. Contractor shall strictly comply with all applicable federal and State laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

**6. CHOICE OF LAW**. Colorado law, and rules and regulations issued pursuant thereto, shall be applied in the interpretation, execution, and enforcement of this contract. Any provision included or incorporated herein by reference which conflicts with said laws, rules, and regulations shall be null and void. Any provision incorporated herein by reference which purports to negate this or any other Special Provision in whole or in part shall not be valid or enforceable or available in any action at law, whether by way of complaint, defense, or otherwise. Any provision rendered null and void by the operation of this provision shall not invalidate the remainder of this contract, to the extent capable of execution.

**7. BINDING ARBITRATION PROHIBITED.** The State of Colorado does not agree to binding arbitration by any extra-judicial body or person. Any provision to the contrary in this contact or incorporated herein by reference shall be null and void.

**8. SOFTWARE PIRACY PROHIBITION. Governor's Executive Order D 002 00**. State or other public funds payable under this contract shall not be used for the acquisition, operation, or maintenance of computer software in violation of federal copyright laws or applicable licensing restrictions. Contractor hereby certifies and warrants that, during the term of this contract and any extensions, Contractor has and shall maintain in place appropriate systems and controls to prevent such improper use of public funds. If the State determines that Contractor is in violation of this provision, the State may exercise any remedy available at law or in equity or under this contract, including, without limitation, immediate termination of this contract and any remedy consistent with federal copyright laws or applicable licensing restrictions.

**9. EMPLOYEE FINANCIAL INTEREST/CONFLICT OF INTEREST**. **CRS §§24-18-201 and 24-50-507**. The signatories aver that to their knowledge, no employee of the State has any personal or beneficial interest whatsoever in the service or property described in this contract. Contractor has no interest and shall not acquire any interest, direct or indirect, that would conflict

in any manner or degree with the performance of Contractor's services and Contractor shall not employ any person having such known interests.

**10. VENDOR OFFSET. CRS §§24-30-202 (1) and 24-30-202.4**. [***Not Applicable to intergovernmental agreements***] Subject to CRS §24-30-202.4 (3.5), the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: **(a)** unpaid child support debts or child support arrearages; **(b)** unpaid balances of tax, accrued interest, or other charges specified in CRS §39-21-101, et seq.; **(c)** unpaid loans due to the Student Loan Division of the Department of Higher Education; **(d)** amounts required to be paid to the Unemployment Compensation Fund; and **(e)** other unpaid debts owing to the State as a result of final agency determination or judicial action.

**11. PUBLIC CONTRACTS FOR SERVICES. CRS §8-17.5-101**. [***Not Applicable to agreements relating to the offer, issuance, or sale of securities, investment advisory services or fund management services, sponsored projects, intergovernmental agreements, or information technology services or products and services***] Contractor certifies, warrants, and agrees that it does not knowingly employ or contract with an illegal alien who will perform work under this contract and will confirm the employment eligibility of all employees who are newly hired for employment in the United States to perform work under this contract, through participation in the E-Verify Program or the Department program established pursuant to CRS §8-17.5-102(5)(c), Contractor shall not knowingly employ or contract with an illegal alien to perform work under this contract or enter into a contract with a subcontractor that fails to certify to Contractor that the subcontractor shall not knowingly employ or contract with an illegal alien to perform work under this contract. Contractor **(a)** shall not use E-Verify Program or Department program procedures to undertake pre-employment screening of job applicants while this contract is being performed, **(b)** shall notify the subcontractor and the contracting State agency within three days if Contractor has actual knowledge that a subcontractor is employing or contracting with an illegal alien for work under this contract, **(c)** shall terminate the subcontract if a subcontractor does not stop employing or contracting with the illegal alien within three days of receiving the notice, and **(d)** shall comply with reasonable requests made in the course of an investigation, undertaken pursuant to CRS §8-17.5-102(5), by the Colorado Department of Labor and Employment. If Contractor participates in the Department program, Contractor shall deliver to the contracting State agency, Institution of Higher Education or political subdivision a written, notarized affirmation, affirming that Contractor has examined the legal work status of such employee, and shall comply with all of the other requirements of the Department program. If Contractor fails to comply with any requirement of this provision or CRS §8-17.5-101 et seq., the contracting State agency, institution of higher education or political subdivision may terminate this contract for breach and, if so terminated, Contractor shall be liable for damages.

**12. PUBLIC CONTRACTS WITH NATURAL PERSONS. CRS §24-76.5-101.**
Contractor, if a natural person eighteen (18) years of age or older, hereby swears and affirms under penalty of perjury that he or she **(a)** is a citizen or otherwise lawfully present in the United States pursuant to federal law, **(b)** shall comply with the provisions of CRS §24-76.5-101 et seq., and **(c)** has produced one form of identification required by CRS §24-76.5-103 prior to the effective date of this contract.

Revised 1-1-09

Contract Routing Number 09 IKA _____

## THE PARTIES HERETO HAVE EXECUTED THIS CONTRACT

*** Persons signing for Contractor hereby swear and affirm that they are authorized to act on Contractor's behalf and acknowledge that the State is relying on their representations to that effect.**

| | |
|---|---|
| **CONTRACTOR**<br>**Legal Name of Contractor**<br>By: Name of Authorized Individual<br>Title: Official Title of Authorized Individual<br><br>______________________________<br>*Signature<br><br>Date: ______________________ | **STATE OF COLORADO**<br>**Bill Ritter, Jr. GOVERNOR**<br>Department of Human Services<br>Karen L. Beye, Executive Director<br><br>______________________________<br>By: Name & Title of Person Signing for Agency<br><br>Date: ______________________ |
| 2nd Contractor Signature if Needed<br>By: Name of Authorized Individual<br>Title: Official Title of Authorized Individual<br><br>______________________________<br>*Signature<br><br>Date: ______________________ | **LEGAL REVIEW**<br>John W. Suthers, Attorney General<br><br>By:______________________________<br>Signature - Assistant Attorney General<br><br>Date: ______________________ |

## ALL CONTRACTS REQUIRE APPROVAL by the STATE CONTROLLER

**CRS §24-30-202 requires the State Controller to approve all State Contracts. This Contract is not valid until signed and dated below by the State Controller or delegate. Contractor is not authorized to begin performance until such time. If Contractor begins performing prior thereto, the State of Colorado is not obligated to pay Contractor for such performance or for any goods and/or services provided hereunder.**

**STATE CONTROLLER**

**David J. McDermott, CPA**

**By:** ______________________________

Richard G. Taylor

**Date:**______________________

# PROCUREMENT

SB 94 Procurement Methods Available Through to the Colorado Department of Human Services:

The following method is exempt from the Colorado Procurement Code and Rules.

The local JSPC may select government agencies as the contractors. The Colorado Procurement Code does not apply to intergovernmental transactions per CRS 24-101-105 (1) and a solicitation process [State issued Request for Proposals (RFP) or Documented Quote (DQ)] is not required in selecting the contractor. Some examples of intergovernmental transactions are:

A. A contract between the Colorado Department of Human Services and the State Judicial Branch-Per R-24-101-105-01 (b), the Procurement Code and Rules are not applicable to procurements made by the Judicial Branch of State government. The Judicial Branch is therefore not required to conduct a solicitation process to select contractors or subcontractors.

