# EXHIBIT 9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-1123-GPG-CYC

ISAAC N., through his next friend Kerry Simpson,
TONY S., through his next friend Leigh Truhe, and
VEGETA K., through his next friend Quentin Montemayor,
for themselves and those similarly situated,

Plaintiffs,

v.

JARED POLIS, in his official capacity as the Governor of Colorado; and
MICHELLE BARNES, in her official capacity as Executive Director of the
Colorado Department of Human Services,

Defendants.

---

# EXPERT REPORT OF DR. PATRICK McCARTHY

**OCTOBER 6, 2026**

---

**Signed:** ______________________

## I. Introduction and Summary of Opinions

I have been retained by Plaintiffs' counsel to provide professional services as an expert in connection with litigation challenging the continued detention of Colorado youth detained in juvenile detention facilities after a court determined they could be released to community placements.

Based on my review of the evidence provided to me and my own decades of professional experience, it is my opinion that 1) there is significant evidence of a pattern of releasable youth being held unnecessarily in detention facilities; 2) there is also considerable evidence that this pattern is being caused or driven by the State's inability to promptly move young people from locked secure custody institutions to less restrictive placements with appropriate services because of three interrelated systemic failures; (3) there are specific known remedies to the factors that are causing the unnecessary detention, and (4) detention of releasable youth is harmful to youth.

Based on my experience, and as also required under Colorado law, the only two legitimate purposes for depriving young people of their liberty by keeping them in detention facilities, disrupting their education, and separating them from their families and communities, are to protect the public from harm and to ensure they attend juvenile court proceedings. In Colorado, this basic standard in the field is also referenced in state law. Colo. Rev. Stat. § 19-2.5-305(3)(a)(IV)(C). Each year in Colorado, hundreds of young people are detained in locked secure detention facilities despite a judicial ruling that they could be released if appropriate services and/or alternative placements were available that would mitigate a substantial risk of serious harm to others or the risk of flight from prosecution.

Based on the materials I have reviewed so far, and my extensive professional experience, there are significant indications that the State's inability to promptly move young people from locked secure custody institutions to less restrictive placements with appropriate services—whether to their own homes, kinship care, foster care or other out-of-home placement—is the result of three interrelated systemic failures:

1. Failure to adequately fund, effectively develop, fully implement and consistently sustain community-based services and placements as alternatives to locked secure custody institutions, resulting in gaps, bed and service shortages, delays in releasing youth, and mismatches between assessed needs and actual services offered;

2. Failure to develop the information management, analysis and planning capacity to successfully design, implement and manage a system and a continuum that could eliminate the unnecessary detention of young people,

resulting in an inability to diagnose and address pressing systemic problems; and,

3. Failure to ensure coordination and collaboration across agencies and jurisdictions that share responsibility for funding, case management and decisions affecting young people held in detention, resulting in delays, confusion and an overall lack of urgency in responding to the unnecessary detention of young people.

These failings affect all detained youth but are particularly acute for youth with mental health disabilities and youth involved with the foster system. For these youth, the state has particular duties that it is failing to meet, including duties to place children in the least restrictive setting and to provide appropriate care and case management.

Mitigating the risk that a young person will seriously harm others does not require resolution of all of a young person's needs and problems before releasing them to their community. Rather, mitigating risk of serious harm to others requires sufficient supervision and support to ameliorate the risk that a young person could cause serious harm.

Although placement in locked detention – effectively imprisoning youth -- may temporarily eliminate the risk that a young person will seriously harm others, studies have shown this temporary reduction in risk is more than offset by the increased risk of recidivism following release. Moreover, detention carries substantial risk of serious harm to detained young people themselves. Recognizing those risks, the Colorado legislature appears to have mandated the Department of Human Services to establish alternatives to detention through a continuum of alternative, less restrictive services and placements and prohibits detaining youth solely because alternative services and placements are not available. These alternatives align with basic standards in the field for the release of detained youth.

As detailed further below and as documented in CDHS annual reports to the legislature over the last four years, hundreds of young people have been held in locked secure custody institutions despite a judicial finding that they could be released if services to mitigate risk were provided. The average time these young people spend in detention is 39 days, including an average of 22 days after a judge has determined they could be released with mitigating services. Many youth are detained for even longer periods, as much as 130 or more days.

Reports provided by the Colorado Department of Human Services show the State has relied on secure detention facilities as holding pens due to the lack of services and alternative placements that could better meet the needs of these young people and mitigate the risk of serious harm to others.

State reports also show that many of these young people have been diagnosed with a variety of disabilities. These youth too can be appropriately served with community placement and supportive services outside of detention. Decades of research and experience, including my own decades of professional experience at the national level and in advising numerous state systems, confirm that people with disabilities are more likely to thrive in community settings that provide the opportunity to develop and strengthen cognitive, behavioral and functional skills.[1] For detained youth, the community services and placements that can address their disabilities and support their development in a setting more integrated into the community can also mitigate the risks of releasing them from secure detention.

Another subgroup among detained but releasable youth are those involved with the child welfare system. The State's data show these young people with child welfare involvement have the longest average and median lengths of stay of those eligible for release with mitigating services. In accord with basic standards in the field of foster placement, and including my own decades of professional experience, foster children should be placed in the least restrictive settings possible to meet their needs. Foster children's extended confinement in detention is perhaps the most obvious and grievous consequence of the fragmentation and misalignment of services for young people in the State of Colorado.

Children who experience secure institutional placement – including those facing unnecessary detention in Colorado -- face serious short- and long-term harms. These harms are confirmed by decades of research, including comprehensive reviews of all available rigorous studies by credible national organizations. Compared to similar peers, young people who have been detained or incarcerated are more likely to be re-arrested as juveniles and adults, more likely to be re-incarcerated, less likely to graduate high school, less likely to secure stable employment, and more likely to experience serious physical and mental health problems. They are also exposed to substantial risk of physical, sexual, and emotional abuse while detained or incarcerated.

[1] Conrad Oh-Young & John Filler, *A meta-analysis of the effects of placement on academic and social skill outcome measures of students with disabilities*, 47 Rsch. Dev. Disabil., 80–92 (2015); Anthoula Kefallinou et al., *Understanding the value of inclusive education and its implementation: A review of the literature,* 49 Prospects, 135-152 (2020); Nina Dalgaard et al., *The effects of inclusion on academic achievement, socioeconomic development and wellbeing of children with special education needs,*18(4) Campbell Sys. Rev., 1–44 (2022); Lucy King et al., *A comprehensive multilevel analysis of the Bucharest Early Intervention Project: Causal effects on recovery from early severe deprivation,* 180 Am. J. Psychiatry 573 (2023); Femmianne Bredewold et al., *Living in the community, the pros and cons: A systematic literature review of the impact of deinstitutionalization on people with intellectual and psychiatric disabilities*, 20 J. Soc. Work 83 (2018).

In Colorado's detention facilities specifically, independent investigations and reports have found serious risks of physical injury including assaults, injuries due to abusive physical restraint, drug overdoses and allegations of sexual abuse by staff.

Importantly, Colorado's system failures are solvable. For more than three decades, states and counties across the country have demonstrated that alternatives to detention can be developed, expanded, implemented and sustained at large scale.[2] For example, New Jersey reduced the detention admissions by 83% and reduced the average daily population in its detention centers by almost 70% while youth crime fell by 87% and serious index offenses fell by almost 80%. Only 4% of youth on alternatives to detention were removed due to a new delinquency charge; ten counties have closed their detention centers entirely.[3]

In Bernalillo County, New Mexico, detention reforms resulted in a decrease of the average daily population by almost half, reduced petition filings of 45% and drops in youth crime of almost 12% for felonies and more than 30% for misdemeanors. The County was also able to save almost $5 million due to the closure of unneeded detention beds.[4]

In Santa Cruz, California, the detention population was reduced by more than 80%, averaging more than 50 youth per day in 1996 and just 9 in 2025. In addition, juvenile felony arrests declined by 48 percent and misdemeanor arrests by 43 percent.[5]

Similar results have been reported by detention reform sites across the country, with reductions in average daily population ranging from more than 35% in Southern states and counties to 56% in Western states and counties, with an overall average reduction of 43% by 2016.[6]

Successful initiatives have addressed the kinds of systemic issues that are apparent in Colorado's current system: shortages of community-based placement and service alternatives to detention settings, fragmentation of responsibilities across jurisdictions and agencies; disjointed case processing and case management; weak information

---

[2] Annie E. Casey Foundation, *JDAI at 25* (Apr. 17, 2017), https://www.aecf.org/resources/jdai-at-25.
[3] Juvenile Justice Commission. State of New Jersey. *New Jersey Juvenile Detention Alternatives Initiative (JDAI) 2023 Annual Data Report* (2025), https://www.nj.gov/oag/jjc/pdf/2023_JDAI_Annual_Data_Report.pdf.
[4] Thomas Swistack et al., *Smaller, Smarter and More Strategic*: *Juvenile Justice Reform in Bernalillo County,* Bernalillo County Youth Services Center (2012), https://www.bernco.gov/public-safety/wp-content/uploads/sites/60/2021/03/Smaller-Smarter-More-Strategic-Bernalillo-County-2011.pdf.
[5] County of Santa Cruz Probation Department, Santa Cruz County JDAI Model Site. https://www.santacruzcountyca.gov/Departments/ProbationDepartment/JDAIModelSite.aspx.
[6] Annie E. Casey Foundation, supra note 2 at 4–5.

management, data analysis and planning systems; poorly supported provider networks; and uncoordinated funding streams.[7]

Successful initiatives have also demonstrated how to mitigate the risk of harm to the public while continuing efforts to resolve more complicated mental health, substance abuse and family problems. These initiatives have built effective community provider networks which provide intensive home-based services and supports for families and kin.[8]

In summary, my review of publicly available reports and other material specifically relevant to this matter, my professional experience over more than 50 years and decades of research lead me to conclude that the State of Colorado unnecessarily confines hundreds of young people in secure custody detention despite judicial findings that they could be released with services and supports to mitigate the risk that they might harm the public. The failure of the Colorado Department of Human Services to timely provide those mitigating services strongly appears to be the direct cause of their continued confinement. While other jurisdictions across the country have successfully developed robust alternatives to detention, leading to significant reductions in the detained population, Colorado has yet to establish an effective system of care and network of such alternatives sufficient to meet the needs of release-eligible young people.

## II. Background, Qualifications, and Experience

As set forth in my CV, attached as Appendix A, I have decades of experience in the field of youth detention and correctional systems, including specifically regarding the overlap of disabled and foster youth in such systems, as well as identifying patterns of structural problems, the drivers and causes of those problems, and possible solutions and their implementation.

From April 2019 to May 2025, I was a consultant to states and counties on ways to improve their juvenile justice systems, first as a Senior Fellow and Research Scholar at the Columbia University Justice Lab and then as a Senior Fellow with Catalyze Justice, a nonprofit organization that was spun off from the Justice Lab.

Through Columbia University, I completed and published a 15-chapter online Desk Guide for leaders of youth correctional systems working on improving results: Transforming Youth Justice: A Desk Guide for System Leaders. I was also the senior

[7] Annie E. Casey Foundation, *Pathways to Juvenile Detention Reform Series* (1999-2009), https://www.aecf.org/series/pathways-to-juvenile-detention-reform-series.
[8] Richard Mendel, *Effective Alternatives to Incarceration*. The Sentencing Project (June 28, 2023), https://www.sentencingproject.org/reports/effective-alternatives-to-youth-incarceration/.

author of The Future of Youth Justice, a joint publication of Harvard University and the National Institute of Justice.

I serve on the steering committee of Youth Correctional Leaders for Justice, an invitation-only organization of more than 70 current and former top administrators of systems that have achieved significant reforms. I have also served as a member or chair of several boards of organizations devoted to issues relevant to this matter, including as chair of the Jim Casey Youth Initiative (focused on young people preparing to move from foster care to independent living), chair of Case Commons (focused on developing software solutions for public and private child welfare, juvenile justice and other human services agencies) and member of the boards of the Annie E. Casey Foundation, Living Cities (focused on community Development), the Executive Alliance for Men and Boys of Color, the East Baltimore Development Initiative (which included establishing community networks of social services), and Community Wealth Partners (focused on nonprofit consulting to foundations and organizations engaged in community strengthening initiatives).

I served as an advisor to the Office of Juvenile Justice and Delinquency Prevention (OJJDP) in the U.S. Department of Justice as a member of the Roundtable on the Juvenile Justice System Reform and Reinvestment Initiative.

I was the President and CEO of the Annie E. Casey Foundation for nine years until my retirement from that organization in 2019. Prior to my appointment as President and CEO, I was a Vice President and then the Senior Vice President for 13 years.

I was initially hired and served for three years as the Casey Foundation's Senior Associate for Mental Health to manage a national initiative demonstrating the feasibility of developing community networks of child mental health services. In my roles as Vice President and Senior Vice President, I oversaw the Foundation's juvenile justice work. Over the last 30-plus years, the Casey Foundation has earned a reputation as the country's leading organization promoting improved outcomes for youth involved with the juvenile justice system, including disabled youth and those also in the foster system.

During my tenure, the Foundation expanded the highly successful Juvenile Detention Alternatives Initiative (JDAI) to over 300 jurisdictions in 39 states. We published numerous policy and practice briefs for the field, including guidance on reducing unnecessary detention, using data to manage and improve youth correctional systems, services and supports that can replace detention, two editions of a conditions of confinement guide, two publications summarizing documented abuses in secure custody institutions and profiles of successful reform efforts. We also launched initiatives to reform policy and practice in probation and aftercare, significantly reduce populations in adult-like juvenile institutions and address racial and ethnic over-representation.

I also served as the Director of the Division of Youth Rehabilitative Services (DYRS) in the Department of Services for Children, Youth and Their Families for the State of Delaware from 1989 through 1992. The Division operated three secure custody institutions, probation, aftercare, community services and residential treatment through contracts with private providers.

Prior to my appointment as the head of DYRS, I served as the Director of the Division of Program Support for the Department; this Division managed all the Department's contracts, monitored provider performance, managed the Department's integrated information system, developed community-based prevention and treatment programs and licensed all child and family serving agencies in the State. I was the Department's first Administrator for Case Management, an office which focused on integrating the child welfare, juvenile justice and child mental health services and programs.

During my tenure with the Delaware Department of Services for Children, Youth and Their Families, I established community-based prevention programs throughout the state as well as a continuum of alternatives to detention and incarceration. I developed Delaware's Family Preservation Initiative as well as the Case Management Initiative to integrate frontline services across the divisions.

I taught graduate level courses in clinical social work practice and child welfare at the University of Southern California and Bryn Mawr College from 1979 through 1987.

Additional experience includes the development and management of an alternative school for youth with severe behavioral and mental health problems; deputy director of a large substance abuse agency serving court-ordered outpatient, residential and inpatient clients; and social worker for a secure forensic psychiatry program and for an inpatient child and adolescent hospital.

I received a PhD with a dual major in public policy and clinical practice from the Bryn Mawr College Graduate School of Social Work and Social Research; an MSW in clinical social work from the University of Pennsylvania; and a BA in psychology from Manhattan College.

In terms of other expert work in litigation, in the last four years I was retained by Plaintiff's counsel in David Meehan v. State of New Hampshire, Department of Health and Human Services et al. to assess whether the State of New Hampshire satisfied the prevailing standards of care for juvenile justice facilities as part of a civil class action suit alleging widespread physical and sexual abuse of young people. I have served as an expert witness on conditions of confinement and juvenile justice systems in a federal lawsuit in Louisiana, *Alex A., et al. v. Edwards, et. al*. I have not provided expert testimony in any other court cases within the last four years.

## III. Methodology

I have been retained at my standard hourly rate of $400 per hour. The matters set forth here are my independent opinions, true and correct of my personal and professional knowledge. If called upon to testify, I could and would competently testify as follows.

Plaintiffs requested that I review whether or not there is any indication of releasable youth being held in detention; if so, whether there is any indication of the cause(s) of that detention; whether there are known remedies that could potentially address and ameliorate these systemic problems, and the impact of institutionalization and detention on these youth. I have reviewed the documents shared with me regarding the above matter and completed an initial review of relevant research. The complete list of documents that I reviewed and considered are listed in Appendix B attached to this report. As discovery in the case has not yet been conducted, I was able to review only limited, publicly available documents as of the date of this declaration, along with materials relating to the named plaintiffs provided by plaintiffs' counsel. I intend to supplement my findings and opinions once discovery materials become available.

The opinions contained in this declaration are provided to a reasonable degree of professional certainty based on my education, training, experience in the field of youth detention and correctional systems, including specifically regarding the overlap of disabled and foster youth in such systems, research and familiarity with the extensive literature on the appropriate use of secure custody detention, conditions of confinement and pragmatic, effective alternatives to detention, and the materials I have reviewed so far in this matter.

