# EXHIBIT 10

# Colorado Statewide Assessment

# Child and Family Services Review (CFSR) Round 4




*Minor formatting adjustments may have been made to this document for 508 compliance. Content is unaffected.*

# Table of Contents

**Table of Contents** .......... 2
**Table of Figures** .......... 3
**Table of Tables** .......... 3
**Section I: General Information** .......... 6
List of Statewide Assessment Participants .......... 7
Description of Stakeholder Involvement in Statewide Assessment Process .......... 15
**Section II: State Context Affecting Overall Performance** .......... 17
Part 1: Vision and Tenets .......... 17
Part 2: Cross-System Challenges .......... 18
Workforce and Budgetary Challenges .......... 18
Service Coverage Changes .......... 18
Falsification of Records and Decertification .......... 20
Part 3: Recent and Current Initiatives .......... 22
Prevention .......... 24
Differential Response .......... 24
Legislation to Support Children and Youth .......... 25
Legislation to Support Parents .......... 26
Legislation to Support Kinship .......... 27
**Section III: Assessment of Child and Family Outcomes** .......... 28
The Administrative Review Division (ARD) .......... 28
Results Oriented Management (ROM) System .......... 28
Safety Outcomes .......... 29
Performance Data Highlights and Brief Analysis .......... 29
Deeper Data Exploration and Change Implementation Activities: Safety .......... 30
Permanency Outcomes .......... 36
Performance Data Highlights and Brief Analysis .......... 36
Deeper Data Exploration and Change Implementation Activities: Permanency .......... 39
Well-Being Outcomes .......... 42
Performance Data Highlights and Brief Analysis .......... 42
Deeper Data Exploration and Change Implementation Activities: Well-Being .......... 47
**Section IV: Assessment of Systemic Factors** .......... 50
Statewide Information System .......... 51
Item 19: Statewide Information System .......... 51
Case Review System .......... 55
Item 20: Written Case Plan .......... 55
Item 21: Periodic Reviews .......... 59
Item 22: Permanency Hearings .......... 64

Item 23: Termination of Parental Rights .......... 68
Item 24: Notice of Hearings and Reviews to Caregivers .......... 72
Quality Assurance System .......... 75
Item 25: Quality Assurance System .......... 75
Staff and Provider Training .......... 82
Item 26: Initial Staff Training .......... 82
Item 27: Ongoing Staff Training .......... 90
Item 28: Foster and Adoptive Parent Training .......... 98
Service Array and Resource Development .......... 111
Item 29: Array of Services .......... 111
Item 30: Individualizing Services .......... 125
Agency Responsiveness to the Community .......... 134
Item 31: State Engagement and Consultation With Stakeholders Pursuant to CFSP and APSR .......... 134
Item 32: Coordination of CFSP Services With Other Federal Programs .......... 148
Foster and Adoptive Parent Licensing, Recruitment, and Retention .......... 153
Item 33: Standards Applied Equally .......... 153
Item 34: Requirements for Criminal Background Checks .......... 163
Item 35: Diligent Recruitment of Foster and Adoptive Homes .......... 171
Item 36: State Use of Cross-Jurisdictional Resources for Permanent Placements .......... 175
**Glossary of Acronyms** .......... **189**
**Appendix A: CFSR State Data Profile** .......... **194**

# Table of Figures

Figure 1: Time to Permanency for D&N Cases Filed by CY .......... 41

# Table of Tables

Table 1: ROM Safety Outcome Data by CY .......... 30
Table 2: ROM Age Representation of Victims of Maltreatment in Care by CY .......... 32
Table 3: ROM Age Representation of Victims of Recurrence of Maltreatment by CY... 34
Table 4: ROM Permanency Outcome Data by CY .......... 37
Table 5: ARD Permanency Outcome Data by CY .......... 38
Table 6: ROM Parent Engagement by CY .......... 43
Table 7: ARD Well-Being Outcomes (Services) by CY .......... 44
Table 8: ARD Well-Being Outcomes (Education) by CY .......... 45

Table 9: ARD Well-Being Outcomes (Health and Dental) by CY.......................... 47
Table 10: Identifiability of Trails Data Elements for Child Welfare Population by FFY. 53
Table 11: ARD Review Parent Engagement by FFY........................................ 57
Table 12: ARD Family Engagement Meeting Frequency by FFY.......................... 58
Table 13: AFCARS Timeliness of Initial Periodic Reviews................................ 63
Table 14: AFCARS Timeliness of Subsequent Periodic Reviews.......................... 64
Table 15: State Court Timeliness of Initial Permanency Hearings by FFY............... 65
Table 16: State Court Timeliness of Subsequent Permanency Hearings by FFY......... 66
Table 17: ARD Required Court Documents in Case File by FFY.......................... 67
Table 18: Trails 15/22 Reviews by FFY...................................................... 71
Table 19: Trails Timeliness of TPR Filings by FFY......................................... 71
Table 20: ARD Compelling Reasons for Not Filing TPR by FFY............................ 72
Table 21: ARD Timely Notice of Periodic Reviews by FFY................................. 74
Table 22: CWTS Completion of Initial Staff Training by SFY.............................. 85
Table 23: CWTS New Caseworker Training Effectiveness by Module by SFY............ 87
Table 24: CWTS Completion of Initial Supervisor Training by SFY........................ 92
Table 25: CWTS Completion of Ongoing Training by SFY.................................. 96
Table 26: CWTS Ongoing Training Effectiveness by Course Type by SFY................. 97
Table 27: ARD Completion Rates of Initial Foster/Adoptive Parent Training by CY....104
Table 28: ARD Completion Rates of Ongoing Foster/Adoptive Parent Training by CY.... 105
Table 29: PSU CPA Training Compliance by CY........................................... 105
Table 30: Core Service Availability, Capacity, and Accessibility by CY................. 119
Table 31: Core Inadequate Capacity of Service Type by CY.............................. 120
Table 32: Core Service Involvements by County Size by CY.............................. 122
Table 33: Core Service Program Evaluation Outcomes by CY............................. 126
Table 34: Core Service Types Accessed by CY............................................ 128
Table 35: Trails Unique Needs of Children/Youth by FFY................................. 129
Table 36: Trails Unique Needs of Families by FFY........................................ 130
Table 37: Colorado State Agencies Administering Federal Programs.................... 149
Table 38: ARD Monitoring for Application of Standards by CY........................... 157
Table 39: PSU Monitoring for Application of Standards by CY........................... 158
Table 40: PSU Complaint and Stage Investigations by CY................................ 160
Table 41: PSU Waivers/Variances Submitted and Granted by CY........................ 162
Table 42: ARD Foster Home Background Checks by CY................................... 167
Table 43: PSU CPA Background Check Compliance by CY................................ 168
Table 44: Trails Racial and Ethnic Characteristics of Foster and Adoptive Parents by FFY....173

Table 45: Trails Racial and Ethnic Characteristics of Children/Youth in Care by FFY....174
Table 46: Use of Cross-Jurisdictional Resources by CY End.... 178
Table 47: Timeliness Of Basic ICPC Home Study Requests Received by Colorado by FFY....184
Table 48: Timeliness Of Expedited ICPC Home Study Requests Received by Colorado by FFY....185
Table 49: ICPC Home Studies Completed as Approved by FFY.... 187
Table 50: ICPC Placements Made by FFY.... 187

# Section I: General Information

Name of State Child Welfare Agency: Colorado Department of Human Services

State Child Welfare Contact Person for the Statewide Assessment

Name: Katie Scherr

Title: Federal Reporting Administrator

Address: 1575 Sherman Street, Denver, CO 80203

Phone: 720-793-5479

E-mail: katie.scherr@state.co.us

# List of Statewide Assessment Participants

Below are the names and affiliations of the individuals who participated in the Statewide Assessment process and their roles in the process. To protect confidentiality, lived experts are represented as focus groups rather than individuals. These focus groups include an asterisk (*) after their names.

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Michelle Barnes | Executive Director, Colorado Department of Human Services (CDHS) | Leadership, Reviewer |
| Minna Castillo | Deputy Executive Director, Community Partnerships, CDHS | Leadership, Reviewer |
| Thomas Miller | Director, Office of Children, Aging, and Community Services (OCACS); CDHS | Leadership, Reviewer |
| Robert “Tres” Newport | Deputy Director, OCACS; CDHS | Leadership, Reviewer |
| Dr. Deborah Monaghan | Medical Director, OCACS; CDHS | Medical Policy and Practice Expert, Contributor |
| Gretchen Russo | Judicial and Legislative Administrator, OCACS; CDHS | Judicial and Legislative Policy and Practice Expert, Contributor |
| James “JP” Sleeger | Trails Product Manager, OCACS; CDHS | Comprehensive Child Welfare Information System (CCWIS) Subject Matter Expert (SME), Contributor |
| Jeffrey Fitzsimmons | Trails Modernization Product Owner | CCWIS SME, Contributor |

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Joe Homlar | Director, Division of Child Welfare (DCW); Office of Children and Community Services (OCACS); Colorado Department of Human Services (CDHS) | Leadership, Reviewer |
| Korey Elger | Co-Deputy Director, DCW; OCACS; CDHS | Child Welfare Policy and Practice Expert, Reviewer |
| April Jenkins | Child Protection and Prevention Services Unit Manager, DCW; OCACS; CDHS | Child Welfare Policy and Practice Expert, Reviewer |
| Alysia Chang | CAPTA and Federal Funding Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Amy Sciangula | Core & Prevention Services Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Carrie Emmott | Compliance Investigator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| James Connell | Intake & Assessment Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Joey Brozek | Institutional Assessment Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Katie Scherr | Federal Reporting Administrator, DCW; OCACS; CDHS | Statewide Assessment Project Manager, Contributor |

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Noelle Smith | Family First Prevention Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Yerson Padilla | Family Preservation (Core) Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Laurie Burney | Provider Services Unit (PSU) Provider Performance Manager, DCW; OCACS; CDHS | Child Welfare Policy and Practice Expert, Contributor |
| Logan Ellett | PSU Provider Development Manager, DCW; OCACS; CDHS | Child Welfare Policy and Practice Expert, Contributor |
| Kate Bradley | Licensing and Adoption Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Lila Mutschelknaus | ICPC Deputy Compact Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Pauline Hoekstra | Backgrounds & Compliance Supervisor, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Nicole Drake | Permanency Unit Manager, DCW; OCACS; CDHS | Child Welfare Policy and Practice Expert, Reviewer |
| Dustie Cummins | ICWA Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Jeannie Berzinskas | Kinship Care Program Administrator | Child Welfare SME, Contributor |

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Lindsey Tapp | Foster Care Program & RGAP Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Toilynn Edwards | Placement Resource Administrator, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Vida Hejazi | Foster, Adoption, Recruitment, and Retention Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Pang Ching "Bobby" Chen | Research, Analysis, & Data Unit Manager, DCW; OCACS; CDHS | Data SME, Contributor |
| Quang Tran | Research & Reporting Data Analyst, DCW; OCACS; CDHS | Data SME, Contributor |
| Kathy Clark | IV-E & Certification Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Moinette Dickens | Family First Training & Development Specialist, DCW; OCACS; CDHS | Child Welfare SME, Contributor |
| Trevor Williams | Youth Services Unit Manager, DCW; OCACS; CDHS | Child Welfare Policy and Practice Expert, Reviewer |
| Maitri Jensen | Foster Care Educational Specialist; OCACS; CDHS | Child Welfare SME, Contributor |
| Vanessa Pagan | Finance Director, DCW; OCACS; CDHS | Child Welfare Finance Expert, Contributor |

| Name | Affiliation | Role in Statewide Assessment Process |
| --- | --- | --- |
| Marc Mackert | Director, Administrative Review Division (ARD); CDHS | Child Welfare Policy and Practice Expert, Contributor |
| Caire Krol | Manager, ARD; CDHS | Child Welfare Policy and Practice Expert, Contributor |
| Tia Whitaker | Research ARD; CDHS | Data SME, Contributor |
| Timothy Russell | Manager, ARD; CDHS | Child Welfare Policy and Practice Expert, Contributor |
| Meredith Villiers | ESA Program Manager, Behavioral Health Administration (BHA) | Behavioral Health Care Policy and Practice SME, Contributor |
| Aaron Miller | Family Strengthening Unit Manager, Colorado Department of Early Childhood (CDEC) | Early Childhood Policy and Practice Expert, Contributor |
| Megan Kearsley | Court Improvement Program (CIP) Coordinator, State Court Administrator's Office | Judicial SME, Contributor |
| Jessica Sucherman | Legal Strategist, State Court Administrator's Office | Judicial SME, Contributor |
| Heather Allan | Evaluation Manager, Child Welfare Training System (CWTS) | Child Welfare Training Expert, Contributor |
| Ida Drury | Impact and Evaluation, CWTS | Child Welfare Training Expert, Contributor |

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Gina Robinson | Senior Policy Advisor/EPSDT Program Administrator, Colorado Department of Health Care Policy and Financing (HCPF) | Health Care Policy and Practice SME, Contributor |
| Meghan Morrissey | Safety Net and Acute Care Unit Supervisor, HCPF | Health Care Policy and Practice SME, Contributor |
| Stacey Davis | Systems of Care Section Manager, HCPF | Health Care Policy and Practice SME, Contributor |
| Family Advisory Council* | DCW; OCACS; CDHS | Focus Group - Lived Experts |
| Lived Experts Action Panel* | Colorado Office of the Child's Representative (OCR) | Focus Group - Lived Experts |
| Reimagining Child Welfare Steering Committee* | Independent Facilitator | Focus Group - Lived Experts |
| Youth Voice Panel* | County Department of Human Services (Anonymous) | Focus Group - Lived Experts |
| Melissa Thompson | Executive Director, Colorado Office of Respondent Parents' Counsel (ORPC) | Focus Group Participant |
| Amanda Schmitz | Case Strategy Director, ORPC | Focus Group Participant |
| Joe Stroh | Director of Parent Advocacy, ORPC | Focus Group Participant |

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Kelli Nagel | Carrie Ann Lucas Civil Rights Director, ORPC | Focus Group Participant |
| Melanie Jordan | Policy Director, ORPC | Focus Group Participant |
| Tracie Jones | Director of Advocacy and Outreach, ORPC | Focus Group Participant |
| Zaven Saroyan | Appellate Director, ORPC | Focus Group Participant |
| Chris Henderson | Executive Director, Colorado Office of the Child's Representative (OCR) | Focus Group Participant |
| Cara Nord | Youth Empowerment Attorney, OCR | Focus Group Participant |
| Gina Circo | Data Scientist, OCR | Focus Group Participant |
| Nathifa Miller | Engagement & Opportunity Staff Attorney, OCR | Focus Group Participant |
| Sheri Danz | Deputy Director, OCR | Focus Group Participant |
| Jolene Holgate | Executive Director, Denver Indian Family Resource Center | Focus Group Participant |
| Shannon Eastwood | Tribal Services Director, Southern Ute Indian Tribe | Focus Group Participant |
| Monycka Snowbird | Southern Ute Indian Tribe, Sweetgrass Advocacy | Focus Group Participant |
| Shauna Jackson | Advocate & Volunteer Coordinator, Sweetgrass Advocacy | Focus Group Participant |

| Name | Affiliation | Role in Statewide Assessment Process |
|---|---|---|
| Large County Connection Meeting | Kempe Center | Focus Group Participants |
| Medium County Connection Meeting | Kempe Center | Focus Group Participants |
| Small County Connection Meeting | Kempe Center | Focus Group Participants |

# Description of Stakeholder Involvement in Statewide Assessment Process

Colorado's Child and Family Services Review (CFSR) Round 4 Implementation Team meets monthly to discuss and implement the CFSR process throughout all phases of the review. This team comprises representatives from the Colorado Department of Services (CDHS) Division of Child Welfare (DCW) and Administrative Review Division (ARD), county partners, the Court Improvement Program (CIP), the Colorado Office of the Child's Representative (OCR), the Colorado Office of Respondent Parents' Counsel (ORPC), the Colorado Department of Health Care Policy and Finance (HCPF), the Behavioral Health Administration (BHA), the Child Protection Ombudsman of Colorado (CPO) and community partners.

As part of its Statewide Assessment, Subject Matter Experts (SMEs) across CDHS were engaged in providing data and soliciting stakeholder input for the relevant sections of the report. The SMEs and agency child welfare leadership are well-suited to determine when, who, and how to engage with their stakeholders relevant to each area of their expertise.

In October 2024, CDHS hosted a statewide CFSR Round 4 kick-off event to educate stakeholders about the CFSR process; present data related to the federal safety, permanency, and well-being outcomes; and solicit stakeholders' feedback on driving factors of Colorado's performance on the statewide data indicators.

In addition to the efforts described above, CDHS hosted targeted focus groups and interview discussions with the following stakeholders to gather input for the Statewide Assessment draft:

- Caregivers with lived experience
- Youth with lived experience
- Colorado Office of the Child's Representative
- Colorado Office of Respondent Parents' Counsel
- Southern Ute Indian Tribe
- Community agencies that support urban Native populations
- County staff involved with initial and ongoing staff training requirements

The Statewide Assessment draft was made available for public review and feedback in April 2026 and four public feedback sessions were held. DCW issued an information memo to distribute the draft widely and encourage participation in the public feedback sessions. Additionally, the Statewide Assessment draft was provided directly

to the participants of the above stakeholder input sessions and to the following groups for review and feedback:

- All county human services directors
- Child Welfare Sub-PAC
- Colorado Human Services Directors Association (CHSDA)
- Southern Ute Indian Tribal Representatives
- Ute Mountain Ute Tribal Representatives
- CFSR Implementation Team members, including:
  - County representatives;
  - CDHS representatives;
  - Court Improvement Program;
  - Stage agency partners; and
  - Community stakeholders

This Statewide Assessment, in conjunction with Colorado's Onsite Review scheduled for July 2026, will be used to determine Colorado's performance on the Round 4 CFSR.

# Section II: State Context Affecting Overall Performance

The Colorado Department of Human Services (CDHS) is pleased to submit the 2026 Statewide Assessment. This Statewide Assessment is presented separately from the 2027 Annual Progress and Services Report (APSR) and complies with the requirements set forth for the Child and Family Services Review Phase I: Statewide Assessment instructions.

## Part 1: Vision and Tenets

Colorado has a state-supervised, county-administered human/social services system, consisting of 64 counties and two federally recognized tribes with reservation lands. Under this system, county departments are the main provider of direct services, including child welfare services, to Colorado's families. CDHS is responsible for rule promulgation, guidance, and program oversight.

Rules are promulgated by the CDHS State Board of Human Services, created pursuant to Colorado Revised Statutes (C.R.S.) 26-1-107. Statutory duties include adopting rules for programs administered and services provided by CDHS, which govern program scope and content; requirements, obligations and rights of clients; adopting non-Executive Director rules concerning vendors, providers and other acts of the State Department; and any other specific statutory provisions granting rule-making authority in relation to specific programs.

The Division of Child Welfare (DCW) is the organizational unit within CDHS that is responsible for monitoring county child welfare practice to ensure alignment with statute, rule, and memo series guidance. Additionally, DCW is responsible for the oversight and coordination of the Child and Family Services Plan (CFSP). Colorado's vision for its child welfare system, as articulated in Colorado's 2025-2029 CFSP[1], is to "create meaningful impact, drive positive change, and empower communities, by ensuring safety, permanency, and well-being for Colorado's children, youth, and families."

[1] 2025-2029 Child and Family Services Plan (PDF)

# Part 2: Cross-System Challenges

Cross-system challenges encountered through Colorado's child welfare system are detailed throughout Colorado's Statewide Assessment. However, three issues not specifically addressed in other sections of this report are described below.

## Workforce and Budgetary Challenges

Cross-cutting issues in Colorado's child welfare system include workforce capacity challenges, with high staff turnover and heavy caseloads impacting service consistency and outcomes. Budget constraints and rising service costs, particularly for placements and specialized care, continue to strain available resources. The state-supervised, county-administered structure creates inherent variability in practice, performance, and access to services across counties. Ongoing legislative and policy changes, including federal reforms emphasizing prevention, require continuous system adaptation. Additionally, community-level factors such as service availability, economic conditions, and disparities in access to culturally responsive care influence program effectiveness statewide.

## Service Coverage Changes

In July 2025, Colorado underwent two changes to its behavioral health service access structure: the consolidation of Regional Accountable Entity (RAE) regions and the launch of Behavioral Health Administrative Services Organizations (BHASOs). Both of these changes are further described below and impact how Coloradans access child welfare services.

### Regional Accountable Entities (RAEs)

The Accountable Care Collaborative (ACC) is the primary delivery system for Colorado's Medicaid program. Managed care entities, referred to as Regional Accountable Entities (RAEs) are responsible for promoting member health and well-being by administering the capitated behavioral health benefit, establishing and supporting networks of providers, and coordinating medical and community-based services for members in their region. The Colorado Department of Health Care Policy and Financing (HCPF) manages contracts with the RAEs, and new contracts launched on July 1, 2025. These contracts reduced the number of RAEs from seven to four.

HCPF is working toward expanding and improving implementation of Intensive Behavioral Health Services that include intensive in-home and community-based

mental health services, intensive care coordination, mobile crisis intervention, and stabilization services. This will support Colorado Medicaid beneficiaries under the age of 21 for whom these services are medically necessary. This work, in partnership with the Behavioral Health Administration, includes implementing the Colorado System of Care (CO-SOC)[2], which expands access to intensive, community-based behavioral health services for Medicaid-enrolled children and youth under age 21. The implementation began with a planning year during SFY 2025 and is occurring through a phased approach that is anticipated to continue through SFY 2031. While RAEs serve as a single point of entry for Medicaid members to access the CO-SOC services, allowing for a centralized system to determine the most appropriate treatment, referrals for behavioral health services may come from a family member, provider or agency, or other system in which the member is engaged. Children/youth who are not Medicaid-eligible but have mental health needs are referred to their BHASO region.

## Behavioral Health Administrative Services Organizations (BHASOs)

As the single statewide behavioral health authority for the state, the Behavioral Health Administration (BHA) is responsible for creating and overseeing a high-quality and accessible behavioral healthcare system for the people of Colorado. In July 2025, BHA launched the new Behavioral Health Administrative Services Organizations (BHASOs) system to establish and administer regional networks of behavioral health services. The BHASOs provide care coordination to help all individuals navigate the full continuum of behavioral health services in Colorado. The BHASOs also fund behavioral health providers to support care for uninsured and underinsured people in Colorado who cannot afford services and have serious or ongoing substance use or mental health disorder challenges. Like Medicaid RAEs, the BHASOs operate under a regional structure, with four BHASO regions that align with the RAE regions. This alignment minimizes confusion for the people seeking services and ensures consistency within the two systems.

Key ways the BHASOs and BHA serve children, youth, and families to help prevent child welfare involvement and support those involved with child welfare system:

- Enhanced Standardized Assessments: BHA oversees the Enhanced Standardized Assessment (ESA) process which Colorado utilizes as the Qualified Residential Treatment Program (QRTP) assessment required by the Family First Prevention Services Act (FFPSA) to access Title IV-E funding. The BHASOs are responsible for maintaining a network of Qualified Individuals (QIs) to conduct ESAs. The

[2] Colorado System of Care (CO-SOC)

BHASOs work directly with the county child welfare agency to coordinate the ESA process.

- Colorado's Child and Youth Mental Health Treatment Act (CYMHTA): Families with children and youth who are not eligible for Medicaid, uninsured, or underinsured and are at risk for out-of-home placement can receive behavioral health services (community and residential) through CYMHTA. In State Fiscal Year 2025, 84% of the children and youth discharged from CYMHTA had no involvement with the child welfare system after leaving the program.
- QRTP Room and Board: Since January 2025, BHA has funded room and board for youth accessing QRTP through Medicaid and are not in the custody of a county child welfare department. This has helped address the disparity in funding sources and reduce the need for youth to enter the child welfare system solely to access funding for QRTP.

# Falsification of Records and Decertification

In recent years, Colorado has worked to address concerns of instances in which there is a confirmation of falsified child welfare records by a child welfare worker. Administrative rules developed by the Falsification of Child Welfare Records Rule Writing Workgroup went into effect in September 2024. During this rule-writing process, stakeholders expressed a strong desire for a decertification due process similar to license revocation for other professions.

The workgroup met monthly from June to December 2024 and gathered stakeholder input to develop new rules pertaining to the decertification review process when falsification of child welfare records has been confirmed in accordance with Volume 7.601.81 (A). These rules were added to the Colorado Code of Regulations (12 CCR 2509-7, Sections 7.601.1 and 7.603.2-6) and became effective on October 30, 2025. In November 2025, DCW issued an Operation Memo to inform county staff and other child welfare stakeholders of the rule additions and the process for the DCW to decertify state-certified child welfare workers upon confirmation of falsified records through a county investigation. These rules apply to any of the following Child Welfare Training Academy certified types:

- Hotline worker;
- Hotline staff supervisor;
- Social caseworker trainee;
- Social caseworker; and
- Social casework supervisor.

Under the current process, counties must notify DCW of any confirmed incident of falsification within three days of the confirmation, and either the reporting county or DCW shall suspend the individual's access to Trails within one business day of the notice. The county is also required to report the incident to law enforcement or their district attorney.

Colorado's decertification rule mandates the formation of a five-member independent review panel. As outlined in rule, this panel must include the division director (or designee) and representatives from a county, the Administrative Review Division, Aging and Adult Services, and either the Family Voice Council or Family Advisory Council. The panel's purpose is to review cases of falsification and determine if the individual should be permanently decertified from their state-issued child welfare certification. If the panel concludes that the county has demonstrated a preponderance of the evidence that falsification occurred, the individual can be permanently decertified. This results in the loss of access to the Trails system, effectively preventing them from serving in any child welfare capacity in Colorado that requires Trails access. To date, the panel is working as intended, conducting robust, thoughtful, and thorough discussions to make decisions regarding decertification. The decertification rules provide the opportunity for a party to file exceptions with the CDHS Office of Appeals if they feel the panel decision should be overturned.

Colorado's decertification process has revealed the need for DCW to address ethical practice and supervisory support within counties. The safety of children, youth and families can be compromised if false information is entered, and families have the right to accurate records. CDHS is responsible for the certification of child welfare staff who require access to the Trails system. Therefore, CDHS has a responsibility to determine whether staff should be allowed further access to the system, which is required for county child welfare staff to carry out their duties, when they violate the user agreement of Trails and enter false information.

Challenges encountered through the early implementation of the new decertification rules include the creation of a new process as required by the rules. Additionally, DCW has not previously engaged in adverse action with state-issued child welfare certification, creating a significant shift for all parties involved. Decertification decisions are difficult and often result in dissatisfaction from either the county or the staff person under review. As DCW engages in early implementation of the decertification process, it is anticipated that there will be future rule changes to the process regarding timeliness of role definitions; DCW will include more information in future reports as updates become available.

# Part 3: Recent and Current Initiatives

Colorado underwent Round 3 of the CFSR in calendar year 2017 and received its final report from the Children's Bureau in March 2018. Colorado was found to be in substantial conformity with two Systemic Factors: Quality Assurance and Agency Responsiveness to the Community. The remaining five Systemic Factors and seven Outcomes were rated as "not in substantial conformity." The primary concerns identified through Colorado's Round 3 CFSR include the following:

- Assessing and managing risk and safety for youth in conflict cases;
- Collaborating with legal and judicial partners to achieve timely permanence for children in out-of-home care;
- Engaging caregivers, especially assessing and addressing fathers' needs;
- Barriers to Colorado's service array including transportation, consistency in services, and availability of services; and
- National standards related to maltreatment in out-of-home care and re-entry into out-of-home care.

To address these concerns, Colorado developed a CFSR Program Improvement Plan (PIP) that included the following five goals and corresponding strategy measurement goals:

1. Goal 1: Increase safety for children and youth through timely response to reports of child maltreatment.
    a. Strategy 1 Measurement: Increase in the percentage of face-to-face caseworker contacts with child(ren)/youth.
2. Goal 2: Ensure safety of child(ren)/youth through a thorough, quality initial assessment and actively engaging families in identifying and addressing safety issues throughout the life of a case.
    a. Strategy 1 Measurement: Increase the percentage of safety assessments completed as required by rule. Improve accuracy and quality of completed safety assessments.
    b. Strategy 2 Measurement: Increase knowledge of appropriate use of safety planning. Improve monitoring of safety using formal and informal processes.
3. Goal 3: Enhance and strengthen agency engagement with fathers and noncustodial parents, through timely identification and consistent engagement, consistent quality contacts, accurate assessments and provision of services appropriately matched to meet the needs of child(ren)/youth and families.
    a. Strategy 1 Measurement: Increase the percentage of cases with fathers identified for each child.

   b. Strategy 2 Measurement: Increase percentage of caseworker contacts with fathers. Improve quality of father contacts as informed through focus groups, inclusion in case planning, surveys, regular feedback from parent workgroup or other convening.
   c. Strategy 3 Measurement: Increase in the number of cases with a documented 90 day review and inclusion in court reports.
   d. Strategy 4 Measurement: Increased identification of services to meet individualized identified educational and mental/behavioral health needs of child(ren)/youth.
4. Goal 4: Improve timeliness of permanency through adoptions for child(ren)/youth and increase relative guardianship assistance program (RGAP) participation by qualified relatives/non-relative kin.
   a. Strategy 1 Measurement: Deliver child study policy, practice clarity to case workers. Increase in accuracy, quality and timely completion of child study.
   b. Strategy 2 Measurement: Increase the percentage of cases with a TPR filing or with a compelling reason for not filing a TPR at 15/22.
   c. Strategy 3 Measurement: Reduce the average number of days for time to disposition in appealed TPR cases.
   d. Strategy 4 Measurement: Increase percentage of eligible relative/nonrelative kin participating in RGAP. Increase the number of judicial, court and attorneys who are trained about the benefits/ processes for relative/ nonrelative placement.
5. Goal 5: Strengthen systemic practices to improve child welfare outcomes for safety, permanency, and well-being.
   a. Strategy 1 Measurement: All case specific data will be captured in Trails. Caseworker certification status will be reflected in Trails.
   b. Strategy 2 Measurement: Kinship navigator programs and post permanency services will expand to rural communities across the state.
   c. Strategy 3 Measurement: Improved consistency in certification and recertification review process for county and Child Placement Agency (CPA) foster homes.

The PIP as outlined above was approved by the Children's Bureau in March 2020 and was implemented from April 2020 through March 2022, during which time Colorado carried out its PIP strategies related to the five goals. Immediately following the PIP implementation period, Colorado entered a non-overlapping evaluation period during which Colorado continued to monitor its PIP measurement goal progress with the goal of improving performance related to Safety Outcome 1, Permanency Outcome 1, and

Well-Being Outcome 1. Colorado successfully exited its Round 3 PIP in September 2023.

Since that time, Colorado has continued work on efforts to improve safety, permanency, and well-being outcomes for children, youth, and families. Several recent and current initiatives are highlighted below.

# Prevention

Colorado continues to refine its child welfare system with a focus on proactively strengthening families through a vast prevention continuum and early intervention strategies. The ultimate goal is to have an array of supportive services available statewide to keep families together safely, only using out-of-home placement when necessary, with prioritization given to kinship and family-like settings. This intentional shift has helped reduce unnecessary placements and foster home utilization, while decreasing the number of families moving further into the child welfare system to access services.

To support children and families through prevention efforts, counties may elect to open a case as Program Area 3 (PA3): Prevention and Intervention Services to Children, Youth, and Families at Risk of Involvement with Child Welfare. Services provided through PA3 may be provided to assist families at risk of involvement with child welfare to safely care for their children. These services must be provided on a voluntary basis and there is not a statewide requirement for providing these services, allowing each county to use PA3 in a way that meets the needs of their specific communities.

# Differential Response

The Colorado Differential Response (DR) practice model provides counties with an opportunity to focus on child/youth safety and provide the appropriate level of support based on the needs of families. This requires assessing risk and safety in the same manner as required in a traditional response with two exceptions: scheduling interviews with families and the alleged victim child/youth are done with the family, and there is no substantiated “finding” of abuse and neglect against the family. Since Round 3, DCW has worked to expand DR practice statewide while maintaining consistency and fidelity. As of State Fiscal Year (SFY) 2026, DR implementation has expanded into all 64 counties, with 63 counties having fully implemented DR and one county in the DR implementation process.

# Legislation to Support Children and Youth

## Bills of Rights for Foster Youth and Siblings

In 2024, Colorado passed HB24-1017: Bill of Rights for Foster Youth[3], a law codifying the rights of children and youth residing in foster care or participating in the Foster Youth in Transition Program. This bill was initiated by the Colorado Office of the Child's Representative (OCR) and passed several years after HB19-1288: Foster Youth Sibling Bill of Rights[4], which increased protections to ensure that children in care maintain relationships with their siblings. In recent years, DCW has partnered with the OCR to ensure that both laws are being implemented with fidelity statewide. The OCR created a Notice of Rights for the Bill of Rights for Foster Youth that is required to be provided to each child or youth in foster care between the ages of 5-21 by the county departments of human services. Additionally, the OCR created a standardized Sibling Youth Bill of Rights notice form. Both notice forms are available on the OCR website[5]. DCW and OCR have coordinated to provide training opportunities to child welfare staff through Colorado's Child Welfare Town Halls, the Foster Care Quarterly, and the Permanency Task Group to ensure county staff are aware of the notice requirements and documentation.

## Counsel for Youth

Colorado passed HB22-1038 Right To Counsel For Youth[6] in 2022, which requires that client-directed Counsel for Youth be appointed for children/youth ages 12 and older in Dependency and Neglect cases. The Counsel for Youth represents the youth's position, rather than what the attorney determines is in a child's best interests. When appropriate, such as for children/youth ages 12 or older with diminished capacity, a Guardian ad Litem may be appointed to the child/youth in addition to the Counsel for Youth. The appointment of Counsel for Youth ensures that children and youth's voice and wishes are heard in dependency and neglect proceedings, which impacts the child's safety, permanency, and well-being outcomes.

---

[3] HB24-1017: Bill of Rights for Foster Youth

[4] HB19-1288: Foster Youth Sibling Bill Of Rights

[5] OCR Website: Foster Youth Rights

[6] HB22-1038 Right To Counsel For Youth

# Legislation to Support Parents

## Family Time

Beginning January 2024, the definition of "Family Time" was clarified through HB23-1027: Parent And Child Family Time[7]. The bill set forth new requirements for dependency and neglect court proceedings, and required the High Quality Parenting Time Task Force to conduct a statewide study on Family Time. The task force partnered with the Colorado Evaluation and Action Lab to identify the current strengths and needs for providing high-quality supervised family time services across the state, identify necessary measures to build capacity to provide high-quality supervised parenting time services, inventory funding sources and allowable costs for providing these services, and make recommendations regarding best practices for funding high-quality parenting time. The findings and evidence-backed recommendations to improve outcomes for families separated during child welfare involvement are included in the Colorado Evaluation and Action Lab's final reports released in October 2024[8].

## Child Support Rules

In May 2024, SB24-202: Assignment of Child Support Foster Youth[9] was signed into law to prevent automatic child welfare referrals to child support. Historically, all individuals in Colorado with a child in paid out-of-home placement were automatically referred to child support. Research has shown that pursuing families to recoup out-of-home placement costs can be detrimental to reunification efforts and increase the amount of time spent in out-of-home placements. Additionally, not paying child support may subject parents to enforcement actions that can jeopardize reunification efforts. Since the implementation of the law, all child welfare referrals to child support must be created manually to ensure they are not created solely due to paid out-of-home placement, and are reviewed every six months to ensure that the referral to child support has not caused harm to the family's reunification efforts.

[7] HB23-1027: Parent And Child Family Time

[8] Best Practices for Family Time in Colorado: A Data-Informed Approach to Drive Outcomes

[9] SB24-202: Assignment of Child Support Foster Youth

## Incarcerated Parents

In January 2024, SB23-039: Reduce Child And Incarcerated Parent Separation[10] took effect to support the relationship between children and their incarcerated parents by reducing family separation caused by parents' detention. As a result, the Permanency Task Group revised Volume 7 rule (sections 7.000.2, 7.301.22, 7.701.3, 7.304.64 and 7.601.2); the new rules went into effect in December 2024.

# Legislation to Support Kinship

## Kinship Foster Homes

During Colorado's 2024 Legislative Session, SB24-008: Kinship Foster Care Homes[11] passed and required CDHS to promulgate rules for modified kinship foster care certification requirements that reduce barriers without compromising the safety of children/youth. DCW is in process of promulgating rules for kinship foster care certification to be included in the Colorado Code of Regulations (12 CCR 2509-8, Section 7.707), and has issued interim guidance to county staff regarding the implementation of new kinship foster care certification standards. SB24-008 also included an expansion of financial assistance to non-certified kinship caregivers and DCW has implemented the statewide non-certified kinship care reimbursement process.

## Notification to Potential Relatives and Kin

New kinship rules regarding the expectations of HB23-1024: Relative and Kin Placement of a Child[12] became effective July 1, 2025. This bill required the development of a standardized notification template for counties to provide to all relatives and identified kin within 30 days of placement. Colorado's standardized notification template, which is available in six languages to date, was developed by a Kinship Rules Work Group sub-group that comprised kinship caregivers, community agency partners, county departments, child placement agencies, the OCR, the ORPC, the ARD, and the DCW.

---

[10] SB23-039: Reduce Child And Incarcerated Parent Separation

[11] SB24-008: Kinship Foster Care Homes

[12] HB23-1024: Relative and Kin Placement of a Child

# Section III: Assessment of Child and Family Outcomes

Colorado's 2025-2029 Child and Family Services Plan (CFSP) outlines a number of measures of progress that CDHS uses to assess the state's performance on federal safety, permanency, and well-being outcomes. This section addresses Colorado's performance on some of these measures of progress, efforts to maintain or improve performance, and in some cases, necessary revisions to better align with the CFSR Round 4 statewide data indicators. The data used to assess the state's performance in the areas of safety, permanency, and well-being primarily come from two sources:

## The Administrative Review Division (ARD)

The Administrative Review Division[13] (ARD) serves as an independent, third-party review system within CDHS and conducts quality assurance reviews for the Division of Child Welfare, the Division of Youth Services, and Adult Protective Services cases. The ARD review instruments are based on federal and state statute as well as practice expectations outlined in Volume 7 of the Code of Colorado Regulations. The ARD works closely with Colorado's counties to train, measure, and assess their adherence to state and federal regulations, including those intended to help prevent unnecessary moves for children in foster care and to assess whether the needs of children, youth, and families are being appropriately addressed. The case review data reflect the opinions expressed by children/youths, their family, foster care providers, county staff, court staff, and others who attend the reviews.

