# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-01123

ISAAC N. through his next friend Katy Saehler, and
TONY S. through his next friend Leigh Truhe, and
VEGETA K., through his next friend Quentin Montemayor, for themselves and those similarly situated,

Plaintiffs,

v.

JARED POLIS, in his official capacity as the Governor of Colorado; and
MICHELLE BARNES, in her official capacity as Executive Director of the Colorado Department of Human Services,

Defendants.

---

**DECLARATION OF DANA WALTERS FLORES**

I, Dana Walters Flores, declare as follows:

## I. BACKGROUND

1. I am over eighteen years of age and competent to testify to the matters set forth below. This declaration is based on my personal knowledge, my professional experience, and my review of Colorado state agency reports, and publicly available state data. If called as a witness, I could and would testify competently to these matters. I am not a party to this action and I am not counsel to any party.

2. I am a Senior Program Manager on the Youth Justice team at the National Center for Youth Law, where I have worked since November 2021. I lead the organization's work in Colorado, building the capacity of directly impacted people and organizations to shape youth justice policy. I have more than twenty years of experience working with young people involved in the juvenile justice system, the child welfare system, and the adult criminal justice system.

3. I hold a Bachelor of Arts degree in Sociology and Urban Studies from Colorado College and a Juris Doctor in Public Interest Law from the University of the District of Columbia, David A. Clarke School of Law.

4. I began my career as a court advocate for youth charged as adults in New York City, at the Youth Advocate Program at the Center for Community Alternatives. I served first as a case manager, carrying a caseload of young people released pre-trial to community-based alternatives to incarceration, and then as the Court Advocate for the entire program, screening every young person referred for eligibility.

5. After law school I worked in Washington, D.C. as an organizer with the Justice for D.C. Youth Coalition and the Campaign for Youth Justice, and as a consultant to D.C. Lawyers for Youth.

6. I returned to Colorado in 2010 and joined the legislative advocacy team at the Colorado Juvenile Defender Center, where I worked until 2012.

7. From 2014 to 2015, I was a caseworker at the Boulder County Department of Housing and Human Services. In that role I worked on child welfare cases, including cases involving foster children held in secure detention.

8. From 2016 to 2021, I was the Director of CASA Programs at Boulder Voices for Children, the court appointed special advocate program serving the 20th Judicial District.

9. In my current role I convene and co-facilitate the Colorado Youth Justice Collaborative, a statewide group of advocates, service providers, and system stakeholders. I have attended the Colorado Youth Detention Continuum ("CYDC") statewide advisory board meetings since July 2023, and I also regularly attend the local Denver CYDC board meetings. I have observed juvenile court proceedings, legislative hearings, agency working groups, and state advisory board meetings across Colorado on a regular basis for more than a decade.

10. I submit this declaration to describe what I have observed about the scope of the unnecessary detention of releasable children in Colorado, the causes of that problem, and the solutions available to address it. In my experience, this is not a problem that varies meaningfully from child to child or from county to county in its causes. It has the same root causes everywhere in Colorado, and those causes originate at the state level.

## II. THE UNNECESSARY DETENTION OF RELEASABLE CHILDREN IS A STATEWIDE PROBLEM AFFECTING A LARGE AND CONSTANTLY CHANGING POPULATION OF CHILDREN.

11. I began following the issue of releasable youth closely in 2023, when it first came to my attention as a critical issue. Each year, on July 1, the Colorado Department of Human Services ("CDHS") releases the Limit the Detention of Juveniles Annual Report required by SB 21-71. I analyzed the latest report released on July 1, 2026. The latest report indicates that there were over 733 youth detained in FY 2024-25, who were identified as "youth awaiting mitigating services" (YAMS).[1] What was most notable to me in reading these latest statistics, is that we do not, as a state, seem to have moved the needle since 2023 when this was first identified as a state-wide concern.

