# EXHIBIT 26

DECLARATION OF NICOLE LYELLS

I, Nicole Lyells, swear under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following information is true and correct:

1. I make this declaration based on my own personal knowledge and if called to testify, I could and would do so competently and truthfully to these matters.

**Background**

2. I am an attorney in good standing in the State of Colorado. I have practiced law in Colorado for 15 years, 14 of which I have represented indigent juvenile clients in their delinquency proceedings.

3. I am a Guardian Ad Litem and as Guardian Ad Litem, I have represented child clients in dependency cases for 8 years..

4. I am the Managing Attorney of the Office of the Child's Representative in El Paso County in Colorado. I have managed other Guardian Ad Litems for almost 5 years and I currently manage 10 attorneys.

5. Throughout my career, I have handled hundreds of cases in which I represented young people facing delinquency allegations.

6. I continue to represent juvenile clients in delinquency cases in El Paso County as well as managing the other attorneys who represent juvenile clients in delinquency cases.

**Children remain detained while waiting for DHS to find placements and services**

7. I have reviewed the amended complaint filed in *Isaac N v. Polis* and in my opinion the Plaintiffs have accurately represented the fact that children are detained due

to lack of placements, services, and policies – a recurring problem we see in our delinquency cases.

20. As a manager, I often speak with attorneys who represent children who are detained because children are waiting for DHS to start a search for placement and services or waiting for beds to open up. These problems have been happening for many years.

8. The Judges in El Paso County have historically made records that can be difficult to understand without experience in the local courts. When there is not an immediate placement available for a child, the orders often say that a child is a flight risk or risk of harm and in need of mitigating services or placements to mitigate those risks. In these situations, the child can be released as soon as a mitigating service or placement is available. So, the truth is that many children are held in detention because they are awaiting placements and services, and when those become available then those children exit detention.

9. We do not see a consistent response from the local Department of Human Services ("DHS") when a youth is in need of a placement. Across many children's cases, DHS does not take the necessary steps to get them out of detention as soon as possible and instead allows the state to keep paying for those children to stay in detention beds.

10. I am not aware of anyone at CDHS who is tracking planning for the kids waiting for mitigating placements. I think there is a gap. While there is information gathering that happens by the state, I am not seeing or aware of proactive planning or coordination.

**DHS delays in searching for placements and services leave children with disabilities detained for longer**

11. Some children remain in detention due to CDHS's inability to provide appropriate treatment or services to meet their needs. CDHS has not created enough QRTP placements or group homes in the state, so high acuity kids often do not have access to non-detained beds.

12. CDHS utilizes a single assessment, called an Enhanced Standardized Assessment ("ESA"), to determine whether a child has significant enough mental health needs for residential treatment. Assessments typically take about two weeks to determine whether the youth qualifies for higher-level care or not.

13. However, there is no automatic process that requires DHS to jump in and immediately assess a specific level of placement for children in detention who are awaiting placements. There are juvenile screeners who can assess for release plans, but they cannot arrange out of home placement if necessary. The request for an assessment for residential can be submitted by a Colorado Community Health Alliance ("CCHA") liaison, a DHS caseworker, or a caregiver and sometimes there is finger-pointing about who is supposed to submit for the ESA to occur.

14.. There is a lack of transparency in the placement search process when DHS is ordered to assess for placement. It often appears that they do not do a robust placement search when ordered to be involved and push for youth to be assessed for higher-levels of care that can be funded by Medicaid rather than DHS.

15. At times, children with lower-level needs still get placed in placements that should go to higher-needs kids due to the lack of lower-level appropriate placements.

Those same facilities do not then accept admission of children with disabilities that more substantially impair daily life because there are lower needs kids filling those beds who do not have appropriate therapeutic foster homes to go to.

16. For children who do qualify for a higher-level placement, on top of waiting the two weeks for assessment, they remain detained while waiting for DHS to find a place that will accept them. Many placements have shut down and disappeared, too. This means that fewer placement beds remain for children with higher needs, who often end up remaining in detention because of the lack of appropriate placements.

17. As such, months-long waitlists have become more prevalent because of the lack of appropriate placements. Children in DYS custody, especially those with high needs due to a disability, wait for months rather than being able to quickly go to a placement.

18. Over the past year, my office has also handled cases with youth with extreme intellectual disabilities who have been kept in detention while waiting for placements. These youth have a hard time being in a restrictive environment without the ability to understand why they are still in detention.

**DYS cannot provide long-term treatment while detention causes decompensation**

21. The mental health supports that DYS facilities can provide are not intended to be long term, yet many of these children who have intensive needs remained detained for a long time. Providers at DYS facilities are limited ethically from starting more intensive services when a child could leave any day, so long as a placement is found.

22. Thus, remaining in the detention environment is not appropriate for children with mental health concerns who are awaiting intensive services. The barriers DYS providers face to developing an ongoing plan are at odds with the ongoing therapeutic

relationships that children should be receiving in the community. Children need community placements so they can engage in ongoing treatment plans. However, they remain stuck in the detention environment, which does not help youth to function in the outside world. For example, DYS facility educational staff are prevented from having contact with youth who spent a long time in detention after their release. Meanwhile, children who are served in the community develop mentorship relationships that can continue over time. The lack of continuity for children who need services but remain in DYS hampers child development. For example, DYS does not allow them exchange apples or food, so ongoing detention prevents them from building natural interaction skills that youth would normally develop outside of detention.

**DHS inaction leads children who may need to enter foster custody to remain detained longer**

23. There does not appear to be any coordinated response for youth who cannot return to their home. Some parents cannot take children back from detention, and the court will not order them to pick up youth, but then DHS will also not get involved. We see a significant gap for these children, and there is not a clear coordinating entity that ensures these kids get into alternative placements.

24. Often, if the child cannot return to their home from detention, the GAL must ask the court to request DHS to get involved in that case. But there is not a clear process that requires DHS get involved for those children who have nowhere to go. This can be really challenging for children who have a conflict that prevents them from reentering their home.

25. The local DHS does not treat the need to find placements that allow those children to leave detention with urgency.

26. Sometimes I see CDHS support the local DHS with placement when a child is already in DHS legal custody. This may be because CDHS has more legal responsibility for children in DHS custody. But even in these situations CDHS does not always jump in in all such cases involving children in DHS legal custody who are difficult to place.

**Children in DHS legal custody remain detained due to a lack of supervision alternatives**

27. The shortage of placements limits children who are in DHS legal custody's ability to get out of DYS facilities. They suffer ongoing detention while at the mercy of placement availability.

28. El Paso County also lacks therapeutic foster homes for teenagers, but my office is not aware of CDHS recruiting or campaigning to create such placements. These placements would teach youth skills to navigate difficulties, which is better for children's development than congregate care. That said, more congregate care options would be better than the status quo of children remaining detained after they could be released.

Executed on the 2nd of October, 2026, at Colorado Springs, Colorado.

Nicole Lyells

Atty. Reg. # 43649