# EXHIBIT 30

COLORADO
Department of Human Services

July 1, 2023

The Honorable Rhonda Fields
Chair, Senate Health and Human Services

The Honorable Dafna Michaelson Jenet
Chair, House Public and Behavioral Health and Human Services Committee

The Honorable Mike Weissman
Chair, House Judiciary Committee

The Honorable Julie Gonzales
Chair, Senate Judiciary Committee

Chief Andrew Prehm
Chair, Alternative to Youth Detention Working Group

Senator Fields, Senator Gonzales, Representative Weissman, Representative Michaelson Jenet and Chief Prehm:

The Colorado Department of Human Services, in response to reporting requirements set forth in Section 19-2.5-1404, C.R.S., respectfully submits the attached Alternative to Youth Detention Working Group report.

> *"(3)(b) On or before July 1, 2023, and on or before July 1 each year thereafter, the Department of human services shall submit a report to the working group, the judiciary committees of the Senate and the House of representatives, or any successor committees, and the health and human services committee of the senate and the public and behavioral health and human services committee of the house of representatives, or any successor committees, including:*
>
> *(I) An analysis of the data collected in accordance with the performance standards and outcome measures developed pursuant to subsection (3)(a)(i) of this section, and an analysis of the progress toward meeting the performance standards and outcome measures developed pursuant to subsection (3)(a)(i) of this section;*
> *(II) The status of implementation of efforts guided by the working group's recommendations pursuant to subsection (3)(a)(ii) of this section;*
> *(III) An analysis of the continuum of in-home and out-of-home placement options and supports for alleged juvenile offenders, including the current availability capacities of the options and supports, including:*
> *(A) An analysis of the availability of and demand for less restrictive alternative placements in each judicial district and county, including but not limited to residential treatment facilities, qualified residential treatment programs, nonqualified residential treatment programs,*

*residential community placements, shelter placements, and family-type settings, including but not limited to foster care;*
*(B) An analysis of the availability and use of funding for less restrictive alternative placements in each judicial district and county, including but not limited to residential treatment facilities, qualified residential treatment programs, nonqualified residential treatment programs, residential community placements, shelter placements, and family-type settings, including but not limited to foster care;*
*(C) An analysis of the availability of and demand for community-based services in each judicial district and county offered to alleged and adjudicated juvenile offenders that assist in allowing children to live with family or kin, including the types of community-based services available and capacity for each type of service in each judicial district and county; and*
*(D) An analysis of the availability and use of funding for community-based services in each judicial district and county offered to alleged and adjudicated juvenile offenders, including the amount of funding spent on different types of services.*
*(IV) An analysis of barriers to placing youth in less restrictive alternative placements;*
*(V) The number of youth in detention awaiting placement in a less restrictive community setting;*
*(VI) The number of youth in detention charged by direct filing pursuant to section 19-2-517 by judicial district or county, and the average length of stay in detention for these youth;*
*(VII) An analysis of the number of youth placed in less restrictive alternative placements, including but not limited to residential treatment facilities, qualified residential treatment programs, nonqualified residential treatment programs, residential community placements, shelter placements, and family-type settings, including but not limited to foster care, and the length of stay in these placements for alleged and adjudicated offenders;*
*(VIII) An analysis of the involvement of youth and their families, and their satisfaction with less restrictive alternative placements;*
*(IX) An analysis of the number of alleged and adjudicated juvenile offenders who are served by county human services departments through their child welfare systems and the impact on those county departments; and*
*(X) The recommendations of the working group made pursuant to subsection (3)(a)(iii) of this section."*

If you have any questions, please contact Kevin Neimond, CDHS' Director of Policy and Legislative Affairs, at 303-620-6450.

Sincerely,

*Minna Castillo Cohen*

Minna Castillo Cohen
Director, Office of Children Youth and Families

# 2022 - 2023 Colorado Senate Bill 21-071
## Inaugural Analysis Report to Inform Performance Standards and Outcome Measures for Pre-Adjudicated and Adjudicated Youth

July 1, 2023



CDHS

COLORADO
Department of Human Services

# TABLE OF CONTENTS


TABLE OF CONTENTS.......... 2
EXECUTIVE SUMMARY.......... 5
GLOSSARY OF ACRONYMS.......... 9
INTRODUCTION.......... 10
Key Term Definitions.......... 12
Challenges of SB21-071 Reporting Requirements.......... 14
Figure 01: SB21-071 Time Frame.......... 17
POPULATION DESCRIPTION.......... 18
Summary.......... 18
Figure 02: ADP and LOS.......... 19
Figure 03: Statewide detention ADP (July - December 2022).......... 19
Table 01: Overview by JD of ADP, LOS, population.......... 19
LOS from Detention Hearing.......... 21
Table 02: LOS for significant detention dates.......... 22
Youth with Child Welfare Involvement.......... 22
PERFORMANCE STANDARDS & OUTCOME MEASURES.......... 23
PERFORMANCE STANDARD 1.......... 23
LOS Over 30 Days.......... 23
Table 03: Admissions with a LOS over 30 days.......... 24
Youth Eligible for Release from Detention.......... 24
Table 04: Unique youth in detention after being made releasable.......... 25
Denials.......... 25
Foster Home Availability.......... 25
Kinship Placements at Release.......... 26
Table 05: Kinship placements from release by county / JD.......... 27
PERFORMANCE STANDARD 2.......... 28
Assessments.......... 28
CJRA Pre-Screen Risk Level Overview.......... 29
Table 06: CJRA pre-screen risk level by unique youth.......... 29
Services.......... 29
Figure 04 - Service map for small JD (7th).......... 30
Figure 05: Perceived barriers for access to services - CYDC JSPCs.......... 31
Figure 06: Perceived barriers for access to services - survey response.......... 32
Youth and Family Perception.......... 32
Services Funded by CYDC and Counties.......... 33
Table 07: Services spending by CYDC.......... 34

CYDC Juvenile Service Plans .......... 35
PERFORMANCE STANDARD 3 .......... 36
JDSAG Screen Results & Overrides .......... 36
Table 08: JDSAG override information & direction .......... 37
Figure 07: JDSAG screen result and actual placement level comparison .......... 38
Access to Facilitated Meetings .......... 38
Detention Bed Availability .......... 38
Table 09: Detention bed capacity by JD .......... 39
LOC Recommendations .......... 40
Table 10: Completed IA recommendations .......... 40
PERFORMANCE STANDARD 4 .......... 41
Impact to Counties .......... 41
Crossover Youth Definition .......... 42
Figure 08: Crossover definition by JD .......... 43
Figure 09: Crossover definition by CMP county .......... 43
Access to Facilitated Family Meetings .......... 44
PERFORMANCE STANDARD 5 .......... 46
Summary .......... 46
Culturally Competent Services .......... 46
Analysis of System Disparities for Minorities .......... 47
Table 11: Summary of CJRA risk level tests .......... 48
Table 12: Summary of child welfare involvement tests .......... 49
Table 13: Summary of LOS tests .......... 50
Table 14: CJRA risk level & LOS .......... 50
ADDITIONAL INFORMATION .......... 51
Direct File and Reverse-Transfer .......... 51
Direct File .......... 51
HB 23-1249 .......... 53
Data Collection Needs .......... 53
Recommendations .......... 54
APPENDIX A - Referenced Bills .......... 55
APPENDIX B - CYDC Advisory Board .......... 56
APPENDIX C - Timeline .......... 58
APPENDIX D - Monthly and YTD ADP & YTD LOS .......... 69
Table 15: Overview by JD of population data .......... 69
Table 16: Statewide ADP and percent of detention capacity .......... 70
Table 17: Monthly ADP by JD .......... 70

Table 18: YTD LOS by JD....... 71
APPENDIX E - Releasable LOS by JD....... 72
Table 19: Releasable LOS by JD....... 72
APPENDIX F - Services Maps....... 73
Figure 10: Services map for 17th JD map....... 73
Figure 11: Services map for 10th JD map....... 74
APPENDIX G - JD and County Services Comparisons....... 75
APPENDIX H - Barriers to Services Summary....... 77
Table 20: Barriers to services summary....... 77
APPENDIX I - Detention Bed Capacity by Month....... 78
Table 21: Detention bed capacity by month....... 78
APPENDIX J - Available Placement Summary....... 79
Table 22: Current licensed QRTP/RCCF providers....... 80
Table 23: Current licensed PRTF/RCCF providers....... 81
Table 24: Providers not eligible for Title IV-E or Medicaid funds....... 81
APPENDIX K - Crossover Youth Definitions....... 85
APPENDIX L - Additional Information for Performance Standard 5....... 95
Table 25: CJRA risk level....... 96
Table 26: Child welfare involvement....... 96
Table 27: LOS....... 96
Table 28: Risk level and LOS....... 97
Table 29: Statistically insignificant results....... 98
Table 30: Ethnicity (Race) population percentages....... 99
Table 31: Gender (staff assigned) population percentages....... 99
Table 32: Gender identity (self identified) population percentages....... 100
Table 33: Sexual orientation population percentages....... 100

# EXECUTIVE SUMMARY

### Purpose

In 2021, the General Assembly of the State of Colorado enacted Senate Bill (SB) 21-071 enhancing the already existing Colorado Youth Detention Continuum (CYDC) Advisory Board ("Advisory Board") with additional partners and manadates. The additional mandates given to this working group by SB21-071 were:

- Develop performance standards and outcome measures to evaluate the degree to which alleged and adjudicated offenders are in the least restrictive setting with appropriate services, due October 2022.
- Evaluate whether the number of alternative placements, range of services offered, and community-based services are available meet the needs of youth in each judicial district (JD) and county.
- Determine whether and how specific data and outcome measures must be reported to evaluate the efficacy of less restrictive placements and community-based services.
- Build and develop an annual report to update findings from the previous fiscal year; submit to the Advisory Board on July 1, 2023 and each year after.

### Data Sources & Methods

During the process to evaluate the directives of the working group, the SB21-071 team worked with:

- Trails, Colorado's current Comprehensive Child Welfare Information System (CCWIS), which maintains records of children and adults served by Colorado's child welfare system.
- Savio Management Group (SMG) data system, which maintains CYDC service authorization and financial records.
- Detention Bed Utilization Tracking Sheet (DBUTS); this Google sheet is the only place certain data has been housed for CYDC programming throughout the 22 Colorado JDs.
- Youth/Family Gap Survey, June 2022.
- Additional high level contextual information from stakeholders.

Qualitative and quantitative data analysis methods were used in this report. First, feedback was gathered in stakeholder meetings which was used to create surveys (conducted in June 2022 and April 2023) to gather stakeholder and partner

knowledge. Secondly, descriptive analysis was used to provide context and summary information about the youth cohort selected for this report. Because the performance standards were approved in October 2022, a limited cohort sample was chosen for this report including youth detained from July 1, 2022 to December 31, 2022. This established a preliminary baseline with the intention that future reports will include an entire state fiscal year (SFY) (July 1 - June 30) for analysis. Lastly, statistical analysis was conducted to test correlations in system disparities. These tests measured statistical significance, which is a measure of whether the results are random or meaningful, and strength of association, which represents the degree to which the results are related.

**Overview of Process and Analysis**

The cohort selected for this report includes youth who were detained in a Division of Youth Services (DYS) youth services center during the time period of July 1, 2022 through December 31, 2022. The cohort included a total of 1,177 unique youth.

- Of the 1,177 unique youth, 389 (33.1%) remained in secure detention 1 day or more after their releasable date (see *Releasability* definition in Key Term Definitions section).
- The average length of stay (LOS) between being made releasable and being released for these youth is 20.41 days.
- The median LOS for releasable youth is 7 days.
- Ninety-four youth (8.0% of 1,177 unique youth in cohort) were detained for more than 30 days after being made releasable. Additional information, including a description of releasable youth, can be found in Performance Standard 1.
- A total of 405 youth out of 1,177 unique youth (34.4%) in the cohort were identified as having either an open assessment or case with county departments of human or social services during or after the time of their detention stay.
- Of the 405 youth that had open involvement on some level with county departments of human or social services during or after their detention stay, 82 youth had new involvement (assessment or open child welfare case) during their detention stay. None of the 82 had open involvement on any level at the time of detention admission.
- Initial statistical analysis indicates there are some system disparities for underrepresented youth. Out of thirteen tested variable combinations, five indicate weak correlations. For example, an analysis of sexual orientation

indicates a non-heterosexual youth is more likely to have a higher Colorado Juvenile Risk Assessment (CJRA) pre-screen risk level. However, the five relationships are weak, meaning other factors are involved and more study is needed. The other eight tests do not currently show meaningful statistical relationships. A full discussion of these results can be found in Performance Standard 5.

- A preliminary analysis of the availability of kinship and foster home placements within counties was conducted.
- Detention assessments such as the CJRA pre-screen and Juvenile Detention Screening and Assessment Guide (JDSAG) were reviewed, as were the Child and Adolescent Needs and Strengths (CANS) assessment and Independent Assessments (IA) conducted at the county level.
- There are currently several working definitions of "crossover youth" among counties and JDs. The SB21-071 team will continue conversations to determine if a statewide definition for crossover youth can be established.
- A preliminary review of services in the community was conducted, including services available as well as costs associated with these services. More thorough analysis will be conducted for future reports.

**Limitations**

The following is a brief list of limitations experienced during the preparation of this report:

- Performance standards and outcome measures were established late in October 2022, thereby limiting the amount of time for data analysis.
- The SB21-071 team has not been fully staffed since its inception. As of March 2023, four of the five staff members were hired and working at the same time for the first time. This allowed only two and a half months' time to complete the entirety of the data analysis and report writing process while at the same time new staff members were learning the systems and gaining an understanding of their new positions.
- Data exports from multiple data collection systems (i.e. Trails, Google sheets, SMG database) were necessary to compile the data needed for this report. Aligning this information was difficult. At times, information was unavailable, and data between systems was incongruent.
- Data Sharing Agreements (DSA) with partner agencies (i.e. Behavioral Health Administration (BHA), Collaborative Management Program (CMP)) are still being negotiated and once fully executed will allow for more specific information to be shared that includes personally identifiable information.

## Next Steps

With the first report completed, it is the recommendation of the SB21-071 team that the following priorities be set. Consideration of these recommendations and next steps will be determined by the Advisory Board throughout the next SFY:

- Work with the Trails team to develop processes and systems for data collection.
- Facilitate working groups for definitions of key terms (i.e., crossover youth, releasable) in an effort to develop statewide definitions to create more consistent data collection and improve understanding of populations.
- Explore partnering with a third party evaluator to ensure fair analysis of culturally competent access to services.
- Clarify definitions and metrics with the Advisory Board.

This inaugural report is an initial snapshot based on available data. There are many data processes that will take time and technology to develop, as well as stakeholder relationships that need to be further developed. However, this report provides some new system information on child welfare involvement, releasable youth, system disparities for minorities and more.

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| ADP | Average Daily Population |
| ASO | Administrative Service Organization |
| AMS | Alcohol Monitoring System |
| BHA | Behavioral Health Administration |
| C.R.S. | Colorado Revised Statutes |
| CANS | Child and Adolescent Needs and Strengths |
| CCWIS | Comprehensive Child Welfare Information System |
| CDAC | Colorado District Attorneys' Council |
| CDHS | Colorado Department of Human Services |
| CJRA | Pre-Screen Colorado Juvenile Risk Assessment |
| CMP | Collaborative Management Program |
| CY | Calendar Year |
| CYDC | Colorado Youth Detention Continuum |
| DBUTS | Detention Bed Utilization Tracking Sheet |
| DCW | Division of Child Welfare |
| DSA | Data Sharing Agreement |
| DSS | Department of Social Services |
| DYS | Division of Youth Services |
| FEM | Family Engagement Meeting |
| FY | Fiscal Year |
| GPS | Global Positioning System |
| HB | House Bill |
| HCPF | Colorado Department of Health Care Policy & Financing |
| IA | Independent Assessment |
| ICJ | Interstate Commission for Juveniles |
| ISST | Individualized Service and Support Team |
| JD | Judicial District |
| JDSAG | Juvenile Detention Screening and Assessment Guide |
| JSPC | Juvenile Services Planning Committee |
| LOS | Length of Stay |
| LOC | Level of Care |
| MST | Multi-Systemic Therapy |
| MDT | Multidisciplinary Team |
| MOU | Memorandum of Understanding |
| OCYF | Office of Children, Youth and Families |
| PII | Personally Identifiable Information |
| PR bond | Personal Recognizance Bond |
| PRTF | Psychiatric Residential Treatment Facility |
| QRTP | Qualified Residential Treatment Program |
| RAE | Regional Accountable Entities |
| RCCF | Regional Child Care Facility |
| RFP | Request for Proposal |
| SB | Senate Bill |
| SFY | State Fiscal Year |
| SMG | Savio Management Group |
| YTD | Year to Date |

# INTRODUCTION

The Colorado General Assembly passed Senate Bill (SB) 21-071 during the 2021 legislative session. Created to address the length of time juveniles are detained, SB21-071 reduced the statewide statutory limit on detention bed capacity from 327 to 215, starting in SFY 2021-2022 (APPENDIX A). From 2003 to present, statewide detention beds have been subjected to statutory reductions on four occasions. This latest reduction in detention beds has initiated the need to progress policy and advance service responses for detained youth.

In 2018, the federal Family First Prevention Services Act (Family First) (APPENDIX A) began a paradigm shift within child welfare. This act granted county departments of human or social services the ability to use federal funding for services that keep children and families safely together. The purpose of this change was to prevent out-of-home placement by providing a continuum of prevention services that support youth, including those involved in the juvenile justice system.

As child welfare and system partners began to align policy and practice with the mandates of Family First, Colorado continued to evolve and innovate resources for youth and families. 2018 also saw the introduction of SB18-154 (APPENDIX A). This bill introduced the definition of Dually Identified Crossover Youth, as well as the requirement for local CYDC Juvenile Services Planning Committees (JSPC) to develop plans on how to best serve crossover youth.

2019 brought the introduction of significant Juvenile Justice reforms from passage of SB19-108 (APPENDIX A). SB19-108 created opportunities to improve the outcomes for youth in the juvenile justice system by standardizing several screening tools to better align youth needs to appropriate, effective services.

Standardized screening, the identification of dually involved youth, and the fact that youth who are involved in the juvenile justice system are now eligible for prevention services through Family First, furthered the opportunity for the paradigm shift. With change comes challenges. One of the challenges faced by the State's juvenile justice system was the reduction in detention bed capacity. Four reductions have occurred over the years. On July 1, 2019, the statewide bed capacity went from 382 to 327, a 55 bed reduction. A little over eight months later through an executive order that coincided with the World Health Organization (WHO) declaring COVID-19 as a worldwide pandemic, the bed capacity was temporarily reduced to 200 (effective April 21, 2020), then further reduced to 188 (on October 25, 2020). When the executive order expired, the detention bed capacity statutorily became 215 as part of SB21-071, effective July 1, 2021.

SB21-071 addresses these challenges by striving to further understand the needs of local pre-adjudicated and adjudicated youth in the context of the juvenile justice and child welfare systems. This includes their appropriate assessment for services and placement in the least restrictive environment.

SB21-071 added members to the existing Advisory Board, referred to as "the working group" in statute, established with SB91-094, including: a county sheriff, youth advocacy organizations, at least two persons directly affected by the incarceration of youth, one of which must be a youth that is or has been in the custody of a DYS facility and a family member directly affected. Additionally, SB21-071 required a minimum of three county departments of human or social services representatives to be added to membership (APPENDIX B).

In addition to their other duties as outlined in statute (C.R.S. 19-2.5-1404), the Advisory Board must *"establish criteria for both detention and commitment for the purpose of determining which juvenile offenders are appropriate for placement in the physical or legal custody of the department of human services."* These criteria must be systematically uniform so that decisions for placement criteria are consistent across the state of Colorado.