B. A contract between the Colorado Department of Human Services and a Political Subdivision or other governmental entity-

   Examples of Political Subdivisions include, but are not limited to the following: local city and county governments, local school districts and other municipal facilities. CDHS may award a contract to a Political Subdivision without the benefit of a solicitation. The selection of any subcontractors by the Political Subdivision is not subject to a State solicitation process. (The subcontractor selection method may be governed by statutes, procedures and policies applicable to the particular Political Subdivision. It is the responsibility of the Political Subdivision to ensure that an appropriate process is utilized.)

The following methods are subject to the Colorado Procurement Code and Rules:

A. Even if a contract is not awarded to a Political Subdivision, the local JSPC may elect to select contractors through a solicitation published by the procurement office of a local city or county government and issued as a cooperative procurement. Per 24-110-201 (1) C.R.S., any public procurement unit can conduct a cooperative purchasing

agreement with any other public procurement unit. A local city or county government could therefore issue an RFP in cooperation with DHS. To be in compliance, a DHS Procurement Office should review the solicitation beforehand, notify vendors about the cooperative procurement by publishing a notice about the solicitation on the Colorado BIDS System and review the final award recommendation.

B. If the total amount for all years of the contract is less than $150,000, a contractor may be selected through a State DQ process, which would be done through the Colorado Department of Human Services, District Procurement Office. The DQ process is relatively informal compared to the RFP process and does not involve lengthy timelines.

C. If the total amount for all years of the contract is over $150,000, contractors may be selected through a State RFP process to be conducted a minimum of once every five years. The local JSPC and the Division of Youth Corrections would conduct an RFP process through the appropriate Colorado Department of Human Services, District Procurement Office.

If adequate justification can be demonstrated that only one contractor is capable of providing the required service for an area, a sole source provider may be selected, and the procurement would not require a State RFP or DQ process. Unless there is a special reason not to, the District Procurement Office will post a sole source notification on the BIDS system for a minimum of three business days. Only the Procurement Director of the Colorado Department of Human Services or designee in the District Procurement Office has the authority to approve a sole source vendor selection. The State of Colorado Sole Source Justification Form would need to be submitted annually for approval, unless a longer term can be justified.

**Procurement Process:**
The SB 94 Statewide Coordinator, DYC Regional Director, and CDHS procurement office will assist districts in developing a Request for Proposals.

# INTERSTATE COMPACT

Interstate Compact for Juveniles is administered through the Division of Youth Corrections. Interstate compact manages the process by which youth who are arrested in Colorado, but have out of state warrants, are returned to the state with jurisdiction. Interstate Compact also manages the process of returning youth to Colorado.

Juveniles who are arrested and detained in Colorado with an out of state warrant will need to have their extradition paperwork filed through the interstate compact office.

Juveniles who are arrested and detained in Colorado shall be considered held under the arresting judicial district's detention bed allocation.

The Division of Youth Corrections Interstate Compact office can be reached by calling (303) 866-7690.

The Division of Youth Corrections Interstate Compact office offers interstate compact training for SB 94 when requested.

Interstate Compact forms can be found on the internet at http://ajca.us/.

# ACRONYMS & COMMONLY USED TERMS

**ABC:** **Access** Behavioral Care

**ACSES:** Automated Child Support Enforcement System (pronounced ay-sis). ACSES provides automated support for the delivery of child support collections to families. It supports child support workers in the 64 county child support units with establishment, enforcement, location, monitoring and other duties necessary for them to perform their jobs.

**ADA:** Average Daily Attendance. In Regional Centers for persons with developmental disabilities and the Mental Health Institutes, ADA means the average number of people served daily over a one-year period of time. This is also an acronym for the Americans with Disabilities Act.

**ADAD:** Alcohol and Drug Abuse Division. This division of the Office of Behavioral Health and Housing Services develops and supports comprehensive services to reduce substance abuse.

**ADAPT:** American Drug Abuse Prevention Team

**ADC:** Alternative Defense Counsel

**ADDS:** Alcohol and Drug Driving Safety Program. ADDS provides programs in judicial districts for probation clients, and is financed by fees collected from persons convicted of Driving under the Influence (DUI) of alcohol or other substances.

**ADP:** Average Daily Population. ADP refers to a population measurement used by the Division of Youth Corrections. ADP is calculated by summing the number of on-grounds minutes for all youth in a facility during a given time period and dividing this sum by the number of minutes in the time period.

**AFC:** Adult Foster Care. AFC provides residential care with supervision for client medications. While these services are not as extensive as those rendered in a nursing home, they represent an important component of a "continuum" of long-term care. The AFC program is not a Medicaid program or service; however, many Adult Foster Care eligible are also Medicaid-eligible. The Department of Health Care Policy and Financing (HCP&F) administers this program.

**AFCARS:** Adoption and Foster Care Analysis Reporting System. Federal rules issued in 1993 mandate national data collection on children by the State agency responsible for child welfare and youth services clients.

**AFDC:** Aid to Families with Dependent Children. The AFDC program was a joint federal/state program designed to provide financial benefits to dependent children and their caretaker relatives in an amount determined sufficient to meet basic needs for a temporary time period. The AFDC program was replaced in 1996 by the enactment of the federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104 -193).

**Aging Out:** Term used in reference to people with developmental disabilities who reach the age of 21 and are no longer eligible for services from the public schools or the child welfare system.

**ALOS:** Average Length of Stay – A measurement used within the Division of Youth Corrections and the Mental Health Institutes. ALOS refers to the average amount of time spent in a program per youth over a specified timeframe. ALOS may be calculated based on hours, days, or months, dependent on the program requirements.

**AMVT:** Aggravated Motor Vehicle Theft

**AND-CS:** Aid to the Needy Disabled - Colorado Supplement. The AND-CS program provides financial benefits to individuals who also receive SSI payments and whose medically determined disability precludes securing or retaining employment for at least twelve months.

**AND-SO:** Aid to the Needy Disabled - State Only. The AND-SO program provides financial benefits to individuals whose medically determined disability precludes them from securing or retaining employment for a period of at least six months.

**ART:** Aggression Repression Therapy

**ASAP:** As soon as possible

**ASSETS:** 40 Development Assets

**Assistive Technology/ Adaptive Equipment:** Items or pieces of equipment that are used to increase, maintain, and/or improve the functional capabilities of individuals with disabilities.

**ATOD:** Alcohol, Tobacco & Other Drugs

**BA:** Breath Analysis

**BA:** Blood Alcohol Content

**BHO:** Behavioral Health Organization. These contractual agencies operate the Colorado Medicaid Mental Health Capitation and Managed Care Program. These agencies provide a wider array of Medicaid-reimbursable mental health services than are available through the Medicaid fee-for-service program, at a lower cost to the state.

**BI:** Bodily injury

**BOCC:** Grand County Board of County Commissioners

**CAB:** Community Accountability Board

**CAC:** Certified Addiction Counselors. CACs are individuals certified by ADAD to provide alcohol and drug abuse treatment services.

**CATC:** Child and Adolescent Treatment Center. Serves children and adolescents ages 17 and under at the Mental Health Institutes.

**CASA:** Court Appointed Special Advocate

**CBMS:** Colorado Benefits Management System. This information system replaces several existing CDHS data systems which support the distribution of assistance payments, medical and food stamp benefits.

**CCCAP:** Colorado Child Care Assistance Program. CCCAP is the name given to the collection of Child Care programs located within the Division of Child Care Services in the Department of Human Services.