## IV. Documentation of Observations and Opinions

I describe below my findings and opinions that (1) CDHS unnecessarily institutionalizes children charged with delinquency in detention facilities who instead should be free from detention with appropriate services; (2) CDHS unnecessarily detains children with disabilities who are found releasable by juvenile courts; (3) CDHS unnecessarily detains children in the foster system who are found releasable by juvenile courts; (4) three specific CDHS's systemic failings cause this unnecessary secure custody detention; (5) there are solutions to these problems that are systemic, and would significantly help ameliorate the problems across all children in this situation; and (6) the CDHS system of detaining releasable children in secure custody institutions harms those children greatly.

## A. CDHS unnecessarily institutionalizes children charged with delinquency in detention facilities who instead should be free from detention with appropriate services.

Based on my review of the limited documents available thus far in this case and based on my decades of experience working with child-serving systems on alternatives to detention and incarceration (including for youth with disabilities and youth in the foster system), there is significant evidence that Colorado is unnecessarily incarcerating children charged with delinquency whom juvenile courts have found should be released with services and/or placements.

### i. Documents Reviewed and Basis for My Observations.

To fulfill a legislative mandate, the Colorado Department of Human Services issues an annual *Limit the Detention of Juveniles* report. Annual reports for the state fiscal years 22-23[9], 23-24[10], 24-25[11] and 25-26[12] provide data on detention admissions, demographics and offenses charged at arrest as well as factors that may explain variances in length of stay.

The series of four available annual *Limit the Detention of Juveniles* reports, which provide data on youth admitted from July 1, 2021, through June 30th, 2025, show a consistent and worsening pattern of holding young people whom a judge has deemed eligible for release with risk-mitigating services. These youth have been held for an average of three weeks after the judicial determination, with some held for months.

- In SFY21-22, the State's Division of Youth Services continued to detain 389 youth in a locked secure custody institution for an average of more than 20 days after a judge found they could be released with services that could mitigate risk; 94 such youth were detained for more than 30 days.[13]

- In SFY22-23, DYS continued to detain 540 youth in a locked secure custody institution for an average of more than 22 days after they were deemed releasable.[14] A total of 152 such youth were detained for more than 30 days, 68 were detained more than 60 days and 36 were detained more than 100 days.[15]

  In SFY23-24, DYS continued to detain 693 youth in a locked secure custody institution for an average of 20 days after a judge found they could be released

[9] CDHS, *Inaugural Analysis Report to Inform Performance Standards and Outcome Measures for Pre-Adjudicated and Adjudicated Youth* (July 1, 2023).
[10] CDHS, *Limit the Detention of Juveniles, Annual Report, State Fiscal Year 23–24* (July 1, 2024).
[11] CDHS, *Limit the Detention of Juveniles, Annual Report, State Fiscal Year 24–25* (July 1, 2025).
[12] CDHS, *Limit the Detention of Juveniles, Annual Report, State Fiscal Year 25–26* (2026).
[13] CDHS, *supra* note 9, at 24.
[14] CDHS, *supra* note 10, at 9.
[15] *Id.* at 89.

with risk-mitigating services,[16] and 141 young people were detained more than 30 days.[17]

- In SFY24-25, DYS detained 733 youth (with a total of 974 admissions) identified as "youth awaiting mitigating services" (YAMS)—defined as youth with a judicial finding that they could be released if services to mitigate the risk of serious harm to others were provided—for an average of 39 days and a median of 21 days (compared to a median of 6.4 days for other youth).[18] This means half of youth designated as awaiting mitigating services had stays longer than three weeks; but the high average of 39 days suggests that some youth spend considerably longer in detention.[19]

Over the three-year period from July 1, 2021 through June 30, 2024, the number of judicially determined release-eligible young people who the State continued to hold in locked secure custody increased more than 75%. In each year, the number of release-eligible youth who were detained despite the judicial finding represented about a third of all youth admitted to the institution that year, and on any given day, they represented more than half of all detained youth in secure custody.

The two monthly reports provided by the Plaintiffs' attorneys show the State's failure to provide timely services and placements for youth who could have been released has continued. Of the 332 young people detained at some point covered by the December 2025 report, 180 were labeled as youth awaiting mitigating services with just 66 releases during the period.[20] The March 2026 monthly report shows 136 youth awaiting mitigating services out of 351 detained young people with just 50 of these youth released during the month.[21]

In the SFY24-25 *Limit Detention* report, the Colorado Department of Human Services explicitly acknowledges that youth are being held in secure facilities solely because alternative placements or necessary community services are unavailable:

> [I]n reality, youth must be placed into a court-approved location that would mitigate the youth's risk to the community or the youth's risk of flight from

[16] CDHS, *supra* note 11, at 10.
[17] *Id.* at 100.
[18] CDHS, *supra* note 12, at 11.
[19] The Colorado Youth Detention Continuum began using the YAMS term to bring more consistency to the definition of the cohort of young people deemed release-eligible if mitigating services were provided as different juvenile courts used different naming conventions. Thus, the numbers cannot be directly compared to prior years, as the new definition is somewhat broader than the earlier definition. Also, it appears that the report no longer provides data on the length of time between a judicial finding and release from detention. *Id.* at 10.
[20] CDHS, C.R.S. 19-2.5-1407.3 *Monthly Report* (Mar. 2026) at 1.
[21] CDHS, C.R.S. 19-2.5-1407.3 *Monthly Report* (June 2026) at 1.

> prosecution. At times, these placements and services are not available or take a long time to find.[22]

Based on their own documents, the State is keenly aware that the existing continuum of services and placements is inadequate and unable to meet the needs of youth who could be released but for this lack of resources. Responding to a question from community groups, the Department of Human Services provided data showing that the detention centers were holding a significant number of release-eligible youth on days when the judicial districts had to rely on emergency beds and even an emergency release due to a detention center reaching full capacity.[23] An emergency release "occurs only when all other release options are exhausted and the court determines no other youth meets release criteria." Clearly, the Department was unable to find a service or a placement for multiple release-eligible youth on these dates. Emergency beds were used for two-thirds of the days in the last fiscal year.[24]

The data contained in the State's own annual report also clearly shows that as many as two-thirds of all youth admitted to locked detention spend at least some time unnecessarily confined. One-third are released almost immediately by a judge, suggesting that they could have been diverted from locked detention prior to admission.[25] Another 38 percent are designated by a judge as eligible for release with mitigating services and/or a placement to be provided by the State.[26] Before the State stopped tracking the data, the CDHS annual report to the legislature reported that these release-eligible youth spent an average of almost 20 additional days in locked confinement—after a judge had ruled they could be released with appropriate services—solely because the State had failed to fund, develop, and sustain an adequate array of the necessary services and placements to meet their needs.[27]

---

[22] CDHS, *supra* note 11, at 21.
[23] Colo. Dep't of Hum. Servs., Responses to Questions Regarding Division of Youth Services Detention Practices at Question 8. CDHS states that 25-27% of detained youth on any given day are "youth awaiting mitigating services" which would enable their release from secure custody.
[24] *Id.* at Question 3.
[25] CDHS, *supra* note 12, at 58.
[26] *Id.* at 10.
[27] A very high proportion of all admissions—as high as 75%—result in a release to home or to kinship care. Although data on this basic question is not included in the reports, the lack of any other explanation for this high proportion of releases to home or kinship care strongly suggests that a great many youth who had been held in detention while "awaiting mitigating services" were nevertheless not released to those services but rather were released only after their adjudicatory hearing, and then to their own homes or a placement with extended family. This explanation would be consistent with the data that show youth awaiting services have extended stays in detention, resulting in their appearance for an adjudicatory and dispositional hearing while still detained. The explanation would also explain why the monthly reports from judicial districts show the number of new admissions classified as "youth awaiting mitigating services" is much higher than the number of discharges for YAMS-classified young people, yet the month-to-month census shows little or no increase in the number or proportion of YAMS-classified youth. The State should be able to provide data to resolve this question.

According to the SFY24-25 *Limit Detention* report, the vast majority of youth—more than 95%—initially placed in locked confinement scored as eligible for locked confinement on the JDSAG.[28] Yet the actual charges for about a third of admitted youth were misdemeanors, while other youth were admitted due to technical violation of conditions of release rather than new charges.[29] This same pattern is seen in the SFY25-26 *Limit Detention* annual report.[30] A more detailed assessment tool is used to gauge the risk of re-offending at some time in the future (Colorado Juvenile Risk Assessment, or CJRA). Based on this tool, only about one-third of the youth admitted to locked confinement score as high risk to re-offend, while 36% score as low-risk and 29% score as moderate risk.[31]

### ii. Opinion.

Secure detention in a locked institution results in a loss of liberty and disconnection from family, education, and community. Secure detention exposes developing adolescents to conditions that have been shown to cause trauma, long-term physical and mental health problems and negative short- and long-term effects on development and overall well-being. As no court has adjudicated the allegation of delinquency for the presenting offense, and as the young person has not been committed to incarceration within the Division of Youth Services, the sole justification for locking an adolescent in a detention facility while awaiting an adjudicatory hearing is evidence that the young person is highly likely to either seriously harm someone or fail to appear for the adjudicatory hearing if released.

All of the youth to be included in this class of youth at issue in this case have been found by a judicial officer to be eligible for release to an alternative to detention, either back to their families with supportive services or to some form of open placement for treatment and/or continued care and supervision. In short, if provided supportive services or placement to mitigate risk to the public, a judge has determined that they do not represent a significant risk of harming someone and that they are not a significant flight risk.

---

[28] Until February 2025, the initial risk screening tool was the Juvenile Detention Screening and Assessment Guide, or JDSAG. The JDSAG was used to estimate the risk that a young person represents a significant risk to public safety and/or a substantial risk of failure to appear at their formal adjudicatory hearing. The JDSAG determined the initial level of supervision a young person will receive, including locked confinement, staff secure placement, or community services. Beginning in February 2025, the State began using the Colorado Youth Detention Screening Instrument (CYDSI); the most recent annual report, released in July 2026, does not include data from the CYDSI and reports partial year data from the JDSAG.

[29] CDHS, *supra* note 11, at 46.

[30] CDHS, *supra* note 12, at 10.

[31] *Id*. at 77.

As summarized above, I found multiple instances of the State Department of Human Services (CDHS) acknowledging responsibility for ensuring young people are released from secure custody with mitigating services to address risks to public safety. CDHS also acknowledges responsibility for developing, implementing, and sustaining a continuum of services and placements to meet the needs of these young people.

As amply documented in its own reports over multiple years, the State has failed in these responsibilities, resulting in hundreds and hundreds of young people being subjected to the unnecessary and harmful experience of extended detention in locked secure custody detention facilities.

As detailed in the next section, the State's lack of sufficient Qualified Residential Treatment Programs, therapeutic foster beds, substance abuse treatment beds and other intensive community-based family and mental health services are among the drivers of extended detention for youth with documented disabilities.

Similarly, the State's lack of sufficient numbers of appropriate foster care, supported kinship care and other placements and the limited availability of intensive community-based services has resulted in extended confinement in secure custody institutions for young people under the care and custody of the Division of Child Welfare. These gaps in services and placements are especially severe and detrimental to young people with mental health or other disabilities as well as involvement with the child welfare system. Taken as a whole, the documents I've reviewed suggest the State is using its detention facilities as grossly inappropriate holding placements as the State attempts to juggle resources of a starved and fragmented system. Young people—including those with disabilities and those who have been victims of child abuse and neglect and who are fully dependent on the State for their care and protection—are the victims of the failure of the State to bring urgent attention and action to the systemic failings that have been apparent for many years. For years, the State has continued to confine hundreds and hundreds of young people in locked secure custody institutions because no community service or placement bed is available. As a result, the State knowingly continues to segregate young people, including young people with disabilities, from family, community, education, and social connections, thus failing to provide timely, integrated placement.

## B. The State routinely confines young people with disabilities in highly restrictive secure custody institutions.

Laws, regulations and best practice require that young people with disabilities should receive rehabilitative services in the least restrictive setting. The preceding section documents ample evidence that the State has confined hundreds of youth in highly restrictive, locked secure custody detention facilities, despite a judicial finding that they could be released with services to mitigate risk of serious harm to others. The State's

reporting suggests that many of these are youth with a disability. The evidence available to me suggests that these youth are being unnecessarily placed in detention facilities because of insufficient community-based placements and services.

### i. Documents Reviewed and Basis for My Observations.

The State's reports do not break out the number or percentage of releasable youth with a disability. However, national estimates of the percent of detained or incarcerated youth with a disability range from 30% to 60%.[32] This published national data matches my own direct experience in multiple state systems for detailed or incarcerated youth. Colorado state reports indicate that some of the longest stays in detention are due to a lack of alternative services or placements for youth with disabilities,[33] despite the state's own statutes explicitly directing that detention in these circumstances is not permissible.[34] The State's annual *Limit Detention* reports document the mismatch between the services and placements recommended for youth with disabilities through independent assessments of each young person's needs and the actual services provided: In the latest report, less than 35% of assessed youth were released to the same level of care as recommended by the assessment.[35]

According to the SFY24–25 *Limit Detention* annual report, State law C.R.S.19-2.5-1404

> ...mandates the statutory working group (Colorado Youth Detention Continuum) Advisory Board, to among other things: develop performance standards and outcome measures to evaluate whether alleged and adjudicated offenders are in the least restrictive environment with appropriate services. This requires the evaluation of alternative placements, range of placements, and the community-based service options available in each judicial district and county.[36]

Review of the materials available to me also identified efforts by the state legislature to create a "system of care" to address the gaps and capacity problems in services for youth either in or at risk of being placed in residential care. HB24-1038 directed the Department of Health Care Policy and Financing, the Behavioral Health Administration and the Department of Human Services to "create a system of care for the youth populations that they deem appropriate, including youth covered by Medicaid."[37] This appears to still be in development.

---

[32] Nat'l Ctr. for Learning Disabilities, *Unlocking Futures: Youth with Disabilities and the Juvenile Justice System* 6 (2023).
[33] CDHS, *supra* note 23 at Question 5.
[34] Colo. Rev. Stat. § 19-2.5-304(3) (2025).
[35] CDHS, *supra* note 12, at 83.
[36] CDHS, *supra* note 11, at 19.
[37] Legislative Council Staff, *HB24-1038 Final Fiscal Note* 2 (2024).

### ii. Opinion.

State reports show that many young people have been diagnosed with a variety of disabilities. Decades of research and my own experience confirm that people with disabilities are more likely to thrive in community settings that provide the opportunity to develop and strengthen cognitive, behavioral and functional skills.[38] Compared to matched peers, people with disabilities living in institutional environments are less likely to develop adaptive and functional skills.[39] Community settings also provide higher quality and more satisfying life experiences, leading to reduced stress and improved mental health along with lower levels of aggressive, self-injurious or other challenging behaviors.[40] Compared to similar peers placed in institutions that segregate them from the community, youth with severe emotional or behavioral disorders who receive community wraparound services have more stable living arrangements, reduced psychiatric hospitalization and decreased juvenile justice involvement.[41]

Placement in a secure custody institution removes young people from their families, communities, educational opportunities, peers, and cultures. Moreover, detention facilities have neither the staff nor the facilities to respond to the challenges associated with their disabilities. For detained youth, the community services and placements that can address their disabilities and support their development in a setting more integrated into the community can also mitigate the risks of releasing them from secure detention.

The materials reviewed support the inescapable conclusion that the State's failures are not limited to a small number of especially challenging cases. The State's own reports as well as investigations by outside organizations and journalists show a persistent, statewide inability to provide residential placements, residential substance abuse treatment, foster or kin placements and a robust, effective community-based continuum of intensive support and supervisory services.[42]

---

[38] Oh-Young & Filler, *supra* note 1; Kefallinou et al., *supra* note 1; Dalgaard et al., *supra* note 1; King et al., *supra* note 1; Bredewold et al., *supra* note 1.

[39] Charlie Lakin et al., *Behavioral outcomes of deinstitutionalization for people with intellectual and/or developmental disabilities: Third Decennial Review of Studies, 1977-2010,* 21(2) Pol'y Rsch. Brief 1 (2011).

[40] Jim Mansell, *Deinstitutionalization and community living: Progress, problems and priorities*. 31(2) J. of Intell. & Developmental Disability 65 (2006).

[41] Jesse Suter & Eric Bruns, *Effectiveness of the wraparound process for children with emotional and behavioral disorders: A meta-analysis* (2009). Presented at the 22nd Annual Research Conference: A System of Care for Children's Mental Health: Expanding the Research Base.

[42] CDHS, *supra* notes 9, 10, 11, 12, and 23; Christopher Osher & Julia Cardi, "*Colorado Youth Detention Dilemma: Kids Languish In Lockup Despite Releasable Status*" Denver Gazette (Sep. 10, 2023), https://gazette.com/2023/09/09/colorado-youth-detention-dilemma-kids-languish-in-lockup-despite-releasable-status-6d4a3f8e-4cf7-11ee-81c1-dfe8adbe0164/.

The small proportion of youth assessed as needing residential treatment who are ever actually placed in such a facility strongly indicates a lack of beds, and therefore state-level funding. While it is possible that intensive home-based treatment, including wrap-around services, might offer an effective alternative to residential treatment, the reports provide no evidence that such services are actually being offered to these young people. Based on my experience, and the documented lack of services and supports in Colorado, it is more likely that following an extended stay in secure custody, these young people are detained until their adjudicatory hearing and then released without the services and supports necessary to respond to their behavioral and mental health needs.