## Results Oriented Management (ROM) System

CDHS contracts with the University of Kansas to manage the state's Results Oriented Management System (ROM) software, which is used to create performance reports based on data entered by county child welfare staff into Colorado's Comprehensive Child Welfare Information System (CCWIS), Trails. Public data is available through the CDHS Community Performance Center[14] to promote transparency in state performance and help ensure the best outcomes for Colorado's most vulnerable children and their

[13] Administrative Review Division
[14] CDHS Community Performance Center

families. Additionally, ROM is used as a tool in continuous quality improvement and performance management at the county and state levels.

# Safety Outcomes

Safety outcomes include:

1. Children are, first and foremost, protected from abuse and neglect.
2. Children are safely maintained in their own homes whenever possible and appropriate.

# Performance Data Highlights and Brief Analysis

Colorado did not achieve substantial conformity on either of the two safety outcomes during Round 3 of the CFSR.

According to Colorado's State Data Profile for August 2025 (Appendix A), which is generated by the Children's Bureau:

- The rate of maltreatment for children in foster care was 11.69 victimizations per 100,000 days in care. The reporting period for this metric is Federal Fiscal Year (FFY) 2023.
- 12.7% of children who were victims of a substantiated maltreatment report experienced a recurrence of abuse within 12 months. The reporting period for this metric is FFY 2024.

Colorado's performance for both data indicators on the Children's Bureau-generated State Data Profile for August 2025 demonstrate state performance that is statistically worse than national performance. Further data analysis on these factors is described later in the Safety Outcomes section of this report.

According to ARD case review data for out-of-home cases, between 97.48% (CY 2025) and 98.2% (CY 2024) of children/youth who had a new safety concern identified during the review period had their safety needs adequately addressed during the review period.

Table 1 reflects safety outcome data for CYs 2023, 2024, and 2025 according to ROM data.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of investigations of reports of maltreatment were initiated timely (per Colorado's state standard).[15] | 87.3% | 89.0% | 90.2% |
| % of children/youth with in-home services who did not have a substantiated report of maltreatment during in-home involvement.[16] | 96.3% | 96.7% | 96.1% |
| % of assessments that had a safety assessment completed and documented timely.[17] | 57.1% | 59.7% | 68.0% |

Table 1: ROM Safety Outcome Data by CY.

The data from recent years' ARD out-of-home case reviews demonstrates that when a safety concern is identified for a child in out-of-home care, the vast majority of children/youth have their safety needs adequately addressed. The data from ROM demonstrates that Colorado continues to make improvements in safety-related outcomes, with statewide performance on timely initiation of investigations and timely completion and documentation of safety assessments increasing during the three-year period. The data also demonstrates that the majority of children/youth with in-home services remain safe during their involvement.

## Deeper Data Exploration and Change Implementation Activities: Safety

Due to Colorado's performance on both State Data Profile safety measures being statistically worse than national performance, DCW prioritized these areas for deeper

[15] This measure examines whether: (1) there was a timely completed contact or attempt during the first response time period, AND (2) subsequent contact attempts were done on a continuous basis during each rolling-time frame until contact was completed. The denominator is the number of children identified as a victim, alleged victim, or youth in conflict in an abuse or neglect report. The numerator is the number of these children who were interviewed within established time-frames or attempts to contact were in compliance with State rule described in this footnote.

[16] The denominator is the number of children having in-home status during the year. The numerator is the number of these children who did not have a substantiated/indicated report of maltreatment during their in-home status.

[17] The denominator is the number of families with an open assessment during the year. The numerator is the number of families with timely safety assessments completed within 14 days of the first successful face to face contact with a victim child in the referral.

data exploration. DCW conducted data analysis between October 2025 and February 2026 to analyze data from CYs 2023, 2024, and 2025.

## Maltreatment in Out-of-Home Care

Colorado's Maltreatment in Care data for CYs 2023, 2024, and 2025 was accessed through ROM. This report examines the rate of victimization per 100,000 days of foster care of all children in foster care during a 12 month period. The report counts substantiated or indicated reports during the rolling 12 month period where the report received date was during the time the child was in a foster care episode lasting eight or more days (including time in a trial home visit). The report excludes substantiated or indicated reports where the child was the age 18 or older at the time of the report, the incident date of the report occurred outside of the removal episode (even if the report date is within the episode), or the report occurred within the first 7 days of removal.

Demographic data of victims of maltreatment in out-of-home care was analyzed for CYs 2023, 2024, and 2025. The denominator for these percentages includes the number of children/youth with a Qualifying Incident (QI), defined as a substantiated or indicated report of maltreatment in care, during the calendar year. The numerator includes the number of children who had the correlating demographic indicator in their client profile in Trails. The data reflects that male children/youth represent between 52-53% of victims each year. White children/youth were represented most often (between 39-40% each year), followed by Hispanic children/youth (between 37-38% each year) and Black/African American children/youth (between 10-11% each year).

Table 2 reflects the age representation of children/youth with QI during CYs 2023, 2024, and 2025. The denominator for this metric includes the total clients with a QI during the calendar year, and the numerator includes the number of children whose age recorded in Trails was within the age category when the QI was identified.

| [Age Ranges] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| Total Clients with QI | 6,315 | 6,039 | 6,161 |
| Age 0-2 | 20.97% | 22.04% | 24.18% |
| Age 3-5 | 17.67% | 16.64% | 15.71% |
| Age 6-8 | 13.33% | 13.58% | 13.75% |
| Age 9-11 | 11.86% | 11.82% | 11.86% |
| Age 12-14 | 11.75% | 11.59% | 12.40% |
| Age 15+ | 24.42% | 24.33% | 22.09% |

Table 2: ROM Age Representation of Victims of Maltreatment in Care by CY.

Children ages 0-5 make up over one third of substantiated reports of maltreatment in care during each calendar year, which is consistent with Colorado's population at greatest risk of maltreatment as identified in Colorado's 2025-2029 Child and Family Services Plan. The data above show a gradual decline in the percentage of children ages 3-5 and a gradual increase in the percentage of children ages 0-2. Discussion with stakeholders involved in Colorado's CFSR Implementation Team highlighted the high parenting needs during these life stages as one root cause; heightened demand on the parent to meet young children's unique needs may also lead to highest levels of parental stress and overwhelm. Stakeholders also noted that referrals for children under age five may be assigned for assessment at a higher rate than similar referrals for older peers due to the increased vulnerability due to age, resulting in a greater number of reports overall and a corresponding greater number of substantiated reports.

Youth age 15 and older are the next highest-represented age group, representing nearly one quarter of qualifying incidents. One potential identified root cause for this trend is that older children/youth in care often have higher or more complex needs than younger children/youth in care. The Institutional Assessment Review Team (IART) has seen trends of referrals for this age group being related to lack of supervision, which may be related to increased independence and higher risk activity with peers that is a part of typical child development for this age group. Lack of supervision referrals for this age group often include risk of substance use runaway behavior in the community. A report of abuse or neglect may be generated for these incidents in order to explore the level to which the provider is adequately providing services for the youth.

The majority of substantiated incidents occurred in Colorado's urban areas, with approximately 80% of incidents occurring in Colorado's 11 Large Counties[18]. While this correlates with the majority of Colorado's population residing in these areas, stakeholders also noted that these areas are provider-dense and have greater numbers of mandated reporters engaging with children/youth of all ages.

## Recurrence of Maltreatment

Colorado uses the Differential Response (DR) practice model when assigning referrals of abuse or neglect for assessment. Through this model, Colorado counties are encouraged to accept and use a Family Assessment Response (FAR) approach with families with low to moderate risk and safety threats. Higher-risk families receive a traditional High-Risk Assessment (HRA), which includes the need to determine whether or not there is evidence that a maltreatment incident occurred and to identify the perpetrators. FAR allows workers to have flexibility in interviewing children with parents present, and FARs do not have a finding at the close of the assessment. Because of this, a child/youth will only be represented in the Recurrence of Maltreatment data indicator if the assessment was assigned as an HRA or if a FAR assessment was changed to an HRA during the assessment, resulting in a finding.

Colorado's Recurrence of Maltreatment data for CYs 2023, 2024, and 2025 was accessed through ROM. This report examines the number of children who were victims of a substantiated or indicated report of maltreatment, and were victims of another substantiated or indicated maltreatment allegation within 12 months of the initial report. This report excludes subsequent reports of maltreatment that occurred within 14 days of the initial report or that have the same incident date (if provided) as the initial report.

Demographic data of victims of recurrence of victims of maltreatment was analyzed for CYs 2023, 2024, and 2025. The denominator for these percentages includes the number of children/youth that had a substantiated or indicated report of maltreatment within 12 months of a prior substantiated/indicated report of maltreatment. The numerator includes the number of children who had the correlating demographic indicator in their client profile in Trails. While male and female children/youth were represented nearly equally in calendar year (CY) 2023, female children/youth were represented at higher rates than their male counterparts in CYs 2024 and 2025 (52.26% and 51.88%, respectively). Hispanic children/youth were represented most often (between 40-43% each year), followed by White

[18] County Size Map

children/youth (between 28-32% each year) and Black/African American children/youth (between 14-21% each year).

Table 3 reflects the age representation of children/youth with substantiated Recurrence of Maltreatment incidents during CYs 2023, 2024, and 2025. The denominator for these percentages includes the number of children/youth that had a substantiated or indicated report of maltreatment within 12 months of a prior substantiated/indicated report of maltreatment. The numerator includes the number of children whose age recorded in Trails was within the age category at the time of the subsequent maltreatment.

| [Age Ranges] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| Total Incidents | 1,053 | 840 | 613 |
| Age 0-2 | 25.36% | 30.00% | 29.69% |
| Age 3-5 | 20.42% | 19.40% | 20.39% |
| Age 6-8 | 19.47% | 17.02% | 18.60% |
| Age 9-11 | 16.90% | 14.64% | 12.89% |
| Age 12-14 | 11.87% | 12.02% | 11.91% |
| Age 15+ | 5.98% | 6.90% | 6.53% |

Table 3: ROM Age Representation of Victims of Recurrence of Maltreatment by CY.

Like the Maltreatment in Care data indicator, children ages 0-5 are represented at the highest frequency; however, in the recurrence of maltreatment data indicator, this population makes up nearly half of all substantiated reports. Root causes identified for the prevalence of this population mirror those described under Maltreatment in Care. Additionally, stakeholders noted that accessibility of services to this population is more limited; for example, children under the age of five may struggle to engage in virtual services and specific therapy modalities. As this data indicator captures children/youth who may or may not be in care at the time of the report, stakeholders noted that post-closure services and supports may have an impact on recurrence of maltreatment, and that lack of supports post-closure may correlate with higher rates of recurrence of maltreatment.

In contrast to the Maltreatment in Care data, older children/youth are less likely to be victims of recurrence of maltreatment, and the percentage of children/youth with substantiated reports in this area decreases as the child/youth's age increases.

Similar to the Maltreatment in Care data, incidents of Recurrence of Maltreatment are substantiated most often in Colorado's urban areas; however, incidents in Colorado's 11 Large Counties make up approximately 90% of the total incidents. Stakeholders noted similar root causes for this trend, indicating the correlation with Colorado's dense population in these areas and the greater numbers of mandated reporters engaging with children/youth of all ages.

Stakeholders reported a need to increase observations of safety prior to case or assessment closure and ensure that the family has services in place for post-closure. Young children in particular are at high risk for injury due to their rapid development, natural curiosity, and limited awareness of danger. In February 2026, DCW issued assessment guidance for working with families with children ages birth through three in support of recommendations made by Colorado's Child Fatality Review Team. The guide provides essential safety topics, explains their importance, and offers tools for engaging families of young children in open, respectful conversations that promote safety.

DCW also developed and distributed a support plan toolkit[19] in September 2023 to enhance caseworkers' use of support plans, which are written plans developed in the absence of safety concerns. A support plan is family-driven, department-facilitated, and includes the family's network, which may include extended family, friends, natural supports, and community resources. The support plan is concrete, agreed upon, and includes the specific actions that the family and network are taking to mitigate risk and ensure future safety. The support plan toolkit was integrated into CWTS trainings during CY 2024 to encourage use of support planning in ensuring post-closure safety.

[19] Support Plan Toolkit (PDF)

# Permanency Outcomes

Permanency outcomes include:

1. Children have permanency and stability in their living situations.
2. The continuity of family relationships is preserved for children.

# Performance Data Highlights and Brief Analysis

Colorado did not achieve substantial conformity on either of the two permanency outcomes during Round 3 of the CFSR.

According to Colorado's Children's Bureau-generated State Data Profile for August 2025 (Appendix A):

- 52.2% of children exited to permanency within 12 months of entering foster care. The reporting period for this metric is FFY 2023.
- 48.6% of children who were in foster care between 12 and 23 months at the start of the 12-month period exited to permanency in the subsequent 12 months. The reporting period for this metric is FFY 2024B/2025A (April 1, 2024 - March 31, 2025).
- 41.8% of children who were in foster care for at least 24 months at the start of the 12-month period exited to permanency in the subsequent 12 months. The reporting period for this metric is FFY 2024B/2025A (April 1, 2024 - March 31, 2025).
- 8.9% of children who were discharged to permanency (excluding adoption) reentered foster care within 12 months of their exit. The reporting period for this metric is FFY2023B/2024A (April 1, 2023 - March 31, 2024).
- The placement stability rate for children in foster care was 3.96 placement moves per 1,000 days in care. The reporting period for this metric is FFY2024B/2025A (April 1, 2024 - March 31, 2025).

According to Colorado's August 2025 State Data Profile, Colorado's performance on all three Permanency in 12 Months data indicators and the Placement Stability data indicator is statistically better than national performance. While it is improving, Colorado's performance on the Reentry to Foster Care data indicator is statistically worse than national performance.

Table 4 reflects permanency outcome data for CYs 2023, 2024, and 2025 according to ROM.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| Average placement stability rate (moves per 1,000 days in care during a rolling 12-month period)[20] | 3.65 | 3.38 | 3.27 |
| % of children/youth were adopted within 12 months of Termination of Parental Rights (TPR)[21] | 51.1% | 54.6% | 57.2% |
| % of children/youth who were discharged to reunification, living with a relative, guardianship, or adoption who re-entered care within 12 months[22] | 1.1% | 0.9% | 1.1% |

Table 4: ROM Permanency Outcome Data by CY.

According to ROM reports from recent years, Colorado is improving its performance related to the average stability rate of children/youth in care and timeliness of adoption following a Termination of Parental Rights. Colorado's re-entry performance has remained relatively stable since 2023 and is further examined later in the Permanency Outcomes section of this report.

Table 5 reflects permanency outcome data for CYs 2023, 2024, and 2025 according to ARD case review data. The denominator for these percentages include the total number of reviews held during the CY for which the item applies.

[20] This measure examines the rate of placement moves per 1,000 days of foster care. The denominator includes the total number of days all children in foster care were in care during the calendar year. The numerator includes the total number of placement moves experienced by the children in the denominator, multiplied by 1,000.

[21] The denominator includes the number of children who became legally free for adoption (TPR) within the previous 12 months. The numerator includes the number of these children who had a finalized adoption within the 12 months of TPR.

[22] The denominator includes the number of children who exited foster care to reunification, living with a relative, guardianship, or adoption within the previous 12 months. The numerator includes the number of children who re-entered foster care within 12 months of their exit.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of children/youth had a frequency of visitation with the mother/guardian/kin that adequately addressed the needs of the child/youth to maintain or promote continuity of the relationship.[23] | 47.29% | 47.26% | 47.37% |
| % of children/youth had a frequency of visitation with the father/guardian/kin that adequately addressed the needs of the child/youth to maintain or promote continuity of the relationship.[24] | 38.87% | 38.26% | 40.93% |
| % of children/youth had a frequency of visitation with the sibling(s) that adequately addressed the needs of the child/youth to maintain or promote continuity of the relationship.[25] | 80.38% | 78.77% | 78.34% |
| % of children/youth for whom the department was making concerted efforts to maintain the child/youth's connections during the review period.[26] | 99.86% | 99.74% | 99.96% |
| % of ICWA requirements met.[27] | 53.56% | 48.18% | 45.55% |

Table 5: ARD Permanency Outcome Data by CY.

[23] The numerator includes reviews for which, in the reviewer's judgment, the visitation/contact with the mother/guardian/kin is frequent enough and of long enough duration to adequately address the needs of the child/youth to maintain or promote continuity of the relationship in relation to the child/youth's current permanency goal.
[24] The numerator includes reviews for which, in the reviewer's judgment, the visitation/contact with the mother/guardian/kin is frequent enough and of long enough duration to adequately address the needs of the child/youth to maintain or promote continuity of the relationship in relation to the child/youth's current permanency goal.
[25] The numerator includes reviews for which, in the reviewer's judgment, the visitation/contact is frequent enough and of long enough duration to adequately address the needs of the child/youth to maintain or promote continuity of the relationship with their siblings.
[26] The numerator includes reviews for which there is evidence the department is making concerted efforts to maintain the child/youth's connections to their neighborhood, community, faith, extended family, activities, rituals, traditions, tribe, school and friends.
[27] The numerator includes reviews for which all of the following applicable requirements have been met: Court-ordered determination, ICWA order of preference for placement is met, documentation of inquiry of Native American heritage, information obtained during the face-to-face portion of the review.

According to ARD case review data from recent years, Colorado's performance related to family time visits between a child/youth and their mother or father have remained relatively stable, while family time between a child/youth and their sibling(s) have slightly decreased. While Colorado's performance on concerted efforts to maintain child/youth connections remains strong, the percentage of cases meeting ICWA requirements have decreased.

# Deeper Data Exploration and Change Implementation Activities: Permanency

Due to its performance on the Reentry to Foster Care data indicator, Colorado has conducted deeper data exploration on this issue. As reported in Colorado's 2026 Annual Progress and Services Report (APSR), the way that kinship placements are recorded in Colorado's Statewide Information System, Trails, is one factor that negatively impacts Colorado's re-entry rates. When a youth is placed with kin, one of three placement types must be selected in Trails:

- Uncertified kinship with County DHS temporary legal custody,
- Uncertified kinship with kinship temporary legal custody, or
- Certified kinship with County DHS temporary legal custody.

These distinct placement types allow Colorado to capture and track data related to providers' certification status and the holder of temporary legal custody. However, if a child or youth is placed under "Uncertified kinship with kinship temporary legal custody" and the kinship provider becomes certified, temporary legal custody is granted to the County DHS and a new removal is created to accurately reflect the status of both criteria; this reflects as a reentry despite the child or youth not moving to a new location.

Colorado examined the impact of this scenario on reentry rates and found that between April 2023 and April 2024, 318 children reentered out-of-home care; 67 of these children (21%) reflected as a reentry resulting from a change in kinship certification that did not involve a true placement move. As Colorado continues to prioritize kinship placements and supports, CDHS has seen an increase in the number of kinship providers electing to become certified and anticipates that this factor will continue to impact statewide reentry performance data. However, as CDHS has monitored this data indicator, performance has improved over the past three State Data Profile reporting periods.

Colorado’s performance on the Permanency Outcomes data indicators remains statistically better than national performance. However, Colorado has prioritized data analysis in this area in recent years to improve permanency outcomes for children and youth with child welfare involvement.

## Court of Appeals Workgroup

The Colorado Judicial Branch Child Welfare Appeals Workgroup comprises legal and child welfare professionals and was appointed in 2018 to consider necessary changes to Colorado practice, rules, and statutes to ensure that appeals in cases concerning relinquishment, adoption, and Dependency and Neglect are resolved within six months of filing. After considering data from the Court of Appeals, the State Court Administrator’s Office requested and received funding for four new Dependency and Neglect staff attorneys for the Court of Appeals.

Throughout CY 2024, an evaluation team assembled by the Timeliness to Permanency Subcommittee of the Child Welfare Appeals Workgroup worked to publish a report identifying gaps and opportunities to improve permanency outcomes for children/youth. The report and its findings are described in the following subsection.

During CY 2025 the work group met to review data and continue discussions around how to address areas of concern identified in the report. In addition, the Court of Appeals developed its own Best Practice Court Team that has been meeting regularly and formalized its purpose statement: “To model collaboration and improve the appellate process and experience by removing barriers to a just, final outcome for all involved.”

## Colorado Court Process Evaluation

In February 2025, the Colorado State University (CSU) Social Work Research Center published the Court Process Evaluation: Final Statewide Report[28]. This report was developed by an evaluation team assembled by the Timeliness to Permanency Subcommittee of the Child Welfare Appeals Workgroup with the goal of identifying gaps and opportunities to improve permanency outcomes for children/youth. Using data from the court case management system and Trails, the report summarizes statewide trends for cases filed between 2012 and 2021. The final report identifies gaps and opportunities to improve permanency outcomes for children/youth and is meant to support local districts’ conversations about timeliness to permanency.

[28] Court Process Evaluation: Final Statewide Report (PDF)

The report includes the time to permanency for five permanency types, as reflected in Figure 1.




Figure 1: Time to Permanency for D&N Cases Filed by CY.

This data reflects that the time to permanency increased from 2012 to 2021 for all permanency types except for OPPLA/Emancipation, which decreased by 38% (294 days). The greatest increase in time to permanency by percentage was remain home (13.8%, 47 days) and by day count was adoption (66 days, 8.5%). Across the five permanency outcomes, the time to permanency increased 8.2% (40 days) from 2012 to 2020 for all D&N cases.

The report also analyzed the time to judicial benchmarks, including adjudication, disposition, permanency hearing, termination of parental rights (TPR) motion, and adoption. The time to adjudication increased from 2012 to 2021 overall for both expedited permanency planning (EPP) and non-EPP cases, while the time from disposition to permanency hearing decreased overall during this time. The time to all TPR events between 2012 and 2020 increased, and the percentage of TPR decisions appealed increased from 28% in 2012 to 45% in 2019 before decreasing to 35% in 2020.

# Well-Being Outcomes

Well-being outcomes include:

1. Families have enhanced capacity to provide for their children's needs.
2. Children receive appropriate services to meet their educational needs.
3. Children receive adequate services to meet their physical and mental health needs.

# Performance Data Highlights and Brief Analysis

Colorado did not achieve substantial conformity on the three well-being outcomes during Round 3 of the CFSR.

Table 6 reflects caregiver engagement data for CYs 2023, 2024, and 2025 according to the ROM Monthly Parent Contacts report. This report measures the percentages of parents (biological, adoptive, and legal) who have been engaged (through face to face, call, text, letter, etc.) according to their expected level of engagement as defined in rule. All parents are expected to be seen face-to-face unless an exception to that contact exists as outlined in rule (7.202.1, F). Parents who do not reside in Colorado or who are incarcerated for 2+ years at the time of identification will be expected to have some form of non-face to face engagement each month (call, letter, video conference, etc.). Parents who cannot be located despite monthly efforts to locate, parents who are deceased, and parents whose rights are terminated or relinquished are excluded from the report. Additionally, parents of Foster Youth in Transition clients are not included in the report unless they have other children/youth involved in a child welfare case.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of adult caregivers engaged as required.[29] | 50.2% | 51.7% | 51.9% |
| % of mothers/guardians/kin engaged as required.[30] | 62.1% | 63.3% | 63.8% |
| % of fathers/guardians/kin engaged as required.[31] | 39.5% | 41.3% | 41.3% |

Table 6: ROM Parent Engagement by CY.

While parent engagement has increased slightly in recent years, engagement rates of fathers remain lower than engagement rates of mothers. As previously reported Goal 3 of Colorado's Round 3 PIP centered around enhancing agency engagement with fathers. Colorado's performance on this metric has improved since Round 3 and continues to trend upward.

## Service Needs

Table 7 reflects service-related outcome data for CYs 2023, 2024, and 2025 according to ARD out-of-home case review data. The denominator for these percentages include the total number of reviews held during the CY for which the item applies.

[29] The denominator includes the number of months where the responsible adult (defined as "caregiver" for the remainder of these engagement metrics) of a state-involved child for the entire month (visit month) should have received a caseworker visit. The numerator includes the number of visit months where the caregiver received caseworker visits as required.
[30] The denominator includes the number of months where the male caregiver of a state-involved child for the entire month (visit month) should have received a caseworker visit. The numerator includes the number of visit months where the male caregiver received caseworker visits as required.
[31] The denominator includes the number of months where the female caregiver of a state-involved child for the entire month (visit month) should have received a caseworker visit. The numerator includes the number of visit months where the female caregiver received caseworker visits as required.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of reviews for which services documented in the Family Services Plan were directed at the areas of need identified through assessment.[32] | 58.95% | 55.00% | 59.44% |
| % of reviews for which needed services were received by the child/family.[33] | 35.87% | 34.07% | 32.16% |

Table 7: ARD Well-Being Outcomes (Services) by CY.

According to the data, nearly four in ten cases reviewed did not have services documented in the case plan to address the family's area(s) of need as identified through formal and ongoing assessment. More than half of cases reviewed each year show a lack of receipt of needed services by the family. This data demonstrates that services remain an area of needed improvement in Colorado, and this topic is further examined under "Results of Deeper Data Exploration for Priority Focus Areas."

## Educational Needs

Table 8 reflects education-related outcome data for CYs 2023, 2024, and 2025 according to ARD out-of-home case review data. The denominator for these percentages include the total number of reviews held during the CY for which the item applies.

[32] The numerator includes reviews for which the Family Services Plan treatment plan objectives and/or action steps reflect services directed at the areas of need identified through assessment (either formal or informal), designed to assure that the child receives safe and proper care.

[33] The numerator includes reviews for which the services the child/family is receiving address the needs identified through ongoing assessment (both formal and informal) that would assure the child received safe and proper care.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of children/youth whose education/school record was in the case file.[34] | 45.10% | 45.95% | 49.13% |
| % of children/youth who changed schools who had a Best Interest Determination (BID) made when required.[35] | 55.67% | 59.75% | 65.47% |

Table 8: ARD Well-Being Outcomes (Education) by CY.

The data demonstrates that Colorado's performance on both ARD measures has improved in recent years. Limitations to the BID data above include that these measures may be relevant to few cases reviewed due to the ARD examining a six-month window of time. With a smaller denominator than other measures, a change in the numerator will more significantly impact the overall percentage. Additionally, the ARD data surrounding BIDs takes into account a child/youth's initial placement or a change of placement that occurred within the review window. However, this measure will exclude BID meetings held outside of the review window even if the BID did occur. Finally, in Trails Legacy, BID meetings and school records may be documented in numerous ways, such as in a Framework or contact note. Because of this, it is possible that a BID could be missed during the review due to inconsistencies in documentation. This barrier will be corrected with Trails Mod, which has added functionality to track whether and when a BID meeting was held when a student is moving from their school of origin, and what the ultimate determination was. Trails Legacy and Trails Mod are further described as Colorado's Comprehensive Child Welfare System under Item 19: Statewide Information System.

As reported in Colorado's 2026 Annual Progress and Services Report (APSR), the Special Education Services for Students in Foster Care Workgroup submitted best practice recommendations related to school stability for students to the General Assembly in 2025 through the Special Education Services for Students in Foster Care Report[36]. These report recommendations include the creation of a Universal BID,

[34] The numerator includes in-county reviews for which the child/youth's education/school record is in the case file, and remote reviews for which the child/youth's education/school record is in the case file or the caseworker reports that the child/youth's education/school record is in the case file.

[35] The numerator includes reviews for which the child/youth changed schools and a best interest determination was made prior to any school move resulting from initial placement or a change in placement.

[36] Special Education Services For Students in Foster Care Report (PDF)

which will align with the functionality described in Trails Mod. This functionality is expected to be available to child welfare staff during SFY 2027; further details may be found in Colorado's 2027 APSR.

In addition to documentation inconsistencies, some counties have encountered barriers to receiving special education documentation such as Individualized Education Plans from school districts. DCW has recently provided training and technical assistance to school districts regarding education statutes and rules to ensure that the required documentation is shared. DCW's Foster Care Education Specialist serves as a resource for counties who encounter this barrier to provide education and advocacy to school districts as needed.

## Physical and Mental Health Needs

Table 9 reflects health-related outcome data for CYs 2023, 2024, and 2025 according to ARD out-of-home case review data. The denominator for these percentages include the total number of reviews held during the CY for which the item applies.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of children/youth who had health information documented in Trails.[37] | 40.00% | 56.37% | 63.38% |
| % of children/youth who received regular health care.[38] | 74.80% | 75.45% | 78.16% |
| % of children/youth who received regular dental care.[39] | 58.43 | 55.19% | 58.26% |
| % of children/youth who had mental health services provided to meet their needs during the review period.[40] | 68.24% | 69.1% | 67.37% |

Table 9: ARD Well-Being Outcomes (Health and Dental) by CY.

The data demonstrates that Colorado has made recent progress related to documentation of health information and children/youth accessing health care regularly. However, dental and mental health services remain an area for improvement. This data is further examined under "Results of Deeper Data Exploration for Priority Focus Areas."

# Deeper Data Exploration and Change Implementation Activities: Well-Being

## Service Needs

As DCW has reviewed service-related data in recent years, DCW observed limited evidence-based programs identified for reimbursement statewide. Service

[37] The numerator includes reviews for which health information (including name and address of current health care provider(s), known medical problems, and current medications) is documented in Trails. This may be documented in the health passport, contact notes, etc.
[38] The numerator includes reviews for which the child/youth has received regular health care and/or treatment for identified health needs and has received appropriate immunizations, or there is documentation and/or information shared during the review that attempts are being made to bring immunizations up-to-date.
[39] The numerator includes reviews for which the child has received regular dental care and treatment for identified dental needs, including regular check ups.
[40] The numerator includes reviews for which, in the reviewer's judgment, the child/youth has received services that match their mental health needs.

authorizations reviewed included generalized topics for service types under providers, such as mental health, home-based service, life skills, and parenting skills. Colorado's reimbursement and program utilization is collected based on the service type entry. DCW found that when child welfare staff completed a service authorization to fund a program, the program was identified within the comment section rather than within service types, preventing reimbursement.

The Trails service authorization process was enhanced in 2025 to include all evidence-based programs offered in Colorado as service type options within the service authorization for all providers. DCW provided new Core Plan templates and state-wide training to counties, who must now identify whether a provider is offering an evidence-based service for the client. If so, the evidence-based service must be inputted as the service type when the county completes the service authorization in order to increase direct coding and therefore funding for the state's Maintenance of Effort (MOE) and Title IV-E reimbursements. These changes will result in more accurate service-related data in Trails that will support future implementation of services to the Family First Prevention Services Act (FFPSA) plan and increase understanding of expansion needs, particularly in Colorado's rural areas.

In early 2026, DCW launched a Program Area 3 (PA3) report that reflects data regarding the use of prevention services in Colorado. This report captures which services are offered to children and families on a voluntary basis, which may help identify trends of services needed within a county's population. DCW is partnering with counties to analyze and incorporate this data by reviewing Core Plans to ensure that the needed services are included within the county's contracted providers.

## Health Needs

The Colorado Department of Health Care Policy and Financing (HCPF) administers Health First Colorado, Colorado's Medicaid Program, in addition to other health care programs. HCPF collects and reports on health-related data for children/youth in Colorado, including well care, oral health care, and lead screening. DCW partnered with HCPF to examine data related to health outcomes for children/youth in Colorado's child welfare system, and engaged in continuous quality improvement discussion with Colorado's CFSR Implementation Team.

Stakeholders discussed documentation barriers, including the format of the Health Passport in Trails and the varying systems county departments use to store scanned documents, which may not currently be stored in Trails. To mitigate barriers to documenting health needs and services received, the Trails Health Passport was modernized in 2025. This migration streamlined documentation capabilities regarding

health service providers to make documentation more efficient for county personnel. These efforts include a drop-down menu of providers for staff to choose from, with an option to add providers not already listed. DCW continues to engage with county staff regarding additional barriers and needs that can be developed within Trails Mod.

Deeper exploration of data tracked by HCPF confirms that Colorado's performance related to children/youth in care receiving health services remains low. Receipt of dental services is particularly low, with around half of children/youth in care receiving at least once dental visit per 12-month period. While documentation barriers may be one issue contributing to Colorado's performance, the data demonstrates that consistent health encounters for children/youth are not being paid by Medicaid or private insurance, suggesting that the services are not being provided.

It was discussed that Colorado rule (12 CCR 2509-4, Section 7.304.62G) outlines the requirements for health services to be provided to children/youth entering care and requires caseworkers to document that ongoing medical and dental care is provided. When the county has legal custody of a child/youth, they are responsible for ensuring that the child/youth receives the care they need, including health and dental care. However, stakeholders noted that the discrepancy between responsibility for documentation and responsibility for ensuring care may be contributing to lack of services provided.

Several counties requested county-level data in order to examine population-specific trends and identify what barriers may exist within each county's processes or communities. DCW plans to partner with HCPF and county departments to further explore data at more local levels and engage in continuous quality improvement processes that may support health outcomes for children and youth in care.

# Section IV: Assessment of Systemic Factors

The systemic factors comprise seven systems within the state that have the capacity, if routinely functioning statewide, to support child safety, permanency, and well-being outcomes:

- Statewide Information System
- Case Review System
- Quality Assurance System
- Staff and Provider Training
- Service Array and Resource Development
- Agency Responsiveness to the Community
- Foster Parent Licensing, Recruitment, and Retention

This section presents evidence that speaks to how well each systemic factor requirement functions across the state.

# Statewide Information System

## Item 19: Statewide Information System

Colorado did not achieve substantial conformity with the Statewide Information System systemic factor during Round 3 of the CFSR, and Item 19 was identified as an area needing improvement. Based on the information presented below and improvements made in recent years, Colorado believes that Item 19 is currently an area of strength.

Trails is Colorado's Comprehensive Child Welfare Information System (CCWIS). The system is a database of the children, youth, and families that are currently receiving or have previously received services. Trails is used statewide by all applicable child welfare personnel and is functional throughout the state to readily provide information on any case management and case planning activities.

Trails is designed so that appropriate child welfare personnel can conduct a client or case search to determine the status of any child with current county child welfare involvement. While applicable child welfare personnel can access the information in Trails, only those assigned to the case as a primary or secondary caseworker, supervisor, or another appropriate security profile can modify the information. Information documented in Trails is used to produce both structured and ad-hoc reports to satisfy federal reporting requirements and also supports CDHS' efforts to assess the performance and effectiveness of Colorado's child welfare services.

The Code of Colorado Regulations requires caseworkers to use the statewide information system to document information regarding status, demographic characteristics, location, and placement goals for every child in foster care. Currently supervisors and caseworkers are responsible for ensuring all relevant and required assessment and case information is entered into Trails. Each open case undergoes a 90-day review process in which the assigned caseworker and supervisor review data entry for completeness and accuracy and case progress and goals for appropriateness. Supervisor approval is necessary for assessment or case closure; this process helps hold caseworkers accountable for timely and accurate data entry.

Trails users may perform a client search to locate both specific and aggregated data related to that client, including:

- Sex
- Date of Birth (DOB)
- Age

- Custody Status
- Whether the client is in placement
- The County/Agency
- Previous and current involvement spans (where applicable)

For additional client information, Trails users may access a client's Client Record through their Trails Client ID to locate information including but not limited to:

- Client Demographics, including physical descriptors;
- Ethnicity, including ethnicity, race, whether the client is of Hispanic origin, Tribal affiliations, and languages;
- Legal Status, including who holds legal custody, the county of affiliation, the legal custody date, and the Tribal Custodian (if applicable); and
- Address, including the start and end dates for each address of residence.

Case-related client information is located in the Case Details, which may be accessed through the "Case" tab on the client page or by searching the Case ID. The Case Details subsections include but are not limited to:

- Family Service Plan, including permanency goal(s) and placement history for each child; and
- Removals and Placements, including the start and end date of each placement, the Provider name, and a link to the Provider Details including the Provider Address.

## Data and Evidence

Trails data was analyzed to identify the percentage of Colorado's foster care population that have the following data elements readily identifiable in Trails:

- Status - legal status of the child
- Demographic characteristics - date of birth (DOB), sex, race, and ethnicity
- Location - where the child is placed
- Goals for Placement - permanency goal (reunification, adoption, guardianship, APPLA)

Table 10 reflects the percentage of the foster care population in Trails that has each element readily identifiable by Federal Fiscal Year (FFY). The denominator for these measures includes the number of children/youth in out-of-home care during the FFY. The numerator includes the number of children with the identified data element present in their client profile in Trails.

| [Data Element] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| Legal Status | 99.76% | 99.69% | 99.64% |
| Demographic - DOB | 100% | 100% | 100% |
| Demographic - Sex | 100% | 100% | 100% |
| Demographic - Race | 94.51% | 93.44% | 92.64% |
| Demographic - Ethnicity | 91.50% | 90.97% | 90.84% |
| Placement | 99.53% | 99.71% | 99.84% |
| Permanency Goal | 63.83% | 69.98% | 89.58% |

Table 10: Identifiability of Trails Data Elements for Child Welfare Population by FFY.

## Trails Modernization

Colorado's Trails Modernization project implementation plan was approved by the Administration for Children and Families (ACF) in 2016 and efforts to complete the modernization have been underway since then. Colorado's CCWIS Modernization effort is nearly complete, ending a nearly ten-year long effort to modernize the system to meet new federal technical requirements while simultaneously building a better system that better meets the needs of caseworkers and supervisors. The Trails Modernization (Trails Mod) project has been completed in phases, with Referral functionality modernized in CY 2017, Assessment functionality modernized in CY 2024, and most Case functionality modernized in CY 2025.

The data demonstrates that Colorado has substantially improved compliance in a number of critical data elements in recent years that can all be attributed to the modernization of the functionality associated with these data entry processes. For example, the modernization of Case has led to a significant increase in the availability of permanency goals for children/youth, as demonstrated by the increase from 63.83% in FFY 2023 to 89.58% in FFY 2025. In Trails Mod, there are certain data elements that staff are required to complete. For example, in Assessment, caseworkers are required to enter race and ethnicity information for all clients prior to closing the assessment. Because client demographics are stored at the client level, this data remains available if the assessment is opened into a case. Trails Mod also provides higher visibility of data elements that are missing, giving staff additional access and reminders to complete required data elements. Highlights of how modernization has improved compliance are outlined below.

## Monitoring Accuracy of Required Data Elements

When entering the required data elements into Trails Mod, users select values by utilizing pre-populated picklists, which help encourage more consistent data entry and eliminate the possibility of staff-level errors such as misspellings. Requiring child welfare staff to enter specific data elements and to choose from specific options minimizes the possibility of manual errors and encourages clear and consistent data entry statewide.