12. The scale is larger than most people assume. Because admissions turn over constantly, the children affected are not the same children for long. A child may sit past the date a judge finds them releasable for days, weeks, or months, and then leave, while other children enter the same position behind them. The affected population changes constantly. On any given day, Colorado holds under 200 youth in detention. But there are over 2,000 unique detention admissions each year.

13. The problem is not confined to particular counties, particular facilities, or particular children. I have observed it across the judicial districts where I work and in the data reported for the state as a whole.

14. The failure to serve releasable youth in the community also does not *only* affect the young people the State classifies as awaiting mitigating services or placement. It

[1] CDHS. *Limit the Detention of Juveniles, Annual Report, State Fiscal Year 25-26* (2026) at 11.

affects every youth in detention. This is because keeping youth in detention when they do not need to be there exacerbates pre-existing issues related to understaffing and overcrowding.

15. The Division of Youth Services ("DYS") already has a critical understaffing problem. Ideally, the Division would like a staffing ratio of one staff member to eight youth. Often, facilities are not even operating at one to sixteen. When understaffing is combined with a detention population that includes many children who do not meet the detention criteria, conditions that are dangerous for everyone become critically dangerous.

16. Emergency situations therefore arise all the time. The young people who end up getting hurt, physically and emotionally, are often young people who should not be in detention at all. They have simply not been matched with a placement. They are also among the most vulnerable youth locked up. Many are youth concurrently involved in child welfare cases with complex trauma histories, disabilities, or both. The result is an atmosphere of chaos and violence that has a negative impact on every single young person detained in a DYS facility at any given time.

17. The Governor and some CDHS officials frequently state publicly that violent juvenile crime is on the rise in Colorado. They cite the higher percentage of young people behind bars in DYS who face serious and violent charges, or who await court decisions on Direct File motions, as compared to pre-pandemic numbers. But that analysis leaves out the statutory evolution of detention criteria and detention screening procedures. Looking strictly at Colorado Bureau of Investigation charging data for ages 10 to 17 and at state judicial filings, juvenile crime as a whole has been falling for two consecutive

years, 2025 and 2026 to date, and the month-to-month DYS Average Daily Population confirms that trend.

18. The “rise” frequently cited by state officials is not a reflection of more children committing crimes in the community. It reflects an artificial bottleneck within DYS facility populations, caused by a lack of contracted community placement options and longer lengths of stay for youth awaiting decisions on Direct File or Transfer motions. All of Colorado’s institutional capacity therefore depends on CDHS executing its responsibility to connect youth to community-based services and placements.

**III. THERE ARE TWO PRIMARY CAUSES OF THIS PROBLEM.**

19. There are two different but related systemic failures that cause the unnecessary detention of releasable children in Colorado. The first is the failure of CDHS and the foster system to take these children into care or to conduct case management for them. The second is the failure of CYDC to invest in community-based programs as alternatives to detention. Both originate in decisions made at the state level and apply to every judicial district in Colorado.

***A. CDHS and local departments of human services do not take these children into custody or provide them case management.***

20. Commonly, juvenile court judges order the department of human services to assess a youth awaiting adjudication for placement and services. It has been my experience over the past ten years, and intensifying since November 2021, that very few

local departments of human services will do anything more than perhaps assign an intake worker to conduct a quick initial interview and then close the case.

21. What Colorado is not doing is opening a program area for these cases under the designation Youth in Conflict. In Colorado, Program Area 4 (PA4) is the "Youth in Conflict" designation managed by the Colorado Department of Human Services (CDHS). It is specifically designed to provide services to children and families who are involved in high-stakes conflicts that risk substantial harm to the child, family, or community—but where traditional child abuse or neglect (Program Area 5) is not the driving factor. Despite a significant population of children and adolescents experiencing behavioral and or family crises that would benefit from the care coordination and resources available through assignment of an Ongoing Caseworker under Program Area 4, CDHS has intentionally changed policy to discourage local departments from opening new cases under Program Area 4.