SB21-071 also tasked the Advisory Board to complete the following prior to October 31, 2022:

A) Develop performance standards and outcome measures to evaluate whether young people who have been alleged and adjudicated offenders are in the least restrictive environment with appropriate services. This requires the evaluation of alternative placements, range of placements, and the community based-service options available in each judicial district and county.

B) Determine whether and how specific data and outcome measures will be reported to evaluate the efficacy of both less restrictive placements and community-based services.

C) Provide recommendations to enhance the continuum of community-based services and placement options, including but not limited to, improvements of availability and quality of less restrictive alternative placement and services.

Prior to July 1, 2023, and every July thereafter:

A) The Department of Human Services is responsible for submitting an annual report to include analysis of data collected in

accordance with the stated performance standards and outcomes measures developed in subsection (3)(a)(I) of this section of SB21-071, as well as:

1) Implementation efforts; analysis of the continuum of in-home and out-of-home placement options and supports; capacity and bed demands; availability/demand of all levels of placement; use of funding for all levels of placement and services; community-based services that allow youth to remain home; barriers to placement; youth detained waiting less restrictive placement; average length of stay for detained youth; family/youth satisfaction with less restrictive alternative placements; and analysis of crossover youth.

On October 25, 2022, and with over 200 requested data points, the Advisory Board approved the 2022-2023 Performance Standards and Outcome Measures to evaluate if young people who have been alleged and adjudicated offenders are in the least restrictive environment with appropriate services.

The Colorado Department of Human Services is pleased to submit the *2022-2023 SB21-071 Inaugural Analysis Report to Inform Performance Standards and Outcomes for Pre-Adjudicated and Adjudicated Youth*.

**Key Term Definitions**

There are key terms used throughout this report and in analysis. Several of these terms are conceptually complex; therefore, definitions are provided for the reader in this section.

Releasability: It was determined during this process that the term “releasability” is not universal among all JDs or stakeholders. For the purposes of this report, releasability is the date in which the court determined a youth may be released from secure detention once all court conditions have been met. This can include youth who are released from detention the same day they are made releasable by the court. This can also include youth in a situation where the court deems them releasable with a condition (the main group of focus for this report). Conditions that may cause a youth to remain in detention past their releasable day are: awaiting placement in a lower level of care (LOC), including in a residential facility; awaiting the signature of a co-signer to a personal recognizance (PR) bond; awaiting extradition if an out-of-state youth who is served by the Interstate Commission for Juveniles (ICJ) has waived their

extradition. Once the conditions have been met, the court agrees that at this point the substantial risk of serious harm to others or flight risk to avoid prosecution has been sufficiently mitigated for release.

Trails: Colorado's current CCWIS known as *Trails*, is the official case record for all Division of Child Welfare (DCW) and DYS documentation. Initially implemented in 2001, it has been continually enhanced and modernized to address issues and meet the changing needs of practitioners and those served by our system.

Emergency Release: An emergency release is the release of youth from detention as a result of a JD reaching a detention capacity limit or a facility reaching an admissions capacity limit. C.R.S. 19-2.5-1515 requires each JD to have a plan to manage its bed allocation. Emergency releases are recommended by CYDC staff who often confer with a team that includes the district attorney, defense attorney, and guardian ad litem. The releases are then approved by the court in their respective JD. Oftentimes, CYDC staff will preempt the need for a potential emergency release by releasing a youth before an emergency release is necessary. CYDC coordinators gather a group of professionals to discuss the youth in detention and determine if it is possible to offer a release with a services plan for one or more youth prior to a long weekend, for example. Trails does provide a way to code a release reason as "emergency release." However, the fact that a release is "emergency release" is not always known to the facility admissions person who is responsible for entering this information into Trails. Additionally, because youth are released preemptively, this reduces the need to report emergency releases. There is currently no mechanism for tracking these youth who are released early.

Detention Bed Utilization Tracking Sheet (DBUTS): The DBUTS is a protected Google Sheet that keeps personally identifiable information (PII) for detained youth within each JD. CYDC coordinators and bed managers use this sheet for bed and case management of youth who are in detention. This information is often manually collected from other sources (i.e., Trails or Colorado State Court Data Access website). For example, this sheet now tracks detention stays from the date of the initial detention hearing date, data only tracked consistently on this Google sheet. The information requested for collection in the DBUTS has increased over time, so some of the information for cases may be unavailable. This is due in part to the fact that information collected retroactively may only be available in cases that have been expunged. Tracking information from one database in a spreadsheet can increase the likelihood of errors, so the SB21-071 team reviews and cleans the data. This process is continually being improved.

Detention Hearing: According to C.R.S. 19-2.5-305 (3) (a) (I), a juvenile taken into custody pursuant to this article and placed in a detention or shelter facility or a temporary holding facility is entitled to a hearing within forty-eight hours, excluding Saturdays, Sundays, and legal holidays, of such placement to determine if he or she should be detained. The detention hearing is the date following detainment where the court decides if a person may be released or must remain in detention. The detention dates for this data set were manually collected by the SB21-071 team via the Colorado State Court Data Access website. In some cases a detention hearing was not listed. Sometimes the hearing dates were probation hearings and the detentions were a result of a court sentence and not a pre-adjudication detainment.

30 Day Time Measure: The SB21-071 performance standards and outcome measures refer to a 30 day time measure as a guideline for the time youth are in detention and awaiting conditional release for out of home placement or access to community services. This benchmark is not a legislated time frame but rather an interval recommended by the Advisory Board as a tangible measure to create a starting point for analysis.

Direct File: The term "Direct File" is used to describe statutory discretion that allows prosecutors to decide whether to bring charges against persons under the age of 18 but 16 years of age or older at time of offense (C.R.S. 19-2.5-801) in juvenile court or in adult criminal court. When a prosecutor chooses to directly file a youth's case in adult criminal court, the juvenile court does not have jurisdiction over proceedings concerning the charge(s). In Colorado, Direct File discretion is limited to specific serious crimes and the age range previously cited. Official language and description can be found in statute.

Reverse-Transfer: Refers to the process whereby after a preliminary hearing, a juvenile may petition the adult criminal court to transfer the case back to juvenile court. Ultimately the court determines whether the juvenile and the community would be better served by criminal (e.g., adult) or adjudicative (e.g., juvenile) proceedings. The reverse-transfer process was established in Colorado in 2012 through House Bill (HB) 12-1271. Complete statutory language and description can be found in C.R.S. 19-2.5-802.

**Challenges of SB21-071 Reporting Requirements**

This first report has been impacted by several challenges, including a shortened data analysis window, limited access to data, and staffing vacancies. Many of the metrics developed will take time to begin tracking, especially as some measures require new data processes and Trails builds, which involve many stakeholders and require

additional discussion. Some of the factors which have impacted this first report are outlined below.

Staffing: There were five positions allocated in the budget for the implementation of the work for this legislation. The positions were divided between DCW and DYS in an effort to establish a collaborative review of the systems under the Office of Children, Youth and Families (OCYF), which is an Office of Colorado Department of Human Services (CDHS). DCW hired the Juvenile Justice Community Resource Administrator in January 2022 and a Juvenile Justice Resource Analyst in February 2022. In September 2022, DYS hired an Evaluator who is housed under CYDC within DYS. The Evaluator within DYS/CYDC and Juvenile Justice Resource Analyst within DCW both resigned in September 2022. In September 2022, one of two Juvenile Justice Resource Analyst positions within DYS was filled within DYS's Data Management and Analysis (DMA) team. The Evaluator position within DYS/CYDC was subsequently filled again in February 2023, and the Juvenile Justice Resource Analyst position within DCW was rehired in March 2023. The second Juvenile Justice Resource Analyst position within DYS was rehired as of June 2, 2023. This position was initially hired on August 5, 2022; however, the Analyst resigned a month later on September 1, 2022. The second posting of this position failed (no qualified candidates applied). The third posting of the position was successful. Final interviews were held in May 2023, with an offer accepted in June 2023. Staffing vacancies and hiring processes have caused this project to move slower than anticipated.

Complex Systems: The overlap and crossover between systems requires vast data matching and integration efforts, along with a critical understanding of subject matter to strategically meet and inform the required SB21-071 reporting mandates. This has required extensive learning, cooperation, planning, stakeholder education/training/buy-in, data collection, cleaning, and additional Trails builds in addition to data analysis, interpretation, and synthesis.

Multiple Data Collection Systems: Two specific data collection systems (Trails and DBUTS) required a massive integration effort for this inaugural report, and the effort was highly manual and staff/time intensive. Trails is considered the official record and the main CCWIS that houses information for DCW and DYS. The DBUTS (defined in Key Term Definitions section) is a protected Google sheet created to house, manage and track information and reporting requirements not readily available in Trails (e.g., LOS from hearing date to release date). Due to the two data systems and their design (i.e., units of analysis), data metrics like LOS were difficult to compare and align. The Trails system is designed to capture detention facility admissions as the primary unit of analysis, whereas the DBUTS system was designed to capture youth as the primary unit of analysis. The SB21-071 team is assessing options to better integrate these

systems to allow for more automated and efficient record linking across systems and mitigating this challenge.

Although DBUTS is not considered an official record, the system was instrumental in capturing and tracking information that would have been otherwise unavailable. For example, to ensure accuracy and a full understanding of each youth's circumstances, for each of the 1,177 youth in the cohort, the results of every court hearing were manually reviewed in the Colorado State Court Data Access website. There were some records that were not identifiable. Generally this was because either the court minutes did not reflect adequate information to make such a determination, or the case had been expunged at the time in which the information was being researched.

Memorandums of Understanding (MOU)/Data Sharing Agreements (DSA): MOUs or DSAs are required for interagency sharing of PII or protected health information. There are several agency agreements that once in place, SB21-071 staff will utilize to report the data elements outlined by the Performance Standards. There are on-going conversations between stakeholders regarding the development and collection process to address this need. To collect this data for the youth identified in this current cohort, an overarching DSA needs to be established between the BHA and OCYF. A DSA would allow individual youth to be aligned with their IA referral history and recommendations. Discussion and meetings continue forward to remove this barrier.

Expungements: Expungement is defined in C.R.S 19-1-103 (63) as "the designation of juvenile delinquency records whereby such records are deemed to never have existed." The expungement process can be reviewed in C.R.S. 19-1-306. At times expunged data can cause data to be removed from systems, impacting the ability to collect or include it in overall analyses. For the context of this report and the unique data needed to understand the experience of detention youth, expungements can be a large challenge as it excludes data that otherwise could be incorporated into a historical analysis and obscures overall trend data.

Request for Proposal (RFP): In October 2022, an RFP was posted on the Vendor Self Service (VSS), the State's solicitation portal where requests such as these are reported. The RFP requested a third party writer for this report. Unfortunately, no responses were received before the November 2022 RFP expiration, and as a result, the SB21-071 team wrote this report in addition to collecting and analyzing the information. This significantly decreased the amount of time available for data collection and evaluation.

*Figure 01: SB21-071 Time Frame*




*additional information can be found in APPENDIX C

# POPULATION DESCRIPTION

Information related to youth detained between July 1, 2022 and December 31, 2022. (APPENDIX D)

**Summary**

Cohort Timeframe: The data in this section gives an overview of the youth cohort used throughout this report, including average daily population (ADP) and LOS. The cohort chosen for this report includes youth who were screened, admitted and detained in a DYS State-operated secure youth services center between July 1, 2022, and December 31, 2022. Most other DYS annual reports follow the state fiscal year. However, since the performance standards were established by the Advisory Board in October 2022, there was a significant amount of missing data to report for July 2021 - June 2022. Therefore, this six month period was selected in order to have the most complete data as possible to report for this first report. Future reports will follow the traditional fiscal year pattern, starting with the report due July 2024 which will reflect data from July 1, 2022 - June 30, 2023.

Key Takeaways: In this cohort, there were 1,177 unique youth and 1,475 total admissions, indicating that some youth had multiple detention stays. The average LOS from admission to release date for all youth is 19.81 days. The ADP across all JDs is 173.47, which is 80.7% of the statutory detention capacity of 215. The average daily maximum is 175.65, which is 81.7% of detention capacity. There were nine districts with a greater number of admits than releases during this six month period. This information is shown on Figures 02 and 03 as well as in Table 01 below.

Data Sources for this section: Data sources for this information are DYS's December 2022 Monthly Management Report, the December 2022 CYDC JDSAG Supplemental Report, and the Trails detention extract. The extract is an export from Trails. This version contains fiscal year to date (YTD) information through December 31, 2022 and is also narrowed to fit the cohort for this report, including any youth who had detention stays between July 1, 2022 and December 31, 2022.

*Figure 02: ADP and LOS*




*Figure 03: Statewide detention ADP (July - December 2022)*



*Table 01: Overview by JD of ADP, LOS, population*

| JD | Counties | Total Population | Youth Population Ages 10-17* | JD Bed Allocation | ADP YTD | LOS YTD |
|---|---|---|---|---|---|---|
| 1ST | Jefferson, Gilpin | 585,539 | 53,137 | 20 | 14.16 | 15.57 |
| 2ND | Denver | 711,973 | 55,643 | 35 | 25.24 | 20.54 |
| 3RD | Huerfano, Las Animas | 21,579 | 1,866 | 2 | 0.69 | 15.95 |
| 4TH | El Paso, Teller | 763,454 | 83,031 | 27 | 32.98 | 23.61 |
| 5TH | Clear Creek, Eagle, Lake, Summit | 103,507 | 8,633 | 2 | 0.45 | 12.91 |
| 6TH | Archuleta, La Plata, San Juan | 70,826 | 6,875 | 2 | 0.05 | 2.01 |
| 7TH | Delta, Gunnison, Hinsdale, Montrose, Ouray, San Miguel | 106,048 | 10,293 | 3 | 2.91 | 26.64 |
| 8TH | Jackson, Larimer | 364,128 | 35,606 | 11 | 6.52 | 9.07 |
| 9TH | Garfield, Pitkin, Rio Blanco | 85,938 | 8,326 | 2 | 1.25 | 83.33 |
| 10TH | Pueblo | 169,504 | 17,262 | 10 | 5.68 | 21.39 |
| 11TH | Chaffee, Custer, Fremont, Park | 92,504 | 7,001 | 2 | 0.41 | 4.29 |
| 12TH | Alamosa, Conejos, Costilla, Mineral, Rio Grande, Saguache | 46,550 | 5,239 | 2 | 1.65 | 20.11 |
| 13TH | Kit Carson, Logan, Morgan, Phillips, Sedgwick, Washington, Yuma | 78,992 | 8,394 | 2 | 2.83 | 22.07 |
| 14TH | Grand, Moffat, Routt | 54,096 | 5,536 | 2 | 0.58 | 14.22 |
| 15TH | Baca, Cheyenne, Kiowa, Prowers | 18,634 | 2,142 | 2 | 1.19 | 8.12 |
| 16TH | Bent, Crowley, Otero | 30,293 | 2,796 | 2 | 0.09 | 3.02 |
| 17TH | Adams, Broomfield | 597,878 | 67,324 | 17 | 16.58 | 18.01 |
| 18TH | Arapahoe, Douglas, Elbert, Lincoln | 1,057,656 | 110,220 | 37 | 34.59 | 19.84 |
| 19TH | Weld | 340,133 | 39,451 | 15 | 11.05 | 10.03 |
| 20TH | Boulder | 329,793 | 29,389 | 10 | 4.17 | 22.24 |
| 21ST | Mesa | 157,323 | 16,327 | 8 | 8.45 | 10.87 |
| 22ND | Dolores, Montezuma | 28,359 | 2,894 | 2 | 1.59 | 8.17 |
| **TOTAL** | **STATE** | **5,814,707** | **577,385** | **215** | **173.47** | **19.81** |

*Department of Local Affairs, Demographer's Office 2022 estimates, as reported in the monthly CYDC JDSAG Supplemental report.

**LOS from Detention Hearing**

Information about the average length of time between the hearing dates, the dates youth were made releasable by the court, and the release dates is available in the table that follows. Typically detention hearings occur within 48 hours from admission date, except over weekends or holidays. Of the 1,177 unique youth in this detention cohort, an estimated 1,061 (90.1%) were made releasable by the court during this time period. This number includes both releasable youth (youth made releasable but remaining in detention awaiting placement, and those youth who were made releasable and immediately released). The average time for these 1,061 youth from the date they were made releasable by the court to release date is 8.69 days. Of these youth deemed releasable, 463 youth, or 39.3% of the total youth cohort, were released on the same day. It is important to note that following the detention hearing, if a youth remains in detention, additional assessments are completed to assess for placement and other services in the community that will support the youth's success upon release. As these decisions and arrangements for placement and services take time, this likely accounts for the days in detention between hearing date and release date. Information on releasable youth awaiting placement is delineated under the Performance Standard 1 section of this report.

Data Quality & Releaseables Data: As previously discussed, the average LOS from Trails and the average days in detention from the DBUTS sheet are calculated using two different methods, resulting in two different figures. The two figures do not align as the unit of analysis varies. The Trails system is designed to capture detention admissions as the primary unit of analysis (average LOS is calculated based upon admissions), whereas the DBUTS system was designed to capture youth as the primary unit of analysis (average LOS is calculated based upon youth or youth episodes). The calculations also vary for other reasons.

The Trails data (or "extracts" of Trails data) is based off of a time stamp, includes same day admissions and releases, and excludes waiting for transfers and time spent in court proceedings. Conversely, the DBUTS data is based off of the first day of entry into the system and last day of exit from the system. Therefore, these two numbers reflect slightly different information.

The hearing dates and dates when youth were made releasable by the courts come from court records and were individually and manually researched by the SB21-071 team. The average LOS in detention from hearing date to release date, and from releasability date to release date, are based on the admissions dates manually entered into the DBUTS, which occasionally differ from the Trails database admissions

dates. It was impossible to tell how the hearing dates in the case notes correspond to admissions; therefore, the hearing dates were filtered to include only those with a hearing date after the admission dates. That means that these numbers are a more conservative estimate and may exclude some information related to multiple admissions by the same youth.

*Table 02: LOS for significant detention dates*

| Average Time in Detention | Days |
|---|---|
| Trails - LOS per Admission | **19.81*** |
| DBUTS - LOS per Detention Stay | **31.13*** |
| LOS - Hearing Date to Release Date | **25.74** |

*As mentioned above, these are the two LOS numbers that do not fully align. This is in part because the numbers track different units of analysis, and in part because the data discrepancies between the two systems were not able to be fully aligned due to time constraints. This is one of the limitations for this report mentioned in the introduction. The SB21-071 team has already begun efforts to mitigate these discrepancies for future reports.

**Youth with Child Welfare Involvement**

A total of 405 youth out of 1,177 unique youth (34.4%) in the cohort were identified as having either an open assessment or case of involvement with county departments of human or social services during or after the time of their detention stay. This does not include all involvement that occurred prior to detention admission but does include those who had active involvement at the time of detention admission. This number does include active involvement with county departments of human or social services that began after detention release up to May 10, 2023 when the data was pulled for this report. Although assessment or case involvement occurred after the time of detention release, there is currently no accurate methodology to determine whether a youth's detention stay caused the subsequent child welfare involvement after detention release.

# PERFORMANCE STANDARDS & OUTCOME MEASURES

## PERFORMANCE STANDARD 1

*A charged juvenile will not remain in detention longer than thirty (30) calendar days after the juvenile's first detention hearing because the juvenile is waiting for the availability of an out-of-home placement that meets the juvenile's individual treatment needs or level of care as assessed by the county department and/or the youth's treatment team.*

---

Performance Metric 1: Number of youth in detention who are releasable (e.g., daily average, monthly average) to out of home placement.

Performance Metric 2: Number of denials when youth are not accepted into a Psychiatric Residential Treatment Facility (PRTF), Residential Child Care Facility (RCCF), Qualified Residential Treatment Program (QRTP), and reasons for denials.