**CCW:** Carrying a Concealed Weapon

**CDE:** Colorado Department of Education

**CDHCP&F (Pronounced hick-puff):** Colorado Department of Health Care Policy and Financing. Formed 7-1-94.

**CDHS:** Colorado Department of Human Services. Formed 7-1-94.

**CDPHE:** Colorado Department of Public Health and Environment. Formed 7-1-94.

**CDPS:** Colorado Department of Public Safety

**CET:** Grand County Community Evaluation Team

**CFR:** Code of Federal Regulations

**CHRP:** Children's Habilitation Residential Program Waiver. A Medicaid-financed waiver program which provides residential care and treatment for children with developmental disabilities placed through child welfare services of the county departments of social services.

**CIC or CIP:** Court Improvement Committee or Project

**CJRA:** Colorado Juvenile Risk Assessment

**CMHC:** Community Mental Health Center. Organizations, defined in statute that deliver comprehensive mental health services for seriously mentally ill persons of all ages. CDHS Mental Health Services unit currently contracts with 17 CMHCs located throughout Colorado, as well as with six specialty clinics which provide more limited services than the CMHCs.

**CMHIFL:** Colorado Mental Health Institute at Fort Logan. Provides inpatient psychiatric treatment to residents of the Denver metropolitan area, as well as some patients from the north central and northeastern areas of the State. Additionally, the Institute operates a licensed Residential Treatment Center to provide comprehensive residential treatment for older children and adolescents with serious psychiatric and behavioral problems. The Institutes receives referrals statewide for children 10 years of age and younger. CMHIFL is organizationally located as part of CDHS' Office of Behavioral Health and Housing.

**CMHIP:** Colorado Mental Health Institute at Pueblo. Provides inpatient psychiatric services seriously mentally ill clients in the southern and western regions of Colorado and certain patients from the north central and northeastern areas of the State. The State Institute for Forensic Psychiatry and an acute care General Hospital, also located at the Institute receive referrals statewide. CMHIP is organizationally located as part of CDHS' Office of Behavioral Health and Housing.

**CMI:** Chronically mentally ill clients. These are individuals who suffer from mental illnesses such as schizophrenia, bipolar disorder, and severe depression, which seriously impair their ability to be self-sufficient.

**CM:** Case Manager

**COFRS:** Colorado Financing and Reporting System. Refers to the statewide government automatic accounting system.

**COLA:** Cost of Living Adjustment. Refers to increases in program costs associated with inflation.

**COWD:** Colorado Office of Workforce Development. Entity in the Department of Local Affairs responsible for oversight of training and employment programs for Colorado citizens that are generally operated through local Workforce Centers.

**CPA:** Child Placement Agency. An entity that places or arranges to place a child under 18 in the care of an institution, family or person unrelated to the child.

**CPCC:** Crime Prevention and Control Commission

**CRCP:** Central Registry for Child Protection. Legal name for the Child Abuse Registry which is an information system mandated by State statute that tracks all confirmed incidents of child abuse and neglect in Colorado.

**CRS:** Colorado Revised Statutes

**CRSP:** Colorado Refugee Services Program. CRSP administers federal formula and competitive grants and coordinates programs that serve refugees who arrive in Colorado annually, as well as the needy members of the residual refugee population.

**CSE:** Child Support Enforcement. The CSE program was established by federal and State law to locate parents and to obtain from them financial and medical support for their children. The State Division of CSE is part of the CDHS Office of Self-Sufficiency. It supervises the administration and operation of 64 county CSE units, which provide the following services: locate parents and their assets; establish paternity; establish and modify child and medical support orders; enforce child support orders; collect child support payments; and enforce medical support orders.

**CSLA:** Community Supported Living Arrangements. CSLA is a Medicaid program for adults with developmental disabilities which were implemented in FY 1993. This program provides the supports necessary to allow individuals to live on their own. It links services and supports provided through the DD system with other generic community services so that these adults, who remain responsible for their own living arrangements, have the necessary supports to be included in typical community life.

**CSP:** Colorado State Patrol

**CWP:** Colorado Works Program. This program is designed to provide assistance to needy families with or expecting children and to provide parents with job preparation, work and support services to enable them to leave public assistance programs and become self-sufficient.

**CYF:** Children, Youth and Families.

**CYO/LSI:** Colorado Youth Offender Level of Supervision Inventory

**DA**: District Attorney (or Assistant District Attorney)

**DAAP:** Domestic Abuse Assistance Program. A program established in the Department of Human Services in 1983 to administer the Domestic Abuse Program Fund. This program provides funding for local programs statewide to serve victims of domestic violence and their families.

**DBT:** Dialectical Behavioral Therapy

**DCP:** Denver Collaborative Partnership

**DCJ:** Colorado Dept. of Public Safety, Division of Criminal Justice

**DD:** Developmental Disability or Disabilities. A disability manifested before a person reaches age 22 that constitutes a substantial handicap and is attributable to mental retardation or related conditions.

**DDD:** Division for Developmental Disabilities. This unit is part of CDHS' Office of Health and Rehabilitation. DDS is responsible for managing State-funded services and supports for persons with developmental disabilities.

**DDS:** Disability Determination Services. Formerly a part of Vocational Rehabilitation, DDS is now a separate division of the CDHS Office of Self-Sufficiency. DDS makes medical disability decisions for Colorado residents who apply for benefits under the federal SSDI and SSI programs.

**DHS or DDHS:** Department of Human Services

**DI:** Deinstitutionalization. DI refers to the ongoing effort to help people move from institutional settings (e.g., Regional Centers, Mental Health Institutes, or nursing homes) to community living.

**DMC:** Disproportionate Minority Confinement

**D & N**: Dependency and Neglect Case

**DOC:** Department of Corrections

**DOLE:** Colorado Department of Labor and Employment.

**DPD:** Denver Police Department

**DPS:** Denver Public School(s)

**DSS**: Grand County Department of Social Services

**Dually Diagnosed**: Individuals who have more than one diagnosis or disability, for example, people with both a developmental disability and a mental health diagnosis, or individuals who have both a substance abuse problem and a mental health diagnosis.

**DV**: Domestic Violence

**DYC:** Division of Youth Corrections, formerly known as the Office of Youth Services (OYS). This CDHS Division is responsible for management and oversight of State-operated and privately contracted residential facilities, and for community alternative programs that serve and treat youth aged 10-21 years who have demonstrated delinquent behavior.

**DUI:** Driving Under the Influence. Refers to the court sentence imposed on drivers convicted of driving vehicles under the influence of alcohol or other substances.

**DVR:** Division of Vocational Rehabilitation. DVR assists people who have disabilities to attain a level of functioning that will enable them to enter, reenter, or maintain employment and/or live independently.

**DWIA:** Driving With Impaired Ability

**EB:** Evidence Based

**EHM:** Electronic Home Monitoring

**EPP:** Expedited Permanency Planning. Sets expedited timeframes for adjudicatory, dispositional and permanency hearings when a child on the petition is less than 6 years old.

**ER**: Emergency or Emergency Release

**ETOH**: Alcohol

**FAC:** Family Agency Collaboration

**FC:** Foster Care. Generally means out of home placement of children for reasons of abuse and neglect or delinquency. More specifically, means placement in family settings as opposed to residential settings, but is sometimes used for any out-of-home placement. While serving this population under Medicaid is a state option, Colorado Statute requires that health care services be provided to this group.

**FCC:** Family Crisis Center

**FCT:** Foster Care Transition. Refers to the movement of young adults with developmental disabilities from Child Welfare services to DD services when they reach age 21 and, thereby, "age out" of Child Welfare services.

**FFT:** Functional Family Therapy

**FIDC:** Family Integrated Drug Court

**FOP:** Female Offender Program

**FP/FS:** Family Preservation and Family Support. This program provides funding and technical assistance to selected communities for the development of early intervention/prevention services that strengthen families and alleviate the need for Child Welfare intervention.