It appears from the State's own data that a young person with a disability due to complex and serious mental health problems is highly likely to spend a month or more awaiting a referral for assessment, another month or more awaiting placement in the recommended program and then be released not to the recommended placement but instead to services much less intensive than recommended by an independent evaluator.[43]

## C. The State routinely unnecessarily confines foster children in secure detention.

Children in the State's foster care are entitled under Colorado law and basic standards in the field to placement in the least restrictive setting that meets their needs, and the State bears a parental duty to secure that placement.[44] The State's own reports show it is failing that duty on a large scale. Foster-involved youth are both the largest group in Colorado's detention facilities and the group held there the longest. The available evidence indicates that the same practice failings described in detail below result in the unnecessary and extended detention of foster youth.

### i. Documents Reviewed and Basis for My Observations.

Children who are involved with Colorado's child welfare system make up the majority of the population held in the State's juvenile detention facilities. The SFY24-25 *Limit Detention* report found that almost 1500 of the roughly 2000 unique youth detained during the year had some child welfare involvement, with 959 youth having an active

[43] CDHS, *supra* note 12, at 83.

[44] *See* American Bar Association Criminal Justice Standards on Dual Jurisdiction Youth, which state "Services provided to youth removed from their home or community should be provided in the least restrictive setting and a setting that is close to family, consistent with public safety and the safety of the youth." https://www.americanbar.org/groups/criminal_justice/resources/standards/dual-jurisdiction-youth/; *See also* Council on Accreditation Residential Treatment Services standards (2023), https://www.social-current.org/2023/05/2023-coa-accreditation-standards-updates/.

child welfare case.[45] On the State's own accounting then, roughly three out of every four young people admitted to secure detention in Colorado are known to the child welfare system, and roughly one in two is a child for whom the State has an open, active child welfare case.

These same foster youth had materially longer stays in detention compared to other youth: an average of 41.8 days and a median of 19.3 days compared to 17 and 2.8 days respectively for other youth.[46] The most recent SFY25-26 *Limit Detention* report, issued in July 2026, showed an even larger gap: an average of 47.7 days and a median of 20.4 for child welfare youth versus an average of 16.5 days and a median of just 2.8 days for other youth.[47] Measured at the median, a foster child now spends roughly seven times as long locked in a Colorado detention facility as a detained child who is not in the State's foster care.

More data and deeper analysis is required to understand fully how often and for what period of time a young person is detained because the child welfare system is unable to come up with a placement, how these cases are eventually resolved, and whether alternatives could have either prevented the detention admission entirely or could have greatly shortened the length of stay.

However, the available materials indicate that the same key practice failings described below help explain why foster children remain in locked detention after a court has found them releasable. As described more fully below, the state has not developed the placements and services these children require, including an adequate array of foster homes and therapeutic foster homes.[48]

In addition, responsibility for these foster children is split across agencies without state level guidance by CDHS. Legal custody is often transferred to the county child welfare agency while the Division of Youth Services retains temporary physical custody of the child in a locked facility.[49] Frontline workers in the juvenile justice system see the placement of youth who have an active child welfare case as the responsibility of the child welfare caseworker.[50] Child welfare workers on the other hand often prioritize other foster children over detained youth, whom they assume to be in a safe environment. [51] Funding authority is divided further still, among county human services, Medicaid, the Regional Accountable Entities, the Behavioral Health Administration, local

[45] CDHS, *supra* note 11, at 11.
[46] *Id.* at 95.
[47] CDHS, *supra* note 12, at 32.
[48] CDHS, *supra* note 10, at 53–54.
[49] CDHS, *supra* note 23 at Question 5.
[50] CDHS, *supra* note 23 at Question 5.
[51] Osher & Cardi, *supra* note 42.

CYDC coordinators, and in some cases a parent's private insurer. CDHS' failure to coordinate across systems on behalf of foster youth is discussed in detail in section D below.

The result is that, under Colorado's current system, no one is accountable for the individual foster child. Multiple governmental and contracted staff carry some fragment of case management, but no single person holds the responsibility and authority to build and drive an individualized plan across the involved agencies. Based on the documents I have reviewed there is no indication that CDHS has provided guidance on who should hold this responsibility.

Finally, as described more fully below, the State does not maintain sufficient data systems to address this problem. Trails, the child welfare information system, is siloed from the Detention Bed Utilization Tracking System, Colorado Courts Data Access, and county financial systems; data from each must be linked by hand.[52] The State cannot track how long a foster youth remains in detention after being determined releasable and does not collect data on provider capacity and referrals.[53]

These failings have persisted for years without correction. As far back as 2018, a report by the Justice Center of the Council of State Governments identified key problems that included a lack of foster care placements and the detention of children who fail out of child welfare placements.

### ii. Opinion.

In my opinion, the extended confinement of foster children in locked detention facilities is the most obvious and grievous consequence of the fragmentation and misalignment of Colorado's services for young people. These are children whom the State removed from their homes, for whom the State has assumed the duties of a parent, and who are wholly dependent on the State for their care and protection. Colorado law requires that they be placed in the least restrictive setting appropriate to their needs, and basic standards in the field of foster placement require the same. A shortage of placements and services and an inability to coordinate among the State's own divisions does not justify holding a child in a locked institution after a judge has found that child should be released.

---

[52] CDHS, *supra* note 11, at 23–24.
[53] CDHS, *supra* note 11, at 103.

## D. CDHS's systemic failings cause this unnecessary secure custody detention.

As noted in the Executive Summary, the State's inability to promptly move young people from locked secure custody institutions to less restrictive placements with appropriate services—whether to their own homes, kinship care, foster care or other out-of-home placement—is the result of three interrelated systemic failures:

1. Failure to adequately fund, effectively develop, fully implement and consistently sustain community-based services and placements as alternatives to locked secure custody institutions, resulting in gaps, bed and service shortages, delays in releasing youth, and mismatches between assessed needs and actual services offered;

2. Failure to develop the information management, analysis and planning capacity to successfully design, implement and manage a system and a continuum that could eliminate the unnecessary detention of young people, resulting in an inability to diagnose and address pressing systemic problems; and,

3. Failure to ensure coordination and collaboration across agencies and jurisdictions that share responsibility for funding, case management and decisions affecting young people held in detention, resulting in delays, confusion and an overall lack of urgency in responding to the unnecessary detention of young people.

Each of these systemic failures are detailed below, along with potential pathways for improving performance through focused corrective action.

### a. The State fails to adequately fund, develop, implement and sustain community-based services and placements as alternatives to locked detention.

Based on my review of the limited documents available thus far in this case, and based on my decades of experience in working with child-serving systems on alternatives to detention and incarceration (including for youth with disabilities and youth in the foster system), there is significant evidence that Colorado has not adequately funded, effectively developed, fully implemented or consistently sustained sufficient community-based services and placements as alternatives to secure custody detention.

#### i. Documents Reviewed and Basis for My Observations.

The Colorado legislature has enacted statutes with explicit language to restrict the use of detention to only those youth who present a substantial risk of serious harm to others

or a significant risk of flight from prosecution. The statute goes even further by enumerating circumstances for which detention is expressly prohibited:

A juvenile shall not be placed in detention solely:

> **(a) Due to lack of supervision alternatives, service options, or more appropriate facilities;**
> **(b) Due to the community's inability to provide treatment or services;**
> **(c) Due to a lack of supervision in the home or community;**
> (d) In order to allow a parent, guardian, or legal custodian to avoid legal responsibility;
> (e) Due to a risk of the juvenile's self-harm;
> **(f) In order to attempt to punish, treat, or rehabilitate the juvenile;**
> (g) Due to a request by a victim, law enforcement, or the community;
> (h) In order to permit more convenient administrative access to the juvenile;
> (i) In order to facilitate further interrogation or investigation; or
> **(j) As a response to technical violations of probation unless the results of a detention screening instrument indicate that the juvenile poses a substantial risk of serious harm to others or if the applicable graduated responses system adopted pursuant to section 19-2.5-1108 allows for such a placement.[54] (emphases added).**

The four available *Limit Detention* annual reports refer to a range of alternatives to detention presently available, at least at some level of capacity, in some counties and judicial districts.[55] This is consistent with the two available CYDC Juvenile Service Plans, submitted for SFY25-26 by Judicial Districts 2 and 8.[56]

These documents include references to a wide variety of services and placements potentially available as alternatives to detention. Taken together, the full array would be considered a fairly robust continuum, including: home detention supports and pretrial supervision of conditions of release;[57] community based treatment and family supports;[58] temporary shelter care; foster and kinship care; therapeutic foster care; residential placements;[59] and residential substance use treatment.

[54] Colo. Rev. Stat. § 19-2.5-304 (2025).
[55] CDHS, *supra* notes 9, 10, 11, and 12.
[56] Colo. Youth Detention Continuum, Eighth Jud. Dist, *Juvenile Services Plan for Fiscal Year 2025–2026.* Colo. Youth Detention Continuum, Second Jud.Dist, *Juvenile Services Plan for Fiscal Year 2025–2026.*
[57] This includes electronic monitoring, substance use monitoring, in-person supervision visits.
[58] This includes mentoring, individual and family therapy such as Multisystemic Therapy and Functional Family Therapy, restorative justice interventions, Youth Advocate Programs, Credible Messenger-type relationships.
[59] This includes Qualified Residential Treatment Programs, Psychiatric Residential Treatment Facilities, Residential Child Care Facilities, group homes.

Nevertheless, the State has documented critical shortfalls in the actual availability and capacity of these services through multiple reports, discussed below.

The SFY23-24 *Limit Detention* report provides a clear summary of the severe gaps in services and placements that are directly causing the unnecessary detention of release-eligible young people. The report states that "(e)very JD (judicial district) reported limited options for placements and services," and that those limited options resulted in "lengthy waitlists for those (placements and services) that are available."[60]
The same report described the findings of a June 2022 Youth/Family Gap Survey, summarizing the responses of representatives of county departments of human or social services. The top five barriers reported by this group were:

1. Lack of appropriate placement options (regarding level of care);
2. Waitlists for services;
3. Lack of substance abuse treatment (specifically inpatient);
4. Poor access to mental health services; and
5. Lack of appropriate available services.[61]

The report's findings also include feedback from judicial districts that listed a lack of inpatient substance abuse services, poor access to mental health services, excessively long waiting lists and concerns that youth were referred to programs chiefly because they were actually available in their region even though they were not the best fit for their needs.[62] Judicial district respondents described placements as "cost prohibitive", especially "if funding via Medicaid or county departments of human or social services is not accessible due to a family not qualifying or already being involved with these services".[63]

In response to a question about staff capacity "to engage with communities and curate a list of community-based providers of non-residential services," CDHS noted that almost all the judicial districts have local coordinators who work with local planning committees to seek out service providers. The response goes on to state: "It is important to note, that the majority of youth awaiting mitigating services, are awaiting residential placement."[64]

The State has gaps in the continuum of services and placements that could provide an alternative to detention. For example, although the state lists them as an option for placement, currently the State has no staff-secure detention options available[65] and the

[60] CDHS, *supra* note 10, at 53–54.
[61] *Id.* at 54–55.
[62] *Id.*
[63] *Id.*
[64] CDHS, *supra* note 23, at Question 38.
[65] CDHS, *supra* note 11 at 73.

State has no residential substance abuse treatment programs and surrounding states do not accept Colorado Medicaid payments.[66]

As documented above, the State has explicitly acknowledged the systemic failure to develop, fund, and implement an effective continuum of services that would enable hundreds of young people to avoid unnecessary locked confinement while awaiting their formal hearing.

In the annual legislatively required report of efforts to limit detention of young people, CDHS expressly acknowledges the consequences of inadequate funding of services and placements that should serve as an alternative to locked confinement of releasable youth. The *Limit Detention* annual report for SFY24-25 includes recommendations to expand investment and to create additional placement options, implement existing funding for placements and ensure the existing incentives for providers are adequate to expand options for youth with simplex mental health and other needs.[67]

The CDHS responses to questions posed by community advocacy groups provides additional evidence that the State is failing to provide needed services and acknowledges that this failure leads directly to using secure locked institutions as holding facilities for young people with severe behavioral, mental health and substance abuse problems. The response to the question "What steps are being taken to ensure quick, if not immediate, placements for youth once they're releasable?" includes a list of factors that the State says can delay release, including:

- A parent refusing to sign a Personal Recognizance (PR) bond
- ***Waiting for an available bed in an out-of-home placement***
- Arranging for transportation for youth returning to their home state
- ***Limited availability of specialized service providers***
- ***Complex needs (e.g., violent offenses, multiple placement failures, or severe mental health challenges) that make placement difficult (emphases added)***[68]

The SFY24-25 *Limit Detention* report provides at least a partial view into how inadequate state-level funding affects treatment options and thus unnecessarily long stays in secure custody. The report summarizes data on youth referred for an "independent assessment," which serves as the critical gateway to placement and services for youth with complex needs. Three key data points stand out:

---

[66] CDHS, *supra* note 10, at 67.
[67] CDHS, *supra* note 11, at 13.
[68] CDHS, *supra* note 23, at Question 5 (emphasis added).

- The average length of stay before referral for an independent assessment was 33.2 days. The overall average length of stay for releasable youth who were referred for an independent assessment was two and a half months (76.2 days).[69]
- Colorado has very few residential substance abuse treatment facility for youth; no out-of-state residential substance abuse treatment facilities accept Colorado Medicaid.
- Of all youth for whom placement in a Qualified Residential Treatment Program (QRTP) was recommended, only 22.6% were placed in a QRTP. Almost half were instead released to their home or to a less intensive placement and another 13% remained in detention awaiting a QRTP bed.[70]

### ii. Opinion.

Despite the apparently rich array of alternatives to detention listed on paper in plans and reports, the available evidence shows inadequate capacity to meet the needs of detained youth. Many of the identified services are only available in parts of the state. Most of the identified services, especially those providing residential care, have only enough capacity to accept a small percentage of referred youth. While they are listed as a possible recommended level of care, currently Colorado has very few residential substance abuse beds within the state and out-of-state programs do not accept Colorado Medicaid and has no staff-secure shelters that could serve as an alternative to detention in a locked secure custody institution.[71]

The reports and documents I reviewed indicate that the state is fully aware of the operational need to increase fiscal investment and execute systemic interventions. The reports show that the State recognizes that a lack of resources prevents youth deemed "release-eligible" by a judicial officer from being promptly placed in appropriate settings.

### iii. Corrective Action Options.

Developing, implementing and sustaining a robust, effective continuum of services, supports and placement options for youth with complex needs is difficult. Yet this is one of the core responsibilities of the Colorado Department of Human Services and the Colorado Youth Detention Continuum. The record shows that hundreds and hundreds

---

[69] CDHS, *supra* note 11, at 76–77. The 76.2 day figure is an underestimate of the actual average length of stay, as 11 youth (13%) were still in detention at the time of the report and so their days in detention were calculated only up to the end of the fiscal year.

[70] *Id.* at 77.

[71] Secure custody detention institutions rely heavily on hardware security, such as multiple locked doors, fencing and concertina wire to prevent escape; in short, the environment communicates "youth jail or prison." Staff-secure shelters are small group homes meant to provide short-term placements for youth who cannot return home while alternative arrangements are sought. They provide 24/7 eyes-on staff for close supervision and security but are far less restrictive than detention institutions.

of young people have been unnecessarily locked in secure custody facilities because the Department has failed to fulfill this core responsibility.

Review of the materials available to me suggest both short-term and long-term opportunities to address the gaps in the existing continuum, each of which I have had direct experience with in multiple state systems. In the short-term, the State and its partners should strengthen the community-based services and supports for youth released to their families, including those placed in kinship care. The State should also implement a treatment foster care program specifically targeting youth in the juvenile justice system who exhibit severe behavioral and mental health problems.

In the long-term, the State should integrate planning, funding, case decision-making, and case management for the relatively small number of youth who truly require some period of placement in a residential treatment facility.

Critiques and recommendations for the current continuum of services sometimes call for expansion of residential treatment and other placement options. Expanding residential treatment capacity is no doubt necessary and urgent, as evidenced by the high number of independent assessments that recommend residential treatment, the waiting lists for beds, and the near-universal reports from the field that the lack of these placement options drive most of the extended stays in detention for youth who could be released if a bed were available.

Nevertheless, the State's best option to quickly reduce unnecessary detention would be to expand the capacity of the non-residential services part of the continuum. This expansion would also reduce pressure on the residential elements of the continuum, providing time for a more thoughtful and strategic long-term approach.

For example, the State could expand programs that provide intensive supervision and mentoring, and expansion and deepening of services and supports for kinship care placement for youth who are not able to return to their own homes. These services directly mitigate the risk of a young person committing another offense and may help to address the youth's mental health and behavioral problems by stabilizing their living situation. Some examples of these programs include:

- Youth Advocates Programs: YAP Advocates meet with young people and their families several times per week to provide supervision, mentoring and other supports, based on an individualized plan that emphasizes safety and support. YAP has been recognized by the National Institute of Justice as a promising model (meaning the model is evidence-based although not all the studies meet the highest scientific standards for rigorous evaluation) and is a Gold Medal Program for Positive Youth Justice.[72]

[72] Youth Advocates Program, *Our Impact,* https://www.yapinc.org/Our-Impact (last visited Sept. 20, 2026).