As noted, each open case in Trails undergoes a 90-day review process in which the assigned caseworker and supervisor review data entry for completeness and accuracy, and case progress and goals for appropriateness. Additionally, the ARD reviews the 90-day requirements in out-of-home case reviews; initial reviews are held when a child/youth has been in out-of-home care for six months and re-reviews are held every six months after. More information about the ARD's case review process can be found under Item 25: Quality Assurance System. Volume VII requirements that are addressed in the 90-day review include the documentation of the child/youth's current goal for placement ("permanency goal") and the child/youth's current residence. Outside of 90-day review requirements, the ARD also reviews whether the child/youth has a signed removal order that does not contain "nunc pro tunc" language, which aligns with the legal status of the child when the county is granted custody.

# Case Review System

## Item 20: Written Case Plan

Colorado did not achieve substantial conformity with the Case Review System systemic factor during Round 3 of the CFSR; however, Item 20 was identified as a strength. Based on the information presented below, CDHS lacks concrete data that measures whether parents are engaged in the development of the case plan. Colorado believes that Item 20 is currently an area needing improvement.

Parent engagement in case planning is a foundational principle of child welfare in Colorado. The Colorado Code of Regulations (12 CCR 2509-1, Section 7.000.F) states that “Case planning shall involve the parents so that relevant services can be provided to permit timely rehabilitation and reunification.” Family engagement is defined in 12 CCR 2509-4, Section 7.300.1 as “joining with the family/kin to establish common goals of safety, well-being, and permanency throughout the involvement and is inclusive of other systems.” Colorado’s core principles of family engagement include:

- Focusing on the strengths and interests of the child, youth, and family;
- Promoting family and youth choice through family and youth-driven decisions;
- Supporting timely access to necessary and appropriate services;
- Supporting relationship building and community participation;
- Fostering mutual trust and respect between families, youth, agency, and stakeholders;
- Valuing the support network and relationships of each individual;
- Ensuring open, honest, and clear information sharing; and
- Extending engagement beyond the immediate family members to those identified by the family as a source of support and strength both during and beyond the involvement of the child welfare system.

Colorado’s written case plan is called the “Family Service Plan” (FSP) and is documented in Trails. FSP Requirements are documented in 12 CCR 2509-4, Section 7.301.2, including but not limited to:

- Services to be provided that are directed at the areas of need identified in the assessment;
- Outcomes to be achieved as a result of the services provided, which are described in terms of specific, measurable, agreed upon, realistic, time-limited objectives and action steps to be accomplished by the parents, child/youth, service providers and county staff;

- Placement prevention strategies for the child/youth that allow the child/youth to remain safely at home or with kin;
- How services to be provided are designed to assure that the child/youth receives safe and proper care.

Per 12 CCR 2509-4, Section 7.301.22, the county shall assure that parents or legal guardians participate in the development of the FSP and engagement activities, except in the Foster Youth in Transition cases in which the youth and caseworker are the only required parties. Parent engagement in case planning is documented in the case record in Trails and is reviewed by supervisors in 90-day reviews. Engagement of the parent in the case plan is also captured in court reports, which are reviewed by judicial officers during court hearings.

Additionally, periodic reviews conducted by the ARD assess the development of the case plan/treatment plan and whether there is one created for each of the required parties. The ARD reviews the extent to which the parent was engaged in the development of the FSP by reviewing contact notes corresponding with the creation of the case and treatment plans, completed needs assessments (including safety and risk assessments), family engagement meetings, and 90-day reviews. When reviewing the content of monthly face-to-face contacts, the ARD reviews the quality of the contact including discussion of case planning, services, barriers, and efforts toward permanency. Additionally, the ARD review instrument includes questions that identify barriers to reaching treatment plan goals and barriers to permanency, which may include no treatment plan has been developed or the treatment plan hasn't been amended when needed.

Table 11 reflects parent engagement data according to ARD case review data for out-of-home cases for FFYs 2023, 2024, and 2025. These measures are based on the engagement definitions outlined in Volume 7 (7.204: Case Contact Requirements and 7.301.22: Family Service Plan Participants) and include contact modalities including face-to-face visits, email, text, phone, virtual meetings, participation in staffings and Court hearings, letters, etc. The ARD assesses the quality of monthly face-to-face contacts and what is discussed during those contacts. The measure is intended to determine whether the frequency of engagement occurred according to Volume 7 rules and whether the parent was engaged in activities that indicate involvement in case and service planning. The denominator for these measures includes the number of months that case-carrying staff were required to engage with the caregiver. The numerator includes the number of months that case-carrying staff engaged with the caregiver.

| [Data Element] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| Engagement with mother/guardian/kin | N/A* | 84.47% | 87.94% |
| Engagement with father/guardian/kin | N/A* | 72.41% | 77.35% |

Table 11: ARD Review Parent Engagement by FFY.

While the measure above captures the frequency of engagement as defined in Volume 7, data for this ARD measure is not available for FFY 2023 due to the ARD instrument question regarding engagement being changed between FFY 2023 and FFY 2024. Prior to the change, the ARD measured engagement through the question "was the mother/guardian/kin (or father/guardian/kin) engaged in case planning, during the review period?" In FFY 2023, 72.09% of cases reviewed indicated that the mother/guardian/kin was engaged in case planning and 54.67% of cases reviewed indicated that the father/guardian/kin was engaged in case planning.

While ARD's engagement measures are not exclusive to case planning, assessment through periodic reviews will capture if a parent was not engaged in the development of the case plan. This is assessed through a variety of questions on the ARD out-of-home review instrument and information in the case file, including contact notes for monthly face-to-face contacts.

As noted previously, counties may engage parents in the development of the written case plan through Family Engagement Meetings (FEMs) and Permanency Roundtables; frameworks for these meetings are documented in Trails. Table 12 reflects the percentage of FEMs that were held when required, according to ARD out-of-home case review data from FFY 2023, 2024, and 2025. The denominator includes cases reviewed for which a FEM should have been held during the review period, per the requirements in Volume VII. The denominator includes the number of these cases for which a FEM was held during the review period.

| [Data Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| % of FEMs held when required | 33.44% | 31.00% | 26.75% |

Table 12: ARD Family Engagement Meeting Frequency by FFY.

FEMs are not always specific to developing the case plan but capture whether and to what extent the parent was engaged in the development of the case plan. Additionally, this data does not capture whether the parent was in attendance, when the FEM was held.

## Stakeholder Feedback: Engagement in Written Case Plan

Four focus group discussions were held with youth and caregivers with lived experience in Colorado's child welfare system regarding their perceptions and experiences being engaged in their case planning. Additionally, two stakeholder interview discussions were held to gather feedback from legal partners regarding their perceptions on Colorado's engagement of caregivers and children/youth in the development of the written case plan. While the key requirement to be measured within this Statewide Assessment Item is whether written case plans are developed jointly with children/youth's parent(s), stakeholder feedback regarding both child/youth and caregiver engagement are described below.

A primary theme arose from lived experts and legal partners that parents are not engaged in the creation of their treatment plan consistently statewide, but that the level of engagement may depend on both the county of involvement and the individual caseworker. Caregivers reported that lack of engagement in the creation of the treatment plan can lead to a sense of revictimization. Stakeholders reported that caregivers are often unaware of their treatment plan until it is presented to them; it was noted that this unawareness may result from not being engaged at all or from not understanding how discussions with their caseworker connect to the development of the treatment plan.

Stakeholders reported a lack of clarity regarding treatment plans, noting that caseworker discussions with parents about the treatment plan are often broad and related to the family's needs, without a clear connection between these needs and the specific objectives identified on the treatment plan. Legal partners reported that while it is within their scope to ensure their client understands the treatment plan, it is the responsibility of the Department to ensure that the treatment plan is written in a way that is understandable and accessible to the client.

Additionally, stakeholders raised concerns about the individualization of case plans, noting that treatment plans often seem "cookie cutter" and include similar or the same objectives for caregivers. Legal partners noted that this is particularly a concern for parents with disabilities or special needs, and that accommodations are not always written into the treatment plan when it is created. Finally, concerns of timeliness were raised by stakeholders, who noted that treatment plans are typically developed post-adjudication, which can cause delays in accessing services that the county may have already identified as necessary for case closure.

## Barriers and Variations

Prior to its migration to the modernized system, Trails Legacy included a checkbox to note whether the written case plan was developed with the parent. Prior to Colorado's CFSR Round 3, the ARD previously reviewed this checkbox to assess this item. This checkbox does not exist within Trails Mod, but each element of the FSP (including the Treatment Plan) includes all participants, including parents, children, the county department, providers, and/or other relevant participants, who are involved in the plan and have an assigned objective(s). The ARD reviews overall engagement, which can occur through monthly contacts with the parents as well as other means. The ARD examines the content of contact notes and FEM frameworks to evaluate whether case planning was discussed when the case plan was initially developed and whether the case plan includes services to address needs identified by the family.

Because documentation of parent engagement is initially reviewed by individuals within each county or jurisdiction, variations across the state are possible. However, Colorado's multiple levels of quality assurance related to parent engagement in case planning (including by judicial officers during court hearings and the ARD during periodic reviews), each case undergoes multiple opportunities to ensure that parents are involved in the development of the case plan.

# Item 21: Periodic Reviews

Colorado did not achieve substantial conformity with the Case Review System systemic factor during Round 3 of the CFSR; however, Item 21 was identified as a strength. Based on the data presented below and continued improvements in recent years, Colorado believes that Item 21 is currently an area of strength.

The Administrative Review Division (ARD) conducts an initial periodic review for each child who is in out-of-home care for at least six months, calculated based on the month the child is considered to have entered foster care (when the child was

removed from the home). Typically a child is removed from the home when there is a court order for the child to be taken into temporary custody. A child may be taken into temporary custody by a law enforcement officer without order of the court under specific circumstances as outlined in C.R.S. 19-3-401. These include:

- When the child is abandoned, lost, or seriously endangered in such child’s surroundings or seriously endangers others and immediate removal appears to be necessary for such child’s protection or the protection of others;
- When there are reasonable grounds to believe that such child has run away or escaped from such child’s parents, guardian, or legal custodian and the child’s parents, guardian, or legal custodian has not made a report to a law enforcement agency that the child has run away from home; or
- When an arrest warrant has been issued for such child’s parent or guardian on the basis of an alleged violation of C.R.S 18-3-304. No child taken into temporary custody pursuant to this paragraph (c) shall be placed in detention or jail.

The ARD then conducts subsequent reviews every six months thereafter, calculated based on the month the previous review was held. Trails creates a notification reminder when an administrative review is due.

In most cases, the court-ordered removal date aligns with the date the child was removed from the home. These dates typically align with the Trails date that the child/youth entered care. In cases where these dates are not aligned, the ARD provides technical assistance to the counties to ensure the county has authority for placement of the child for the time the child is in out-of-home care. In addition, it is important for Trails to accurately reflect removals and placements for the county to monitor which children are in their custody and in what placement they reside. Rare gaps in those dates may include Court-Ordered removal of a child without placement (the child remains in the home for a couple of days) or Court Ordered removal when a child is on the run (a placement is not opened until the child returns from the run and is placed in foster care).

Periodic reviews are held in the county, unless a specific jurisdiction/court requests that they be held as Court-Ordered Administrative Reviews. Colorado has not had any counties conducting Court Ordered reviews in recent years; therefore, periodic reviews have been held in the county. The ARD submits their findings (either the actual written findings, or a caseworker summary of the findings) to the Courts regularly as required in Volume 7.

The ARD uses a standardized instrument[41] that cross-references the review questions with the requirements as outlined in federal and state statute, CDHS program rules, and the CFSR Items. Review questions examine topics including, but not limited to:

- The safety of the child
- The continuing necessity for and appropriateness of the child's placement
- The extent of parties' compliance with the case plan
- The extent of progress made toward the child's permanency goal

Because the ARD completes periodic reviews for all 64 of Colorado's counties, the process is standardized statewide. As part of the CDHS Results Driven Management System (RDMS), the ARD implemented a process in 2023 to evaluate the timeliness of out-of-home case reviews for children in Colorado. Each month, the ARD identifies children who are eligible for an out-of-home review (having an open removal for six months or longer). At the end of each month, the ARD tracks the percent of review-eligible children who are current on their review status, defined as having a review in the past six months.

The ARD tracks reasons why the ARD reviews may be canceled when scheduled and develops strategies to mitigate cancellations. The most frequent reasons for cancellations include ARD reviewer needing to cancel (e.g. the reviewer is out ill, canceled due to inclement weather causing county office closure or unsafe driving conditions, etc.), scheduling issues on the part of the county (e.g. all required parties were not invited to the review, all required parties were not given required 14 day notice), and children/youth leaving county custody during the month they are scheduled for review. The ARD identifies and engages with county departments that may have higher cancellations and higher rates of untimely reviews to improve processes and ensure that children eligible for review receive the periodic review as a part of their case.

## Data and Evidence

Quantitative data for Item 21 was calculated using unofficial AFCARS extracts during the time periods under review. The AFCARS elements used to calculate this measure include data element FCE5-Date of Most Recent Periodic Review, FCE21-Date of Latest Removal from Home, and FCE56-Date of Discharge from Foster Care. FCE5-Date of Most Recent Periodic Review includes periodic reviews held by courts or by the Administrative Review Division.

---

[41] Administrative Review Instrument

Children are excluded from the data for this Item if:

- The initial review was not due until after the end of the reporting period
- Youth were placed in a secure Division of Youth Services (DYS) Facility for the entire reporting period
- The Child/Youth exited care prior to reporting period
- The Child/Youth exited before the initial review was Due (Initial review due date would have occurred during the report period however length of stay was less than six months at exit)
- The Child/Youth exited during the month due for initial (sixth month in care but did not reach the end of the sixth month in care) and was not reviewed.

To determine if a child was due for initial or subsequent review, six months was added to the removal date. If the child was due for initial review in a month during the reporting period, the child was considered due for an initial review. If the child's initial review due date occurred prior to the report begin date, the child was considered as due for a subsequent review.

For review scheduling purposes, Colorado has a report in Trails that identifies children/youth as due for their initial review six months from the removal date. Review scheduling protocol is to begin scheduling initial reviews in that sixth month. For subsequent reviews, the due date is calculated six months out from the last review date, and scheduling protocol is to schedule the review in that month when possible.

Children's Bureau guidance requires timeliness for the first periodic review to be calculated beginning from the date a child is considered to have entered foster care, which should align with the first judicial finding or 60 calendar days from the date the child was removed from the home. In Colorado, Adjudicatory Hearings are required within 90 days after service of the petition, unless children are under six years of age, in which case they are due no later than 60 days after service of the petition. Because of this, initial reviews are considered timely in the tables below if the review was held by the eight month in care (60 days after the removal date, plus six months for the periodic review to occur).

Table 13 depicts the number of children/youth who had a removal episode duration of six months from their entry into foster care during FFYs 2023, 2024, and 2025 and the number of these that had a timely initial periodic review. FFY-A refers to the first half of the FFY (October 1 through March 31) and FFY-B refers to the second half of the FFY (April 1 through September 30).

| [Data Description] | FFY 2023-A | FFY 2023-B | FFY 2024-A | FFY 2024-B | FFY 2025-A | FFY 2025-B |
|---|---|---|---|---|---|---|
| # of Initial Due (denominator) | 967 | 1003 | 987 | 889 | 1031 | 1062 |
| # of Timely/Current Initial Reviews Held (numerator) | 889 | 933 | 859 | 772 | 957 | 972 |
| % of Timely/Current Initial Reviews Held | 91.93% | 93.02% | 87.03% | 86.84% | 92.82% | 91.53% |

Table 13: AFCARS Timeliness of Initial Periodic Reviews.

To determine if the child was timely for subsequent reviews using the AFCARS files, it was assessed if the child's most recent periodic review date was current during the review period. If the most recent periodic review date shows current during the review period, the child/youth was considered timely.

Table 14 depicts the number of children/youth who had a removal episode duration of at least six months beyond their initial periodic review during FFYs 2023, 2024, and 2025 and the number of those that were current for the case review based on the most recent periodic review listed in the AFCARS extract. This population captures children/youth who were due for a subsequent review during the FFY and identifies whether the child is current for periodic reviews during the time frame. FFY-A refers to the first half of the FFY (October 1 through March 31) and FFY-B refers to the second half of the FFY (April 1 through September 30).

| [Data Description] | FFY 2023-A | FFY 2023-B | FFY 2024-A | FFY 2024-B | FFY 2025-A | FFY 2025-B |
|---|---|---|---|---|---|---|
| # of Subsequent Due (denominator) | 2495 | 2548 | 2612 | 2567 | 2421 | 2519 |
| # of Timely/Current Subsequent Reviews Held (numerator) | 2333 | 2363 | 2266 | 2345 | 2240 | 2260 |
| % of Timely/Current Subsequent Reviews Held | 93.51% | 92.74% | 86.75% | 91.35% | 92.52% | 89.72% |

Table 14: AFCARS Timeliness of Subsequent Periodic Reviews.

Overall, Colorado's performance on timeliness of initial periodic reviews is comparable to the state's performance on timeliness of subsequent periodic reviews, with an average of around 90% of both review types being held timely.

## Variations

Smaller counties tend to have fewer children/youth in care and therefore fewer administrative reviews. The ARD attempts to prioritize timeliness of reviews in these smaller counties because they have fewer opportunities to receive feedback on practice through the administrative review process.

# Item 22: Permanency Hearings

Colorado did not achieve substantial conformity with the Case Review System systemic factor during Round 3 of the CFSR; however, Item 22 was identified as a strength. Based on the information and performance data presented below, Colorado believes that Item 22 is currently an area needing improvement.

Colorado Judicial's case management system (CMS) captures the date that each child's removal order is signed; this is the date the Court considers the child to have entered care and is used to calculate the time to the child's first permanency hearing. Court judicial assistants in each jurisdiction have a significant role in ensuring timeliness of permanency hearings as they help facilitate the scheduling of each hearing and are responsible for scheduling these hearings within the required timeframes. Statewide training on the required timelines of hearings in these cases is provided by a training team made up of Court Education Specialists to train all court judicial assistants who support the case management of dependency and neglect cases. Court staff are also provided with Best Business Practices, which provides

guidelines for the case management of all case types. Additionally, the Court relies on County Attorneys to support timeliness of permanency hearings by reminding the team when these hearings are due.

The Court Improvement Program (CIP) has access to a Timeliness Report that shows the timeliness of hearings on a statewide basis using information from the CMS. Accuracy of the report data is subject to coding accuracy entered by court staff. This report is available to counties, though not each county accesses it on a regular basis.

Table 15 depicts the number of children/youth who required an initial Permanency Hearing (PH) (calculated as child/youth having a removal episode duration of 12 months from entry into foster care) during FFYs 2022, 2023, and 2024 and the number of those that had an initial PH within 12 months of their entry into foster care. The data below was pulled from the State Courts data system and comprises children with an open child welfare removal, regardless of the placement type. This data excludes children/youth in the Foster Youth in Transition program and children/youth who had their parental rights terminated within the first 12 months of removal. The denominator for this metric includes children who had a removal episode of 12 months during the FFY. The numerator includes the number of these children who had an initial PH during the FFY.

| [Data Description] | FFY 2022 | FFY 2023 | FFY 2024 |
|---|---|---|---|
| # of children requiring initial PH (denominator) | 1,148 | 1,056 | 982 |
| # of initial PH held within 12 months of entry into care (numerator) | 632 | 588 | 682 |
| % of initial PH held timely | 55.05% | 55.68% | 69.45% |

Table 15: State Court Timeliness of Initial Permanency Hearings by FFY.

The Strengthening Abuse and Neglect Courts Act (SANCA) allows for electronic data information sharing between the Judicial Courts System (Integrated Colorado Online Network “ICON”/Eclipse) and Trails. As reported in Colorado’s previous Annual Progress and Services Reports, SANCA-ICON functionality in Trails went dormant during SFY 2016, preventing the transfer of Court data to Trails. As of November 2022, this information exchange was fully restored and all D&N cases open after this time were connected in the Trails and ICON/Eclipse programs automatically. However, this disruption in functionality presents a limitation of data during FFY 2022 and the first portion of FFY 2023. During that period, caseworkers manually entered TPR in Trails in order to move forward with adoption proceedings, but most other Court data is not available in Trails.

Table 16 depicts the number of children/youth who required a subsequent PH (calculated as child/youth had a removal episode duration of at least 12 months from their initial PH) during FFYs 2022, 2023, and 2024 and the number of these that had a subsequent PH within 365 days of their most recent PH. The data below was pulled from the State Courts data system and comprises children with an open child welfare removal, regardless of the placement type. This data excludes children/youth in the Foster Youth in Transition program and children/youth who had their parental rights terminated within the first 12 months of removal. The denominator for this metric includes children who had a removal episode of 12 or more months beyond their initial PH during the FFY. The numerator includes the number of these children who had a subsequent PH held within 365 days of their most recent PH during the FFY.

| [Data Description] | FFY 2022 | FFY 2023 | FFY 2024 |
|---|---|---|---|
| # of children requiring subsequent PH (denominator) | 3,248 | 2,653 | 2,030 |
| # of subsequent PH held within 365 days of previous PH (numerator) | 2,184 | 1,924 | 1,701 |
| % of subsequent PH held timely | 67.24% | 72.52% | 83.79% |

Table 16: State Court Timeliness of Subsequent Permanency Hearings by FFY.

Additionally, the ARD reviews the required language in Court Orders from permanency hearings. During initial reviews the ARD reviews whether there is a signed removal order, which includes the date that is used to calculate the deadline of the initial permanency hearing. During subsequent reviews of children in care 12 months or longer, the ARD assesses whether there is a court order in the case file that was signed and dated within the last 12 months that contains reasonable efforts to achieve permanency language. For cases open longer than 12 months, this court order is often signed and dated relative to the most recent permanency hearing. Table 17 reflects the percentage of out-of-home case reviews conducted by the ARD during FFYs 2023, 2024, and 2025 that had the required court documents in the case file.

| [Data Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of initial periodic reviews requiring a signed removal order. (denominator) | 1,495 | 1,482 | 1,725 |
| % initial periodic reviews had a signed removal order that met requirements.[42] | 76.25% | 74.09% | 82.43% |
| # of subsequent periodic reviews for child/youth in care 12+ months requiring a signed court order. (denominator) | 1,349 | 1,363 | 1,312 |
| % of subsequent periodic reviews that had a signed court order that met requirements.[43] | 78.50% | 77.40% | 84.22% |

Table 17: ARD Required Court Documents in Case File by FFY.

## Variations

Colorado has 23 judicial districts that serve its 64 counties. While there is statewide training that is provided to all judicial districts, each jurisdiction operates differently and assigns administrative and oversight responsibilities in the way that best serves their district. This may result in variations across the state, but grants each district the responsibility to monitor its own effectiveness and make changes as needed.

Additionally, the date of entering care is subject to some level of change on a case-by-case basis as it is based on the date of the signed removal order (rather than, for example, the physical removal or the child or the adjudicatory hearing). Because of this, the date reflected as the start of the removal episode in Trails may differ from that in the Court Case Management System; however, Colorado's best practice standards encourage child welfare staff to align these dates for consistency. As noted in Item 21, the ARD reviews this during periodic reviews and provides technical assistance in cases where there is a difference between the date when DHS received custody, the date the removal order was signed, and/or the date entered in Trails as the start of the removal episode.

[42] The numerator includes the number of cases reviewed that had a signed removal order that contains: contains best interest or welfare of the child language, and contains a reasonable efforts determination, and does not contain "nunc pro tunc" language.
[43] The numerator includes the number of cases reviewed that had a court order in the case file that was signed and dated within the last 12 months that contains reasonable efforts to achieve permanency language, and does not contain "nunc pro tunc" language.

# Item 23: Termination of Parental Rights

Colorado did not achieve substantial conformity with the Case Review System systemic factor during Round 3 of the CFSR, and Item 23 was identified as an area needing improvement. Based on the information and performance data presented below, Colorado believes that Item 23 is currently an area needing improvement.

As with Item 22, the date that each child's removal order is signed is the date the Court considers the child to have entered care and is used to calculate the time to the filing of a termination of parental rights (TPR) petition. As noted, this date is typically aligned with the removal start date in Trails and the ARD provides technical assistance in cases where these dates are not aligned.

Colorado's Court procedures related to permanency planning are outlined in 12 CCR 2509-4, and include that the county department shall file for TPR no later than the end of the 15th month of placement for any child who has been in foster care under the responsibility of the state for 15 of the last 22 months unless there is a compelling reason submitted to the court identifying why it is in the child's best interest to not terminate parental rights.

The amount of time that a child/youth is in care within the most recent 22 months is tracked in Trails. Progress toward reunification and whether a child/youth is approaching the 15/22 month timeframe is discussed in 90-day reviews and court reports, both of which provide accountability to ensure that, when required, TPR petitions are filed timely.

In Trails Legacy, the Family Service Plan (FSP) included a "5B special review" section that tracked this information. Within Trails Mod, this information is captured in the "15/22 Review," which documents whether a motion for TPR has been filed for a child in care 15/22 months and if not, whether a compelling reason has been documented. Caseworkers are responsible for completing this review.

When a client has an open removal for 15 months (450 days, not consecutive) and has an open out-of-home placement for 22 months (excluding adoption and RGRDS), Trails Mod generates an alert for the primary caseworker within the Case Alerts subsection of the Case file. The Case Alerts subsection indicates the date that the 15/22 attachment is due and the date that the 15/22 review was completed. The 15/22 Review form in Trails Mod requires the county staff to determine whether a TPR motion has been filed; when the response is "No," county staff should select within the review form which of the following applies:

- The county has determined that there is a compelling reason, based on specific facts, that filing a petition for Termination of Parental Rights would not be in the best interests of the child such as:
    - The family is involved, cooperative and achieving significant success on an approved plan and it is likely that the reunification will occur as specified in the Family Service Plan within six months AND there have been no previous extensions.
    - Permanent custody or a legal guardianship action, which the county supports, is already pending.
    - A county appointed review team has determined that adoption would not be in the best interest of the child because the child's mental or physical needs, or conditions, or behaviors deemed it improbable that such child would have a successful adoption. This will be reassessed and documented in the 90-day case review.
    - A child who is 12 years or older and has declined adoption after being counseled by staff who are trained in adoption or relinquishment. The decision that adoption was not in the best interest of the child was made with the involvement of the caseworker and guardian ad litem. A county appointed review team has determined that adoption would not be in the best interest of the child or youth. This will be reassessed by the county appointed review team at the 90-day case review.
    - The child has been in foster care under the responsibility of the county department for fifteen of the last twenty-two months due to circumstances beyond the control of the parent, such as incarceration of the parent, AND the parent has otherwise followed the plan supported by the county department.
    - After extensive counseling has been provided to the child or youth by a staff that is trained in adoption and trauma, and the decision is made that adoption is not in the best interest of the child or youth, the following actions shall occur. The county shall take into consideration the child's or youth's: age, cognitive, emotional, physical, and behavioral capacities; evaluate the appropriateness of pursuing TPR and at a minimum on a 90-day timeframe; and, consult with the child or youth, caseworker, guardian ad litem, and any other individuals with significant knowledge of the circumstances shall occur.
    - The child's family is actively involved and it is in the child's best interests to retain this permanent, supportive relationship. (PRNP cases only)
- The county deems the child is being cared for by a relative in a planned permanent living arrangement. Adoption, guardianship or permanent custody is being actively pursued.

- The county has not provided the family of the child, consistent with the time period in the Family Service Plan, such services as the county deems necessary for the safe return of the child to the child's home; AND there is a reasonable chance that with such services safe reunification could occur within six months; AND there are no other grounds for termination of parental rights.

In addition to selecting from the above reasons, county staff may enter case-specific details related to the reason in the comment section of the 15/22 Review form.

The date the petition is filed is recorded in the case's minute orders. However, there is not a reliable way to report on minute order data from the Judicial data system. Therefore, data for this measure was pulled from Trails using the 15/22 Review. Table 18 reflects data regarding 15/22 Reviews completed during FFYs 2022, 2023, 2024, and 2025, according to Trails. The number of children/youth in foster care for 15/22 months includes all children/youth in care for 450 days (may be nonconsecutive) during a 22-month period as of October 1 during the FFY. The 15/22 Review data includes information from the most recent 15/22 Review completed for that child by September 30 of the FFY.

| [Data Description] | FFY 2022 | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|---|
| # of children/youth in foster care for 15/22 months | 729 | 690 | 728 | 680 |
| # of children/youth that had a completed 15/22 Review | 594 | 530 | 547 | 498 |
| # of children/youth whose 15/22 Review indicated that TPR was filed | 312 | 252 | 252 | 205 |
| # of children/youth whose 15/22 Review indicated that TPR was not filed | 282 | 278 | 295 | 293 |
| # of children/youth that had a 15/22 Review that documented an exception to filing TPR | 276 | 274 | 286 | 281 |

Table 18: Trails 15/22 Reviews by FFY.

Table 19 reflects the percentage of TPR filings made in accordance with Adoption and Safe Families Act (ASFA) requirements during FFYs 2022, 2023, 2024, and 2025, according to 15/22 Review data from Trails. The denominator includes the total number of children/youth in foster care for 450 days (may be nonconsecutive) during a 22-month period as of October 1 during the FFY minus the number of children/youth with an exception to TPR filing documented in a 15/22 Review. The numerator for this metric includes the children/youth that had a 15/22 Review indicating that TPR had been filed.

| [Data Description] | FFY 2022 | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|---|
| # of children/youth in care 15/22 with no documented exception to TPR filing (denominator) | 453 | 416 | 442 | 399 |
| # of children/youth that had a 15/22 Review indicating that TPR was filed (numerator) | 312 | 252 | 252 | 205 |
| % of TPR filings made in accordance with ASFA | 68.87% | 60.58% | 57.01% | 51.38% |

Table 19: Trails Timeliness of TPR Filings by FFY.

During periodic reviews for cases that have not had a petition/motion to terminate parental rights filed, the ARD reviews whether a compelling reason has been identified, and if so whether the compelling reason is appropriate. Table 20 shows out-of-home case review data for FFYs, 2024, and 2025 including the number of cases reviewed by the ARD where the child was in care for 15 out of the most recent 22 months but did not have a petition/motion to TPR filed, the number that had a compelling reason identified that the reviewer agreed was appropriate, the number with a compelling reason identified that the reviewer did not agree was appropriate, and the number without a compelling reason identified.

| [Data Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of cases reviewed that did not have TPR filing when required (denominator) | 389 | 400 | 405 |
| # of cases reviewed that had a compelling reason identified as appropriate (numerator) | 211 | 161 | 183 |
| % of compelling reasons identified as appropriate | 54.24% | 40.25% | 45.19% |
| # of cases reviewed that did not have an appropriate compelling reason identified (denominator) | 178 | 239 | 222 |
| % of cases reviewed with an inappropriate compelling reason[44] | 18.50% | 18.00% | 15.30% |
| % of cases reviewed without a documented exception[45] | 83.10% | 82.40% | 84.70% |

Table 20: ARD Compelling Reasons for Not Filing TPR by FFY.

# Item 24: Notice of Hearings and Reviews to Caregivers

Colorado did not achieve substantial conformity with the Case Review System systemic factor during Round 3 of the CFSR, and Item 24 was identified as an area

[44] The denominator for this measure includes the number of cases reviewed that did not have an appropriate compelling reason identified. The numerator includes the number of cases that had a documented exception that the reviewer determined was not appropriate.
[45] The denominator for this measure includes the number of cases reviewed that did not have an appropriate compelling reason identified. The numerator includes the number of cases that did not have any documented exception in the case file.

needing improvement. While notice of reviews are being sent timely for most cases, based on the information presented below, CDHS lacks concrete data that measures whether all caregivers are provided notice of hearings. Therefore, Colorado believes that Item 24 is currently an area needing improvement.

## Notice of Hearings

Per Colorado statute (C.R.S. 19-3-702), the court shall hold all permanency planning hearings in person, provide proper notice to all parties, and provide all parties the opportunity to be heard. According to this statute, the court or designee of the court shall issue a notice of the permanency planning hearing that includes the hearing purpose, the constitutional and statutory rights of the child/youth's parents or guardian, and the statutory rights of the child/youth. The notice of hearing must also comply with the requirements in C.R.S. 19-3-502 (7), which states that in addition to providing notice to all parties, the court shall ensure that notice is provided of all hearings and reviews held regarding a child to the persons with whom a child is placed (including foster parents, pre-adoptive parents, and/or relatives) and that such persons have the right to be heard at the hearing/review. As these providers are typically not a party to the case, the Court is not responsible for providing them notice, but rather for ensuring that notice is provided.

In most counties, notice of permanency hearings is sent to foster parents, pre-adoptive parents, and relative caregivers of children in care by the county attorney, who is also responsible for filing with the court when this notice was given. In some counties, the caseworker is responsible for forwarding the notice of hearing to the placement provider. Parties may optionally request to waive notice, which would result in no notice being sent to parties. This is included in the minute order for the case and may be viewed for each individual case; however, there is not a mechanism in place to monitor what percentage of notices are sent to caregivers statewide.

## Notice of Reviews

The ARD tracks whether notice of periodic reviews is sent to foster parents, pre-adoptive parents, relative caregivers, and care providers (including residential settings) of children in care. Periodic review notices (invitation letters) are generated through Trails and sent by the county departments. The notice provides invited participants with the location, date, and time of the review and encourages their participation. The notice also outlines the purpose of the reviews, including discussing the need for the child to continue in out-of-home care, the appropriateness of the placement, safety of the child(ren), progress on the treatment plan, permanency goal for the child(ren), and providing the parties' opportunity to be heard. The

standardized notice aims to use language that is accessible and understandable by parties involved in the review. For example, instead of using the language "right to be heard," the language used in the notice is "the purpose is to…hear your ideas and concerns." The language in the standardized invitation is as follows:

"You are invited to attend an Administrative Review regarding the above named child(ren). The Colorado State Department of Human Services conducts this meeting to assure compliance with federal and state statutes for children in out-of-home placements and to assure the placement is the most appropriate to meet the child(ren)'s needs. The purpose of this review is to:

- Evaluate progress on the treatment plan.
- Review the need to continue out-of-home placement.
- Hear your ideas and concerns about services.
- Check safety of the child(ren).
- Talk about the permanency goal for the child(ren).
- Meet with members of the treatment team, i.e.: parents, children, caseworker, GAL (Guardian ad Litem- the child's court appointed attorney), therapist, foster parents, etc.

This is an important meeting and we encourage you to attend. You may participate by phone if you are unable to attend in person. Please make these arrangements in advance."

Notices must be sent two weeks prior to the review to all required parties. As noted under Item 21, the ARD will cancel and reschedule a review if all required parties were not invited to the review or given the required 14-day notice so that proper notice can be sent. Table 21 reflects the number and percentage of periodic reviews held in FFYs 2023, 2024, and 2025 that met the requirement for all required parties to be invited to the review and given at least two week's notice.

| [Data Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of periodic reviews held (denominator) | 4,737 | 4,779 | 4,984 |
| # of periodic reviews for which all required parties were given at least two week's notice (numerator) | 4,457 | 4,505 | 4,642 |
| % of notices of periodic reviews sent timely | 94.09% | 94.27% | 93.14% |

Table 21: ARD Timely Notice of Periodic Reviews by FFY.

Per the data above, notice of periodic reviews is sent timely for the majority of cases.

# Quality Assurance System

## Item 25: Quality Assurance System

Colorado achieved substantial conformity with the Quality Assurance System systemic factor during Round 3 of the CFSR, and Item 25 was identified as a strength. Based on the information presented below and continued improvements in recent years, Colorado believes that Item 25 is currently an area of strength.

As described earlier in this report, the ARD manages the qualitative case review portion of Colorado's child welfare quality assurance system. The ARD works closely with Colorado's counties to train, measure, and assess their adherence to state and federal regulations. Such regulations are in place to help prevent unnecessary moves for children in foster care and to assess whether the needs of the families and children are being appropriately addressed. The ARD also collaborates with the DCW to enhance policies and practice expectations designed to improve outcomes for children and families.

In accordance with the federal requirements outlined in 5 CFR 1355.34 (C (3)), Colorado's quality assurance system is operating in the jurisdictions where the services included in the CFSP are provided. The ARD conducts administrative, qualitative, case reviews of children and youth placed into foster care in all 64 of Colorado's counties. Additionally, the ARD conducts these reviews for youth placed into the Department's custody with the Division of Youth Services (DYS). The ARD conducts reviews statewide for the following populations:

- Children in the child welfare system who are in out-of-home care for at least six months (all eligible, every six months)
- County-certified foster and kinship foster homes (random sample for every county with certified homes, annually)
- Qualified Residential Treatment Programs (at the request of participants, every 90 days)
- Screened out institutional abuse referrals (random sample of statewide referrals, monthly)
- Hotline calls falling under three populations: Child Welfare, Child Welfare Inquiries, and Information and Referral (random sample of statewide calls from each population, monthly)
- Fatal, near fatal, and egregious incidents determined to be a result of child maltreatment, when the child or family had previous involvement with the

child welfare system within three years of the incident (reviewed by the Child Fatality Review Team, within 45 business days of receiving documentation)
- Screened out child welfare referrals (random sample, when possible)

More information about reviews for each population is detailed below.

## Administrative/Periodic Reviews

The ARD reviews all children in the child welfare system who are in out-of-home care for at least six months, and every six months thereafter, if the child remains in care. Reviews are also conducted every six months for youth in DYS who are in a community placement.

Colorado's case review instrument and process has been established to ensure that Colorado complies with federal requirements. These include the following:

- 45 CFR 1357.15 (u), which requires a quality assurance system that regularly assesses the quality of services provided under the CFSP, and
- Section 475 (5) of the Social Security Act, which requires the case review system to assure:
    - Each child has a case plan designed to achieve placement in a safe setting and it is the least restrictive and most appropriate setting available in close proximity to the parents' home, and meets the best interest and needs of the child,
    - Further assure:
        - The safety of the child,
        - The continuing necessity for and appropriateness of placement,
        - Extent of compliance with the case plan,
        - Extent of progress made toward alleviating/mitigating the causes necessitating placement in foster care,
        - Opportunities for the child/youth to engage in age and/or developmentally appropriate activities,
        - Procedural safeguards are applied specific to permanency hearings, filing petitions for the TPR, changes in placements, removal of the child from the home, etc.,
    - Health and education records are in the case file, and any identified services required for the health or education of the child are being provided,
    - When a child has been in care for 15 of the 22 past months, a petition for TPR has been filed, or a compelling reason exists for not filing,

  - Appropriate independent living and transition plans and services are in place for older youth,
  - Credit reporting checks are conducted for older youth, and,
  - The status of each child is reviewed no less frequently than once every six months.
- Section 475 (6) of the Social Security Act, which defines an "administrative review" as a review that is open to the participation of the parents of the child, and is conducted by an individual not responsible for the case management or delivery of services to the child or parents.