22. In the past, the definition of "Youth in Conflict" allowed counties to open PA4 cases broadly. Through child welfare core dollars, CDHS assigned ongoing caseworkers who would do all the things an ongoing caseworker does on a child welfare case, but on a juvenile delinquency case. They looked for services in the local community. They leveraged support systems such as family and kin. They asked whether the family could get to a provider and whether in-home services were needed.

23. Then, sometime around 2021, Colorado abandoned the practice of assigning DHS caseworkers to do any case management or service matching for these children and promulgated stricter rules defining it precisely as a conflict resulting in a "high

likelihood of suffering substantial harm and/or injury to the child/youth, family, and/or community." Combined with rigorous screening criteria at the state's central hotline, many cases are "screened out" by Child Welfare and simply redirected to law enforcement to address by charging and detaining the youth. CDHS also actively resisted stakeholder efforts around any legislation that would have called upon the Department to reengage in that work.

24. This is a stated position of CDHS's highest leadership. Michelle Barnes, Gretchen Russo, Minna Castillo Cohen, and Emily Hanson have said, on the record several times, that CDHS is understaffed and already not sufficiently equipped to deal with its child welfare children, and that therefore that there is no way the Department can deal with juvenile delinquency children as well. During the 2022 and 2023 legislative sessions, when large coalitions were working to raise the minimum age of juvenile court jurisdiction, these officials repeated, over and over, the position that CDHS was not willing to spend money for children in juvenile detention and did not see that as within its purview.

25. I have repeatedly witnessed juvenile court judges express open frustration in court that DHS is not following their orders to find placements or services for pre-adjudication children. I have heard judges say that they will "order it one more time," that they "need it actually done," and that they "need someone to appear in person and give a progress report," because three to six months have passed and the child is still sitting in detention. I have personally heard this hundreds of times, in multiple judicial districts, over a period of years.

26. There are a small number of exceptions, and they demonstrate that this problem could be addressed. Larimer County has a small but dedicated ongoing team within its local department of human services that prioritizes assigning ongoing caseworkers to youth who become involved with the delinquency system, particularly youth who have had prior contact with the local child welfare system. There are comparatively fewer releasable youth sitting in detention there. The 9th Judicial District on the Western Slope is also a standout Judicial District where the single entity that contracts with CYDC to serve pre-disposition youth, YouthZone, has proven highly competent at keeping kids out of detention.

27. Judicial Districts that are getting releasable youth out of detention quickly, or preventing them from entering detention at all, are doing so because they have developed a local mechanism for care coordination and intentional service matching. The difference between a child detained in one of those districts and a child detained anywhere else in Colorado is not a difference in the child's conduct or circumstances, it's the absence of a statewide requirement for individualized care coordination aimed at release with community support for every youth who enters detention.

28. At the July 24, 2026 CYDC statewide advisory board meeting, CDHS shared full fiscal year data on crossover youth for the first time. When the State finally arrived at a number, it was that 75% of all unique admissions to detention had current or prior child welfare involvement, or both. In substantial part, then, these are already CDHS's children, despite the foster system's refusal to take responsibility for them.

***B. CYDC does not invest in community-based programs as alternatives to detention.***

29. The CO Youth Detention Continuum, formerly known as Senate Bill 94, is the statutory body tasked with ensuring that Colorado consistently increases reliance on a robust network of community-based Alternatives to Detention and reduces reliance on the inherently harmful practice of incarcerating children. Despite its statutory mandate, in over 30 years since its inception, CYDC has not viewed its primary function as increasing reliance on community based Alternatives to Detention.

30. CYDC receives approximately $17 million in statewide funding. That sounds like a great deal of money, but it does not break down that way across judicial districts. In some of the smaller districts, either as a matter of policy or of preference, CYDC allocates 100% of their funding to pay for a CYDC coordinator. The result is a single part-time coordinator responsible for detention bed management and for all of the reporting and tracking required by the various statutes that implicate CYDC. It does not matter how many community organizations are knocking down their doors to work with these children, because without one person who has enough time, no one will ever go through the process of meeting with a community provider and contracting. There is no funding or bandwidth for that.