Performance Metric 3: Number of beds available and number of licensed beds in PRTF, RCCF, QRTP, non-QRTP high-acuity beds managed by the Colorado Department of Human Services, group homes, and/or congregate care.

Performance Metric 4: Estimated foster home availability to alleged and adjudicated offenders ages 10 and above.

Performance Metric 5: Number of youth placed in kinship placement by the county and released to kinship placement by judicial district.

Process Recommendation 1: Work with the Judicial Department to create language/processes that standardizes court orders across the state.

Process Recommendation 2: Develop common definitions for terms used, and a data dictionary that displays data sources and calculations used for outcome measures.

---

**LOS Over 30 Days**

Information regarding why a youth is detained over 30 days is not currently tracked; however, the section that follows shows the number of youth admissions in detention longer than 30 days from the admission date. (Youth may have multiple admissions in detention during this time frame; admissions reflects the total admissions for all youth in the cohort). Table 03 shows that 75% of admissions in this cohort were detained 30 days or less starting from their admit date, while 25% were detained over

30 days. Future reports will reflect these numbers from the hearing date, when that data is fully available.

*Table 03: Admissions with a LOS over 30 days*

| LOS Time Frame | # of Admissions | Percent |
|---|---|---|
| LOS 30 days and under | 1,107 | 75.0% |
| Over 30 days | 369 | 25.0% |
| Over 60 days | 202 | 13.7% |
| Over 90 days | 117 | 7.9% |

**Youth Eligible for Release from Detention**

The table that follows shows the number of unique releasable youth and their admissions. Releasable youth in this context indicates youth detained one day or more after being determined releasable by a court. In these cases, their releasability status is conditional (i.e., awaiting placement, ICJ arrangements, awaiting co-sign on a PR bond), and therefore an immediate release should not be expected. Because conditional reason(s) for why a youth remains in detention after being made releasable by the court is not collected or required, a Trails build is necessary. A build in Trails that would prompt a reason why a youth is in detention past their hearing date will continue to be explored.

- Of the 1,177 unique youth, 389 (33.1%) remained in secure detention 1 day or more after their releasable date.
- The average LOS between being made releasable and being released for these youth is **20.41 days.**
- The median LOS for releasable youth is **7 days**.
- Of these youth, **94 youth** (8.0%) were detained for **more than 30 days** after being made releasable. For a breakdown of this information by JD, see Appendix E.

*Table 04: Unique youth in detention after being made releasable*

| Days Remaining in Detention | # of unique youth | % of unique youth |
|---|---|---|
| 1 day or more | 389 | 33.1% |
| 7+ days | 213 | 18.1% |
| 14+ days | 155 | 13.2% |
| 30+ days | 94 | 8.0% |
| 50+ days | 55 | 4.7% |
| 100+ days | 15 | 1.3% |

**Denials**

The number of denials when youth are not accepted into the recommended LOC are not currently collected. The reasons for denials to placement are not currently recorded in a way that can be collected consistently and effectively. A system would need to be created to uniformly collect this information.

**Foster Home Availability**

Foster home placement and kinship foster home placement are beneficial options for youth who need out-of-home placement, and especially for detained youth who need out-of-home placement following their first detention hearing. These youth may face unique hurdles in gaining placement in a foster home if available provider preferences limit the type of youth that are accepted. Examples of these preferences can include the number of children or youth allowed in the home, their ages and their gender identities. While foster caregivers are able to identify preferences at the time of certification, they are certified to serve youth aged from birth to 18. For example, a foster caregiver may have a higher comfort level with youth who are younger but are certified and may be willing to accept a youth in an older age range depending on the youth's individual circumstances.

Although foster home preferences for number of youth, age or gender identity may appear as a challenge for some placements, the greater concern as it relates to SB21-071 performance standards remains a lack of clear and established preferences when considering acceptance of pre-adjudicated or adjudicated youth. Because foster

homes in Colorado are managed by counties or Child Placement Agencies, there is not an ability to consistently record and report a foster home's preference in accepting alleged and adjudicated youth.

Similar to foster homes, kinship foster homes are certified to serve youth aged from birth to 18. Kinship foster caregivers are people with a significant relationship with the youth, including relatives, friends, and neighbors. These homes are considered kinship family foster care. Kinship family foster homes are designated and certified by the county departments of human and social services to provide care for the youth and receive financial assistance from the county similar to foster homes; non-certified kinship placements do not receive foster care reimbursement from the county.

### Kinship Placements at Release

Non-certified formal and informal kinship placements are not uncommon options for youth being released from detention. Of the youth in the cohort who were released from detention, 89 were released to formal kinship placements facilitated by county departments of human or social services. Of those youth released to formal kinship placements, 59 returned to active and pre-existing kinship placements, while 30 youth went to new kinship placements. It is important to note here that in addition to youth formally placed with kin by county departments of human or social services, many youth may be released per statute to relatives or kin without any formal placement through county child welfare. There is currently no mechanism for collection of data around these informal kinship placements.

Although this data collection process considered all 64 counties, 22 JDs and four DYS regions statewide, only a small proportion had instances of kinship placement from detention release. Most notably absent was the DYS Western Region, where six JDs and 17 counties, including Mesa County, are located. No kinship placements were reported in this area during the time frame of this report.

*Table 05: Kinship placements from release by county / JD*

| Region/Judicial District | Youth Released Back to Kinship | Youth Placed in Kinship |
|---|---|---|
| 8th JD | 16 | 8 |
| 17th JD | 2 | 1 |
| 19th JD | 8 | 6 |
| 20th JD | 2 | 0 |
| **Northeast Total** | **28** | **15** |
| 1st JD | 0 | 1 |
| 2nd JD | 13 | 2 |
| 18th JD | 16 | 10 |
| **Central Total** | **29** | **13** |
| 3rd JD | 1 | 0 |
| 4th JD | 0 | 2 |
| 10th JD | 1 | 0 |
| **Southern Total** | **2** | **2** |
| **Western Total** | **0** | **0** |
| **Release/Placement Total** | **59** | **30** |

| County | Youth Released Back to Kinship | Youth Placed in Kinship |
|---|---|---|
| Adams | 2 | 1 |
| Arapahoe | 8 | 8 |
| Boulder | 2 | 0 |
| Denver | 13 | 2 |
| Douglas | 8 | 2 |
| El Paso | 0 | 2 |
| Huerfano | 1 | 0 |
| Jefferson | 0 | 1 |
| Larimer | 16 | 8 |
| Pueblo | 1 | 0 |
| Weld | 8 | 6 |
| **Release/ Placement Total** | **59** | **30** |
| **Kinship Placement Total Overall** | **89** | |

## PERFORMANCE STANDARD 2

*Colorado Youth Detention Continuum youth in every judicial district and county can access services within 30 calendar days from their initial detention hearing to address their needs as identified through assessments, including community services that would support youth in returning home or to kinship.*

---

Performance Metric 1: Create a data collection plan for assessment data.
Performance Metric 2: Create a visual map depicting the array of services available in all judicial districts and counties, including crisis teams and crisis intervention. Including but not limited to, the services through Colorado Youth Detention Continuum (CYDC), Collaborative Management Program (CMP) and county services available across the state, and all payment sources.
Performance Metric 3: Generate a list of barriers to youth accessing services.
Performance Metric 4: Collect qualitative data, from family and youth, regarding access to services to address their needs.
Performance Metric 5: Analyze the average length of time between a referral to services and service received, overall and by service type.
Performance Metric 6: CYDC Juvenile Services Planning Committees (JSPC) will include SB21-071 Performance Standards and Outcome Measures within their yearly Juvenile Service Plans including planning, provisions, and solutions addressing each standard.

---

**Assessments**

Three assessments were reviewed for this report by the SB21-071 team: CJRA pre-screen, JDSAG, and CANS assessment. These assessments address risk of reoffense, secure detention need and LOC recommendations respectively. Results from the first two assessments are currently available, and conversations are underway with relevant stakeholders to finalize a DSA/MOU for the LOC results from the CANS assessment specific to this cohort. These are the assessments reviewed by the SB21-071 team to be used throughout all the relevant sections of this report which compare LOC to other factors. These assessments were selected because of their relevance to other sections of the bill and the performance standards; however, other assessments may be reviewed in future by the direction of the Advisory Board.

### CJRA Pre-Screen Risk Level Overview

The table that follows shows the risk levels for the cohort identified by the CJRA pre-screen. The CJRA pre-screen is used to assess risk of recidivism as a measure of predicted reoffense over time and uses the two domains of social and criminal history. (This pre-screen does not take into account the current alleged offense or measure lethality). These assessments show a fairly even distribution of risk among the cohort.

*Table 06: CJRA pre-screen risk level by unique youth*

| CJRA Risk Level | Number of Youth | Percent |
|---|---|---|
| Low | 394 | 33.5% |
| Moderate | 284 | 24.1% |
| High | 278 | 23.6% |
| Missing | 221 | 18.8% |
| **TOTAL** | **1,177** | **100.0%** |

Note on missing data: once an initial screen for a youth is completed in Trails, it does not currently copy/associate to every detention admission in the system. Therefore, although every youth is given the CJRA pre-screen at admission, Trails did not export a record for every admission.

The JDSAG screen results are discussed further in Performance Standard 3.

### Services

A visual map of services in all JDs and county departments can be reviewed in Figure 04 below and additionally in Appendix F. Included within this appendix is a comparison of services available in three districts: 7th (small), 10th (medium), 17th (large). Information comparing all services across JDs and counties can be found in Appendix G.

*Figure 04 - Service map for small JD (7th)*




*Amount listed is the total CYDC dollars spent for the June 1, 2022 to December 31, 2022 cohort. All reported figures above come from the Savio Management Group.

**Barriers to Services**

Reported by JD: CYDC coordinators along with the JSPCs for each JD were asked to answer questions for SB21-071 as part of their annual service plans submitted in January 2023. The groups were tasked with creating a complete list of barriers to youth accessing services in their JD. The intention of this metric was to include information from CYDC, probation, diversion, county departments of human or social services and other community stakeholders. As this metric is qualitative in nature, the barriers identified here are based on the perceptions of the local coordinators and members of the JSPCs and are not a comprehensive system analysis. The 22 responses were compiled into a list and reduced to the top 12 common categories. Once these 12 common categories were identified, the CYDC coordinators were asked during a coordinators meeting to rate the impact of access to services for each of the 12 identified barriers on a scale from one to five (5 = high impact; 3 = moderate impact; 1 = low impact). (Note: This was asked of coordinators and not requested for review by the entire JSPC due to time constraints, as some JSPCs meet monthly or quarterly and would not have had an opportunity to meet prior to the need of this requested information). The graphic that follows displays the top five barriers identified by the coordinators. All 12 common categories scored can be found in Appendix H.

*Figure 05: Perceived barriers for access to services - CYDC JSPCs*




Reported by Counties: In June 2022, the SB21-071 team disseminated the Youth/Family Gap Survey to all local JSPCs, directors of county departments of human or social services, school districts, law enforcement, guardians ad litem (GAL), public defenders, and district attorneys, and requested they share it with whomever they

felt should have an opportunity to respond. The survey requested that respondents identify gaps in alternative youth placement, service provision within alternative youth placement, community-based services, and the juvenile justice continuum, among other things. Responses from persons who identified themselves as a professional representative of the county department of human or social services were reviewed and compiled into common categories.

Of the 182 responses received from the survey, 51 were submitted by persons who identified themselves as professional representatives of county departments of human or social services. Twenty-five of 64 counties are represented in these 51 responses. The graphic that follows displays the top five perceived barriers identified by these respondents.

*Figure 06: Perceived barriers for access to services - survey response*




**Youth and Family Perception**

Due to time constraints and difficulty with staffing patterns, the team was unable to create and disseminate surveys to address the needs of youth and families regarding their access to services. The team has been working to identify other places where youth and families are surveyed to see if collaboration is an option for gathering this important information and/or how best to gather this information in the least-intrusive, yet meaningful way.

**Services Funded by CYDC and Counties**

The information available for services rendered by CYDC for this cohort came from SMG and for services rendered by the county departments of human or social services from Trails. The data was made available one week prior to the due date of the report. As a result, time constraints greatly impacted the ability of the data for services to be analyzed and compared. Additional information will be provided in future reports.

The data reported in the table that follows is aggregate information for all services reported by SMG, which for some JDs includes money spent for screening and assessments contracted from outside providers. Because this and other line items are not congruently reported across JDs, the information being reported are estimates. Future reports will contain a more thorough itemized list of services.

Of the 1,177 unique youth served, 1,071 are reported as having received a service paid for by CYDC funding. An estimated 100-200 of these youth received only screening and assessment services upon arrest. Approximately $1.26 million was spent on services including, but not limited to: mental health assessments and treatment, drug/alcohol testing and substance use treatment, in-home detention services, mentoring/coaching, educational services, basic needs (e.g., food, clothing, education), transportation and family therapy/engagement services. Of the remaining amount of funds, more than $1.4 million was spent on community case management and care coordination services. Additionally, nearly $62,000 was spent on some level of community supervision. Approximately $43,000 was spent on other various services, such as career navigation services, life skills classes, incentives, and others. Roughly $550,000 was spent on intake assessments and screenings at the time of arrest.

Of the 1,177 unique youth in the cohort for this report, 31 are reported as having received a service paid for by county departments of human or social services. These 31 youth represent a total of 81 service authorizations for this report's cohort. There were 17 different service types reported for this population. The list includes, but is not limited to: mental health services, substance use treatment, family therapy, parenting/coaching/mentoring, kinship supports, and residential out-of-home placement. Information regarding specific dollar amounts tied to these services authorizations was not available in time for this report. This will be reported in the future.

The average length of time between a referral to services and service received is not a measurement currently collected by SMG or Trails. This would require development

of additional Trails functionality or functionality in a separate system. Currently, services authorization information is available with start and end dates of service authorizations. Additionally, information regarding payment for services is available with SMG but the actual connection between the two is not formally recorded.

*Table 07: Services spending by CYDC*

| JD | Dollars per JD | Unique Cohort Youth * | Average Dollars per Youth ** |
|---|---|---|---|
| 1 | $280,570.49 | 111 | $2,527.66 |
| 2 | $436,792.99 | 101 | $4,324.68 |
| 3 | $30,524.60 | 7 | $4,360.66 |
| 4 | $571,770.98 | 123 | $4,648.54 |
| 5 | $14,277.27 | 4 | $3,569.32 |
| 6 | $7,253.01 | 3 | $2,417.67 |
| 7 | $58,597.35 | 10 | $5,859.74 |
| 8 | $250,989.70 | 44 | $5,704.31 |
| 9 | $11,805.79 | 2 | $5,902.89 |
| 10 | $196,070.08 | 47 | $4,171.70 |
| 11 | $30,456.69 | 7 | $4,350.96 |
| 12 | $18,304.41 | 6 | $3,050.74 |
| 13 | $72,018.73 | 24 | $3,000.78 |
| 14 | $22,079.01 | 4 | $5,519.75 |
| 15 | $2,553.40 | 6 | $425.57 |
| 16 | $2,574.38 | 1 | $2,574.38 |
| 17 | $300,162.80 | 145 | $2,070.09 |
| 18 | $568,310.79 | 233 | $2,439.10 |
| 19 | $257,663.42 | 98 | $2,629.22 |
| 20 | $110,971.79 | 23 | $4,824.86 |
| 21 | $147,392.97 | 63 | $2,339.57 |
| 22 | $14,494.44 | 9 | $1,610.49 |
| **TOTAL** | **$3,405,635.10** | **1071** | **$3,179.86** |

** Indicates number of unique cohort youth who received CYDC funding for services at some point during the time frame for this report, not total unique cohort youth*

*** Costs for services vary depending on the needs of the youth and do not represent actual costs per youth*

**CYDC Juvenile Service Plans**

As previously mentioned, a section was added to the annual JSPC Annual Plans for FY 2023-2024. The intention was to create awareness of the parameters of SB21-071 and to request information as needed for reporting. This section of the JSPC plans will remain and will be updated with any changes made to performance standards and outcome measures annually. All 23 metrics were listed in the plan for FY 2023-2024; however, coordinators and JSPCs were only asked to respond to five. Responses were requested for the following performance standards and metrics:

Performance Standard 1, Metric 1: This metric is collected each time a CYDC Coordinator or Bed Manager enters detention information on the Detention Bed Utilization Tracking Sheet. The responsibility of CYDC personnel is the timely, accurate, and complete entry and updates of data on the sheet. Describe the policy around entering youth on the Detention Bed Utilization Tracking Sheet in a timely, accurate and complete manner. This is to include how information is to be maintained over time.

Performance Standard 2, Metric 3: Create a complete list of barriers to youth accessing services. This metric includes CYDC, Probation, Diversion and DHS.

Performance Standard 2, Metric 6: The responsibility of the CYDC Juvenile Services Plan within this metric is to provide quality and timely data to each standard as applicable.

Performance Standard 3, Metric 2: Provide a list of facilitated meetings used for families. Include all facilitated meetings, even if they are not listed above.

Performance Standard 4, Metric 4: Develop a common definition of crossover youth to facilitate statewide understanding and uniform data collection.

## PERFORMANCE STANDARD 3

*Youth in the delinquency system will be served in the least restrictive setting that meets the youth's individual needs, including education and basic needs, and mitigates the risk to the community and victim(s).*

---

Performance Metric 1: Number of overrides by detention screen level and reasons for override.
Performance Metric 2: Access to facilitate meetings for families, with facilitated meetings defined as Family Engagement Meetings (FEM), Individualized Service and Support Team (ISST) Meetings, Multidisciplinary Team Meetings (MDT), and Creative Solutions.
Performance Metric 3: Number of youth in the delinquency system who are in a different level of care than the independent assessment recommends, and the reason why.

---

**JDSAG Screen Results & Overrides**

This analysis compares the initial JDSAG assessment-recommended level and actual placement level assigned to youth after any potential overrides by the courts. This dataset includes the youth from the cohort who had detention involvement between July 1, 2022 and December 31, 2022 and any JDSAG screens done between July 1, 2022 - December 31, 2022. It is important to also note that since not all youth are screened to secure placement, this section includes youth outside the cohort as well.

Level Summary: (the following definitions are from the JDSAG manual)

- *Level 1 — Secure Detention*: the custodial status of youth who are being confined after arrest or while awaiting the completion of judicial proceedings in a physically secure/locked facility.

- *Level 2 — Staff Secure Facility*: a group facility or home where each juvenile is under continuous staff supervision and where all services such as education and treatment are provided at that location. A staff secure facility may or may not be a locked facility (C.R.S. 19-1-103).

- *Level 3 — Residential/Shelter Residential*: *Residential* - a placement in the community in a non-secure living situation; *Shelter and Temporary Shelter* - as defined by C.R.S. 19-1-103.

- *Level 4 — Home Detention/Services*: when the youth is released to home with increased supervision and/or services prior to the detention hearing. This term is often used interchangeably with "release conditions," pretrial supervision, and pending detention hearing.
  - Release Conditions: This occurs when the youth is awaiting court appearances and includes conditions such as: pretrial supervision, home detention, pending detention hearing, promise to appear, and electronic home monitoring (C.R.S. 19-2-302[4]).

- *Level 5 — Release*: can include release to a parent or guardian or release with services.
  - Release to Parent or Guardian: This occurs when those who have been taken into temporary custody are released into the care and supervision of a patent or other responsible adult (C.R.S. 19-2-507[3].

  - Release with Services: This occurs when the court decides that a youth may be released from custody on certain conditions, such as electronic home monitoring and periodic reporting.

<u>Key Takeaways Tables 09 & 10</u>: There were 323 (17.2%) total overrides out of 1,877 screens. Therefore 1,553 (82.7%) of youth screened were placed at the same level as they were screened. Of the 1,877 screens, 89 (4.7%) were overridden to place youth in a higher setting than the screen recommended, and 234 (12.5%) were overridden to place youth in a lower setting. The reasons for these overrides are not consistently logged in the Trails database.