**FSR:** Family Support Registry. FSR is the central child support enforcement payment receiving and disbursement center. Over $300 million in child support payments are received and subsequently disbursed to approximately 125,000 families annually.

**FSSP:** Family Support Services Program. Within the DD service delivery system, this program provides in-home supports to families who have a dependent with DD in order to have that dependent remain at home.

**FTA:** Failure to Appear

**FY**: Fiscal Year

**GCC**: Secure detention facility in Rife, Griffith Centers for Children – West

**GCJSD**: Grand County Juvenile Services Dept.

**GMYSC**: Secure detention facility in Grand Junction, Grand Mesa Youth Services Center

**GPS**: Global Positioning System

**GRASP:** Gang Rescue and Support Project

**HB1255:** House Bill 1255: Permancy Planning

**HHS:** Health and Human Services. Federal agency that provides oversight and funding for many CDHS programs and services.

**High Need Individuals:** Individuals with developmental disabilities who have very intensive service needs. They may have multiple disabilities, medically intensive conditions, or present challenging behaviors. The higher cost of providing services for these individuals includes higher staff: client requirements, specialized professional staffing requirements, and specialized medical expenses and/or adaptive equipment.

**HSS**: Hot Sulphur Springs

**Hx**: History of…

**ICF/MR Conditions of Participation:** Refers to the eight specific conditions that must be met in order to qualify for funding under the Medicaid program (Title XIX).

**ICPC:** Interstate Compact for the Placement of Children. Establishes guidelines that must be adhered to when placing a child in an out-of-state placement.

**ICWA:** Indian Child Welfare Act. Requires specific procedures in cases where a child is eligible for membership in a Native American tribe.

**IEP:** Individualized Education Plan (sometimes referred to as SIEP)

**IGA**: Intergovernmental Agreement

**ILP**: Individualized Literacy Plan

**IRT:** Intensive Residential Treatment. A type of treatment for alcohol/drug clients which involves a residential stay averaging 21 days combined with intensive, daily therapy.

**ISP**: Intensive Supervision Probation

**JAC:** Juvenile Assessment Center

**JAIBG (commonly pronounced Jay-big):** Federal funding through the Juvenile Accountability Incentive Block Grant given to law enforcement agencies to address delinquency and youth offenders. Violations of the Juvenile Justice Delinquency Prevention Act (when juveniles are improperly detained in secure detention) may reduce the funding that the state and local jurisdictions receive through this source.

**JD**: Juvenile Delinquency case or Judicial District

**JDSAG**: State of Colorado Juvenile Detention Screening and Assessment Guide

**JIS:** Juvenile Information Sharing

**JISP:** Juvenile Intensive Supervision Probation

**JJDPA**: United States Juvenile Justice & Delinquency Prevention Act of 1974

**JSPC**: Juvenile Services Planning Commission

**JTHF**: Juvenile Temporary Holding Facility

**LEAP:** Low-Income Energy Assistance Program. LEAP provides cash assistance to help low-income households meet the costs of winter home heating. Funding for LEAP is 100% federal.

**LRE**: Least Restrictive Environment

**MAYSI:** Massachusetts Youth Screening Instrument

**MC:** Minor Child

**MH:** Mental Health

**MHCD:** Mental Health Center of Denver

**MHI:** Mental Health Institutes. The Colorado Mental Health Institutes at Pueblo and Fort Logan that serve predominately Medicaid, forensics and indigent Colorado residents with serious mental illness. The Institutes are under the direction of the CDHS Office of Behavioral Health and Housing.

**MHS:** Mental Health Services. This unit of the CDHS Office of Behavioral Health and Housing provides policy oversight and program monitoring for the integrated public mental health system, which delivers statewide services for mentally ill persons of all ages who meet service criteria.

**MIP**: Minor in Possession (of alcohol)

**MOE:** Maintenance of Effort. This term usually refers to the level of State financial participation required to continue to receive federal grant dollars.

**MOR:** Minority Over-Representation

**MOU**: Memorandum of Understanding

**MST:** Multi-Systemic Therapy

**MSW:** Minimum Support Waiver. This program provides community-based services to persons with developmental disabilities who are eligible under the Intermediate Care Facility for the Mentally Retarded (ICF/MR) screen.

**MVT:** Motor Vehicle Theft

**NAPI:** National Aging Program Information System. A national reporting system which gathers data from programs funded by the Older Americans Act.

**NSCD**: National Sports Center for the Disabled

**OCFS:** Office of Children, Youth and Families.

**OCR:** Office of Child's Representative which oversees contracts with and training for attorneys who ach as Guardians as Litem

**OJJDP:** Office of Juvenile Justice & Delinquency Prevention

**OPPLA:** Other Permanent Planned Living Arrangement (permanency goal not favored by the feds)

**PC**: Probable Cause

**PCS:** Possession of Controlled Substance

**PD**: Police Dept.

**PO:** Parole Officer/Probation Officer

**P & P**: Policies and Procedures

**PPH:** Permanency planning hearing

**PPP:** Preliminary Protective Proceeding. D&N hearing to determine if child will be removed from the home or reunified with parent/guardian if the child has already been removed from the home.

**PR**: Personal Recognizance

**PRP**: Pre-ajudication Release Plan

**PRTF:** Psychiatric Residential Treatment Facility

**PSI:** Pre-sentence Investigation

**PYS:** Paramount Youth Services

**RCCF:** Residential Child Care Facility. RCCFs are facilities licensed to provide 24-hour group care and treatment for five or more children with behavioral problems.

**RFI:** Request for Information. RFI is used to obtain preliminary information about a market, type of available service or a product when there is not enough information readily available. The RFI must clearly state that no award will result.

**RFP:** Request for Proposal. RFP is a process used in acquiring services or merchandise when factors other than cost need to be evaluated in selecting a contractor.

**ROP:** Rites of Passage

**RPC:** Respondent Parent's Counsel

**RTCs:** Residential Treatment Centers. RTCs are licensed RCCFs that provide care and Medicaid-funded mental health treatment for children and youth with mental health diagnoses. Terminology no longer used.

**Rx**: Prescription

**S/A or SA**: Sexual Assault

**SACWIS:** State Automated Child Welfare Information System. SACWIS is used to provide automated case management reporting tools to child welfare, juvenile justice, Medicaid, Child Support and child care programs on statewide basis.

**SAMHSA:** Substance Abuse and Mental Health Services Administration.

**SARB:** School Attendance Review Board

**SB 94 Senate Bill 91-94:** Refers to the locally-based DYC programs, established by Senate Bill 91-94 (SB 94), that care for delinquent youth in their own communities.

**SBI**: Serious Bodily Injury

**SJS**: Specialized Juvenile Supervision

**SO**: Grand County Sheriff's Office

**SO:** Sex Offender

**SOMB:** Sex Offender Management Board

**SRO:** School Resource Officer

**SSA:** Social Security Act or Administration. The SSA is the set of Federal Laws, Titles I through XX, enacted by Congress to establish a system of Federal old-age benefits and to enable the states to make more adequate provision for aged persons, blind persons, dependent children, maternal and child welfare, and public health. Also, "SSA" may refer to the Federal agency responsible for administering the Social Security Act.

**SSDI:** Social Security Disability Insurance. SSDI payments are made under provisions of Title II of the Social Security Act to eligible individuals who are unable to engage in a substantial gainful activity due to a physical or mental disability.