- Credible Messengers: Developed in New York City's probation department in 2013 and replicated in Washington D.C. in 2016, Credible Messenger programs are now expanding in states and cities across the country. The Urban Institute found reductions of 60% in recidivism in New York and the John Jay College of Criminal Justice found 50% reductions. The program enlists adults with histories of criminal justice involvement who have demonstrated successful reintegration into the community to serve as mentors and assist in supervision for young people.[73]

- Functional Family Therapy (FFT) is an evidence-based family intervention with over 50 studies documenting effectiveness over the last five decades. FFT is included as an effective model in the Family First Prevention Services Act (FFPSA) database and is therefore eligible for Federal reimbursement funding.[74]

- Multisystemic Family Therapy (MST) is another evidence-based intervention with decades of research support and also eligible for Federal reimbursement funding through the Family First Prevention Services Act. The model provides intensive counseling and support to families, with multiple sessions per week and 24/7 availability for crisis intervention.

- Wraparound Services: Developed over 30 years ago in Milwaukee, Wraparound is both a practice model and a systemic intervention. Bringing together funding and decision-making across multiple systems, Wraparound provides a highly individualized plan and support network for youth with serious mental health and/or behavioral problems.[75] The model includes 24/7 crisis intervention, a blend of natural and professional supports and intensive case management to ensure coordination and effectiveness.[76] Results for high-risk youth include a recidivism rate of less than 10% and reductions in residential treatment expenditures.[77]

---

[73] Credible Messenger Mentoring Movement, *Our Journey to Launch CM3,* https://crediblemessenger3.org/ (last visited Sept. 18, 2026).
[74] FFT LLC, *Evidence-Based Interventions for Youth and Families*, https://www.fftllc.com/ (last visited Sept. 18, 2026).
[75] Nat'l Wraparound Initiative, *Wraparound Basics or What is Wraparound: An Introduction, https://nwi.pdx.edu/wraparound-basics/*; Wraparound Milwaukee *30 years of Community Impact*, https://county.milwaukee.gov/files/county/DHHS/BHD/Wraparound/WM-30-Years-of-Community-Impact.pdf (last visited Sept. 18, 2026).
[76] Patricia Miles et al., *Wraparound Implementation Guide: A Handbook for Administrators*, Nat'l Wraparound Initiative at 53–54; https://nwi.pdx.edu/wraparound-implementation-guide/; County of Milwaukee, *Wraparound Milwaukee 2017 Quality Assurance Report*, /https://county.milwaukee.gov/files/county/DHHS/Providers/2017QAQIAnnualReport.pdf (2017).
[77] Some counties in Colorado reportedly provide YAP, FFT and/or MST but the material provided to me does not include information on how many counties offer these services as an alternative to detention. The material also does not include data on how many young people receive these services as part of a release plan, waiting lists, rejections of referrals or other basic service delivery data. I anticipate reviewing additional material on this once discovery in the case proceeds.

HB-24-1038 directed HCPF, CDHS and BHA to expand access to treatment foster care as an alternative to residential treatment facilities.[78] Drawing from the experience of other states and counties, Colorado could implement a treatment foster care program specifically targeting youth involved with the juvenile justice system—including detained youth—who exhibit severe behavioral and mental health problems.

The premier model for this approach is Treatment Foster Care Oregon ("TFCO") (formerly known as Multidimensional Treatment Foster Care). The program works closely with both the birth family and the foster family, with the goal of providing intensive supervision, addressing risky and illegal behavior, returning the young person home and enabling their families to guide them to a successful transition to adulthood. TFCO is a heavily researched, evidence-based model found to be effective by multiple studies and is included on lists of effective programs by the Department of Justice Office of Juvenile Justice and Delinquency Prevention; the Coalition for Evidence-Based Policy; Crime Solutions; and Blueprints for Healthy Youth Development (University of Colorado, Boulder).[79]

Another example of an effective alternative to detention are Day/Evening Reporting Centers. These centers require youth to spend a portion of their days—usually between 3:00 pm and 9:00 pm, which is when youth crime peaks—in a community center where they can engage in highly structured positive activities including tutoring and other academic support, career readiness, mentoring and recreation.[80] If these types of programs can be housed in an existing community center, they can be mounted fairly quickly and inexpensively given a stable source of funding.

Expansion of family-centered and community-based services can be done much more quickly and much less expensively than expanding residential treatment capacity. As a result, many more young people could be released from detention and many more families would be helped. This strategy would reduce waiting lists for currently available residential beds while also reducing the populations of the detention facilities.

For both SFY23–24 and SFY24–25, almost two-thirds of youth released from detention went back to their own homes, and another 13.9% and 13.1% were placed with kin.[81]

---

[78] Legislative Council Staff, *supra* note 37, at 2.
[79] Treatment Foster Care Oregon, https://www.tfcoregon.com/#:~:text=OJJDP%20Model%20Programs%3A%20EFFECTIVE (last visited Sept. 20, 2026).
[80] Paul DeMuro, *Consider the Alternatives*, Annie E. Casey Foundation, at 19–21, https://www.bernco.gov/public-safety/wp-content/uploads/sites/60/2021/03/AECF-ConsidertheAlternatives-1999.pdf.
[81] CDHS, *supra* note 10, at 94; CDHS, *supra* note 11, at 107.

### b. The State has failed to develop the necessary information management, analysis and planning capacity.

Based on my review of the limited documents available thus far in this case, and based on my decades of experience in working with child-serving systems on alternatives to detention and incarceration (including for youth with disabilities and youth in the foster system), there is significant evidence that Colorado has not developed the information management, analysis and planning capacity to successfully design, implement and manage an effective system and continuum of services.

The State has been aware for years of the problems and barriers that have resulted in the unnecessary secure custody detention of hundreds of young people. For at least the last four years, as documented in mandated annual reports to the legislature, CDHS has published plans to address these problems. Yet efforts to address these problems have not been informed by the basic data and information necessary to assess the systemic causes of the problems and to develop effective solutions.

#### i. Documents Reviewed and Basis for My Observations.

The State acknowledges the lack of reliable and consistent data necessary to identify the key factors driving extended detention of release-eligible youth. The State's own reports show a record of persistent structural deficiencies in information management, siloed data systems, inefficient manual workarounds, critical data gaps, and almost no actionable data on the providers within the alternatives to detention continuum. As a result, the State is unable to produce the integrated, reliable information necessary for both system-level planning and real-time case planning.

To provide basic information to the legislature, CDHS relies on at least five separate systems and is unable to access critical planning data from several others. Core data sources including Trails (child welfare information system), Savio Management Group Data System, the Detention Bed Utilization Tracking System (DBUTS), Colorado Courts Data Access, and county-level financial systems are siloed, such that data from each must be linked manually.[82] Other data must be compiled manually by reading case records; the State reports that pulling information from court case records "represents thousands of hours of research alone for this report."[83]

The State lacks an integrated information system capable of collecting and analyzing data on release-eligible youth across the multiple agencies and jurisdictions responsible for delivering placement and other services. The State must therefore collect and align data from multiple sources manually, often with conflicting definitions of key variables,

[82] CDHS, *supra* note 12, at 24.
[83] CDHS, *supra* note 10, at 25.

such as the definition of "releasable" youth in the first three annual reports and the loss of critical performance data, such as the inability to track how long youth are held in detention once they have been determined to be "awaiting mitigating services."[84]

While a data sharing agreement was completed among the Division of Child Welfare, the Division of Youth Services, and the Judicial Court Services Division in September 2025, the agreement merely provides for sharing monthly datasets of certain juvenile court records. The purpose of sharing the monthly datasets is "to link additional and otherwise inaccessible court records with youth records in Trails (the child welfare information system) … however, these datasets are voluminous and require manual matching."[85]

The State must often use a "stopgap data collection method for data requested by the [CYDC] Advisory Board[.]"[86] The SFY24–25 *Limit Detention* report lists critical limitations of this method, including relying on "multiple users, manual data entry, expunged records and attempting retroactive lookups for additional data requests."[87] Basic court information is often gathered manually through reading case notes "to find information around releasable status, release dates, bonds, placements and more."[88]

The State has not historically collected and analyzed data on which providers reject referrals for services or placements, how often each provider rejects a referral and the reasons given for those rejections.[89] In responding to questions from community advocacy groups, the State was unable to link the systemic bottlenecks leading to extended detention of release-eligible youth to the strains on bed-capacity of detention facilities.[90]

The State is unable to provide statewide information about specific providers, their funding, the services provided and the target population, the level of demand for their services, criteria for acceptance, reasons for rejecting referrals, lengths of stay, their capacity and their performance measures. There is not even a public-facing list of providers contracted by the judicial district CYDCs, and compiling such a list would require manual review of each district's annual plan and/or surveying every local CYDC coordinator.[91] Yet the SFY23–24 *Limit Detention* report noted: "Every JD [judicial district]

---

[84] CDHS, *supra* note 10, at 22; CDHS, *supra* note 11, at 21; CDHS, *supra* note 12, at 17.
[85] CDHS, *supra* note 12, at 20.
[86] CDHS, *supra* note 11, at 24.
[87] *Id.*
[88] *Id.*
[89] *Id.* at 103.
[90] CDHS, *supra* note 23, at Question 8–9.
[91] *Id.* at Question 37.

reported limited options for placements and services, which they report, in turn, results in lengthy waitlists for those that are available."[92]

In shaping plans, CDHS has been unable to gather and use information directly from young people themselves and their families, thus missing critical perspectives, ideas, feedback and recommendations from those most directly affected by the system's failures.[93]

C.R.S.19-2.5-1404 requires the Department of Human Services to report annually on systemic barriers to providing placement and services to detained youth to ensure they are in the least restrictive environment. The *Limit Detention* report published in state fiscal year 25–26 was the first annual report to include a response to this mandate. According to the report, a drop-down menu was added to the Detention Bed Utilization Tracking System (DBUTS) to allow users to enter a barrier to finding a service or placement.

Rather than providing insight into systemic barriers, however, this method identified four characteristics of youth themselves that were considered by the respondents as barriers for all youth and for youth detained more than 130 days: History of aggressive behavior (35.2% for all admissions and 60.1% for youth detained more than 130 days); Mental health needs (22.1% and 39.3%); History of elopement (21.5% and 27.7%); History of substance abuse (14.3%). No identified barrier was identified for almost 27.7% of youth detained for over 130 days.[94]

None of the mentioned barriers consider system or provider barriers, focusing solely on individual youth characteristics, characteristics that should be expected in a delinquent population. The entries lack criteria regarding recorder qualifications or judgment reliability. Moreover, it is concerning that 27.7% of youth detained 130+ days had no barrier listed. This supports the conclusion that systemic barriers were rarely, if ever, considered by the respondents.

[92] CDHS, *supra* note 11, at 53–54.

[93] The first three annual *Limit Detention* reports cite variously a lack of time and staff to develop a survey (CDHS, *supra* note 9, at 32); concerns about "saturation" which would require a "targeted approach" (CDHS, *supra* note 10, at 69); and a lack of a system to track results from "family engagement meetings" facilitated by local Collaborative Management Programs (CDHS, *supra* note 11, at 85). The latest *Limit Detention* annual report, released in July 2026, continued to focus on family engagement meetings as a potential source of gathering input from youth and their families, but was unable to provide any information, stating "further exploration of available and accessible data resources is required in order to provide meaningful analysis" (CDHS, *supra* note 12, at 20).

[94] CDHS, *supra* note 12, at 75, 85.

### ii. Opinion.

Designing, implementing and sustaining an effective system and a continuum of services for young people with multiple and often complex needs is difficult. It is also a clear responsibility of any governmental agency that takes physical custody of a child and locks that child in a secure custody institution, especially when a judge rules that the child can be released to an alternative service or placement.

To fulfill that responsibility, the State must develop the information management, data analysis and planning capacity to successfully design and implement a system and continuum that could eliminate the unnecessary detention of young people.

The fragmented, misaligned data systems across the multiple agencies and jurisdictions sharing responsibility for release-eligible youth parallels and worsens the case-level fragmentation and disjointed accountability that leads directly to young people being held in secure custody detention unnecessarily. At both the whole-system and case levels, the failure to integrate information and resources for these vulnerable youth betrays a lack of urgency to meet their needs. This lack of urgency is reflected in a willingness to use the detention facilities as convenient and secure holding pens for young people while they await needed services.

The State is unable to track provider capacity, patterns of rejection of referrals, reasons for denial of admission and youth-specific sources of funding across the multiple governmental and private organizations providing funding. This failure is a major, almost insurmountable, barrier to creating and maintaining a continuum of alternatives to detention for young people eligible for release.

The State is reportedly working on the CDHS legacy TRAILS information system, which provides an opportunity to address the multiple information gaps listed above, but there is no evidence in the materials I reviewed on whether or how the changes will address the problems listed above or a timeline for when changes will be rolled out.

The annual reports to the legislature on limiting detention contain ample descriptive data to reveal the depth, severity and chronicity of the failure to provide needed services to young people eligible for release. More critical analysis is missing, however, because the reports lack significant data elements necessary to fully assess the causes and barriers as well as lacking the more in-depth analysis necessary to suggest solutions. The limited information reporting on "barriers" included in the State's reports appears to blame the youth themselves, rather than identifying actual system barriers. The reported "barriers" reflect characteristics of the young people rather than provider slot availability, provider rejection histories, geographic service shortages budgetary constraints or other systemic failures.

Similarly, as noted below, the *Limited Detention* report published in SF Y25–26 does not provide sufficient financial analysis to identify the sources of funds, how funds are currently apportioned, or even whether allocated funds are fully expended. This type of analysis is necessary to identify opportunities for reallocation as well as opportunities to avoid unnecessary expenditures. For example, would reallocating funds from expensive and often unnecessary locked detention enable development of a more robust continuum of services and placements in the community? Would agreements to purchase a set number of bed spaces or service slots per year (rather than per diem contracts) provide a level of financial stability and predictability to enable providers to open, expand and/or stay in business and provide incentives for them to accept referrals from detention?

The Annual *Limit Detention* reports published both in July 2025 and July 2026 provide basic information about admissions and lengths of stay. Although more in-depth and comprehensive analysis would likely yield multiple opportunities to improve services and supports for youth detained in a locked institution, the relatively limited data included in these two reports led to identically worded conclusions pointing to "…two potential opportunities for analysis and decision-making:

1. To focus on the youth with short detention admissions for potential lower-level overrides, with less serious offenses and no prior detention history.

2. To focus on the youth with admission over 30 days to better understand the conditions that led to detention and the barriers to placement outside of detention."[95]

Both of these *Limited Detention* reports correctly identify these two data points as critical indicators of opportunities to reduce unnecessary detention (as well as to free up resources for more effective, humane alternatives, although the reports do not discuss this benefit). Rather than labeling these as opportunities for future analysis and decision-making, however, these two data points call for urgent and immediate action. Seeing the exact same findings and the exact same language about next steps after a full year has gone by underscores the lack of urgency shown by CDHS to actually address the problems that the agency has known have existed for years.

Research, data and experience in the field across many jurisdictions have identified these two data points as critical indicators of the need for policy, practice, and system reforms for over three decades**.** Unfortunately, neither the 2025 nor the 2026 *Limit Detention* report includes trend lines for these data points, an important element in performance management.

[95] CDHS, *supra* note 11, at 57; CDHS, *supra* note 12, at 58.

Nevertheless, these reports demonstrate clearly that young people are being held in locked detention due to the failure of CDHS to divert them from admission entirely and, for those who are admitted, to quickly find more effective, safer alternatives through intensive supervision, mentoring and home-based interventions or through an alternative placement.

### iii. Corrective Action Options.

Based on the materials available to me, and my direct experience in the field in multiple state systems, it appears that Colorado continues to invest in a child welfare information management system with limited ability to integrate with the information systems of other child-serving public agencies. Federal funding and regulations have shifted from the legacy Statewide Automated Child Welfare Information System (SACWIS) to the Comprehensive Child Welfare Information System (CCWIS) framework, which supports and actually encourages more flexible, shared information systems.[96]

Federal regulations and funding also allow for an incremental approach to transitioning to a CCWIS system which could meet many of Colorado's immediate needs for integrated system-level and case-level planning. One analysis of the opportunities presented by the Federal transition to CCWIS found that

> "…states and tribes may obtain FFP (Federal Financial Participation) to build smaller, more modular subsets of functionality aligned with their practice models, or perhaps with an incremental legacy system replacement plan.
>
> They might choose to obtain certain types of data through automated integrations rather than collect it within the child welfare application itself. From an implementation perspective, they might opt for a project approach based on modern Agile software development techniques, as California and other states have done."[97]

A number of states have implemented multi-system information systems, including Delaware, New Hampshire, New Mexico and Vermont, while others rely on direct data linkages among separate systems to share data, including Arizona, Maine and Rhode Island. Colorado can and should follow the lead of these states.