To evaluate the adequacy and quality of services provided under the CFSP, the ARD's instrument has a series of questions designed to review the adequacy of the services included in the case plan, as well as those that are being provided to each child/youth and their family, specific to their permanency goal(s). In addition to these specific areas, the ARD's qualitative case review instrument has items and response sets designed to measure the quality of case practice in the following areas:

- Mental health
- Substance abuse
- Educational stability and progress
- Frequency and quality of contacts with the child/youth and parents
- Engagement of the child/youth and parents in case planning
- Adequacy of visitation between the child/youth and their siblings and parents
- Timeliness of Title IV-E eligibility

Lastly, the Administrative Review instrument has been mapped to the CFSR Items. This theory-based approach focuses on mapping practice areas to specific child welfare outcomes they are believed to influence, and improved practice in specific areas should result in enhanced outcomes for children and families along specific CFSR Items. Instructions for the review instrument are directly linked to Federal and State statute, Colorado's child welfare program rules, and are additionally informed by direct citations from the federal Onsite Review Instrument (OSRI).

## Foster Home Certification Reviews

The purpose of the annual foster home certification review is to determine if county departments of human/social services are complying with certification requirements for foster homes and kinship foster homes as outlined in the Code of Colorado Regulations, Colorado Revised Statute, and federal law. A thorough and qualitative case review of the county certified provider case file is completed to determine if the certifying county and provider are in compliance with rules and regulations during the

review period to provide a safe living environment for children in out-of-home care. Questions on this instrument were designed to help address CFSR Item 33: Standards Applied Equally on the OSRI regarding how well the State applies standards equally to all licensed or approved foster family homes receiving title IV-B or IV-E funds.

Any foster home or kinship foster home that is certified by a county department of human/social services is eligible for a Foster Home Certification Review by the ARD. These reviews are conducted once a year for any county with certified foster homes (a foster home or kinship foster home can be reviewed if the Trails approval screen indicates a “Pending” and “Certify” status for a provider). Reviews are conducted on a random sample with a 90% confidence level and a 10% confidence interval.

## Qualified Residential Treatment Program (QRTP) Reviews

As part of Family First implementation, the responsibility for reviewing the ongoing necessity and appropriateness of QRTP placements was added to the ARD beginning in CY 2021. The QRTP Placement Review instrument is in the Trails system, so data from the reviews is stored directly in Colorado’s Comprehensive Child Welfare Information System (CCWIS). Within child welfare, the courts will always conduct the first QRTP review. Subsequent reviews, contingent on the request and desire of the case participants, can then be conducted by the ARD. For DYS, the ARD conducts all QRTP reviews. In Colorado, review of the ongoing appropriateness of QRTP placements occurs every 90 days.

## Institutional Abuse Screen-Out Reviews

The purpose of the monthly statewide institutional abuse screen-out review is to determine if county departments of human/social services are appropriately screening out institutional abuse referrals as outlined in the Code of Colorado Regulations and Colorado Revised Statutes. The source for all information used during this review is the Colorado Trails database. A random sample (90% confidence level with a 10% interval) of statewide screened out institutional abuse referrals is reviewed monthly and a thorough and qualitative case review of the counties' decision to screen out the institutional abuse referrals is completed based on information contained within Trails. A review of each hotline call can be completed when needed. If the review determines the referral should have been assigned, it is then sent for a second level consideration by staff from DCW and two county departments. If the second level concurs that the referral should have been assigned, ARD staff notify the county department of the finding.

Additionally, the ARD compiles aggregate data reports on a quarterly basis and provides those to DCW.

## Hotline Reviews

The ARD conducts qualitative reviews of the child welfare hotline system. Each month, reviews are conducted of three populations of calls: Child Welfare, Child Welfare Inquiries, and Information and Referral (non-Child Welfare). Reviews are based on a random sample (90% confidence level with a 10% interval) of statewide calls from each population. If the review identifies that either a call met the definition of a referral but was not entered into Trails as a referral, or a referral was screened out that was determined to have met criteria for assessment, the ARD identifies these as an Issue for Administration. The ARD notifies the appropriate county or the Hotline County Connection Center (HCCC) and notifies DCW of the resolution. The ARD also compiles aggregate data reports on a quarterly basis and provides ad-hoc reports to counties with results of reviews from their counties when requested. It should be noted that, as it is a statewide sample, county-level results are not generalizable.

## Child Fatality Review Team (CFRT)

The CFRT is composed of up to 20 multidisciplinary team members including the Child Protection Ombudsman of Colorado (CPO), medical professionals, law enforcement, child advocacy, public health, etc. The CFRT reviews fatal, near fatal, and egregious incidents determined to be a result of child maltreatment, when the child or family had previous involvement with the child welfare system within three years of the incident. In addition to reviewing these incidents, CFRT puts forth recommendations regarding policy and practice considerations that may help prevent future incidents of fatal, near fatal, or egregious abuse or neglect, and/or strengthen the systems that provide direct service delivery to children and families.

## Screen Out Reviews

The ARD conducted a Screen Out Review of child welfare referrals in October 2023 and again in October 2025. The sample population for the ARD Screen Out Review includes all child welfare referrals that were screened out during a six-month period. The sampling provides generalizability at a 90% confidence level with a 10% confidence interval. The sample was stratified based on the county making the decision to screen out the referral, giving the ARD the ability to provide each county individual data they can use to generalize to all of their child welfare screened out referrals, as well as aggregate the data to determine statewide performance.

## Qualitative Case Review Data

The ARD's instrument is designed with a response set that allows for the identification of both case specific and systemic strengths and barriers to meeting the needs of Colorado's children/youth and families. Specifically, the response set items identified as within a county departments' direct influence (e.g., making a referral for mental health services) as well as those that are broader, systemic issues (e.g., families not receiving mental health services due to Medicaid issues).

## Distribution of Qualitative Case Review Data

Data collected from these various qualitative case reviews are made publicly available on the ARD website[46] at the county, regional, and/or statewide level. Additionally, the ARD provides reports to agency administration on the quality of services evaluated and areas of needed improvement. The ARD's case review instrument, implemented within Trails, allows for the creation and dissemination of routine aggregate reports (e.g., quarterly performance reports), as well as more advanced, ad-hoc analysis. Because the case review instrument exists within the CCWIS system, it allows for advanced statistical analysis of specific case practice factors that may be related to a child/youth's safety, permanency, and well-being.

## Use of Qualitative Case Review Data in Program Improvement Measures

The ARD's case review instrument consists of questions that have remained stable over time, as well as ad-hoc questions. For areas of case practice where expectations do not experience frequent change, these stable questions allow for trend analysis sensitive to how other systems-level changes impact practice in these areas. Ad-hoc questions are often added to the instrument when new practice expectations are implemented. This creates an immediate feedback loop that informs early implementation efforts and allows for any necessary adjustments to be made in a more responsive and timely manner.

Case review data is integrated into numerous continuous quality improvement processes, including:

- CFSR Implementation Team meetings and discussions
- CDHS Results-Driven Management System (RDMS) discussions

[46] ARD Website

- CDHS Child Welfare Sub-Policy Advisory Committee (Sub-PAC) rule and work group assignment

# Staff and Provider Training

## Item 26: Initial Staff Training

Colorado did not achieve substantial conformity with the Staff and Provider Training systemic factor during Round 3 of the CFSR, and Item 26 was identified as an area needing improvement. Based on the information presented below, Colorado believes that Item 26 is currently an area needing improvement. Colorado is engaged in improvement efforts including a redesign of the State's initial staff training that is described within the Training Effectiveness section of this Item.

Colorado's Child Welfare Training System (CWTS) through the Kempe Center provides pre-service training for new caseworkers. To practice as a caseworker in child welfare in Colorado, all child welfare staff are required to be certified. Certification requirements include completion of Colorado's pre-service training (New Caseworker Academy) through the CWTS learning management system (LMS). CDHS does not require staff to complete the New Caseworker Academy within a specified amount of time; however, new child welfare staff are encouraged to prioritize the pre-service training requirements because they cannot request certification until they have completed the New Caseworker Academy. The New Caseworker Academy is a 92.5-hour, seven-module course that takes approximately six to seven weeks to complete. The modules of the Academy include:

1. Welcome to Colorado Child Welfare (1.5 hours)
    a. A self-guided online training designed to give learners a basic understanding of the Colorado child welfare system.
2. Hotline and RED Team: Where Assessment with Families Begins (16 hours)
    a. A two-day hybrid course designed provides the knowledge, skills, and abilities necessary to successfully carry out the duties associated with the referral and screening processes. This module places emphasis on personal and professional experiences that promote quality customer service.
    b. As part of this training, the Mandatory Reporter web-based training is included here and is for all individuals who are required by law to make reports of suspected child abuse or neglect. It is 2 hours and is in addition to the 16 hours for the Hotline and RED Team training.
3. Safety through Engagement (19.5 hours)
    a. A three-day classroom-based course that uses a problem-based learning model to facilitate growth. With a single complex case scenario

interweaved throughout the course, learners conduct an in-depth assessment of safety with a family.

4. Working Toward Closure (19.5 hours)
    a. A three-day classroom-based course designed to provide basic understanding of the crucial decisions that inform case planning with families and bring to life the values, concepts, skills, and practices of child welfare in Colorado.
5. Legal Preparation for Caseworkers (14 hours)
    a. A two-day classroom-based course designed to provide understanding of the details of each of the key moments in the court process for both dependency and neglect and delinquency cases.
6. Choose Your Own Trail: Documentation and Practice (13 hours)
    a. A two-day virtual course designed to provide caseworkers with a foundational understanding of basic Trails functions and how to document the work that they do with families in a manner that is culturally inclusive, behaviorally specific, and comprehensive yet concise. In this course, learners work independently to conduct a case review using an Administrative Review Division (ARD) instrument, followed by a group coaching discussion to debrief learners' experiences navigating Trails and identify needs for continued support regarding case documentation in Trails.
7. Fundamentals Practice Simulation (7 hours)
    a. Upon completion of the six prerequisite courses, learners demonstrate the competencies learned throughout the Academy in a live, case scenario-informed interaction with a real family, played by professional actors. Following the simulation, learners engage in reflection with their supervisor and a facilitated peer review experience.

During and following the New Caseworker Academy, participants complete eleven (11) required and four (4) optional Transfer of Learning (TOL) experiences. Completion of the TOLs are documented and initialed by the supervisor on a TOL checklist. In addition to the New Caseworker Academy and TOLs, individuals must complete two courses prior to caseworker initial certification: Mandatory Reporter Training and Educational Rights for Students in Foster Care. Completion of these training modules is tracked in the LMS. Throughout this process, county supervisors and/or training coaches ensure their new staff have participated and successfully completed all requirements prior to requesting certification.

There is a specific course in the LMS to request certification. The learner must verify that they have fully completed all pre-service training requirements described above before requesting certification, which includes the submission of the formal request

(signed by the worker's supervisor) and completed TOL checklist (initialed by the supervisor). Certification requests are reviewed by DCW's Learning and Development Team, who verify completion of all pre-services training and the additional two trainings prior to issuing certification.

New hires may not be certified to practice as child welfare staff until all certification requirements are successfully completed. CDHS does not allow exceptions to the requirements for initial certification. CWTS trainers monitor new workers going through the Academy and address concerns with the worker's supervisor, who must sign off on the formal request. This quality assurance process ensures that new workers may not request certification unless they are meeting the certification requirements. The TOL experiences can pose a challenge to Colorado's small counties, who have smaller workforces and fewer shadowing opportunities than Colorado's medium and large counties. However, small counties often collaborate with other counties to ensure that new workers complete shadowing experiences that may not be available within their own county at the time.

Certification requests that are found to not meet all requirements are held by DCW's Learning and Development Team or reassigned to the new worker within the LMS until the new worker has completed all requirements. DCW engaged in a Continuous Quality Improvement process for new caseworker certifications during SFY 2025, due to a large number of certification requests being held or returned. This process led to enhancements within the LMS that clarify the need for all requirements to be completed prior to the new worker requesting initial certification. Early data collected during SFY 2026 has demonstrated an improvement in this process, with few requests requiring a DCW hold or return. The reasons for these few incidents have included incomplete training and missing or incomplete request documentation.

Table 22 reflects the percentage of persons during SFYs 2023, 2024, and 2025 who completed at least one seminar of the New Caseworker Academy and who completed initial certification as either a hotline caseworker or a caseworker. This data was pulled by CWTS and is represented by SFY as this is the year type that aligns with Colorado's certification and recertification schedules.

The average number of staff who began the New Caseworker Academy is reflected rather than the total number of staff because the Academy includes multiple courses in the LMS. Though CWTS and DCW advise against this, new staff may take these courses out of order and or spanning fiscal years. As a state supervised, county administered system, DCW and CWTS do not track county personnel data including hiring dates, and county staff must set up registration and an LMS profile independently when they are ready to begin pre-service academy for initial certification. The average number of staff beginning training provides an

approximation of the number of individuals who began the pre-service training requirements during the state fiscal year.

| [Data Description] | SFY 2023 | SFY 2024 | SFY 2025 |
|---|---|---|---|
| Average # of staff beginning New Caseworker Academy (denominator) | 517 | 487 | 403 |
| Total # of staff completing initial certification (numerator) | 507 | 472 | 471 |
| % of staff who completed at least one course in the Fundamentals Preservice Academy who completed certification | 98% | 96.9% | 117% |

Table 22: CWTS Completion of Initial Staff Training by SFY.

It is important to note that completion of the New Caseworker Academy modules and subsequent certification requests may span across fiscal years; therefore, the number of staff who complete certification requirements may be higher or lower than the number of staff who begin the New Caseworker Academy during the same year. Because of this, the certification completion percentage is not an accurate completion rate for all individuals, but rather provides a ratio of the number of staff who began pre-service training requirements (denominator) to the number of staff who are certified (numerator) during the state fiscal year.

Post-certification, Colorado requires new staff to complete four additional courses:

- Cracking the Medical Code (8.5 hours)
- Worker Safety: Protecting Those Serving Others (6.5 hours)
- Habits of Resiliency (6.5 hours)
- Confidentiality Bootcamp (7.5 hours)

Once a new hire is initially certified in the LMS, they are automatically enrolled into a program that tracks their completion of these four post-certification trainings. These four courses are intended to be completed by caseworkers within the first year after they become certified to enhance learning of staff once they are completing casework. However, there is no consequence to staff who do not complete them within their first year, so long as the staff completes the 40 hours of required training for recertification. While CWTS offers these trainings throughout the year, due to time of initial certification or new worker capacity, new workers may wait until late in the state fiscal year to complete these four courses which causes them to fill quickly. New workers who cannot complete the trainings during their first year of

certification are asked to complete the courses during the next fiscal year. Once the trainings are completed, the program in the LMS will show as completed.

## Case Assignment for New Workers

All newly hired child welfare staff are required to complete the caseworker academy prior to being assigned to primarily work on any child welfare assessments or cases. Trails permissions are tied to certification and staff may not have full Trails access, be assigned as the primary worker on a case, or complete casework responsibilities prior to permissions being granted post-certification. Trails allows staff to be assigned as a secondary worker on a case regardless of certification; however, they will not have access to view or complete tasks within Trails that require caseworker certification.

Counties have the option to request a trainee certification of a new worker. The trainee certification is a professional training level position with intensive supervision and/or coaching by the county in which assignments are limited to 50% of the county's average workload or ten (10) assessments and/or cases, whichever is less. To be trainee-certified, the new worker is only required to complete the Academy and two additional courses. Trainee certification allows them time to complete the TOL activities and gain experience at a slower pace. Trainee certification is active for up to one year from the date it is issued, after which they must obtain Caseworker Certification to continue practicing as a caseworker.

## Variations

In addition to the required statewide training described above, some of Colorado’s counties offer additional training through their onboarding, coaching, and/or learning and development teams. This additional training is most often provided in Colorado’s larger counties and includes county-specific requirements for staff above and beyond what the State requires. While CDHS does not engage in formal monitoring of county-specific training or curricula, DCW’s County Intermediaries monitor their assigned counties’ practice and address discrepancies. This has not been observed as an issue in Colorado as county-specific training is offered as supplemental learning beyond state-required training, which is monitored by DCW as previously described.

## Training Effectiveness

CWTS administers training evaluations to all learners at the conclusion of all training experiences. Questions are answered on a seven-point Likert scale (1 meaning “strongly disagree” and 7 meaning “strongly agree”). Table 23 reflects the average

course evaluation score for the question “This course provided critical information that will enable me to do my job better” for each module of the New Caseworker Academy during SFYs 2023, 2024, and 2025.

| [Training Module] | SFY 2023 | SFY 2024 | SFY 2025 |
|---|---|---|---|
| Welcome to Colorado Child Welfare | 6.4 | 6.4 | 6.4 |
| Hotline and RED Team | 6.5 | 6.5 | 6.6 |
| Safety Through Engagement | 6.4 | 6.5 | 6.5 |
| Working Toward Closure | 6.3 | 6.4 | 6.4 |
| Legal Preparation for Caseworkers | 6.6 | 6.6 | 6.7 |
| Choose Your Own Trail | 5.6 | 5.8 | 6.0 |

Table 23: CWTS New Caseworker Training Effectiveness by Module by SFY.

As demonstrated through the data, the Choose Your Own Trail module is rated lower than other New Caseworker Academy modules. This is in part due to the lack of a “sandbox” or demo site of Trails to be used as a training environment, limiting the hands-on application of learning for new workers until they are certified and gain full Trails access. Counties are expected to support their new workers in going through the ARD’s periodic review tool in Trails as a way to familiarize their new worker with Trails. To mitigate this concern, a Trails training environment has been recently created and will be implemented with Colorado’s redesigned initial staff training, further described under “Redesign of Colorado’s Initial Staff Training.”

In addition to self evaluations, child welfare staff may choose to provide feedback on required and supplemental training through DCW’s Training Steering Committee, County Connection Meetings hosted by CWTS for small, medium, and large counties, and the annual survey sent out to certified staff.

## Stakeholder Feedback: Initial Staff Training

A CFSR-specific survey was distributed to counties in early 2026 through the DCW-issued Director’s Digest newsletter and the Training Steering Committee to gather information on counties' experience and observations of how well Colorado's initial and ongoing child welfare staff training addresses basic skills and knowledge needed by staff to carry out their duties. Following the survey, three focus group discussions were held with small, medium, and large counties respectively through the County Connection Meetings facilitated by the Kempe Center. In these focus groups, county stakeholders discussed the extent to which Colorado’s current staff training prepares

new caseworkers with the basic skills and knowledge necessary for staff to carry out their duties and current barriers.

Stakeholders reported that the time to competency is significant for new caseworkers, with new staff working for an average of 18 months before feeling confident in their role. There was acknowledgement that the initial staff training cannot address all skills and knowledge needed by caseworkers to fulfill their duties, and that new workers engage in on-the-job training that supplements formal training.

County stakeholders reported specific practical skills that are not comprehensively covered by the current New Caseworker Academy, including Trails navigation and documentation. Stakeholders reported that the training focuses heavily on early child welfare involvement such as referral and intake, but does not comprehensively prepare caseworkers for ongoing casework. This was particularly noted as a challenge for caseworkers who specialize in ongoing or permanency casework, and for smaller counties whose staff are “generalists” and may work with a family for the duration of their involvement.

Additionally, county stakeholders reported that the New Caseworker Academy focuses on “hard skills” but does not currently prepare caseworkers with communication, trauma-informed engagement, or workload management skills. Stakeholders also noted that post-Academy training varies widely by county, with large counties often having structured training or coaching. Colorado’s small counties typically do not have their own training systems, but many rely on shadowing opportunities for new caseworkers to observe and practice hands-on casework skills under the supervision of a certified caseworker.

Stakeholders reported several barriers to timely initial caseworker training, including transportation barriers, particularly for staff working in counties far from the Denver Metro area. However, staff emphasized the effectiveness of in-person training opportunities and noted that virtual training opportunities limit engagement and networking opportunities. County stakeholders also reported that cohort scheduling poses difficulty when cohorts do not align closely with staff hiring dates. Small counties in particular indicated the challenge of accessing timely initial training for caseworkers in small workforces. Some of Colorado’s counties employ only one or two caseworkers, which poses a challenge if a new worker is unable to join a New Caseworker Academy cohort for several weeks.

## Redesign of Colorado’s Initial Staff Training

In February 2024, DCW contracted a research team from the University of Washington to conduct focus group discussions with various stakeholders regarding the current

state of the Colorado Child Welfare Training Academy, and the final CWTS Evaluation report was released in June 2024. The report included three main themes: issues with the current Colorado academy training, concerns that arise post-academy training, and suggestions for improvements. Concerns with the current academy included the following:

- The current academy training is primarily focused on front-end intake and assessment, but misses elements more specific to the ongoing, kinship care, and adoptions programs. This is felt particularly acutely by caseworkers in smaller counties who tend to be generalist workers rather than being assigned a specific program area.
- New workers lack understanding of Volume 7 and how it pertains to their work. The Academy also lacks effective Trails training and new workers must learn how to document once they are certified, which causes challenges as they ramp up their caseloads.
- The current academy training focuses on hard skills but does not equip new workers with client engagement skills related to minimizing family discomfort and handling conflicts between caseworkers and the family.
- The existing simulation module does not effectively prepare workers to engage with families as these scenarios do not accurately represent workers' encounters with families. Focus group participants also noted the difference between simulations conducted in-person versus those conducted virtually.

In addition to these concerns, the report included post-academy training concerns about the difference in resources available at large versus small counties, such as post-academy coaching and shadowing opportunities. The report included several recommendations for the future of the CWTS, including:

- Emphasize effective experiential learning opportunities, including reexamining the simulation module;
- Integrate shadowing opportunities into the academy training;
- Include more technical training, particularly of the Trails system; and
- Promote meaningful feedback from supervisors in the TOL activities to effectively use these activities to track the competencies that workers are expected to gain.

Following the release of the CWTS Evaluation report, DCW convened a work group with members from county departments, the Training Steering Committee, CWTS, and DCW to update and clarify the objectives and expectations of Caseworkers and Supervisors. The workgroup is engaged in ongoing conversation to align on what competencies the training system should focus on and to redesign a Caseworker

Fundamental Academy that is comprehensive and addresses the newly established competencies.

A draft of the updated training, which will be titled the Pre-service Caseworker Academy (PCA), was presented to the Child Welfare Sub-PAC in March 2026 and approved for continued development. The PCA proposal addresses the concerns listed in the CWTS Evaluation report by adding a training module specific to interviewing and communication skills, increasing opportunities for knowledge checks and feedback through a Learner Portfolio that the supervisor may also access, and a Review Meeting to engage the new worker, supervisor, and PCA facilitator in a conversation around the new worker's learning progress and needs.

Additional PCA revisions intended to address stakeholders' feedback on the current New Caseworker Academy include:

- Multiple smaller simulation activities called Skills Practice and Observation Times (SPOTs) that will include a feedback loop for workers' supervisors;
- Use of a Trails training environment to help learners understand Trails functions and the importance of proper documentation;
- Combining in-person, synchronous virtual, and asynchronous web-based training modules that meet various learning styles and can be tailored to the learner's schedule and role; and
- A field observation tool that will reinforce basic skills through structured practice and communication assessment, real-world practice with families observed by supervisors or other designees in the county setting, and guidance for ongoing skill and competency development.

The PCA is expected to be piloted during SFY 2027 and updates will be provided in Colorado's future Annual Progress and Services Reports.

# Item 27: Ongoing Staff Training

Colorado did not achieve substantial conformity with the Staff and Provider Training systemic factor during Round 3 of the CFSR; however, Item 27 was identified as a strength. Based on the information presented below and improvements made in recent years, Colorado believes that Item 27 is currently an area of strength.

## Initial Training for Supervisors

Colorado's Child Welfare Training System (CWTS) provides pre-service training for new supervisors. To gain Supervisor certification in Colorado, new supervisors are first required to complete the New Supervisor Academy. Prior to completing the New

Supervisor Academy, child welfare staff must first be caseworker certified and the Caseworker Academy is a prerequisite of the Supervisor Academy. The New Supervisor Academy underwent a change midway through SFY 2023; prior to this change, the modules of the Supervisor Academy included:

- Charting Your Course in a Sea of Supervision (Web-Based Training)
- Supportive Supervision
- Educational Supervision
- Administrative Supervision
- Supervisory Skills Practice and Peer Review

During SFY 2023, the New Supervisor Academy was migrated from multiple courses (like the New Caseworker Academy) to one comprehensive course on the CWTS website. The New Supervisor Academy as it exists today (New Supervisor Academy: Foundations in Leadership) launched in the latter portion of SFY 2023. This is a 49-hour, multi-session course that takes approximately six weeks to complete. Like the New Caseworker Academy, CDHS does not require staff to complete the New Supervisor Academy within a specified amount of time. However, new supervisors are encouraged to prioritize the pre-service training requirements because they will not have access in Trails to complete supervisor activities until they obtain supervisor certification. Colorado's New Supervisor Academy includes an orientation, a three-day workshop, technical sessions, pod (small group) meetings, an independent project, and a closing session.

Upon completion of these pre-service training requirements, new supervisors may request supervisor certification through CWTS. Completion of the New Supervisor Academy is tracked in the LMS, and supervisors are responsible for tracking their staff's record of learning in the LMS and ensuring that the New Supervisor Academy is completed as required. For Lead Caseworkers completing the academy, the Casework Supervisor is responsible for monitoring completion; for Casework Supervisors, their superior is responsible for monitoring completion. Certification requests are reviewed by DCW's Learning and Development Team, who verify completion of the required training prior to issuing certification.

Table 24 reflects data related to completion of new supervisor training completed during SFYs 2023, 2024, and 2025. This training underwent a change midway through SFY 2023, which migrated the New Supervisor Academy from multiple courses to one comprehensive course on the CWTS website; data for SFYs 2024-2025 is represented as the total number of staff who began initial supervisor training or certification, while data for SFY 2023 is represented as the average number of staff who completed any module of the previous version and all completions of the new version. This data

was pulled by CWTS and is represented by SFY as this is the year type that aligns with Colorado's certification and recertification schedules.

| [Data Element] | SFY 2023 | SFY 2024 | SFY 2025 |
|---|---|---|---|
| # of new supervisors who began initial supervisor training (denominator) | 120 | 91 | 93 |
| # of staff completing initial certification as supervisor (numerator) | 85 | 78 | 91 |
| % of certification achieved per total staff completing at least one seminar in the old academy and/or the entirety of the new academy. | 70.8% | 85.7% | 97.9% |

Table 24: CWTS Completion of Initial Supervisor Training by SFY.

## Variations

All newly hired supervisors are required to complete the New Supervisor Academy prior to performing any supervisor duties. Some of Colorado's counties, particularly the larger counties, offer additional training through their on-boarding coaching and/or learning and development teams. This training generally includes how that county may require their staff to complete specific requirements above and beyond what the State requires.

## Training Effectiveness

Feedback regarding Colorado's New Supervisor Academy may be shared during DCW's Training Steering Committee meetings, the County Connection Meetings hosted by CWTS, the annual survey distributed by CWTS, and at Child Welfare Sub-PAC meetings.

### Stakeholder Feedback: Initial Supervisor Training

A CFSR-specific survey was distributed to counties in early 2026 through the DCW-issued Director's Digest newsletter and the Training Steering Committee to gather information on counties' experience and observations of how well Colorado's initial and ongoing child welfare staff training addresses basic skills and knowledge needed by staff to carry out their duties. Following this survey, three focus group discussions were held with small, medium, and large counties respectively through the County Connection Meetings facilitated by the Kempe Center. In these focus groups, county stakeholders discussed the extent to which Colorado's current staff training prepares

new supervisors with the basic skills and knowledge necessary for staff to carry out their duties and current barriers.

Stakeholders reported that contrary to the New Caseworker Academy, the New Supervisor Academy places emphasis on soft skills and lacks hard skills such as requirements for case reviews and documentation approval processes. County stakeholders also noted that the training emphasizes general supervisory skills but does not include content on building workers' child welfare skills or how to mitigate commonly encountered case staffing challenges such as worker bias.

Similar to the New Supervisor Academy, county stakeholders reported challenges related to cohort scheduling. Small counties in particular indicated the challenge of accessing timely initial training for supervisors in small workforces, particularly when the county employs only one supervisor. Some of Colorado's small counties report assigning an experienced caseworker to complete the new supervisor academy to be available as a back-up supervisor, which may also help in times of staff turnover.

As with the New Caseworker Academy, county stakeholders reported that the virtual training environment limits engagement and networking for new supervisors. Stakeholders also reported challenges to timely certification, particularly for supervisors who are new to child welfare and must complete both the New Caseworker Academy and the New Supervisor Academy. Finally, stakeholders reported that post-Academy supports vary from county to county, with larger counties offering more opportunities for mentorship and engagement with other child welfare supervisors.

## Ongoing Training for Caseworkers and Supervisors

Full-time child welfare personnel maintain certification by completing 40 hours of in-service training each state fiscal year. Part-time child welfare employees are required to complete prorated training hours based on their percentage of full-time employment (FTE). For example, a half-time caseworker or supervisor (0.5 FTE) would be required to complete 20 hours of in-service training annually.

At a minimum, 16 of the required 40 in-service training hours (or the prorated number of hours based on FTE) need to align with the caseworker's or supervisor's primary job responsibilities. Content areas for in-service training for caseworkers and supervisors may include the following:

- assessment of safety and risk;
- family strengths and needs;
- interviewing children and youth;

- engaging with families;
- legal and policy basis for child welfare practices;
- implications and considerations of foster care and adoption;
- child and adolescent development;
- the effects of abuse/neglect on development;
- the impact of trauma and trauma-informed practices;
- sexual abuse;
- sex trafficking issues and implications;
- mental health factors and considerations;
- domestic violence factors and implications;
- substance abuse factors and implications; and
- practices that influence permanency.
- Supervisors' in-service training may also include:
    - data-driven leadership and management;
    - worker safety; and
    - building a resilient workforce.

Additionally, Educational Rights for Students in Foster Care must be completed by all caseworkers and supervisors every two calendar years. Completion of these trainings is tracked in the LMS.

The LMS automatically recertifies individuals who complete the required number of hours through CWTS and DCW-offered training that are tracked in the LMS. If staff complete training outside of CWTS (for example, through individual county trainings, conferences, higher education, etc.), they must complete a non-CWTS log with those trainings and hours included. Those logs are reviewed by DCW's Learning & Development team and are added to learners' record of learning as non-CWTS hours. Staff who do not earn all 40 hours of in-service training through the CWTS LMS submit a training log with all non-CWTS trainings completed in that state fiscal year. These logs are reviewed by DCW's Learning and Development Team, who verify completion of the required training prior to issuing certification.

DCW contracts with CWTS to meet the learning and professional development needs of Colorado's case-carrying staff and other child welfare professionals. According to the CWTS Annual Report for SFY 2025, CWTS offered 170 unique learning experiences that included facilitated seminars and web-based training. Colorado's child welfare personnel also have the opportunity to earn training hours through training and activities completed outside of the CWTS; however, staff must submit specific documentation for CDHS' evaluation and approval for training hours completed outside of the CWTS. Guidelines for obtaining in-service training hours are available to all child welfare staff via the CWTS website.

Table 25 reflects the percentage of persons required to complete ongoing training from SFYs 2023, 2024, and 2025 who did complete the training. It is important to note that the percentage of caseworkers and supervisors who completed ongoing training as required does not account for turnover throughout the fiscal year; some staff may be included in the count of staff requiring ongoing training hours but not complete recertification due to turnover during the fiscal year. This may be reflected as a lower rate of required completion but due to staffing being tracked at the county level, DCW cannot definitively state the degree of impact on this metric. This data was pulled by CWTS and is represented by SFY as this is the year type that aligns with Colorado’s certification and recertification schedules.

| [Data Element] | SFY 2023 | SFY 2024 | SFY 2025 |
|---|---|---|---|
| # of caseworkers requiring ongoing training hours (denominator) | 1186 | 1505 | 1870 |
| # of caseworkers who completed 40+ in-service hours (numerator) | 1097 | 1082 | 1321 |
| % of caseworkers who completed ongoing training as required | 92.5% | 72.1% | 70.6% |
| # of supervisors requiring ongoing training hours (denominator) | 615 | 720 | 809 |
| # of supervisors who completed 40+ in-service hours (numerator) | 573 | 590 | 651 |
| % of supervisors who completed ongoing training as required | 93.2% | 81.9% | 80.5% |

Table 25: CWTS Completion of Ongoing Training by SFY.

Barriers to staff completing ongoing training as required may include job requirements (such as emergency and crisis situations, court attendance, etc.) or personal health or family issues that result in the staff going on leave. In these cases, if staff are not able to complete their ongoing training hours before the end of the state fiscal year, the staff is placed on a training plan that requires them to complete the missing hours during the next state fiscal year. These training hours must be completed in addition to the 40 training hours required for the fiscal year in which the training plan is completed.

Training plans are developed by the staff and their supervisor or county trainer-coach (when applicable). The county department is responsible for reporting the plan and anticipated timeframe to DCW's Learning and Development team; depending on the number of outstanding hours required, plans are typically set for completion within 60 days. Once the county notifies DCW that the plan is complete, the Learning and Development team updates the LMS to show completion of the required hours. To date, training plans have not been completed only when the employee has left the county. When this occurs, the staff's certification in Trails expires. If the staff is re-hired or hired by a different county, they must work with the Learning and Development team to bring their certification status to current.

## Variations

As described, statewide requirements for ongoing training include the number of training hours and approved content areas. However, child welfare staff may choose the specific courses or agencies through which they complete their ongoing training, resulting in variations in the specific training provided to staff across the state. This variation allows staff members, with support from their supervisors, to complete learning opportunities that are most relevant to their role and client base, ultimately creating a more individualized learning experience for child welfare staff. This is a strength in Colorado's child welfare system by supporting child welfare staff in meeting the unique needs of their communities and clients.

## Training Effectiveness

CWTS administers training evaluations to all learners at the conclusion of all CWTS-hosted training experiences. Questions are answered on a seven-point Likert scale (1 meaning "strongly disagree" and 7 meaning "strongly agree"). Table 26 reflects the average course evaluation score for the question "This course provided critical information that will enable me to do my job better" for hybrid, seminar, and online/web-based training provided by CWTS during SFYs 2023, 2024, and 2025.

| [Course Type] | SFY 2023 | SFY 2024 | SFY 2025 |
|---|---|---|---|
| Hybrid | 6.3 | 6.4 | 6.5 |
| Seminar | 6.5 | 6.5 | 6.5 |
| Online/Web-Based Training | 6.3 | 6.3 | 6.3 |

Table 26: CWTS Ongoing Training Effectiveness by Course Type by SFY.

### Stakeholder Feedback: Ongoing Training

A CFSR-specific survey was distributed to counties in early 2026 through the DCW-issued Director's Digest newsletter and the Training Steering Committee to gather information on counties' experience and observations of how well Colorado's initial and ongoing child welfare staff training addresses basic skills and knowledge needed by staff to carry out their duties. Following this survey, three focus group discussions were held with small, medium, and large counties respectively through the County Connection Meetings facilitated by the Kempe Center. In these focus groups, county stakeholders discussed the extent to which Colorado's current staff training addresses the basic skills and knowledge necessary for child welfare staff to carry out their duties and current barriers.

Overall, stakeholders reported a variety of available training content that effectively meets the needs of their staff. While some stakeholders reported that staff encounter barriers finding training applicable to their specific roles, others reported that CWTS provides new training opportunities each year that continuously build on learned skills even for tenured staff.

County stakeholders reported that in-person and virtual training environments are both beneficial for ongoing training, with in-person training opportunities offering more networking and engagement with staff from other counties and virtual opportunities offering more flexibility in scheduling. Small counties reported that training that includes a networking component is particularly helpful. For example, Child Welfare Town Halls and content-specific recurring meetings (ex. Adoption Quarterly, Core Quarterly) are available virtually, promoting connections between staff with similar roles across different counties.

County stakeholders provided mixed feedback regarding timeliness of ongoing training. Some staff reported that full-day seminars can be difficult for staff to attend, particularly in counties with small workforces where case coverage is not accessible. Conversely, some staff reported that trainings with shorter meetings over multiple days can be challenging when one of the sessions conflicts with other standing appointments; for example, one county reported having Court once per month, which would prohibit some staff from attending a training at the same time. It was noted that child welfare staff in different roles may have varying preferences regarding training environment and length depending on their level of crisis response or coverage options. Feedback provided suggests that offering both types of schedules may best meet the varying needs of county staff based on their workforce size and capacity.

Common barriers reported include staff unable to access training due to case-related crises or high workloads. Stakeholders reported that both of these barriers may lead child welfare staff to seek recertification training hours toward the end of the state fiscal year, causing courses to reach capacity and limiting training options.

# Item 28: Foster and Adoptive Parent Training

Colorado did not achieve substantial conformity with the Staff and Provider Training systemic factor during Round 3 of the CFSR, and Item 28 was identified as an area needing improvement. Based on the information presented below and improvements made in recent years, Colorado believes that Item 28 is currently an area of strength.

# Foster and Adoptive Caregivers

## Initial Training Requirements for Foster and Adoptive Caregivers

Each applicant for general foster care must complete 27 total hours of pre-service training, including 12 hours of core training that is outlined by the Colorado Children's Code, Volume 7. Volume 7 outlines the topic areas that are required for each general foster care applicants' core training, including but not limited to:

- A general overview of foster care;
- Administrative rules, laws, and legal issues;
- The impact of child abuse and neglect on child development;
- Parenting and family dynamics;
- Key concepts of child growth and development; Addressing child/youth behaviors;
- The importance of the team approach;
- Discipline;
- The effects of fostering on the foster family;
- The importance of maintaining meaningful relationships between children/youth and their parents or legal guardians, including regular visitation;
- The reasonable and prudent parent standard;
- Trauma-informed care as specified in Section 7.701.400;
- Medication administration;
- Health issues in foster care, including health services available to children and youth in foster care;
- The rights of a child or youth in foster care;
- The rights of siblings in foster care, located in C.R.S. 19-7-203; and,
- Understanding the role of a Child Welfare Education Liaison, as described in C.R.S. 22-32-138(2).