31. The annual reporting CYDC submitted to the Joint Budget Committee in 2023, 2024, 2025, and 2026 shows a consistent statewide pattern of spending roughly 95% of its state allocation on staffing, assessments, physical supervision tools, or what CYDC calls "direct support." "Direct support" means financial support or other tools necessary for a young person to comply with terms and conditions of their release, or to actually use

physical supervision tools such as ankle monitors that must be charged (ie. to pay for electricity costs).

32. CYDC is willing to spend direct support money to pay a utility bill so that a young person on an ankle monitor can stand for a few hours with the two-foot cord attached in order to charge the monitor. CYDC is not willing to spend money to onboard new community-based contractual providers who might address the underlying causes of the behavior that led the court to order that a youth be on an ankle-monitor. This is true even in areas where there are *ample* community-based providers offering successful programs, including credible messengers, violence intervention, and a panoply of both clinical and culturally rooted mental health services. Those are the very services proven to be most effective at preventing recidivism while a case is pending and at addressing the underlying causes of the offense.

33. It is striking that those percentages have not meaningfully changed statewide over the course of a four-year period, even as more and more people have named the problem at the highest levels.

34. When Matt Friesen was the CYDC Director, there was a systemic stonewall against flipping that ratio to add contractual partners who could serve youth in the community pre-disposition. Neither CYDC nor CDHS, in his view, had any obligation to invest in or even utilize community-based alternatives that aimed to do more than physically supervise and thereby contain risk. Because that perspective was backed up by Director Barnes and Governor Polis, nothing changed even when the Joint Budget

Committee, in hearings in early 2024 and again in 2025, asked CDHS explicitly why it was spending its CYDC budget this way.

35. Additional barriers to contracting with effective community-based providers are uniform across the state because they are set at the state level. Local CYDC coordinators and the statewide advisory board are well aware of what these barriers are: they include the current fee-for-service model, the background check requirements for potential partners, and the level of insurance partners must carry. All are barriers that could be addressed. Community members raise these issues. But no CYDC coordinator, CYDC employee, or statewide CYDC director I have heard will speak to those barriers or express any willingness to consider whether they could be changed through legislation or any other mechanism. That has remained true even after the crisis of releasable youth became public knowledge.

36. These barriers exclude many of the providers Colorado most needs. CYDC and CDHS have struggled to contract with providers who have the fundamental competency to work with young people charged with, or with histories of, serious acts of violence. That is not because there are not enough providers with those qualifications. There are dozens. They are eager to accept children regardless of their charges; that is the population they work with. Their staff are trained to work with young people with histories of violence and are much less intimidated by these behaviors than the staff working in DYS facilities or at CYDC. But these providers, in particular, often run into the barriers identified above.

37. We have mapped these programs statewide. The Colorado Youth Justice Collaborative combined a survey of its members and their knowledge of their local communities with a landscape analysis conducted by a contracted provider, which identified 50 community-based programs across the state. We consider all of those programs to be ones that could potentially be utilized to provide mitigating services to young people who are sitting in detention right now. We cross-checked how many of them contract with the local CYDC entity, and we were not surprised to find that the answer is not very many. I still have not found any judicial district that contracts with more than five providers. In many cases I have found judicial districts that contract with only one.

38. Recent statewide applications for deflection funding confirm how much capacity exists among community-based providers. Fifty-eight different programs submitted applications to the State that fit all of the criteria the State required. The services those programs offer are the same services that are widely recognized as the most effective services in community-based alternatives to detention.

39. Unfortunately, there is no directory of these programs. For example, there is no page anywhere on the CDHS website listing all of the contracted providers who work with CYDC and can serve children who come into contact with law enforcement and have a delinquency case. That makes it very hard for anyone to engage in well-informed service matching, because even a caseworker for CDHS does not know where to begin. The only way to find out is to call the CYDC coordinator for that judicial district and ask which organizations they are contracting with.