*Table 08: JDSAG override information & direction*

| Level Difference | Number | Percent |
|---|---|---|
| Same (no override) | 1,553 | 82.7% |
| Lower | 234 | 12.5% |
| Higher | 89 | 4.7% |
| Missing | 1 | 0.1% |
| **Total** | **1,877** | **100.0%** |

The chart that follows shows a comparison between the initial screen level and the actual placement level.

*Figure 07: JDSAG screen result and actual placement level comparison*




**Access to Facilitated Meetings**

Information regarding facilitated meetings will be discussed in Performance Standard 4.

**Detention Bed Availability**

Detention bed availability varies daily. However, general bed availability can be intuited from the maximum bed counts tracked in Trails and published monthly in various DYS reports (e.g., the CYDC JDSAG Supplemental report). This report shows the highest number of filled beds per JD during a given month or during a given year. The table that follows shows an example from the December 2022 report. The highest percentage of filled beds compared to capacity across all JDs between July 1, 2022 and December 31, 2022 was 96.7%. Each month's capacity is presented in Appendix I.

*Table 09: Detention bed capacity by JD*

| JD | Bed Allocation | YTD Max | % of Cap |
|---|---|---|---|
| 1 | 20 | 23 | 115.0% |
| 2 | 35 | 35 | 100.0% |
| 3 | 2 | 2 | 100.0% |
| 4 | 27 | 40 | 148.1% |
| 5 | 2 | 2 | 100.0% |
| 6 | 2 | 1 | 50.0% |
| 7 | 3 | 5 | 166.7% |
| 8 | 11 | 13 | 118.2% |
| 9 | 2 | 3 | 150.0% |
| 10 | 10 | 11 | 110.0% |
| 11 | 2 | 4 | 200.0% |
| 12 | 2 | 4 | 200.0% |
| 13 | 2 | 6 | 300.0% |
| 14 | 2 | 2 | 100.0% |
| 15 | 2 | 3 | 150.0% |
| 16 | 2 | 1 | 50.0% |
| 17 | 17 | 26 | 152.9% |
| 18 | 37 | 44 | 118.9% |
| 19 | 15 | 18 | 120.0% |
| 20 | 10 | 9 | 90.0% |
| 21 | 8 | 15 | 187.5% |
| 22 | 2 | 4 | 200.0% |
| **State** | **215** | **208** | **96.7%** |

### LOC Recommendations

IAs occur when it is believed a youth may qualify for Qualified Residential Treatment Program (QRTP) LOC. The CANS assessment and the IA are completed by a Qualified Individual who is contracted with the local Administrative Service Organization (ASO). These IAs are funded by the BHA unless the IA is requested by the Regional Accountable Entity (RAE). In that instance, the RAE funds the IA. The completed IA and a recommendation for LOC/placement is reported. The BHA compiles data regarding referrals for and completion of IAs across the state. The previously mentioned DSA between BHA and OCYF will allow more specific information as it relates to this cohort to be reviewed. RCCF placement recommendations are not included as they are no longer eligible for Title IV-E or Medicaid per-diem reimbursements as of October 2021 as a result of the Family First Prevention Services Act. While the option for recommendation for residential substance use treatment is available and is used, there are neither residential substance use treatment facilities currently in Colorado nor out-of-state substance use treatment facilities that accept Colorado Medicaid. During the time period reviewed in this report, there were a total of 274 IA referrals of which 268 were completed prior to the end of the time period. These IAs include those completed for youth at any age and are not specific to the juvenile justice population. There were 13 out of a total of 261 youth that had two IA referrals during this time period.

The total number of unique youth in the cohort that were involved on some level with county departments of human or social services at the time of release (not necessarily requiring formal placement) is 394. This is not specific to placement location (e.g., PRTF or QRTP). Because recommendation information specific to this cohort could not be shared, the information regarding placement recommendation and actual placement is unavailable for this report but should be available in future reports once a DSA/MOU with BHA is in place. A summary of available placements (i.e., PRTF, QRTP, RCCF) can be found in Appendix J.

*Table 10: Completed IA recommendations*

| LOC Recommendation | Total |
|---|---|
| PRTF | 4 |
| QRTP | 197 |
| Residential Substance Use Treatment | 3 |
| Community-Based Services | 64 |
| **Total IAs Completed** | **268** |

## PERFORMANCE STANDARD 4

*County Human Services Departments will have resources to meet the needs of pre-adjudicated and adjudicated youth.*

---

Performance Metric 1: Number of youth served by counties due to release from detention, including prior child welfare involvement (open child welfare involvement includes: either an assessment, in-home, or out-of-home case at the time of detention. This can include all program areas.).
Performance Metric 2: Impact to county workload of youth served due to release from detention, including time spent in court.
Performance Metric 3: Quantify the financial impact to counties, as youth are released from detention and served, including staffing costs, placement costs, and service costs.
Performance Metric 4: Develop a common definition of crossover youth to facilitate statewide understanding and uniform data collection.
Performance Metric 5: Access to facilitated meetings for families, with facilitated meetings defined as Family Engagement Meetings, Individualized Service and Support Team Meetings, Multidisciplinary Team Meetings, and Creative Solutions.

---

**Impact to Counties**

As previously reported, a total of 405 youth out of 1,177 unique youth (34.4%) in the cohort were identified as having either an open assessment or case of involvement with county departments of human or social services during or after the time of their detention stay. This does not include all involvement that occurred prior to detention admission but does include those who had active involvement at the time of detention admission. Of the 405 youth that had open involvement on some level with county departments of human or social services during or after their detention stay, 82 youth had new child welfare involvement during their detention stay. Although none of these youth had open cases at the time of admission, they may have received services from the county departments of human or social services in the past. Based on the limited information available at the time of this report, it is difficult to determine the impact to county caseload as a result of services provided for this cohort. Information was not available at the time of this report to analyze the financial impact to counties as a result of serving pre-adjudicated or adjudicated youth.

**Crossover Youth Definition**

Developing a statewide definition of crossover youth is a task of the SB21-071 team. Colorado Revised Statute currently states (C.R.S. 19-2.5-102 (19)): "Dually identified crossover youth" means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case. Although this definition is part of statute, it is broad and allows for some flexibility; therefore, there are still differences across JDs and counties who choose to use other definitions that may better reflect how they are serving this population locally. While many JDs and counties in Colorado have similar components to their definitions, there are notable differences in many. Additionally, there are JDs and counties that do not have a formal definition. Having a common definition allows for the State to identify a thorough crossover youth plan that could better support these dually-involved youth across the state and those who serve them. The first step in the development of a common definition of crossover youth is to understand how crossover youth are defined across the state. To do this, JSPCs were asked to provide their JDs' crossover youth definitions as part of their plans for FY 23-24. Additionally, in an effort to understand how counties define crossover youth, the SB21-071 team partnered with the CMP. Counties were asked to provide their definitions of crossover youth in their annual reports for FY 21-22.

In the JSPC plans, the SB21-071 team provided two examples of definitions for the JSPCs to use as a guide when discussing their definitions. Several JDs adopted one of the examples as a representation of their definition of crossover youth, while others presented an alternate definition. Figures 08 and 09 that follow present the findings. The crossover youth sample definitions provided in the JSPC plans, as well as all JD and county crossover youth definitions can be found in Appendix K.

JSPC plans showed 11 JDs have their own definition of crossover youth, while three adopted the definition in statute. One JD reported not having a definition. The remaining seven JDs selected one of the sample definitions for their own. This is displayed in Figure 08. CMP annual reports indicated 38 of 49 counties involved with CMP have their own definition of crossover youth. Five CMP counties reported having no definition, while four CMP counties adopted the definition in statute. The remaining 15 counties did not report a definition due to not having a CMP and thus not having the opportunity to provide any definition for this report. These 15 are not reflected in the whole on Figure 09.

*Figure 08: Crossover definition by JD*




*Figure 09: Crossover definition by CMP county*



**Access to Facilitated Family Meetings**

When a youth and their family has, or is at risk of having, a new child welfare case opened, CMP sites and county departments of human or social services can coordinate structured, family-centered facilitated meetings to prevent child welfare involvement or support the process of achieving sustained permanency for the youth.

Individual Service and Support Team (ISST) meetings occur upon a referral to the local facilitator when a youth and/or their family require multi-system support services. The team involved in the ISST includes professionals with several different expertise backgrounds, working with the youth and their family to coordinate needed community services, and develop a plan of support. FEMs differ from ISST meetings because they are mandatory when high-risk assessments occur in the child welfare system in order to prevent re-involvement, and are required within seven days of the opening of a new child welfare case. The FEM allows the youth, the family, their supports, a neutral facilitator, and other child welfare professionals to work together to develop and plan for the involved children or youth's safety and permanency.

These meetings blend the expertise of the family with the expertise of professionals, serving a vital role in supporting families prior to and after any child welfare involvement. FEMs are entirely voluntary for the family and are only court-ordered in rare circumstances, whereas ISSTs are often court-ordered. Because of these specific missing pieces, it is a challenge to measure the utilization of these services.

Considering all 1,475 cohort admissions, there were 84 distinct facilitated family meetings scheduled that involved 71 unique youth. Of these scheduled meetings, 33 were FEMs, and 51 were ISST meetings. Although these meetings were scheduled in advance, six scheduled FEMs were not held because the youth was either unable to attend or did not report for the meeting, and two scheduled ISST meetings were not held for the same reasons. The originations of these meetings were a result of both new openings of child welfare cases and referrals for those not yet open. A total of 31 of the 33 FEMs were for youth and families with newly open child welfare cases, and 25 of the 51 ISSTs cases were for youth and families who did not yet have an open child welfare case.

Housed under the Department of Health Care Policy and Financing (HCPF) and facilitated by RAE, Creative Solutions meetings aid in the collaboration between funders and programs to connect children, youth, and families who have open involvement with county departments of human services with appropriate and necessary services. Currently, there is no formal DSA between OCYF and HCPF or the

RAEs. As a result, information regarding these meetings is currently unavailable due to the protection of personal identifying information. Discussions are currently underway to create these agreements.

## PERFORMANCE STANDARD 5

*The Colorado Department of Human Services in conjunction with designated juvenile justice serving partners will gather and analyze data to assist in reducing inequities, to ensure youth have access to culturally competent services.*

---

Performance Metric 1: Summarize the availability of culturally competent services by judicial district and county.
Performance Metric 2: Analyze demographic information of youth who are detained while releasable and youth who are served by counties due to release from detention.
Performance Metric 3: Analyze demographic information and identify any disparities as they relate to length of stay in detention.
Performance Metric 4: Analyze demographic information and identify any disparities as they relate to level of care recommended by detention screen and level of care received.
Performance Metric 5: Analyze demographic information and identify any disparities as they relate to acceptance and/or termination into/out of facilities/program/providers.

---

### Summary

To analyze disparities related to certain demographic traits, a statistical analysis was completed for three separate available demographic traits (race, gender identity, and sexual orientation) compared to four different outcome measures (CJRA risk level, child welfare involvement, LOS, and LOS for releasable youth). These tests looked for a correlation or relationship between these variables. In total, 35 statistical evaluations were completed. The results are discussed below. To analyze culturally competent services, data tracking processes need to be established and Trails systems need to be updated.

### Culturally Competent Services

Performance standard 5 seeks to ensure youth have access to culturally competent services and inequities are reduced. However, that analysis is not available for this report and requires some additional steps before it will be available. A full analysis of cultural competency should include an evaluation of service providers based on a verified matrix, feedback from stakeholders on their perceptions of cultural competency access, and a comparison of placements to cultural competent services based on the assessed needs of the individual. Therefore, further steps are needed to

achieve a summary of available culturally competent services, including creating surveys for youth and families and finding or creating an evaluation framework for cultural competency. Ideally, these assessments should be done by a third party evaluator, and should avoid making assumptions on whether services are culturally competent based solely on demographic traits. Furthermore, access to culturally competent services was one of the barriers identified in Performance Standard 2 which limits access to services overall.

Additionally, as mentioned in other sections of this report, access to referral and outside service information is currently very limited. There is currently no information on the cultural competency of outside service organizations. Accessing this data will involve establishing data tracking processes in each county and JD and in building the necessary Trails forms. This involves including the Trails team to develop new Trails systems, and several hours of staff training to begin using them. A list is being created of ideal Trails projects and builds related to SB21-071. Conversations have been started with the Trails team to begin prioritizing and designing them.

**Analysis of System Disparities for Minorities**

Performance metrics 2-5 require an analysis between several demographic traits and aspects of the detention continuum, looking for disparities minorities encounter in the system. For this report, three demographic traits (race, gender identity, and sexual orientation) and four outcome measures (CJRA risk level, child welfare involvement, LOS, and LOS for releasable youth) were immediately available in Trails. The other traits listed are either not tracked in Trails, require additional work to export out of Trails, or have significant data quality concerns. For a listing and more information on those other traits requested, see Appendix L; these traits will be added to future reports as the data becomes available.

Brief explanation of statistical analysis: For this report, 35 different statistical analyses with 13 different variable combinations were conducted on the demographic traits and the outcomes measures listed above. These analyses indicate if relationships exist between variables (through statistical significance tests) and also measure the strength of relationships found. Statistical significance analyzes the likelihood that any data correlation is real and meaningful, as opposed to random. For more detail on the specific tests conducted, statistics referenced, test result values, and value interpretation, please refer to Appendix L.

<u>Results:</u>

Of the 35 tests conducted, a few demonstrated statistically significant relationships (i.e., meaningful, not random), but weak results (i.e., strength of the relationship was weak), which is the focus of the results presented below. From these tests and results, analysts can intuit that the minority traits examined and described below do indicate a disparity in the system; however, each trait is a weak or mild predictor of the associated outcome, meaning additional factors exist that impact a youth's experience in the system.

No tests had moderate or strong results. A full table of results is included in Appendix L. Included on that list are some tests that did not have statistically significant results or which had almost null relationships. It is important to note that these tests do not produce definitive proof there are no disparities between these minorities and the outcomes measures tested. Over time the results of these tests may differ, and therefore the data should be continually assessed.

*<u>CJRA Risk Level</u>:* Of the three demographic traits examined, race and sexual orientation weakly correlate to CJRA risk level. Race demonstrates a negative correlation, which means BIPOC are less likely to have a higher risk level assigned than majority (non-minority) youth. Sexual orientation, however, has a weak positive relationship, which means youth who do not identify as heterosexual are more likely to have a higher risk level assigned.

*Table 11: Summary of CJRA risk level tests*

| Independent Variable | Dependent Variable | Statistically Significant Relationship? | Relationship Strength | Type of Relationship |
|---|---|---|---|---|
| Race | CJRA Risk Level | Yes | Weak | Negative |
| Sexual Orientation | CJRA Risk Level | Yes | Weak | Positive |
| Gender Identity (self ID) | CJRA Risk Level | No | - | - |

*Child Welfare (CW) Involvement:* Of the three demographic traits examined, race and gender identity weakly correlate to child welfare involvement. Non male youth are more likely to have child welfare involvement than male youth. The results of the tests for race and child welfare involvement are inconclusive. Although each test did identify there is a relationship, the results were unclear which youth are more or less likely to have child welfare involvement. Future reports will expand upon this investigation. Increased cohort sizes will lend additional data for analyses and subsequently provide needed clarity on the relationship and results.

*Table 12: Summary of child welfare involvement tests*

| Independent Variable | Dependent Variable | Statistically Significant Relationship? | Relationship Strength | Type of Relationship |
|---|---|---|---|---|
| Race | CW Involvement | Yes | Weak | Inconclusive |
| Gender Identity (self ID) | CW Involvement | Yes | Weak | Positive |
| Sexual Orientation | CW Involvement | No | - | - |

*LOS:* Of the three demographic traits examined, gender identity weakly correlates to LOS. This is a negative correlation indicating that male youth have a longer LOS. However, male youth represent 81.9% of the 737 records analyzed and are overrepresented in the data set. Because of this, a longer LOS for male youth is an expected result.

*Table 13: Summary of LOS tests*

| Independent Variable | Dependent Variable | Statistically Significant Relationship? | Relationship Strength | Type of Relationship |
|---|---|---|---|---|
| Gender Identity (self ID) | LOS | Yes | Weak | Negative |
| Race | LOS | No | - | - |
| Sexual Orientation | LOS | No | - | - |

*Releasable LOS:* None of these tests revealed statistically significant results/relationships.

CJRA Risk Level & LOS: This test examines whether there is a positive correlation between a youth's CJRA prescreen risk level and LOS. The results indicate there is a weak, positive relationship. In other words, youth who are deemed high-risk to recidivate have longer lengths of stay in detention (25.9 days, on average; 9.7 median) than youth who are deemed moderate-risk (18.3 days, on average; 5.9 median) or low-risk (15.2 days, on average; 2.5 median) to recidivate. However, there is a high amount of deviation/ variation in these numbers, meaning that averages are more influenced by outliers in the dataset.

*Table 14: CJRA risk level & LOS*

| Independent Variable | Dependent Variable | Statistically Significant Relationship? | Relationship Strength | Type of Relationship |
|---|---|---|---|---|
| CJRA Risk Level | LOS | Yes | Weak | Positive |

# ADDITIONAL INFORMATION

**Direct File and Reverse-Transfer**

In this section, more context and information regarding Direct File and Reverse-Transfer cases is provided. Both types of cases are important as it pertains to detention bed management. Youth as parties to these case types can remain in detention for extended periods of time, as the courts ultimately decide which jurisdiction will best serve the juvenile and the community.

Direct File

The definition of Direct File is provided in the Key Term Definitions section of this report, but it can also be generally described as cases in which the district attorney has made the decision to prosecute a case against a person under the age of 18 but 16 years of age or older (C.R.S. 19-2.5-801) at the time of offense in adult court. Information on Direct File cases is not adequately or fully collected in any State database, although three separate systems do partially track this data. The official source of Direct Filed cases is the Colorado District Attorneys' Council (CDAC) and their CDAC ACTION case management system. This database includes and incorporates user-entered information from all JDs but is subject to data entry errors. Two other state systems also house limited portions of this data, but are incomplete, inconsistent and difficult to quality assure: the Colorado State Courts Data Access system (managed by the State Judicial) and Trails (managed by CDHS). In short, the three separate systems are not linked and do not have a ready mechanism for sharing this information; the current collection, review and summary process is highly manual.

CDHS has partnered with CDAC over the years to obtain summaries of Direct File (and Reverse Transfer) information by calendar year (CY). In support of the reporting requirements for which the Department is responsible, the CDAC staff prepares and provides this data, allowing CDHS to share aggregate counts. CDAC also provides detailed case information that allows for cross-system data checks and validation efforts to take place.

CDAC reported there were 50 Direct File cases recorded in CY 2022, compared to 44 from CY 2021. It is not known how many of these cases were associated with youth examined in this report cohort; however, analysts are working toward developing the reporting ability for future reports.

In addition to the data housed in three separate systems, a clear definition of a Direct File case/youth has not been established, trained or communicated to guide statewide use and analysis. There are multiple points in the process where a case could be deemed "direct file" including:

- Direct File hearing scheduled
- Direct file hearing held
- Direct file decision made (case closed in juvenile court; new case opened in adult court)
- Sentenced to Adult Corrections, but still in detention awaiting transfer
- Reverse-Transfer motion filed
- Reverse-Transfer hearing scheduled
- Reverse-Transfer hearing held
- Reverse-Transfer decision made by courts

<u>Reverse-Transfer</u>

The definition of Reverse-Transfer is provided in the Key Term Definitions section of this report, but can generally be described as the process whereby a juvenile petitions the adult criminal court to transfer their case back to juvenile court. CDAC has stated that the Reverse-Transfer Hearing data continues to be difficult to obtain, as it is not regularly tracked in the ACTION database. While CDAC may not be considered the official source of Reverse-Transfer hearing data, staff have advised that the information can be found in Judicial's Colorado State Courts Data Access system by manually searching specific court cases, then reading and counting Reverse-Transfer hearing notes. The current data was made available as CDAC staff manually retrieved and reviewed court cases within Judicial's Data Access system, which originated from hearing notes/minutes entered by courtroom clerks.