**SSI:** Supplemental Security Income. SSI payments are made under provisions of Title XVI of the Social Security Act to eligible individuals 65 years of age and over; eligible individuals who are blind; and eligible individuals 18 years of age and over who are permanently and totally disabled.

**STIRRT:** Short-term Intensive Residential Remediation Treatment. This program, which is managed by the Alcohol and Drug Abuse Division, treats clients who have substance abuse problems and are at risk of incarceration.

**SUS:** Substance Use Survey

**TANF:** Temporary Assistance for Needy Families. TANF is the federal program established by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193) which replaced the AFDC, JOBS and Emergency Assistance programs.

**TASC:** Treatment Alternatives to Street Crime. TASC is a federal program which provides funding for community programs to assist system involved juveniles and families focusing on substance abuse and co-occurring diagnosis.

**TBI:** Traumatic Brain Injury. TBI is defined as damage to the brain caused by external physical force, including acceleration/deceleration injuries. This does not include brain injury caused by a congenital causation, degenerative diseases, surgical interventions or anoxia.

**TC:** Therapeutic Community

**TDM:** Team Decision-making Meeting

**THF**: Temporary Holding Facility

**Title IV-A:** Title IV-A of the Social Security Act. Refers to the Temporary Assistance for Needy Families Program.

**Title IV-B:** Title IV-B of the Social Security Act. Refers to the Child Welfare Services Program.

**Title IV-D:** Title IV-D of the Social Security Act. Refers to the Child Support Enforcement Program.

**Title IV-E:** Title IV-E of the Social Security Act. Refers to the Foster Care and Adoption Assistance Program.

**Title IV-F:** Title IV-F of the Social Security Act. Refers to the Job Opportunities and Basic Skills Program.

**Title XVIII:** Title XVIII of the Social Security Act. Refers to Medicare. This program funds health insurance for the aged and disabled.

**Title XIX:** Title XIX of the Social Security Act. Refers to Medicaid.

**Title XX:** Title XX of the Social Security Act. Refers to Social Services other than those included in the other Titles of the Social Security Act. This title is also referred to as the Social Services Block Grant.

**TPR:** Termination of parental rights

**TRCCF:** Therapeutic Residential Child Care Facility

**Tx**: Treatment

**UA:** Urine Analysis

**UPS**: Useful Public Service

**USC**: United States Code

**YDC:** Youth Development (Drug) Court

**YOS:** Youthful Offender System

# JUVENILE JUSTICE TERMS AND DEFINITIONS

**Absconding from Court Ordered Conditions:** This refers to when the youth leaves the place in which he or she has been court-ordered to reside or the services he or she has been court-ordered to receive, without permission. Absconding from court ordered conditions is a violation of court conditions.

**Actual Placement**: This is the location in which the youth is placed after the Initial Screening (see **Initial Screening**).

**Adjudication/ Adjudicatory:** The judicial hearing wherein guilt or innocence is determined either by the child's admission of by trial to a court or jury in the juvenile justice system, adjudication is the same as a conviction. It is a finding of guilt by the court (see **Conviction**).

**Adult:** A person eighteen (18) years of age or over, except when the Court's jurisdiction continues past the eighteenth birthday, in which case the term "child" shall still apply.

**Advisement:** A court procedure formally advising the accused of certain statutory and constitutional rights. The advisement is delivered during the first appearance in court.

**Advisement of Rights:** 1.) A court procedure formally advising a person of certain statutory and constitutional rights. Such advisement must be given at the first appearance in court. 2.) A set of warnings which must be given to a person upon arrest (see **Miranda Warning**).

**Aggravating Factors:** (see also **Mitigating Factors**): Aggravating factors are characteristics of the youth or his or her situation that suggests he or she may need to be placed in a higher level of security. These factors include prior offenses, weapons use, the terrible nature of the crime, or threats to victims or witnesses.

**Allege:** To assert to be true without proving.

**Appearance:** The formal proceeding by which an offender presents him or herself to the jurisdiction of the court.

**Apprehend:** To arrest, take into custody, or seize a person on a criminal charge.

**Arraignment:** A court hearing where the accused is brought before the court to plead to the criminal charge in the indictment or information. The accused is advised of the charges pending against him or her, as well as his or her constitutional rights to have a lawyer and a trial.

**Arrest:** An arrest refers to any time a youth is taken into police custody. Note this does not include mere police contact with the youth.

**Arson:** Arson is the act of setting fire to a property.

**Assessment:** This is the second stage involved in completion of the Juvenile Detention Screening and Assessment Guide (JDSAG). The Assessment consists of verifying the information completed during the Initial Screening and is used in the decision making process at the detention hearing (see **Screening guide** and **Initial screening**).

**Assaultive Offense against Persons:** This term includes those crimes that involve an assault of another person. They include assault (1st, 2nd, and 3rd degree), vehicular assault, menacing, criminal extortion, aggravated extortion, reckless endangerment, and any assault against an elderly person or person with a disability (Source: CRS 18-3-201).

**At-risk Adult:** An at-risk adult is any person who is sixty (60) years of age or older or any person who is eighteen (18) years of age or older and is a person with a disability (Source: CRS: 18-6.5-102; see P**erson with a Disability**).

**At-risk Juvenile:** An at-risk juvenile is any person under the age of eighteen (18) who has a disability (Source: CRS 18-6.5-102; see P**erson with a Disability**).

**Bail:** Security, in the form of money or property, deposited with the court to insure the appearance of the accused at a future time and place (see **Bond**).

**Bail Bond:** An obligation signed by the accused, with sureties to secure his or her appearance in court.

**Bench Warrant:** Process issued by the court itself, or "from the bench," for the apprehension or arrest of a person.

**Bond:** A type of security required by the court before an offender is released from custody. An accused may be released on his or her own promise (personal recognizance), by having a licensed bondsman post an agreement to pay a certain amount (bond) by personally depositing money in cash (bail), or by encumbering property (property bond). The court may allow the amount of bail posted in cash to be a percentage of the total amount of bail set; however, in the event of default, the entire amount of bail set is forfeited and becomes due to the state.

**Bond Condition Violations:** This is a violation of conditions that the youth must carry out before the adjudication hearing. These include violations of the periodic telephone communications, office visits, home visits, mental health and substance abuse services, domestic violence or child abuse counseling, electronic monitoring, work release, or day reporting, and day treatment (Source: 19-2-302 [4], C.R.S.).

**Bond, Personal Recognizance (PR Bond):** An obligation of record entered into before a court requiring the performance of an act such as appearing in court as instructed or penalty of money forfeiture (Webster's 7th New Collegiate Dictionary).

**CCIC:** Colorado Crime Information Center

**Change of Venue:** The removal of a suite begun in one county or district, to another, for trial, or from one court to another in the same county or district.

**Charge:** The charge is the specific offense the youth is accused of committing.

**Child:** Any person under eighteen (18) years of age (Statutory Definition).

**Colorado Children's Code:** Title 19, Colorado revised statute. This code sets forth the definitions, jurisdiction, procedures, and powers in juvenile cases.

**Complaint and Summons:** The formal charge, which initiates a criminal proceeding in a court. It must contain the name of the defendant, the offense, and statute number, and direct the defendant to appear before a specified court at a given date, time, and location.

**Contempt of Court:** This occurs when a youth does not obey an order of the court, such as releases conditions. When the youth is released home prior to a court appearance, the youth and the parent or other responsible adult are required to sign a written promise to bring the youth to court at a set time. If the youth fails to appear, the youth and the parent or guardian may be found in contempt of court and subject to penalties (Source: CRS 19-2-302; see **Release Conditions** and **Responsible Adult**).