In the short term, two information system modules could be developed and launched rather quickly. The first would be used by the lead case manager to track youth and family information for those relatively small number of youth who are referred for an Enhanced Standardized Assessment (ESA).

---

[96] Binti, *CCWIS vs. SACWIS: What Changed in Regulation, Funding and Daily Operations* (June 25, 2026). https://binti.com/blog/ccwis-vs-sacwis/.
[97] Casebook, *Understanding the CCWIS Final Rule*, https://www.casebook.net/blog/understanding-the-ccwis-final-rule/ (last visited Sept. 20, 2026).

The second would track key provider information as summarized above: their funding, the services provided and the target population, the level of demand for their services, criteria for acceptance, reasons for rejecting referrals, lengths of stay, their capacity and their performance measures.[98] These two modules could then be linked to assist in finding service and placement resources as well as forming the basis for a performance-based contracting system.

The State should also increase resources directed to integrating data and other information across the multiple agencies and jurisdictions that share responsibility for preventing unnecessary secure detention. The continuing failure to integrate information across the multiple agencies and jurisdictions that share responsibility for these young people connects directly to the State's continuing failure to address the systemic problems and barriers detailed in the State's own reports.

The State and its partners must develop a clear understanding of the barriers that exist and the gaps that must be filled. This requires:

- standardized definitions of the youth to be served;
- reliable tracking of the reasons for extended detention stays;
- data on the frequency and reasons for providers rejecting referrals;
- data on the linkage between the number of eligible youth and the day-to-day capacity of service and placement providers;
- basic financial analysis of the sources, allocation and expenditures of the system's multiple funding streams;
- data on post-release outcomes;
- specific gaps in the service continuum across different regions of the state;
- service utilization metrics for each of the different service types;
- agreement on the definition of the core performance metric: mitigating the risk of serious harm to others; and
- feedback and recommendations from young people and their families.

The State must develop the capacity to move from descriptive statistics—what is happening—to analysis—why is this happening. This often requires comparative analysis, examining change over time, comparisons among youth, comparisons across judicial districts, comparisons among providers. This also requires qualitative data to understand context and the "story behind the numbers."

The State should move quickly to develop a deeper understanding of the systemic and provider barriers affecting the release from detention of youth awaiting mitigating services.

---

[98] One example of a suite of modular software solutions for youth and families—including case management and provider tracking--has been developed by Casebook. *See* Casebook, *Casebook for Children, Youth and Family Services*, .https://www.casebook.net/casebook-for-child-youth-and-family-service/ (last visited Sept. 20, 2026). Similar modules are offered by many other developers.

### c. Failures in Collaboration and Coordination of Services.

As with many states, the Colorado system for delivering services to youth and families involved with the juvenile corrections system includes a number of loosely connected departments and agencies at various levels of government, with varying jurisdictional authority and responsibilities, multiple strands of funding and regulations and diffuse networks of service providers, including some operated by a government agency and others operated by nongovernmental agencies under contract.[99]

Each of these agencies and organizations has its own rules, regulations, eligibility and other decision criteria – an absence of consistency and uniformity. They each rely on a variety of local, state and federal funding sources, which in turn have their own rules and regulations. Each has frontline and administrative staff which may include people trained in different disciplines and each has different priorities, norms and cultures. Many are routinely overburdened with high caseloads as well as staff turnover and vacancies.

Typically, the juvenile court transfers legal custody of releasable youth to county human services agencies to find placement and schedules ongoing status hearings. If an out-of-home residential placement is needed, the process is managed by the county DHS, the Regional Accountability Entity (RAE) via Medicaid, or sometimes parents' private insurance. For other mitigating services, local CYDC coordinator work under a judge's oversight via a DYS contract.[100]

---

[99] While not necessarily exhaustive, the list of agencies with some level of responsibility for a youth who has been detained includes: CDHS Division of Youth Services (Operates secure custody institutions and takes physical custody of youth charged with a delinquency offense); CDHS Division of Child Welfare (Funds and supervises county departments of human or social services, including setting statewide policies and rules); CDHS Division of Community Programs (Distributes and oversees state and federal resources for community-based programs; through the Collaborative Management Program (CMP), helps local agencies streamline services for families and children); CDHS Behavioral Health Administration (Responsible for policy, funding, coordination and oversight of behavioral health services); Department of Health Care Policy and Financing/Health First Colorado (Manages programs providing access to health care for low-income families through programs such as Medicaid and CHP+); 4 Regional Accountable Entities (RAE) (Regional coordination of physical and behavioral health funded via Medicaid); Division of Probation Services (At the state level, sets standards and provides support; probation services in the 22 judicial districts provide supervision, casework and other services); 64 county departments of human/social services (Funded, regulated and supervised by CDHS, these county departments are responsible for finding placements for children and youth removed from their homes as well as in-home services to prevent unnecessary removal); Parents' private insurance companies (Depending on a family's insurance plan, pays for hospital, psychiatric residential treatment or qualified residential treatment programs); 22 Judicial Districts; 22 Colorado Youth Detention Continuum planner/coordinators (develop annual juvenile service plans, manage detention risk assessments and bed usage, coordinate with other agencies, provide case management, manage local contracts, collect data and distribute resources).

[100] CDHS, *supra* note 23, at Question 5.

Despite these multiple systems and departments, CDHS is the principle agency responsible for the planning, funding, contracting, oversight, and case management for services and placements for young people in the custody of the Department, whether custody is through child welfare or youth services. CDHS has state-wide responsibility for creating consistency and uniformity across these multiple agencies to ensure that youth in its care are appropriately served, for ensuring effective, integrated case decision-making and case management, and for coordinating the continuum of services for youth who would otherwise be detained.

### i. Documents Reviewed and Basis for My Observations.

Evidence that the State has failed to ensure coordination and integration across jurisdictions, agencies and organizations is abundant in the State's own assessments of CDHS, DYS and CYDC systems, cited previously. Annual reports and other State publications document recurring shortages and misalignment of community alternatives resulting in the confinement of hundreds of young people in secure custody institutions for the purposes of assessment and/or placement.

As far back as 2018, a report by the Justice Center of the Council of State Governments listed essentially the same problems that are repeated in current Judicial District Juvenile Service Plans, surveys of county human and social service departments, annual Limit Detention reports and State responses to questions submitted by community advocacy groups: a lack of alternatives to detention, such as shelter beds, residential placements and foster care; a lack of services and placements to meet the needs of young people with significant mental health, developmental and other disabilities leading to their placement in detention; detention of children who fail out of child welfare placements; and reliance on detention as a holding facility while assessments and evaluations are completed or to allow for the coordination of services.

The evident multiple failures among the different elements of the State's systems of care and protection to provide timely services that allow the release of youth from confinement in secure custody institutions is the direct result of failures to ensure decisions, services and case management are coordinated through cooperative collaboration among all agencies that touch the lives of young people.

The multiple potential sources of funding and authorization for admission—including private insurance, Medicaid, Regional Accountability Entities, local CYDC coordinators, the State's Behavioral Health Administration, and county departments of human or social services—result in a highly fragmented system of care for youth with complex mental health and behavioral needs. Based on the materials reviewed to date, lead responsibility for determining which entity manages and funds placement is unclear.

While coordination failures occur across multiple state systems, perhaps the clearest examples of the challenges of working across agencies and across jurisdictions are seen with young people who are active with both the juvenile justice system and the child welfare system. As described above, these youth had materially longer stays in detention compared to other youth. The most recent *Limit Detention* report, issued in July 2026, showed an even larger gap in the length of stay for youth involved with child welfare than previous reports: an average of 47.7 days and a median of 20.4 for child welfare youth versus an average of 16.5 days and a median of just 2.8 days for other youth.[101]

The longer detention stays for youth with active child welfare involvement suggests that for many youth, the challenges in finding mitigating services lie at the intersection of overlapping responsibilities among county human/social services, the local CYDC coordinators, the Division of Child Welfare (DCW), the Division of Youth Services (DYS), and funding sources, including Medicaid and private insurance.

In my experience with other states and counties, I've found that child welfare workers with heavy caseloads prioritize young children in unsafe living conditions over older detained youth who they assume are in a safe environment. Finding an alternative placement for a detained youth, especially if the youth has complex needs and a history of failed placements, is unlikely to receive urgent attention from a worker trying to find placements for younger children who have been abused or neglected.

This perspective is captured well in a quote from an attorney who served as a Guardian ad Litem, included in a Denver Gazette article that examined delays in finding services and placements for releasable youth held in detention:

> "If anywhere safe was identified for him to go, then they would be able to do that," said S. Grace Williams, the attorney initially appointed as guardian ad litem. "I generally feel like they just kind of refuse to find options for our kiddos that are in detention because they know they at least have a roof over their heads. But it's not a quality placement at all. It's not what we should be investing in."[102]

At the same time, probation officers, CYDC coordinators and other frontline workers in the juvenile justice system see the placement of youth who have an active child welfare case as the responsibility of the child welfare caseworker. The CDHS/DYS response to questions submitted by community advocacy groups states that for the purposes of finding a placement, courts routinely award legal custody of detained youth to child

[101] CDHS, *supra* note 12, at 32.
[102] Osher & Cardi, *supra* note 42.

welfare agencies within county departments of human and social services, even though the Division of Youth Services has temporary physical custody.[103]

Thus, although child welfare caseworkers often view juvenile justice involvement as justification to put cases involving detained youth on the back burner, workers in the juvenile justice system see child welfare as the lead agency in finding a placement for detained youth. These dual agency, cross-over youth are then stuck as the workers try to resolve the "not my kid" disagreements that hinder collaboration and coordination between child welfare and juvenile justice public agencies.[104]

The State's 2025-2029 Child and Family Services Plam (CFSP), submitted to the Federal government as required to access Title IVE funding under the Family First Act includes youth under probation supervision or in DYS custody as part of the target population for the CFSP.[105]This enables the State to claim Federal Financial Participation for services and supports that prevent out-of-home placement for juvenile justice involved youth, as well as for specified out-of-home placements, including foster care, kinship care, treatment foster care, Qualified Residential Treatment Programs and Psychiatric Residential Treatment Facilities.

The CFSP Plan describes a number of ongoing efforts to respond to the fragmentation and agency misalignment problems identified above.[106] The CFSP plan does not include any data or other information on how well or poorly these various collaboration efforts are functioning. Similarly, while the annual *Limit Detention* reports mention these processes in describing efforts to coordinate across agencies and funding sources, the

---

[103] CDHS, *supra* note 23, at Question 5.
[104] Casey Family Programs, *Is There An Effective Model For Serving Youth Involved In Both The Child Welfare And Juvenile Justice Systems?* (Nov. 22, 2023), https://www.casey.org/crossover-youth-practice-model/; Annie E. Casey Foundation. *No Place for Kids* (2013). https://assets.aecf.org/m/resourcedoc/aecf-NoPlaceForKidsFullReport-2011.pdf; Sarah Vidal et al. *Multisystem-Involved Youth: A Developmental Framework and Implications for Research, Policy, and Practice*, Adolescent Research Review 15 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6404973/.
[105] Congressional Research Service*, Child Welfare: Purposes, Federal Programs, and Funding* (2026); *Colorado 2025-2029 Child and Family Service Plan* (submitted to the U.S. Dep't of Health & Human Services, Admin. For Child. & Fams. June 30, 2024).
[106] These efforts include: 1) The Department of Health Care Policy and Financing (Medicaid), the Department of Human Services (DCW and DYS) and the Behavioral Health Administration formed a cross-agency collaboration in 2023 "to review and analyze the needs faced by children and youth". The formation of this consultation process followed "concerns regarding releasable youth being detained without available placement" which were raised in 2019; 2) A multi-agency case staffing process, Creative Solutions, is designed "to ensure all possible support and care coordination entities are involved to address the identified needs;" 3) The Collaborative Management Program provides for county-level cross-systems work through Interagency Oversight Groups—focused on leadership-level collaboration—and Individualized Service and Support Teams—to collaborate with families on the direct service level. This effort began in 2004 with six counties; 50 of Colorado's 64 counties now participate. CDHS, *2025–2029 Child and Family Service Plan* at 72, 50.

annual reports do not provide any data measuring the effectiveness of these processes in efforts to move young people out of detention.

In addition to the collaboration initiatives and processes described in the State's Child and Family Service Plan, the current website of the Department of Health Care Policy and Financing summarizes several initiatives that are relevant to youth awaiting mitigating services.[107] Similar to the CFSP the website does not include any data or other information on how well or poorly these various collaboration efforts are functioning.

### ii. Opinion

Given the consequences for young people and their families, ensuring collaboration and coordination among jurisdictions, agencies and organizations is one of the most important responsibilities of the State's Department of Human Services. The CDHS mission, size, reach, funding, procurement systems, and regulatory and oversight powers places the largest share of responsibility with the Department, which has executive agency custody over these releasable youth. CDHS has failed to fulfill its state-wide responsibility for creating consistency and uniformity across these multiple agencies to ensure that youth in its care are appropriately served and for coordinating the continuum of services for youth who would otherwise be detained.

Developing effective interventions for youth with complex histories is undeniably difficult, but that is the clear mandate of these funded state systems. A shortage of service slots or an ineffective service array does not justify stripping a young person of their liberty. Young people should not bear the burden or endure the potential trauma of unnecessary confinement in locked detention facilities because state agencies cannot coordinate care.

---

[107] These include the following: 1) To comply with the recently enacted SB 26-188 legislation, HCPF has convened a steering committee to support "the transition of services provided in Qualified Residential Treatment Programs (QRTP), Psychiatric Residential Treatment Facilities (PRTF), and Out-of-State High Intensity Residential Treatment (OHIRT) from a Fee-for-Service benefit to a Behavioral Health Capitation benefit for members who are either in the custody of a County Department of Human Services/Child Welfare or committed to the Division of Youth Services (DYS);" 2) Children's Habilitation Residential Program (CHRP) provides services for children and youth who have an intellectual or developmental disability, very high needs, or a serious emotional disturbance which put them at risk of, or in need of, out-of-home placement; 3) HCPF is "working toward expanding and improving implementation of intensive behavioral health services, under the Colorado System of Care (CO-SOC) that include intensive in-home and community-based mental health services, intensive care coordination, mobile crisis intervention, and stabilization services…in the most integrated and least restrictive setting". 4) To comply with House Bill 24-1038 and in collaboration with CDHS and the Behavioral Health Administration, HCPF has developed a Treatment Foster Care Plan that "outlines strategies to expand services for children and youth with complex behavioral health needs". Colorado Department of Health Care Policy and Financing. *Children and Youth Behavioral Health*. https://hcpf.colorado.gov/childrenandyouth

### iii. Corrective Action Options:

Navigating the thicket of overlapping jurisdictional, agency and organizational responsibilities would challenge any family and indeed, most frontline case workers; therefore, proactive, persistent system and case management integration by CDHS is critical. Even more critical, however, is clarity on roles and systemic supports to ensure that decisions about every young person are made with the sense of urgency that an admission to detention for a release-eligible youth demands.

While more information is needed to craft an appropriately narrow remedy, it appears that the State has workgroups and planning processes in place which could be able to address the long-standing failures to provide services and placement as alternatives to detention, including for youth with challenging behavioral, mental health and/or substance abuse problems. These include initiatives and processes managed by the Department of Human Services and groups coordinated by the Department of Health Care Policy and Financing that are working on plans to reform funding mechanisms, create a system of care, and expand treatment foster care.

CDHS has not, however, publicly provided any empirical or even anecdotal evidence on how well existing processes are performing, how often they are used, how often they are able to resolve jurisdictional, system or funding barriers, and how many young people they have helped move from detention. While references to planning processes to comply with state law are promising, the State's history of failure in converting announced intentions into improved services and supports for children demands true accountability for results.

From the perspective of Results Based Accountability (RBA)—perhaps the most commonly used accountability framework for governmental and nonprofit organizations[108]—the State urgently needs to develop the ability to answer three basic questions for the system as a whole and for each of the case management and service providers in the system. In ensuring that no young person is unnecessarily confined in a secure custody detention institution, all state agencies and contractors should publish answers to the following questions:

- How much did we do? (Basic outputs, such as how many youth were served by each part of the system and by each provider; the current *Limit*

[108] Barbara Walters and Betty Blythe, *Results Accountability: A Critical Component of Community Support for Children and Families* 9(1) Journal of Policy Practice (2009); Annie E. Casey Foundation, *Results Count: Helping leaders, organizations and groups move from intention to action for children and families* https://www.aecf.org/work/leadership-development/results-count; Results Based Accountability has been incorporated into budgeting processes in Connecticut and Vermont and integrated into planning and administration processes in the United Kingdom, Ireland, Australia, New Zealand and South Africa (Mark Friedman, personal conversation).