In addition to the 27 hours of pre-service training, foster and adoptive parents must also include CPR/First Aid. There is no statewide timeframe required for foster and adoptive parents to complete this training; however, counties and Child Placement Agencies (CPAs) may set their own timeframe requirements that are not tracked at the State level.

Foster parents who seek certification for therapeutic or treatment foster care receive additional training and support specifically tailored to serving children/youth with higher behavioral and mental health needs. Therapeutic foster care certification requires 12 additional hours of training in specific content related to mental health

diagnoses, behaviors, interventions, and other identified needs of the population(s) served. Treatment foster care certification requires 32 hours of training in the areas of:

- Trauma-informed care, including the impact of trauma, grief, and loss;
- Trauma-informed behavior management;
- Child/youth-specific content related to diagnoses, behaviors, and/or other identified needs;
- Intensive mental and behavioral health training;
- Confidentiality and cultural responsiveness; and
- Annual requirements for foster parents.

As with traditional foster certification, there is no statewide timeframe required for therapeutic foster parents to complete required training; however, counties and CPAs may set their own timeframe requirements that are not tracked at the State level. County departments and CPAs monitor completion of training requirements independent of State oversight.

Colorado's Senate Bill 24-008 allowed the state to promulgate rules for modified kinship foster care certification requirements in order to ease the process for kinship caregivers seeking certification, without compromising the safety of children/youth. DCW is in process of promulgating these rules, but has released a series of operational memos with interim kinship foster care certification guidance and requirements per the legislation. Until rules are promulgated, these memos outline the requirements for counties and CPAs who certify kinship foster care homes.

## Preferred Curricula

As a state-supervised, county-administered child welfare system, Colorado allows each certifying agency to establish their own training program as long as it meets the requirements outlined in Volume 7. Colorado has preferred training structures and curricula that are recommended but not required; these are described below. There is no statewide timeframe required for foster and adoptive parents to complete any of these training curricula; however, counties and CPAs may set their own timeframe requirements that are not tracked at the State level. County departments and CPAs monitor completion of all applicants' training requirements independent of State oversight.

## Foster and Adoptive Caregiver Certification Program[47]

Colorado's state recommended Foster and Adoptive Caregiver Certification Program is a 27.5-hour initial certification program for those who will be caring for a child/youth they do not know or have a relationship with. This certification program comprises three courses:

1. National Training and Development Curriculum (NTDC)
2. Mandatory Reporter Training
3. Safe Sleep: Creating Safe Sleep Environments for Infants

The National Training and Development Curriculum (NTDC) includes three seminar sessions over a period of one to three weeks (depending on scheduling), in addition to independent learning assignments including a self-assessment, course reading, and web-based training and videos. NTDC offers foster and adoptive caregivers relevant education around child development and behavior, trauma-responsive care, the importance of maintaining familial connections, and the role of foster parents in the child welfare system. NTDC is rated a Promising practice in the California Evidence-Based Clearinghouse, with a scientific rating of 3, with high relevance to the child welfare system.

In partnership with Spaulding, DCW implemented a statewide train-the-trainer program in CY 2024 designed to build the capacity of counties and CPAs to facilitate the training independently. Currently NTDC is available in English via the Learning Management System (LMS) through CWTS. Spaulding, collaborating with various states, released a Spanish version of the curriculum in February 2025. CWTS has incorporated this version and now offers NTDC in Spanish.

## Pressley Ridge

Colorado has adopted the Pressley Ridge Training and Model as the preferred training for treatment and therapeutic foster care certification. Pressley Ridge is an evidence- and competency-based program that is designed to help trainers and program managers ensure a high standard of excellence in services for children and youth in foster care and kinship care. This curriculum has been one of CDHS' two approved pre-service curriculums for all foster parents in the state, and is endorsed as a preferred curriculum for counties and agencies who are certifying and supporting therapeutic and treatment level youth. The Pressley Ridge curriculum is guided by a

---

[47] Foster and Adoptive Caregiver Certification Program

common treatment philosophy called Re-Education (Re-ED) that focuses on the strengths of each child and family and holds these beliefs:

- It is possible to teach competence;
- Change is possible; and
- The development of trusting relationships with caring, committed adults is the most significant factor in turning around the lives of seriously troubled children.

The Pressley Ridge training curriculum was initially provided to trainers and agencies in CY 2022. In CY 2024, DCW conducted two train-the-trainer cohorts for agencies implementing therapeutic and treatment foster care programs. As part of the state's capacity-building efforts, DCW's Learning and Development team has certified four individuals as master trainers who will deliver ongoing training across the state to ensure fidelity to the model, that training is up-to-date, and to provide technical assistance.

Should a county or CPA choose to use a different curriculum to certify therapeutic or treatment foster parents, they must submit an application to CDHS that includes the proposed curriculum. DCW grants approval for variation in curriculum provided the proposed curriculum meets the training requirements outlined in Volume 7.

### Kinship Caregiver Certification Program[48]

This certification program is offered to those caring for a child/youth they are related to or with whom they have a previous relationship who choose to become certified as a kinship foster care provider. The Kinship Caregiver Certification Program comprises six hours of training, including an introduction to kinship caregiving in Colorado, child development and the effects of trauma, family dynamics, and responding to children in crisis. The kinship training is available through the CWTS website in both English and Spanish to meet language accessibility requirements and to expand the population of kinship caregivers who can benefit from the training.

## Variations

As described, statewide requirements for foster and adoptive training include the number of training hours and approved content areas. However, while NTDC is the preferred curriculum for training new foster parents, DCW does not require this curriculum. Counties or CPAs may choose a different curriculum that better suits the needs of their specific communities, resulting in variations in the specific training

[48] Kinship Caregiver Certification Program

provided to foster parents across the state. This variation allows each governing body to select an appropriate curriculum that is most relevant to the families they certify and their communities. CDHS does not monitor the individual curricula used by each certifying agency; however adherence to training topic requirements is reviewed by the ARD through county-certified Foster Home Certification Reviews and by the Provider Services Unit (PSU) through CPA-certified foster home file reviews conducted during annual CPA licensing visits.

As noted above, counties and CPAs who choose to use a curriculum other than Pressley Ridge to certify therapeutic or treatment foster parents must submit an application to CDHS that includes the proposed curriculum. DCW grants approval for variation in curriculum provided the proposed curriculum meets the training requirements outlined in Volume 7.

## Ongoing Training Requirements for Foster and Adoptive Parents

To maintain certification, foster and adoptive parents are required to complete 20 hours of ongoing training annually that is applicable care for the children/youth populations served by the foster parent, including any increased or specialized training that may be needed.

DCW maintains a contract with several providers that offer training to support ongoing learning and development for foster and adoptive parents. In addition to supporting the initial training of foster and adoptive parents, CWTS provides a number of ongoing training offerings that are available as a mix of synchronous and asynchronous learning. Be the Source and Project 1.27 are two additional organizations that offer foster parent training on an ongoing basis. Additionally, CDHS contracts with Foster Parent College, an online training platform, to offer courses that aim to strengthen the skill sets, knowledge, expertise, and personal growth of these caregivers to meet the varied needs of the children and youth placed in their care.

CDHS does not monitor ongoing training requirements for every certified foster home in Colorado; however adherence to training topic and training hour requirements is reviewed by the ARD through county-certified Foster Home Certification Reviews and by the PSU through CPA-certified foster home file reviews conducted during annual CPA licensing visits. Should a foster family be out of compliance with ongoing training requirements, one of three options outlined in Volume 7 of the Colorado Code of Regulations (12 CCR 2509-6, Section 7.500.315B) may be explored:

- The recertification status may be approved as "pending" for a period of up to 15 days during which time the provider must come into compliance;

- The home may be put on a provisional license for up to 90 days during which time the provider must come into compliance; or
- The home may be closed.

## Variations

As previously noted, CDHS allows each certifying agency to establish their own training program as long as it meets the requirements outlined in state statute and Volume 7.

## Data and Evidence

Table 27 reflects the number of county-certified foster and adoptive caregivers reviewed by the ARD who were required to complete initial training during CYs 2023, 2024, and 2025 the percentage of those caregivers who did complete the training.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of county-certified providers reviewed (initial) | 242 | 245 | 260 |
| % of county-certified providers that completed core training[49] | 85% | 90% | 98% |
| % of county-certified providers that completed remaining pre-service training after core training[50] | 87% | 86% | 95% |

Table 27: ARD Completion Rates of Initial Foster/Adoptive Parent Training by CY.

Table 28 reflects the number of county-certified foster and adoptive caregivers reviewed by the ARD who were required to complete ongoing training during CYs 2023, 2024, and 2025 the percentage of those caregivers who did complete the training.

[49] The denominator for this measure includes the number of county-certified providers who underwent an initial review. The numerator includes the number of providers reviewed who completed 12 hours of required initial foster parent core training.
[50] The denominator for this measure includes the number of county-certified providers who underwent an initial review. The numerator includes the number of providers reviewed who completed core training, who also completed the 15 additional hours of required pre-service training.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of county-certified providers reviewed (ongoing) | 308 | 301 | 280 |
| % of county-certified providers that completed ongoing training as required[51] | 81% | 83% | 91% |

Table 28: ARD Completion Rates of Ongoing Foster/Adoptive Parent Training by CY.

A manual review of ROIs from CYs 2023 through 2025 was conducted to identify the number of CPAs that had violations related to foster parent training. This data is presented in Table 29. Violations may include insufficient training hours, missing required training topics, or expired training such as CPR/First Aid. This data includes both initial certification and ongoing/recertification requirements. Because the ROI is created by CPA, not by foster home, an ROI may include multiple violations and the data below indicates the number of CPAs with violations, not the total number of violations.

| [Data Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of licensed Foster Care CPAs overseen by the PSU | 38 | 36 | 35 |
| # of CPAs with foster parent training violations | 14 | 7 | 15 |
| % of CPAs in compliance with all foster parent training violations[52] | 63.16% | 80.34% | 57.14% |

Table 29: PSU CPA Training Compliance by CY.

## Training Effectiveness

In early 2026, DCW partnered with NCDR to host the three focus groups to gather direct, qualitative feedback from foster families with lived experience. The topics discussed during these focus groups included training, resources and supports that have been most helpful, and ideas for strengthening recruitment, preparation, and ongoing support for caregivers. A primary theme identified through these focus groups was the need for a network of other foster families with shared experiences to allow

[51] The denominator for this measure includes the number of county-certified providers who underwent a recertification review. The numerator includes the number of providers reviewed who completed a minimum of 20 hours of required ongoing foster parent training.
[52] The denominator for this measure includes the number of Foster Care CPAs overseen by the PSU. The numerator includes the number of CPAs who did not have a training violation observed during the calendar year.

peer-to-peer connection and support. However, formal results from these interviews are not yet available for reporting.

DCW is also in the process of developing a statewide survey for current and previous foster parents; this survey is anticipated to be distributed before the end of SFY 2026. DCW intends to utilize data from both initiatives to reform practice and to better support retention of current foster parents.

## Staff of State Licensed or Approved Facilities

For any direct child care staff, supervisor, clinical staff, case management staff, management, administrative staff, and director, the initial and ongoing training requirements are outlined in 12 CCR 2509-8; Sections 7.714.92 and 7.714.93. These rules require the following at initial hire for staff:

- Introductory training and orientation that includes emergency and safety procedures, professional boundaries, and the general and specific duties and responsibilities of the job completed within 30 days of hire.
- For staff with unsupervised contact with children, they must receive training within 90 days of hire:
  - Behavior management including positive behavior supports and appropriate discipline strategies for the population served according to a trauma-informed care model.
  - Administrative procedures and program goals.
  - De-escalation strategies to be used.
  - Child supervision based on the individual needs of the child.
  - Development and implementation of the child/youth plan.
  - Trauma-informed care model approved by the Department.
  - Confidentiality per the Health Insurance Portability and Accountability Act.
  - Mandatory reporter training.
  - Volume 7 rules and regulations training.
  - Recognizing if/when children have been victims of labor or sex trafficking and reporting to the hotline.
- Every 6 months and/or 2 times per training year:
  - Facility's emergency and safety procedures i.e. fire evacuation drills, disaster drills, etc.
  - Physical restraint
- Additional training requirements
  - QMAP
  - CPR/First Aid

    - 10 hours specialized training specific to the facility's stated purpose and children being served at the facility
    - 32 hours of annual training for facilities serving youth on CHRP waivers
- Colorado Provider Training Academy (CPTA) general training requirements in regulation
    - 40 hours of initial foundational certification within 90 days of employment
    - Staff hired before implementation of CPTA to complete 40 hours of initial foundational certification within 6 months of the implementation of the rules.
    - Supervisors receive 6 additional hours of supervisor certification program
    - Transfer of learning activities
    - Demonstrated competence through reflection, pre and post tests, trainer review, observation, and verification by CPTA staff
- CPTA modules/topics for initial training, including but not limited to:
    - Trauma-Informed v. Trauma-Ingrained
    - Self-Care
    - Needs and Resistance
    - I Generation
    - Limit Setting
    - Milieu Culture
    - Healthy Teams and Professionalism
    - ADA and Non-Discrimination
    - Foster Youth Bill of Rights
    - Working with IDD Youth and Developmental Stages
    - Healthy Sexuality
    - Mandatory Reporting
    - Volume 7 Rules
    - Critical Incident Reporting and Investigations
    - Naloxone Use
    - Human Trafficking
    - Suicide Prevention
    - Supervision of Youth in the Milieu
    - Milieu Management and Safety
    - Family Engagement and Aftercare
    - Lived Experience Panel
    - Supervisors
        - Attachment
        - Treatment Plans
        - Educational Stability of Children/Youth in Foster Care

- Treatment Plans
- Decision Making
- Developing Policies and Procedures
- CHRP Services
- Reasonable and Prudent Parenting

Currently, agencies and facilities monitor compliance with training requirements through their own internal systems. Some have contracts with programs that help to track their online training and progress toward completion, that the agency/facility will designate. Others have checklists that staff use to review policies and procedures and complete training with their supervisor as required. Through CPTA, all residential facilities will have the online modules and progress bars to ensure completion with initial and ongoing training requirements once the Academy is fully established and operational.

DCW's licensing and monitoring staff with PSU are responsible for the oversight of agencies and facilities' day-to-day operations, including their staff training compliance. Through these staff and regular audits, the PSU also ensures compliance with minimum training requirements as outlined in regulation and provides violations and required corrections should any staff come up short on their minimum required training. If a staff does not complete training requirements, depending upon the duties of their job, they would not be allowed unsupervised contact with children/youth, and the facility/agency will receive a violation for every training requirement missed with a requirement to correct it and ensure the staff member completes the required training.

## Colorado Provider Training Academy (CPTA)

DCW's Provider Services Unit (PSU) has developed the Colorado Provider Training Academy (CPTA) for all Residential Child Care Facility (RCCF), Qualified Residential Treatment Program (QRTP), and Psychiatric Residential Treatment Facility (PRTF) providers as required under C.R.S. 26-6-923(1). The CPTA is a collection of 40 hours of training housed in an Open Learning Management System (LMS) electronic platform similar to the Child Welfare Training System (CWTS) for caseworkers. It will include an online resource library with an updated collection of trauma-informed training, including appropriate interventions and treatment models, based on evidence and research. The initial and ongoing training are accessed through the Open LMS and tracked electronically. The established training curriculum consists of five units comprising a combination of webinars, lived expert panels, videos, quizzes, and live coaching sessions.

HB24-1038 and C.R.S. 26-6-923(2) required DCW to promulgate rules for the CPTA by September 15, 2025. Additionally, all staff in residential facilities (RCCF, QRTP, and PRTF) are statutorily required to complete the CPTA. The CPTA piloted in February 2025 with 38 facility staff and 10 CDHS staff. Following this pilot, DCW's goal was to pilot and implement the 40-hour Academy with 25% (approximately 200) of the state's approximately 800 Residential Child Care Facilities (RCCF, QRTP, and PRTF) staff by June 30, 2026. CDHS has met this goal, with 214 providers having started the training as of February 2026.

## Training Effectiveness

DCW's PSU finished developing the CPTA core 40-hour training in February 2026. As of March 2026, five facilities are going through the pilot. The CPTA team is developing a QA process to include pre and post surveys as well as 6 month check ins to identify if it has been effective at training and retaining staff at our residential facilities. Enhancements will be made as the pilot groups deliver feedback to the CPTA team about the current curriculum.

While the CPTA pilot initially began in February 2025 with 50 staff across 38 facilities, the pilot was paused until January 2026 when staff for the CPTA team were hired and trained. It is anticipated that five full facilities with around 250 staff will be completely trained in the entire curriculum by the end of SFY 2026, in alignment with Colorado's Wildly Important Goal (WIG) goal for the fiscal year.

Because the CPTA curriculum is newly-developed, DCW does not yet have data on the percentage of staff who are required to complete the initial training and their completion rates in the required timeframes per regulation. It is expected that the Open LMS system will be able to track completion rates and generate reports for future development and refinement of the curriculum, its delivery, and to ensure compliance with regulatory timeframes for completion.

Data is not yet available on how well the initial and/or ongoing training addresses the skills and knowledge needed to carry out the job duties of a residential staff. As the CPTA implementation continues, the residential staff who have started modules will be able to complete all 40 hours and consult with PSU CPTA staff specific to its effectiveness. The CPTA team plans to evaluate effectiveness through pre- and post-training surveys as well as check-ins with those staff 90 days and six months into their roles to determine the extent to which the content of the curriculum prepared the staff member for their functioning in the facility. Feedback will also be used to determine how CPTA modules and training content for new staff may be improved and any ongoing training modules that may need to be developed in the future. The CPTA

team anticipates being able to build out pre- and post-surveys as well as ongoing training modules during the next fiscal year.

## Variations

As of September 1, 2025, the regulations pertaining to the CPTA were promulgated into 12 CCR 2509-8, Sections 7.714.92 and 7.714.93.

Section 7.714.92 requires:

- policies for the initial and ongoing training of staff,
- documentation of appropriate training per position including:
    - timeframes for training,
    - additional training required, and
    - written documentation requirements for all in-service training.

Section 7.714.93 requires specific staff at the facility to complete the certification process through CPTA and the specific timelines, access, hours of training, additional training for supervisors, transfer of learning exercises, and demonstrations of competence required by the CPTA.

Because CPTA and its regulations are new to Colorado's providers and are in the initial pilot phase, PSU anticipates variations across the state until the CPTA is fully implemented statewide, and until CPTA's system functionality, including tracking, data reports, and effectiveness surveys, are live. Until the PSU CPTA staff are able to implement the CPTA with each RCCF, providers may continue to use their current training capacities and program. Because of this, there are likely to be variations in how training content is delivered statewide until all RCCF staff and their executive directors, boards of directors, and advisory committees have been onboarded to the CPTA. However, Colorado's minimum rules and regulations promulgated above set the foundation for all RCCFs to minimally comply with the CPTA and its respective training requirements as the initial implementation is rolled out. The PSU licensing team will be conducting annual audits of every RCCF specific to their adherence to Section 7.714.92 and Section 7.714.93 to ensure compliance with training regulations.

# Service Array and Resource Development

## Item 29: Array of Services

Colorado did not achieve substantial conformity with the Service Array and Resource Development systemic factor during Round 3 of the CFSR, and Item 29 was identified as an area needing improvement. Based on the information presented below and both recent and current efforts to improve the availability and accessibility of services statewide, Colorado believes that Item 29 is currently an area of strength.

Colorado's service array includes a range of services including those that:

- Assess the strengths and needs of children and families and determine other service needs;
- Address the needs of families in addition to individual children in order to create a safe home environment;
- Enable children to remain safely with their parents when reasonable; and
- Help children in foster and adoptive placements achieve permanency.

## Colorado Child Welfare Services Continuum

Services that address one or more of these categories fall into Colorado's child welfare services continuum, as outlined below.

### Prevention and Family Strengthening Services

Services in this category strengthen all families in Colorado and help prevent child maltreatment and child welfare system involvement. These services, supports, and dedicated funding streams include:

- Promoting Safe and Stable Families (PSSF)
- Family Resource Centers (FRC)
- Universal home visiting programs
- Colorado Fatherhood Program
- Universal Preschool
- Quality Childcare and Early Learning
- Colorado Child Care Assistance Program For Families (CCAP)
- Colorado Works/Temporary Assistance for Needy Families (TANF)
- Medicaid
- Housing Services and Supports
- Early Periodic Screening, Diagnosis, and Testing (EPSDT)

- Child Support
- Parenting Classes
- Support Groups
- Supplemental Nutrition Assistance Program (SNAP)

## Early Intervention and Family Preservation Services

Early intervention and family preservation services are designed to address the needs of families at risk or in crisis, to strengthen and stabilize families and prevent entry into out-of-home care. These services include:

- Family First Evidence-Based Services Array
- Core Services
- Kinship Supports
- Tony Grampsas Youth Services Program (described below)
- Home-Based Interventions
- Sexual Abuse Treatment
- Day Treatment
- Life Skills
- Intensive Family Therapy
- Behavioral Health Services
- Substance Abuse Treatment
- County-Designed Programs
- Special Economic Assistance (SEA)
- Child and Youth Mental Health Treatment Act (CYMHTA)
- Children's Habilitation Residential Program, Home and Community Based Services Waiver
- Aftercare Services

## Child Protective Services

Child Protective Services (CPS), housed within the Child Protection and Prevention Services Unit at the DCW, are where the assessments of allegations of suspected abuse and neglect as well as the provision of treatment services for children, youth and families are offered. Child protection services are provided to protect children whose physical, mental or emotional well-being is threatened by the actions of parents, legal guardians, custodians, or persons responsible for providing out-of-home care. These services include:

- Statewide Hotline
- Review, Evaluate, Direct (RED) Teams

- Differential Response (DR)
- Assessment of Safety
- Assessment of Risk
- Assessment of Family Strengths and Supports
- Dispositional Findings of Abuse and Neglect
- Family Engagement Strategies: Team Decision Making Meetings (TDM), Facilitated Family Engagement Meetings (FEM), and Family Group Conferences
- Safety Planning
- Support Planning
- Service Referral and Provisions
- Community-Based Services and Resources
- Core Services
- Human Trafficking Screening
- Collaborative Management Program
- County-Designed Programs

Youth in Conflict services reduce or eliminate conflicts between youth and their family members or the community when conflicts affect the youth's well-being, the normal functioning of the family, or the well-being of the community. Additional services may include:

- Chafee Foster Care Program for Successful Transition to Adulthood Services
- The Tony Grampsas Youth Services Program (TGYS)
- Housing Supports
- Employment Supports
- Educational Supports
- Youth Leadership Programs
- Foster Youth in Transition

## Foster Care Services

Foster care services are for the placement of children and youth in out-of-home care with services designed to meet the child's/youth's needs for safety, permanency and well-being. Higher levels of residential care focus on treatment services. Following are the components of Foster Care Services in place:

- Kinship Placement
- Kinship Foster Care
- General Foster Care
- Specialized Foster Care
    - Therapeutic Foster Care

    - Treatment Foster Care
    - Professional Foster Care
- Residential Child Care Facilities (RCCF)
- Specialized Group Facilities
    - Specialized Group Homes or Group Centers
    - Specialized Group Centers
- Qualified Residential Treatment Programs (QRTP)
- Psychiatric Residential Treatment Facilities (PRTF)
- Respite Services
- Interstate Compact on the Placement of Children (ICPC)

## Kinship Care Services

Kinship care services are for the placement of children and youth in out-of-home care with kin designed to meet the child's/youth's needs for safety, permanency and well-being and to support the kinship placement.

- Kinship Case Management Services
    - Coordination of Services
    - Strength-Based Support and Consultation
    - Benefits Navigation
- Kinship Support Services
    - Basic Needs/Hard Goods
    - Respite Care
    - Transportation
    - Therapeutic/Educational Needs (not covered elsewhere)
- Attendance at Family Meetings, Court and/or Individualized Education Program Meetings
- Kinship Navigator Programs
- Kinship Adoption Program

## Permanency Services

Permanency services determine and implement permanent plans for children and youth. The spectrum of permanency options organizes these services:

- Reunification with the Family of Origin
- Permanency with Relatives or Kin (Adoption or Guardianship)
- Permanency with Someone Other Than Kin (Adoption or Guardianship)
- Relative Guardianship Assistance
- Other Planned Permanency Living Arrangement (OPPLA) with Kin

- OPPLA with Someone Other Than Kin
- Permanency Roundtables
- Independent Living/Emancipation
- Expedited Permanency Planning (EPP)
- Reinstatement of Parental Rights

## Post-Permanency and Aftercare Services

Post-permanency and after-care services support permanent placements for children and youth and include:

- Post-Legal Adoption Services
- Reunification Services
- Relative Guardianship Assistance Program (RGAP)
- Chafee Foster Care Program for Successful Transition to Adulthood Services
- Core Services Program (including County Designed Programs)
- Kinship Caregiver Supports
- Adoption Assistance
- Family Unification Program (FUP) Vouchers for Youth
- Trauma-Informed/Evidence-Informed Trust Based Relational Intervention (TBRI) Training for families and professionals
- In-Home Coaching to assist TBRI-Trained families in successfully implementing the parenting model
- Implementation and Connection Groups on a regional basis to provide ongoing support, learning opportunities and natural points of connection for families
- Access to a pool of TBRI-trained families and/or individuals to provide respite care as needed for program participating families
- Online directory of mental health professionals available to offer crisis intervention and ongoing therapeutic services for families
- Resource navigation and referral for post-permanency families, and,
- Specialized in-person and web-based training for families and professionals.

# Availability of Services

Colorado's Child Welfare Core Services Program[53] was established in 1994 to provide strength-based resources and support to families when children and youth are at imminent risk of out-of-home placement, in need of services to return home, or to maintain a placement in the least restrictive setting possible. The program is

[53] Child Welfare Core Services Program

structured as a state-supervised, county-administered system with CDHS overseeing funding allocations and working with county staff to set policies and procedures.

The Core Services Program is based on a foundation of research and practice in family preservation. Family preservation services are defined in Colorado as assistance that focuses on a family's strengths and empowers a family by providing alternative problem-solving techniques and child-rearing practices, as well as promoting effective responses to stressful living situations for the family. Family preservation services are generally short-term services that may be provided for up to eighteen (18) months. These family-based services are designed to support families in crisis by improving parenting and family functioning while keeping children/youth safe. The Core Services Program includes ten designated types of family preservation services:

- Aftercare Services: Any of the Core Services provided to prepare a child for reunification with his/her family or other permanent placement and to prevent future out-of-home placement of the child.
- County-Designed Services: An optional service tailored by the specific county to meet the needs of families and children in the community to prevent the out-of-home placement of children or facilitate reunification or another form of permanence. County-designed services encompass components of the menu of Core Services, yet are structured in their delivery and tracked uniquely to gain detailed data on evidence-based programs, as well as programs that are providing positive outcomes in communities around the state.
- Day Treatment: Comprehensive, highly structured services that provide education to children and therapy to children and their families.
- Home-Based Intervention: Services provided primarily in the home of the client and include a variety of services, which can include therapeutic services, concrete services, collateral services, and crisis intervention directed to meet the needs of the child and family.
- Intensive Family Therapy: Therapeutic intervention typically with all family members to improve family communication, functioning, and relationships.
- Life Skills: Services provided primarily in the home that teach household management, effectively accessing community resources, parenting techniques, and family conflict management.
- Mental Health Services: Diagnostic and/or therapeutic services to assist in the development of the family services plan and to assess and/or improve family communication, functioning, and relationships.
- Sexual Abuse Treatment: Therapeutic intervention designed to address issues and behaviors related to sexual abuse victimization, sexual dysfunction, sexual abuse perpetration, and to prevent further sexual abuse and victimization.

- Special Economic Assistance: Emergency financial assistance of not more than $2,000 per family per year in the form of cash and/or vendor payment to purchase hard services.
- Substance Abuse Treatment: Diagnostic and/or therapeutic services to assist in the development of the family service plan, to assess and/or improve family communication, functioning, and relationships, and to prevent further abuse of drugs or alcohol.

To be eligible for Core Services, children, youth, and families must either:

- Meet Program Area 3 (PA3) eligibility criteria, or
- Meet the criteria for Program Area 4, 5, or 6 target group, and
    - Meet the Colorado out-of-home placement criteria at the time of each placement in any Core Services Program, and/or,
    - Require a more restrictive level of care but may be maintained at a less restrictive out-of-home placement or in his/her own home with Core services.

Colorado's county-administered, state-supervised system allows each county to select and contract with service providers they deem appropriate to meet their communities specific needs. County departments are responsible for their contracts with service providers, and are responsible for the monitoring and supervision of the services provided in their county. Each of Colorado's 64 counties develop and submit annual plans to address family preservation efforts through locally tailored strategies and services. Some of Colorado's smaller counties partner on these annual Core Plans; DCW received 60 total Core Plans for SFY 2026, with eight small counties pairing to submit dual-county plans. Pairing is often seen among rural or resource-sparse communities to ensure availability of services as needs arise. Core Plans are reviewed and approved annually by DCW's Core and Prevention Services team, who partners with each county to continuously assess and monitor the accessibility and availability of services in every jurisdiction across the state. Opportunities for providers and counties to collaborate with DCW staff are available throughout the year. These include ongoing open office hours, in-person county visits, and Core Services and Child Welfare Quarterly (Core Quarterly) meetings. These forums are designed to help identify and address service gaps and barriers, and highlight opportunities to ensure access to needed services across the state.

DCW's Core Quarterly meetings serve as a space for counties' Core administrators to learn about updates, ask questions, give and receive feedback, and problem-solve around prevention and Core services. Core Quarterly meetings are a critical avenue for DCW to assess and monitor the accessibility and availability of services across the

state by gaining firsthand understanding of the composition and unique needs of Colorado's counties.

The Core and Prevention Services Team also distributes a monthly Prevention and Core Services Newsletter to over 500 recipients, including county DHS directors, supervisors, and caseworkers statewide. This newsletter provides a monthly communication channel for counties that includes updates on prevention initiatives, Core services, and Family First implementation and features frequently asked questions DCW receives from counties regarding Core and prevention services.

In addition to the Core Quarterly meetings and monthly newsletter, DCW's Core and Prevention Services Team maintains a proactive and comprehensive support system for all counties through one-on-one consultation meetings upon counties' request. During these meetings, DCW staff deliver in-depth, county-specific support, information, and technical assistance that is relevant to the immediate and unique challenges, demographics, and priorities of the requesting county. Consultation meetings include key personnel, including directors, supervisors, and caseworkers, to collaboratively review strategies, troubleshoot implementation issues, discuss best practices, and offer guidance on complex case scenarios and program requirements. This direct, targeted engagement allows DCW to monitor the availability and accessibility of services in every jurisdiction, while enhancing the capacity of county staff to effectively implement prevention services and achieve better outcomes for families and children.

## Data and Evidence

The Core Services Program is evaluated annually by the CSU Social Work Research Center and evaluation reports are sent to the Colorado General Assembly, the Chief Justice of the Colorado Supreme Court, and the Governor. As mandated by C.R.S. 19-1-116, Core Services Coordinators from each county were asked to complete a web-based version of the Family Preservation Commission (FPC) Report in coordination with their FPC or Placement Alternative Commission (PAC) to provide context to the descriptive, outcome, and cost results for the Core Services evaluation. Coordinators were asked to respond to service availability, capacity, and accessibility barriers, workforce challenges and opportunities, prevention services opportunities, Core Services funding strategies, and the successes and challenges for delivery of the Core Services Program.

Table 30 reflects the availability, capacity, and accessibility of services in counties as reported in the Core Services Evaluation Reports for CYs 2022, 2023, and 2024. The denominator for these measures includes the number of counties that completed the

FPC Report during the year. The numerator includes the number of responses that indicated an answer aligned with the measures below.

| [Description] | CY 2022 | CY 2023 | CY 2024 |
|---|---|---|---|
| % of counties that reported that the availability of Core Services in their community was adequate to address the needs of children, youth, and families. | 55% | 68% | 59% |
| % of counties that reported that specific services needed in their county are not available. | 88% | 82% | 76% |
| % of counties that reported that the capacity of Core Services in their community was adequate to address the needs of children, youth, and families. | 38% | 48% | 49% |
| % of counties that reported that there was inadequate capacity for needed Core Services. | 40% | 75% | 75% |
| % of counties that reported that there are barriers to accessing needed services. | 28% | 78% | 88% |

Table 30: Core Service Availability, Capacity, and Accessibility by CY.

Overall, the rates of counties reporting that specific services are not available in their communities is decreasing, and the rates of counties reporting adequate capacity of Core Services in their communities is increasing. However, the rates of counties reporting inadequate capacity for specific service types and barriers to accessing needed services are increasing. Recent Evaluation Reports indicate that issues such as inadequate staffing and clinician turnover can cause longer waitlists that negatively impact the capacity of these Core Services at the county-level, especially for mountain communities.

Table 31 reflects the inadequate capacity of services by service type as reported in the Core Services Evaluation Reports for CYs 2022, 2023, and 2024. The denominator for these measures includes the number of counties that reported that the capacity of Core Services in their community was not adequate to address the needs of children, youth, and families during the CY. The numerator includes the number of responses that reported inadequate capacity for the following specific service types.

| Service Type | CY 2022 | CY 2023 | CY 2024 |
|---|---|---|---|
| County-Designed Services[54] | 25% | 18% | 18% |
| Day Treatment | 63% | 58% | 52% |
| Home-Based Intervention | 63% | 51% | 36% |
| Intensive Family Therapy | 46% | 51% | 45% |
| Life Skills | 38% | 44% | 30% |
| Mental Health Services | 79% | 69% | 64% |
| Sexual Abuse Treatment | 50% | 51% | 57% |
| Special Economic Assistance | 13% | 18% | 23% |
| Substance Abuse Treatment Services | 96% | 71% | 64% |
| Trama-Informed Services | 50% | 40% | 39% |

Table 31: Core Inadequate Capacity of Service Type by CY.

While reports of inadequate capacity for services such as day treatment, mental health services, and substance abuse treatment remain high, the reported rates of inadequate capacity are trending downward. Some of this trend may be related to additional providers being identified and trained as a result of the Colorado Department of Health Care Policy and Financing's (HCPF) work toward increasing availability and access of services throughout the state. HCPF's focus has included expanding and improving implementation of the Colorado System of Care (Intensive Behavioral Health Services) that include intensive in-home and community-based mental health services, intensive care coordination, mobile crisis intervention, and stabilization services.

The reported rates of inadequate capacity for special economic assistance and sexual abuse treatment during the past few years have been increasing; one factor contributing to increased need but inadequate capacity within special economic assistance is rising costs of living, including the cost of housing and utility payments. While increased costs often result in additional families seeking assistance through

[54] County-Designed Services in this report include Multisystemic Therapy, Functional Family Therapy, domestic violence services, family engagement meetings, Family Time, supervised and therapeutic visitation, coaching, mentoring, and/or culturally competent services.

special economic assistance, the increase in need does not have a corresponding increase in funds available.

In addition to the Core Services Program Evaluation Reports, DCW monitors the presence of service waitlists statewide through individual county communication. The most common example of this is when a county has identified a Medicaid-covered provider for a needed service that has a waitlist and a private-pay community service provider who may be paid through Core funds. While reports of waitlists have decreased since the COVID-19 pandemic, DCW has been informed of waitlists for mental health, substance abuse, and sexual abuse services across the state, particularly in rural communities. In Colorado's behavioral health system, Regional Accountable Entities (RAEs) are responsible for promoting health and well-being for Medicaid members by managing the capitated behavioral health benefit, establishing and supporting networks of providers, and coordinating medical and community-based services in their region. Behavioral Health Administrative Service Organizations (BHASOs) are contracted by Colorado's Behavioral Health Administration (BHA) to coordinate safety-net behavioral health services primarily for uninsured or underinsured individuals, with a focus on improving access and coordination. DCW partners with Colorado's RAEs and BHASOs for resource development when availability or accessibility is a concern.

Common themes in the barriers reported to service accessibility include clinician/therapist turnover and transportation, which were reported as a top barrier by over 80% of counties in CYs 2022 through 2024. Transportation remains a primary barrier in Colorado's rural communities, and counties often enact creative and community-specific approaches to mitigating transportation concerns. These may include county staff and other providers offering transportation to families, providing gas cards or vouchers for families driving long distances to reach a provider, or utilizing monetary resources such as special economic assistance. Many counties also refer clients to virtual services when possible if transportation is a barrier for a family.

Table 32 reflects the percentage of Core Service involvements that were open by county size by CY. The denominator includes the total open Core Service involvements as reported in the Core Services Evaluation Reports for CYs 2022, 2023, and 2024. The numerator includes the number of involvements that were open in the counties designated as large, medium, or small[55] by CWTS.

[55] County Size Map

| [Description] | CY 2022 | CY 2023 | CY 2024 |
|---|---|---|---|
| Statewide Total | 21,092 | 19,860 | 18,056 |
| Large County | 81.80% | 81.82% | 80.70% |
| Medium County | 14.04% | 14.24% | 15.40% |
| Small County | 4.16% | 3.94% | 3.90% |

Table 32: Core Service Involvements by County Size by CY.

The data reflects that approximately four out of five clients receiving a Core Service reside in one of Colorado's large counties, further demonstrating a lower rate of service accessibility in Colorado's rural regions.

## Stakeholder Feedback: Service Array

Four focus group discussions were held with youth and caregivers with lived experience in Colorado's child welfare system regarding their perceptions and experiences with Colorado's Service Array. Additionally, four stakeholder interview discussions were held to gather feedback from legal partners and community service providers regarding their perceptions on Colorado's Service Array.

Feedback received highlighted Colorado's need for additional placement and community-based resources for youth with highly acute needs. A lack of placement options was noted for older teens in general, particularly beyond the Front Range. Caregivers also expressed a need for additional respite services, especially for caregivers supporting youth with highly acute needs.

Some stakeholders reported that waitlists were historically a barrier to service availability but that this barrier has decreased in recent years. Other stakeholders reported that waitlists remain a barrier for specific services, including substance use and sex offender treatment, and that when professionals refer to trusted providers, the need can exceed the capacity causing these providers to maintain waitlists.

One common theme across stakeholders is that lived experts are not always aware of what services are available to them. In particular, foster and adoptive caregivers reported a lack of proactive crisis services referrals, noting a significant coordination burden on caregivers when crises arise. Youth reported not being aware of different types of therapy or mentorship available to them, which also relates to their engagement in treatment plan development as described in Item 20. Service providers also reported that child welfare staff may not have awareness of culturally

appropriate services within their county, and that some clients are left to identify these services and self-refer.