40. Increasingly, community programs work around the system. With permission from defense counsel, programs that have some relationship to a youth or family go directly into court as non-legal advocates, explain what they would offer and how frequently they would report back, and wait to see whether the judge releases the youth, sometimes over the objections of CYDC and the district attorney. This is happening with increasing frequency. But it is a workaround, not a system. It is not sustainable, because it directs no funding and relies on private donors and philanthropy, and it reaches only the handful of children who happen to have a program already connected to them.

## III. THESE FAILURES REFLECT LONGSTANDING CDHS POLICY, NOT LOCAL CIRCUMSTANCE.

41. Colorado has a long history of legislation on this subject and a series of working groups created by statute. Looking at all of them together, it seems inconceivable that we have not arrived at the obvious conclusion: we need CDHS to recognize the existing capacity of community-based providers that are currently willing and able to provide youth with needed mitigating services, we need CDHS to fund and utilize these existing resources, we need to break down the barriers that prevent CDHS from accessing them, and we need CDHS to provide the appropriate mechanisms for youth and their families to be connected to and access those services.

42. The reason prior efforts have not changed outcomes on the ground is that CDHS has continually taken the position that releasable children are not its responsibility. CDHS says these are not child welfare cases, and that once a child goes into detention, DYS is responsible. DYS then says, including in its proposed budget, that its duty has

nothing to do with planning what services a youth will receive if and when released, and that its duty is only to provide care for a young person while in detention. DYS does not even say it has a duty to cooperate with CYDC. DYS falls under CDHS, and CDHS falls under the Governor.

43. The clearest written record of this is the first annual report generated after SB 21-071 was passed. In that report, the working group within CDHS tasked with this very issue simply throws up its hands and recommends that CDHS do nothing. It was bizarre to see a long, detailed, thoroughly researched report outlining a clear civil rights crisis, and then to reach the section that was the whole point of the report — the recommendations the legislature might act on — and find it conspicuously absent of recommendations. That was true the following year as well. The report was essentially a written description of how to pass the buck.

44. For DYS to keep saying, every year, in its budget and in every document it puts out describing population trends, that its responsibility begins when a child comes into detention and ends when they leave, but that it has no say or role in how long that stay will be, strikes me as more than just an omission.

45. The consequence is that there are no statewide procedures for this work. There is no state requirement governing who assesses a releasable child, who conducts case management, who performs release planning, on what timeline, or with what notice to the child and their advocates. Every judicial district is left to improvise, which is why a handful improvise well and most do not. A child’s prospects of leaving detention after a judge has found them releasable depend on which county they happen to be detained in.

**IV. THERE ARE KNOWN SOLUTIONS TO THESE PROBLEMS, AS ILLUSTRATED BY MY OWN WORK IN OTHER JURISDICTIONS.**

46. The solutions here are not mysterious, we already know what they are. Other states have implemented them at the state level, and I have done this work myself in another jurisdiction.

47. Some examples of states that have made the most progress toward decarceration and community reinvestment include Connecticut, Kentucky, Utah, Ohio, California, Kansas, and Texas.

48. In California, for example, this happened because of the youth reinvestment grant program in 2018 and 2019, and the resulting creation of the Office of Youth and Community Restoration. That office created funding and sustainable pathways to move youth out of detention and into community-based diversion programs. The California model of a dedicated state office has been adopted elsewhere and has had a significant impact.

49. My own work in New York city shows what the intervention looks like in practice. As a case manager and then Court Advocate at the Center for Community Alternatives, I worked with young people whose cases were pending and whom a judge had released to a community-based alternative to incarceration. The components included curfew; participation in activities with the case manager; support with life skills; connection to a mentor (preferably one with similar lived experience); referral to outside mental health providers (with a report to the court on whether the referral landed); transportation; and educational advocacy, including visiting the school to make sure it

would accept the young person back. These are the same services that are effective for youth pre-disposition on delinquency matters anywhere in the country.