CDAC reported there were six Reverse-Transfer hearings held in CY 2022, compared to 14 from CY 2021. Again, it is not known how many of these hearings were associated with cohort youth examined for this report; however, analysts are working toward developing this ability for future reports. Please note these are Reverse-Transfer hearings confirmed to have been held. There are several reasons why a Reverse-Transfer hearing may be scheduled, but never actually held. These reasons include, but are not limited to: the case pled out and the hearing was vacated, failure to appear and/or warrant status, waiver of hearings, case dismissals, and cases still considered "open," with hearings scheduled in the future days/months.

Similar to Direct File, there is no clear definition of a Reverse-Transfer case; at least not one that has been established, trained or communicated to guide and foster

uniform statewide tracking. There are multiple points in the process where a case could be deemed "reverse-transfer" including:

- Reverse-Transfer request filed
- Reverse-Transfer hearing scheduled
- Reverse Transfer hearing held
- Reverse Transfer decision made by courts

**HB 23-1249**

Please note data required as a result of HB 23-1249 Reduce Justice Involvement will be discussed in the next annual report in 2024. This bill is not in effect until August 2023 and there is not sufficient time to get the new data required by the date this report is due.

**Data Collection Needs**

- Create a report for reason detained status from Trails
- Develop Trails prompt for reason/ barriers for youth being in detention longer than 30 days
- Referral Form for services and with follow up on denials from services
    - Add data to track cultural competency of services
    - Add means of tracking denial reason, and barriers for placement based on youth characteristics or circumstances
- Add DBUTS data to Trails
- Reason for overrides on LOC - consistent entry
- Tailor Trails builds and recommendations to staff entering data, balance priorities based on workload
- Work on data consistency and quality for demographics
- Track information related to court orders, especially around when a youth is made releasable
- Copy CJRA Pre-Screen risk level across each admission for youth
- Other Trails builds as needed

**Recommendations**

- Train CYDC, DYS, and child welfare staff for data processes, quality, and consistency related to SB21-071 desired outcomes
  - Release reason
  - New Trails builds
- Collaborate with other departments and stakeholders
  - Continue to investigate areas of overlap with other departments on data and reporting
  - Continue to work on DSAs/ MOUs to gather information relevant to this report
  - Work with the judicial department to record court related information
  - Outreach the state's two tribal nations (Southern Ute Indian Tribe and Ute Mountain Ute Tribe) to increase understanding of their unique needs
- Refine and clarify term definitions and performance standards with the Advisory Board
  - Cultural competency – establish definition and affirm validated evaluation tool
  - Releasability – including an updated list, with definitions, unto whom a youth may be released
  - Clarify assessments desired or approved assessments collected for Performance Standard 2 and related data points throughout report
  - Address education metrics for detention youth
  - Balance risks to victims with criminogenic needs of youth in detention continuum
  - Clarify Performance Standard 4, metric 1 – youth served "due to release from detention"
  - Clarify Performance Standard 4, metric 2 – impact to counties, and time spent in court
- Partner with third party evaluators
  - For future annual reports
  - For analysis on cultural competency
- Plan Trails development with relevant stakeholders to support future data collection efforts

# APPENDIX A - Referenced Bills

| | |
|---|---|
| HR 253 | Family First Prevention Services Act of 2017<br>https://www.congress.gov/115/bills/hr253/BILLS-115hr253ih.pdf |
| SB 18-154 | Juvenile Planning Committee Crossover Youth Plans<br>https://leg.colorado.gov/sites/default/files/2018a_154_signed.pdf |
| SB 18-254 | Child Welfare Reforms<br>https://leg.colorado.gov/sites/default/files/2018a_254_signed.pdf |
| SB 19-108 | Juvenile Justice Reform<br>https://leg.colorado.gov/sites/default/files/2019a_108_signed.pdf |
| SB 21-071 | Limit The Detention Of Juveniles<br>https://leg.colorado.gov/sites/default/files/2021a_071_signed.pdf |
| HB 23-1249 | Reduce Justice-involvement For Young Children<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1249_enr.pdf |
| HB 23-1269 | Extended Stay And Boarding Patients<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1269_enr.pdf |
| HB 23-1307 | Juvenile Detention Services And Funding<br>https://leg.colorado.gov/sites/default/files/documents/2023A/bills/2023a_1307_enr.pdf |

# APPENDIX B - CYDC Advisory Board

| NAME | REPRESENTATIVE |
|---|---|
| Kelly Abbott | Manager, Office of Adult and Juvenile Justice Assistance (OAJJA), Division of Criminal Justice |
| Amy Bishop | 17th JD Education Advocate, Colorado Youth Detention Continuum |
| Sara Boylan | 20th JD Coordinator, Colorado Youth Detention Continuum |
| Stacie Colling | Juvenile Defense Coordinator, Office of the Alternate Defense Counsel |
| Katie Hecker | Youth Justice Attorney, Office of the Child's Representative |
| Kelly Friesen | 14th JD Coordinator, Colorado Youth Detention Continuum |
| Audrey Galloway | 19th JD District Court Magistrate |
| Priscilla Gartner | Public Defender, Colorado State Public Defender's Office |
| Rebecca Gleason | 18th JD Chief Deputy Attorney, Colorado District Attorneys' Council |
| Bill Gurule | 12th JD Chief Probation Officer |
| Tom Harbaugh | Probation Analyst II, State Court Administrator's Office |
| Kim Howard | 2nd JD Chief Probation Officer |
| Anders Jacobson | Division Director, Division of Youth Services |
| Catania Jones | Director, El Paso County Children, Youth and Family Services |
| Kira Jukes | 1st JD Coordinator & Director Jefferson County Juvenile Assessment Center, Colorado Youth Detention Continuum |

| NAME | REPRESENTATIVE |
|---|---|
| Joe Kellerby | Division Director,<br>Mesa County Children, Youth and Families and Adult Protection |
| Kelly Kissell | Programs Manager,<br>Office of Victims Programs |
| Brie Knight | Assistant Director,<br>La Plata County Department of Human Services |
| VACANT | Youth Advocacy Representative |
| Elizabeth McCarthy | 2nd JD Magistrate |
| Christine Meyer | Senior Advisor for Children, Youth and Families,<br>Behavioral Health Administration |
| Jessica Perrill | Assistant Attorney General,<br>Attorney General's Office |
| Andrew Prehm | Bureau Chief,<br>El Paso County Sheriff's Office |
| Tim Read | Commander,<br>Westminster Police Department |
| Gretchen Russo | CDHS Judicial/Legislative Administrator |

# APPENDIX C - Timeline

| Senate Bill 21-071 Tasks and Deliverables Timeline Year One (October 2021 - November 1, 2022) | | | | |
|---|---|---|---|---|
| TIME FRAME | October 2021 - January 1, 2022 | January - April 2022 | April - July 2022 | July - October 2022 |
| MEETING SCHEDULE | 1. October 22, 2021 Advisory Board Meeting<br>2. Sub Committee Meeting(s) as required | 1. January 28, 2022 Advisory Board Meeting<br>2. Sub Committee Meeting(s) as required | 1. April 22, 2022 Advisory Board Meeting<br>2. Sub Committee Meeting(s) as required | 1. July 22, 2022 Advisory Board Meeting<br>2. October 25, 2022 Advisory Board Meeting<br>3. October 25 -27, 2022 CYDC Conference<br>4. Sub Committee Meeting(s) as required |
| DUE DATES / MILESTONES | 1. Identify data<br>2. Hire DCW (2) and DYS Staff (3) | 1. Collect Data<br>2. Complete need assessment<br>3. Assess impact on County DHS<br>4. January - Juvenile Justice Community Resource Administrator, OCYF hired<br>5. February - Juvenile Justice Resource Analyst, OCYF hired | 1. Draft Performance Measures and Outcomes<br>2. Gather Stakeholder input | 1. Performance Measures adopted by Advisory Board<br>2. CYDC Evaluator hired and resigned<br>3. September - Juvenile Justice Resource Analyst, OCYF resigned<br>4. October - Data Analyst, DYS hired |

| Senate Bill 21-071 Tasks and Deliverables Timeline Year One (October 2021 - November 1, 2022) | | | | |
|---|---|---|---|---|
| TASKS | 1. Identify Necessary Data:<br>● In-home services<br>● Out-of-home services<br>● Community-based services<br>● Funding availability.<br>2. Identify data sources<br>● Div. of Child Welfare<br>● CYDC<br>● Div. of Youth Services<br>● County DHS<br>● Youth/Families<br>● State Judicial | 1. Collect Data:<br>● Child Welfare data<br>● CYDC data<br>● DYS data<br>2. Begin/Create Needs Assessment<br>3. Collect information from youth and families.<br>4. Assess impact on County DHS | 1. Analyze Data<br>2. Develop recommendations and input from stakeholders on in-home and out-of-home service continuums. | 1. Deliver Draft Measures to Colorado stakeholders in early August 2022<br>2. Schedule and Hold 2 virtual listening sessions for feedback on draft measures<br>3. Finalize measures at October Conference |

| Senate Bill 21-071 Tasks and Deliverables Timeline Year Two (November 1, 2022 - October 31, 2023) | | | | |
|---|---|---|---|---|
| TIME FRAME | November 2022 - January 2023 | February - April 2023 | May - July 2023 | August - October 2023 |
| MEETING SCHEDULE | 1. January 6, 2023 Advisory Board Meeting<br>2. Sub Committee Meeting(s) as required | 1. April 28, 2022 Advisory Board Meeting<br>2. Sub Committee Meeting(s) as required | 1. July 28, 2022 Advisory Board Meeting<br>2. Sub Committee Meeting(s) as required | 1. October 25, 2023 Advisory Board Meeting<br>2. October 25 -27, 2023 CYDC Conference<br>3. Sub Committee Meeting(s) as required |

| Senate Bill 21-071 Tasks and Deliverables Timeline Year Two (November 1, 2022 - October 31, 2023) | | | | |
|---|---|---|---|---|
| DUE DATES / MILESTONES | 1. Distribute Performance Standards and Outcome Measure<br>2. Develop data SB21-071 staff collection, responsibility, and timeline plan | 1. Identify report format<br>2. Organize data collected and begin writing Annual Report.<br>3. Deliver data outline and first draft of annual report to Advisory Board at quarterly meeting for review<br>4. February - CYDC Evaluator hired<br>5. March - Juvenile Justice Resource Analyst, OCYF hired | 1. May 24, 2023 Annual Report submitted for review, revision, and clearance<br>2. Begin Drafting Performance Standards for 2023-2024<br>3. June - Data Analyst, DYS hired<br>4. July - 1st Annual SB 21-071 report due to Legislature | 1. Performance Measures adopted by Advisory Board |
| TASKS | 1. Develop reporting point for all metric data and rank order of availability<br>2. Assign responsible parties for data in task one of this section<br>3. Develop time frames for data based on task one of this section | 1. Continue analyzing data<br>2. Begin cleaning and refining Data<br>3. Metrics identified as immediate and actionable completed<br>4. Metrics identified as actionable but may take time, started with a plan for completion | 1. Edit/revise written report<br>2. Engage stakeholders, providers, community through meetings, one-on-ones, surveys, etc. | 1. Deliver 2nd year Draft Measures to Colorado stakeholders in early August 2023.<br>2. Finalize 2nd year Performance Standards and Outcome Measures at October CYDC Conference Advisory Board Meeting |

**Senate Bill 21-071 Process & Meetings for Year One**

| Senate Bill 21-071 Process & Meetings for Year One (October 2021 - November 1, 2022) |
|---|
| October 2021<br>● 21st - CYDC/SB94 Advisory Board Meeting<br>● Subcommittee Meetings as Required/Needed<br>● Identify Data<br>● Identify Data Sources |
| November 2021<br>● Subcommittee Meetings as Required/Needed<br>● Identify Data...continued from October<br>● Identify Data Sources...continued from October |
| December 2021<br>● Subcommittee Meetings as Required/Needed<br>● Identify Data...continued from November<br>● Identify Data Sources...continued from November |
| January 2022<br>● 24th - Cassandra Shook start date, Juvenile Justice Community Resource Administrator, DCW<br>● 28th - CYDC/SB94 Advisory Board Meeting<br>● Subcommittee Meetings as Required/Needed<br>● Collect Data<br>● Complete Needs Assessment<br>● Assess impact on county DHS |
| February 2022<br>● 1st - SB71 Update Meeting<br>● 22nd - Start date, Juvenile Justice Resource Analyst, DCW<br>● 16th - RFP initial draft meeting<br>● 28th - Juvenile Justice Resource Analyst Meet & Greet<br>● Subcommittee Meetings as Required/Needed<br>● Collect Data...continued<br>● Complete Needs Assessment...continued from January<br>● Assess impact on County DHS...continued from January |
| March 2022<br>● 2nd - DCW Prep SB71 Meeting<br>● 2nd - Crossover Data with Colorado Lab<br>● 11th - SB71 DCW Scope Meeting #1<br>● 14th - CMP/SB71 Meeting<br>● 15th - CMP/SB71 |

- 21st - SB71 DCW Scope Meeting #2
- 29th - SB71 Meet & Greets with Denver DA Diversion; Denver Collaborative Management; Community Based Services & Alternative to Detention; Denver Anti-Trafficking Alliance; and the Office of Community Violence Solutions
- 30th - CHSDA/SB71 Meet & Greet
- RFP- drafting...continued from February
- Subcommittee Meetings as Required/Needed
- Collect Data...continued from February
- Complete Needs Assessment...continued from February
- Assess impact on County DHS...continued from February

April 2022

- 12th - SB71 Check-In Meeting
- 12th - SB71 Data update & progress needs
- 12th - HFW and COACT/SB71 Meet & Greet
- 12th - SB71 Next Steps- Internal DCW SB71 meeting
- 13th - Data Check-in
- 13th - Financial data pulling
- 15th - Foster Parent Recruitment/Retention Efforts
- 15th - Crossover Youth w/FAR and PREV services
- 19th - How to pull services by County in Trails meeting
- 22nd - CYDC Advisory Board Meeting Presentation of SB 21-071 Data RFP-drafting...continued from March
- Subcommittee Meetings as Required/Needed
- Draft Performance Measures & Outcomes
- Gather Stakeholder Input

May 2022

- 2nd - Mesa County Crossover Youth Meet & Greet
- 5th - CYDC Coordinators Quarterly Meeting
- 9th - RFP Meeting
- 10th - RFP submitted for next step
- 10th - Larimer County Crossover Youth Meet & Greet
- 16th - First Interview for DYS Data Position
- 18th - Initial Gaps/Barriers Survey Meeting
- 19th - DYS/DCW Data Collaboration Meeting
- 19th - Boulder County Crossover Youth Meet & Greet
- 20th - Crosswalk of SB71 Roles/Staff & Senior Authority Deliverables
- 24th - Crossover Youth Definition for Data Analysis
- 24th - CYDC Survey Touchbase
- 25th - SB71 Presentation for CWLT Leadership Meeting
- 25th - 18th JD Crossover Youth Meet & Greet
- 25th - CHSDA Check-in on County Needs
- 31st - Survey Follow-up
- Subcommittee Meetings as Required/Needed

- Draft Performance Measures & Outcomes...continued From April
- Gather Stakeholder Input...continued from ApriJune 2022

June 2022

- 2nd - Colorado Youth/Family Service Gap Survey sent out
- 7th - DCW Program/Service Mapping
- 8th - SB71 Data for July Advisory Board Meeting
- 14th - 1st JD Crossover Youth Discussion
- 14th - SB71 Huerfano County Impact / SB21-071 Meet & Greet Impact
- 15th - Crossover Judicial Code Discussion
- 17th - Mesa County / SB21-071 Meet & Greet- Impact
- 21st - 10th JD / SB21-071 Meet & Greet - Impact
- 21st - Fremont County / SB21-071 Meet & Greet -Impact
- 22nd - Gilpin County / SB21-071 Meet & Greet - Impact
- 23rd - 12th JD / SB21-071 Meet & Greet - Impact
- Subcommittee Meetings as Required/Needed
- Draft Performance Measures & Outcomes...continued from May
- Gather Stakeholder Input...continued from May l

July 2022

- 1st - Mesa County FAP Executive Committee (21st JD & CMP) / SB21-071 Meet & Greet - Impact
- 6th - 16th JD / SB21-071 Meet & Greet - Impact
- 6th - SB21-071 SubCommittee Meeting
- 7th - 14th JD / SB21-071 Meet & Greet - Impact
- 7th - Denver County / SB21-071 Meet & Greet - Impact
- 7th - Adams County / SB21-071 Meet & Greet - Impact
- 8th - Broomfield County / SB21-071 Meet & Greet - Impact
- 11th - Jefferson County / SB21-071 Meet & Greet - Impact
- 11th - Grand/Jackson County / SB21-071 Meet & Greet - Impact
- 11th - SB21-071 Annual Report RFP
- 12th - 1st JD / SB21-071 Meet & Greet - Impact
- 12th - Montezuma/Dolores CMP / SB21-071 Meet & Greet - Impact
- 13th - 5th JD / SB21-071 Meet & Greet - Impact
- 13th - El Paso County / SB21-071 Meet & Greet - Impact
- 14th - Douglas County / SB21-071 Meet & Greet - Impact
- 14th - El Paso County CMP / SB21-071 Meet & Greet - Impact
- 15th - Routt County IOG / SB21-071 Meet & Greet - Impact
- 18th - 7th JD / SB21-071 Meet & Greet - Impact
- 18th - Eagle County CMP / SB21-071 Meet & Greet - Impact
- 19th - 6th JD / SB21-071 Meet & Greet - Impact
- 20th - Lake County CMP / SB21-071 Meet & Greet - Impact
- 20th - Montrose County CMP / SB21-071 Meet & Greet - Impac
- 21st - Alamosa & Saguache County CMP / SB21-071 Meet & Greet - Impact
- 22nd - CYDC Advisory Board Meeting

- 25th - Washington County CMP / SB21-071 Meet & Greet - Impact
- 27th - Broomfield County CMP / SB21-071 Meet & Greet
- 28th - CYDC Coordinator Quarterly Meeting
- 29th - Rio Blanco CMP / SB21-071 Meet & Greet - Impact
- 29th - Delta DHS / SB21-071 Meet & Greet - Impact
- 29th - Washington County CMP / SB21-071 Meet & Greet - Impact

August 2022

- 1st - LaPlata CMP / SB21-071 Meet & Greet - Impact
- 2nd - Garfield / SB21-071 Meet & Greet - Impact
- 2nd - Larimer County Hybrid / SB21-071 Meet & Greet - Impact
- 4th - CYDC Advisory Committee and SB21-071 Working Meeting
- 8th - Pitkin County CMP / SB21-071 Meet & Greet - Impact
- 9th - Adams County / SB21-071 Meet & Greet - Impact
- 11th - SB21-071 Draft Performance Standards and Outcome Measures Management Review #1
- 18th - SB21-071 Draft Performance Standards and Outcome Measures Management Review #2
- 23rd - SB21-071 Draft Performance Standards and Outcome Measures Management Review #3
- 24th - SB21-071 RFP Reporting Meeting
- 31st - SB21-071 & CHSDA Check-in Meeting

September 2022

- 1st - Crystal Baker Meet and Greet, CYDC Evaluator / SB21-071
- 12th - Ouray/San Miguel DHS / SB21-071 Meet & Greet - Impact
- 22nd - Teller County CMP - SB21-071 Meet & Greet - Impact
- 7th - SB21-071 Weekly County/CDHS Update Meeting Presentation of SB21-071
- 12th - CYDC Detention Bed Utilization Tracking Sheet Feedback Session #1
- 14th - SB21-071 DRAFT Performance Standards and Outcome Measures Feedback session #1
- 21st - CYDC Detention Bed Utilization Tracking Sheet Feedback Session #2
- 23rd - CYDC Northeast Region Catchment Meeting
- 26th - SB21-071 DRAFT Performance Standards and Outcome Measures Feedback session #2
- 29th - SB21-071 Subcommittee Meeting #1: Performance Standards and Outcome Measures for Sept. 2022 Feedback Sessions
- 29th - CYDC Western Region Catchment Meeting