**Conviction:** A conviction occurs when the judge or court decides that the youth is guilty of a crime (see **Adjudication**).

**Court Finding:** These include court orders for evaluations and service referrals. They do not include orders regarding level of placement (see **Level of Placement**).

**Crime:** A crime is an offense that is serious enough to deserve imprisonment as part of the punishment. Crimes are defined by Congress and state lawmakers.

**Crime against Persons:** This includes any felony or misdemeanor crime directly committed against a person. These include manslaughter, murder, vehicular homicide, criminally, negligent homicide, assaults, menacing, criminal extortion, reckless endangerment, kidnapping, enticement, and unlawful sexual behavior (Source: CRS 18-3-201; see **Felony** and **Misdemeanor**).

**Crime of Violence:** If a youth commits a crime of violence, he or she usually goes to a secure detention. Crimes of violence include: any crime against an at-risk adult or at-risk juvenile, murder, first or second degree assault, kidnapping, sexual assault, aggravated robbery, first degree arson, first degree burglary, escape, and criminal extortion. This may also include felony unlawful sexual offenses (Source: CRS 16-11-309; see **Secure Detention**, **At-risk Adult**, **At-risk Juvenile**, and **Sex Offense**).

**Cultural Sensitivity:** To be culturally sensitive means to be aware of the cultural factors that may impact the interviewer in assessing the youth's situation and the youth's responses in the interview. Cultural variables include: ethnic background, language, economic status, gender, sexual orientation, and other non-obvious differences between the screener and the youth.

**Custody of Social Services:** To be in custody of Social Services means that legal authority for the youth has been transferred to the County department responsible for child welfare placements as a result of dependency/ neglect petitions or other orders of juvenile courts.

**Dangerous Weapon:** A dangerous weapon includes a firearm silencer, machine gun, short shotgun, short rifle, or ballistic knife (Source: CRS 18-12-102; see Weapon).

**Deferred Disposition/Prosecution, Deferred Sentence:** Some defendants are granted a deferred prosecution, which means that the judge and district attorney (DA) permit the accused person to delay going to trial for a period of time, usually one year. During this period, the accused is supervised by a probation officer, if the person complies with all the requirements of the deferred prosecution, the charges may be dismissed. A defendant who pleads guilty to a crime may be given a deferred sentence, which means the judge does not impose a sentence immediately but continues the case up to two years, placing the defendant under the Probation Department's supervision. If the defendant complies with all the requirements, the charges against him will be dropped.

**Delinquent/Delinquent Juvenile:** A child ten (10) years of age or older, who violates any federal or state law, except State Traffic and Game and Fish Law, or any lawful order of the court made under the Colorado Children's Code. This is the common term for a youth who commits an illegal offense.

**Delinquency Petition:** A petition charging a child with a violation of the penal statute or municipal ordinances.

**Detention:** Placing the child in a facility designed for minors. This is a secure facility designed to be a non-punitive facility and located as close to the minor's home as possible.

**Detention Hearing:** A judicial hearing held within forty-eight (48) hours (excluding weekends and court holidays) after a child is taken into Temporary Custody to determine whether continued detention is necessary.

**Dispositional Hearing:** A judicial hearing at which time information is presented and reviewed along with recommendations for disposition. The conclusion is the court's official disposition order, (i.e. probation, commitment, etc.).

**District Attorney (DA):** A lawyer elected of appointed in a specific district to serve as the chief or administrative prosecutor for the State in criminal cases.

**Diversion:** A decision is made by a person with authority or a delegate of that person that results in specific official action of the legal system not being taken in regard to a specific juvenile or child and in lieu thereof providing individually designed services by a specific program. The goal of diversion is to prevent further involvement of the juvenile or child in the formal legal system. Diversion of a juvenile or child may take place either at the pre-filing level as an alternative to the probation services following an adjudicatory hearing pursuant to section 19-2-907. "Services", as used in this subsection (44), includes but is not limited to diagnostic needs assessment, restitution programs, community services, job training and placement, specialized tutoring, constructive recreational activities, general counseling and counseling during a crisis situation, and follow-up activities (Source: CRS 19-1-103 [44]).

**DYC (Department of Youth Corrections) Commitment:** When a youth is committed to DYC, this means legal custody for the youth is transferred to DYC. DYC commitment occurs when a judge or magistrate sentences a youth for charges of delinquent acts.

**DYC Escapee:** A DYC escapee is a committed youth who leaves without permission the facility in which he or she has been placed by DYC. Depending on the district, a list of current DYC escapees is provided in the CCIC database.

**Electronic Home Monitoring:** This may be a condition under which the youth is released from custody. Electronic home monitoring means that the youth is required to be within a certain area and wear an electric ankle bracelet that keeps track of whether the youth goes outside of that area (see **Release with Services**).

**Expungment:** The legal process whereby a child's juvenile court record can be sealed upon request three (3) years after unconditional release from probation, ten (10) years upon release from Department of Human Services or parole.

**Failure to Appear (FTA):** FTA is a legal status that means the youth did not appear at a scheduled court hearing.

**Family:** A family is usually defined as two or more people who live together and share resources. Family is commonly referred to as the placement where the youth will be returned after release from custody.

**Felony:** A felony is serious crime, regarded by the law as grave, and more serious than a misdemeanor. Felonies are usually punishable by a prison term (see Misdemeanor).

**Felony Offense against a Person:** This is a serious crime against a person such as manslaughter, murder, vehicular homicide, criminally negligent homicide, assaults, menacing, criminal extortion, reckless endangerment, kidnapping, enticement of a child, and unlawful sexual behavior. It is distinguished from a crime against a person because it only refers to a felony offense (Source: CRS -18-3-101, 18-3-201, 18-3-201, 18-3-301, 18-3-401; see **Crime against a Person** and **Felony**).

**Firearm:** A firearm includes any type of gun or other device capable of discharging bullets (Source: CRS 18-1-901).

**Gang Member:** This is an individual who is one of a group of three or more individuals with a common interest, bond, or activity, characterized by criminal or delinquent conduct, engaged in either collectively or individually (Source: CRS 19-1-103 [52]).

**Guardian Ad Litem (GAL):** A person appointed by a court to look after the interests of a child in litigation.

**Guardianship:** The duty and authority vested in a person or agency buy court action to make major decisions affecting a child, which may include: consent of marriage, military enlistment, medical or surgical treatment, adoption when parental rights have been terminated, or representation of a child in legal actions.

**Habeas Corpus:** An order of the court to bring a person before the court to show cause why that person is being deprived of his or her liberty.

**Home:** This includes any place in which the youth normally lives, usually with whomever he or she considers "family" (see **Family**).

**Home Detention/Services:** Home detention is considered a level four placement. This refers to when the youth is released to home with increased supervision and/or services prior to the detention hearing. The term is often used interchangeably used with "release conditions," pretrial supervision, and pending detention hearing (see **Level of Placement** and **Release Conditions**).

**Illegal Weapon:** This refers to weapons that are not commonplace and are against the law to have in possession. They include a blackjack, gas gun, metallic knuckles, gravity knife, or switchblade knife (Source: CRS 18-12-102).

**Incarceration:** Imprisoned in a lockup/holding facility, jail, juvenile detention center, juvenile correctional facility, or prison.

**Indictment:** An accusation in writing found and presented by a grand jury, charging that a person therein named has done some act, or been guilty of some omission that by law is a crime.