*Detention* annual reports focus primarily on this question for institutional detention but not for alternatives to detention)

- How well did we do it? (Measures of quality, such as time from admission to detention to referral for services, percentage of referrals accepted by contracted providers, the match between assessed need and actual service, youth and family perspectives on the quality of services provided)

- Is anyone better off? (Outcome measures, including changes in status or condition, such as percentage of youth designated as release-eligible youth released within 24 hours, percentage of youth receiving risk-mitigating services with no rearrest prior to adjudicatory hearing)[109]

A clear advantage of bringing the RBA framework into efforts to improve system functioning is a long track record of other juvenile justice systems and their leaders using the RBA model to improve outcomes for young people. For example, over the last two decades the Juvenile Justice Applied Leadership Network has worked with a total of five cohorts of leaders from dozens of systems across the country to apply the methods of RBA and Results Count to problems in their systems.[110]

The State should also assess the effectiveness of the various case management systems in place. Multiple governmental and contracted staff carry some aspect of case management for the system, including probation staff, child welfare workers, and CYDC coordinators. The State faces a challenge and a choice: either the case decision-making and case-level funding allocations should be greatly simplified or the capacity and sophistication of frontline case managers should be strengthened considerably. An important principle is to clearly designate a primary case manager with the responsibility and authority to develop and shepherd an individualized plan that knits together the funding and services from all involved agencies.

Additional data and further analysis are necessary to fully address coordination among the Division of Youth Services, the Division of Child Welfare and the CDHS-supervised county-level child welfare agencies who are charged with collaborating on behalf of dually-involved young people. The same is true for young people with disabilities, many of whom are also involved with the child welfare system as well as the Behavioral Health Administration, Medicaid, and/or private insurance companies.

However, the available data on lengths of stay, referrals and findings all suggest the need for more integrated services at both the system and the individual case level.

---

[109] Clear Impact, *What is Results-Based Accountability?*, https://clearimpact.com/results-based-accountability/.

[110] Annie E. Casey Foundation, *About the Juvenile Justice Applied Leadership Network.* https://www.aecf.org/work/juvenile-justice/jdai/about-the-juvenile-justice-applied-leadership-network.

While this is a common problem for many state and county systems, national and state initiatives provide examples and potential pathways to improving collaboration and outcomes. Three examples include:

- Wraparound models that bring together frontline workers from across systems, including child welfare, juvenile justice and mental health; facilitated by a lead coordinator (primary case manager) from one of the agencies, the team works with the youth and family to develop a highly individualized plan of services and supports. Typically, funding sources are pooled and braided together to reduce bureaucratic barriers. A lead case manager works with the family and youth to ensure services are provided and to adapt the plan over time. Perhaps the best known and longest running example is Wraparound Milwaukee, where the initial focus was on youth with complex mental health needs and subsequently included youth active with multiple systems.[111]

- The National Resource Center for the Transformation of Juvenile Justice provides technical assistance and other supports for jurisdictions working to improve outcomes for dually involved youth. The Dual System Youth Reform initiative guides states and counties in aligning policies, procedures, practices and protocols for youth involved with both the juvenile justice and child welfare systems.[112]

- Based on review of the Juvenile Services Plans from the Second and Eighth Judicial Districts, it appears Colorado was among the states implementing the Georgetown University Crossover Youth Practice Model (CYPM) some years ago.[113] CYPM draws on research and best practice to identify systemic changes states and counties can make to accomplish four interrelated goals: reduction in the number of youth who cross over from one child-serving system to another; reduction in the number of youth placed in out-of-home care; reduction in the use of congregate care; and reduction in the disproportionate representation of youth of color.[114] While the Juvenile Service Plans describe a number of process steps to ensure coordination

---

[111] Milwaukee County Department of Health and Human Services, *30 Years of Community Impact: Wraparound Milwaukee* (2024), https://county.milwaukee.gov/files/county/DHHS/BHD/Wraparound/WM-30-Years-of-Community-Impact.pdf.
[112] RFK National Resource Center for Juvenile Justice. Dual Status Youth - Technical Assistance Workbook: Updated Edition. (2021), https://nrctyj.org/wp-content/uploads/2022/11/Dual-Status-Youth-Technical-Assistance-Workbook-Updated-Edition.pdf.
[113] *See Colorado Youth Detention Continuum Juvenile Services Plan*, Fiscal Year 2025-2026, *Second Judicial District* 31,35 (Feb. 15, 2025). *Colorado Youth Detention Continuum Juvenile Services Plan*, Fiscal Year 2025-2026, *Eighth Judicial District* 35, 37 (Mar. 7, 2025).
[114] Georgetown University, Crossover Youth Practice Model (2024), https://cyj.georgetown.edu/our-work/crossover-youth-practice-model/.

among the various agencies involved with youth, the Plans do not report on performance metrics that would indicate whether the initiative as implemented is making a difference in the case outcomes for young people.[115]

### d. Confining Youth to Secure Custody Carries Risks of Serious and Long-lasting Harm.

Relying on locked institution risks compromising adolescent development with consequences for long-term youth and adult well-being. If confinement in a secure custody institution were a medical intervention, it would require a "black box" warning, as secure custody of children has been linked to severe, sometimes life-threatening and permanently disabling side-effects. While sometimes necessary in those very rare circumstances in which a young person is at significant risk of inflicting serious harm to others, the research and experience over decades clearly confirm that placement in a secure custody institution carries the risk of lifelong harm for young people with at best uncertain and negligible benefit to either the young person or the public.[116]

#### i. Documents Reviewed and Basis for My Observations.

In February 2024, the Federal Office of Juvenile Justice and Delinquency Prevention conducted a literature review in support of the publication *Alternatives to Detention and Confinement*. The summary of findings tied directly to secure detention states "…spending time in secure detention can negatively affect a youth's mental and physical well-being, psychosocial development, education, and future employment, while interrupting positive family, peer, and school relationships and promoting a negative peer culture".[117]

This same literature review also concluded that spending time in secure detention increased the probability of going deeper into the juvenile justice system. One study found that each additional day in detention "increased the odds of a formal disposition by between 9 and 20 percent" when compared to peers; the study controlled for "gender, race, gang membership, household status, history of abuse, juvenile court history, and current offense characteristics".[118]

---

[115] Colo. Youth Detention Continuum, Second Jud. Dist., *supra* note 56; Colo. Youth Detention Continuum, Eighth Jud. Dist., *supra* note 56.
[116] Note: Research and related publications documenting the risks of serious and long-lasting harm associated with even relatively brief periods of institutional confinement are voluminous. Rather than citing dozens of individual studies, this section draws from several comprehensive reviews to summarize the findings. The reviews are publicly available and include detailed citations for each of the findings summarized below.
[117] Office of Juvenile Justice and Delinquency Prevention, Department of Justice, *Alternatives to Detention and Confinement: Literature Review: A product of the Model Programs Guide (2024).*
[118] *Id.*

Reviewing the findings of multiple studies, a joint publication of the Harvard Kennedy School of Government and the National Institute of Justice[119] concluded:

> Adult-style prisons that emphasize confinement and control are devoid of the essentials required for healthy adolescent development—engaged adults focused on their development, a peer group that models prosocial behavior, opportunities for academic success, and activities that contribute to developing decision-making and critical thinking skills. At the same time, these facilities provide too many of the elements that exacerbate the trauma that most confined youth have already experienced and reinforce their poor choices and impulsive behavior. Maltreatment is endemic and widespread.

Summarizing a key finding of a ground-breaking and thorough review of the intersection of adolescent development and delinquency, the Harvard/NIJ study noted that: "Adolescents have less capacity for self-regulation in emotionally charged situations; their sensitivity to environmental influences is heightened and they have not yet learned to make decisions with a future orientation."[120]

The U.S. Supreme Court relied on the emerging science of adolescent brain development in two key decisions. As summarized in the Harvard/NIJ publication:

> In *Roper v. Simmons*, 543 U.S. 551, 127 S.Ct. 1183 (2005), the Court wrote that youth have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity and heedless risk-taking. In *Miller v. Alabama,* No.10-96-46, 567 U.S. (2012), the Court also found that children "are more vulnerable…to negative influences and outside pressures"; they have limited "control over their environment" and are therefore unable to extricate themselves from crime-producing settings and since a child's character is not as "well-formed" as an adults, his traits are "less fixed" and his actions less likely to be "evidence of irretrieveabl(e) deprav(ity)".[121]

The Court's findings cited above are relevant not only to the question of culpability for harmful behavior and therefore the justice of the sentence imposed, which was the issue before the Court in both cases. The findings cited by the Court are also relevant to the question of whether young people confined inappropriately are subjected to unnecessary risks of severe disruption to their opportunities for normal development and maturation. The consequences of this disruption can be seen in the consistent

---

[119] Patrick McCarthy et al., *The Future of Youth Justice: A Community-Based Alternative to the Youth Prison Model*, Harv. Univ. & Nat'l Inst. of Just. (2015).
[120] *Id.* at 5.
[121] *Id.*

findings of poor short- and long-term outcomes for young people who have been confined in a locked institution.

The Harvard/NIJ paper described how prior history of traumatic experiences increases the risk of developmental disruption for detained and incarcerated young people:

> Justice-involved youth often have histories of abuse and failure by adults around them that add to the complexities of normal adolescent development. The trauma many of these young people have experienced makes them especially sensitive to environmental triggers, and yet, many are kept in institutional environments that seem designed to trigger trauma and rage: long periods of isolation; harsh, sterile surroundings; bright lights; a constant din; and a near-constant threat of violence.[122]

After reviewing research on adolescent development and institutional confinement, the Harvard/NIJ paper concluded that:

> Youth prisons communicate to young people constantly and in a variety of ways that they are dangerous, feared, worthless, and have no real future. With this identity firmly in place, with more trauma and more deeply entrenched behaviors, they are sent back to their communities with little follow-up or connection to help get them back on track.[123]

**Research on recidivism** shows no reduction in delinquent behavior following incarceration, while some studies show an increase in the probability that a young person will be re-arrested, convicted and incarcerated as adults. Studies that controlled for other predictive variables—such as demographic, family and social background, severity of offense and histories of prior arrests—"…have found that confinement most often results in higher rates of rearrest and re-incarceration" compared to alternative interventions.[124] A matched propensity scoring study analyzing more than 46,000 juvenile cases across 32 jurisdictions found that pre-hearing detention was associated with a 33% increase in felony recidivism, and 11% increase in misdemeanor recidivism within one year. This same study found a one percentage point increase in the odds of felony recidivism for each additional day spent in detention.[125]

In addition, studies across multiple states have found that confining young people in secure detention increases the likelihood of deeper involvement in the justice system,

---

[122] McCarthy et al., *supra* note 119 at 5.
[123] *Id.*
[124] Richard Mendel, *Why Youth Incarceration Fails: An Updated Review of the Evidence*. Sentencing Project (Mar. 1, 2023), https://www.sentencingproject.org/reports/why-youth-incarceration-fails-an-updated-review-of-the-evidence/#Part-1.
[125] Sarah Walker & Jerald Hertig, *The Impact of Pretrial Juvenile Detention on 12-month Recidivism: A Matched Comparison Study*. 66 Crime & Delinq. 13 (2020) (cited in Mendel, *supra* note 124).

"greatly increasing the odds that youth will be placed in residential custody if they are found delinquent in court" and also increases the odds that they will be arrested for future offenses as juveniles and also as adults.[126]

**Research on education and employment** shows reduced likelihood of completing high school compared to similar youth who were released to the community as well as very low rates of return to school following detention or incarceration.[127] A large sample (more than 5000 youth), 12-county study in Michigan found that compared to similar peers who were not detained, "detention leads to a 38% decline in the probability of high school graduation, and a 27% increase in the probability of arrest".[128] Longitudinal data on outcomes for youth who have been incarcerated show "lower wages, fewer weeks worked, and less job experience" as adults and "reduced total educational attainment".[129]

**Research on physical and mental health:** A longitudinal study of health outcomes found that "any length of incarceration was associated with higher odds of having worse adult health".[130] Incarceration worsens the serious health problems that many young people experience prior to entering secure custody; two-thirds of young people admitted to secure facilities have been shown to have one or more physical health problems, including dental, vision, or hearing problems, an illness or an injury.[131]

Even relatively short-term confinement in a secure custody institution can lead to long-term mental health problems. A national longitudinal study found that "youth who were incarcerated for less than one month had higher rates of depression in adulthood than comparable peers who were not incarcerated", while those who were confined for a year or more were "over four times more likely to experience depression and twice as likely to have suicidal thoughts in adulthood than comparable peers who were not incarcerated".[132]

An Indiana study found that youth confined to detention or correctional institutions were "1.7 and 2.5 times more likely to die prematurely, respectively, than youth who were arrested but never confined."[133]

---

[126] Mendel, *supra* note 124.
[127] *Id.*
[128] E. Jason Baron et al., *Pretrial Juvenile Detention*, 217 J. Pub. Econ. 9 (2022).
[129] Heejun Jung, *The Long-Term Impact of Incarceration During the Teens and 20s on the Wages and Employment of Men*, 54 *Journal of Offender Rehabilitation* 54(5), 317 (2015) (cited in Shruti Nayak & Leslee Haisma, *Could Apprenticeships Reduce Recidivism Among Young People?*, Urb. Inst. (Mar. 25, 2024), https://www.urban.org/urban-wire/could-apprenticeships-reduce-recidivism-among-young-people).
[130] Elizabeth S. Barnert et al., *How Does Incarcerating Young People Affect Their Adult Health Outcomes?*, 139(2) Pediatrics 1 (2016) (cited in Mendel, *supra* note 124).
[131] Mendel, *supra* note 124.
[132] *Id.*
[133] *Id.*

**Research on physical, sexual and emotional abuse:** A 2015 study documented "systemic or recurring maltreatment" in juvenile correctional facilities in 29 states and the District of Columbia since 2000, and in 43 states, the District of Columbia, and Puerto Rico over the longer historical period.[134] That same study found more than 50 lawsuits resulting in court-sanctioned corrective actions due to violence, physical abuse and/or sexual abuse, excessive use of isolation and physical restraints and other abusive conditions of confinement.[135]

Following changes to statute of limitations laws in many states, thousands of adults who were detained or incarcerated as juveniles have come forth to join class action lawsuits seeking damages for the sexual abuse they suffered while confined. California, Georgia, Illinois, Kansas, Louisiana, Maryland, Michigan, New Hampshire, New Jersey, New York, Oregon, Pennsylvania, Tennessee and Washington are among the states that have been sued.[136]

**Risk of harm in Colorado's detention facilities:** *Breaking Point: Conditions in the Colorado Division of Youth Services September 2021–October 2025*, a report issued by Disability Law Colorado, documents allegations of physical abuse, assaults and improper use of physical restraints. Examples include staff slamming youth into the ground, pinning them, pushing their heads into the ground, choking them, and striking them with a knee.[137] More than 35% of youth interviewed said they had been injured or had seen another youth injured during a physical restraint.[138] The more invasive and dangerous types of physical restraints increased 60% over the period covered by the report and use of mechanical restraints increased by 54%,[139] with the levels reaching their peaks by 2025, even though the population of the centers had reached its lowest level.[140]

Disability Law Colorado reached this same conclusion, "The danger and dysfunction we observed at DYS reflect an agency at the breaking point".[141] after documenting a series of troubling indicators concerning safety, supervision and quality of care: "The confluence of multiple indicators…points to systemic challenges rather than isolated

---

[134] Richard A. Mendel, *Maltreatment of Youth in U.S. Juvenile Corrections Facilities* 6, Annie E. Casey Found. (2015).
[135] *Id.*
[136] Amanda Watford, Thousands are Suing States Over Sexual Abuse in Juvenile Detention Facilities, STATELINE (Mar. 19, 2025), https://stateline.org/2025/03/19/thousands-are-suing-states-over-sexual-abuse-in-juvenile-detention-facilities/.
[137] Disability Law Colorado, *Breaking Point: Conditions in the Colorado Division of Youth Services September 2021–October 2025* at 1 (2026). Note: Since the publication of the Breaking Point report, Disability Law Colorado has been renamed Disability Justice.
[138] *Id.* at 9.
[139] *Id.* at 7.
[140] *Id.* at 8.
[141] *Id.* at 26.

events. Taken together, these indicators reveal a pattern of staffing instability, workload pressures, and operational irregularities. That pattern calls into question DYS's ability to provide consistently safe, therapeutic, and developmentally appropriate supervision."[142]

Colorado's Child Protection Ombudsman observed "violent physical interactions between staff and youth in DYS centers" and found evidence in reviewing video surveillance that youth had been "pushed into walls, shoved and thrown to the floor, sometimes, by multiple adults".[143]

The Denver Post reviewed a year's worth of incident reports and found "at least 135 allegations of excessive force" and at least six youth who were placed in concussion protocol after hitting their heads during restraints and another five youth who suffered broken bones during staff restraints.[144] This same article reported "at least 47 allegations of staff or family members bringing in illicit drugs, including cocaine and fentanyl", "at least three youth" who had to be given naloxone for overdoses, and "at least seven allegations that staff engaged in sexual relations with youth".[145]

According to the State's own annual reports, 67-75% of youth had both mental health and substance abuse problems; 80-87% required intervention for mental health problems; and 78-84% required substance abuse treatment.[146] As noted above, research shows young people who are confined to a locked institution experience increased risk of both immediate and long-term mental health and substance abuse problems.