Availability of family time services was also raised as a point of concern. Stakeholders noted that family time is not offered as liberally as it could be, potentially due to county staff capacity limitations or lack of contracted providers. One service provider also noted a lack of resources that support sibling relationships outside of family time services, particularly for siblings who are described as having a “trauma bond.” It was also noted that children born after a case opens may not have access to their siblings if they are not a party to the case.

Timeliness of services was raised as a concern regarding service accessibility. As noted in Item 20, stakeholders noted that the treatment plan is typically not developed until after adjudication, which may delay clients from accessing needed services in the interim. Additionally, service providers and lived experts reported that communication delays between child welfare staff and clients or child welfare staff and service providers impacts the timeliness of client access. Finally, clients reported that dual-system-involvement can cause delays to service coordination when system partners do not collaborate efficiently or come to agreement on what services are required and who is responsible for coordination. This was particularly noted for children/youth who have dual involvement with the child welfare and juvenile justice systems.

Additional barriers to clients accessing services include logistical barriers such as transportation. In addition to transportation as a barrier in rural communities, stakeholders reported that transportation can pose a barrier for children/youth who may require additional supervision in a vehicle setting or when placement providers are unable to provide transportation. Stakeholders also reported that scheduling barriers are frequent and that service providers may not be able to accommodate clients’ scheduling needs. This was raised as a concern for children/youth who are required to miss school to attend services and for caregivers who must either miss work to attend services or do not have flexibility in their work schedule and cannot access services.

## Variances

There is significant variance in the availability of Core services across Colorado, particularly between densely populated urban areas and sparsely populated rural and frontier communities. The Denver Metro area currently possesses the most comprehensive array of Core services, while rural and frontier communities are most acutely impacted by a lack of available services. Counties situated in Colorado’s

Eastern Plains and the Western Slope are frequently described as "resource deserts," characterized by scarcity of necessary infrastructure, specialized professionals, and established service providers. Furthermore, geographic inaccessibility becomes a barrier to services that are otherwise available, with long travel distances and limited public transportation making regular access impractical or impossible for many.

To combat this challenge and address the varying needs of Colorado’s distinct regions, County-Designed services have emerged as a critical, localized strategy. These services allow individual counties to tailor prevention and support programs specifically to the unique demographic, geographic, and economic realities of their jurisdictions. County-Designed services are further described under Item 30: Individualizing Services.

## Placement Resources

As of January 2026, Colorado’s out-of-home placement continuum includes the following licensed agencies and facilities:

- 10 Child Placement Agencies - Adoption (CPAAD)
- 40 Child Placement Agencies - Foster Care (CPAFH)
    - 88 Treatment and Therapeutic Foster Care Homes
- 49 Day Treatment Facilities (DT)
- 29 Specialized Group Homes/Group Centers (SGF)
- 2 Homeless Youth Shelters (HYS)
- 4 Psychiatric Residential Treatment Facilities (PRTFs)
- 20 Qualified Residential Treatment Programs (QRTPs)
- 53 Residential Child Care Facilities (RCCFs)

As of November 2025, Colorado had 482 county-licensed traditional foster family homes and 794 county-licensed kinship foster care homes. At this time, there were 982 CPA-certified traditional foster family homes and 95 CPA-certified kinship foster care homes.

Despite the Colorado’s many available placement resources, the state is lacking placement resources for the following specialized needs:

- Survivors of Sex Trafficking and Human Trafficking
- Mutual Care
- Youth Stepping Down from Detention
- Substance Use Disorder
- Dual Diagnosis and Co-Morbidity

Additionally, among the currently licensed placement resources, there are often waitlists for PRTFs, QRTPs, and at times, specialized foster care homes due to the need being greater than the available resources.

As a part of Colorado's Governor's Wildly Important Goal (WIG) focused on youth with high acuity needs, DCW has been working to expand placement resources and the quality of the placement resources since 2023. Between June 2023 and December 2025, DCW has seen:

- Growth of 171 specialized foster care beds
- Licensure of two QRTPs
- Expansion of DT and SGF
- Working with two PRTFs who will be opening in Summer/Fall 2026
- Build of the 40-Hour Colorado Provider Training Academy (CPTA) for residential staff currently being implemented with 200 RCCF/QRTP/PRTF staff
- Expansion of QRTP contracted beds that the state manages intake/discharges for
- A decrease in the average length of stay for children and youth in county office and hotel settings from 18 days in 2024 to 11 days in 2025.

Further reporting on this WIG can be found in the "Staff of State Licensed or Approved Facilities" section of Item 28: Foster and Adoptive Parent Training within this Statewide Assessment and in Colorado's Annual Progress and Services Reports.

# Item 30: Individualizing Services

Colorado did not achieve substantial conformity with the Service Array and Resource Development systemic factor during Round 3 of the CFSR, and Item 30 was identified as an area needing improvement. Based on the information and stakeholder feedback below, Colorado believes that Item 30 is currently an area needing improvement.

Colorado's Child Welfare Core Services Program combines the consistency of centralized state administrative oversight with the flexibility and accountability of a county-run system to individualize services that meet the complex and varying needs of children, youth, and families across Colorado's many regions and communities. Findings from recent CSU Social Work Research Center evaluation reports support the Core Services Program as an effective approach to meeting clients' individualized needs and strengthening families by keeping or returning children/youth home or in the least restrictive setting while maintaining safety. Table 33 reflects the program outcomes as reported in the Core Services Evaluation Reports for CYs 2022, 2023, and 2024.

| [Description] | CY 2022 | CY 2023 | CY 2024 |
|---|---|---|---|
| # of total service episodes open during CY | 27,856 | 25,285 | 23,871 |
| % of children/youth who received prevention services that remained home | 99% | 99% | 99% |
| % of all service episodes determined to be "successful" or "partially successful" | 71% | 68% | 70% |
| % of PA3 (prevention) service episodes determined to be "successful" or "partially successful" | 88% | 93% | 91% |
| % of children/youth who attained their service goal | 81% | 77% | 78% |
| % of children/youth who received a Core Service through a case that closed in the prior CY that had a subsequent assessment | 30% | 31% | 31% |
| % of children/youth who received a Core Service through a case that closed in the prior CY that had a subsequent case | 9% | 10% | 9% |
| % of children/youth who received a Core Service through a case that closed in the prior CY that had a subsequent placement | 3% | 3% | 4% |

Table 33: Core Service Program Evaluation Outcomes by CY

The data shows that prevention services through Colorado's Core Services Program are particularly individualized to children and families' needs, with almost all children/youth who received these services remaining home and about nine out of 10 services found to be successful or partially successful. Additionally, the rate of subsequent child welfare cases and placements for children and youth who previously received a Core Service remains low; according to the Core Services Evaluation Reports for CYs 2022, 2023, and 2024, between 3-4% of children/youth who received Core Services during their open case had a subsequent placement in the year following their case closure. This rate is lower than Colorado's statewide reentry to foster care rate of 8.9% reflected in Colorado's August 2025 State Data Profile (Appendix A). This demonstrates that the services received by children and youth are targeted to the individual needs of the client and their family and reduce their risk of future involvement.

The individualization of services to clients' specific needs is achieved through a system of checks and balances involving the county department, the service provider,

and the RAE or BHASO. When a county refers a client to a service, the service provider utilizes an intake or assessment process to determine which service type is clinically indicated to meet the client's individual needs. The county then has a responsibility to identify a provider (either the same provider who completed the assessment or a different provider) who can provide the recommended service and to enter a service authorization for the recommended service using the correct funding stream. Prior to approving funding, the regional RAE or BHASO determines whether the service is necessary for the specific client; when the RAE or BHASO approves funding, this indicates that they agree with the provider and county department that the service is necessary. All of the partners in this process have a role in ensuring the appropriate service to meet the need is provided.

## Population Needs and Characteristics

Colorado's Core Services program offers services that meet a variety of unique needs. Table 34 reflects the total number of distinct clients served through Core Services and the percentage of clients accessing each service type during CYs 2022, 2023, and 2024. The denominator for these measures includes the total number of Core Service episodes open during the CY. The numerator includes the number of service episodes open for each service type.

| Service Type | CY 2022 | CY 2023 | CY 2024 |
|---|---|---|---|
| All Core Services | 20,965 | 19,735 | 17,930 |
| County-Designed Services[56] | 35.5% | 35.4% | 35.0% |
| Day Treatment | 0.3% | 0.2% | 0.3% |
| Home-Based Intervention | 5.4% | 5.5% | 5.0% |
| Intensive Family Therapy | 8.7% | 7.7% | 8.6% |
| Life Skills | 13.9% | 14.6% | 15.5% |
| Mental Health Services | 14.4% | 12.7% | 12.0% |
| Sexual Abuse Treatment | 1.8% | 1.4% | 1.2% |
| Special Economic Assistance | 10.3% | 12.8% | 13.9% |
| Substance Abuse Treatment Services | 9.8% | 9.6% | 8.5% |

Table 34: Core Service Types Accessed by CY.

County-designed services remains the most frequent service type utilized by child welfare clients, with over one third of all individuals accessing Core Services during CYs 2022 through 2024 accessing a county-designed service. As noted in Item 29, county-designed services are an optional service type that allows counties to meet the specific needs of families and children in their communities in order to prevent the out-of-home placement of children or to support reunification or another permanency goal. County-designed services are inherently individualized to the specific community, and may be further individualized to meet the needs at the client level.

Following county-designed services, the most-utilized Core Service types are life skills, mental health services, and special economic assistance. These service types may be correlated with needs such as lack of parenting education or resources, family conflict, diagnosed mental illnesses, and financial hardship.

[56] County-Designed Services in this report include Multisystemic Therapy, Functional Family Therapy, domestic violence services, family engagement meetings, Family Time, supervised and therapeutic visitation, coaching, mentoring, and/or culturally competent services.

Data regarding the unique needs of children/youth in care for FFYs 2023, 2024, and 2025 as documented in the Trails client Health Passport are presented in Table 35. The child count includes children/youth who had an open child welfare involvement for one or more days during the year under Program Area 4 (Youth in Conflict), Program Area 5 (Children in Need of Protection), or Program Area 6 (Specialized Services, only including children/youth who are legally free but do not yet have a finalized adoption). The mental diagnosis and Intellectual and Developmental Disability (IDD) characteristics include data from risk and safety assessments and removal reasons, represented by individual client count.

| [Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| Child Count | 14,469 | 13,134 | 12,081 |
| Language Other than English | 328 | 337 | 392 |
| Client Needs Translator | 46 | 44 | 37 |
| Mental Diagnosis | 547 | 477 | 378 |
| IDD | 1550 | 1439 | 1326 |
| Autism | 239 | 223 | 218 |

Table 35: Trails Unique Needs of Children/Youth by FFY.

Because these characteristics are not required to be documented in Trails, the data above is likely underreported. The data comprises information entered by child welfare workers who either know this information because of client disclosure or make an assumption about the characteristic and subsequently document the information.

Parent information for the above characteristics is not reportable through Trails due to parents' client file not including a Health Passport. Reportable data from these areas most often represents data entered for the parent if they had previous child welfare involvement as a child/youth and is not representative of current parent characteristics. While unique needs of parents may be documented in contact notes, these are not reportable statewide.

Data regarding unique family needs as documented in completed risk and safety assessments for FFYs 2023, 2024, and 2025 are presented in Table 36. The parent count for each FFY includes the parents (biological, adoptive, and legal) of the child population defined above, excluding parents who cannot be located despite monthly efforts to locate, parents who are deceased, and parents whose rights are terminated or relinquished. The case count includes the total number of cases open under

Program Area 4 (Youth in Conflict), Program Area 5 (Children in Need of Protection), or Program Area 6 (Specialized Services, only including children/youth who are legally free but do not yet have a finalized adoption). The characteristic counts are based on completed risk assessments and therefore are represented at the case level rather than the parent or child/youth client level.

| [Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| Parent Count | 13,996 | 12,702 | 11,716 |
| Case Count | 7,222 | 6,791 | 6,410 |
| Caregiver has previous mental health concern | 3,406 | 3,170 | 3,031 |
| Presence of domestic violence | 2,211 | 2,031 | 1,966 |
| Caregiver substance use | 4,180 | 3,911 | 3,631 |
| Housing issue | 2,139 | 2,129 | 2,060 |
| Child mental or behavioral health issue | 3,012 | 2,930 | 2,773 |
| Child physical disability | 2,587 | 2,449 | 2,363 |

Table 36: Trails Unique Needs of Families by FFY.

According to recent Core Services Program Evaluation Reports, lack of bilingual providers has remained a commonly reported barrier to clients ability to access individualized services. During CYs 2022, 2023, and 2024, Core Services Coordinators reported that families with a first language other than English were less likely to be able to access local, in-person care. To mitigate these concerns, most counties reported referring clients to multi-lingual and multi-cultural providers (in-person or virtual) and translation services, many of which are available by phone.

## Stakeholder Feedback: Individualization of Services

Four focus group discussions were held with youth and caregivers with lived experience in Colorado’s child welfare system regarding their perceptions and experiences with Colorado’s Service Array. Additionally, four stakeholder interview discussions were held to gather feedback from legal partners and community service providers regarding their perceptions on Colorado’s Service Array.

Stakeholders noted challenges to individualizing services for specific populations, such as older youth, individuals with disabilities, and Native individuals. Stakeholders reported that there are limited foster placements for older youth, creating a small pool of placement options that may not be an individualized fit for the youth needing

placement. Stakeholders also reported that individuals with disabilities or special needs may be placed in generalized services that are not a good fit for the client, such as group therapy in which the client does not view other participants as their peers. Service providers noted that culturally appropriate services may be limited for certain service types, such as sobriety programs that are often generalized and not specific to the client's cultural needs.

Stakeholders also reported underutilized resources, such as Medicaid Care Coordinators or county Utilization Managers that can support caregivers in navigating the system of care. Some caregivers reported these roles to be the most supportive to their needs, while other caregivers were not aware of this resource. Similarly, stakeholders noted that it is difficult for clients to feel that services are individualized to their needs when they are not aware of what services are available or engaged in determining which services they want to participate in. Some lived experts reported feeling like they were "checking a box" by engaging in services assigned by the county, rather than participating in service selection.

Lived experts also noted a lack of service individualization across sibling groups. Some youth reported receiving the same services as their sibling(s), while noting that they had different needs. One parent reported believing that the department focused on their children as a sibling group rather than individual children. The parent expressed belief that some of their children could have returned home safely while others remained in out-of-home care but that this was not explored.

Stakeholders praised Colorado's Foster Youth in Transition services, with youth expressing being consulted as a participant in decision-making and a focus on their individualized needs. Service providers also reported that when they are utilized, culturally appropriate services (including Colorado's two ICWA Courts) are effective in meeting clients needs and drive positive outcomes for children, youth, and families.

## Flexible funding

Colorado provides all 64 county child welfare agencies with three block allocations to finance their activities and services:

- Child Welfare Services Block
- Family and Children's Programs Block
- Child Welfare Staffing Block

Each of these block allocations are described below.

## Child Welfare Services Block

This allocation, often referred to as the "child welfare block," is a critical component of state and local funding for child welfare systems. It represents the largest of the three block allocations and offers the greatest flexibility regarding utilization criteria. The Child Welfare block is multifaceted, allowing jurisdictions to address a broad range of operational and service needs within the child welfare continuum. Examples include:

- Administrative requirements at the county level such as staff training;
- Out-of-home care placements — such as foster care, group homes, or residential treatment facilities — that are not otherwise covered by federal sources (like Medicaid) or private insurance held by the child's family, and address a broad spectrum of child welfare-related services and activities;
- A comprehensive array of preventative, protective, and rehabilitative services as identified and driven by community needs.

The expansive scope of the Child Welfare Services block enables local child welfare agencies the ability to customize their service array to meet the unique and evolving needs of vulnerable children and families in their communities.

## Family and Children’s Programs Block

The Family and Children’s Programs Block is also known as “Core Services,” described under Item 29: Array of Services, and is a statutorily mandated program for children and their families who qualify for family preservation services. The legislative authorization mandates that specific services are accessible statewide. However, the program maintains flexibility at the local level, allowing each county to operate the Core Services Program in ways that address the unique needs of children, youth, and families in their community as well as according to their yearly allocation. There are ten areas of service required by statute, detailed in Item 29.

## Child Welfare Staffing Block

This allocation represents a dedicated funding mechanism established to empower counties with the resources necessary to hire additional child welfare personnel. The genesis of this block dates back to 2015, following the completion of a comprehensive statewide workload study. This critical study provided concrete evidence that the existing child welfare system was severely understaffed, concluding that the state urgently required hundreds of new caseworkers to manage caseloads effectively and ensure timely, quality service delivery to vulnerable children and families.

The creation of the Staffing block was a direct legislative and administrative response to the study's findings, acknowledging that overburdened staff leads to compromised case management, increased burnout, and potentially detrimental outcomes for families in the system. By providing targeted funding, the state aimed to alleviate unmanageable caseloads, improve staff retention, and enhance the overall capacity of county-level child protective services to meet mandated safety and permanency goals. This block is an essential component of the state's strategy to stabilize the child welfare workforce and invest in the human capital required to sustain a responsive and effective child safety net.

# Agency Responsiveness to the Community

## Item 31: State Engagement and Consultation With Stakeholders Pursuant to CFSP and APSR

Colorado achieved substantial conformity with the Agency Responsiveness to the Community systemic factor during Round 3 of the CFSR, and Item 31 was identified as a strength. Based on the information presented below and continued improvements in recent years, Colorado believes that Item 31 is currently an area of strength.

### Ongoing Consultation With External Representatives

CDHS believes that collaboration with stakeholders is critical to promoting positive outcomes for the children and families served by Colorado's child welfare system, and therefore strives to engage stakeholders with varying perspectives in the implementation of the provisions of the Child and Family Services Plan (CFSP) and the development of related Annual Progress and Services Reports (APSRs). These stakeholders include those with lived experience, county departments of human services, State agencies, legal and judicial partners, and Tribal partners. Colorado's 2025-2029 Child and Family Services Plan summarizes CDHS' major collaborations, and additional information about program-specific collaborations is documented in relevant sections throughout this report. CDHS leads many collaborative committees and work groups to solicit community feedback about its programs and initiatives, identify gaps in services, and support the development of solutions to improve the lives of Colorado's children and families; several examples are described below.

#### Policy Advisory Committee (PAC) and Child Welfare Sub-PAC

One of CDHS' formal stakeholdering processes is the CDHS Policy Advisory Committee (PAC), whose primary responsibility is to develop and present draft program policies to be adopted by Colorado's State Board of Human Services and written into the Code of Colorado Regulations. The Child Welfare Sub-PAC brings together state and county human services leaders to collaboratively develop human services policies that improve practice, the delivery of services, and outcomes for children/youth, families, and adults across the state of Colorado. Task Groups formed by the Child Welfare Sub-PAC comprise stakeholders from a variety of backgrounds and are the mechanism through which rule revisions and proposals are drafted. The Child Welfare Sub-PAC has many such task groups, including but not limited to:

- Administrative Review Division Steering Committee
- Child Protection Task Group
- Child Welfare & Domestic Violence Task Group
- Child Welfare Prevention Task Group
- Child Welfare Training Steering Committee
- Colorado Trails User Group
- Institutional Abuse Review Team
- Permanency Task Group
- Substance Use Disorder/Exposed Newborn Workgroup

## CDHS Memo Series

CDHS' Memo Series is another way that stakeholders are engaged in the provision of child welfare services. The Memo Series is designed to streamline and clarify CDHS policies and expectations of county partners and contracted entities. There are two types of memos:

- Operation Memos: Provide specific guidance to counties or other state designated agencies, where applicable, on how to operationalize or apply a state or federal law, federal regulation, or state rule. These memos neither expand such obligations nor create new obligations. These memos may also be used to inform stakeholders how the department will measure performance compliance.
- Information Memos: Provide important information for counties or other state designated agencies that is strictly informational and timely. Examples include announcements of grants that counties may apply for, posting of a Request for Proposal, a cancelled webinar or training, etc.

In addition to publicizing existing engagement opportunities such as task groups and workgroups, the Memo Series is one mechanism through which CDHS reports back to stakeholders on changes to policy or practice resulting from the stakeholder engagement process.

## State-Level Collaborative Councils

CDHS leads and participates in several councils aimed to elevate and involve the voices of individuals with lived systems experience into programs and service delivery. Several examples are described below.

The CDHS Family Voice Council[57] (FVC) is made up of people who have been involved with, or are currently engaged in, two or more CDHS services or programs. Current FVC members and alumni continue to inform and guide the Department's efforts. Recent FVC efforts are detailed in Colorado's APSRs and are a critical avenue for CDHS to gather feedback from individuals involved with multiple services or systems.

DCW's Child Welfare Family Advisory Council[58] (FAC) was created in 2022 to include family voices and those with lived experience in providing feedback on DCW's work. This includes planning, policies, and procedures to improve the design and delivery of high-quality child welfare services to the youth and families in Colorado. FAC members' personal experience with the child welfare system includes youth formerly involved in the child welfare system, biological parents involved in the child welfare system, kinship or family providing certified and non-certified out-of-home care, and foster and adoptive parents. Beginning in January 2025, FAC members were invited to join Child Welfare Sub-PAC subgroups to ensure that the voices of those with lived experience are included in recommendations to the Child Welfare Sub-PAC.

The Reimagining Child Welfare Steering Committee[59] is a multi-year project to transform Colorado's child welfare system into a system that supports and uplifts families rather than inadvertently causing harm or relying on family separation as a means to provide safety for children. The Steering Committee, comprising lived experts, child welfare professionals, organizations serving children, youth, and families, and other community members, creates actionable solutions by listening to and learning from Coloradans who have been involved in Colorado's child welfare system and are committed to collaborating for positive change. The Steering Committee's primary goals include:

- Building Lived Expertise into public and other systems such as public health, education, early childhood, human services, courts, etc. to inform policy and practice changes and innovation.
- Designing and piloting community-based prevention resource "warm lines" as an alternative to the child welfare hotline.
- Development of a Parent Handbook so that every parent, caregiver, and child can have a better understanding of how Colorado's child welfare system works when they become involved.

The Colorado Foster Youth Successful Transition to Adulthood Grant Program ("State Grant Program") Advisory Board was created through HB21-1094: Foster Youth In

57 CDHS Family Voice Council

58 Child Welfare Family Advisory Council

59 Reimagining Child Welfare Steering Committee

Transition Program to guide decisions on the State Grant Program, and has also been utilized to provide recommendations on the implementation of SB23-082: Colorado Fostering Success Voucher Program. This Advisory Board includes representation from county departments of human services, runaway and homeless youth providers, youth with lived experience, the Colorado Workforce Development Council, the Colorado Department of Higher Education, and CDHS.

Additionally, CDHS coordinates the quarterly Colorado Youth Leadership Network, which comprises staff members from Youth Advisory Boards (YABs) across Colorado and other community-based youth-serving agencies, to collaborate on youth voice and engagement opportunities, including speaking and panel opportunities. The DCW also solicits feedback from YABs on policy and practice issues that impact youth, in addition to the evaluation of annual Chafee plans.

## Coordination with County Departments of Human Services

As a state-supervised, county-administered child welfare system, each of Colorado's 64 counties is responsible for the delivery of child welfare services within their jurisdiction. In addition to administering services, CDHS engages county departments of human services in the statewide implementation of several child welfare programs. For example, counties are engaged in the implementation of the Chafee program through Chafee Quarterly stakeholder meetings, at which DCW presents on National Youth in Transition Database (NYTD) data to ensure feedback collected directly from youth is shared with the professionals who directly support the youth. Counties are also engaged in annual Chafee reporting to identify strengths of the program and barriers encountered across the state, and DCW shares finalized changes to the Chafee program that are made based on NYTD data or agency feedback at the stakeholder meetings to ensure that the feedback loop is completed.

### The Colorado Human Services Directors Association (CHSDA)[60]

The CHSDA is a non-profit association representing the human/social services directors from all of Colorado's 64 counties. CHSDA works under the authority and direction of Colorado's Boards of County Commissioners and brings together human services directors from each of Colorado's counties to advance the well-being and self-sufficiency of individuals, families, and communities. The association's core functions are three-fold: developing and enhancing opportunities and resources to serve the needs of CHSDA members; advocating for proactive policy, regulatory, and

---

[60] Colorado Human Services Directors Association

statutory changes that support individuals and families; and driving innovation in Colorado's human service delivery system. CDHS and CHSDA work closely together through various task groups and committees to develop policy and advance best practices for child welfare, specifically the CDHS Policy Advisory Committee and the Child Welfare Allocation Committee.

## DCW County Intermediaries

To provide support to counties and increase consistency in practice across the state, each county in Colorado has an assigned County Intermediary (CI) within DCW who serves as a single point of contact for county staff to receive state information regarding statute, policy, and practice. DCW's Specialized Response Team (SRT) was established in 2020 to provide enhanced support for all counties and their assigned CIs and to ensure that communications are aligned between the state and county agencies.

CIs are expected to have, at minimum, monthly contact with their assigned counties and quarterly in-person visits to strengthen relationships and engagement. The SRT develops a monthly agenda for all CIs to use in their monthly contacts, which ensures a consistent baseline of items discussed with each county. In addition to high priority items requiring discussion and engagement, the CI monthly agenda includes crucial feedback opportunities including surveys distributed by DCW's Subject Matter Experts (SMEs) and stakeholder feedback sessions held by Child Welfare Sub-PAC task groups. When counties provide real-time feedback during their monthly meeting with their CI, the CI is expected to share this feedback with the appropriate SME or task group. SMEs are ultimately responsible for tracking the feedback loop for items that fall within their purview, and DCW's Child Welfare Leadership Team tracks feedback across all program areas. Additionally, counties are encouraged to share their feedback with the Colorado Human Services Directors Association (CHSDA) on items that may lead to practice or policy change.

# Judicial and Legal Partners

The Guided Reference in Dependency (GRID) is Colorado's comprehensive guide to the legal landscape governing dependency and neglect cases and offers best practices for child welfare attorneys. The GRID covers the important stages of a dependency and neglect case by providing the relevant black-letter law, statutes, seminal cases, checklists of activities, and considerations for each hearing type. It also contains detailed fact sheets highlighting substantive issues arising in dependency and neglect cases. As a complete reference guide for guardians ad litem (GALs), counsel for youth (CFY), and respondent parent counsel (RPC), the GRID is utilized and updated

regularly by the Colorado Office of the Child's Representative (OCR) and Colorado Office of Respondent Parents' Counsel (ORPC) intended to improve high-quality legal representation in dependency and neglect cases in Colorado.

CDHS collaborates with the Court Improvement Program, the OCR, and the ORPC, all of which are further described below. These agencies meet at minimum quarterly to discuss challenges, opportunities for improvements, and successes.

## Court Improvement Program (CIP)

The Colorado Department of Human Services has a long history of collaborating with the Court Improvement Program (CIP). During SFY 2025, DCW's Division Director joined the CIP Committee as CDHS' representative. DCW continues to partner with the CIP to provide training throughout the year, particularly on legislative changes that impact the courts. Those trainings are documented in more detail in the annual CIP Self-Assessment, which is submitted separately to the Children's Bureau.

## Colorado Office of the Child's Representative (OCR)[61]

The Colorado Office of the Child's Representative (OCR) was created by the General Assembly in 2000 to provide competent and effective legal representation to children and youth involved in judicial proceedings in Colorado by establishing minimum practice standards and providing litigation support, accessible high-quality statewide training, and oversight of the practice. The OCR oversees attorneys that provide legal representation through different roles, including Guardians ad Litem, Counsel for Youth, and Child's Legal Representative. CDHS entered into a memorandum of understanding (MOU) with the OCR several years ago to draw down Title IV-E legal reimbursement funds to support high-quality legal advocacy for children/youth involved in Colorado's child welfare system. CDHS and OCR have regular meetings to update existing MOUs and processes related to the reimbursements.

### OCR Lived Experts Action Panel (LEAP)

OCR's LEAP began in 2021 and comprises young adults with lived experience in Dependency and Neglect, Foster Youth in Transition Program, juvenile justice, and/or truancy proceedings. The goals of the LEAP are to provide these young adults with opportunities to:

- Share experiences, feedback, and ideas about OCR attorneys and court with supportive peers and adults;

[61] Colorado Office of the Child's Representative

- Grow personal and professional networks;
- Learn about topics they want to learn about, as well as what OCR does and what OCR attorneys do;
- Gain skills and knowledge they can use in their everyday lives; and
- Participate in OCR's efforts to create and improve laws, policies, and OCR attorney practice in ways that serve the best interests of youth.

DCW consults with the LEAP often regarding child welfare practice and policy. The LEAP participated in one of DCW's Statewide Assessment focus groups and their input is represented throughout this report.

## Colorado Office of Respondent Parents' Counsel (ORPC)[62]

The Colorado Office of Respondent Parents' Counsel (ORPC) was established in 2016 to provide effective legal representation for parents in dependency and neglect proceedings, protect due process and statutory rights, and promote preservation of family relationships. The ORPC plays a critical role in helping achieve the best outcomes for families by recruiting and training attorneys statewide, advocating for family-centered policies, and promoting transparency in the system through data. CDHS entered into a memorandum of understanding (MOU) with the ORPC several years ago to draw down Title IV-E legal reimbursement funds to support high-quality legal advocacy for parents involved in Colorado's child welfare system. CDHS and ORPC have regular meetings to update existing MOUs and processes related to the reimbursements.

### ORPC Parent Advocate Program

The ORPC has utilized Title IV-E funds to include people with lived experience on legal teams. Launched in 2021, the ORPC's Parent Advocate program allows parents navigating the dependency and neglect system to get support from a parent who has successfully reunified with their children. Results from the Colorado Evaluation and Action Lab showed parents who receive representation from an interdisciplinary team have better outcomes and that these teams are able to support parents with more complex needs, consistent with national data supporting this promising practice. Parent advocates also participate in rulemaking and consult with CDHS and county departments on policy issues, program design, and evaluation.

---

[62] Colorado Office of Respondent Parents' Counsel

# Tribal Partners

There are two federally recognized tribes with land bases in Colorado: the Southern Ute Indian Tribe (SUIT) and the Ute Mountain Ute Tribe (UMUT). The SUIT is located primarily in La Plata County and includes 13,475 members as of 2023[63]. The UMUT is located primarily in Montezuma County with another community in White Mesa, Utah and includes 1,485 enrolled members as of 2023[64].

In addition to the two federally recognized tribes, CDHS partners with organizations that serve the state's American Indian urban communities to address ongoing and emerging human services concerns for the state's American Indian urban populations. These organizations include, but are not limited to, the Colorado Commission of Indian Affairs, Denver Indian Center Inc., Denver Indian Family Resource Center, Haseya Advocate Program, and Denver Indian Health and Family Services.

CDHS consults, collaborates, and coordinates with both federally recognized tribes within the state, as well as with Colorado-based organizations that serve the state's American Indian urban communities. To facilitate communication and collaboration, CDHS employs a CDHS Tribal Affairs Specialist and a DCW Indian Child Welfare Act (ICWA) Specialist who are responsible for nurturing and strengthening CDHS' relationship with the tribes and organizations that serve the state's American Indian urban communities.

## CDHS Tribal Consultations

CDHS holds an in-person formal consultation with each of Colorado's federally-recognized tribes as schedules allow, with the goal of holding the consultation annually. These consultations are kept to a small group consisting of CDHS leadership the Tribal Council. Consultations held during each fiscal year are reported in Colorado's Annual Progress and Services Reports.

Consultations consist of presentations of each CDHS Director's departments and the varying programs CDHS supports. The Tribal Council asks questions, provides comments, and informs CDHS leadership of the Tribal needs for which they would like support. Requests and concerns are captured in the consultation Action Log, which supports CDHS and the Tribe in collaborating on issues and seeking solutions between formal consultations.

---

[63] Southern Ute Reservation Census Profile

[64] Ute Mountain Reservation Census Profile

## Southern Ute Indian Tribe (SUIT)

CDHS' Tribal Affairs Specialist maintains weekly contact with the SUIT Tribal Services Director, as requested by SUIT Tribal Services, and engages in monthly meetings with the SUIT Executive Officer. These standing meetings allow for continuous work and communication to occur at the direct program level by bringing in CDHS SMEs and program directors to discuss matters and problem solve directly with the SUIT Tribal Services Director and Executive Officer. Additionally, the frequency of meetings allows for a more immediate response to any changes and concerns that come up throughout the year and create a continuous feedback loop.

DCW's ICWA Specialist engages in monthly virtual meetings with the SUIT Tribal Services Director to maintain regular contact and makes quarterly in-person visits to SUIT to discuss any matters requested by the SUIT Tribal Services Director. The SUIT handles child welfare concerns within their Tribal boundaries and has a highly effective Tribal Service team, public safety team and process, Tribal child code, and extensive court system to handle any Indian Child Welfare concerns within their boundaries. The ICWA Specialist position helps the local counties, La Plata and Archuleta, connect with SUIT on cases where non-native children living within the Southern Ute boundaries have concerns. SUIT is a checkerboarded reservation that requires consistent communication between the State, county, and Tribal offices.

Additionally, DCW's Chafee Administrator meets with a representative from the Southern Ute Indian Tribe's social services department on a monthly basis to discuss the provision of Chafee services within the SUIT's jurisdiction and address barriers as they arise.

## Ute Mountain Ute Tribe (UMUT)

A formal in-person consultation with the UMUT has not been held since October 2019; however, CDHS' Tribal Affairs Specialist engages in contact with UMUT leadership through email, online meetings, and in-person visits. While the relationship is maintained through frequent communication, engagement with the UMUT has not been as regimented as CDHS' connections with SUIT, reflecting the individual needs and culture of each Tribe.

DCW's ICWA Specialist also had continuous contact with UMUT through monthly scheduled virtual meetings with the UMUT Tribal Services Director and quarterly in-person visits to UMUT to discuss any matters requested by the UMUT Social Services Director. UMUT handles child welfare concerns within their Tribal boundaries, and utilizes the Bureau of Indian Affairs for public safety and court process utilizing the

UMUT Tribal Code. The ICWA Specialist helps the local county, Montezuma, connect with the UMUT Social Services as needed.

## Stakeholder Feedback: Engagement and Consultation with Tribes

DCW held three stakeholder input meetings with the SUIT and two organizations that serve Colorado's American Indian urban communities. During the drafting of this report, the UMUT social services program was being reorganized and DCW had begun preliminary contact but was unable to hold a stakeholder input meeting. DCW plans to consult with both the UMUT and SUIT during the Stakeholder Interviews that will be held concurrently with Colorado's Onsite Review in July 2026.

When asked about the coordination between CDHS and the SUIT, the SUIT Tribal Services Director reported that the Tribe is very satisfied with their opportunities to share feedback with CDHS and appreciates CDHS' efforts to build and improve relationships. The SUIT reports that child welfare feedback they have shared with DCW has been received and understood but that there is opportunity to improve coordination between the Tribe and local county department when jurisdictional issues occur. The SUIT was one of the leaders in the passing of HB25-1204: Colorado Indian Child Welfare Act[65], which codified the federal Indian Child Welfare Act of 1978 into State law. The SUIT reports that the most recent CDHS Consultation was very effective and looks forward to increasing the Director-to-Director relationship between the SUIT and CDHS.

Both community agencies interviewed reported that while culturally appropriate services exist primarily in the Denver Metro area, fewer are available in other urban regions and culturally appropriate services may be sparse in rural regions. Feedback provided regarding service availability, accessibility, and individualization is reported within the Service Array and Resource Development systemic factor. Both organizations reported experiencing inconsistent referrals received from county departments, and that lack of referrals received may impact the timeliness of connecting clients with culturally-appropriate services. Both organizations reported offering training to DHS staff on service availability, consultation, and active efforts, but that child welfare staff turnout is low.

The community agency staff reported limited opportunities to provide feedback directly to the county departments of CDHS, but that they have built strong relationships with Court partners to increase awareness of culturally appropriate services. In 2017, Denver and Adams Counties each established a Juvenile ICWA Court ("ICWA Court") that were the third and fifth of their kind in the nation, respectively.

[65] HB25-1204: Colorado Indian Child Welfare Act

Set up as a Best Practice Court Team project to enhance ICWA compliance, the ICWA Courts strive to:

- Work toward solutions to ICWA compliance challenges;
- Improve ICWA case identification during the early stages of a case;
- Build Tribal relationships;
- Find ICWA compliant placements;
- Provide a Court environment where Native families feel valued and respected; and ultimately
- Improve outcomes for reunification.

Both community agencies interviewed reported success observed through Colorado's ICWA Courts. Due to funding and staffing limitations, Colorado currently has no plans to expand ICWA Courts to additional jurisdictions.

# Statewide Grievance Process

The Colorado Children's Code (C.R.S. 19-3-211) requires CDHS to implement and monitor a statewide grievance process to address child welfare complaints related to employee conduct in performing their duties and related to Title 3 of the Colorado Children's Code. Individuals may submit a grievance concerning an action taken on a case to the County Department, the CDHS Client Services Unit, or the Office of Colorado's Child Protection Ombudsman.

Prior to April 2024, complaints received by CDHS were emailed to the identified county and the DCW County Intermediary (CI). The county had 10 business days to send a response addressing the specific complaint, after which the CI had 10 business days to review the complaint. The expectation for the CI review included identifying the main concern(s) in the complaint, reviewing the county response to ensure they addressed the concern(s), reviewing Trails information, the Colorado Children's Code or other statute, the administrative rules and county response to determine if violations had occurred and if so, how the county addressed the concern. The CI's responsibility was to determine if there were systematic practice concerns that needed to be addressed with the county, providing technical assistance to the county when necessary, and to identify specific policies and processes that needed to be addressed in the written response to the complainant.

DCW identified a need to increase customer satisfaction with how their grievances were addressed and utilized its internal continuous quality improvement process to revise the child welfare grievance process. Beginning in April 2024, the new process allows for a grievance to be assigned to either the identified county's CI or an overflow CI to alleviate the bottleneck and increase timeliness of response letters

being sent to complainants. While the previously-defined CI responsibilities in addressing the complaint remain, the assigned CI is also responsible for staffing the grievance with DCW's Child Protection and Prevention Services Manager to discuss the nature of the grievance, whether a SME needs to be involved for interpretation of rule or statute, and identify next steps in addressing the complaint. The identified county is then given a choice to have a meeting instead of or in addition to a written response. The assigned CI also contacts the complainant to ensure a thorough understanding of the identified concern and an opportunity for the complainant to provide additional context about the identified concern. This new process is designed to improve the customer service experience of the complaint process for both counties and complainants, underscoring the CDHS values of accountability and transparency.