50. In my role, I would go to a detention facility, show my badge, and be permitted to interview the young person to see whether he could come into our program. I then had a two-week window to visit the young person's home and school and get to know other supportive adults in his community. I used that information to draft and present to the court an individualized service plan that would be provided to the youth and family to mitigate any risk of recidivism and help promote healthy development while the case was pending.

51. New York also solved the information problem that Colorado has not. An Alternatives to Incarceration Judicial Advisory Board kept a list of all community groups that served youth. That list eventually became a formal resource available to all juvenile court judges, with a process for the judge to get to know a specific program before referring to it, and accountability measures afterward.

52. In my role convening and co-facilitating the Colorado Youth Justice Collaborative, we have polled members about the remedies they want to co-create with the State. Two answers were clearly the largest, each over 30%.

53. The first is increased investment in community-based programs that already offer viable alternatives to detention but are not utilized by CYDC or CDHS, and that therefore receive no state or local funding. Members want increased utilization of available programs, including a mechanism at the state level for training and convening the bench around this issue.

54. The cost is modest. These programs average an annual cost of between $5,000 and $10,000 per youth served at the highest level, and many are much cheaper. There is a fiscal incentive for the State, because money currently tied up in carceral systems would be better spent on preventative early intervention that supports child and family stability.

55. The second is a commitment from the State to shift toward a decarceration and community reinvestment model. That means continuing to intentionally bring down the population of youth exposed to the extraordinary harm of detention. Research shows that even in the best models, detention is uniquely and severely harmful for children. It also means a willingness to engage on a continuous basis in case-by-case analysis. That does not seem difficult to achieve with a detention population under 200 on any given day, and it would not require a huge outlay of resources if there were more transparency and openness to bringing in community partners to conduct the analysis.

56. At its current funding level, CYDC has barely enough money to do assessments and pay a staff member, but not enough for a role like community engagement coordinator. The State could increase CYDC's funding and make the other half of the agency responsible for developing relationships with organizations that serve young people locally, with annual requirements for orientation sessions, site visits, and new or renewed provider contracts. That would have to come with more flexibility in how the State contracts with available providers.

57. In addition, families should be viewed as part of this network, including people who could be kinship providers but are not blood relatives. Maryland, Ohio, and Utah use

funding available to kinship providers to integrate families into pre-disposition release plans. That means finding family, or family-like people in the community, willing to take placement with some financial support while the case is pending. That is a much bigger universe of available adults than the universe of child welfare placements, because delinquency cases are shorter and the commitment is often only weeks or months. Relatedly, CYDC could simply interview young people repeatedly, or connect a young person to someone they trust who can come into detention and ask whether the youth has a family friend willing to have them stay.

58. Colorado has already demonstrated on a small scale that this strategy works when someone is assigned to do it. In Boulder County, the Collaborative Management Program brought everything into one room: resources available through CYDC and eligibility programs available through the local department of human services. Those resources could not only be matched to a youth and family but actually deployed, because the statutory partners in that staffing have authority to act on the spot. By the end of a two-hour meeting, the youth and family would have selected two or three targeted interventions, would have a referral date, would know whom they were seeing and when, and it would already be paid for. What it required was a person responsible for coordinating it. That is precisely what the State does not require anywhere.

59. We have already identified the community-based and faith-based organizations that offer the services the State says it is looking for to mitigate risk while a young person is pre-disposition, irrespective of their charge. But CDHS has failed to implement a mechanism to bring those organizations into the process. Colorado needs

both increased investment and increased utilization to ensure that any remedy is implemented in a way that is sustainable and with fidelity. Each of these changes need to be made at the state level, and to apply to every child held in detention after a court has found them releasable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Executed on this __2nd__ day of __October_________, 2026, at
__Longmont___________________, Colorado.

Dana Walters Flores

_______________________________

Dana Walters Flores, J.D.