October 2022

- 4th - SB21-071 SB21-071 Draft Performance Standards and Outcome Measures Subcommittee Sept. 2022 Management Review #1
- 6th - CHSDA Child & Family
- 6th - CHSDA Check-in

| |
|---|
| • 10th - SB21-071 Subcommittee Meeting #2: Performance Standards and Outcome Measures for Sept. 2022 Feedback Sessions<br>• 25 - 27th CYDC Advisory Board Conference<br>• 31st - SB 21-071 Performance Standards & Outcome Measures DUE<br>• Subcommittee Meetings as Required/Needed |

Senate Bill 21-071 Process & Meetings for Year Two

| Senate Bill 21-071 Process & Meetings for Year Two<br>(November 1, 2022 - October 2023) |
|---|
| November 2022<br>• Subcommittee Meetings as Required/Needed<br>• RFP distributed to write the annual SB21-071 report<br>• 2nd - SB21-071 Trais meeting<br>• 7th - CHSDA & SB21-071 Meeting check in<br>• 11th - Children's Home Meet & Greet<br>• 15th - CMP Steering Committee<br>• 16th- CYDC Plan Review Subcommittee<br>• 17th - CYDC Plan Format for SB21-071 needs<br>• 18th - CYDC Service Plans / SB21-071<br>• 21st - SB21-071 Data / Next Steps Planning Meeting |
| December 2022<br>• Subcommittee Meetings as Required/Needed<br>• 2nd - CYDC Bed Detention Utilization Sheet / Detention Roster discussion<br>• 5th- CHSDA & SB21-071 Meeting check in<br>• 5th - SB21-071 DATA / Next Steps Planning Meeting<br>• 7th - Southern Region Catchment Meeting<br>• 8th - 11th CYDC / SB21-071 Meet and Greet<br>• 8th - SB21-071 Weekly Check in<br>• 15th - SB21-071 Weekly Check in<br>• 19th - SB21-071 DATA / Next Steps Planning Meeting<br>• 21st - SB21-071 Data Chat<br>• 22nd - CYDC SB21-071 Analyst Interviews |
| January 2023<br>• 6th CYDC Advisory Board Meeting<br>• Subcommittee Meetings as Required/Needed<br>• 5th - SB21-071 DATA / Next Steps Planning Meeting<br>• 5th - SB21-071 Weekly Check in<br>• 9th - JSPC Sub Committee Meeting<br>• 10th - 8th CYDC / Detention Bed Utilization Sheet<br>• 11th - 9th JD Crossover Plan Discussion<br>• 12th - SB21-071 Weekly Check-in Meeting |

- 12th - CMP / SB21-071 Check-in Meeting
- 19th - SB21-071 Data discussion
- 19th - SB21-071 Weekly Check in
- 24th - BHA / SB21-071 data Meeting
- 26th - SMG / SB21-071 data Meeting
- 26th - SB21-071 Weekly Check-in Meeting
- 26th - CMP / SB21-071 Check-in Meeting
- 30th - SB21-071 Data Discussion
- 30th - SB21-071 DATA / Next Steps Planning Meeting
- 31st - Juvenile Justice Resource Analyst Interview

February 2023

- Subcommittee Meetings as Required/Needed
- 2nd - SB21-071 Weekly Check-in Meeting
- 2nd - Juvenile Justice Resource Analyst Interview
- 3rd - Northeast Region Catchment Meeting
- 3rd - Juvenile Justice Resource Analyst Interview
- 6th - CYDC SB21-071 Evaluator starts with the team
- 8th - 14th JD JSPC Meeting
- 9th - SB21-071 Weekly Check-in Meeting
- 9th - CMP / SB21-071 Check-in Meeting
- 13th - CHSDA & SB21-071 Meeting check in
- 13th - SB21-071 DATA / Next Steps Planning Meeting
- 14th - New CYDC SB21-071 Evaluator Meet & Greet
- 22nd - LINC- Crossover Data Meeting
- 3rd - CYDC Plans
- 23rd - SB21-071 Weekly Check-in Meeting
- 23rd - CMP / SB21-071 Check-in Meeting
- 24th - SB21-071 Data
- 27th - SB21-071 Meet and Greet, three members

March 2023

- Subcommittee Meetings as Required/Needed
- 1st - CYDC FY 23 Conference Committee Meeting
- 2nd - SB21-071 Weekly Check-in Meeting
- 3rd - Southern Region Plan Meeting
- 6th - DCW Juvenile Justice Resource Analyst starts with the team
- 6th - CYDC Pre-Plan Review meeting (Western Region) (Group 4)
- 6th - SB21-071 DATA / Next Steps Planning Meeting
- 7th - Placement Support Consult with Teller County
- 8th - NE Plan Overviews (CYDC)
- 8th - SB21-071 data check-in
- 9th - Release Reason Trails Meeting
- 13th - EDI and SB21-071 Meet and Greet
- 13th - Mini SB21-071 Team Meeting Check-in

- 13th - SB21-071 DATA / Next Steps Planning Meeting
- 14th - Cornerstone Programs Intensive In-Home Services
- 14th - 17th JD Detention Bed Utilization Tracking Sheet
- 15-16th- CYDC ANNUAL PLAN REVIEWS
- 20th - SB21-071 Sub Committee
- 21st - CMP Steering Committee
- 22nd - CHSDA & SB-21-071 Team Meet & Greet
- 22nd - SB21-071 Team Meeting
- 28th - SB71 DCW data questions
- 28th - SB21-071 DATA / Next Steps Planning Meeting
- 28th - CYDC Advisory Board Meeting
- 29th - High Acuity: Data Workgroup
- 30th - SB21-071 Team Meeting

April 2023

- Subcommittee Meetings as Required/Needed
- 3rd - 7th Forum Discussion
- 3rd - SB21-071 Sub Committee
- 4th - SB 71 Data Check-In
- 6th - SB21-071 Team Meeting
- 7th - Southern Region Catchment Meeting
- 10th - CHSDA / 13TH Presentation Working Sessing
- 10th - SB21-071 DATA / Next Steps Planning Meeting
- 12th - Regional Forum- 7th Judicial Forum
- 13th - CYDC Coordinator Meeting
- 14th - CYDC Coordinator Meeting
- 17th - SB21-071 Sub Committee
- 17th- 10th JD Detention Bed Utilization Tracking Sheet
- 18th - CMP Steering Committee
- 20th - SB21-071 Report Writing / Advisory Board Prep
- 20th - SB21-071 Team Meeting
- 21st - SB21-71 Data Questions/Clarifications
- 21st - SB21-071 Report Writing / Advisory Board Prep
- 24th - Trails walk through
- 24th - SB21-071 Advisory Board Check-in
- 24th - SB21-071 DATA / Next Steps Planning Meeting
- 24th - CMP Family Voice and Choice for SB21-71 report
- 25th - SB21-071 Report Writing / Advisory Board Prep
- 25th - Meet And Greet Juvenile Justice Resource Analyst
- 27th - SB21-071 Presentation Prep
- 27th - SB21-071 Report Writing / Advisory Board Prep
- 27th - SB21-071 Team Meeting
- 27th - CMP / SB21-071 Check-in Meeting

| |
|---|
| May 2023<br>• May 1 - June 1, 2023 Annual Report reviewed by Stakeholders<br>• Subcommittee Meetings as Required/Needed<br>• 1st - SB21-071 Sub Committee<br>• 2nd - Diversion/SB21-071 Meet & Greet<br>• 4th - SB21-071 Team Meeting<br>• 4th - Savio (SMG) / SB21 questions<br>• 8th - CHSDA & SB21-071 Meeting check in<br>• 8th - SB21-071 DATA / Next Steps Planning Meeting<br>• 9th - BHA / CANS / SB21-071 Meet & Greet<br>• 9th - Trails CYDC/Admission/SB23-1307 Questions<br>• 9th - HB 1307 Implementation<br>• 9th - SB21-071 data CANS / BHA<br>• 11th - SB21-071 Team Meeting<br>• 11th - HB 1307 Implementation<br>• 12th - BHA/SB17 Data Sharing Summary Work<br>• 16th - IA Referral Sources (DCW, HCPF, BHA)<br>• 16th - DSA/MOU rules review<br>• 17th - SB21-071 Team Meeting<br>• 18th - SB21-071 Team Meeting |
| June 2023<br>• May 1 - June 1, 2023 Annual Report reviewed by stakeholders<br>• 2nd - Annual Report returned to Offeror for finalization<br>• Subcommittee Meetings as Required/Needed |
| July 2023<br>• 1st Annual SB 21-071 report due to Legislature<br>• Subcommittee Meetings as Required/Needed |
| August 2023<br>• Subcommittee Meetings as Required/Needed |
| September 2023<br>• Subcommittee Meetings as Required/Needed |
| October 2023<br>• Subcommittee Meetings as Required/Needed<br>• 25-27th CYDC Advisory Board Conference |
| November 2023<br>• Subcommittee Meetings as Required/Needed |

# APPENDIX D - Monthly and YTD ADP & YTD LOS

*Table 15: Overview by JD of population data*

| JD | Total Youth Population by JD | Population % | ADP YTD | ADP % | New Admits YTD | Detention Releases YTD | LOS YTD |
|---|---|---|---|---|---|---|---|
| 1 | 53,137 | 9.2% | 14.16 | 8.2% | 140 | 130 | 15.57 |
| 2 | 55,643 | 9.6% | 25.24 | 14.5% | 201 | 196 | 20.54 |
| 3 | 1,866 | 0.3% | 0.69 | 0.4% | 5 | 7 | 15.95 |
| 4 | 83,031 | 14.4% | 32.98 | 19.0% | 218 | 215 | 23.61 |
| 5 | 8,633 | 1.5% | 0.45 | 0.3% | 5 | 6 | 12.91 |
| 6 | 6,875 | 1.2% | 0.05 | 0.0% | 3 | 3 | 2.01 |
| 7 | 10,293 | 1.8% | 2.91 | 1.7% | 8 | 8 | 26.64 |
| 8 | 35,606 | 6.2% | 6.52 | 3.8% | 76 | 73 | 9.07 |
| 9 | 8,326 | 1.4% | 1.25 | 0.7% | 3 | 3 | 83.33 |
| 10 | 17,262 | 3.0% | 5.68 | 3.3% | 50 | 52 | 21.39 |
| 11 | 7,001 | 1.2% | 0.41 | 0.2% | 15 | 15 | 4.29 |
| 12 | 5,239 | 0.9% | 1.65 | 1.0% | 9 | 7 | 20.11 |
| 13 | 8,394 | 1.5% | 2.83 | 1.6% | 19 | 22 | 22.07 |
| 14 | 5,536 | 1.0% | 0.58 | 0.3% | 7 | 7 | 14.22 |
| 15 | 2,142 | 0.4% | 1.19 | 0.7% | 14 | 14 | 8.12 |
| 16 | 2,796 | 0.5% | 0.09 | 0.0% | 2 | 1 | 3.02 |
| 17 | 67,324 | 11.7% | 16.58 | 9.6% | 129 | 130 | 18.01 |
| 18 | 110,220 | 19.1% | 34.59 | 19.9% | 257 | 259 | 19.84 |
| 19 | 39,451 | 6.8% | 11.05 | 6.4% | 110 | 101 | 10.03 |
| 20 | 29,389 | 5.1% | 4.17 | 2.4% | 27 | 25 | 22.24 |
| 21 | 16,327 | 2.8% | 8.45 | 4.9% | 108 | 109 | 10.87 |
| 22 | 2,894 | 0.5% | 1.59 | 0.9% | 11 | 8 | 8.17 |
| **Total** | **577,385** | | **173.47** | | **1,417** | **1,389** | **19.81** |

*Table 16: Statewide ADP and percent of detention capacity*

| | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|
| Statewide ADP | 158.70 | 167.30 | 171.70 | 182.10 | 183.70 | 176.50 | 173.50 |
| % of Detention Cap | 73.8% | 77.8% | 79.9% | 84.7% | 85.4% | 82.1% | 80.7% |

*Table 17: Monthly ADP by JD*

| ADP byJD | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|
| 1 | 10.24 | 12.06 | 15.61 | 13.46 | 16.93 | 16.74 |
| 2 | 26.76 | 28.47 | 24.22 | 22.49 | 24.82 | 24.02 |
| 3 | 0.55 | 0.13 | 1.02 | 1.00 | 1.00 | 0.47 |
| 4 | 33.97 | 32.16 | 33.35 | 33.13 | 34.72 | 32.61 |
| 5 | 0.42 | 1.28 | 0.90 | 0.00 | 0.03 | 0.05 |
| 6 | 0.00 | 0.10 | 0.00 | 0.15 | 0.00 | 0.02 |
| 7 | 3.13 | 3.12 | 3.25 | 2.87 | 2.60 | 2.46 |
| 8 | 4.43 | 5.23 | 4.89 | 7.69 | 9.83 | 7.08 |
| 9 | 1.00 | 1.00 | 1.05 | 1.46 | 1.00 | 1.98 |
| 10 | 6.54 | 7.50 | 5.37 | 6.60 | 4.69 | 3.34 |
| 11 | 0.00 | 1.32 | 0.45 | 0.05 | 0.13 | 0.51 |
| 12 | 0.00 | 0.78 | 1.61 | 2.22 | 3.21 | 2.13 |
| 13 | 4.23 | 2.52 | 2.56 | 2.63 | 2.76 | 2.15 |
| 14 | 0.00 | 0.06 | 0.08 | 1.84 | 1.49 | 0.06 |
| 15 | 0.12 | 0.88 | 0.80 | 1.97 | 2.11 | 1.28 |
| 16 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.39 |
| 17 | 15.68 | 14.62 | 15.36 | 18.32 | 16.41 | 18.03 |
| 18 | 33.52 | 30.59 | 34.77 | 36.21 | 36.11 | 36.34 |
| 19 | 5.26 | 11.15 | 11.17 | 14.14 | 12.94 | 11.71 |
| 20 | 2.64 | 4.36 | 6.91 | 4.41 | 3.56 | 3.22 |
| 21 | 9.75 | 9.04 | 7.15 | 8.10 | 6.97 | 8.65 |
| 22 | 0.02 | 0.77 | 1.02 | 2.40 | 2.14 | 3.21 |

*Table 18: YTD LOS by JD*

| JD | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|
| 1 | 15.93 | 16.96 | 14.55 | 13.88 | 15.94 | 15.57 |
| 2 | 21.43 | 27.61 | 27.29 | 25.08 | 21.25 | 20.54 |
| 3 | 3.46 | 2.80 | 6.75 | 6.73 | 6.72 | 15.95 |
| 4 | 16.39 | 21.62 | 22.08 | 20.93 | 22.82 | 23.61 |
| 5 | 3.12 | 5.09 | 19.21 | 19.16 | 15.30 | 12.91 |
| 6 | | 3.05 | 3.04 | 3.03 | 3.02 | 2.01 |
| 7 | | 6.11 | 5.57 | 5.55 | 25.59 | 26.64 |
| 8 | 15.77 | 10.06 | 8.84 | 8.01 | 7.77 | 9.07 |
| 9 | | | | 0.00 | 0.00 | 83.33 |
| 10 | 2.67 | 17.46 | 21.21 | 23.81 | 21.69 | 21.39 |
| 11 | | 2.62 | 4.23 | 3.95 | 3.88 | 4.29 |
| 12 | | 3.06 | 6.75 | 6.73 | 7.55 | 20.11 |
| 13 | 37.04 | 55.87 | 48.60 | 45.51 | 25.52 | 22.07 |
| 14 | | 1.03 | 0.51 | 1.52 | 16.44 | 14.22 |
| 15 | 2.06 | 1.53 | 4.55 | 4.54 | 3.94 | 8.12 |
| 16 | | 3.06 | 3.04 | 3.03 | 3.02 | 3.02 |
| 17 | 34.09 | 32.43 | 28.70 | 22.86 | 18.58 | 18.01 |
| 18 | 15.99 | 22.90 | 21.99 | 20.28 | 20.25 | 19.84 |
| 19 | 8.33 | 6.43 | 8.28 | 10.01 | 10.29 | 10.03 |
| 20 | 5.87 | 7.01 | 13.30 | 15.83 | 15.23 | 22.24 |
| 21 | 6.62 | 8.44 | 11.01 | 10.39 | 9.78 | 10.87 |
| 22 | 0.02 | 0.01 | 0.01 | 3.43 | 8.63 | 8.17 |
| Statewide Average | 17.50 | 20.90 | 20.70 | 19.30 | 19.50 | 19.80 |

# APPENDIX E - Releasable LOS by JD

*Table 19: Releasable LOS by JD*

| | Average number of Days | | |
|---|---|---|---|
| JD | In Detention | From Hearing Date | From Releasable Date |
| 1 | 23.6 | 19.1 | 18.4 |
| 2 | 34.5 | 29.5 | 18.4 |
| 3 | 19.7 | 16.9 | 0.0 |
| 4 | 34.1 | 29.8 | 32.1 |
| 5 | 17.1 | 14.8 | 52.0 |
| 6 | 2.9 | 1.3 | 0.0 |
| 7 | 67.7 | 65.4 | 74.0 |
| 8 | 24.9 | 17.7 | 15.3 |
| 9 | 97.6 | 96.0 | 0.0 |
| 10 | 26.2 | 24.3 | 28.4 |
| 11 | 5.4 | 4.1 | 1.0 |
| 12 | 38.4 | 35.8 | 3.0 |
| 13 | 28.3 | 27.1 | 31.8 |
| 14 | 17.9 | 16.0 | 0.0 |
| 15 | 15.9 | 13.3 | 2.0 |
| 16 | 7.8 | 4.5 | 0.0 |
| 17 | 30.9 | 28.5 | 22.0 |
| 18 | 36.3 | 29.5 | 14.8 |
| 19 | 36.6 | 25.7 | 29.0 |
| 20 | 30.2 | 22.9 | 18.6 |
| 21 | 20.2 | 12.7 | 10.0 |
| 22 | 32.5 | 30.9 | 18.0 |
| Average | 31.1 | 25.7 | 20.4 |

# APPENDIX F - Services Maps

*Figure 10: Services map for 17th JD map*




*Amount listed is the total CYDC dollars spent for the June 1, 2022 to December 31, 2022 cohort. All reported figures above come from the Savio Management Group.

*Figure 11: Services map for 10th JD map*




*Amount listed is the total CYDC dollars spent for the June 1, 2022 to December 31, 2022 cohort. All reported figures above come from the Savio Management Group.