**Informal Adjustment:** A type of disposition used primarily for first time offenders, which does not involve a court hearing. If the child admits the facts of the allegation (with parental consent), the child may be supervised for a period without being adjudicated.

**Jurisdiction:** The legal Power to hear and decide cases; the territorial limits of such power.

**Juvenile Court:** The Division of the district court or, in Denver, the separate court, which exercises original jurisdiction over children and subject matter set forth in the Colorado Children's Code.

**Juvenile Detention and Screening Guide (JDSAG):** The instrument used statewide to determine the appropriate level of detention for youth in the custody of law enforcement.

**Level of Placement:** There are five different places to which a youth can be sent after the Initial Screening and Assessment. They include: Level 1 (secure detention), Level 2 (Staff Secure), Level 3 (Residential/Shelter), Level 4 (Home Detention/Services), and Level 5 (Release). (See **Secure Detention**, **Staff Secure**, **Residential/Shelter**, **Home Detention/Services**, and **Release**).

**Local Policy:** This refers to the policies within each judicial district that indicate when an override of a "screaming tree" decision is necessary. These local policies are almost always authorized by the local courts (see **Screaming Tree**).

**Mandatory Hold Factors:** Some factors absolutely require that the youth be held in a secure detention. These factors include: current crime of violence, use of a firearm during commission of a felony offense against a person, and possession of a dangerous weapon or illegal weapon (Source: 19-2-508; see **Crime of Violence**, **Firearm, Felony Offense against a Person**, **Dangerous Weapon**, and **Illegal Weapon**).

**Miranda Warning:** Four (4) statements which must be made to a suspect under interrogation before any evidence or confession elicited from that person can be admitted as evidence in court: 1.The person's right to remain silent. 2. Anything the person says may and will be used against them in a court. 3. The person's right to have the assistance of an attorney, and 4. The person's right to have an attorney appointed if he or she cannot afford one.

**Misdemeanor:** A misdemeanor is a crime less serious than a felony. Minor theft (of articles worth less than a certain amount), first-time drunk driving and leaving the scene of an accident are all common misdemeanors (see **Felony**).

**Mittimus:** An order of court directing the sheriff to transport a defendant to a specific place to serve a sentence of imprisonment.

**Municipal Court:** Courts whose territorial authority is confined to the city or community.

**National Crime Information Center (NCIC):** A National computer system with information relative to any active warrants on individuals.

**Nolo Contendere** (no'lo kno-ten'de-re): A pleading usually used by defendants in criminal cases, which literally means, "I will not contest it," and is treated as a guilty plea when it comes for sentencing.

**Non-secure Living Situations:** These include placements that are unlocked facilities such as foster care or Residential Child Care Facilities (RCCF's; see **Placement**).

**Ordinance:** A law passed by a city or town lawmaking body.

**Order:** An order means a decision issued by a court or judge.

**Override:** A screener may decide that the youth placement as indicated by the screening tree decision is inappropriate and needs to be changed based on one or more of the following conditions: local policy, professional judgment, aggravating factors, mitigating factors, or other special factors. In most cases, a screening override requires supervisory approval (see **Screening Tree**, **Local Policy**, **Professional Judgment**, **Aggravating Factors**, and **Mitigating Factors**).

**Pending (charge):** This refers to a charge that has bee already filed.

**Personal Recognizance (PR):** Security for the appearance of a criminal defendant, in the form of a personal promise without posting any bail or filing a formal bond.

**Person with a Disability (see also At-Risk Adult):** This includes any person who: 1.) is impaired because of the loss of or permanent loss of a hand or foot or because of blindness or the permanent impairment of vision in both eyes to such a degree as to constitute virtual blindness; 2.) is unable to walk, see, hear, or speak; 3.) is unable to breathe without mechanical help; 4.) is developmentally disabled; 5.) is mentally impaired or mentally ill, or 6.) is blind (Source: 18-6.5-102).

**Petition:** A formal application in writing made to the Court, requesting judicial action concerning some matter therein set forth.

**Placement:** A placement is a residence in which the child has been formally placed. Examples include foster care and Residential Child Care Facilities (RCCF).

**Plea:** The defendant's formal response to criminal charges. If a defendant stands mute, the judge will enter a plea of not guilty for the defendant. Examples are: guilty, not guilty, nolo contendere, not guilty by reason of insanity.

**Plea Bargaining:** A compromise reached by the prosecution and defense after negation resulting in a plea of guilty or nolo contendere to a charge or one of the charges, or to a lesser charge, dismissal of remaining charges, elimination of the trial, and the possibility of a lesser sentence. Plea-bargaining is conducted between counsel, and not before the judge. The compromise reached is presented to the judge by the prosecution and must be agreed upon by the judge before it can become effective. Plea-bargaining results from a number of factors: 1. the prosecution has sole discretion to file charges, 2. Open negotiation may disclose the strengths or weaknesses of either side's case, and 3. Heavy trial dockets necessitate reducing the trial load in large volume in prosecution offenses.

**Positive Rapport:** The screener develops positive rapport with the youth when the youth shows that he or she feels fairly comfortable with the screener and is able to answer most questions without too much distress. Positive rapport includes positive regard.

**Pre-adjudication Status:** This status refers to when the judge has not made a decision about whether or not the youth is guilty.

**Preliminary Hearing (Prelem):** A discretionary hearing to determine if there is a probable cause to believe that the facts alleged in the petition bring the child/defendant within the courts jurisdiction.

**Pre-Sentence Investigation:** Social diagnostic study, which is a report to the judge to help him determine an appropriate sentence.

**Prior:** In the context of this manual, this term refers to one or more incidents of a certain behavior that occurred before the present point in time.

**Probation Violation:** a probation violation occurs when the youth does not comply with what he or she is required to do according to his or her probation agreement. Example of probation violations include: new offenses while on probation, not reporting to a probation officer, not paying restitution, and failing to complete useful public services.

**Professional Judgment:** This refers to the screener's decision regarding the most appropriate placement level for the youth based on the screener's own experience, training, understanding of the youth's risks and needs, and common sense.

**Prostitution:** Prostitution is the act or practice of engaging in sexual activity indiscriminately especially for money. This includes exchanging/trading sex for drugs, money, or a place to stay.

**Probable Cause:** A legal term meaning that there is sufficient reason or belief to detain or cause a petition to be filed. This is based on a legal examination of the facts.

**Probation:** A sentence alternative to incarceration, whereby an adjudicated juvenile may be released under certain conditions and under the supervision of a probation officer for a specific time. In some cases, a short detention sentence or "work release" program is combined with the probation.

**Probationer:** Convicted law violator allowed to remain in free society while under a probation officer's supervision, in lieu of serving a detention sentence or being committed to the Division of Youth Corrections.

**Prosecution**: The procedure by which a person is charged and tried for a criminal offense. Also, the charging, as opposed to defending, side of a criminal case.

**Public Defender:** An attorney, system of attorney's, funded by the state, to represent indigent persons in criminal or juvenile cases.

**Public Safety Risk:** This refers to factors that suggest the youth may pose a threat to the safety or well being of members of the community.

**Recidivism:** The return to criminal activity after completion of a sentence following an earlier conviction. A statistical measure of "failure" of offenders previously convicted of a crime.

**Release:** this is considered a level 5 placement. It can include release to a parent or guardian or release with services (see Level of Placement, Release to a Parent or Guardian, and Release with Services).

**Release Conditions:** This occurs when the youth is awaiting court appearances and includes conditions such as: pretrial supervision, home detention, pending detention hearing, promise to appear, and electronic home monitoring (CRS 19-2-302[4]).