The National Center for Youth Law found that drug overdoses in Colorado facilities accounted for at least seven hospitalizations and one death in 2024, and that a screening of all children held in one detention center found that 20 of the 48 children tested positive for Fentanyl.[147]

### ii. Opinion:

As described above, the professional and practice literature provides ample evidence of the risks associated with institutional confinement of adolescents.

In addition, my own experience in managing youth detention and incarceration institutions as well as my decades of national work focused on reforming juvenile

---

[142] *Id.* at 16.
[143] Child Protection Ombudsman of Colorado, *Issue Brief: Surveillance Within the Division of Youth Services* 2 (July 30, 2024).
[144] Sam Tabachnik, *Broken Bones, Excessive Force and Drug Overdoses: Inside Colorado's Juvenile Detention Facilities,* THE DENVER POST (Mar. 2, 2025), https://www.denverpost.com/2025/03/02/colorado-juvenile-detention-excessive-force/#.
[145] *Id.*
[146] Disability Law Colorado, *supra* note 137, at 3.
[147] National Center for Youth Law, Slide presentation: "The Division of Youth Services and the CO Youth Detention Continuum: Colorado Juvenile Justice in Brief 17" (Jan. 2025).

correctional systems lead me to conclude that the reported combination of under-staffing, high staff vacancy rates, excessive staff absenteeism, and chronic staff turn-over all contribute to deteriorating and dangerous conditions in Colorado's secure custody institutions.

The Colorado legislature explicitly recognized the potential for harm to young people due to confinement in a secure custody detention facility:

> The general assembly declares that the placement of children and juveniles in a detention facility exacts a negative impact on the mental and physical well-being of the child or juvenile, and such detention may make it more likely that the child or juvenile will reoffend. Children and juveniles who are detained are more likely to penetrate deeper into the juvenile justice system than similar children or juveniles who are not detained, and community-based alternatives to detention should be based on the principle of using the least-restrictive setting possible and returning a child or juvenile to his or her home, family, or other responsible adult whenever possible consistent with public safety. It is the intent of the general assembly in adopting section 19-2.5-304 and amending sections 19-2.5-303, 19-2.5-305, and 19-2.5-1404 to limit the use of detention to only those children and juveniles who pose a substantial risk of serious harm to others or that are a flight risk from prosecution.[148]

Fulfilling this vision of the General Assembly requires collaborative leadership, commitment and a sense of urgency to act on behalf of Colorado's most vulnerable and at-risk youth.

## V. Conclusion

In summary, based on my professional experience as summarized earlier, my review of the materials available to me, including publicly available reports issued by the Colorado Department of Human Services, leads me to conclude that the State has routinely and consistently confined hundreds of young people to secure custody detention despite judicial findings that they could be released with services and supports to mitigate the risk of harm to others. This practice has continued for years. The factors that contribute to this practice are within the responsibility and control of the State. Experience in other states and counties demonstrates the feasibility and effectiveness of developing systemic and programmatic alternatives to this practice. Continued over-reliance on secure custody institutions will result in serious, long-term yet preventable harm to detained young people with negligible benefit to the public.

[148] Colo. Rev. Stat. § 19-2.5-301 (2025).

# APPENDIX A

Patrick T. McCarthy, PhD
879 Cox Road
Moorestown, NJ 08057
Phone: 610-357-7984
pmccarthy@aecf.org

## Professional Experience

**Catalyze Justice**

Senior Fellow and Founding Advisor 9/23 to 9/25

Catalyze Justice, a nonprofit subsidiary of Possibility Labs, was formed to continue the work of the Youth Justice Initiative previously housed at the Columbia University Justice Lab. In addition to the work previously managed at Columbia as described below, I provide advice and support to the management team of Catalyze Justice, assist in raising funds and contribute to online tools and resources. Recent projects and work include the early design for a curriculum and leadership development initiative to support state and county task forces and work groups focused on improving results in their youth justice systems, facilities, and programs. I also serve on the Roundtable on Juvenile Justice System Reform, an advisory group of the U.S. Department of Justice's Office of Juvenile Justice and Delinquency Prevention.

**Columbia University** **New York, NY**
**The Justice Lab**

Senior Fellow and Research Scholar 3/19 to 9/23

Following retirement as the President and CEO of the Annie E. Casey Foundation, appointed as a Stoneleigh Fellow deployed to the Columbia University Justice Lab. Upon completion of the Fellowship, continued in this role as a Senior Fellow and Research Scholar.

Provide consultation and advice to states and counties on strategies for improving the operations and results of their juvenile justice systems. Work on initiatives to respond to the most pressing problems facing juvenile justice, such as how best to intervene with young people who are charged with committing serious harm, how to build out an evidence-based continuum of services and supports and how to manage secure custody facilities.

Completed a Desk Guide for the Transformation of Youth Justice, an online book-length manual for public system leaders to guide action steps from planning through implementation.

**The Annie E Casey Foundation** **Baltimore, Maryland**

President and Chief Executive Officer 4/10 to 1/19

Strategic and operational direction of the country's largest foundation focused on children and families.

Major accomplishments included launch of six major initiatives; significant expansion of policy advocacy capacity; integration of equity and inclusion into all aspects of the Foundation's work and operations; national effort to end reliance on youth prisons as a response to juvenile crime; refocusing Foundation strategy while bringing annual spend rate in line with endowment resources.

Senior Vice President 1/08 to 4/10

Oversaw the Foundation's Center for Effective Family Services and Systems, including work in the areas of health, reproductive health, mental health, substance abuse, juvenile justice, education, early childhood, youth development, child welfare and income security, as well as the Foundation's Strategic Consulting Group and the Foundation's direct service arm, Casey Family Services.

Major accomplishments include integrating the staff and financial resources of three operating units into a more cohesive whole; developing a long-range strategic vision and implementation plan for demonstrating improved child and family outcomes through a new approach to system reform; and increasing the Foundation's capacity to influence policy, public systems and fields of practice, through redeployment of staff and funds in policy advocacy, research and communications.

Vice President, System and Service Reform 4/97-1/08

Directed the Foundation's efforts to improve policy and practice in health, reproductive health, mental health, substance abuse, juvenile justice, education, child welfare and income security; supervised staff managing the Juvenile Detention Alternatives Initiative; the Family to Family Initiative; the Plain Talk Initiative; and the Mental Health Initiative.

Major accomplishments of the System and Service Reform unit include expansion of JDAI, Family to Family and Plain Talk to national scale, with demonstrated results such as reductions in the number and rate of youth detained in locked facilities, reductions in length of time spent in foster care, reductions in the reliance on institutional care, reduced teen pregnancy, and stronger networks of adults and youth engaged in advocacy.

Senior Associate 10/94-4/97

Managed the Mental Health Initiative for Urban Children, a five year, twenty million dollar effort to develop neighborhood-based systems of care for children; managed the Foundation's grants affecting mental health policy and practice.

**Center for Assessment and Policy Development** **Bala Cynwyd, Pennsylvania**

Senior Program Officer 6/92 to 10/94

Member of senior policy team of this small not-for-profit intermediary that designs, implements, and evaluates interventions for disadvantaged families. Significant projects included development of strategies to reduce youth violence for the City of Pittsburgh; comprehensive review of services for children and families for the State of Delaware; and senior liaison to states participating in The Children's Initiative, a broad effort to improve children's outcomes by implementing a comprehensive system of universal preventive services through a reconfigured system of services. Provided policy direction for the development and implementation of the Initiative's design for new forms of practice with families and children, and for development of governance strategies.

**Department of Services for Children, Youth and their Families** **Wilmington, Delaware**
**State of Delaware**

Director, Division of Youth Rehabilitative Services 12/89 – 6/92

Directed operations of the Division of Youth Rehabilitative Services. The Division provides all juvenile corrections services for the State of Delaware, including probation, aftercare, two detention centers, a secure juvenile corrections facility, and a broad range of alternatives to both detention and incarceration.

Major accomplishments included redesign and reform of institutional treatment; creation of a range of alternatives to detention, leading to a decrease in the average daily detained population from 65-70 to 25-30; negotiation of working agreements with Court, Attorney General and other stakeholders to create dispositional guidelines for juveniles; development of community-based intensive programs as an alternative to incarceration; major overhaul and integration of Division's case management system.

Director, Division of Program Support 8/88-12/89

Directed operations of the Division of Program Support. The Division includes the Offices of Planning, Licensing Services, Case Management and Prevention. Responsibilities of the Division include coordinating Department planning, monitoring and evaluating Department programs, developing case management strategies, case review, regulation of day care and residential programs, developing and managing the Department's information system, and providing primary prevention services statewide.

Deputy Director, Division of Program Support 1/88-8/88

Assisted Director in overseeing overall operation of the Division; managed the Division's special project and technical assistance functions; coordinated development of new

programs and demonstration projects; directed the Department's Information Management and Support Unit; directed the Family Preservation Project.

Administrator, Office of Case Management 1/85-1/88

Directed operations of the Department's Office of Case Management, including Interdepartmental Relations, Quality Assurance, and Information Management Units; designed and evaluated interdivisional case management policy and procedures; prepared and managed budget for the Office; participated with other staff of the Division of Program Planning and Productivity in Departmental planning and evaluation efforts; developed and directed the Unified Case Management Pilot Project.

**Bryn Mawr College** **Bryn Mawr, Pennsylvania**
Graduate School of Social Work and Social Research

Lecturer

Taught graduate courses in clinical practice, group process, marital therapy, and data analysis (full-time, 1983-1985).

**University of Southern California** **Los Angeles, California**
Graduate School of Social Work

Assistant Professor 9/81-8/83

Taught graduate courses in child welfare, clinical practice, marital and family therapy, and research design. Developed and implemented continuing education courses in family therapy and supervision.

**Bryn Mawr College** **Bryn Mawr, Pennsylvania**
Graduate School of Social Work and Social Research

Coordinator of Research Development and Lecturer 9/79-6/81

Managed grants and contracts, prepared research proposals, identified research opportunities. Taught graduate courses in research and data analysis.

**Camden County Drug Treatment Program and Alternative School** **Lakeland, New Jersey**

Deputy Director 9/76-9/77

Responsibilities included preparing grant and contract proposals, public relations, program development and evaluation, budgeting staff development, management support to each of five units: a residential therapeutic community, an outpatient counseling program, an intermediate medical unit, a methadone maintenance program, and an alternative school for emotionally disturbed, dependent adolescents.

Program Director 5/74-9/76

Developed alternative school for youth with emotional and behavioral problems; responsible for all clinical and educational activities in the outpatient program and alternative school; individual, family and group therapy.

**Camden County Mental Health Center** **Lakeland, New Jersey**

Psychiatric Social Worker 5/71-9/72

**Consulting:** 1977-1985

Developed and managed private consulting firm, specializing in social service management, training and evaluation. Clients included:

- Pennsylvania Department of Public Welfare
- Delaware State Department of Services for Children, Youth and Their Families
- Delaware County Department of Human Resources
- Montgomery County Department of Mental Health
- U.S. Department of Energy
- Northwest Community Mental Health Center
- Volunteers of America
- INTERAC Multi-Service Center Program for Aging

## EDUCATION

**Bryn Mawr College** **Bryn Mawr, Pennsylvania**
Graduate School of Social Work and Social Research Ph.D. 1977-1981

Social policy, program development, administration and research. Dissertation on decision-making models in child welfare. NIMH Fellowship.

**University of Pennsylvania** **Philadelphia, Pennsylvania**
M.S.W. 1972-1974

Mental Health concentration. Master's paper on goal distortion in community-based drug abuse program. NIMH Fellowship.

**Manhattan College** **New York, New York**
Major in psychology. Phi Beta Kappa B.A. 1967-1971

**Philadelphia Child Guidance Clinic** **Philadelphia, Pennsylvania**
1976-1977

Family therapy extern program, with live supervision, videotape analysis, and seminar led by Salvador Minuchin.

# APPENDIX B

**RESOURCES CONSIDERED**

Expert Report of Dr. Patrick McCarthy

| **Document Title** |
|---|
| CDHS, *Limit the Detention of Juveniles, Annual Report, State Fiscal Year 24–25* (July 1, 2025) |
| Colo. Dep't of Hum. Servs., Responses to Questions Regarding Division of Youth Services Detention Practices |
| CDHS, C.R.S. 19-2.5-1407.3 *Monthly Report* (Mar. 2026) |
| CDHS, C.R.S. 19-2.5-1407.3 *Monthly Report* (June 2026) |
| Disability Law Colorado, *Breaking Point: Conditions in the Colorado Division of Youth Services September 2021–October 2025* (2026) |
| Child Protection Ombudsman of Colorado, *Issue Brief: Surveillance Within the Division of Youth Services* (July 30, 2024) |
| Child Protection Ombudsman of Colorado, *Issue Brief: Strip Search Procedures and Outcomes in the Division of Youth Services* (Sep. 30, 2025) |
| Elysia Versen & Christian Belcher, Colo. Evaluation & Action Lab, *Crossover Youth: Informing an Approach to Routine and Replicable Data* (2024) |
| National Center for Youth Law, Slide Presentation: "The Division of Youth Services and the CO Youth Detention Continuum: Colorado Juvenile Justice in Brief" (Jan. 6, 2025) |
| CDHS, *Inaugural Analysis Report to Inform Performance Standards and Outcome Measures for Pre-Adjudicated and Adjudicated Youth* (July 1, 2023) |
| CDHS, *Limit the Detention of Juveniles, Annual Report, State Fiscal Year 23–24* (July 1, 2024) |
| Colo. Div. of Youth Servs., *A Guide for Colorado Families* (6th ed. 2023) |
| Emily Pope & Joint Budget Comm. Staff, *Staff Budget Briefing FY 2026-27: Department of Human Services Executive Director's Office / Administration and Finance / Office of Children, Youth and Families* (2025) |
| Colo. Dep't of Hum. Servs., *Performance Plan 2025–2026* (2025) |
| Colo. Div. of Youth Servs., *Youth Seclusion & Restraint Working Group Semi-Annual Report: March 1, 2024–August 31, 2024 (6 months)* (2025) |
| Colo. Div. of Youth Servs., *Youth Seclusion & Restraint Working Group Semi-Annual Report: September 1, 2024–February 28, 2025 (6 months)* (2025) |

| |
|---|
| *Colorado 2025-2029 Child and Family Service Plan* (submitted to the U.S. Dep't of Health & Human Services, Admin. For Child. & Fams. June 30, 2024) |
| S.B. 21-071, 73rd Gen. Assemb., 1st Reg. Sess. (Colo. 2021) |
| *Colorado Youth Detention Continuum Juvenile Services Plan*, Fiscal Year 2025-2026, *Second Judicial District* (Feb. 15, 2025) |
| *Colorado Youth Detention Continuum Juvenile Services Plan*, Fiscal Year 2025-2026, *Eighth Judicial District* (Mar. 7, 2025) |
| Sam Tabachnik, *Violence, 16-Hour Days and No Support: Why Staff Say They're Fleeing Colorado's Juvenile Detention Centers*, The Denver Post, Dec. 22, 2025, https://www.denverpost.com/2025/12/22/colorado-division-youth-services-staffing-shortages/ |
| Sam Tabachnik, *Colorado Increases Number of Young People Who Can Be Held in Pre-trial Detention in Emergencies*, The Denver Post, June 5, 2025, https://www.denverpost.com/2025/06/03/colorado-youth-detention-emergency-beds/ |
| Sam Tabachnik, *Broken Bones, Excessive Force and Drug Overdoses: Inside Colorado's Juvenile Detention Facilities,* The Denver Post, Mar. 2, 2025, https://www.denverpost.com/2025/03/02/colorado-juvenile-detention-excessive-force/# |
| Sam Tabachnik, *Teen in Greeley Youth Detention Center Died from Fentanyl Overdose*, The Denver Post, Jan. 28, 2025, https://www.denverpost.com/2025/01/28/platte-valley-youth-services-center-overdose-death-autopsy-report/ |
| Jennifer Brown, *Colorado Is Keeping Kids Locked in Juvenile Jails Months Longer than Needed Because of Lack of Foster Homes, Treatment Options*, The Colo. Sun, Feb. 2, 2024, https://coloradosun.com/2024/02/01/juvenile-detention/ |
| Jennifer Brown, *One-third of Teens in Colorado Juvenile Corrections Held for an Average of 20 Extra Days Because There's No Place to Go*, Sep. 6, 2023, https://coloradosun.com/2023/07/19/juvenile-corrections-delayed-release/ |
| Christopher Osher & Julia Cardi, "*Colorado Youth Detention Dilemma: Kids Languish In Lockup Despite Releasable Status*" Denver Gazette (Sep. 10, 2023), https://gazette.com/2023/09/09/colorado-youth-detention-dilemma-kids-languish-in-lockup-despite-releasable-status-6d4a3f8e-4cf7-11ee-81c1-dfe8adbe0164/ |
| Luis de Leon, *Aurora Resolution Sparks Conversation Around Bed Capacity at Colorado Juvenile Detention Centers*, Feb. 21, 2023, 9NEWS, https://www.9news.com/article/news/local/bed-capacity-colorado-juvenile-detention-centers/73-bb009853-ba02-416f-b542-5b1ce08ede6f |
| Mary Gifford-Smith et al., *Peer Influence in Children and Adolescents: Crossing the Bridge from Developmental to Intervention Science*, 33 J. Abnormal Child Psychol. 255 (2005). |
| Elizabeth S. Barnert et al., *How Does Incarcerating Young People Affect Their Adult Health Outcomes?,* 139 Pediatrics (Jan. 23, 2017). |