DCW has created an internal DCW Complaint Data Summary report for review and analysis since SFY 2021. The data reflects that during CY 2023, only 12.50% of complaints were processed within 60 calendar days; this increased to 81.48% of complaints processed within 60 days during CY 2024. Data gathered also allows DCW to monitor concerns and trends by county, which increases efficiency in the feedback loop from complaints received to technical assistance and support provided to counties.

### Child Protection Ombudsman of Colorado[66]

The Child Protection Ombudsman of Colorado (CPO) is an independent agency that was created in 2010 to ensure that Colorado's complex child protection system consistently provides high-quality services to children and families in all 64 Colorado counties. The CPO engages with the public about their experience with or concerns about the child protection system, researches and investigates these concerns, and determines the best way to resolve each concern. In addition to elevating family and community voice, the CPO's work includes collaboration with lawmakers, professionals, and other stakeholders to advance legislation and policies that will have a lasting, positive impact on Colorado's children and families.

## Stakeholder Feedback: State Engagement and Consultation With Stakeholders

Four focus group discussions were held with youth and caregivers with lived experience in Colorado's child welfare system regarding their perceptions and experiences with CDHS' engagement and consultation with lived experts. Additionally,

[66] Child Protection Ombudsman of Colorado

four stakeholder interview discussions were held to gather feedback from legal partners and community service providers regarding their perceptions on Colorado's engagement and consultation with stakeholders.

Overall, participants expressed mixed perspectives regarding Colorado's consultation with stakeholders. A common theme arose from lived experts that their input was not always valued during their open involvement. In particular, caregivers with specific reasons for involvement (including substance use) and children/youth felt that their perspectives were not taken seriously or that they were excluded from decisions. These individuals noted a lack of transparency around case decisions and that child welfare professionals do not always provide comprehensive rationale for decisions, instead deflecting with statements like "this is how we do it" in reference to the child welfare system. Children/youth in particular expressed feeling excluded from decisions, that their perspectives aren't taken seriously due to their age, and that staff often ignore children/youth feedback regarding placements or concerns, which may be perceived as complaints.

However, stakeholders reported an increase in CDHS' engagement of lived experts in policy-making in recent years, particularly of lived experts involved in CDHS Committees Councils. Stakeholders reported that CDHS' stakeholdering process is at times inefficient as it slows the timeline of progress regarding rules and statute, but that the process meaningfully engages stakeholders from various perspectives and incorporates concerns into draft revisions. Children/youth reported that at the case level, many felt most comfortable providing feedback with their attorney rather than with the county department. Legal partners reported strong collaboration with CDHS bolstered by consistent meetings and increased consultation since Round 3, which supports the integration of clients' experiences into Colorado's policy-making process.

Additionally, caregivers from the Reimagining Child Welfare Steering Committee emphasized the creation of a Parent Handbook that the Committee is creating as a supportive resource for caregivers entering the child welfare system. Caregivers reported that the child welfare system is overwhelming for parents who are newly involved. The Parent Handbook, developed with parent input, aims to guide caregivers through the child welfare system by providing education around what caregivers can expect as they navigate their child welfare case. The Handbook is currently in final stages of development and once published will be shared widely with caregivers and child welfare staff to be incorporated into engagements between county personnel and their clients.

Stakeholders noted that the process for providing feedback is inconsistent statewide. While some lived experts were aware of escalation opportunities through their county department or at the state level such as CDHS complaints or the Child Protection

Ombudsman of Colorado (CPO), other lived experts expressed feeling unable to provide feedback during their open involvement. Themes of fear of retaliation and mistrust arose, with both caregivers and youth expressing worry that they would be penalized for sharing negative feedback while participating in their child welfare case. In particular, youth expressed fear that sharing negative feedback may result in a placement move, which for some youth (especially older youth) may result in a loss of connections if a local placement alternative is not available. Additionally, lived experts reported that staff turnover can erode clients' trust and impact their willingness to provide feedback at all. Lived experts reported that outside of formal consultation groups and committees, their feedback is not requested and it is the responsibility of the individual to proactively identify avenues to provide feedback. Stakeholders noted that this can be time-consuming and may discourage individuals from engaging in consultation. Overall, stakeholders reported more willingness to provide feedback when they are not actively involved in an open case, and when there is a level of trust between them and the child welfare agency and child welfare staff.

## Documentation of Concerns and Interests

CDHS' 2025-2029 Child and Family Services Plan was developed in CY 2024 in partnership with state child welfare staff, county child welfare staff, out-of-home placement providers, service providers, people with lived experience, and other community partners. A survey was sent out through newsletters and DCW CIs to share with all Colorado counties, community and tribal partners, and other state agencies in March and April 2024, to consolidate Colorado's four priorities in the 2025-2029 CFSP. Survey participants included representation from county departments of human services, community partners, the judicial branch and legal partners, foster parents, child placement agencies, Guardians ad Litem, counsel for youth, family resource centers, academic partners, healthcare workers, respondent parent counsel, and people with lived experience.

The results of the survey identified the following topics as the top priority areas for respondents:

- Expanding Child Abuse and Maltreatment Prevention Services and Supports;
- Supporting Child Welfare Workforce Recruitment and Retention;
- Preventing Unnecessary Out-of-Home Placements; and
- Increasing Timeliness to Permanency.

Additionally, 37% of respondents identified Lack of Services and Supports, and 25% of respondents identified Caseworker Recruitment and Retention as the biggest

challenge in child welfare system improvements. The survey results are reflected in the four goals of the 2025-2029 CFSP:

- Goal 1: Supporting child welfare workforce recruitment and retention efforts.
- Goal 2: Children, youth, and families are strengthened through access to evidence-based services and resources that meet their needs at the right time and in the right place.
- Goal 3: Children and youth have safe, permanent, and stable living situations with appropriate supports to meet their individualized needs.
- Goal 4: Youth who leave foster care in Colorado have the tools necessary to be safe, healthy, educated, connected, housed, and contributing young adults.

# Item 32: Coordination of CFSP Services With Other Federal Programs

Colorado achieved substantial conformity with the Agency Responsiveness to the Community systemic factor during Round 3 of the CFSR, and Item 32 was identified as a strength. Based on the information presented below and continued improvements in recent years, Colorado believes that Item 32 is currently an area of strength.

To further promote positive outcomes for children and families impacted by Colorado's child welfare system, CDHS fosters intra- and interagency collaborations that ensure coordination with other federally-assisted programs serving the same population. These collaborations also facilitate removal of systemic barriers and promote unified treatment approaches.

## State Organization

CDHS' Community Partnerships houses both the Office of Children, Aging, and Community Services (OCACS) and the Office of Economic Security (OES). The Division of Child Welfare (DCW) is seated within OCACS, along with the Division of Community Programs (DCP). CDHS underwent an organizational structure change[67] in January 2026 to better address the needs of the populations CDHS serves while streamlining CDHS reporting structures and navigating increased budgetary restraints and staffing vacancies. This restructure grouped all 24/7 facilities under CDHS' Residential & Reintegration Services, which removed the Division of Youth Services (DYS) from OCACS; however, collaboration between DCW and DYS remains essential to serve the

[67] CDHS Structure Changes Effective January 2026 (PDF)

youth within these programs and the Divisions maintain a strong partnership. These shifts also moved the Division of Aging and Adult Protective Services (AAPS) under OCACS.

The OES houses several divisions, including those that oversee Colorado's Supplemental Nutrition Assistance Program (SNAP) Colorado Works, Colorado's Temporary Assistance for Needy Families (TANF) program, and as of January 2026, the Division of Disability Determination Services. These programs serve populations that overlap with those served by the DCW, and intra-agency collaborations support the coordination of services between programs.

In addition to inter-office and inter-division collaborations within CDHS, the DCW coordinates with several other state agencies who administer services or benefits of federal or federally assisted programs that serve the child welfare population. Table 37 reflects these state agencies and the programs they administer.

| State Agency | Program(s) Administered |
|---|---|
| Colorado Behavioral Health Administration (BHA) | Substance abuse and mental health programs |
| Colorado Department of Early Childhood (CDEC) | • Colorado Child Care Assistance Program (CCCAP)<br>• Head Start<br>• MaryLee Allen Promoting Safe and Stable Families Program (PSSF)<br>• Community-Based Child Abuse Prevention (CBCAP)<br>• Maternal, Infant, and Early Childhood Home Visiting (MIECHV) Program<br>• Colorado's Fatherhood Program |
| Colorado Department of Health Care Policy and Financing (HCPF) | Health First Colorado (Colorado's Medicaid Program) |
| Colorado Department of Local Affairs (DOLA) | Housing and urban development programs |
| Colorado Department of Public Safety's Division of Criminal Justice | Colorado Juvenile Justice and Delinquency Prevention Council |

Table 37: State Agencies Administering Federal Programs

To support the coordination of services amongst these agencies, CDHS hosts a weekly "State Agency/County Call" that brings together county departments of human services and representatives from the DCW, OCACS, OES, BHA, CDEC, HCPF, and

others. These meetings include opportunities for each agency to share programmatic shifts or changes and for county departments to raise questions or concerns.

## Service Coordination and Data

### Service Coordination Through Community Pathways

Colorado's Family First Prevention Plan includes a strategy called "Community "Pathways," which allows the state to increase opportunities for federal reimbursement through the availability and utilization of evidence-based services to children and families who may or may not have current child welfare involvement. Knowing that child welfare involvement is a risk factor to out-of-home placement, providing these services upstream outside of child welfare involvement aims to keep families together and prevent out-of-home placement altogether.

Community Pathway opportunities vary between services, and Colorado continues to analyze and adjust approaches to implementation. Colorado's first Community Pathway, approved by the Children's Bureau in December 2024, is SafeCare® Colorado, managed by the CDEC. A large percentage of families accessing SafeCare® in Colorado do so without open child welfare or juvenile justice involvement but otherwise meet the Family First candidacy criteria.

Colorado has also proposed a second Community Pathway for Motivational Interviewing (MI) through Family Resource Centers (FRC), overseen by the CDEC. As defined by statute, FRCs are local agencies that serve as a single point-of-entry for providing comprehensive and integrated family-centered, community-based services to vulnerable families, individuals, children, and youth. Similar to SafeCare®, many families accessing services at FRCs may not have open child welfare or juvenile justice involvement, but otherwise meet the Family First Candidacy Criteria.

All FRC staff are trained in MI and utilize it throughout their engagement with families. Colorado has 37 Family Resource Centers and serves more than 46 counties. CDHS is working with CDEC to evaluate the use of MI when used within the FRC's Family Development Services team in order to claim Federal reimbursement. FRCs collect data on families accessing Family Development Services, which is a CDEC-funded program, in Salesforce.

DCW is partnering with CDEC to ensure the proper information-sharing agreements are in place to begin collecting federal reimbursement for SafeCare® and Motivational Interviewing. These community pathway opportunities demonstrate the partnership CDHS has with CDEC to ensure that service coordination occurs using existing processes and programs.

As these programs are voluntary for families to participate in, the data gathered may help identify further opportunities for cross-agency collaboration in serving families in a coordinated and targeted manner. The voluntary nature of the programs may also pose a limitation to the data that is gathered, as it is not representative of localized or statewide needs.

## Service Coordination Between Core and Medicaid

As described under Item 29: Array of Services, DCW provides oversight and guidance to counties on their Core Services funding expenditure and service utilization. There is overlap between services that can be provided with Core dollars that are Medicaid services. In late 2025, DCW created reports which pull from data entered in Trails to track county Core expenditures and service utilization. Compared to earlier data collection efforts, these reports offer a clearer understanding of:

- How Core funds are utilized.
- Which services are most frequently delivered under Core.
- The demographics of individuals who receive services within each county.

Resolving limitations in collected information, particularly regarding specific Core expenditures, requires direct contact with county staff. This is most often necessary when Core funding covers services potentially covered by Medicaid or private insurance. This need for deeper engagement with county staff has become an opportunity to better understand the various barriers and gaps across different areas of Colorado. This has also led to stronger communication between DCW and its partners at the BHA, RAEs, and HCPF. In situations where Core is being used to supplement the lack of a Medicaid or private insurance provider in a specific region of Colorado, communication about this gap happens quickly to begin discussions about recruitment to fill the need.

As described in Item 29: Array of Services, DCW monitors the presence of service waitlists statewide through individual county communication. In Colorado’s behavioral health system, Regional Accountable Entities (RAEs) are responsible for promoting health and well-being for Medicaid members by managing the capitated behavioral health benefit, establishing and supporting networks of providers, and coordinating medical and community-based services in their region. Behavioral Health Administrative Service Organizations (BHASOs) are contracted by Colorado’s Behavioral Health Administration (BHA) to coordinate safety-net behavioral health services primarily for uninsured or underinsured individuals, with a focus on improving access and coordination. DCW partners with Colorado’s RAEs and BHASOs for resource development when availability or accessibility is a concern.

## Stakeholder Feedback: Coordination of Services With Other Federal Programs

Four focus group discussions were held with youth and caregivers with lived experience in Colorado's child welfare system regarding their perceptions and experiences with CDHS' coordination of child welfare services with other federal programs. Additionally, four stakeholder interview discussions were held to gather feedback from legal partners and community service providers regarding their perceptions on service coordination.

As noted under Item 29, stakeholders expressed that dual-system involvement poses challenges for clients. Stakeholders reported that disagreements among professionals regarding responsibility in cases limit service availability or delay service access. Stakeholders also reported redundant program processes, such as requests for duplicative information, that create unnecessary stress for caregivers. Finally, stakeholders reported that program staff are not always aware of what services are available through other programs, which leads to missed opportunities for referrals or service connections.

However, stakeholders reported positive service coordination when program staff had strong collaboration and relationships with other programs. In particular, caregivers reported that Medicaid Care Coordinators, while underutilized, are extremely effective in supporting caregivers navigating complex systems. Additionally, stakeholders reported that smaller communities demonstrate a high level of collaboration, often going beyond their defined roles to address service gaps that support positive outcomes for clients.

# Foster and Adoptive Parent Licensing, Recruitment, and Retention

## Item 33: Standards Applied Equally

Colorado did not achieve substantial conformity with the Foster and Adoptive Parent Licensing, Recruitment, and Retention systemic factor during Round 3 of the CFSR, and Item 33 was identified as an area needing improvement. Based on the information presented below, CDHS lacks concrete data that measures whether standards are applied equally to all foster homes statewide. Colorado believes that Item 33 is currently an area needing improvement.

CDHS provides regulatory oversight of certification and licensing activities, which are administered by the DCW, county departments of human services, and child placement agencies (CPAs).

### Licensing Standards

Colorado has two avenues for foster care home certification: certification through a private or nonprofit CPA or certification through a county department of human/social services. Foster care homes are certified annually or at the expiration of their certificate through one of these two options.

Colorado's State standards vary by license or certificate type, but not by the governing body type. Colorado's license types are outlined in Volume 7 of the Colorado Code of Regulations (CCR) in the following sections:

- Permanent License: 12 CCR 2509-8 7.701.361
  - May be granted when the facility or agency is in compliance with the appropriate Department rules and C.R.S. 26-6-901 through C.R.S. 26-6-923.
- Time-Limited License: 12 CCR 2509-8 7.701.362
  - May be granted for specific types of child care facilities or agencies when the facility or agency is in compliance with the appropriate Department rules and C.R.S. 26-6-901 through C.R.S. 26-6-923. The time-limited license will expire on a set date.
- Provisional License: 12 CCR 2509-8 7.701.363
  - May be issued only for the initial six-month licensing period in the event of a zoning or other delay or dispute between a facility and the

municipality, city and county, or county where the facility is situated. This license permits the facility to operate while it is temporarily unable to conform to all rules upon proof by the applicant that attempts are being made to comply with the rules.

- Probationary License: 12 CCR 2509-8 7.701.364
  - The Department may make the license of any facility probationary as provided in C.R.S. 26-6-914(2). Making a license probationary is a negative licensing action as defined in C.R.S. 26-6-903(21).
- Multiple Licenses: 12 CCR 2509-8 7.701.365
  - May be issued if a licensee wishes to assume child care responsibility in more than one classification of care or operate more than one facility of the same classification at different locations

The standards that apply to all certified foster care homes, licensed child care facilities, and licensed CPAs across the state, regardless of certifying agency, are outlined in Volume 7 of the CCR in the following sections:

- 12 CCR 2509-6, Section 7.500 - Resource Development (County-Facing)
- 12 CCR 2509-8, Section 7.701 - General Rules for Child Care Facilities (County and CPA Facing)
- 12 CCR 2509-8, Section 7.708 - Rules Regulating Family Foster Care Homes (County and CPA Facing)
- 12 CCR 2509-8, Section 7.710 - Rules and Regulations for Child Placement Agencies (CPA Facing)

## Consistent Application and Monitoring

Colorado's protocols to standardize certification and licensure and ensure compliance with requirements outlined in the CCR include county-certified foster home certification reviews conducted by the ARD and annual CPA licensing reviews conducted by DCW's PSU.

Each year, the ARD reviews all counties with an open certified foster home or kinship foster home. ARD Foster Home Certification Reviews are conducted on a random sample drawn from the county's overall population of certified foster/kinship homes. The sample size reviewed for each county is dependent on the number of certified foster/kinship homes for that county and is determined using the Raosoft Sample Size Calculator[68] to provide results with a minimum of a 90% confidence level with a 10% confidence interval. The sample size must be sufficient to determine generalizability. Because of this, counties with a small number of certified homes may have all of their

[68] Raosoft Sample Size Calculator

certified foster homes reviewed, while counties with many certified homes will have a random sample of their homes reviewed. The ARD's foster home certification review instruments (Initial Certification Review Instrument and Recertification Review Instrument) can be found on the ARD website[69] under "Instruments and Instructions." The Initial Certification Review Instrument includes 53 certification requirements that are reviewed, and the Recertification Review Instrument includes 45 certification requirements that are reviewed.

During annual CPA licensing reviews, the PSU reviews a minimum of 30% of the CPA's foster home files. The PSU uses one of three instruments to review foster family files during CPA licensing visits: CPA Traditional Foster Parent(s) Records Checklist, CPA Therapeutic Foster Parent(s) Records Checklist, or CPA Treatment Foster Parent(s) Records Checklist. These checklists include each regulation in Volume 7 that corresponds to the foster home certification type (approximately 100 requirements reviewed by each instrument type). The PSU does not utilize a different instrument for initial versus recertification reviews.

To address concerns identified through Colorado's Round 3 CFSR about the equal application of standards to all certified foster homes, the Office of Performance and Strategic Outcomes performed an audit in 2019 focused on identifying the differences between the ARD and PSU review processes. The results were published in Colorado's 2021 APSR and found that despite the different review instruments used by ARD and PSU for the certification reviews, the requirements for foster care homes certified by the county and for those certified by a CPA are similar. The audit also found that both reviews are completed using the state and federal requirements for certification of a foster care home in Colorado.

## Administrative Review Division (ARD)

County-certified foster care and kinship foster care homes are reviewed for compliance with rules and regulations in state and federal requirements initially by the county department staff and through ongoing annual reviews conducted by the ARD. The ARD utilizes two review instruments, one for initial certifications and another for recertifications, which are mapped to relevant regulations. These instruments may be found on the ARD website[70] under "Instruments and Instructions."

Each year, every county that certified or recertified foster care homes is reviewed. Random samples of certifications and recertifications are pulled in each county to provide results with a minimum confidence level of 90%. At the conclusion of the

[69] ARD Website
[70] ARD Website

review, ARD reviewers share findings and action items with county staff that must be resolved within an assigned time frame. The ARD does not assign corrective action plans when reviewing counties, nor does the review impact providers' certification or recertification. Instead, the ARD notifies the county of compliance issues when a certification standard is not met. If that certification standard lapsed but is currently in compliance, no action item is issued. Certification standards that are out of compliance at the time of the review are assigned either an immediate action item or a 30-day action item that the county must respond to. Immediate action items are assigned to items that potentially pose an immediate safety concern, such as missing background checks, while 30-day action items are assigned to items that pose a potentially non-immediate safety concern such as inadequate training hours. The ARD's foster home certification reviews are further described under Item 25: Quality Assurance System.

Table 38 reflects the number of counties and county-certified foster care homes that were reviewed by the ARD for compliance with rule and certification standards and the number of counties that had compliance findings and action items resulting from the review.

| [Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of counties reviewed | 31 | 31 | 28 |
| # of counties reviewed that received action items (30-day or immediate). | 31 | 31 | 28 |
| # of counties reviewed that received only 30-day action items (no immediate action items) | 5 | 4 | 3 |
| # of county-certified foster care homes reviewed by the ARD. | 551 | 546 | 541 |
| # of county-certified foster homes that received action items(30-day or immediate). | 432 | 424 | 386 |
| # of county-certified foster homes that received an immediate action item. | 171 | 171 | 176 |

Table 38: ARD Monitoring for Application of Standards by CY.

## Provider Services Unit (PSU)

The PSU consists of licensing and monitoring teams that issue licenses to CPAs that certify and recertify foster care homes and 24-hour child care facilities, including residential child care facilities and specialized group facilities. Licenses are issued when all requirements have been met, including successful completion of onsite visits. Renewals are granted pending the results of unannounced, onsite supervisory visits, in which licensing staff review a minimum of 30% of the provider's records (to include 30% of all foster home files, child/youth files, and staff files) for background checks and all other licensing requirements. Onsite supervisory visits occur at minimum annually and occur about 90 days prior to the license expiration date to allow DCW to proactively address licensing concerns. During onsite visits, PSU's licensing staff use a standardized instrument that is mapped to the regulations for each license as outlined in Volume 7. At the conclusion of the review, the PSU creates a Report of Inspection (ROI) for each provider, who must then respond to each violation indicated in the ROI with either a refutal indicating how they are currently meeting the requirement or a plan to come into compliance. If the PSU accepts the response, the ROI is finalized and stored in ILINX, the document portal used by the PSU. If the PSU does not accept the response, the PSU provides technical assistance and training to the provider until the provider has achieved or developed a plan to come into compliance with the State's standards.

Table 39 reflects the number of CPAs and 24-hour out-of-home care facilities that were reviewed by the PSU for compliance with rule and certification standards and those that had violations. The CPA counts include only child welfare-serving CPAs, not CPAs specializing in private or international adoption. The licensed facility counts include Residential Child Care Facilities (RCCF, including QRTP and PRTF) and Specialized Group Centers (SGC, including group homes and group centers).

| [Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of licensed Foster Care CPAs overseen by the PSU | 38 | 36 | 35 |
| # of licensed CPAs that received an ROI after a licensing visit from the PSU | 38 | 36 | 35 |
| # of licensed 24-hour out-of-home care facilities overseen by the PSU[71] | 50 | 60 | 66 |
| # of licensed 24-hour out-of-home care facilities that that received an ROI after a licensing visit from the PSU | 50 | 60 | 66 |

Table 39: PSU Monitoring for Application of Standards by CY.

## Investigation of Violations

The PSU's monitoring staff investigates all complaints and referrals that contain a licensing violation:

- Screened out referrals may be investigated as complaints;
- All referrals assigned for assessment are investigated as a Stage II investigation after the county has closed out their assessment to ensure that in addition to accurate and timely filing of Critical Incident Reports (CIRs, when required), providers are monitored for and supported in compliance with Colorado regulations and related statutes.

In both cases, monitoring staff provide technical assistance to the facility on how to come into compliance. At times, adverse action may be recommended for a facility or agency if there has been an established pattern and inability to come into compliance with statutes and regulations specific to the program's license type. Adverse action options include:

[71] The licensed facility counts include Residential Child Care Facilities (RCCF, including QRTP and PRTF) and Specialized Group Centers (SGC, including group homes and group centers)

- Probation;
- Revocation;
- Summary suspension;
- Informal settlement; or
- Fines.

If adverse action is recommended, the specialist makes a recommendation to the Adverse Action Administrator of the PSU. A unit-wide staffing is held and, if all agree to move forward, the assigned specialists develop a Data, Views, and Arguments (DVA) letter and send it to the receiving group. During this time, monthly inspections and technical assistance continue for the provider. A recommendation for adverse action is sent to the Division Director for final approval. The provider is then given a meaningful opportunity to comply with the CDHS regulation while visits and technical assistance continue. After a meaningful opportunity to comply, a final adverse action decision is made. If adverse action includes probation, informal settlement, or fines, the Department generates stipulations and next steps. If revocation is recommended, then the Attorney General’s Office is consulted for litigation.

Table 40 reflects the number of CPAs and 24-hour out-of-home care facilities that were reviewed by the PSU for compliance with rule and certification standards and those that had violations. The CPA counts include only child welfare-serving CPAs, not CPAs specializing in private or international adoption. The licensed facility counts include Residential Child Care Facilities (RCCF, including QRTP and PRTF) and Specialized Group Centers (SGC, including group homes and group centers).

| [Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of complaints investigated for CPAs | 62 | 111 | 42 |
| # of CPA-licensed homes that received stage investigations | 69 | 68 | 67 |
| # of licensed CPAs that were recommended for adverse action | 0 | 0 | 1 |
| # of county-licensed homes that received stage investigations[72] | 51 | 64 | 62 |
| # of complaints investigated for licensed facilities[73] | 54 | 146 | 87 |
| # of licensed facilities that received stage investigations | 48 | 49 | 69 |
| # of licensed facilities that were recommended for adverse action | 0 | 2 | 4 |

Table 40: PSU Complaint and Stage Investigations by CY.

The data above demonstrates an increase in the number of complaints investigated during CY 2024. During this timeframe, the PSU had increased focus on ensuring the timeliness of submitting critical incident reports to CDHS. When a licensed provider was out of compliance based on Trails reports submitted, the PSU investigated these incidents as a complaint and generated an ROI which documented the observed licensing violation, giving the provider the opportunity to clearly define their plan for coming into compliance. These incidents continue to be investigated by the PSU, but as evidenced by the decrease in investigated complaints during CY 2025, providers are coming into compliance with this issue.

## Appeals/Waivers

Applicants and licensees have a right to appeal any standard that creates an undue hardship of when they believe the standard has been applied too stringently. This appeal/waiver process is covered under C.R.S. 26-6-909(4). that outlines the purpose

[72] Unlike CPAs, counties are responsible for completing their own stage investigations. Stage II investigations are recommended by the Institutional Assessment Review Team (IART) if they believe there are any licensing issues that need to be addressed. More information on the IART can be found under Item 34: Requirements for Criminal Background Checks.
[73] This metric includes RCCF, QRTP, PRTF, and SGC

of the appeal panel, the appointed membership, and the term limits of the panel members.

In Colorado, appeal/waiver requests are submitted through the Provider Services – Appeal/Waiver Application[74]. The request and all corresponding paperwork are routed to a Department email address to be read and evaluated for completeness. The appointed appeal panel members convene monthly to read all requests and to determine if the requesting party will be granted their appeal/waiver request and if the rule being appealed does appear to present a true hardship.

Upon the appeal panel's decision, the appeal/waiver request is sent to the DCW Provider Services Unit's (PSU) appeal administrator to make a final determination based on the panel's recommendations. The requestor is then sent an official letter on DCW letterhead with the final appeal/waiver decision and rationale along with the process for appealing the decision through an Administrative Law Judge under C.R.S. 24-4-105.

Regulations specific to appeal/waiver requests are located in 12 CCR 2509-8, Section 7.701.13.

Licensed providers, provider applicants, and county departments of human services may submit a Hardship Waiver Request to DCW if they would like to request to temporarily waive compliance with child care licensing rules that the licensed provider, applicant, or department of human services believes creates undue hardship for them, a child and/or family, or the community. Additionally, applicants or licensees may submit an Emergency Hardship Waiver Request to excuse noncompliance with a specific child care licensing rule due to urgent, significant, and unexpected situations outside of the applicant's or licensee's control, including:

- natural disasters,
- infectious disease outbreaks,
- mold outbreaks,
- acts of nature resulting in structural damage to the child care facility, or
- an immediate, child/youth-specific, emergency placement or situation that might disrupt placement or pose a safety risk to children/youth in out-of-home placement.

Hardship Waiver Requests apply to licensing regulations but do not apply to or supersede statute. DCW did not have a comprehensive process to track waiver requests prior to CY 2024. Upon a change in department staff overseeing the waiver

[74] Provider Services – Appeal/Waiver Application

process mid-year 2023, the process for tracking waiver requests was updated to an efficient and thorough system of documentation. Comprehensive data is now logged in an online spreadsheet and maintained by and accessible to the PSU for all waiver requests. The spreadsheet includes but is not limited to the date of waiver submission, the provider or county making the request, the rule citation for which the waiver request is being made, a brief description of the request, the panel decision, and the date on which a decision letter was sent to the requestor. Additionally, the waiver requester, type of request, rule citation for which the waiver request is being made, reason for request, waiver receipt date, and panel decision with rationale is tracked in Trails under the provider profile. Table 41 reflects the number of waivers/variances submitted and approved during CYs 2024 and 2025.

| [Description] | CY 2024 | CY 2025 |
|---|---|---|
| # of waiver requests submitted | 198 | 225 |
| # of waiver requests approved | 145 | 180 |

Table 41: PSU Waivers/Variances Submitted and Granted by CY.

During CY 2024, waivers/variances were most commonly requested for the following items:

- Staff qualifications (22 total, for 7.705.44.A, 7.705.46.A, 7.706.14.G, 7.710.22.A)
- Provisional certification (16 total, for 7.710.34.A.2)
- Space and sleeping arrangements (9 total, for 7.708.22.B.3, 7.708.B.8, 7.708.B.9)
- Emergency medical agreement (9 total, for 7.709.25.C.1)
- Overload capacity (7 total, for 7.708.1.A.1, 7.708.31.E.3)
- Proof of education (7 total, for 7.709.23.D)
- Audit (6 total, for 7.710.21.D)

During CY 2025, waivers/variances were most commonly requested for the following items:

- Staff qualifications (40 total, for 7.705.41.A, 7.705.42, 7.705.43.A.5, 7.706.14.F, 7.706.14.G, 7.710.22.A - Staff Qualifications)
- Transportation harness (31 total, for 7.701.2)
- Provisional certification (14 total, for 7.710.34.A.2)
- Sleeping arrangements for children over 18 months (10 total, for 7.708.31.E.3)

## Variations

As described in Item 19: Statewide Information System, Colorado's CCWIS (Trails) is undergoing a Modernization process to bring it into compliance with CCWIS standards. Profiles for each provider, including the certificates for certified foster parents and relative regulatory requirements to maintain their certificates, and licenses for CPAs and their respective regulatory requirements to maintain their license, are captured in Trails. Because Trails does not currently include document uploading capabilities, PSU uses ILINX to store licensing details and documents for governing bodies, including the Reports of Inspection issued after onsite supervisory visits. ILINX does not have reporting capabilities and is used only for document storage by the PSU. Despite licensing review results being stored in a separate system, there is no variation in the application of state licensing standards or the monitoring of application.

# Item 34: Requirements for Criminal Background Checks

Colorado did not achieve substantial conformity with the Foster and Adoptive Parent Licensing, Recruitment, and Retention systemic factor during Round 3 of the CFSR; however, Item 34 was identified as a strength. Based on the information presented below and both recent and current improvement initiatives, Colorado believes that Item 34 is currently an area of strength.

## Background Check Process

Colorado Revised Statutes and the Code of Colorado Regulations (12 CCR 2509-8) require the following background checks for prospective foster parents, adoptive parents, relatives seeking kinship certification, and staff who work in child care institutions:

- Fingerprint-based criminal history check with the Colorado Bureau of Investigation (CBI) (Section 7.701.33);
- Fingerprint-based criminal history check with the Federal Bureau of Investigation (FBI) (Section 7.701.33);
- Child abuse and/or neglect checks in Trails at initial certification and renewed every 5 years (Section 7.701.32.A-H);

- Out-of-state Adam Walsh abuse and neglect background check for confirmed child abuse and/or neglect for all adults living in the foster care home that have not resided in Colorado for five years ( Section 7.701.32.J);
- Name and date of birth search in the court case management system for comparison with the CBI check (Section 7.701.33.H); and
- Both Colorado and National Sex Offender Registries (Section 7.701.321).

Adherence to the rule requirement is included in certification reviews prior to final approval of a certificate for a prospective foster parent and annual or five-year checks as required by statute and regulation. Documentation of all of these checks is mandatory in Trails and directly associated with the foster care applicant.

Per 7.304.21.D, kinship caregivers must complete the same background checks indicated above prior to placement. In the event of an emergency placement, a National Crime Information Center (NCIC) check must be completed prior to placement. Beginning July 1, 2025, Colorado revised the disqualifying factors for kinship caregivers to reduce unintended barriers for kinship caregivers in becoming placement options. Disqualifying factors for kinship caregivers include:

- Felony child abuse (previously any child abuse conviction)
- Crime of violence enhancer - excludes escape
- Felony drug-related offenses within three years
- Pattern of misdemeanors - two or more convictions of domestic violence within five years

County and CPA staff are expected to use good judgement and thorough assessment in determining the appropriateness of each individual considered for placement.

Background checks may be initiated after a prospective foster or adoptive parent has submitted their application to their governing body (either the county or CPA). The governing body provides the applicant a code to complete their fingerprints through CBI, which are ultimately sent to the FBI for the federal criminal check, and results are directed to the appropriate governing body based on the code provided.

Colorado has strict protocols for the staff who are eligible to receive the Criminal History Record Information (CHRI) and process criminal fingerprint checks from the FBI. These staff include 62 staff across the county departments, 10 licensing staff in the PSU, and the Background Investigations Unit (BIU) through the Colorado

Department of Early Childhood (CDEC)[75]. These staff are Criminal Justice Information System (CJIS) trained, operate in compliance with Public Law 92-544, and ensure that all federal and state statutes are adhered to regarding CHRI.

The county staff who are eligible to receive the CHRI for county-certified providers are responsible for processing the background check, having mitigation conversations with the applicant, and generating eligibility letters for the county staff. The CDEC's BIU is responsible for processing results for applicants seeking certification through a CPA and generating eligibility letters, which are sent to the CPA; DCW's licensing specialists are responsible for mitigation conversations with these applicants. For applicants seeking certification through a CPA, the CHRI is sent to the CPA but addressed to the applicant; it is the responsibility of the CPA to provide the unopened CHRI to the applicant. PSU recognizes that this process is operating under repealed statutes and presented HB26-1298: Background Checks for Child Welfare Placements[76] during Colorado's 2026 Legislative Session to come into alignment with Public Law 92-544. As part of this initiative, PSU is also working to hire staff to take on all background investigation processes from CDEC to ensure that the CHRI is delivered to the appropriate regulatory authority at the state and that CHRI is only handled by the applicant and the approved and CJIS trained state staff.

## Appeals/Waivers

Because background check requirements are aligned with state and federal statute, Colorado does not have a process to grant waivers for foster or adoptive parents who have disqualifying criminal behavior. If the foster or adoptive applicant does not have a conviction that would disqualify them but does have a criminal history and/or convictions that would potentially cause harm to the child/youth in care, then mitigation is achieved through the SAFE Home Study process and in discussion with the PSU licensing specialist and the applicant themselves.

## Consistent Application and Monitoring

To verify whether Colorado's criminal background clearance process ensures that background checks are occurring as required, the ARD and PSU as the state regulatory bodies over the counties and CPAs ensure through regular audits that the counties and

---

[75] Currently, the BIU executes all federal background check requirements, including out-of-state Adam Walsh abuse and neglect background checks, for CPAs, specialized group facilities, and residential child care facilities.

[76] HB26-1298: Background Checks for Child Welfare Placements

CPAs are conducting the checks as required. Both regulatory bodies provide violations and required corrections if errors are identified.

As noted in Item 33, the ARD reviews county-issued certification and recertifications of foster care and adoptive homes; these reviews include whether the required background checks were completed appropriately and timely. If a certification is found to be out of compliance, ARD requires county staff to resolve compliance issues within 30 days following the review. Any safety-related compliance issues, which include lack of appropriate background checks, require the county to develop a plan within 24 hours addressing how they will alleviate the issue.

Table 42 reflects the percentage of county-certified foster care home certifications reviewed that met CBI and FBI background check requirements during CYs 2023, 2024, and 2025, according to ARD data. The denominator for these measures includes the number of county-certified foster homes reviewed during the CY. The numerator includes the number of homes reviewed that met the background check requirement, including for the foster parent and the foster parents' children who turn 18 and remain residing in the home, when applicable.

| [Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| % of CBI fingerprint-based background checks completed on required individuals (initial certification review) | 88% | 89% | 84% |
| % of FBI fingerprint-based background checks completed on required individuals (initial certification review) | 88% | 89% | 85% |
| % of name and address checks conducted against the CBI Sex Offender Registry when required (initial certification review) | 56% | 67% | 61% |
| % of FBI fingerprint-based background checks completed on required individuals who left the state for three consecutive months (recertification review) | 0% | 100% | N/A |
| % of individuals whose CBI flags were reviewed by the county prior to recertification (recertification review) | 90% | 89% | 93% |
| % of name and address checks conducted against the CBI Sex Offender Registry when required (recertification review) | 79% | 80% | 80% |

Table 42: ARD Foster Home Background Checks by CY.

The data point above regarding FBI fingerprint-based background checks completed on required individuals who left the state for three consecutive months often applies to very few homes. For example, during CYs 2023 and 2024 this requirement applied to only one home reviewed, and during CY 2025 there were no applicable homes reviewed.

As described in Item 33, the DCW's PSU licenses and monitors CPAs that certify and recertify foster care homes. During a CPA's initial licensing process, DCW's licensing staff review background check information in all new applicant files and have mitigation conversations with applicants should the results identify any charge or conviction that would require dispositions or mitigation prior to certification. DCW's licensing staff also review background check information during the CPA's licensing renewal process as well when files are pulled for annual audits of the CPA.

If providers are found to be out of compliance, the PSU provides a violation to the CPA for every instance of noncompliance. Reports of Inspection (ROIs) are generated at every licensing or monitoring visit to a CPA, and violations for safety violations such as noncompliance with federal criminal background check requirements must be corrected within 72 hours. Violations that are not related to background checks or other safety issues must be resolved within 30 days. If the CPA does not address the violation timely, the PSU may impose fines and/or move toward adverse action depending upon the severity of the violations.