# APPENDIX G - JD and County Services Comparisons

| Judicial Districts | County | DYS Catchment Region | DYS Residential Youth Centers (Geographic Locations) | Where Each JD Takes A Youth When Detained | Juvenile Diversion | Juvenile Probation | CMP | CHSDA Region | RAE Region | ASO Region | MSO Region | BHSO Region |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1ST | Jefferson, Gilpin | Central | X | Rocky Mountain Youth Services Center | X | X | EXCEPT GILPIN | Metro | 6 | 6 | 2 | IN PROCESS (Will be three Regions) |
| 2ND | Denver | Central | X | Gilliam Youth Services Center | X | X | X | Metro | 5 | 5 | 2 | |
| 3RD | Huérfano, Las Animas | Southern | | Pueblo Youth Services Center | X | X | X | Southeast | 4 | 4 | 4 | |
| 4TH | El Paso, Teller | Southern | X | Zebulon Pike Youth Services Center | X | X | X | Southeast | 7 | 7 | 3 | |
| 5TH | Clear Creek, Eagle, Lake, Summit | Central | | Rocky Mountain Youth Services Center | X | X | ALL EXCEPT SUMMIT | Metro (Clear Creek), Northwest for the other three | 6, 1, 4, 1 | 6, 1, 4, 1 | 2, 6, 3, 6 | |
| 6TH | Archuleta, La Plata, San Juan | Western | | Grand Mesa Youth Services Center | X | X | ALL EXCEPT SAN JUAN | Southwest | 1 | 1 | 5 | |
| 7TH | Delta, Gunnison, Hinsdale, Montrose, Ouray, San Miguel | Western | | Grand Mesa Youth Services Center | X | X | ALL EXCEPT HINSDALE | Southwest | 1 | 1 | 5 | |
| 8TH | Jackson, Larimer | Northeast | | Platte Valley Youth Services Center | X | X | EXCEPT JACKSON | Northwest, Metro | 1 | 1 | 6, 1 | |
| 9TH | Garfield, Pitkin, Rio Blanco | Western | | Grand Mesa Youth Services Center | X | X | ALL EXCEPT RIO BLANCO | Northwest | 1 | 1 | 6 | |
| 10TH | Pueblo | Southern | X | Pueblo Youth Services Center | X | X | X | Southeast | 4 | 4 | 4 | |
| 11TH | Chaffee, Custer, Fremont, Park | Southern | | Pueblo Youth Services Center | X | X | ALL EXCEPT CHAFFEE & | Southeast | 4, 4, 4, 7 | 4, 4, 4, 7 | 3 | |

| Judicial Districts | County | DYS Catchment Region | DYS Residential Youth Centers (Geographic Locations) | Where Each JD Takes A Youth When Detained | Juvenile Diversion | Juvenile Probation | CMP | CHSDA Region | RAE Region | ASO Region | MSO Region | BHSO Region |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | CUSTER | | | | | |
| 12TH | Alamosa, Conejos, Costilla, Mineral, Rio Grande, Saguache | Southern | | Pueblo Youth Services Center | X | X | ONLY ALAMOSA & SAGUACHE | San Luis Valley | 4 | 4 | 4 | |
| 13TH | Kit Carson, Logan, Morgan, Phillips, Sedgwick, Washington Yuma | Northeast | | Platte Valley Youth Services Center | X | X | ALL EXCEPT YUMA, PHILLIPS, OR SEDGWICK | Northeast | 2 | 2 | 1 | |
| 14TH | Grand, Moffat, Routt | Western | | Grand Mesa Youth Services Center | X | X | X | Northwest | 1 | 1 | 6 | |
| 15TH | Baca, Cheyenne, Kiowa, Prowers | Southern | | Pueblo Youth Services Center | X | X | X | Southeast, Northeast | 4, 2, 4, 4 | 4, 2, 4, 4 | 4, 1, 4, 4 | |
| 16TH | Bent, Crowley, Otero | Southern | | Pueblo Youth Services Center | X | X | X | Southeast | 4 | 4 | 4 | |
| **17TH** | **Adams, Broomfield** | Northeast | X | Prairie Vista Youth Services Center | X | X | X | Metro Area | 3 | 3, 6 | 2 | |
| **18TH** | **Arapahoe, Douglas, Elbert, Lincoln** | Central | X | Marvin W. Foote Youth Services Center | X | X | X | Metro, Northeast | 3, 3, 3, 2 | 3, 3, 3, 2 | 2, 2, 1, 1 | |
| **19TH** | **Weld** | Northeast | X | Platte Valley Youth Services Center | X | X | X | Metro Area | 2 | 2 | 1 | |
| **20TH** | **Boulder** | Northeast | | Platte Valley Youth Services Center | X | X | X | Metro Area | 6 | 6 | 7 | |
| **21ST** | **Mesa** | Western | X | Grand Mesa Youth Services Center | X | X | X | Southwest | 1 | 1 | 6 | |
| 22ND | Dolores, Montezuma | Western | | Grand Mesa Youth Services Center | X | X | X | Southwest | 1 | 1 | 5 | |

*JDs highlighted in **blue** indicate they are one of 10 largest JDs.*
*Counties highlighted in **red** indicate they are one of the 11 largest counties.*

# APPENDIX H - Barriers to Services Summary

*Table 20: Barriers to services summary*

| | Waitlists for Services | Lack of Appropriate Services | Lack of Transporta-tion | Lack of Inpatient Substance Use Treatment | Lack of Mentors | Lack of Placement Options | Lack of Youth/Family Engagement | Lack of Access to Mental Health Services, including Psychiatry | Lengthy QRTP Process | Funding Barriers (Medicaid or other) | Lack of Culturally Competent Services (Language availability) | Lack of Gang Intervention Services |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL** | 89 | 86 | 80 | 103 | 55 | 105 | 66 | 69 | 88 | 62 | 62 | 58 |
| **AVE.** | 4.05 | 3.91 | 3.64 | 4.68 | 2.5 | 4.77 | 3.00 | 3.14 | 4.00 | 2.82 | 2.82 | 2.64 |

*CYDC coordinators were asked to rank each of the listed perceived barriers as they impact access to services for youth in their JD. (5 = high impact; 3 = moderate impact; 1 = low impact). The aggregate totals from each of the 22 JDs is the TOTAL, and the average out of a total of five is the AVERAGE.*

# APPENDIX I - Detention Bed Capacity by Month

*Table 21: Detention bed capacity by month*

| | | Jul | | Aug | | Sep | | Oct | | Nov | | Dec | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JD | Allocation | Max | % | Max | % | Max | % | Max | % | Max | % | Max | % |
| 1 | 20 | 13 | 65% | 19 | 95% | 19 | 95% | 18 | 90% | 22 | 110% | 20 | 100% |
| 2 | 35 | 35 | 100% | 37 | 106% | 30 | 86% | 28 | 80% | 31 | 89% | 29 | 83% |
| 3 | 2 | 2 | 100% | 1 | 50% | 2 | 100% | 1 | 50% | 1 | 50% | 1 | 50% |
| 4 | 27 | 36 | 133% | 36 | 133% | 38 | 141% | 37 | 137% | 38 | 141% | 40 | 148% |
| 5 | 2 | 2 | 100% | 2 | 100% | 2 | 100% | 0 | 0% | 1 | 50% | 1 | 50% |
| 6 | 2 | 0 | 0% | 1 | 50% | 0 | 0% | 1 | 50% | 0 | 0% | 1 | 50% |
| 7 | 3 | 4 | 133% | 4 | 133% | 4 | 133% | 4 | 133% | 5 | 167% | 3 | 100% |
| 8 | 11 | 6 | 55% | 9 | 82% | 9 | 82% | 12 | 109% | 13 | 118% | 12 | 109% |
| 9 | 2 | 1 | 50% | 1 | 50% | 3 | 150% | 3 | 150% | 1 | 50% | 2 | 100% |
| 10 | 10 | 10 | 100% | 9 | 90% | 7 | 70% | 11 | 110% | 6 | 60% | 6 | 60% |
| 11 | 2 | 0 | 0% | 4 | 200% | 1 | 50% | 1 | 50% | 1 | 50% | 2 | 100% |
| 12 | 2 | 0 | 0% | 2 | 100% | 2 | 100% | 4 | 200% | 4 | 200% | 4 | 200% |
| 13 | 2 | 6 | 300% | 4 | 200% | 4 | 200% | 4 | 200% | 4 | 200% | 4 | 200% |
| 14 | 2 | 0 | 0% | 1 | 50% | 2 | 100% | 2 | 100% | 2 | 100% | 1 | 50% |
| 15 | 2 | 1 | 50% | 3 | 150% | 1 | 50% | 2 | 100% | 3 | 150% | 3 | 150% |
| 16 | 2 | 0 | 0% | 1 | 50% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 50% |
| 17 | 17 | 18 | 106% | 19 | 112% | 19 | 112% | 24 | 141% | 22 | 129% | 21 | 124% |
| 18 | 37 | 37 | 100% | 33 | 89% | 40 | 108% | 41 | 111% | 41 | 111% | 44 | 119% |
| 19 | 15 | 10 | 67% | 15 | 100% | 15 | 100% | 18 | 120% | 18 | 120% | 14 | 93% |
| 20 | 10 | 5 | 50% | 6 | 60% | 9 | 90% | 6 | 60% | 6 | 60% | 4 | 40% |
| 21 | 8 | 15 | 188% | 12 | 150% | 11 | 138% | 11 | 138% | 10 | 125% | 12 | 150% |
| 22 | 2 | 1 | 50% | 1 | 50% | 2 | 100% | 4 | 200% | 3 | 150% | 4 | 200% |

Statewide Maximum Count - 208
Statewide Average Daily Maximum - 175.65
Statewide Average Daily Population - 173.47

# APPENDIX J - Available Placement Summary

**Residential Child Care Facility**

A Residential Child Care Facility (RCCF) is a 24-hour residential facility where children and youth live together with, or are supervised by, adults other than their parents or relatives. These children do not require inpatient psychiatric care, but sometimes require mental health services.
(https://hcpf.colorado.gov/residential-child-care-facilities)

**Qualified Residential Treatment Program**

Qualified Residential Treatment Programs (QRTPs) are residential trauma-informed treatment programs designed to meet the behavioral health needs of children. QRTPs were created in compliance with the federal Family First Prevention Services Act (FFPSA), and in collaboration with other State agencies and providers to support the spectrum of treatment.
(https://hcpf.colorado.gov/qualified-residential-treatment-program)

**Psychiatric Residential Treatment Facility**

A Psychiatric Residential Treatment Facility (PRTF) is an inpatient psychiatric facility for children and youth who need intensive psychiatric care but do not require the level of care of an inpatient hospital setting.
(https://hcpf.colorado.gov/psychiatric-residential-treatment-facilities)

*Table 22: Current licensed QRTP/RCCF providers*

| PROVIDER | CURRENT LICENSE TYPE | CAPACITY |
|---|---|---|
| Alternative Homes for Youth | RCCF/QRTP | 16 |
| Brad's Place * | RCCF/QRTP | 9 |
| Drew's Place | RCCF/QRTP | 5 |
| Future Bound | RCCF/QRTP | 6 |
| Gateway Residential Program | RCCF/QRTP | 15 |
| Griffith Centers | RCCF/QRTP | 16 |
| Rise Home for Boys * | RCCF/QRTP | 5 |
| Nevada House | RCCF/QRTP | 10 |
| Shiloh - Yarrow | RCCF/QRTP | 8 |
| Shiloh - Estes | RCCF/QRTP | 7 |
| Shiloh - Longmont | RCCF/QRTP | 16 |
| TGTHR Attention Homes - Boulder | RCCF/QRTP | 10 |
| The Daisy Center | RCCF/QRTP | 16 |
| Third Way - Bannock ** | RCCF/QRTP | 16 |
| Third Way - Pontiac | RCCF/QRTP | 16 |
| **TOTAL** | | **171*****|

*Table 23: Current licensed PRTF/RCCF providers*

| PROVIDER | CURRENT LICENSE TYPE | CAPACITY |
|---|---|---|
| Cedar Springs/RCCF/PRTF | RCCF/PRTF | 24 |
| Third Way - Lowry | RCCF | 30 |
| Southern Peaks | PRTF | 40 |
| Devereux Colorado **** | RCCF/PRTF | 40 |
| Denver Children's Home | RCCF | 32 |

*Table 24: Providers not eligible for Title IV-E or Medicaid funds*

| PROVIDER | CURRENT LICENSE TYPE | CAPACITY | POPULATION SERVED |
|---|---|---|---|
| 1643047 Ariel Sprite House | Group Center Care | 4 | Male/Female; CHRP |
| 1705636 Ascend | Group Center Care | 5 | Male; 9-21 years old; URM; IDD; county youth |
| 1655992 Blue River Center | Group Center Care | 10 | Males/DYS; 10-21 years old; 10-13, on case by case basis |
| 1502911 Dale House Project 24 | RCCF | 8 | DYS and pregnant/parenting populations |
| 1502990 Dale House Project 802 | RCCF | 12 | DYS and pregnant/parenting populations |
| 1588158 Denver Children's Home/Discovery Home | Group Center Care | 8 | Step down from Denver Children's Home PRTF |

| PROVIDER | CURRENT LICENSE TYPE | CAPACITY | POPULATION SERVED |
|---|---|---|---|
| 1750080 Eating and Recovery Center | RCCF | 28 | Male/Female; Private pay only; 11-18 years old |
| 1639923 Gems and Jewels | Group Home Care | 5 | Female; CHRP; county youth; 5-21 years old |
| 1585302 Glory Group Home Aurora | Group Home Care | 5 | Female; 10-18 years old |
| 1724195 Griffith Centers for Children, Inc. | RCCF | 9 | Only operating to supplement QRTP |
| 88459 Jefferson Hills | RCCF | 70 | Acute stabilization only |
| 1760454 Kismet House Group Center | Group Care Center | 5 | Males; CHRP; 12-21 years old |
| 1734100 Laradon | RCCF | 15 | IDD/CHRP only |
| 45115 Mountain States Children's Home | RCCF | 24 | Private, admission through church not-for-profit only |
| 1536590 Mt. Evans Qualifying House | RCCF | 15 | DYS independent living/transition |
| 1547107 Open Sky Wilderness Therapy | RCCF | 100 | Private Pay Only |
| 1725061 Red Mountain Colorado, LLC | RCCF | 28 | Private Pay Only |
| 1723736 Reflections | Group Center Care | 5 | Females; CHRP; county youth; 13-21 years old |
| 1680477 Rise Home for Boys | Group Center Care | 5 | Males; IDD, Sexual Boundaries, Conduct Disorders; 12-21 years old |

| PROVIDER | CURRENT LICENSE TYPE | CAPACITY | POPULATION SERVED |
|---|---|---|---|
| 1698196 Rite of Passage Morrison Home | RCCF | 10 | CHRP |
| 45211 Roundup Fellowship III | RCCF | 7 | CHRP |
| 45212 Roundup Fellowship V | RCCF | 7 | CHRP |
| 1728032 Sandstone Care Cos, LLC | RCCF | 28 | Private Pay; SUD |
| 1669240 Sarah's Home Corp | Group Center Care | 8 | Females; sex trafficked; 12-18 years old |
| 48170 Savio House | RCCF | 25 | Not operating |
| 1745202 Seeds Wilderness Therapy | RCCF | 10 | Private pay only |
| 96482 Serenity Children's Home | RCCF | 9 | CHRP; IDD; mostly females; 6-21 years old |
| 6566 Serenity II Children's Home | RCCF | 11 | CHRP; IDD; mostly males; 6-21 years old |
| 1528492 Shiloh Home - Adams Campus | RCCF | 20 | Short term stabilization |
| 1672508 Shiloh House - Family Resource Pavilion | RCCF | 12 | Short term stabilization |
| 62208 Sunrise Youth Shelter | Group Center Care | 11 | Male/Female; tribal youth |
| 1750306 Third Way Center, Inc. - Lincoln | RCCF | 25 | Independent living only; not title IV-E; 16-21 years old |

| PROVIDER | CURRENT LICENSE TYPE | CAPACITY | POPULATION SERVED |
|---|---|---|---|
| 1759289 Treasured Lights Group Center | Group Center Care | 5 | Males; county youth; 10-18 years old |

** This facility was licensed between 7/1/22 - 12/31/22. All others were licensed prior.*
*** This facility is temporarily suspended; anticipated availability in Spring 2023.*
**** The Family First website includes a typo for the total QRTP bed count (186), when the actual count should be 171.*
***** This facility is not operating until new unit operational - staffing issues.*

*- data from the tables was last updated 12/12/2022 and was found at https://co4kids.org/family-first-dashboard/provider-ffpsa-transitioning*

# APPENDIX K - Crossover Youth Definitions

**Statute Definition**: "Dually identified crossover youth" means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case (CRS 19-2.5-102 (19)).

**Sample Definition One**: "A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare systems or any youth that becomes involved in the Juvenile Justice system and in the past three years has had a history of being involved in the Child Welfare system. History includes: any Child Welfare case opened for assessment or services due to a Dependency and Neglect or Juvenile Delinquency case, or non-court ordered/voluntary services case. Exclusions include: youth charged with a sexual offense, youth ages 10 through 12 years of age (these youth will be served through the Youngers program), and youth committed to the Department of Youth Services."

**Sample Definition Two (Georgetown)**: Crossover youth are defined as youth who have experienced abuse and/or neglect and who engage in delinquency.
Dual system: Crossover youth who are referred for an investigation and/or have involvement with both the CW and JJ systems.
Dual involved: Dual system youth who are referred for an investigation and/or have involvement with both CW and JJ systems concurrently.
Dual contact: Dual systems youth who are referred for an investigation and/or have involvement with both the CW and the JJ systems but the referral/involvement across systems is non-concurrent.
Dually Adjudicated: Dual systems youth who are formally adjudicated in both CW and JJ systems concurrently.
(Hertz, D. & Dierkhising, C. (2018). OJJDP Dual-System Youth Design Study. Summary of Findings and Recommendations for Pursuing a National Estimate of Dual System Youth).

**1st JD - Gilpin County, Jefferson County**

**1st JD definition:** A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare systems or any youth that becomes involved in the Juvenile Justice system and in the past three years has had a history of being involved in the Child Welfare System. History includes: any Child Welfare case opened for assessment with a founded outcome, services due to ta Dependency and neglect or Juvenile Delinquency case or non-court ordered/voluntary services case. Exclusions include: youth

charged with a sexual offense, youth ages 10-13 years of age (these youth will be served through the Younters program) and youth committed to the Department of Youth Services).

**Gilpin**: *Not available (No CMP)*

**Jefferson definition:**Youth who are dually system involved.

**2nd JD - Denver County**

**2nd JD definition:** Youth who have an open case (voluntary, Dependency/Neglect, through delinquency) with Denver Department of Human Services (DDHS) or a prior DHS assessment, as well as having been charged with a delinquency case at the District level. Exclusions include: youth committed to the Department of Youth Services.

**Denver definition:** Youth who have an open case (voluntary, Dependency/Neglect, through delinquency) with Denver Department of Human Services (DDHS) or a prior DHS assessment, as well as having been charged with a delinquency case at the District level.

**3rd JD - Huerfano County, Las Animas County**

**3rd JD definition:** Crossover youth are defined as youth who have been screened through CYDC who have historical or current child welfare involvement cases (voluntary, Dependence/Neglect or Delinquency) with Department of Human Services/Social Services (DHS/DSS), a finding of maltreatment in their history ,as well as having been arrested at the district level (not municipal) or currently under the supervision of State Probation for a delinquency case.

**Huerfano definition:** CYDC youth involved in CW

**Las Animas definition:** CYDC youth involved in CW

**4th JD - El Paso County, Teller County**

**4th JD definition:** Crossover Youth: Juvenile justice system involved youth who cross from the juvenile justice system to the dependency and neglect system. Reverse Crossover Youth: Juvenile justice system youth who cross from the dependency and neglect system to the juvenile justice system.

**El Paso definition:** Youth who were involved in a Juvenile Justice case, and then a D&N case opens.

**Teller definition:** Teller County defines Crossover Youth as youth who are involved in both the child welfare and juvenile justice systems simultaneously

**5th JD - Clear Creek County, Eagle County, Lake County, Summit County**

**5th JD definition:** A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare systems or any youth that becomes involved in the Juvenile Justice system and in the past three years has had a history of being involved in the Child Welfare system. History includes: any Child Welfare case opened for assessment or services due to a Dependency and Neglect or Juvenile Delinquency case, or non-court ordered/voluntary services case. Exclusions include: youth charged with a sexual offense, youth ages 10-12 years of age (these youth will be served through the Youngers program) and youth committed to the Department of Youth Services.

**Clear Creek definition:** *Not reported*

**Eagle definition:** Youth involved with DHS and Probation

**Lake definition:** Youth involved in diversion. probation, legal and Child Protective Services at any time during their life.