**Release to Parent or Guardian:** This occurs when the youth who has been taken into temporary custody is released into the care and supervision of a parent or other responsible adult (Source: CRS 19-2-507[3]; see **Responsible Adult**).

**Release with Services:** This occurs when the court decides that a youth may be released from custody on certain conditions, such as electronic home monitoring and periodic reporting (see **Electronic Home Monitoring**).

**Residential:** Along with shelter placement, this is considered a Level 3 placement. It includes placement in the community in a non-secure living situation (see Shelter, Level of Placement and Non-Secure Living Situation).

**Responsible Adult:** A responsible adult is the child's parent, legal guardian or custodian, or any other person responsible for the youth's health and welfare.

**Revocation:** A court order rescinding or withdrawing a previous court order. When a person on probation has violated one or more of the terms and conditions of probation, a petition to revoke probation or modify the terms and conditions may be filed with the court. If the allegations are proven, the judge may modify the terms of probation or revoke probation and exercise any of the dispositional alternatives, including commitment to the Division of Youth Corrections.

**Risk Assessment Scale:** A tool to assist in predicting continued criminal activity. The primary factors considered are; criminal history, stability, substance abuse and employment.

**Runaway:** This refers to when the youth unjustifiably leaves his or her designated living setting, usually overnight, one or more times. If the youth left those settings because of justifiable reasons (for example: if he or she is in danger), the instance should not be considered runaway.

**Runaway (repeated):** This is the act of running away two or more times (see **Runaway**).

**Screener:** This refers to the person appointed by the judge or court to recommend whether a juvenile who is in temporary custody should be released or admitted to a detention or shelter facility (see also **Screening Team**).

**Screening Guide:** This is the common term for the juvenile Detention Screening and Assessment Guide (JDASG), which is used to screen and access youth who have been picked up and detained by law enforcement in the juvenile justice system. It is also commonly referred to as the Screening Tree and Screen.

**Screening Team:** The person or persons designated by the chief judge in each judicial district or, for the second judicial district, the presiding judge of Denver Juvenile Court to make recommendations to the juvenile court concerning whether a juvenile taken in to temporary custody should be released or admitted to a detention or shelter facility (see also **Screener**; Source: CRS 19-1-103[94.5]).

**Screening Tree:** This is a decision support tool used during the Initial Screening to determine temporary placement of youth who have been picked up by police and present for screening and assessment.

**Secure Detention:** This is considered a Level 1 placement. Secure detention refers to the custodial status of youth who are being confined after arrest or while awaiting the completion of judicial proceedings in physically secure/locked facility (see **Level of Placement** and **Secure Facility**).

**Secure Facility:** This refers to a facility licensed by the Department of Human Services (DHS) or operated by the Division of Youth Corrections (DYC) as a physically secure or locked facility, or is operated by a county as a secure detention facility (see **Secure Detention**).

**Self-Harm:** Self-harm means putting oneself at risk of injury or death. Examples would include cutting behavior, running from placements, and severe substance abuse.

**Serious Repeat Delinquency:** This means that a youth engages in behaviors repeatedly and/or frequently that indicate a pattern of delinquency. This could include such behaviors such as prior felony adjudications, pending felony charges at the time of the new arrest, being on bond for other delinquency charges, past failures to appear (FTA) for court hearings, a history of crimes against persons, arson or weapon related offenses (see **Felony**, **Adjudication**, **Bond**, **Failure to Appear (FTA)**, **Crimes Against Persons**, **Arson**, and **Weapon**).

**Severe Substance Abuse:** Substance abuse refers to abuse of alcohol or drugs. Severe substance abuse refers to the use of substances such an extent that it interferes with the person's behavior and life activities. It also refers to substance use during the commission of criminal behavior, or arrest or conviction of drug related charges.

**Sex Offense:** A sex offense is a crime such as rape and pedophilia (sex with a child). It also includes enticement (offering money or reward for sex) of a child, and/or sexual assault when the victim is a child younger than fifteen (15) years old. There are different degrees of these offenses (1st, 2nd, etc.) that are defined by various statutes. These may be affected by the age of the child, the age of the perpetrator, whether the perpetrator in a position of trust, etc. Sex offenses also include indecent exposure, incest, sexual exploitation of a child, trafficking in children, keeping a place of child prostitution, pandering or pimping for child prostitution, and/or patronizing a child prostitute (Source: CRS 18-3-411).

**Serious Habitual Offender/ Directed Intervention (SHODI):** This status refers to a list of known juvenile offenders who are to be arrested and detained if found breaking the law. It is applicable to jurisdictions with formal programs operating in the law enforcement community.

**Shelter:** Along with residential placement, this is considered a Level 3 placement. It includes the temporary care of a child in unrestricted facilities while waiting for the court to make a decision about placement, or waiting for placement decisions to be carried out (see **Residential** and **Level of Placement**).

**Stable School/Work Situation:** This concept refers to whether the youth has a full-time schedule and has been in regular attendance in either setting.

**Staff Secure Facility:** This is considered a Level 2 placement. It is a group facility or home where each juvenile is under continuous staff supervision and where all services such as education and treatment are provided at that location. A staff secure facility may or may not be a locked facility (Source: CRS 19-1-103).

**Suicide (thoughts of)**: This refers to thought and/or intentions to take one's own life.

**Summons:** A notice requiring a person to appear in court on a specific day at a specific time. The summons is returned to the court to reflect that the person was served with it.

**Threats to Harm:** These include verbalization and gestures that would alert any reasonable person to the possibility of being harmed.

**Venue:** The particular county, city or geographical area in which a court with jurisdictions may hear and determine a case.

**Verdict:** The decision the jury or judge makes at the conclusion of trials to the accused guilt or innocence.

**Victim:** This refers to the person immediately and directly harmed in some way by the youth, and anyone with whom the victim is close and has regular contact (Source: 19-1-103[112]).

**Victimization:** This includes any acts of physical, sexual, or emotional abuse that adversely affect the youth or his or her family (see **Family**).

**Victimization (risk of):** This includes any behaviors that make the youth vulnerable to being harmed in some way within the community. Examples of such behaviors include prostitution, homelessness, a pattern of dangerous drug use, and gang involvement (See **Prostitution**).

**Warrant:** A warrant s a written order issued by a judicial official authorizing an officer to perform a specified act required for the administration of justice.

**Weapon:** A weapon is an object that could be used to physically harm or threaten to harm another individual.

**Weapon Use:** This includes using any object to physically harm or threaten to harm another person.

**Witness:** A witness is someone who has seen or knows something about a crime or serious event.

**Youth:** This is a juvenile between the ages of ten (10) and seventeen (17) who is being charged with any crime committed prior to their eighteenth birthday.

## WEBSITES

Division of Youth Corrections Homepage
http://www.cdhs.state.co.us/dyc

Senate Bill 94 Homepage
http://www.cdhs.state.co.us/dyc/sb94.htm

Colorado Department of Human Services Homepage
http://www.cdhs.state.co.us

Trails (and CBMS) application training.
https://my-cdhs.state.co.us/training/center

Colorado General Assembly Homepage
http://www.leg.state.co.us/

Colorado State Judicial Branch
http://www.courts.state.co.us/Courts/Index.cfm

Resources for Clients/families with disabilities
http://www.disabilityinfo.gov

## CONTACT INFORMATION

Statewide Coordinator
Division of Youth Corrections
4255 S. Knox Ct., Denver, Co 80236
Office (303) 866-7334
Fax (303)-866-7982