| |
|---|
| E.L. McGlinchey et al., *The Role of Sleep Disturbance in Suicidal and Nonsuicidal Self-Injurious Behavior Among Adolescents*, 47 Suicide & Life-Threatening Behav. 103 (2017) |
| Kevin Neimond, Colo. Joint Budget Comm. Staff, *Staff Figure Setting FY 2017-18: Department of Human Services* (Mar. 6, 2017). |
| Memorandum from Kevin Neimond, JBC Staff, Colo. Joint Budget Comm., to Members, Colo. Joint Budget Comm., Div. of Youth Corr. Figure Setting Recommendations (Mar. 8, 2017). |
| Dev. Serv. Grp. *DYS Program Performance Evaluation Vol. II. Main Findings* (June 30, 2018) |
| *Improving Outcomes for Youth in Colorado - Second Presentation to Task Force (CSG)* (2018) |
| Colo. Div. Crim. Just., *Task Force Identifies Juvenile Justice Policies* (2018) |
| Richard J. Bonnie, et al., *The Promise of Adolescence: Realizing Opportunity for All Youth* Nat'l Acads. Of Scis., Eng'g & Med (2019) |
| JSPC, *Minutes of the Senate Bill 94 Advisory Board Meeting* (2019) |
| Joe St. George, *Gov. Polis speaks on need for changes at Lookout Mountain following most recent escape*, FOX31 Denver (June 26, 2019) https://kdvr.com/news/gov-polis-speaks-on-need-for-changes-at-lookout-mountain-following-most-recent-escape/ |
| M. Krezmien, et al., *Detained and Committed Youth: Examining Differences in Achievement, Mental Health Needs, and Special Education Status* 31 J. of Ed. and Treatment of Child. 445 (2008) |
| CCJJ Age of Delinq. Task Force, *Council of State Governments Justice Center Work in Colorado* (Jan. 9, 2019) |
| *Governor Polis Signs State Budget that Balances Fiscal Responsibility with Important Investments in Education and Public Safety*, Colorado Governor Jared Polis (Apr. 28, 2025) https://governor.test.colorado.gov/governor/news/governor-polis-signs-state-budget-balances-fiscal-responsibility-important-investments |
| Colo. Dep't of Hum. Servs., *Limit the Detention of Juveniles Annual Report State Fiscal Year 25-26* (July 1, 2026) |
| Colo. Div. Crim. Just., *Colorado's Compliance Monitoring Policy and Procedures Manual for JJDPA & JJRA* (2020) |
| Derek Rodgers, et al., *The writing abilities of juvenile justice youths: A confirmatory factor analysis* 113:6 The J. of Ed. Rsch. 438 (2020) |
| Sen. Buckner et al., *Senate Bill 21-071* (2021) |
| Jennifer Brown, *Colorado's governor funds new programs to add more youth psychiatric beds amid mental health crisis*, The Colo. Sun (Nov. 8, 2021, 4:16 AM), https://coloradosun.com/2021/11/08/governor-youth-mental-health-funding/ |

| |
|---|
| E. Jason Baron, et al., *Pretrial Juvenile Detention* 217 J. of Pub. Econ. 104798 (2022) |
| Natalia Orendain, et al., *Juvenile confinement exacerbates adversity burden: A neurobiological impetus for decarceration* Frontiers in Neuroscience (Sep., 2022) |
| Nat'l Ctr. for Learning Disabilities, *Unlocking Futures: Youth with Disabilities and the Juvenile Justice System* (2023) |
| *Governor Polis Takes Action to Make Colorado Communities Safer*, Colorado Governor Jared Polis (Oct. 9, 2023), https://governor.test.colorado.gov/news/10801-governor-polis-takes-action-make-colorado-communities-safer |
| Pamela J. Harris et al., *Reading Achievement of Incarcerated Youth in Three Regions*, 60 J. of Corr. Educ. 120 (2009) |
| E. Ackerman et al., *Systematic review: Impact of juvenile incarceration*, 3 J. of Child Prot. and Prac. 100083 (2024) |
| Colo. Legis. Council Staff, *Final Fiscal Note: High-Acuity Crisis for Children & Youth (HB 24-1038)* (2024) |
| Anders Jacobson, *Policy S-9-13 Searches of Youth, Employees, Visitors, and Youth Centers*, CDHS Dept. of Youth Services (2024) |
| Colo. Off. of Child., Youth, and Fam., *Universal Placement Referral Form Pilot Recommendations June 1, 2024 – December 1, 2024* (Feb. 6, 2025) |
| U.S. DOJ Civ. Rts. Div., *Statement of the DOJ on Enforcement of the Integration Mandate of Title II of the ADA and Olmstead v. L.C.*, Archive.ADA.gov (Feb. 25, 2025), https://archive.ada.gov/olmstead/q&a_olmstead.htm |
| Universal Referral Task Grp., *Summary of Stakeholder Sessions 1–4* (2025) |
| *Gov. Polis Announces Boards and Commissions Appointments*, Colorado Governor Jared Polis (May 16, 2025), https://governorsoffice.colorado.gov/governor/news/gov-polis-announces-boards-and-commissions-appointments-45 |
| *Redesigned Colorado Placement Referral Form (DRAFT) Updated per Task Group Comments* (June, 2025) |
| Logan Seacrest, *Abused by the State: The Hidden Crisis Inside America's Juvenile Detention System*, 331 R Street Pol'y Study 1 (2025) |
| CDYS Home Page, https://cdhs.colorado.gov/dys (last visited Mar 16, 2026) |
| Mariam Arain et al., *Maturation of the Adolescent Brain* 9 J. of Neuropsychiatric Disease and Treatment 449 (2013) |
| CDYS, *A Guide for Colorado Families (6th Edition)* https://drive.google.com/file/d/0B6RNEF9DYEdYVUc0aU1uZ19FQ1k/view?resourcekey=0-0FnHNzVJinHqu-TNXdXo4w |
| *Conditions of Confinement - Looking at the Lockup* |

| |
|---|
| Colo. Dep't of Hum. Servs., *Limit the Detention of Juveniles Annual Report State Fiscal Year 24-25* (July 1, 2025) |
| CDHS, *Gov. Polis appoints Michelle Barnes as executive director of CDHS* Colorado Department of Human Services (Feb. 8, 2019) https://cdhs.colorado.gov/press-release/gov-polis-appoints-michelle-barnes-as-executive-director-of-cdhs |
| CDHS DYC, *Senate Bill 94 Reference Manual* (2009) |
| *Universal Referral Pilot Feedback* |
| Colo. Gen. Assembly Joint Budget Comm., *FY 2015-16 Staff Budget Briefing Department of Human Services* (2014) |
| Annie E. Casey Foundation, *Maltreatment of Youth in U.S. Juvenile Corrections Facilities An Update* (June 24, 2015) https://assets.aecf.org/m/resourcedoc/aecf-maltreatmentyouthuscorrections-2015.pdf |
| Nicole Pyle, et al., *Individual-Level Risk Factors of Incarcerated Youth* 37 J. of Remedial and Special Ed. 172 (2016) |
| Jonas Quist, et al., *Sleep and Cardiometabolic Risk in Children and Adolescents* 29 Sleep Med. Rev. 76 (2015) |
| Conrad Oh-Young & John Filler, *A meta-analysis of the effects of placement on academic and social skill outcome measures of students with disabilities*, 47 Rsch. Dev. Disabil., 80–9 (2015) |
| Anthoula Kefallinou et al., *Understanding the value of inclusive education and its implementation: A review of the literature,* 49 Prospects, 135-152 (2020) |
| Nina Dalgaard et al., *The effects of inclusion on academic achievement, socioeconomic development and wellbeing of children with special education needs,*18(4) Campbell Sys. Rev., 1–44 (2022) |
| Lucy King et al., *A comprehensive multilevel analysis of the Bucharest Early Intervention Project: Causal effects on recovery from early severe deprivation,* 180 Am. J. Psychiatry 573 (2023) |
| Femmianne Bredewold et al., *Living in the community, the pros and cons: A systematic literature review of the impact of deinstitutionalization on people with intellectual and psychiatric disabilities*, 20 J. Soc. Work 83 (2018) |
| Annie E. Casey Foundation, *JDAI* (Apr. 17, 2017), https://www.aecf.org/resources/jdai-at-25 |
| Juvenile Justice Commission. State of New Jersey. *New Jersey Juvenile Detention Alternatives Initiative (JDAI) 2023 Annual Data Report* (2025), https://www.nj.gov/oag/jjc/pdf/2023_JDAI_Annual_Data_Report.pdf |
| Thomas Swistack et al., *Smaller, Smarter and More Strategic*: *Juvenile Justice Reform in Bernalillo County,* Bernalillo County Youth Services Center (2012), |

| |
|---|
| https://www.bernco.gov/public-safety/wp-content/uploads/sites/60/2021/03/Smaller-Smarter-More-Strategic-Bernalillo-County-2011.pdf |
| County of Santa Cruz Probation Department, Santa Cruz County JDAI Model Site. https://www.santacruzcountyca.gov/Departments/ProbationDepartment/JDAIModelSite.aspx |
| Annie E. Casey Foundation, *Pathways to Juvenile Detention Reform Series* (1999-2009), https://www.aecf.org/series/pathways-to-juvenile-detention-reform-series |
| Richard Mendel, *Effective Alternatives to Incarceration*. The Sentencing Project (June 28, 2023), https://www.sentencingproject.org/reports/effective-alternatives-to-youth-incarceration/ |
| Colo. Rev. Stat. § 19-2.5-304 (2025) |
| Charlie Lakin et al., *Behavioral outcomes of deinstitutionalization for people with intellectual and/or developmental disabilities: Third Decennial Review of Studies, 1977-2010,* 21(2) Pol'y Rsch. Brief 1 (2011) |
| Jim Mansell, *Deinstitutionalization and community living: Progress, problems and priorities*. 31(2) J. of Intell. & Developmental Disability 65 (2006) |
| Jesse Suter & Eric Bruns, *Effectiveness of the wraparound process for children with emotional and behavioral disorders: A meta-analysis* (2009) |
| American Bar Association Criminal Justice Standards on Dual Jurisdiction Youth, https://www.americanbar.org/groups/criminal_justice/resources/standards/dual-jurisdiction-youth/ |
| Council on Accreditation Residential Treatment Services standards (2023), https://www.social-current.org/2023/05/2023-coa-accreditation-standards-updates/ |
| Youth Advocates Program, *Our Impact,* https://www.yapinc.org/Our-Impact (last visited Sept. 20, 2026) |
| Credible Messenger Mentoring Movement, *Our Journey to Launch CM3,* https://crediblemessenger3.org/ (last visited Sept. 18, 2026) |
| FFT LLC, *Evidence-Based Interventions for Youth and Families*, https://www.fftllc.com/ (last visited Sept. 18, 2026) |
| Nat'l Wraparound Initiative, *Wraparound Basics or What is Wraparound: An Introduction, https://nwi.pdx.edu/wraparound-basics/*; Wraparound Milwaukee *30 years of Community Impact*, https://county.milwaukee.gov/files/county/DHHS/BHD/Wraparound/WM-30-Years-of-Community-Impact.pdf (last visited Sept. 18, 2026) |

| |
|---|
| Patricia Miles et al., *Wraparound Implementation Guide: A Handbook for Administrators*, Nat'l Wraparound Initiative, https://nwi.pdx.edu/wraparound-implementation-guide/ |
| County of Milwaukee, *Wraparound Milwaukee 2017 Quality Assurance Report*, https://county.milwaukee.gov/files/county/DHHS/Providers/2017QAQIAnnualReport.pdf (2017) |
| Treatment Foster Care Oregon, https://www.tfcoregon.com/#:~:text=OJJDP%20Model%20Programs%3A%20EFFECTIVE (last visited Sept. 20, 2026). |
| Paul DeMuro, *Consider the Alternatives*, Annie E. Casey Foundation, https://www.bernco.gov/public-safety/wp-content/uploads/sites/60/2021/03/AECF-ConsidertheAlternatives-1999.pdf. |
| Binti, *CCWIS vs. SACWIS: What Changed in Regulation, Funding and Daily Operations* (June 25, 2026). https://binti.com/blog/ccwis-vs-sacwis/. |
| Casebook, *Understanding the CCWIS Final Rule*, https://www.casebook.net/blog/understanding-the-ccwis-final-rule/ (last visited Sept. 20, 2026) |
| Casey Family Programs, *Is There An Effective Model For Serving Youth Involved In Both The Child Welfare And Juvenile Justice Systems?* (Nov. 22, 2023), https://www.casey.org/crossover-youth-practice-model/ |
| Annie E. Casey Foundation. *No Place for Kids* (2013). https://assets.aecf.org/m/resourcedoc/aecf-NoPlaceForKidsFullReport-2011.pdf |
| Sarah Vidal et al. *Multisystem-Involved Youth: A Developmental Framework and Implications for Research, Policy, and Practice*, Adolescent Research Review 15 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6404973/ |
| Congressional Research Service*, Child Welfare: Purposes, Federal Programs, and Funding* (2026) |
| Colorado Department of Health Care Policy and Financing. *Children and Youth Behavioral Health*. https://hcpf.colorado.gov/childrenandyouth |
| Barbara Walters and Betty Blythe, *Results Accountability: A Critical Component of Community Support for Children and Families* 9(1) Journal of Policy Practice (2009) |
| Annie E. Casey Foundation, *Results Count: Helping leaders, organizations and groups move from intention to action for children and families* https://www.aecf.org/work/leadership-development/results-count |
| Clear Impact, *What is Results-Based Accountability?*, https://clearimpact.com/results-based-accountability/ |

| |
|---|
| Annie E. Casey Foundation, *About the Juvenile Justice Applied Leadership Network.* https://www.aecf.org/work/juvenile-justice/jdai/about-the-juvenile-justice-applied-leadership-network |
| Milwaukee County Department of Health and Human Services, *30 Years of Community Impact: Wraparound Milwaukee* (2024), https://county.milwaukee.gov/files/county/DHHS/BHD/Wraparound/WM-30-Years-of-Community-Impact.pdf |
| RFK National Resource Center for Juvenile Justice. Dual Status Youth - Technical Assistance Workbook: Updated Edition. (2021), https://nrctyj.org/wp-content/uploads/2022/11/Dual-Status-Youth-Technical-Assistance-Workbook-Updated-Edition.pdf |
| Georgetown University, Crossover Youth Practice Model (2024), https://cyj.georgetown.edu/our-work/crossover-youth-practice-model/ |
| Office of Juvenile Justice and Delinquency Prevention, Department of Justice, *Alternatives to Detention and Confinement: Literature Review: A product of the Model Programs Guide* (2024) |
| Patrick McCarthy et al., *The Future of Youth Justice: A Community-Based Alternative to the Youth Prison Model*, Harv. Univ. & Nat'l Inst. of Just. (2015) |
| Richard Mendel, *Why Youth Incarceration Fails: An Updated Review of the Evidence*. Sentencing Project (Mar. 1, 2023), https://www.sentencingproject.org/reports/why-youth-incarceration-fails-an-updated-review-of-the-evidence/#Part |
| Sarah Walker & Jerald Hertig, *The Impact of Pretrial Juvenile Detention on 12-month Recidivism: A Matched Comparison Study*. 66 Crime & Delinq. 13 (2020) |
| E. Jason Baron et al., *Pretrial Juvenile Detention*, 217 J. Pub. Econ. 9 (2022) |
| Heejun Jung, *The Long-Term Impact of Incarceration During the Teens and 20s on the Wages and Employment of Men*, 54 *Journal of Offender Rehabilitation* 54(5), 317 (2015) |
| Shruti Nayak & Leslee Haisma, *Could Apprenticeships Reduce Recidivism Among Young People?*, Urb. Inst. (Mar. 25, 2024), https://www.urban.org/urban-wire/could-apprenticeships-reduce-recidivism-among-young-people) |
| Elizabeth S. Barnert et al., *How Does Incarcerating Young People Affect Their Adult Health Outcomes?*, 139(2) Pediatrics 1 (2016) |
| Richard A. Mendel, *Maltreatment of Youth in U.S. Juvenile Corrections Facilities*, Annie E. Casey Found. (2015) |

| |
|---|
| Amanda Watford, Thousands are Suing States Over Sexual Abuse in Juvenile Detention Facilities, Stateline (Mar. 19, 2025), https://stateline.org/2025/03/19/thousands-are-suing-states-over-sexual-abuse-in-juvenile-detention-facilities/ |
| Colo. Rev. Stat. § 19-2.5-301 (2025) |