A manual review of ROIs from CYs 2023 through 2025 was conducted to identify the number of CPAs that had violations related to background checks. The number of CPAs that had background check violations for FBI, CBI, National Sex Offender Registry, Colorado Sex Offender Registry, or Trails abuse and neglect inquiries are presented in Table 43. As of July 2025, the data also includes expanded background check requirements to include state criminal and state sex offender registry in every state where an applicant has lived in the past five years. Violations may include missing or expired background checks. Because the ROI is created by CPA, not by foster home, an ROI may include multiple violations and the data below indicates the number of CPAs with violations, not the total number of violations. The denominator for these measures

| [Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of licensed Foster Care CPAs overseen by the PSU | 38 | 36 | 35 |
| # of CPAs with background check violations | 12 | 13 | 20 |
| % of CPAs in compliance with all background check requirements[77] | 68.42% | 63.89% | 42.86% |

Table 43: PSU CPA Background Check Compliance by CY.

The data shows an increase in background check violations during CY 2025, which correlates with the July 2025 rule changes described above that increased requirements for provider background checks who resided in another state during the past five years. During supervisory visits to CPAs in CY 2025, the PSU found that not all CPAs were ensuring that these background checks were completed for previously-certified foster families. Technical assistance was provided to CPAs regarding the

[77] The denominator for this measure includes the number of Foster Care CPAs overseen by the PSU. The numerator includes the number of CPAs who did not have a background check violation observed during the calendar year.

requirement of these background checks for both initial certifications and for recertifications of existing providers.

Colorado underwent a federal IV-E audit in November 2024 and received the audit results in August 2025, which found that two foster care providers and one specialized group facility were out of compliance with timeliness of background check requirements. CDHS has begun a Program Improvement Plan (PIP) to ensure that counties, CPAs, and congregate care facilities have the proper background checks. During CY 2026, PSU's licensing staff will be completing an audit of all of background checks for all CPA-certified foster/adoptive parents and staff of licensed child care facilities to ensure that:

- Background checks are being completed timely as required by law;
- Results are being mitigated, if needed, in a home study or through mitigation conversations with licensing staff; and
- There is documentation of mitigation efforts.

## Case Planning and Child Safety

Colorado's case planning process includes home studies that assess the safety of foster care and adoptive placements for children. The home study, Structured Analysis Family Evaluation (SAFE), is required for all foster care certifications and adoption approvals, regardless of whether the family is county- or CPA-certified. The SAFE is completed by staff of the certifying county department or CPA, and documentation of the home studies are included in the case files, which are subjected to quality assurance or licensing reviews. SAFE home studies are updated annually during the foster care recertification process to ensure the safety of children and youth in the foster care home. Updates also assess the strengths and needs of the foster care parents. Addendums to the SAFE home study must be completed whenever there is a significant change during the year for foster families and adoptive families who are awaiting an adoption. Both the ARD's and the DCW's reviews of foster care home certifications and recertifications include an assessment of whether SAFE home studies were completed according to Colorado's requirements.

Safety concerns that surface for children in foster care and adoptive placements are primarily tracked through the governing body and its certification process, monthly home visits, and contacts with the foster parents. If a safety concern arises, it is handled by the certifying body. If a child/youth is temporarily placed in an unconventional placement such as a hotel or office, it is the responsibility of the county department of human services to address safety concerns for these children/youth.

When a referral of abuse or neglect regarding a child/youth in out-of-home care is received into the child welfare hotline, the county with jurisdiction determines if it meets criteria to be assigned for assessment, the assessment is completed by the county where the facility is located.

All Colorado caseworkers are trained to complete institutional assessment during the child welfare academy, and Colorado's criteria of abuse and/or neglect is the same regardless of whether the incident occurs in an intrafamilial or out-of-home setting. All institutional assessments are completed in Trails. All providers are identified in the Trails system with a provider identification number for tracking and management purposes. Regulations specific to institutional referral and assessment are located in 12 CCR 2509-2, Section 7.100-7.104.24.

CDHS' Institutional Assessment Review Team (IART) is a citizen review panel that is required by the Child Abuse Prevention and Treatment Act (CAPTA) (P.L. 111-320). The IART reviews Institutional Assessments to determine whether the county conducted a thorough assessment, provide technical assistance and coaching to facilities and county staff, provide feedback to the counties through the child welfare case management system, and provide the county who completed the assessment with guidance on the missing information. CDHS's Institutional Assessment Specialist provides technical assistance to county departments for compliance with statutes and regulations specific for completing institutional referral and assessments.

With the support of IART members, DCW, and Colorado Results Oriented Management (ROM) System administrators, CDHS developed an Institutional Referral and Assessment data report in ROM to assist counties when making placement decisions and to analyze county practices and outcomes related to institutional referral and assessments.

If a safety concern arises to the level of a critical incident report (CIR) as outlined in Section 7.701.52, then the governing body must submit a CIR in Trails detailing exactly what happened, precipitating incidents, critical incident definition under Section 7.701.52 that it falls under, who was notified, what the follow up actions were, any support needed from the State, etc. Critical incident reports are submitted in Trails and kept under the governing body and provider for reference purposes. All critical incidents are followed up with by the PSU's monitoring team to ensure child safety.

## Variations

There are slight variations across the state in terms of the availability of approved background check vendors, which are IdentoGo and Colorado Fingerprinting. Those

living in more rural areas have less access to these approved vendors and are required to travel farther to get fingerprints completed. However, use of one of these two vendors is required, regardless of where the applicant resides and both counties and CPAs follow the state-prescribed process for submitting and completing criminal fingerprint background checks at the direction of CDHS as well as the Colorado Bureau of Investigation and respective statutes and regulations. Therefore, this variation does not impact Colorado's statewide functioning of this requirement.

# Item 35: Diligent Recruitment of Foster and Adoptive Homes

Colorado did not achieve substantial conformity with the Foster and Adoptive Parent Licensing, Recruitment, and Retention systemic factor during Round 3 of the CFSR; however, Item 35 was identified as a strength. Based on the information presented below and improvement efforts in recent years, Colorado believes that Item 35 is currently an area of strength.

DCW oversees Colorado's five-year Foster and Adoptive Parent Diligent Recruitment Plan, which includes strategies to support the recruitment of foster and adoptive parents that reflect the racial and ethnic diversity of child welfare-involved children/youth in Colorado and is submitted as an appendix to Colorado's Annual Progress and Services Report. DCW is working with the National Center for Diligent Recruitment (NCDR) to implement its Diligent Recruitment Plan.

As described previously, foster and adoptive families in Colorado are licensed by either a county department or a licensed Child Placement Agency (CPA). Approximately 35 CPAs operate statewide with a primary service of providing foster home capacity to county departments. CPAs maintain responsibility for the end-to-end recruitment, training, certification, and oversight of foster families within their agencies. County departments utilize CPA resources when internal placement capacity is insufficient or when a child/youth in their custody has specialized needs that cannot be met through county-certified foster homes.

DCW employs two staff that have broad responsibilities for recruitment and retention of foster and adoptive parents; their role is to be the connectors for diligent recruitment with the county departments and CPAs supporting a peer-to-peer model and interagency networking. These staff set the Diligent Recruitment plan template and process to ensure counties and CPA's plans are in alignment with the state Diligent Recruitment plan goals.

Each county department and CPA develops data-informed Diligent Recruitment Plans that are federally required for entities using Title IV-E funds for foster care and adoption. These plans are updated on a two-year cycle, allowing the agency time to evaluate effectiveness and make improvements as needed during the two-year timeframe. Prior to submitting Diligent Recruitment Plans, DCW provides each county department with a data report outlining the race and ethnicity of children/youth involved with their county's child welfare system, organized by three-year age intervals. The report also identifies the zip codes where removals occurred and the number of children/youth associated with each zip code. In addition, primary language spoken at home and placement types are analyzed and reported within the same age group intervals. This data is pulled from Trails and all data reflect the full calendar year prior to the Diligent Recruitment Plan submission deadline. County departments and CPAs are instructed to utilize the data of both their provider resources and the children/youth in out-of-home care to strategically identify areas for increased recruitment in their communities and to specify goals and action steps to increase their resources to align with the population of youth in out-of-home care.

Every plan is reviewed individually by DCW's Recruitment and Retention staff, who contact agencies for clarification when content is unclear or adherence to the requirements is of concern. During biennial meetings with the county departments and CPAs, staff discuss the goals outlined in the plans and confirm that the agencies are actively implementing their stated strategies. DCW Recruitment and Retention staff also host triannual meetings for county and CPAs to share strategies and provide ongoing information sharing opportunities.

Along with DCW, NCDR will co-host a statewide summit in April 2026 to bring together staff involved in foster and adoptive family recruitment. The summit will focus on strengthening understanding of the importance of data-informed recruitment efforts, enhancing the influence of recruitment practices, and reinforcing the importance of customer service across all agency staff in order to retain foster parents. The event will also provide opportunities for collaborative brainstorming to identify and develop innovative recruitment strategies.

## Data and Evidence

In early 2026, DCW partnered with NCDR to host three focus groups to gather direct, qualitative feedback from foster families with lived experience. The topics discussed during these focus groups included training, resources and supports that have been most helpful, and ideas for strengthening recruitment, preparation, and ongoing support for caregivers. A primary theme identified through these focus groups was the need for a network of other foster families with shared experiences to allow peer-to-

peer connection and support. However, formal results from these interviews are not yet available for reporting.

Table 44 reflects the racial and ethnic characteristics of foster and adoptive homes licensed during FFYs 2023, 2024, and 2025 according to Trails data. More than one race may be selected for each provider, leading the cumulative counts by race to exceed the total count of providers.

| Race | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| Total Providers | 4,039 | 3,479 | 3,682 |
| African American | 370 (9.16%) | 365 (10.49%) | 433 (11.76%) |
| Asian | 104 (2.57%) | 94 (2.70%) | 109 (2.96%) |
| White | 3,188 (78.93%) | 2,923 (84.02%) | 3,082 (83.70%) |
| Hispanic | 731 (18.10%) | 711 (20.44%) | 834 (22.65%) |
| Indian | 58 (1.44%) | 55 (1.56%) | 52 (1.41%) |
| Hawaiian | 22 (0.54%) | 19 (0.55%) | 17 (0.36%) |

Table 44: Trails Racial and Ethnic Characteristics of Foster and Adoptive Parents by FFY.

Table 45 reflects the racial and ethnic characteristics of children/youth in foster care during FFYs 2023, 2024, and 2025 according to Trails data. The total child/youth counts per category are indicated in parentheses. More than one race may be selected for each provider, leading the cumulative counts by race to exceed the total count of children/youth.

| Race | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| Total Children/Youth | 6,341 | 6,140 | 6,071 |
| African American | 1,062 (16.75%) | 1,084 (17.65%) | 1,140 (18.78%) |
| Asian | 89 (1.40%) | 80 (1.30%) | 74 (1.22%) |
| White | 5,107 (80.54%) | 4,828 (78.63%) | 4,657 (76.71%) |
| Hispanic | 2,407 (37.96%) | 2,329 (37.93%) | 2,280 (37.56%) |
| Indian | 216 (3.41%) | 208 (3.39%) | 192 (3.16%) |
| Hawaiian | 45 (0.71%) | 36 (0.59%) | 52 (0.86%) |

Table 45: Trails Racial and Ethnic Characteristics of Children/Youth in Care by FFY.

## Variations

Direct diligent recruitment is carried out by county departments and CPAs to address the unique needs of their local communities; however, entering the demographic information of each child/youth and of prospective foster parents into the statewide database is standard practice. DCW has partnered with county stakeholders to ensure that all required information is entered into the statewide database and to reduce the number of records labeled as unknown. Significant efforts are underway to accurately document race, ethnicity, and language spoken by foster families, with the goal of minimizing incomplete data fields. These data fields were not previously mandatory in Trails, but are now mandatory to increase the availability of this data for use in counties' Diligent Recruitment plans. Counties and CPAs must also document how their placement resources align with the characteristics of children/youth in out-of-home care through their local Diligent Recruitment plans. These efforts are intended to improve the ratio of available appropriate foster parents to children/youth in care and to better inform targeted recruitment of families who reflect the racial and ethnic diversity of children/youth in out-of-home placements.

As Colorado has shifted significantly toward kinship care placements, the need for recruitment of non-relative foster care homes with increased skill and capacity for caring for youth with high acuity needs has become apparent.

# Item 36: State Use of Cross-Jurisdictional Resources for Permanent Placements

Colorado did not achieve substantial conformity with the Foster and Adoptive Parent Licensing, Recruitment, and Retention systemic factor during Round 3 of the CFSR, and Item 36 was identified as an area needing improvement. Based on the information and performance data presented below, Colorado believes that Item 36 is currently an area needing improvement.

## Cross-Jurisdictional Resources

DCW contracts with Raise the Future (Raise) to oversee the management of the Colorado Heart Gallery (COHG). This partnership focuses on high-quality recruitment and advanced security to manage the digital and physical presence of waiting children and youth. Raise lists waiting children and youth, which allows persons interested in adoption to submit an inquiry on the child/youth's profile. Inquiries are directed to the child/youth's county team, who is responsible for responding to inquiries. These inquiries can be submitted by those living in Colorado or outside of Colorado.

Raise manages and oversees operations of the COHG, which makes profiles for waiting children and youth based on information provided from the child/youth's team. These profiles are shared across multiple platforms, including COHG, Raise the Future's website, and AdoptUSKids.org to increase the visibility of children and youth who have been waiting the longest for permanent homes or who do not have an identified resource to obtain permanency. Raise handles all logistics for professional photo and video shoots across the state and timely posting of photos and videos to the COHG website, AdoptUSKids.org, and the Raise website. Children and youth's emotional well-being and safety is protected by onsite staff who utilize trauma-informed, child-centered practices to conduct interviews. To protect children/youth's anonymity, Colorado is shifting towards hobby-focused collages and video content that avoid direct facial shots. Raise also coordinates the logistics of physical Heart Gallery displays, including banners and wall exhibits, in high-traffic venues to raise public awareness. County caseworkers coordinate directly with Raise to list children and youth in need of recruitment. Raise maintains the digital accuracy of all listings, processing status changes provided by a child/youth's team, such as adoptions or holds, within 24 business hours to ensure visible recruitment profiles are current, and submits weekly status change reports to DCW.

In collaboration with CDHS, Raise implements a joint annual communications and marketing strategy that includes targeted social media promotion and leveraged earned media opportunities, such as the "Wednesday's Child" segments. This partnership includes active participation in quarterly recruitment meetings and the facilitation of monthly collaborative meetings to review data, identify emerging trends, and ensure the use of respectful, adoption-competent language across all materials. To evaluate program effectiveness, Raise provides comprehensive data management through monthly reports detailing inquiry sources, website analytics, child demographics, and adoption finalizations, culminating in an annual evaluation aimed at identifying successes and opportunities for programmatic improvement.

Annually, counties are responsible for filing either an initial CARR registration for children/youth who are legally free within 90 days of termination or relinquishment of parental rights, or a renewal CARR registration for children/youth already registered. Alternatively, the county may file a CARR exclusion in cases where a child/youth should be excluded from recruitment, such as when the current placement provider is willing to adopt the child/youth. DCW monitors the CARR registry and exclusions to ensure that every child/youth has a permanency plan, that the exclusions from recruitment are for appropriate reasons, and that alternative efforts to achieve permanency are being made in lieu of recruitment. As noted, county departments work directly with Raise or AdoptUSKids when foster or adoptive providers submit an inquiry about a child/youth in their custody. Colorado does not accept inquiries for children/youth who are legally free from providers interested parties unless they already have completed the home study process. This allows the county to know a family has met adoptive safety standards, which reduces the time delays for a family to complete the certification process, having families that have completed training to understand children and youth with trauma or complex needs, and ensuring workers are not utilizing time responding to numerous inquiries that are not serious.

Colorado also utilizes the Interstate Compacts on the Placement of Children (ICPC) process to explore permanent placement with out-of-state families who submit an inquiry and can meet the needs of legally free children and youth. This also includes the utilization of the National Electronic Interstate Compact Enterprise (NEICE), which allows a quicker timeframe of sending required paperwork to other states. The use of ICPC is further described later in this Item.

The Colorado Kinnected Kinship Navigator Model is also utilized to strengthen a sustainable support community around children, youth, and their families. This program was created to assist relative caregivers in learning about and accessing programs and services to meet their needs and the needs of children and youth they are caring for. The number of children and youth entering foster care in Colorado has

decreased in recent years, and Colorado has worked with more kinship caregivers to provide care for those who become involved in the child welfare system as a whole. Colorado has prioritized keeping children and youth with kin, which includes utilizing kinship adoption whenever possible in cases where adoption is indicated.

The Colorado Legislature passed House Bill 23-1157, The Uniform Unregulated Child Custody Transfer Act, which sought to address the issue of re-homing children/youth without relevant oversight. The Act, drafted by the Uniform Law Commission, made changes to Colorado Revised Statutes Title 19, giving county departments of human/social services the authority to make the decision to accept referrals containing allegations or concerns of unregulated custody transfer for assessment, regardless of the report having concerns of child abuse or neglect. Rule changes were made to apply the statutory changes, defining what constitutes an Unregulated Child Custody Transfer (UCCT) and when UCCT does not apply. The rule change also clarified actions required to be taken should county departments accept referrals concerning UCCT for assessment, including notifying relevant law enforcement and reporting the unregulated custody transfer of internationally adopted children to CDHS.

DCW continues work with the National Center for Diligent Recruitment to better identify and improve strategies that Colorado can recruit, support, and develop foster and adoptive parents. The team is looking at reports of waiting children/youth to find ways to engage counties and get better insight into their cases. Ideally, Colorado would like to see more homes willing to provide permanency for children and youth with complex needs, and be provided with training and support to be successful. More information about Colorado's efforts regarding Diligent Recruitment can be found under Item 35.

Throughout the Trails Modernization process described in Item 19, adoption case activities have been operating out of both Trails Legacy and Trails Mod as portions of Trails Mod functionality have been released. This has at times posed a challenge for county staff navigating both systems, and DCW’s Permanency Resource team continues to partner with the Trails team on Trails modernization and release. This has included regular participation in work groups, creating/updating job aides, and obtaining feedback from county partners. Adoption functionality in Trails Mod is anticipated to be released before the end of SFY 2026, with training and testing opportunities for counties beginning in spring of 2026.

## Effectiveness of Tools/Resources

Colorado prioritizes identifying permanent placements for children/youth within the state whenever possible. There are times that it may not be appropriate to recruit for a child/youth outside of Colorado, such as if the child/youth has significant permanent connections within the state, including siblings, extended kinship relationships or other community supports, or if the child/youth has significant needs that are met by a specialized care team within Colorado.

In reviewing Colorado's adoption program, DCW, county departments, and community partners have continued work on statewide efforts to improve outcomes for children and youth in Colorado. Colorado has observed a decline in the number of finalized adoptions over the past several years, with the most significant decrease occurring this past year. As of December 1, 2025, there were 287 children and youth who had been legally freed and were waiting for adoption. This is the lowest number of waiting youth in several years, decreased from 342 children and youth in December 2024 by 55 young people.

During SFY 2025, DCW observed a slight decrease in the number of kinship adoptions, as there were 524 total adoptions, 227 of which were finalized kinship adoptions (43.3%). Of Colorado's finalized kinship adoptions, 114 were non-certified kinship adoptions (50.2%) and 113 were certified kinship adoptions (49.8%). This decreased from 260 total kinship adoptions in the previous state fiscal year.

Table 46 reflects the data regarding legally free children as of December of each calendar year who were registered with and placed in adoptive/permanent homes through the COHG.

| [Description] | CY 2023 | CY 2024 | CY 2025 |
|---|---|---|---|
| # of children/youth legally free for adoption | 370 | 342 | 287 |
| # of children/youth with an active CARR registration | 164 | 129 | 136 |
| # of children/youth registered with COHG for recruitment of adoptive families | 130 | 79 | 94 |
| # of children/youth registered with COHG who were placed in an adoptive/permanent home | 8 | 12 | 7 |

Table 46: Use of Cross-Jurisdictional Resources by CY End.

The placements represented in the table above were facilitated through COHG recruitment efforts.

## Variations Across the State

Colorado has 64 counties across Colorado, which each monitor their adoption programs independently. DCW provides oversight to ensure adherence with Volume 7 and Title 19. Like many systems, there are formalized requirements and processes, but how counties use them may vary slightly. Colorado rules regarding legally free children and adoption may be found in:

- 12 CCR 2509-4, Section 7.306.13: requirements for CARR regarding legally free children and youth in Colorado.
- C.R.S. 26-1-111: requirements for Colorado's statewide adoption resource registry.

DCW's Permanency Unit collaborates with DCW's Research, Analysis, and Data Unit to monitor adoption reports including:

- Waiting legally free children and youth;
- Children and youth with CARR registrations and exclusions;
- Other Permanent Planned Living Arrangements (OPPLA); and
- Adoption stability.

Adoption-specific reports are also available on ROM, including timeliness of permanency, countdown to adoption, and out-of-home exits. DCW's Permanency Unit monitors these reports to identify patterns with whom children and youth are placed, length of time out-of-home, level of placement, disparities amongst children and youth, counties needing further guidance, and a larger look at adoption practice across Colorado.

The Adoption and Foster Care Analysis and Reporting System (AFCARS) collects case-level information on all children served by the foster care system and those who have been adopted with title IV-E agency involvement. This information is reviewed through the AFCARS Dashboard by the DCW's Permanency Unit, who primarily utilizes the exit reports. These reports provide information about the living arrangement, age, race, and ethnicity of children and youth exiting the child welfare system.

# Interstate Compact on the Placement of Children

Colorado's Interstate Compact on the Placement of Children (ICPC) procedures are outlined in 12 CCR 2509-4, Section 7.307.32. Colorado is a county administered, state supervised state that requires all 64 counties to appoint an Interstate Compact on the Placement of Children (ICPC) Liaison for their county. The county department director shall be the Compact Liaison in each Colorado county. At each director's discretion,

duties of the Liaison may be delegated to staff within the county department. It is recommended that the designated liaison be at the Child Welfare Supervisor level or above, and the director shall notify the Colorado Deputy Compact Administrator in writing of the designee who shall perform the county Liaison functions.

CO ICPC County Liaisons are required to provide the following in the processing of cross-jurisdictional placement requests:

- Communication Link: point of contact between states
- Compliance Monitoring: ensuring all ICPC Regulations and Articles are adhered to for safety and legal purposes, monitoring timeframes, and closing ICPCs with the appropriate paperwork
- Packet Review & Processing: ensuring flow of documents to address the child's current needs are received or sent for an effective child-specific home study and ongoing supervision reports resulting in approval or denial of a placement request and resulting in permanency for the child
- Data Management of Documents: home studies and supervision reports
- Problem Resolution: managing needs of children and addressing violations of the Compact
- Technical Assistance - outlining ICPC processes to agency staff, attorneys, & courts

Colorado's engagement in the ICPC establishes orderly procedures to facilitate the assessment of cross-jurisdictional placement options, determine permanency options with kinship, kin-like, and foster families out of Colorado's jurisdiction, and to ensure the safety of Colorado children and youth when placed in higher levels of care.

The National Electronic Interstate Compact Enterprise (NEICE) was developed as the national electronic system for quickly and securely exchanging all data and documents required by the ICPC to place children across state lines. In December 2023, Colorado implemented the NEICE Secure Document Portal (SDP) to better transmit ICPC documents between the state of Colorado and the other states who have implemented the NEICE. During early implementation, CDHS, county Liaisons, and other NEICE states have observed that documentation is received and processed more timely and that the NEICE SDP has decreased the loss of emails, faxes, and mail resulting from county and state staffing changes. However, Colorado does not yet have measurable data to reflect these improvements. Colorado is anticipated to connect directly with the NEICE in CY 2026.

DCW evaluates Colorado's ICPC system through county program reviews and relevant Trails reports, including tracking the number of ICPC requests Colorado receives and sends and the number of children involved in those ICPC requests. Trails also includes

a field to indicate the reason when timely home studies did not occur to better capture data and address barriers to timely home study completion. As indicated, the implementation of Trails Modernization for ICPC, including its connection with NEICE, is anticipated in Spring 2026. These systemic enhancements are expected to significantly increase Colorado's capacity to effectively facilitate cross-jurisdictional home studies and timely placements. The system updates will also facilitate more effective inter-state collaboration, which is crucial for the timely achievement of permanency goals.

## Variations

County size and staffing limitations have an impact on when home study requests are started, how long it takes to complete, and ultimately the approval/denial process which may cause delays for youth.

## Effectiveness of Tools/Resources

Colorado evaluates the effectiveness of its ICPC process and resources based on the numbers of children/youth involved in ICPC requests sent and received by the state, and the number of these requests that resulted in placements within and outside of Colorado. Efforts are being made to enhance the effectiveness of ICPC tracking through the Trails Modernization process and connection to the NEICE. Upon the implementation of ICPC in Trails Mod and connection to NEICE, Trails Mod will automatically track the status of each ICPC request, send alerts to county and state liaisons, notifying them of upcoming tasks due, as well as when tasks are overdue. Overdue task alerts will also be sent to the liaison's supervisor for additional accountability and monitoring. Liaisons and supervisors will also have access to new reports detailing all assigned ICPC requests and their corresponding status to sharpen monitoring of all ICPC cases.

When a receiving request is received through the NEICE, Trails Modernization will also automatically populate the information into a case, open the ICPC request, and set the status of the request to pending; this enhanced functionality will remove any data errors for future reporting.

## Data/Evidence

The Colorado ICPC maintains a high standard of data integrity and staff proficiency by providing all 64 county ICPC Liaisons with quarterly ad-hoc reports from Trails. Data in the ICPC Colorado Trails User Group Trails Ad-Hoc Report is obtained from Trails Legacy and captures ICPC activities for cross-jurisdictional placements for sending and

receiving requests processed by the 64 Colorado county departments. The report includes data regarding home studies sent and received, home study timeliness, types of care requested, placement outcomes and tracking correct closures of cross-jurisdictional requests. It also reflected placements for permanency resulting from these ICPC requests.

The ICPC County Liaison's role is to review the quarterly ad-hoc report and validate all data entries, which includes:

- Confirming the accuracy of ICPC home study numbers for all sending and receiving cases.
- Verifying report details to ensure all necessary data is accurately entered into Trails.
- Adding or correcting any missing information, including documentation of timely completion or the rationale for untimely ICPC home study recommendations.
- Providing feedback on “pending” delays for technical assistance with the Colorado ICPC Deputy Compact Administrator.

In addition, the CO ICPC Deputy Compact Administrator contacts all Colorado county Liaisons quarterly to either verify zero ICPC activity (received or sent) for the period or to prompt the addition of unrecorded entries. A response is required from county Liaisons to verify the complete status of all ICPC entries for the referenced timeframe. In recent years, CDHS has leveraged the ad-hoc report by increasing the frequency of review and the quality of data captured. The CY 2023 data report was run in the beginning of 2024, the CY 2024 data report was run three times during the year, and the CY 2025 reports were requested and sent out quarterly to all 64 county departments. To ensure data quality, CO ICPC completed ICPC data collection in Trails, provided ICPC training, provided specialized training for new ICPC Liaisons, and distributed quarterly ad hoc reports.

This practice ensures the timely review and accuracy of all data entries, creating a consistent opportunity to identify and input missing information. Furthermore, it serves as a valuable tool for training new ICPC staff, ensuring consistent tracking of all cross-jurisdictional requests. However, some data was identified as inconsistent, incorrect, or missing as reflected on the FFY yearly reports run in January 2026. It was subsequently addressed timely and corrected prior to the final APSR report date.

## Timely Completion of ICPC Home Studies

Colorado ICPC County Liaisons and the Colorado ICPC Central state office receive ICPC home study requests from the sending states in the NEICE SDP or by encrypted emails.

Documents are downloaded, reviewed, missing documents are requested, and when documentation is received to complete a home study assessment; the ICPC home study is assigned. The Colorado county staff document the ICPC assignment in Trails Legacy.

Upon the implementation of ICPC in Trails Modernization and connection to NEICE, documents received as a part of the ICPC request transmitted through NEICE will download into a location accessed through the Trails ICPC request. The ICPC liaison will review the submission for missing documents, make requests for additional information as needed, and when the information is complete, the ICPC home study will be assigned in Trails Mod to a county worker to complete the home study. Requests for additional information and assignment of the home study are tracked within the Trails Modernization system. In addition, notifications and alerts regarding upcoming due dates for the home study as well as when the home study is overdue will be sent to the worker, the ICPC liaison, and the associated supervisors.

During this review period, parental home studies were completed using either the state provided parent home study template (2013), the kinship assessment tool implemented in late 2024, or the kin specific Structured Analysis Family Evaluation (SAFE). Foster Home study requests are completed using the SAFE tool. Kinship or Kin-like certified and non-certified home studies were previously completed by using SAFE or a Kinship Care Evaluation tool. Beginning December 2024, Colorado Counties and CPAs were required to utilize a new Kinship Foster Care Assessment and Home Inspection Checklist to certify kinship foster care homes and non-certified kinship foster care homes; the SAFE home study is no longer required for kinship and kin-like foster care home study requests. To meet Safe & Timely requirements, CO Counties and CPAs use the appropriate tool to complete the home study assessment in a timely fashion.

When the home assessment is completed, it is reviewed by supervisors. Documents are submitted to the ICPC county staff or team in order to make recommendations to approve or deny the ICPC. The ICPC County Liaisons document their recommendations in the Trails Legacy system. The Colorado ICPC Central state office documents their ICPC foster home study recommendations on a secured Google spreadsheet. Both the Colorado ICPC County Liaisons and the Colorado Central office send the signed 100A, along with the home study and any supporting documentation, to the sending state's ICPC office by using the NEICE SDP or by encrypted email.

Table 47 reflects the number of basic ICPC home study requests received by Colorado (including the state ICPC, counties, and CPAs) from FFY 2023 through FFY 2025 and the number that were completed timely (within 60 days of the state receiving the request).

| [Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of basic ICPC home study requests received (denominator) | 219 | 254 | 193 |
| # of received basic requests completed within 60 days (numerator) | 100 | 116 | 119 |
| % of received basic requests completed timely | 45.66% | 45.67% | 61.66% |

Table 47: Timeliness Of Basic ICPC Home Study Requests Received by Colorado by FFY.

Table 48 reflects the number of expedited ICPC home study requests received by Colorado (including the state ICPC, counties, and CPAs) from FFY 2023 through FFY 2025 and the number that were completed timely (within 30 days of the state receiving the request). Expedited requests may only be made if a case meets the criteria outlined in ICPC Regulation No. 7 by the American Public Human Services Association when the child is being considered for placement in another state with a:

- parent,
- stepparent,
- grandparent,
- adult uncle or aunt,
- adult brother or sister, or
- the child's guardian,

And must meet at least one of the following criteria in order to be considered an Expedited Regulation No. 7 case:

1. Unexpected dependency due to a sudden or recent incarceration, incapacitation or death of a parent or guardian. Incapacitation means a parent or guardian is unable to care for a child due to a medical, mental or physical condition of a parent or guardian, or
2. The child sought to be placed is four years of age or younger , including older siblings sought to be placed with the same proposed placement resource; or
3. The court finds that any child in the sibling group sought to be placed has a substantial relationship with the proposed placement resource. Substantial relationship means the proposed placement has a familial or mentoring role with the child, has spent more than cursory time with the child, and has established more than a minimal bond with the child; or
4. The child is currently in an emergency placement.

| [Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of expedited ICPC home study requests received (denominator) | 11 | 11 | 24 |
| # of received expedited requests completed within 60 days (numerator) | 1 | 2 | 13 |
| % of received expedited requests completed timely | 9.09% | 18.18% | 54.17% |

Table 48: Timeliness Of Expedited ICPC Home Study Requests Received by Colorado by FFY.

ICPC processes can be initiated and processed without the required data entry into the designated ICPC pages within the Trails Legacy system. This procedural gap results in inconsistencies in the reported data. Ongoing, proactive training for new ICPC staff, delivered by the Colorado ICPC Deputy Compact Administrator, is necessary to remedy this issue when identified.

The ICPC Colorado Trails User Group Trails Ad-Hoc Report for each FFY includes the most common reasons for home study delays. It is possible for more than one reason to be given for each home study request received. The most common reasons provided across FFYs 2023, 2024, and 2025 include:

- Difficulty coordinating provider schedule;
- Lack of cooperation from provider;
- Provider did not respond timely; and
- Lack of employee resources.

Recent years have shown provider schedules, cooperation, and timely responses to be ongoing barriers to timely completion of received home study requests. While ICPC staff strive to be flexible to meet with providers based on their availability, providers often cancel or no-show scheduled appointments without reasonable notification. CO ICPC coaches CO counties to only use "provider reasons" as listed above when delays are caused by the provider.

In smaller counties, limited workforce capacity often requires staff to function as 'Generalists.' Consequently, their involvement in ICPC processes is handled intermittently and can lead to delays when other high-priority duties concerning the immediate safety of a child take precedence. Contracting with external state resources (for example, licensed child placement agencies) to complete ICPC home studies, certifications, and ongoing supervision has been identified as a mitigation strategy for county staffing limitations, but is not currently scalable statewide for all counties.

## Placements Made through ICPC

Colorado ICPC tracks the number of waiting children who were placed in an approved ICPC home. The available data for placements made reflect the number of placements that were made for each ICPC request; however, this may reflect multiple placements for one child/youth if the child/youth was initially placed in a foster-approved home and later on an adoption-approved home, with the same provider. If the child/youth was included on a second (Adoption) home study request during the same FFY, they will be counted twice in the child/youth placement count.

Table 49 reflects the percentage of total received ICPC home study requests, both basic and expedited, that were approved during FFYs 2023, 2024, and 2025.

| [Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of ICPC home study requests received (denominator) | 341 | 374 | 332 |
| # of received home studies completed as approved (numerator) | 184 | 216 | 184 |
| % of received ICPC home study requests completed as approved | 53.96% | 57.75% | 55.42% |

Table 49: ICPC Home Studies Completed as Approved by FFY.

Only home studies completed as approved may be pursued as a placement for children/youth included in ICPC requests. Table 50 reflects the percentage of total children/youth included in received ICPC requests who were placed in an approved ICPC placement during FFYs 2023, 2024, and 2025.

| [Description] | FFY 2023 | FFY 2024 | FFY 2025 |
|---|---|---|---|
| # of children included in basic and expedited ICPC home study requests received (denominator) | 407 | 444 | 407 |
| # of out-of-state children/youth placed in CO from other states (numerator) | 119 | 134 | 101 |
| % of children included in received ICPC home study requests who were placed in CO | 29.23% | 30.18% | 24.82% |

Table 50: ICPC Placements Made by FFY.

Limitations in the data above include the following:

- An ICPC may be approved or denied but not entered in Trails Legacy during the review period;
- A placement date may not be entered until the ICPC is closed and permanency is met;
- Data is not always entered into Trails timely and entries may happen months or years later; and
- An ICPC approval is good for six months and the child may be placed in a different fiscal year than the ICPC was approved.

Because of these limitations, DCW cannot definitively state the percentage of waiting children who were placed in adoptive or permanent placements through ICPC in any specific period of time. However, the data above indicates that approximately half of

received home studies are completed as approved, and approximately one in four children/youth included in a received ICPC home study request are placed in Colorado within the same federal fiscal year.

# Glossary of Acronyms

| | |
|---|---|
| ACF | Administration for Children and Families |
| APSR | Annual Progress and Services Report |
| ARD | The Administrative Review Division |
| BHA | Behavioral Health Administration |
| BID | Best Interest Determination |
| CAPTA | Child Abuse Prevention and Treatment Act |
| CARR | Colorado Adoption Resource Registry |
| CBCAP | Community Based Child Abuse Prevention |
| CCR | Code of Colorado Regulations |
| CCWIS | Comprehensive Child Welfare Information System |
| CCWSC | The Colorado Child Welfare Scholars Consortium |
| CDEC | Colorado Department of Early Childhood |
| CDHS | Colorado Department of Human Services |
| CDPHE | Colorado Department of Public Health and Environment |
| CFRT | Child Fatality Review Team |
| CFSP | Child and Family Services Plan |
| CFSR | Child and Family Services Review |
| CHSDA | The Colorado Human Services Directors Association |
| CIP | Court Improvement Program |
| CIR | Critical Incident Reports |
| COVID-19 | Coronavirus Disease 2019 |
| CPA | Child Placement Agencies |

| | |
|---|---|
| CPO | Child Protection Ombudsman of Colorado |
| CPTA | Colorado Provider Training Academy |
| CSU | Colorado State University |
| CWTS | Child Welfare Training System |
| CY | Calendar Year (January 1 through December 31) |
| CYMHTA | The Children and Youth Mental Health Treatment Act |
| DCW | Division of Child Welfare |
| DR | Differential Response |
| DYS | Division of Youth Services |
| FAC | Family Advisory Council |
| FAR | Family Assessment Response |
| FFPSA | Family First Prevention Services Act |
| FFY | Federal Fiscal Year (October 1 through September 30) |
| HCPF | Colorado Department of Health Care Policy and Financing |
| HRA | High Risk Assessment |
| IART | Institutional Assessment Review Team |
| ICON | Integrated Colorado Online Network and Management Information System |
| ICPC | Interstate Compact on the Placement of Children |
| ICWA | Indian Child Welfare Act |
| LMS | Learning Management System |
| MIECHV | Maternal, Infant, and Early Childhood Home Visiting |
| NCDR | National Center for Diligent Recruitment |
| NEICE | National Electronic Interstate Compact Enterprise |

| | |
|---|---|
| NTDC | National Training and Development Curriculum |
| NYTD | National Youth in Transition Database |
| OCACS | Office of Children, Aging, and Community Services |
| OCR | Colorado Office of the Child's Representative |
| ORPC | Colorado Office of Respondent Parents' Counsel |
| PA | Program Area |
| PRTF | Psychiatric Residential Treatment Facilities |
| PSSF | MaryLee Allen Promoting Safe and Stable Families |
| PSU | Provider Services Unit |
| QRTP | Qualified Residential Treatment Program |
| RCCF | Residential Child Care Facility |
| RGAP | Relative Guardianship Assistance Program |
| ROM | Results Oriented Management |
| SANCA | The Strengthening Abuse and Neglect Court Act |
| SFY | State Fiscal Year (July 1 through June 30) |
| SRT | Specialized Response Team |
| SUIT | Southern Ute Indian Tribe |
| TBRI | Trust Based Relational Intervention |
| TPR | Termination of Parental Rights |
| UMUT | Ute Mountain Ute Tribe |
| YAB | Youth Advisory Boards |

# Appendix A: CFSR State Data Profile

[The State Data Profile is available from the state or the Children's Bureau upon request, and is posted at https://acf.gov/cb/data-research/data-and-statistics-cfsr-statewide-data-indicators.]

The August 2025 CFSR State Data Profile was generated and transmitted by the Children's Bureau for use in completing the Statewide Assessment.