**Summit definition:** *Not available (No CMP)*

**6th JD - Archuleta County, La Plata County, San Juan County**

**6th JD definition:** A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare systems or any youth that becomes involved in the JUvenile justice system and has had a history of being involved in the Child Welfare System. History includes: any Child Welfare case opened for assessment or services due to a Dependency and Neglect or Juvenile Delinquency case, or non-court ordered/voluntary services case.

**Archuleta definition:** We have no definition

**La Plata definition:** Youth who are known to both the child welfare and juvenile justice systems

**San Juan definition:** *Not available (No CMP)*

**7th JD - Delta County, Gunnison County, Hinsdale County, Montrose County, Ouray County, San Miguel County**

**7th definition:** Any youth, ages 10 through 17, who are currently involved in the Juvenile Justice System and the Child Welfare System or have a history in the Child Welfare System that includes, but not limited to, a family assessment response services plan or an open case (Senate Bill 18-154, 44.7). Youth initially involved in the child welfare system who are subsequently referred to and become involved in the juvenile justice system and youth who are initially involved in the juvenile justice system and are subsequently referred to and

become involved in the child welfare system. Engagement of the model occurs when a youth has open involvement in both juvenile justice and child welfare.

**Delta definition:** *Not reported*

**Gunnison definition:** The population to be served includes youth (ages 10 through 17) and their families who are simultaneously receiving services or has a history of services, at any level, from both the child welfare and juvenile justice systems. This also includes youth who are concurrently adjudicated by both child welfare and juvenile justice systems.

**Hinsdale definition:** *Not available (No CMP)*

**Montrose definition:** Youth, ages 10-17, who are currently or previously involved in the Juvenile Justice system and Child Welfare System. Youth with history of services, at any level, from both child welfare and juvenile justice systems, including those who are concurrently adjudicated by both systems.

**Ouray definition:** Youth involved with Juvenile Services/Diversion who also has a history or is currently Social Services involvement

**San Miguel definition:** Youth involved with Juvenile Services/Diversion who also has a history or is currently Social Services involvement

**8th JD - Jackson County, Larimer County**

**8th definition:** A crossover youth is defined as any youth who has experienced maltreatment and engaged in delinquency (regardless of whether he or she has come to the attention of the child welfare and/or delinquency systems) 2. Dually involved youth are a subgroup of crossover youth who are simultaneously receiving services, at any level, from both the child welfare and juvenile justice systems 3. Dually adjudicated youth are a subgroup of the dually involved youth, encompassing only those youth who are concurrently adjudicated by both the child welfare and juvenile justice systems.

**Jackson definition:** *Not available (No CMP)*

**Larimer definition:** Youth who have simultaneous involvement in the child welfare and juvenile justice system.

**9th JD - Garfield County, Pitkin County, Rio Blanco County**

**9th definition:** A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare systems or any youth that becomes involved in the Juvenile Justice system and in the past three years has had a history of being involved in the Child Welfare system. History includes: any Child Welfare case opened for assessment with a founded outcome, services due to a Dependency and Neglect or Juvenile Delinquency case, or non-court/voluntary services case.

**Garfield definition:** We use the CYDC definition, ie youth having multiple system involvements or being currently involved in the juvenile justice system and who have had a past open case, or a current open assessment or case plan with the family or youth or who are currently involved in the child welfare system and become involved in the juvenile justice system or have a history in the juvenile justice system.

**Pitkin definition:** We use the CYDC definition, ie youth having multiple system involvements or being currently involved in the juvenile justice system and who have had a past open case, or a current open assessment or case plan with the family or youth or who are currently involved in the child welfare system and become involved in the juvenile justice system or have a history in the juvenile justice system

**Rio Blanco definition:** *Not available (No CMP)*

**10th JD - Pueblo County**

**10th definition:** To be identified as a Crossover a youth must have a child welfare case (any Child Welfare case opened for assessment where services were provided directly to the identified youth due to a Dependency and Neglect or Juvenile Delinquency case, or non-court ordered/voluntary services case) and enters the Juvenile Justice System through a JD or JV case.

**Pueblo definition:** Youth with child welfare and juvenile justice involvement

**11th JD - Chaffee County, Custer County, Fremont County, Park County**

**11th definition:** A crossover youth is identified at the time of the juvenile screening. If a youth has current or previous involvement with the Department of Human Services, they are identified as a crossover youth. This information is obtained by reviewing the client's history in TRAILS, Family Court history and Truancy history.

**Chaffee definition:** *Not available (No CMP)*

**Custer definition:** *Not available (No CMP)*

**Fremont definition:** Children/youth who are involved in both child welfare and juvenile justice

**Park definition:** Youth involved in both the child welfare and juvenile justice systems

**12th JD - Alamosa County, Conejos County, Costilla County, Mineral County, Rio Grande County, Saguache County**

**12th definition:** A Crossover youth is defined as a youth who is currently involved with both the Juvenile Justice and Child Welfare Systems or in the

past 5 years has had a history of being involved in the Child Welfare System. This includes any Child Welfare case opened for assessments and services due to a Dependency and Neglect, Juvenile Delinquency case, Youth in Conflict case, or voluntary case.

**Alamosa definition:** Youth who are dually involved in both the child welfare and juvenile justice systems

**Conejos definition:** *Not available (No CMP)*

**Costilla definition:** *Not available (No CMP)*

**Mineral definition:** *Not available (No CMP)*

**Rio Grande definition:** *Not available (No CMP)*

**Saguache definition:** Dually involved youth who have current and simultaneous involvement in both the child welfare and juvenile justice systems

**13th JD - Kit Carson County, Logan County, Morgan County, Phillips County, Sedgwick County, Washington County, Yuma County**

**13th JD definition:** A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare systems or any youth that becomes involved in the Juvenile Justice system and in the past three years has had a history of being involved in the Child Welfare System. History includes: any Child Welfare case opened for assessment with a founded outcome, services due to ta Dependency and neglect or Juvenile Delinquency case or non-court ordered/voluntary services case. Exclusions include: youth charged with a sexual offense, youth ages 10-13 years of age (these youth will be served through the Younters program) and youth committed to the Department of Youth Services).

**Kit Carson definition:** Youth who are involved in both DHS and juvenile justice at the same time

**Logan definition:** A crossover youth is involved in both the juvenile justice system and the child welfare system.

**Morgan definition:** Crossover Youth is targeted at youth that is dually involved in both the child welfare system and the juvenile justice system.

**Phillips definition:** *Not available (No CMP)*

**Sedgwick definition:** *Not available (No CMP)*

**Washington definition:** *Not available*

**Yuma definition:** *Not available (No CMP)*

**14th JD - Grand County, Moffat County, Routt County**

**14th definition:** A crossover youth is defined as a youth who is currently involved in both the Juvenile Justice and the Child Welfare Systems or any youth that becomes involved in the Juvenile justice system or the Child Welfare System and in the past has had a history of an open assessment in the Child Welfare system or a case in the Juvenile Justice System. History includes: any Child Welfare case opened for assessment or services due to a Dependency and Neglect or Juvenile Delinquency case, or non-court ordered/voluntary services case.

**Grand definition:** Dual involvement in Child Welfare and Juvenile Justice.

**Moffat definition:** Youth who have current and simultaneous involvement in the child welfare and/or juvenile justice system.

**Routt definition:** There is no crossover youth definition in the ByLaws or ISST Handbook. However, our IOG loosely defines Crossover Youth as youth with any multi-system involvement with school, mental health, DHS, DYS, Juvenile Justice, or any other intensive service or agency where the youth and family would benefit from a combined plan of service.

**15th JD - Baca County, Cheyenne County, Kiowa County, Prowers County**

**15th definition:** Dual system: Crossover youth are youth who are referred for .an investigation and/or have involvement with both Child Welfare and Juvenile Justice systems.

**Baca definition:** A youth currently involved with both the Juvenile Justice System and DHS/DSS

**Cheyenne definition:** A youth currently involved with both the Juvenile Justice System and DHS/DSS

**Kiowa definition:** A youth currently involved with both the Juvenile Justice System and DHS/DSS

**Prowers definition:** A youth currently involved with both the Juvenile Justice System and DHS/DSS

**16th JD - Bent County, Crowley County, Otero County**

**16th definition:** To be identified as Crossover a youth must have a child welfare case (any Child Welfare case opened for assessment where services were provided directly to the identified youth due to a Dependency and Neglect or Juvenile Delinquency case, or non-court ordered/voluntary services case) and enters the Juvenile Justice System through a JD or JV case.

**Bent definition:** A crossover youth is a child who is involved in the juvenile justice system who is either currently involved in or has previously had DHS

involvement within the past three (3) years (C.R.S. 19-1-103). Involvement with DHS can be defined as (but not limited to) having a Family Assessment Response Service (FAR) Plan or an open case.

**Crowley definition:** A crossover youth is a child who is involved in the juvenile justice system who is either currently involved in or has previously had DHS involvement within the past three (3) years (C.R.S. 19-1-103). Involvement with DHS can be defined as (but not limited to) having a Family Assessment Response Service (FAR) Plan or an open case.

**Otero definition:** A crossover youth is a child who is involved in the juvenile justice system who is either currently involved in or has previously had DHS involvement within the past three (3) years (C.R.S. 19-1-103). Involvement with DHS can be defined as (but not limited to) having a Family Assessment Response Service (FAR) Plan or an open case.

**17th JD - Adams County, Broomfield County**

**17th JD definition:** Open D&N/Open JD/Open Truancy (combo of 2 or 3) Open JD with History of D&N or Truancy Open D&N with History of JD or Truancy Open Truancy with HIstory of JD or D&N

**Adams definition:** The Adams County CMP defines crossover youth as any youth with two or more open cases across systems of either dependency and neglect, juvenile delinquency, or truancy OR who has an open case in one and history in another.

**Broomfield definition:** The 17th Judicial District defines a dually identified crossover youth as a youth currently involved in the juvenile justice system and the child welfare system or have a history of child welfare involvement. To identify these youth at the earliest reasonable point of contact, the 17th JD continues working closely with the court who provides weekly Crossover Youth Notification Forms. Crossover Youth Practice Model (CYPM) code will be entered through the Court. These forms will be disseminated to a Probation and Department of Human Services representative in Broomfield County who will review and determine the need for an Engage Multi-Disciplinary Team Staffing.

**18th JD - Arapahoe County, Douglas County, Elbert County, Lincoln County**

**18th definition:** All 4 counties in the 18th Judicial District have Collaborative Management Programs. We will work together to develop a standard definition that is inclusive of each county's individual needs to ensure understanding and harmony within our district.

**Arapahoe definition:** Youth that are dually involved in both the juvenile

justice system and Arapahoe County Department of Human Services or bouncing back and forth between systems.

**Douglas definition:** Youth who have current and simultaneous involvement in the child welfare and/or juvenile justice system.

**Elbert definition:** A Crossover Youth who has been involved with DHS and Judicial.

**Lincoln definition:** A Crossover Youth who has been involved with DHS and Judicial.

**19th JD - Weld County**

**19th definition:** Crossover youth are defined as youth who have experienced abuse and/or neglect and who engage in delinquency. Dual system: Crossover youth who are referred for an investigation and/or have involvement with both the CW and JJ systems. Dual involved: Dual system youth who are referred for an investigation and/or have involvement with both CW and JJ systems concurrently. Dual contact: Dual systems youth who are referred for an investigation and/or have involvement with both the CW and the JJ systems but the referral/involvement across systems is non-concurrent.Dually Adjudicated: Dual systems youth who are formally adjudicated in both CW and JJ systems concurrently.

**Weld definition:** Youth that have an open D&N and an open delinquency court case.

**20th JD - Boulder County**

**20th definition:** A detained youth that has an open or previously open Child . Welfare case, or history of contact with Child Welfare. We will be further defining this in the coming months so as to better specify that eligibility would likely depend on substantiation, FAR, etc. specific to the detained youth, and not include screened out family referrals or contact not relevant to the detained youth (if it was related to another family member, sibling, etc.)

**Boulder definition:** Youth that enter the JAC and are detained that have CW involvement in the fiscal year in question.

**21st JD - Mesa County**

**21st definition:** Dually identified crossover youth (CYPM) means youth who are currently involved in the juvenile justice system and the child welfare system or have history in the child welfare system that includes but is not limited to a family assessment response service plan or an open case; and any prior founded findings of abuse or neglect, CRS 19-1-103 (44.7)

**Mesa definition:** Dually identified Crossover youth (CYPM) means youth who are currently involved in the juvenile justice system and the child welfare system or have history in the child welfare system that includes but is not limited to a family assessment response service plan or an open case; and any prior founded findings of abuse or neglect, C.R.S. 19-1-103 (44.7).

**22nd JD - Dolores County, Montezuma County**

**22nd definition:** Dually identified crossover youth means youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case.

**Dolores definition:** Crossover youth are identified as youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case.

**Montezuma definition:** Crossover youth are identified as youth who are currently involved in the juvenile justice system and the child welfare system or have a history in the child welfare system that includes, but is not limited to, a family assessment response service plan or an open case.

# APPENDIX L - Additional Information for Performance Standard 5

**Variable Overview**

We were asked for several data points for Performance Standard 5. The list below shows what was available for this report and what was not.

Demographic traits currently tracked in Trails:

- Race (named Ethnicity in Trails)
- Gender (staff assigned)
- Gender Identity (self assigned)
- Sexual Orientation

Demographic traits tracked, with data accessibility or quality issues:

- Region, county, city
- School attended
- Highest education completed

Demographic traits not currently tracked:

- Socioeconomic status
- Type of school attended (public, private, charter, alternative)
- Currently pursuing education

Outcome measures currently available:

- Youth detained while releasable
- LOS in detention
- CJRA Pre-Screen screen level
- Child welfare involvement

Outcomes measures currently unavailable:

- LOC recommended
- Differences between recommended and received care
- Youth served by counties due to release from detention
- Acceptance into facilities or providers

**Results for Correlations Tests Discussed in Performance Standard 5**

Detailed explanation of statistical analysis: As referenced in the report body, 35 different statistical analyses were conducted on the available demographic traits and the outcomes measures. These tests indicate if relationships exist between variables (through statistical significance) and also measure the strength of relationships found. Statistical significance analyzes the likelihood that any data correlation is real and meaningful, as opposed to random. This Appendix provides greater detail on the specific statistical tests conducted, statistics referenced, and test result values.

Traditionally, a score of 0.05 or less is considered statistically significant. If the test has a score of greater than 0.05, no meaningful correlation or relationship is assumed.

Strength of association, typically expressed as a proportional reduction of error, shows how strong any correlation is.

- Values below 0.20 are considered weak
- Values between 0.20 - 0.40 are considered moderate
- Values between 0.40 - 0.80 are considered strong

Statistically Significant Results:

*Table 25: CJRA risk level*

| Independent Variable | Dependent Variable | Test | N Size | Statistical Significance | Strength of Association |
|---|---|---|---|---|---|
| Race | CJRA Risk Level | Spearman | 877 | 0.002 | -0.103 |
| Sexual Orientation | CJRA Risk Level | Somer's D | 723 | 0.011 | 0.184 |

*Table 26: Child welfare involvement*

| Independent Variable | Dependent Variable | Test | N Size | Statistical Significance | Strength of Association |
|---|---|---|---|---|---|
| Race | CW Involvement | Cramer's V | 877 | 0.001 | 0.158 |
| Race (Binary) | CW Involvement | Somer's D | 877 | <0.001 | -0.129 |
| Gender Identity (self ID) | CW Involvement | Phi | 877 | 0.021 | 0.125 |

*Table 27: LOS*

| Independent Variable | Dependent Variable | Test | N Size | Statistical Significance | Strength of Association |
|---|---|---|---|---|---|
| Gender Identity (self ID) | LOS | Spearman | 737 | 0.002 | -0.085 |

*Table 28: Risk level and LOS*

| Independent Variable | Dependent Variable | Test | N Size | Statistical Significance | Strength of Association |
|---|---|---|---|---|---|
| CJRA Risk Level | LOS | ANOVA | 1082 | 0.011 | 0.105 |

**Additional Test Results**

Statistically Insignificant Results: The results in Table 27 that follows have a statistical significance (p) of greater than 0.05, which indicates that any relationship between the variables is not generalizable (or not meaningful). We would therefore deduce no relationship between the variables assessed (upholding the null hypothesis).

*Table 29: Statistically insignificant results*

| Independent | Dependent | N Size | Test Name | Statistical Significance | Strength of Association | Data Type |
|---|---|---|---|---|---|---|
| Ethnicity | LOS | 1475 | Spearman | 0.773 | -0.008 | Admits |
| Ethnicity | LOS | 877 | Spearman | 0.587 | -0.018 | Unique |
| Ethnicity-Y/N | LOS | 1475 | T Test | 0.075 | 0.143 | Admits |
| Ethnicity-Y/N | LOS | 877 | T Test | 0.064 | 0.137 | Unique |
| Gender - Self | Release LOS | 410 | Spearman | 0.471 | -0.036 | Admits |
| Gender - Self | CJRA Score | 737 | Spearman | 0.259 | 0.042 | Unique |
| Gender - Self | Release LOS | 389 | Spearman | 0.681 | 0.021 | Unique |
| Gender-Y/N | CJRA Score | 877 | Spearman | 0.334 | 0.033 | Unique |
| Sexual orientation | LOS | 1276 | Spearman | 0.708 | 0.01 | Admits |
| Sexual orientation | Release LOS | 406 | Spearman | 0.922 | -0.005 | Admits |
| Sexual orientation | CW Involvement | 723 | Phi | 0.249 | 0.104 | Unique |
| Sexual orientation | LOS | 723 | Spearman | 0.347 | 0.035 | Unique |
| Sexual orientation-Y/N | LOS | 1276 | T Test | 0.693 | 0.407 | Admits |
| Sexual orientation-Y/N | Release LOS | 406 | T Test | 0.25 | 0.269 | Admits |
| Sexual orientation-Y/N | LOS | 723 | T Test | 0.215 | 0.341 | Unique |

### Descriptives

The information in the tables that follow shows population percentages for the cohort discussed in performance standard 5 and adds additional context.

*Table 30: Ethnicity (Race) population percentages*

| Primary Ethnicity | Frequency | Percentage |
|---|---|---|
| American Indian or Alaskan Native | 15 | 1.3% |
| Asian | 11 | 0.9% |
| Black or African American | 271 | 23.0% |
| White | 412 | 35.0% |
| Unable to Determine | 33 | 2.8% |
| Native Hawaiian or Other Pacific Islander | 7 | 0.6% |
| Hispanic | 428 | 36.4% |
| **Total** | **1,177** | **100%** |

*Table 31: Gender (staff assigned) population percentages*

| Gender (staff assigned) | Frequency | Percentage |
|---|---|---|
| Female | 236 | 20.1% |
| Male | 941 | 79.9% |
| **Total** | **1,177** | **100%** |

*Table 32: Gender identity (self identified) population percentages*

| Gender Identity | Frequency | Percentage |
|---|---|---|
| Missing | 158 | 13.4% |
| Male | 816 | 69.3% |
| Female | 192 | 16.3% |
| Gender Diverse | 5 | 0.4% |
| Gender Queer | 5 | 0.4% |
| Unknown | 1 | 0.1% |
| **Total** | **1,177** | **100%** |

*Table 33: Sexual orientation population percentages*

| Sexual Orientation | Frequency | Percentage |
|---|---|---|
| Heterosexual | 916 | 77.8% |
| Bisexual | 51 | 4.3% |
| Homosexual | 11 | 0.9% |
| Pansexual | 9 | 0.8% |
| Other | 1 | 0.1% |
| Do Not Know | 8 | 0.7% |
| Prefer No Label | 3 | 0.3% |
| Asexual | 2 | 0.2% |
| Refuse Answer | 1 | 0.1% |
| Missing | 175 | 14.9% |
| **Total** | **1,177** | **100%** |